No. 23-35136

# In The United States Court Of Appeals For The Ninth Circuit

MAVERICK GAMING LLC,

*Plaintiff – Appellant*,

v.

UNITED STATES OF AMERICA, *et al.*,

*Defendants – Appellees*,

SHOALWATER BAY TRIBE,

*Intervenor – Defendant – Appellee.*

On Appeal From the United States District Court for the
Western District of Washington
Case No. 3:22-cv-05325-DGE

The Honorable David G. Estudillo

**OPENING BRIEF OF PLAINTIFF-APPELLANT
MAVERICK GAMING LLC**

THEODORE B. OLSON
MATTHEW D. MCGILL
LOCHLAN F. SHELFER
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: 202.955.8668
Email: tolson@gibsondunn.com

*Counsel for Plaintiff-Appellant*

## RULE 26.1 STATEMENT

Maverick Gaming LLC, a nongovernmental limited liability company, has no parent company, subsidiary, or affiliate that has outstanding securities in the hands of the public, and no publicly held corporation owns 10% or more of Maverick Gaming LLC's stock.

# TABLE OF CONTENTS

RULE 26.1 STATEMENT ................................................................iii

TABLE OF AUTHORITIES ..........................................................iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ................................................ 3

STATEMENT OF THE ISSUES.................................................... 4

STATEMENT OF THE CASE ........................................................ 5

I.      Background.............................................................................. 5

      A.      The Indian Gaming Regulatory Act ........................ 5

      B.      Washington State's Tribal Gaming Monopoly........................ 8

      C.      Maverick ...................................................................... 11

II.     Procedural History............................................................ 12

      A.      Maverick's Complaint .............................................. 12

      B.      District Court Proceedings ...................................... 15

SUMMARY OF ARGUMENT .................................................... 17

LEGAL STANDARDS ................................................................ 23

ARGUMENT ................................................................................ 25

I.      The Tribe Is Not A Required Party Under Rule 19(a)................... 26

      A.      Disposing Of This Action In The Tribe's Absence Would Not Impair The Tribe's Ability To Protect Its Interests ...... 26

      B.      The Tribe's Joinder Is Not Required To Accord Complete Relief .................................................................... 48

II.     This Action Should Proceed In The Tribe's Absence Under Rule 19(b).................................................................. 51

      A.      All Four Rule 19(b) Factors Counsel Against Dismissal...... 51

      B.      The Public-Rights Exception Applies.................................... 60

III.    The Tribe Can Be Joined Because It Waived Its Tribal Immunity By Intervening In This Suit ......................................... 66

CONCLUSION .......................................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alto v. Black*,
738 F.3d 1111 (9th Cir. 2013)..........................27, 32, 36, 38, 48, 49, 51

*Am. Greyhound Racing, Inc. v. Hull*,
305 F.3d 1015 (9th Cir. 2002)........................................................59, 64

*Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*,
795 F.3d 351 (2d Cir. 2015) .................................................................38

*Amador Cnty. v. Salazar*,
640 F.3d 373 (D.C. Cir. 2011)...........................................8, 29, 33, 43

*Arakaki v. Cayetano*,
324 F.3d 1078 (9th Cir. 2003)........................................................31, 32

*Arizona v. Navajo Nation*,
599 U.S. __, 2023 WL 4110231 (2023) .................................................44

*Artichoke Joe's v. Norton*,
353 F.3d 712 (9th Cir. 2003)................................................................29

*Artichoke Joe's v. Norton*,
216 F. Supp. 2d 1084 (E.D. Cal. 2002)................................................29

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
140 S. Ct. 2335 (2020).........................................................................57

*In re Bayshore Ford Trucks Sales, Inc.*,
471 F.3d 1233 (11th Cir. 2006)...........................................................67

*Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*,
653 F.3d 448 (7th Cir. 2011)................................................................66

*Bond v. United States*,
564 U.S. 211 (2011)..............................................................................64

iii

*Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*,
547 F.3d 962 (9th Cir. 2008) ................................................................. 23

*California v. Cabazon Band of Mission Indians*,
480 U.S. 202 (1987) ................................................................................. 5

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
42 F.4th 1024 (9th Cir. 2022) ............................................. 8, 50, 64, 65

*Cisneros-Perez v. Gonzales*,
465 F.3d 386 (9th Cir. 2006) ................................................................ 39

*Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*,
471 F. Supp. 2d 295 (W.D.N.Y. 2007) ........................................... 30, 65

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ............................................................. 61

*Danielson v. Inslee*,
945 F.3d 1096 (9th Cir. 2019) ....................................................... 39, 47

*De Csepel v. Republic of Hungary*,
27 F.4th 736 (D.C. Cir. 2022) ..................................................... 52, 53, 60

*Deschutes River All. v. Portland Gen. Elec. Co.*,
1 F.4th 1153 (9th Cir. 2021) ....................................................... 21, 59

*Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*,
932 F.3d 843 (9th Cir. 2019) ............... 17, 39, 40, 41, 42, 43, 59, 63, 67

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ....................................................... 50, 56

*EEOC v. Peabody W. Coal Co.*,
400 F.3d 774 (9th Cir. 2005) ....................................................... 23, 24

*Gradel v. Piranha Cap., L.P.*,
495 F.3d 729 (7th Cir. 2007) ................................................................ 67

iv

*In re Greektown Holdings, LLC*,
917 F.3d 451 (6th Cir. 2019)..............................................................67

*Heckler v. Mathews*,
465 U.S. 728 (1984)......................................................................56, 57

*Issa v. Sch. Dist. of Lancaster*,
847 F.3d 121 (3d Cir. 2017)...............................................................35

*Jamul Action Comm. v. Chaudhuri*,
200 F. Supp. 3d 1042 (E.D. Cal. 2016)..............................................49

*Jamul Action Comm. v. Simermeyer*,
974 F.3d 984 (9th Cir. 2020).............................................................42

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001)..........................................................46

*Kescoli v. Babbitt*,
101 F.3d 1304 (9th Cir. 1996).....................................................61, 63

*Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*,
48 F.4th 934 (9th Cir. 2022)................................24, 39, 44, 45, 46, 67

*Knox v. U.S. Dep't of Interior*,
759 F. Supp. 2d 1223 (D. Idaho 2010)...............................................30

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.*,
535 U.S. 613 (2002)......................................................................22, 66

*Lyon v. Gila River Indian Cmty.*,
626 F.3d 1059 (9th Cir. 2010)............................................................47

*Makah Indian Tribe v. Verity*,
910 F.2d 555 (9th Cir. 1990)..........................................25, 26, 48, 58

*Manygoats v. Kleppe*,
558 F.2d 556 (10th Cir. 1977)...........................................................42

*McDonald v. Means*,
309 F.3d 530 (9th Cir. 2002).............................................................34

v

*Nanko Shipping, USA v. Alcoa, Inc.*,
  850 F.3d 461 (D.C. Cir. 2017) ............................................................ 25

*Nat'l Licorice Co. v. NLRB*,
  309 U.S. 350 (1940) .......................................................... 22, 61, 62, 63

*Parravano v. Babbitt*,
  70 F.3d 539 (9th Cir. 1995) .............................................................. 33

*Pettigrew v. Oklahoma ex rel. Okla. Dep't of Pub. Safety*,
  722 F.3d 1209 (10th Cir. 2013) ........................................................ 66

*Pueblo of Sandia v. Babbitt*,
  47 F. Supp. 2d 49 (D.D.C. 1999) ...................................................... 65

*Pueblo of Santa Ana v. Kelly*,
  104 F.3d 1546 (10th Cir. 1997) ........................................................ 50

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*,
  87 F.3d 1338 (D.C. Cir. 1996) ..................................................... 28, 46

*Republic of Philippines v. Pimentel*,
  553 U.S. 851 (2008) ................................................................ 23, 59, 60

*S. Utah Wilderness All. v. Kempthorne*,
  525 F.3d 966 (10th Cir. 2008) .......................................................... 62

*Sac & Fox Nation of Mo. v. Norton*,
  240 F.3d 1250 (10th Cir. 2001) ................................................... 28, 49

*Salinas v. U.S. Rr. Ret. Bd.*,
  141 S. Ct. 691 (2021) ....................................................................... 58

*Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
  584 F.3d 253 (6th Cir. 2009) ............................................................ 54

*Seminole Nation of Okla. v. Norton*,
  206 F.R.D. 1 (D.D.C. 2001) ............................................................. 34

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017) .......................................................................... 56

*Shermoen v. United States*,
  982 F.2d 1312 (9th Cir. 1992)............................................32, 62, 63, 65

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).......................................................................... 62

*Statewide Masonry v. Anderson*,
  511 F. App'x 801 (10th Cir. 2013) ...................................................... 46

*Sw. Ctr. for Biological Diversity v. Babbitt*,
  150 F.3d 1152 (9th Cir. 1998).....................................18, 28, 34, 35, 37

*Thomas v. United States*,
  189 F.3d 662 (7th Cir. 1999)........................................................46, 54

*United States v. Alpine Land & Reservoir Co.*,
  431 F.2d 763 (9th Cir. 1970)............................................................... 34

*United States v. City of Los Angeles*,
  288 F.3d 391 (9th Cir. 2002).........................................................32, 41

*United States v. Oregon*,
  657 F.2d 1009 (9th Cir. 1981)............................................................. 67

*Victim Rts. L. Ctr. v. Rosenfelt*,
  988 F.3d 556 (1st Cir. 2021) .............................................................. 31

*W. Flagler Assocs. v. Haaland*,
  573 F. Supp. 3d 260 (D.D.C. 2021)..............................29, 38, 52, 53, 66

*Washington v. Daley*,
  173 F.3d 1158 (9th Cir. 1999).....................................27, 28, 33, 34, 35

*White v. Univ. of Cal.*,
  765 F.3d 1010 (9th Cir. 2014)............................................................. 41

*Wichita & Affiliated Tribes of Okla. v. Hodel*,
  788 F.2d 765 (D.C. Cir. 1986)......................................................41, 67

**STATUTES**

5 U.S.C. § 706(2)(A) ............................................................................ 13

15 U.S.C. § 1175(a) .................................................................. 7

18 U.S.C. § 1166(a) .................................................................. 7

18 U.S.C. § 1166(c) .................................................................. 7

18 U.S.C. § 1166(c)(2) ............................................................ 50

18 U.S.C. § 1955(a)–(b) ........................................................... 7

25 U.S.C. § 2701(4) .................................................................. 6

25 U.S.C. § 2701(5) .................................................................. 6

25 U.S.C. § 2702(1) .................................................................. 6

25 U.S.C. § 2702(1)–(2) .......................................................... 33

25 U.S.C. § 2702(2) .................................................................. 6

25 U.S.C. § 2703(8) .................................................................. 6

25 U.S.C. § 2704(a) .................................................................. 7

25 U.S.C. § 2704(b) .................................................................. 7

25 U.S.C. § 2710(d)(1)(A) ........................................................ 7

25 U.S.C. § 2710(d)(1)(B) ........................................................ 7

25 U.S.C. § 2710(d)(1)(C) ........................................................ 7

25 U.S.C. § 2710(d)(3)(A) ........................................................ 7

25 U.S.C. § 2710(d)(3)(B) .............................................. 8, 10, 11

25 U.S.C. § 2710(d)(6) ...................................................... 7, 50

25 U.S.C. § 2710(d)(7)(B) ........................................................ 8

25 U.S.C. § 2710(d)(8) ............................................................. 8

25 U.S.C. § 2710(d)(8)(B) ........................................................ 8

viii

25 U.S.C. § 2710(d)(8)(B)(iii) ..................................................... 6, 33, 43, 45

25 U.S.C. § 2710(d)(8)(C) ................................................................ 8

2020 Wash. Legis. Serv. ch. 127, § 1 ........................................... 10

Wash. Rev. Code §§ 9.46.220–.222 .............................................. 8

Wash. Rev. Code § 9.46.231(1)(a) ................................................. 9

Wash. Rev. Code § 9.46.0241 ....................................................... 9

Wash. Rev. Code § 9.46.0269 ....................................................... 8

Wash. Rev. Code § 9.46.0269(1)(a)–(c) ........................................ 9

Wash. Rev. Code §§ 9.46.0305–.0361 .......................................... 9

Wash. Rev. Code § 9.46.0364(1) ................................................. 10

**RULES**

Fed. R. App. P. 4(a)(1)(B) ............................................................. 4

Fed. R. Civ. P. 12(b)(7) ............................................................... 23

Fed. R. Civ. P. 19(a)(1) ............................................................... 24

Fed. R. Civ. P. 19(a)(1)(A) .......................................................... 49

Fed. R. Civ. P. 19(a)(1)(B) .......................................................... 18

Fed. R. Civ. P. 19(a)(1)(B)(i) ...................................................... 26

Fed. R. Civ. P. 19(a)(1)(B)(ii) ..................................................... 26

Fed. R. Civ. P. 19(b) ....................................................... 24, 51, 52

Fed. R. Civ. P. 19(b)(2)(B) .......................................................... 55

Fed. R. Civ. P. 24 ....................................................................... 32

## OTHER AUTHORITIES

*Gaming Compacts*, Wash. State Gambling Comm'n ........................ 10, 11

S. Rep. No. 100-446 (1988) .......................................................... 5

Tribal-State Compact for Class III Gaming Between the
    Tulalip Tribes of Washington and the State of
    Washington (Aug. 2, 1991) ............................................. 9, 10

WIGA, *Washington Indian Gaming Association Statement on
    Maverick Gaming's Federal Lawsuit Seeking to
    Undermine Washington's State's System of Tribal Gaming*
    (Jan. 11, 2022) ...................................................................... 15

7 Wright & Miller, Fed. Prac. & Proc. § 1604 (3d ed.) ............................ 38

7 Wright & Miller, Fed. Prac. & Proc. § 1608 (3d ed.) ...................... 52, 58

**INTRODUCTION**

Maverick Gaming LLC is a casino gaming company that owns and operates cardrooms in the State of Washington. As it has in other States, Maverick would like to expand its operations to offer popular games like roulette, craps, and sports betting. Maverick, however, cannot do so because a tribal-state compact approved by the Secretary of the Interior has given Indian tribes a monopoly over lucrative casino-style gaming—preventing non-tribal entities, like Maverick, from competing with tribal casinos on an equal footing. To challenge this unlawful tribal monopoly, Maverick brought this case under the Administrative Procedure Act ("APA") and 42 U.S.C. § 1983 against the federal and state officials who have approved and maintained it in violation of the Constitution's guarantee of equal protection, the Tenth Amendment, and the Indian Gaming Regulatory Act ("IGRA").

Nine days before Maverick filed its motion for summary judgment—and only *after* the case had been transferred to this Circuit—the Shoalwater Bay Tribe moved to vacate the case schedule, intervene in the lawsuit, and dismiss the case under Federal Rule of Civil Procedure 19. The district court obliged, concluding that the Tribe was a required

party who could not be joined due to sovereign immunity, and that the case should not proceed without the Tribe. The court acknowledged that Maverick would be left without any forum in which to bring its claims, but concluded that the Tribe's sovereign immunity outweighed that concern.

This stunning ruling that tribes must be joined as parties in all APA challenges to the Secretary's approvals of tribal-state gaming compacts—and that those challenges must then be dismissed based on tribal immunity—would render such APA claims entirely unreviewable, a result at odds with common sense, fundamental principles of judicial review of agency actions, and the consistent practice of federal courts. In fact, the district court's holding flies in the face of a long line of cases—in this Court and others—holding that lawsuits implicating tribal interests generally may proceed where the federal government is a defendant, because the federal government (absent some conflict of interest) will adequately represent the tribe. Indeed, courts around the country routinely invoke that rule to allow challenges to tribal-state gaming compacts to proceed under IGRA. Rule 19 exists to protect absent parties' interests—not to give those parties the power to short-circuit litigation where their

interests are already well defended. And here, the Tribe could not identify a *single* merits argument it would make that the federal defendants would not. The Tribe's presence in this case would make no difference in how the litigation would unfold; the Tribe simply does not want the litigation to unfold at all. That is not what Rule 19 is for.

The result in this case breaks sharply from decades of precedent in this Circuit and others, and it would produce extreme and startling consequences. Under the logic of the decision below, an Indian tribe (or any other sovereign) that claims an interest in a case will have the power to foreclose judicial review of a vast array of federal agency action—flouting the APA and the strong presumption favoring judicial review of executive decision-making. That cannot be, and is not, the law. This Court should reverse and remand for the district court to consider Maverick's administrative, statutory, and constitutional claims.

## JURISDICTIONAL STATEMENT

Because this action arises under the Administrative Procedure Act, the Indian Gaming Regulatory Act, 42 U.S.C. § 1983, the Declaratory Judgment Act, and the U.S. Constitution, ER-91, the district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C.

§ 1346(a)(2).  This Court has jurisdiction under 28 U.S.C. § 1291 because Maverick appeals from the district court's order and judgment granting the Shoalwater Bay Tribe's motion to dismiss, which finally disposed of all claims in the action.  ER-4–20.  The district court entered its final order and judgment on February 21, 2023, and Maverick filed a timely notice of appeal on February 22, 2023.  ER-176–78; *see* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

**I.**     Whether an Indian tribe is a required party under Federal Rule of Civil Procedure 19(a) in an action challenging its tribal-state IGRA gaming compact when the federal government is a party.

**II.**     Whether, if an Indian tribe is a required party in such a case and cannot be joined, the action should proceed in equity and good conscience under Rule 19(b).

**III.**     Whether, even if an Indian tribe is a required party in such a case, the tribe waives its immunity by intervening in the case as a defendant to file a motion to dismiss.

4

## PERTINENT AUTHORITIES

The pertinent constitutional provisions, statutes, and rules appear in this brief's addendum.

## STATEMENT OF THE CASE

### I.    Background

### A.    The Indian Gaming Regulatory Act

The Indian Gaming Regulatory Act ("IGRA") creates a framework for state regulation of gaming on Indian lands.  In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Supreme Court held that California could not enforce its generally applicable gaming regulations against Indians on Indian lands within the State.  Congress, the Court reasoned, had not consented to any such exercise of state jurisdiction over Indian gaming.  *See id.* at 207.  Dissatisfied with the uneven regulatory landscape that *Cabazon* produced, Congress enacted IGRA the next year to "foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied" and to promote "free market competition" between state-licensed gaming operators and Indian tribes.  S. Rep. No. 100-446, at 6, 13 (1988).

In passing IGRA, Congress found that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming

5

activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). Congress also found that a "principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government." *Id.* § 2701(4); *see also id.* § 2702(1). In service of that goal, IGRA "provide[d] a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." *Id.* § 2702(2). IGRA also invokes "the trust obligations of the United States to Indians" and requires the federal government to safeguard tribal interests. *Id.* § 2710(d)(8)(B)(iii).

IGRA divides gaming into three classes, and it specifies a different set of regulations for each. Class III gaming—the kind at issue in this case—includes many of the games typically found in casinos (such as blackjack, roulette, and craps), *see* 25 U.S.C. § 2703(8), and it is the most heavily regulated. Class III gaming is lawful on Indian lands only if three conditions are met. *First*, the gaming activities must be "authorized by

6

an ordinance or resolution" that (i) "is adopted by the governing body of the Indian tribe having jurisdiction over such lands," (ii) "meets the requirements of subsection (b)"—*i.e.*, the rules governing class II gaming—and (iii) "is approved by the Chairman" of the National Indian Gaming Commission. *Id.* § 2710(d)(1)(A).[1] *Second*, the gaming activities must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." *Id.* § 2710(d)(1)(B). *Third*, the gaming activities must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." *Id.* § 2710(d)(1)(C).[2]

To satisfy the third condition, an Indian tribe that wants to allow class III gaming on its land can ask "the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C.

---

[1] The National Indian Gaming Commission is a body "established within the Department of the Interior" consisting of a Chairman appointed by the President (subject to Senate confirmation) and two associate members appointed by the Secretary of the Interior. 25 U.S.C. § 2704(a), (b).

[2] If these requirements are not met, then it is a federal crime to conduct class III gaming on Indian lands. *See* 15 U.S.C. § 1175(a); 18 U.S.C. §§ 1166(a), (c), 1955(a)–(b); 25 U.S.C. § 2710(d)(6).

§ 2710(d)(3)(A). "Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.* And "[i]f a state does not negotiate in good faith, the tribe may sue in federal court and obtain remedies designed to force the state to the bargaining table and get the deal done." *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1029 (9th Cir. 2022); *see* 25 U.S.C. § 2710(d)(7)(B).

Once the State and the tribe conclude a compact, the compact goes to the Secretary of the Interior for approval. *See* 25 U.S.C. § 2710(d)(3)(B), (d)(8). If the Secretary approves the compact, it goes into effect. *Id.* § 2710(d)(3)(B), (d)(8)(C). The Secretary must disapprove a tribal-state compact if "such compact violates . . . (i) any provision of [IGRA], (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or (iii) the trust obligations of the United States to Indians." *Id.* § 2710(d)(8)(B); *see also Amador Cnty. v. Salazar*, 640 F.3d 373, 380–81 (D.C. Cir. 2011).

### B. Washington State's Tribal Gaming Monopoly

Washington makes it a crime to offer most forms of gaming in the State. A person faces imprisonment or a fine (or both) if he "engages in,

8

or knowingly causes, aids, abets, or conspires with another to engage in professional gambling."  Wash. Rev. Code §§ 9.46.220–.222; *see also id.* § 9.46.0269 (broadly defining "professional gambling").  Washington's definition of "professional gambling" excludes activities "authorized by this chapter," *id.* § 9.46.0269(1)(a)–(c), but Washington authorizes only limited types of gaming (such as raffles, bingo, social card games, amusement games, pull-tabs, punchboards, sports pool boards, and fundraising events), *id.* §§ 9.46.0305–.0361.  It is a crime to offer the vast majority of casino-style class III games, including roulette, craps, and sports betting. In addition, "[a]ll gambling devices" "are subject to seizure and forfeiture and no property right exists in them." *Id.* §§ 9.46.0241, 9.46.231(1)(a).

But Washington has exempted Indian tribes in the State from these criminal prohibitions, granting the tribes a statewide casino-gaming monopoly.

Beginning in the early 1990s, the State—purporting to act pursuant to IGRA—began entering into tribal-state compacts permitting Indian tribes to offer a wide a range of class III games that remain a crime for non-tribal entities to offer, including roulette and craps. *See*, *e.g.*, Tribal-State Compact for Class III Gaming Between the Tulalip Tribes

9

of Washington and the State of Washington at 4–5 (Aug. 2, 1991).[3] Washington has executed such compacts with "[a]ll 29 federally recognized tribes in Washington." *Gaming Compacts*, Wash. State Gambling Comm'n.[4] The Secretary of the Interior approved these compacts, rendering them in effect under IGRA. ER-100, -115, -123; *see* 25 U.S.C. § 2710(d)(3)(B).

In March 2020, Washington expanded its tribal casino-gaming monopoly by enacting a law permitting Indian tribes to amend their gaming compacts "to authorize the tribe to conduct and operate sports wagering on its Indian lands." Wash. Rev. Code § 9.46.0364(1). That law expressly preserved the State's tribal monopoly, noting that it "has long been the policy of this state to prohibit all forms and means of gambling except where carefully and specifically authorized and regulated" and stating an intent to "further this policy by authorizing sports wagering on a very limited basis by restricting it to tribal casinos in the state of Washington." 2020 Wash. Legis. Serv. ch. 127, § 1. So far, 20 of Washington's 29

---

[3] https://wsgc.wa.gov/sites/default/files/public/searchable-compacts/tulalip/A-1991%20Compact%20%28s%29.pdf.

[4] https://wsgc.wa.gov/tribal-gaming/gaming-compacts.

10

federally recognized Indian tribes have amended their tribal-state com-
pacts to permit them to offer sports betting. *See Gaming Compacts*,
Wash. State Gambling Comm'n, *supra* at 10 n.4. The Secretary of the
Interior has approved each of these compact amendments, rendering
them in effect under IGRA. ER-101–03; *see* 25 U.S.C. § 2710(d)(3)(B).

### C. Maverick Gaming LLC

Maverick is a non-tribal gaming company that owns and operates
cardrooms in Washington. ER-112. Maverick also owns casinos in Ne-
vada and Colorado, which offer a range of class III games (including
sports betting) to patrons in those States. *Id.* Seeking to expand its
Washington gaming offerings to include games like roulette, craps, and
sports betting, Maverick has identified economically viable opportunities
in the State. ER-112–13. But Maverick is excluded from Washington's
highly lucrative class III gaming market because Washington permits
only Indian tribes to offer those games, and criminalizes them for non-
tribal entities like Maverick.

Washington's tribal gaming monopoly confers on tribal casinos a
competitive advantage over Maverick's cardrooms because the tribal ca-
sinos can offer their patrons a more attractive suite of games. ER-113–

11

14. Maverick has to incur increased advertising, promotional, and entertainment expenses in order to effectively compete with the tribes' expanded gaming offerings, and even given those expenses, Maverick continues to lose revenue from customers who would visit Maverick's card-rooms if they offered the same games tribal casinos can offer. *Id.* Maverick brought this suit to level the playing field in Washington, either by expanding the games Maverick may offer or by applying Washington's general class III gaming prohibitions equally to tribal and non-tribal entities alike. ER-115–16.

## II. Procedural History

### A. Maverick's Complaint

Maverick filed this action in the U.S. District Court for the District of Columbia against the federal officials responsible for approving Washington's tribal-state gaming compacts, the Washington state officials responsible for executing and administering those compacts, and the Washington state officials responsible for enforcing Washington's criminal gaming prohibitions. ER-134–75. Maverick's complaint brought three claims.

*First*, Maverick brought an Administrative Procedure Act ("APA") claim against the federal officials, alleging that the Secretary's approvals of the sports-betting compacts were "not in accordance with law," 5 U.S.C. § 706(2)(A)—specifically, that the Secretary was required to disapprove the sports-betting compacts under IGRA itself, the constitutional equal-protection guarantee, and the Tenth Amendment's anti-commandeering principle. ER-167. Maverick sought a declaration that the sports-betting compacts themselves and the Secretary's approval of them violated federal law, vacatur of the Secretary's approval, a declaration that the tribes' sports-betting activities violated federal law, and nominal damages, costs, and attorneys' fees. ER-168.

*Second*, Maverick brought a claim against the Washington state officials under 42 U.S.C. § 1983, equitable principles, and the Declaratory Judgment Act, alleging that the state officials' execution and administration of the tribal-state compacts (both the original compacts from the 1990s and the recent amendments allowing sports betting) likewise violated IGRA, the constitutional equal-protection guarantee, and the Tenth Amendment's anti-commandeering principle. ER-169. Here again, Maverick sought a declaration that the compacts themselves (and the sports-

13

betting amendments) and the state officials' execution and continued administration of them violated federal law, a declaration that the tribes' class III gaming activities violated federal law, an order enjoining the state officials from continuing to administer the compacts (and the sports-betting amendments) or entering into any new compacts that would grant a tribal class III gaming monopoly, and damages, costs, and attorneys' fees. ER-170–71.

*Third*, Maverick brought another claim against the Washington state officials under § 1983, equitable principles, and the Declaratory Judgment Act—this time alleging that Washington's discriminatory enforcement of its class III gaming criminal prohibitions violated the constitutional equal-protection guarantee. ER-171–72. Unlike the first two claims, this claim did not ask the court to declare the compacts, the sports-betting amendments, or the tribes' class III gaming activities unlawful. Instead, Maverick sought a declaration that the state officials' "continued enforcement of Washington's criminal laws prohibiting class III gaming—including roulette, craps, and sports betting—violates the Constitution's guarantee of equal protection, and an injunction prohibiting the [state officials] from enforcing those laws against Maverick." ER-

173. Maverick also sought nominal damages, costs, and attorneys' fees. ER-174.

## B. District Court Proceedings

Shortly after Maverick filed its complaint in the District of Columbia, the state defendants moved to transfer venue to the Western District of Washington, and the district court granted that motion. Thereafter, the parties stipulated to a briefing schedule for an amended complaint and dispositive motions, and the court adopted the parties' stipulated schedule. ER-127–33. Maverick filed an amended complaint in July 2022, bringing the same claims and requesting the same relief described above. ER-84–126. Maverick also began preparing its motion for summary judgment.

Nine days before Maverick's summary judgment motion was due, the Shoalwater Bay Tribe ("Tribe") moved to intervene as a defendant in the case and asked the court to vacate the parties' stipulated schedule.[5]

---

[5] The Washington Indian Gaming Association (of which the Tribe is a member and has a seat on the board of directors) had issued a statement opposing Maverick's litigation on the day Maverick filed its initial complaint in January 2022. WIGA, *Washington Indian Gaming Association Statement on Maverick Gaming's Federal Lawsuit Seeking to Undermine Washington's State's System of Tribal Gaming* (Jan. 11, 2022),

Maverick opposed both motions, and before briefing on those motions was complete, Maverick filed its summary judgment motion on the stipulated due date. The district court then granted the Tribe's motions, staying the briefing schedule and allowing the Tribe to intervene in the case and file a motion to dismiss. ER-64–79.

The Tribe filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(7) and 19. ER-29–63. It argued that it was a required party under Rule 19(a), that it could not be joined (despite its intervention) because of its tribal immunity, and that the case should not proceed without it in equity and good conscience under Rule 19(b). ER-50–61.[6] The state defendants filed a brief supporting dismissal. The federal defendants filed a brief stating: "The general position of the United States" is "that in most contexts it is the only required and indispensable party in litigation challenging final agency action under the Administrative

---

https://www.washingtonindiangaming.org/wp-content/up-loads/2022/01/Media-Release-1.11.2022-1-1.pdf. The Tribe, however, never participated in this litigation until it sought to intervene and vacate the stipulated schedule seven months later, after the case had been transferred to this Circuit.

[6] A group of non-party tribes filed an *amicus* brief supporting the Shoalwater Bay Tribe's motion to dismiss.

16

Procedure Act." ER-22. But the federal defendants read this Court's decision in *Dine Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, 932 F.3d 843 (9th Cir. 2019), to "control[] in this case and support[] dismissal pursuant to Rule 19." *Id.* The federal defendants therefore "d[id] not dispute that the Tribe's motion to dismiss should be granted under the current state of the law in the Ninth Circuit," but noted that "the United States disagrees with the ruling in *Dine Citizens* and reserves the right to assert in future proceedings that the United States is generally the only required and indispensable defendant in APA litigation challenging federal agency action." ER-26 (citation omitted).

The district court granted the Tribe's motion to dismiss, ER-4–20, and Maverick appealed.

## SUMMARY OF ARGUMENT

The district court foreclosed judicial review of Maverick's administrative, statutory, and constitutional claims because it concluded that the Tribe (1) was a required party (2) that could not be joined and (3) whose absence prevented the suit from going forward in equity and good conscience. Each step of that analysis was wrong. The district court's reasoning ventured far outside established Rule 19 practice in courts around

17

the country, and, in so doing, produced a startling result that would grant Indian tribes—or any other absent sovereign—the power to insulate a vast array of final agency actions from any judicial review. That cannot be, and is not, the law.

**I.** The Tribe is not a required party under Rule 19(a).

**A.** The Tribe's primary argument—that proceeding in its absence would leave its interests unprotected, *see* Fed. R. Civ. P. 19(a)(1)(B)—runs up against longstanding precedent that "[t]he United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe." *Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir. 1998) (per curiam). Here, that general rule is buttressed by three overlapping presumptions that apply where parties share the same ultimate objective, where the government defends its own action, and where the government has a duty to represent the interests of an absentee. Neither the Tribe nor the district court offered any persuasive reason to depart from those presumptions in this case.

Even without the presumptions, the traditional test for adequate representation—which asks whether the absentee would offer arguments

or some other evidence that existing parties would not—shows that the Tribe is not a required party: there is no difference in how this litigation would unfold whether the Tribe is present or not. Rule 19 exists to protect the interests of absent parties; it does not give parties the power to short-circuit litigation when their interests are already well defended. The Tribe's contrary position is based on an overreading of two recent decisions by this Court, but neither one of those decisions worked the sea change in Rule 19 doctrine that the Tribe ascribes to them.

Additionally, even if the federal defendants would be inadequate representatives for the Tribe, one of Maverick's claims merely asks for an injunction preventing the state defendants from enforcing Washington's criminal gaming laws against Maverick. That claim does not implicate the Tribe's compact at all.

**B.** The Tribe's backup argument—that complete relief is unavailable in its absence—was not reached below, and in any event is meritless. The possibility of complete relief looks to whether relief is meaningful *as between the parties*. For an APA claim, this Court has held that reversal or vacatur of the agency's action qualifies as meaningful relief among the parties, and does not require an absent sovereign. The same

goes for the claims against the state defendants: an order declaring their execution and administration of the compacts unlawful would be meaningful as between them and Maverick, even if the Tribe were not bound directly. The Tribe's suggestion that it could continue to offer class III games even without a valid compact is both wrong as a matter of law and irrelevant to whether a court could grant meaningful relief as between Maverick and the federal and state defendants in this proceeding.

**II.** In any event, if the Tribe chooses not to participate in this litigation, considerations of "equity and good conscience" weigh strongly in favor of allowing this case to proceed without it under Rule 19(b).

**A.** Each of the Rule 19(b) factors counsels against dismissal. *First*, there is no prejudice because the Tribe has not identified any merits argument it would make that the federal defendants would not. *Second*, even if there were any prejudice, it could easily be avoided by allowing the Tribe to raise its arguments in an *amicus* brief. The district court could also tailor the relief in this case to allow Maverick to offer class III gaming, without affecting any of the Tribe's gaming activities. *Third*, Maverick can obtain complete relief against the federal and state defendants. The district court sidestepped this issue, asserting that any relief

20

in this case would necessarily invalidate the Tribe's compact. But that is both wrong (the district court could grant relief by allowing Maverick to offer class III gaming) and nonresponsive (even if invalidating the compacts were the only available remedy, that would also be complete relief). *Fourth*, as the district court agreed, the lack of any alternative forum for Maverick's claims weighs against dismissal—especially in light of the strong presumption favoring judicial review of administrative action.

The Tribe and the district court also relied heavily on this Court's statement that balancing the Rule 19(b) factors "almost always favors dismissal when a tribe cannot be joined due to tribal sovereign immunity." *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021) (internal quotation marks omitted). But the court overread that case. If Rule 19(b) does not allow *this* case to proceed—where all factors weigh against dismissal, and there is no identifiable conflict of interest—then it would not allow *any* case with an absent sovereign to proceed. Both this Court and the Supreme Court have rejected any such *per se* rule, and the Tribe cannot win with anything less.

**B.** Apart from the Rule 19(b) factors, the public-rights exception allows this case to proceed. In cases "narrowly restricted to the protection

and enforcement of public rights," traditional joinder rules do not apply. *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 363 (1940). A lawsuit seeking to enforce governmental compliance with administrative and constitutional law is a classic example of public-rights litigation. The district court refused to apply this doctrine because it concluded that this case threatens the Tribe's "legal entitlements," but the tribal-state compacts at issue here do not confer the sort of private legal entitlements that forestall application of the public-rights exception. Rather, they set the balance of public regulatory authority among sovereigns—a quintessential matter of *public* rights.

**III.** Finally, even if the Tribe were a required party, it can be joined to this suit because it has waived its sovereign immunity by voluntarily intervening in this case. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002). While it is an unsettled question whether a tribe may intervene for the limited purpose of filing a Rule 19 motion without waiving its immunity, the better view is that it cannot. The waiver doctrine is designed to avoid the "seriously unfair results" that flow from allowing a sovereign to inject itself into a case and then assert that the court has no power over it. *Id.* And the result here is

particularly unfair: the Tribe knew about this litigation from the day it was filed, but waited until the case was transferred to this Circuit to intervene and assert its Rule 19 arguments.

## LEGAL STANDARDS

A court may dismiss a complaint for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Rule 19 requires "three successive inquiries." *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005).[7]

*First*, the court must determine whether a party is "required" under Rule 19(a). Rule 19(a)(1) defines a person as a "[r]equired [p]arty" if, "in that person's absence, the court cannot accord complete relief among existing parties," or "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's

---

[7] An older version of Rule 19 (and the cases interpreting it) used the words "necessary" to describe parties who should be joined under Rule 19(a) and "indispensable" to describe parties whose absence required dismissal under Rule 19(b). A 2007 amendment to the rule calls parties who should be joined under Rule 19(a) "required" and deletes the word "indispensable." The changes "were stylistic only," and "the substance and operation of the Rule both pre- and post-2007 are unchanged." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 855–56 (2008); *see also Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 969 n.6 (9th Cir. 2008).

23

absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1).

*Second*, if a person is required under Rule 19(a), the court must determine whether that person can be joined. *Peabody*, 400 F.3d at 779.

*Third*, if joinder is not feasible, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). Rule 19(b) provides four factors for courts to consider: (1) "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties"; (2) "the extent to which any prejudice could be lessened or avoided"; (3) "whether a judgment rendered in the person's absence would be adequate"; and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." *Id.*

This Court "review[s] a district court's decision to dismiss a case for failure to join a required party under Rule 19 for abuse of discretion," but it "review[s] any legal questions underlying that decision de novo." *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 943 (9th Cir. 2022).

## ARGUMENT

"A decision under Rule 19 *not* to decide a case otherwise properly before the court is a power to be exercised only in rare instances." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 465 (D.C. Cir. 2017) (internal quotation marks and alteration omitted). And "if no alternative forum is available to the plaintiff, the court should be extra cautious before dismissing the suit." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir. 1990) (internal quotation marks and emphasis omitted). The Tribe's position in this case would turn a rare exception into the rule *whenever* an Indian tribe (or another absent sovereign) claims an interest in a case—thereby foreclosing judicial review of a vast array of administrative, statutory, and constitutional claims.

The law does not compel such an extreme result. The Tribe is not a required party in this case. Even if it were, equity and good conscience dictate that this suit should proceed in the Tribe's absence if it chooses not to participate. Finally, the tribe's voluntary intervention in this suit means that it can be joined in any event. This Court should reverse and remand for the district court to consider Maverick's claims on the merits.

25

## I. The Tribe Is Not A Required Party Under Rule 19(a).

### A. Disposing Of This Action In The Tribe's Absence Would Not Impair The Tribe's Ability To Protect Its Interests.

Rule 19(a)(1)(B) provides that a person is a required party if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i).[8] The Tribe has a legitimate interest in the legality of its tribal-state gaming compact. But disposing of this case in the Tribe's absence would not leave that interest unprotected for two independent reasons: the federal defendants will vigorously defend that interest, and a ruling in Maverick's favor could leave the Tribe's compact wholly unscathed.

---

[8] Rule 19(a)(1)(B) also states that a person is a required party if disposing of the action in their absence could "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B)(ii). That provision is not implicated here. Moreover, the Tribe did not invoke it below, and the district court did not address it. *See Makah*, 910 F.2d at 558 (on Rule 19 motion, the "moving party has the burden of persuasion in arguing for dismissal").

26

### 1. The Federal Defendants Adequately Represent The Tribe's Interests.

**a.** Longstanding precedent establishes that the federal defendants adequately represent the Tribe's interests in this case.

"[A]n absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013) (internal quotation marks omitted). Thus, courts routinely hold that, in light of the federal government's "trust responsibility" to Indian tribes, "Tribes are not necessary parties" when the federal government is already a party because "[t]he United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe." *Washington v. Daley*, 173 F.3d 1158, 1167–68 (9th Cir. 1999) (internal quotation marks omitted). In light of that commonsense rule, a long line of cases—in this Court and others—recognizes that, absent a divergence of interests, the federal government's presence in a case challenging federal agency action suffices under Rule 19 to protect the interests of absent parties (including Indian tribes) who benefit from that action. *See*, *e.g.*, *Alto*, 738 F.3d at 1127–29 (tribe not a required party in suit against Bureau of Indian Affairs

27

challenging Bureau's order upholding tribe's member-disenrollment decision); *Daley*, 173 F.3d at 1167–69 (tribes not required parties in suit against Secretary of Commerce challenging regulation allocating fish harvest to tribes); *Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1153–54 (9th Cir. 1998) (per curiam) (tribe not a required party in suit against Secretary of Interior challenging government's plans for dam in which tribe had rights to store water); *see also*, *e.g.*, *Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1258–59 (10th Cir. 2001) (tribe not a required party in suit against Secretary of Interior seeking to prevent Secretary from taking land into trust for tribe and approving gaming activities thereon); *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1350–52 (D.C. Cir. 1996) (tribes not required parties in suit against Secretary of Interior challenging allocation of funds that tribes received).  In short, it is settled law that "[t]he United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe." *Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154.

Accordingly, federal courts have uniformly held that the federal government adequately represents an Indian tribe when it "share[s] the

Tribe's position . . . that [an IGRA] Compact is consistent with [federal law]." *W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 270–71 (D.D.C. 2021), *aff'd in relevant part on other grounds*, 2023 WL 4279219 (D.C. Cir. June 30, 2023). In fact, challenges to tribal-state gaming compacts under IGRA just like this one have regularly gone forward, in this Circuit and elsewhere, where the federal government defends the legality of a tribal-state compact under IGRA. *See*, *e.g.*, *Amador Cnty. v. Salazar*, 640 F.3d 373, 375 (D.C. Cir. 2011) (considering challenge to Secretary's approval of IGRA compact). As this Court noted in *Artichoke Joe's California Grand Casino v. Norton*, although a *State* cannot "adequately represent the tribes because their interests [a]re potentially adverse and because the state owe[s] no trust responsibility to Indian tribes," an IGRA challenge brought against the Secretary of the Interior—like this one— is different because "[t]he Secretary's interests are not adverse to the tribes' interests and the Department of Interior has the primary responsibility for carrying out the federal government's trust obligation to Indian tribes." 353 F.3d 712, 719 n.10 (9th Cir. 2003); *see also*, *e.g.*, *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1118 (E.D. Cal. 2002) (tribes "are not necessary parties [to challenge to IGRA compact] because their

legal interest can be adequately represented by the Secretary"), *aff'd*, 353 F.3d 712; *Knox v. U.S. Dep't of Interior*, 759 F. Supp. 2d 1223, 1235–37 (D. Idaho 2010) (Secretary adequately represents absent tribes' interests in challenge to IGRA compact because "the Secretary approved those [compacts] and hence has every incentive to zealously defend its approval" and there are "no arguments the . . . tribes could make to defend the Secretary's approvals that the Secretary himself would not make"); *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 314–16 (W.D.N.Y. 2007) ("the United States may adequately represent an Indian tribe [in a challenge to an IGRA compact] unless there is a conflict between the United States and the tribe").  Indeed, the tribe cannot point to a single IGRA challenge where, as here, the interests of the federal government and the absent tribe were aligned, yet the court held that the absent tribe was a required party.

The federal government, too, has repeatedly taken the position that Indian tribes are not required parties in challenges of this nature because "the Federal Defendants adequately represent the Tribes' interest in seeing [a compact] approval upheld."  Federal Defendants' Response to Seminole Tribe of Florida's Motion to Dismiss 9, *W. Flagler*, 2021 WL 8344054

30

(D.D.C. Oct. 26, 2021). As the federal government explained, finding a tribe to be a necessary party in a challenge to governmental action would "undermine important public rights crafted by Congress," such as the right to "judicial review of agency action." *Id.* at 8.

Additionally, three overlapping presumptions confirm that the federal government is an adequate representative for the Tribe's interests.

*First*, in a case like this one, where "an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises," and "[i]f the applicant's interest is identical to that of one of the present parties, a compelling showing should be required to demonstrate inadequate representation." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). When parties have the "same ultimate objective, differences in litigation strategy do not normally justify intervention." *Id.*

*Second*, when a "movant seeks to intervene as a defendant alongside a government entity" whose actions have been challenged, there is a "presumption that the government will defend adequately its action" that can be rebutted only by a "strong affirmative showing that the [government] is not fairly representing the applicants' interests." *Victim Rts. L.*

31

*Ctr. v. Rosenfelt*, 988 F.3d 556, 561 (1st Cir. 2021) (internal quotation marks omitted). This is because "[t]here is also an assumption of adequacy when the government is acting on behalf of a constituency that it represents," which can be defeated only by a "very compelling showing to the contrary." *Arakaki*, 324 F.3d at 1086 (internal quotation marks omitted).

*Third*, "a presumption of adequate representation generally arises when the representative is a governmental body or officer charged by law with representing the interests of the absentee." *United States v. City of Los Angeles*, 288 F.3d 391, 401 (9th Cir. 2002) (internal quotation marks omitted); *see also Arakaki*, 324 F.3d at 1086.[9]

The Tribe cannot make the compelling showing needed to rebut the multiple, overlapping presumptions that it is adequately represented here. First, it shares an identical objective as the existing defendants:

_____

[9] These cases arose in the context of motions to intervene, *see* Fed. R. Civ. P. 24, but their analysis of when one party adequately represents another party's interest "parallels" the analysis under Rule 19. *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992); *compare Arakaki*, 324 F.3d at 1086 (listing "three factors [for] determining the adequacy of representation" under Rule 24), *with Alto*, 738 F.3d at 1127–28 (listing same three factors for Rule 19 analysis).

the dismissal of Maverick's challenges to the actions of the federal and state defendants authorizing and enforcing Washington's tribal class III gaming monopoly. Second, because Maverick is challenging the actions of state and federal governmental actors, there is a strong presumption that the defendants will adequately defend those actions. Third, the federal defendants' "trust responsibility" to Indian tribes makes them proper representatives of the Tribe absent a clear conflict of interest in this case. *Daley*, 173 F.3d at 1167–68. This Court has "noted, with great frequency, that the federal government is the trustee of the Indian tribes' rights." *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995); *see also*, *e.g.*, *Daley*, 173 F.3d at 1168. And IGRA itself turns the trust obligation into a statutory mandate by requiring the Secretary to disapprove any compact that "violates . . . the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B)(iii); *see also id.* § 2702(1)–(2) (stating IGRA's purpose of "promoting tribal economic development, self-sufficiency, and strong tribal governments," and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation"); *Amador Cnty.*, 640 F.3d at 380–81. Accordingly, federal courts routinely deny motions to intervene brought by Indian tribes on the ground that the tribe is

adequately represented. *McDonald v. Means*, 309 F.3d 530, 541 (9th Cir. 2002); *United States v. Alpine Land & Reservoir Co.*, 431 F.2d 763, 765 (9th Cir. 1970); *Seminole Nation of Okla. v. Norton*, 206 F.R.D. 1, 9–10 (D.D.C. 2001).

Thus, there is an overwhelming presumption in this case that the federal government will adequately represent the absent tribe's interests. To overcome that presumption, it is not enough for the Tribe to invent hypothetical future conflicts that are not "at issue" in the present suit or speculate that the federal government's "potentially inconsistent responsibilities" might result in some undetermined conflict with the Tribe. *Daley*, 173 F.3d at 1168 (internal quotation marks omitted). The Tribe must "demonstrate how such a conflict might actually arise *in the context of this case*." *Id.* (emphasis added); *see also Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154.

The Tribe has not done so. Neither the Tribe nor the district court offered anything special about this case that would justify departing from this triple-layered presumption of adequacy. The Tribe repeatedly noted below that *before* it had a gaming compact, the federal government sought to prevent it from offering class III games. *See*, *e.g.*, ER-42–45.

But that was because *those offerings violated federal law*. The district court accepted that argument, finding that "conflicts" with the United States exist in light of "a documented history of the federal government acting as an adverse party to [the Tribe] *in the absence of a tribal compact* with Washington that permits Class III gaming." ER-15 (emphasis added).

This conclusion was erroneous twice over. First, the Tribe has no cognizable interest in violating federal law. If a court ends up declaring that the Secretary did not validly approve the compacts, then the Tribe has no interest in conducting illegal gambling. *See Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) (a party has "'no interest in continuing practices' that violate" the law). The Tribe's obdurate desire to violate federal law is not an interest that is cognizable in the Rule 19 (or any other) context.

Second, the Tribe's desire to flout a court order does not establish any conflict *in this litigation*, which is where the Rule 19 inquiry looks. Rather, the Tribe must show how "a conflict might actually arise *in the context of this case*." *Daley*, 173 F.3d at 1168 (emphasis added); *see also Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154 (reversing where

35

"[n]either the district court nor any of the parties . . . explained how such a conflict might actually arise *in the context of* [*plaintiff's*] *suit*" (emphasis added)).  For similar reasons, the district court's speculation that "changes in policy or personnel within the federal government may lead to changes in approach to federal litigation strategy," ER-15, is no basis for dismissal: the mere possibility that "conflicts can arise between the United States and an Indian tribe" is not enough where "no such conflict has surfaced to this point in this case." *Alto*, 738 F.3d at 1128.

Even setting aside the phalanx of presumptions, courts typically consider "three factors" to assess adequacy: (1) whether "the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments," (2) whether the present party "is capable of and willing to make such arguments," and (3) whether "the absent party would offer any necessary element to the proceedings that the present parties would neglect." *Alto*, 738 F.3d at 1127–28 (internal quotation marks omitted).  Those factors are organized around a unifying theme:  Would the litigation look any different without the absent party than with it?

36

The answer here is no. The Tribe has not identified a single argument in defense of the compacts that it would raise and the federal defendants would not—except its Rule 19 assertions. But this Court has emphatically rejected this "circular" argument: It "would preclude the United States from opposing frivolous motions to dismiss out of fear that its opposition would render it an inadequate representative" and "would also create a serious risk that non-parties clothed with sovereign immunity, such as [an Indian tribe], whose interests in the underlying merits are adequately represented could defeat meritorious suits simply because the existing parties representing their interest opposed their motion to dismiss." *Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154. Because the Tribe cannot show an actual conflict with the federal defendants that is likely to arise in the litigation of this case, it is not a required party under Rule 19(a).

The federal defendants are also fully capable of and willing to vigorously defend the legality of the compacts, as demonstrated in this litigation to date. And this is a case whose merits will be decided on the papers—so there is no need for the Tribe to offer or conduct any discovery. *See* ER-128 (parties stipulated that case "presents questions of law that

appear to be resolvable through dispositive motions . . . without the need for factual discovery").

That puts this case on all fours with *Alto*. There, this Court held that a tribe's interest was adequately represented by the Bureau of Indian Affairs because (1) "the United States share[d] with the Tribe an interest in defending" agency action, (2) "consistent with its fiduciary responsibility to Indian tribes, the [Bureau] ha[d] repeatedly avowed its intention and ability to represent the [Tribe's] interests," and (3) review was "limited to the administrative record before the [Bureau]," so "the Tribe could not offer new evidence." 738 F.3d at 1128. So too here. There is no difference in how this case would unfold with or without the Tribe's presence as a party—except that the Tribe hopes to interpose its immunity to prevent the case from unfolding at all. That is antithetical to the purpose of Rule 19, whose guiding "philosophy . . . is to avoid dismissal whenever possible," not to give absent parties the power to short-circuit litigation when their interests are already well defended. 7 Wright & Miller, Fed. Practice & Proc. § 1604 (3d ed.); *cf. Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 360 (2d Cir. 2015) ("Rule 19

is about protecting absent persons from unfair prejudice—it is not about giving a named defendant veto power over the plaintiff's chosen forum.").

**b.**    The Tribe's contrary position in this case, accepted by the district court, is based on an overreading of two recent decisions by this Court: *Dine Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, 932 F.3d 843 (9th Cir. 2019), and *Klamath Irrigation District v. U.S. Bureau of Reclamation*, 48 F.4th 934 (9th Cir. 2022).  But neither case worked the sea change in Rule 19 doctrine that the Tribe ascribes to them.  Moreover, this Court is "required to reconcile prior precedents if [it] can do so," *Danielson v. Inslee*, 945 F.3d 1096, 1099 (9th Cir. 2019) (quoting *Cisneros-Perez v. Gonzales*, 465 F.3d 386, 392 (9th Cir. 2006)), and so it must interpret those decisions as consonant with the Circuit's long line of cases applying the presumption that the United States is an adequate representative in cases like this one.

*Dine Citizens* was a suit brought by "[a] coalition of tribal, regional, and national conservation organizations" challenging "a variety of agency actions that reauthorized coal mining activities on land reserved to the Navajo Nation" under the Endangered Species Act and the National Environmental Policy Act.  932 F.3d at 847.  There were numerous

39

government bodies involved in this process,[10] and the suit alleged that the government had erred across the board by relying on a "faulty" Biological Opinion from the Fish and Wildlife Service (and a faulty Environmental Impact Statement) to find that "the proposed action would not jeopardize the continued existence of any of the threatened and endangered species evaluated." *Id.* at 849–50. This Court held that the tribal corporation that owned the mine had an interest in its continued mining operations, and then concluded that while it was a "closer" question, the federal government did not adequately represent that interest. *Id.* at 853.

Unlike here, the circumstances in *Dine Citizens* gave concrete reasons to doubt that the government would adequately represent tribal interests. For example, there were already tribal organizations in the case as *plaintiffs*, thus pitting conflicting tribal interests against one another. *See* 932 F.3d at 847. The federal government cannot represent one tribe's

---

[10] The reauthorization process itself required approvals from the Office of Surface Mining Reclamation and Enforcement, the Bureau of Indian Affairs, and the Bureau of Land Management. *Dine Citizens*, 932 F.3d at 849. That, in turn, required "cooperat[ion]" with the National Park Service and the Fish and Wildlife Service, and "coordinat[ion]" with the U.S. Army Corps of Engineers and the Environmental Protection Agency. *Id.*

interest when "whatever allegiance the government owes to the tribes as trustee[] is necessarily split among . . . competing tribes." *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 775 (D.C. Cir. 1986).

Additionally, the claims were brought under two statutes—the Endangered Species Act and the National Environmental Policy Act—that required the government to prioritize environmental interests over tribal interests in the event of a conflict. *See Dine Citizens*, 932 F.3d at 855. In administering environmental statutes, the government is beholden to the general citizenry in a way that prevents it from prioritizing tribal interests. *Cf. White v. Univ. of Cal.*, 765 F.3d 1010, 1027 (9th Cir. 2014) (no adequate representation where University had "a broad obligation to serve the interests of the people of California, rather than any particular subset"); *City of Los Angeles*, 288 F.3d at 401 (presumption of adequate representation "arises *when the government is acting on behalf of a constituency that it represents*" (emphasis added)). The government's bottom-line position *happened* to align with the tribe's interest in *Dine Citizens* at the moment, but that alignment was based on a different and potentially shifting foundation—the environmental statutes, rather than any interest in furthering tribal interests—that could lead to rifts as the

41

litigation progressed. The government had an "overriding interest . . . in complying with environmental laws," and "the environmental goals of [the National Environmental Policy Act] were 'not necessarily coincidental with the interest of the Tribe.'" 932 F.3d at 855 (quoting *Manygoats v. Kleppe*, 558 F.2d 556, 558 (10th Cir. 1977)).

Indeed, this Court has characterized *Dine Citizens* in precisely that way, noting that the outcome in that case turned on the fact that the federal defendants' "obligations to follow relevant environmental laws were in tension with tribal interests." *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 997 (9th Cir. 2020).

Here, by contrast, the interests of the federal defendants and the Tribe are perfectly aligned. Both believe that the compacts do not violate IGRA or any other provision of federal law and should continue in effect.

Unlike in *Dine Citizens*, the federal defendants' shared position here on the legality of the Tribe's gaming compact is no mere happenstance. IGRA *requires* the Secretary to assess whether a compact comports with "the trust obligations of the United States to Indians"—and to disapprove any compact that violates those obligations. 25 U.S.C. § 2710(d)(8)(B)(iii); *see also Amador Cnty.*, 640 F.3d at 380–81. Thus,

42

when the Secretary defends the legality of an IGRA tribal-state compact that the Secretary has already approved, the government's position is *necessarily* based on a determination that the compact itself aligns with tribal interests—or, to use *Dine Citizens*'s words, the federal government's interest in defending a compact that it has already approved under IGRA is "*necessarily coincidental with the interest of the Tribe*." 932 F.3d at 855 (emphasis added; internal quotation marks omitted); *see also* ER-80 (letter from Department of Interior to Tribe confirming its view that the compact comports with "the trust obligations of the United States to Indians"). This case thus is precisely opposite to the situation in *Dine Citizens*: here, there is no divergence of interests between the federal government and the Tribe, and the usual standard for assessing adequate representation (undergirded by three mutually reinforcing presumptions) compels the conclusion that the Tribe's interests are protected by the federal government's presence.

*Klamath* was similar. In that case, various water users in Oregon—irrigation districts, farmers, and landowners—sued the Bureau of Reclamation over its operating procedures for the "distribution of waters in the Klamath Water Basin," which the Bureau adopted "in consultation with

other relevant federal agencies." 48 F.4th at 938. Two Indian tribes intervened because the challenge "imperil[led] the Tribes' reserved water and fishing rights." *Id.*

As in *Dine Citizens*, the government had interests that diverged from those of the tribes. The Bureau of Reclamation "has the nearly impossible task of balancing multiple competing interests in the Klamath Basin"—including not just the tribes' water and fishing rights, but also "maintain[ing] contracts with individual irrigators and the irrigation districts that represent them" and "managing the Klamath Project in a manner consistent with its obligations under the [Endangered Species Act]." 48 F.4th at 940–41 (internal quotation marks omitted); *see also Arizona v. Navajo Nation*, 599 U.S. __, __, 2023 WL 4110231 (2023) (slip op., at 10) ("Allocating water in the arid regions of the American West is often a zero-sum situation."). In fact, while *Klamath* was pending before this Court, the tribes were separately "in active litigation over the degree to which Reclamation [was] willing to protect [their] interests in several species of fish." 48 F.4th at 945. This Court, relying on *Dine Citizens*, concluded that the interests of the Bureau of Reclamation and the tribes were "not so aligned as to make Reclamation an adequate representative"

of the tribes. *Id.* at 944; *see also id.* at 945 ("Reclamation and the Tribes share an interest in the ultimate outcome of this case for very different reasons.").

*Klamath* differs from this case for the same reasons as *Dine Citizens*: rather than dividing the federal government's loyalty, IGRA expressly conditions the Secretary's approval of a tribal-state compact on satisfaction of "the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B)(iii). While the government in *Klamath* happened to land in the same place as the tribes, it did so for "very different reasons." 48 F.4th at 945. Here, by contrast, the federal defendants and the Tribe seek the same outcome for the same reasons: they believe that Washington's compacts are lawful, and they believe that the compacts benefit the tribes. So here, unlike in *Klamath*, there is no reason to doubt that the federal government will "make all of the same arguments that the Tribe[] would make" to defend the compacts. 48 F.4th at 945.[11]

---

[11] In any event, the United States' motivations need not be identical to the tribes'. *See Statewide Masonry v. Anderson*, 511 F. App'x 801, 806 (10th Cir. 2013) (presumption of adequate representation "applies if [the parties] have a common objective with respect to the suit; their motivations for pursuing that common objective are immaterial").

The Tribe's extreme position in this case would effectively immunize all manner of federal agency action from judicial review where an Indian tribe (or another sovereign) claims an interest in the outcome. *Dine Citizens* and *Klamath*, however, do not stretch Rule 19 this far. Indeed, the United States has repeatedly taken the position that it "is generally the only required and indispensable defendant in APA litigation challenging federal agency action." ER-26; *see also*, *e.g.*, Federal Defendants' Response to Seminole Tribe of Florida's Motion to Dismiss 8–10, *W. Flagler*, 2021 WL 8344054. Other circuits have followed that approach. *See*, *e.g.*, *Kansas v. United States*, 249 F.3d 1213, 1226–27 (10th Cir. 2001); *Ramah Navajo Sch. Bd.*, 87 F.3d at 1350–52 (D.C. Cir.); *Thomas v. United States*, 189 F.3d 662, 667–68 (7th Cir. 1999). Based on that general rule, the United States maintains that *Dine Citizens* was wrongly decided. ER-26. But this Court need not abrogate that case to conclude that the United States is an adequate representative in this case. *Dine Citizens* and *Klamath* hold only that the federal government's presence is not enough where the statutes at issue implicate competing interests and there are tribal interests on both sides of the issue. The Tribe asks this Court to expand those cases to cover a statute that expressly aligns

the federal defendants' interests with the Tribe's and a case in which tribal interests are unified. This Court should decline the invitation. Rather, particularly in light of the long history in this Circuit of finding the United States to be an adequate representative of tribal interests and of allowing challenges to tribal-state compacts under IGRA, the Court should "reconcile" its decisions by interpreting *Dine Citizens* and *Klamath* not to preclude judicial review in this case, *Danielson*, 945 F.3d at 1099 (internal quotation marks omitted).

### 2. One Of Maverick's Claims Does Not Implicate The Tribe's Compact At All.

Even if the federal defendants were not adequate representatives, Maverick's third claim would still be able to proceed because it poses no threat to any tribal interest.

Required-party status under Rule 19(a) must be assessed on a claim-by-claim basis. *See*, *e.g.*, *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1068 (9th Cir. 2010) ("Of course, the United States may be necessary as to some claims and not others."); *Alto*, 738 F.3d at 1129–31; *Makah*, 910 F.2d at 559. The first two claims in Maverick's complaint challenge (1) the Secretary's approval of Washington's sports-betting compacts and (2) the state officials' execution and administration of the

47

tribal-state compacts (the original ones and the sports-betting amendments). ER-116–20. Those two claims seek declarations that the Tribe's compact is unlawful. *Id.* But Maverick's third claim does not challenge any compacts; instead, Maverick alleges that the state defendants' enforcement of Washington's criminal gaming prohibitions against Maverick violates the Constitution's equal-protection principles. And the only relief Maverick seeks (other than nominal damages, costs, and attorneys' fees) is a declaration that the "continued enforcement of Washington's criminal laws prohibiting class III gaming—including roulette, craps, and sports betting—violates the Constitution's guarantee of equal protection, and an injunction prohibiting the [state officials] from enforcing those laws against Maverick." ER-122. Because that relief does not threaten the Tribe's compact or its gaming activities at all, the Tribe cannot possibly have a "legally protectable interest" in this claim. *Jamul Action Comm. v. Chaudhuri*, 200 F. Supp. 3d 1042, 1052 (E.D. Cal. 2016).

## B. The Tribe's Joinder Is Not Required To Accord Complete Relief.

The Tribe contended below that "complete relief is not available where the absent party is a tribe that is a signatory to the agreement at issue because the judgment would not be binding on the tribe, which

48

could assert its rights under the agreement." ER-51; *see* Fed. R. Civ. P. 19(a)(1)(A).  The district court never addressed this backup argument, and it is meritless.

"To be 'complete,' relief must be 'meaningful relief *as between the parties*.'"  *Alto*, 738 F.3d at 1126 (citation omitted).  Where a party challenges federal agency action, an order vacating that action "is 'meaningful' as between the [party] and the [agency], even if it does not bind the Tribe directly."  *Id.*  "[C]omplete relief—that is, relief limited to that available in an APA cause of action, which is affirmation, reversal or remand of the agency action—can be provided between the parties."  *Id.* at 1127; *see also Sac & Fox Nation*, 240 F.3d at 1258.  As this Court has explained, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated" across the board. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (internal quotation marks omitted; alteration in original).  The same goes for Maverick's challenge to the state officials' execution and administration of the compacts—an order declaring those actions unlawful would be meaningful as between Maverick and the state defendants, even if the Tribe were not bound directly.

49

The Tribe also suggested below that it could continue to offer class III gaming *even without a valid compact*. ER-15 (quoting Tribe's argument that it has "inherent authority to govern gaming activities on its Indian lands [that] predates IGRA and colonization"). That position is wrong as a matter of law: "Class III gaming is permitted on Indian lands only if, *inter alia*, a tribe and the state enter a tribal-state compact that the Secretary of the Interior then approves." *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022); *see also*, *e.g.*, 25 U.S.C. § 2710(d)(6) (waiving federal ban on gambling devices only for "gaming conducted under a Tribal-State compact that . . . is in effect"); 18 U.S.C. § 1166(c)(2) (extending state gambling prohibitions to Indian lands, but excepting "class III gaming conducted under a Tribal-State compact . . . that is in effect"); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1552 (10th Cir. 1997). And, regardless, any actions the Tribe might take *after* Maverick obtains a favorable ruling would not vitiate the "meaningful relief *as between the parties*" that Maverick can obtain in this suit. *Alto*, 738 F.3d at 1126 (internal quotation marks omitted). A ruling in favor of Maverick would make the compacts no longer "in

effect," rendering the Tribe's class III gaming illegal under federal and state law and curing the violations alleged in Maverick's complaint.

## II. This Action Should Proceed In The Tribe's Absence Under Rule 19(b).

Even if the Tribe were a required party, Rule 19(b) provides a safety valve to avoid dismissal in cases where it would be unjust: a court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). If the Tribe chooses not to participate in this litigation, then the case can and should proceed without it.

### A. All Four Rule 19(b) Factors Counsel Against Dismissal.

Rule 19(b) directs courts to consider four factors when deciding whether to dismiss a case: (1) "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties"; (2) "the extent to which any prejudice could be lessened or avoided"; (3) "whether a judgment rendered in the person's absence would be adequate"; and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b). All four of those factors tilt decisively in favor of allowing this suit to proceed.

51

*(1) Prejudice.* "The first Rule 19(b) factor asks whether a party might suffer prejudice not simply from an adverse result, but specifically from the decision being 'rendered in [its] absence.'" *De Csepel v. Republic of Hungary*, 27 F.4th 736, 748 (D.C. Cir. 2022) (alteration in original); *see also W. Flagler*, 573 F. Supp. 3d at 270–71. That is why "[f]inding that other existing parties may adequately represent the absentee's interests may demonstrate a lack of prejudice"—a proposition that would make little sense if the relevant "prejudice" is an adverse decision, but good sense if the relevant "prejudice" is a party's ability to have its views fairly presented to the court. 7 Wright & Miller, Fed. Prac. & Proc. § 1608. There is no such prejudice here: again, the Tribe has not identified *any difference* in how this litigation would unfold whether it participated or not. There is no discovery—much less discovery that the Tribe would be uniquely situated to offer. And the Tribe has not even hypothesized any merits argument it would make that the federal defendants would not. *See W. Flagler*, 573 F. Supp. 3d at 271 ("[T]he Tribe's absence is not prejudicial because both the Secretary and the State of Florida have defended the Compact on its merits.").

52

The district found that the first factor favored dismissal because "[i]f Maverick were to prevail in seeking to invalidate the tribal compacts, the prejudice to Shoalwater would be substantial." ER-17. But that misconceives the question that the first factor asks: the question is not whether *the result* of this suit could be adverse for the Tribe, but whether *proceeding without the Tribe* is itself prejudicial. *De Csepel*, 27 F.4th at 748; *W. Flagler*, 573 F. Supp. 3d at 270–71. The district court erred in focusing on the effect of an adverse result itself. The Tribe would not be prejudiced by a decision rendered in its absence because both the state and the federal defendants are zealously defending the legality of the compacts.

**(2) Extent to which prejudice could be lessened or avoided.** Given the lack of prejudice, this factor does not favor dismissal because "[t]he ability to minimize prejudice . . . bears on indispensability only when there is prejudice to be minimized." *W. Flagler*, 573 F. Supp. 3d at 271. And even if there were any prejudice, it could easily be avoided by allowing the Tribe to participate as an *amicus* in the case. As a number of other non-party tribes did below, the Tribe "could have provided the Court with arguments as to [its] interests without jeopardizing sovereign

immunity by appearing as amic[us] curiae." *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 266 (6th Cir. 2009) (en banc); *see also Thomas*, 189 F.3d at 669. Because there is no discovery in this case, allowing the Tribe to advance its legal arguments as an *amicus* would fully redress any prejudice that its absence could cause.

The district court's analysis of this factor fell into the same error as its analysis of the first factor. The court stated that Maverick's challenge to the compacts "threatens not only tribal revenue and contracts, but also tribal and non-tribal employment and other businesses," and concluded that "relief cannot be tailored to lessen the prejudice faced by Shoalwater or other absent tribes." ER-18. But, again, the focus must be on whether *the Tribe's absence from the litigation* is prejudicial, not whether the end result could adversely affect the Tribe.

The district court's analysis was also wrong on its own terms. As explained above, *see supra* at 47–48, Maverick's equal-protection claim could be remedied by an order enjoining the state defendants from enforcing Washington's criminal laws against Maverick, without affecting any of the Tribe's gaming activities. *See* ER-122, -124 (requesting this

54

relief); Fed. R. Civ. P. 19(b)(2)(B) (asking whether prejudice could be avoided by "shaping the relief").

**(3) *Adequacy of judgment.*** Whether or not the Tribe participates in this case, Maverick can obtain all of the relief requested in its complaint through a judgment against the federal and state defendants who executed, approved, and administered the tribal-state compacts. *See supra* at 48–51. Because *complete* relief against the federal and state defendants is available, it necessarily follows that a judgment in favor of Maverick would be *adequate*.

The district court sidestepped this issue. It stated that, "[t]o afford Maverick the relief it seeks, the Court would not only have to find that tribal gaming violates IGRA and the Equal Protection Clause, but also that the State's criminal laws prohibiting Class III gaming are unconstitutional." ER-18. It then concluded that, "assuming the Court determined the Washington law permitting sports betting at tribal operated casinos was unconstitutional, the proper remedy would be to strike the provision, not extend intrusive injunctive relief" prohibiting Washington from enforcing its criminal laws against Maverick. *Id.*

The district court was wrong. Maverick has challenged the Secretary's approvals of the IGRA compacts under the APA, and if it prevails, its injuries will be fully redressed if the court issues the "ordinary" relief for such cases by "vacat[ing]" those approvals. *E. Bay Sanctuary Covenant*, 993 F.3d at 681 (internal quotation marks omitted). That relief would be complete, adequate, and entirely typical.

But even if the district court were inclined instead to "strike" the law authorizing tribal sports betting, it offered no explanation for why that relief would not be adequate. It clearly would: "[W]hen the right invoked is that of equal treatment, the appropriate remedy is a mandate of *equal* treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler v. Mathews*, 465 U.S. 728, 740 (1984) (internal quotation marks omitted); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 76 (2017) (adopting the former remedy).

The district court's analysis fails even on its own terms. If the district court were correct that a remedy invalidating the compacts would render the Tribe indispensable and require dismissal under Rule 19, then that fact itself would weigh in favor of a remedy that allowed Maverick

56

to offer class III games (and left the compacts intact). The district court's cursory forecast that such a remedy would be unavailable was based on its severability analysis. ER-18–19. But a court's choice between "withdrawal of benefits from the favored class" and "extension of benefits to the excluded class," *Heckler*, 465 U.S. at 740, must account for any legal impediments to one of those options, *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2354 (2020) (plurality) (noting that "some equal-treatment cases can raise complex questions about whether it is appropriate to extend benefits or burdens," such as "due process, fair notice, or other independent constitutional barriers"). Thus, if the district court were correct that Rule 19 foreclosed a remedy that would invalidate the compacts, that fact should have steered it toward a remedy that extended benefits to Maverick instead of withdrawing benefits from the Tribe. Indeed, Rule 19 "places the court under an obligation to seek out an alternative to dismissing the action, especially when it appears unlikely that plaintiff will be able to join all of the interested parties in an equally satisfactory forum." 7 Wright & Miller, Fed. Prac. & Proc. § 1608. The court erred in ignoring this obligation.

**(4) *Lack of alternative remedies.*** Under the Tribe's theory, there is *no* available forum to challenge the federal agency action approving the compacts or Washington state's tribal gaming monopoly—no matter whether the Secretary violated IGRA or the APA or the U.S. Constitution, and no matter whether Washington's regime unconstitutionally discriminates on the basis of race. As the district court acknowledged, ER-19, that withdrawal of judicial review weighs against dismissal. And as this Court has warned, when dismissal would deny the plaintiff any judicial forum to hear its claims, courts "should be extra cautious before dismissing the suit." *Makah*, 910 F.2d at 560 (internal quotation marks and emphasis omitted). That warning takes on even greater force here, given the "strong presumption favoring judicial review of administrative action." *Salinas v. U.S. Rr. Ret. Bd.*, 141 S. Ct. 691, 698 (2021) (internal quotation marks omitted).[12]

---

[12] The Tribe contended below that Maverick could lobby Congress or the Washington legislature to amend the law in its favor, or ask the government to bring an enforcement action against the Tribe. ER-40, -54. But the Rule 19(b) inquiry addresses the lack of an "alternate forum in which *to sue.*" *Dine Citizens*, 932 F.3d at 858 (emphasis added). The Tribe's argument also makes no sense: the entire basis of Maverick's lawsuit is that the law as it currently stands *already* entitles Maverick to relief.

58

The district court also relied on this Court's statement that "[t]he balancing of equitable factors under Rule 19(b) almost always favors dismissal when a tribe cannot be joined due to tribal sovereign immunity." ER-19 (quoting *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021)). But if Rule 19(b) does not allow this case to proceed without the Tribe, then it would not allow *any* case involving an absent sovereign to proceed: every factor weighs against dismissal, and the Tribe is unable to explain how it would add anything to this litigation other than to abruptly halt it. This Court has expressly rejected such a *per se* rule. *See Dine Citizens*, 932 F.3d at 857 (quoting *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1025 (9th Cir. 2002), for the proposition that "we have continued to follow the four-factor process even with immune tribes"). For good reason: a rule like that would be inconsistent with the Supreme Court's approach of extensively examining all four Rule 19(b) factors even after concluding that an absent sovereign was required but could not be joined. *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 865–72 (2008). If sovereign immunity were dispositive (or nearly dispositive), as the district court assumed, there would be no need to conduct an in-depth analysis of the Rule 19(b) factors in immunity

cases.  But the Supreme Court has explained that the "design of the Rule . . . indicates that the determination whether to proceed will turn upon factors that are case specific"; there is no *per se* rule.  *Id.* at 862–63.

Other courts, too, have refused to dismiss cases under Rule 19 despite the absence of an immune sovereign.  *De Csepel*, 27 F.4th at 746–49 (while Hungary was a required party with sovereign immunity, suit could proceed without it because its "interests [were] so aligned with those of the remaining defendants that their participation in the litigation protects Hungary against potential prejudice").  And given the circumstances here—where the complaint presents purely legal questions teed up for decision on the papers, and the Tribe identifies no arguments it would advance in defense of the compacts that the federal defendants would neglect—the Tribe cannot win under Rule 19(b) with anything less than a *per se* rule.

### B.    The Public-Rights Exception Applies.

Even if Rule 19(b) counseled in favor of dismissal, the district court's ruling would still be wrong because the public-rights exception applies here.

The Supreme Court has recognized an exception to traditional joinder rules in cases "narrowly restricted to the protection and enforcement of public rights." *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 363 (1940). In those cases, "there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Id.* In applying the public-rights exception, this Court has recognized "the potential danger of expanding joinder requirements in the public rights area," which could "sound[] the death knell for any judicial review of executive decisionmaking." *Conner v. Burford*, 848 F.2d 1441, 1460 (9th Cir. 1988).

This Court has applied the public-rights exception where two conditions are met: "the litigation must transcend the private interests of the litigants and seek to vindicate a public right," and "although the litigation may adversely affect the absent parties' interests, the litigation must not 'destroy the legal entitlements of the absent parties.'" *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) (quoting *Conner*, 848 F.2d at 1459).

A lawsuit seeking to enforce governmental compliance with administrative and constitutional law is a classic example of public-rights

litigation. *See Shermoen*, 982 F.2d at 1319 (the "interest in being governed by constitutional laws" and the "interest in an administrative process that is lawful" are public rights (internal quotation marks omitted)). This is no mere tort or contract suit; it is about more than just the "adjudication of private rights." *Nat'l Licorice*, 309 U.S. at 362.[13]

The district court refused to apply the public-rights exception, however, because it concluded that "Maverick seeks to invalidate tribal gaming compacts, an acknowledged legal entitlement." ER-20. That analysis misconceives the "legal entitlements" that this Court and others have found sufficient to forestall application of the public-rights exception. In

---

[13] The district court suggested in a footnote that it was "not convinced this litigation is brought in the public interest" because "invalidation of the tribal compacts would 'increas[e] Maverick's commercial revenue.'" ER-20 n.2 (alteration in original). But the public-rights exception turns on the nature of the right at issue, not whether resolution of the case might benefit the party bringing it. *See Nat'l Licorice*, 309 U.S. at 362 (suit affected private contracts, but was "not for the adjudication of private rights"); *cf. S. Utah Wilderness All. v. Kempthorne*, 525 F.3d 966, 970 (10th Cir. 2008) ("[F]rom a broader perspective the private interests the district court's judgment incidentally affects are not unlike the myriad of private interests affected when the protection of public lands is at stake."). Indeed, the district court's logic would paradoxically foreclose the public-rights exception for any litigant who has standing to bring the suit in the first place. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (injury "must be both concrete *and* particularized" to seek redress for statutory violations).

those cases, tribes held agreements conferring *private legal entitle-ments—i.e.*, private rights—that the court sought not to "destroy." *See*, *e.g.*, *Dine Citizens*, 932 F.3d at 860 ("leases and rights-of-way" held by utility companies); *Kescoli*, 101 F.3d at 1311–12 ("lease agreements" held by coal company); *Shermoen*, 982 F.2d at 1316, 1319 (federal law parti-tioning reservation land and distributing funds from timber revenues). That accords with *National Licorice*, where the Supreme Court noted that, despite the NLRB's finding that an employer unlawfully procured certain contracts with its employees, the absent employees remained "free to assert such legal rights as they may have acquired under their contracts." 309 U.S. at 366.

Tribal-state compacts are fundamentally different: they do not con-fer private legal entitlements, but rather set the balance of public regu-latory authority among sovereigns. "Congress passed IGRA in response to *Cabazon*"—which "held that California lacked the federal statutory authority required to regulate bingo halls on tribal lands"—and sought to "strike a delicate balance between the sovereignty of states and feder-ally recognized Native American tribes." *Chicken Ranch*, 42 F.4th at 1031 (internal quotation marks omitted). IGRA thus "created a statutory

basis for regulating these gaming activities" via a system of "cooperative federalism" that was meant "to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." *Id.* at 1031–32 (internal quotation marks omitted).

In *American Greyhound Racing*, this Court declined to apply the public-rights exception in a case involving tribal-state gaming compacts. But the basis for that decision was not merely that the suit would "destroy" a private legal entitlement, but that the suit was not truly public in nature: this Court concluded that "the rights in issue between the plaintiffs in this case, the tribes and the state are more private than public," because the plaintiffs' "interest is in freeing themselves from the competition of Indian gaming, not in establishing for all the principle of separation of powers." 305 F.3d at 1026. The Supreme Court has since rejected, however, artificial distinctions between individual interests predicated on separation-of-powers principles and those principles themselves. *See Bond v. United States*, 564 U.S. 211, 222 (2011). And the claims here challenge federal agency action under the APA, the Constitution, and a federal statute (IGRA) that allocates regulatory authority

among sovereigns—all paradigmatic fonts of public-rights litigation. *See Shermoen*, 982 F.2d at 1319. The challenge to federal agency action distinguishes this case from *American Greyhound Racing*, and any broader reading of that case would contradict *Bond*, *National Licorice*, and this Court's other public-rights cases.

Tribal-state compacts establish a "regulatory scheme" by "prescrib[ing] rules for operating gaming, allocat[ing] law enforcement authority between the tribe and State, and provid[ing] remedies for breach of the agreement's terms." *Chicken Ranch*, 42 F.4th at 1032 (internal quotation marks omitted). Unlike agreements conferring private entitlements, a compact between a State and a tribe (subject to approval by the federal government) that sets the balance of regulatory authority among sovereigns is a quintessential matter of *public* rights. Indeed, courts have rightly distinguished challenges to tribal-state compacts from run-of-the-mill contract cases. *See Pueblo of Sandia v. Babbitt*, 47 F. Supp. 2d 49, 53 (D.D.C. 1999) (challenge to tribal-state compact "is not an ordinary contracts case" and "does not lie in contract"); *Citizens Against Casino Gambling*, 471 F. Supp. 2d at 314 & n.12 (similar). And when such a compact violates federal administrative, statutory, and constitutional

law, a suit challenging it on those grounds is not one aimed at *private* legal entitlements.  The public-rights exception applies in full force.

## III.  The Tribe Can Be Joined Because It Waived Its Tribal Immunity By Intervening In This Suit.

"[F]ederal courts disagree on whether a sovereign may intervene in an action while preserving its sovereign immunity."  *W. Flagler*, 573 F. Supp. 3d at 269.  As the Supreme Court has explained, generally "a State's voluntary appearance in federal court amount[s] to a waiver of its Eleventh Amendment immunity."  *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002); *see also*, *e.g.*, *Pettigrew v. Oklahoma ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1213 (10th Cir. 2013) ("moving to intervene in federal-court litigation" waives sovereign immunity); *Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 463 (7th Cir. 2011) (same).  The same goes for Indian tribes: the waiver doctrine is designed to avoid the "seriously unfair results" that flow from allowing a sovereign to inject itself into a case and then assert that the court has no power over it.  *Lapides*, 535 U.S. at 619.  That is why this Court and others have concluded that intervening in a case constitutes consent to the court's jurisdiction.  *See*, *e.g.*, *United States v. Oregon*, 657 F.2d 1009, 1014 (9th Cir. 1981) (holding that "the Tribe's

66

intervention constitutes consent"); *In re Greektown Holdings, LLC*, 917 F.3d 451, 464 (6th Cir. 2019) (noting that "two circuits have held that intervening in a lawsuit constitutes waiver" and concluding that "*[l]ike intervention*, . . . filing a lawsuit manifests a clear intent to waive tribal sovereign immunity" (emphasis added)), *abrogated on other grounds by Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689 (2023); *Wichita & Affiliated Tribes*, 788 F.2d at 773 (tribes' "voluntary intervention as party defendants was an express waiver of their right not to be joined"); *cf. Gradel v. Piranha Cap., L.P.*, 495 F.3d 729, 731 (7th Cir. 2007) (party who intervened "submitted himself to the jurisdiction of the court"); *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1248 (11th Cir. 2006) ("by filing a successful motion to intervene, [party] acquiesced to [personal] jurisdiction"). While this Court has affirmed dismissal in cases where an Indian tribe intervened to assert a Rule 19 immunity-based defense, *see*, *e.g.*, *Klamath*, 48 F.4th at 938; *Dine Citizens*, 932 F.3d at 847–48, those cases did not consider waiver.

Here, Maverick sued various federal and state officials for their actions in violation of federal law. ER-84–126. Despite knowing of the

lawsuit from the day it was filed, the Tribe waited to enter the case until it was transferred to this Circuit, and then filed a motion to intervene both permissively and as of right. The Tribe's presence in this case adds nothing of substance to the litigation: no new facts (there is no discovery in this case) and no new arguments (the Tribe has not even hypothesized any merits argument that it would make that the federal government would not). The *only* intent of the Tribe's strategically timed intervention is to short-circuit the litigation entirely by denying Maverick a forum to assert its claims against the federal and state defendants. That is precisely the sort of unfairness the waiver doctrine works to avoid.

**CONCLUSION**

This Court should reverse and remand for the district court to consider Maverick's claims on the merits.

Dated: July 3, 2023                    Respectfully submitted,

> /s/ Theodore B. Olson
> THEODORE B. OLSON
> MATTHEW D. MCGILL
> LOCHLAN F. SHELFER
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, DC 20036
>
> *Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35136

I am the attorney or self-represented party.

**This brief contains** | 13,960 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Theodore B. Olson | **Date** | July 3, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

# CONSTITUTIONAL, STATUTORY, AND RULES ADDENDUM

**Constitutional Provisions** ............................................................. Add.2

U.S. Const. amend. V ..................................................................... Add.2

U.S. Const. amend. X ..................................................................... Add.2

U.S. Const. amend. XIV, § 1 .......................................................... Add.2

**Statutory Provisions** ................................................................... Add.2

25 U.S.C. § 2701............................................................................. Add.2

25 U.S.C. § 2702............................................................................. Add.3

25 U.S.C. § 2710(d) ........................................................................ Add.4

Wash. Rev. Code § 9.46.0269 ....................................................... Add.11

Wash. Rev. Code § 9.46.0364 ....................................................... Add.12

Wash. Rev. Code § 9.46.220 ......................................................... Add.12

Wash. Rev. Code § 9.46.221 ......................................................... Add.13

Wash. Rev. Code § 9.46.222 ......................................................... Add.14

**Rules**............................................................................................ Add.15

Fed. R. Civ. P. 12(b)....................................................................... Add.15

Fed. R. Civ. P. 19 ........................................................................... Add.15

## Constitutional Provisions

U.S. Const. amend. V.

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. X.

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

U.S. Const. amend. XIV, § 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## Statutory Provisions

25 U.S.C. § 2701. Findings.

The Congress finds that—

(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

Add.2

(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

25 U.S.C. § 2702.  Declaration of policy.

The purpose of this chapter is—

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

Add.3

25 U.S.C. § 2710.  Tribal gaming ordinances.

(d) Class III gaming activities; authorization; revocation; Tribal-State compact

(1) Class III gaming activities shall be lawful on Indian lands only if such activities are—

(A) authorized by an ordinance or resolution that—

(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

(ii) meets the requirements of subsection (b), and

(iii) is approved by the Chairman,

(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

(2)(A) If any Indian tribe proposes to engage in, or to authorize any person or entity to engage in, a class III gaming activity on Indian lands of the Indian tribe, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution that meets the requirements of subsection (b).

(B) The Chairman shall approve any ordinance or resolution described in subparagraph (A), unless the Chairman specifically determines that—

(i) the ordinance or resolution was not adopted in compliance with the governing documents of the Indian tribe, or

Add.4

(ii) the tribal governing body was significantly and unduly influenced in the adoption of such ordinance or resolution by any person identified in section 2711(e)(1)(D) of this title.

Upon the approval of such an ordinance or resolution, the Chairman shall publish in the Federal Register such ordinance or resolution and the order of approval.

(C) Effective with the publication under subparagraph (B) of an ordinance or resolution adopted by the governing body of an Indian tribe that has been approved by the Chairman under subparagraph (B), class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact entered into under paragraph (3) by the Indian tribe that is in effect.

(D)(i) The governing body of an Indian tribe, in its sole discretion and without the approval of the Chairman, may adopt an ordinance or resolution revoking any prior ordinance or resolution that authorized class III gaming on the Indian lands of the Indian tribe. Such revocation shall render class III gaming illegal on the Indian lands of such Indian tribe.

(ii) The Indian tribe shall submit any revocation ordinance or resolution described in clause (i) to the Chairman. The Chairman shall publish such ordinance or resolution in the Federal Register and the revocation provided by such ordinance or resolution shall take effect on the date of such publication.

(iii) Notwithstanding any other provision of this subsection—

(I) any person or entity operating a class III gaming activity pursuant to this paragraph on the date on which an ordinance or resolution described in clause (i) that revokes authorization for such class III gaming activity is published in the Federal Register may, during the 1-year period beginning on the date on which such revocation ordinance or resolution is published under clause (ii), continue to operate such activity in

Add.5

conformance with the Tribal-State compact entered into under paragraph (3) that is in effect, and

(II) any civil action that arises before, and any crime that is committed before, the close of such 1-year period shall not be affected by such revocation ordinance or resolution.

(3)(A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

(B) Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.

(C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

Add.6

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

(4) Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment.

(5) Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal-State compact entered into by the Indian tribe under paragraph (3) that is in effect.

(6) The provisions of section 1175 of Title 15 shall not apply to any gaming conducted under a Tribal-State compact that—

(A) is entered into under paragraph (3) by a State in which gambling devices are legal, and

(B) is in effect.

(7)(A) The United States district courts shall have jurisdiction over—

(i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) or to conduct such negotiations in good faith,

(ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect, and

(iii) any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).

(B)(i) An Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).

(ii) In any action described in subparagraph (A)(i), upon the introduction of evidence by an Indian tribe that—

(I) a Tribal-State compact has not been entered into under paragraph (3), and

(II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith,

the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.

(iii) If, in any action described in subparagraph (A)(i), the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of gaming activities, the court shall order the State and

Add.8

the Indian Tribe to conclude such a compact within a 60-day period. In determining in such an action whether a State has negotiated in good faith, the court—

(I) may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and

(II) shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

(iv) If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian tribe within the 60-day period provided in the order of a court issued under clause (iii), the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. The mediator shall select from the two proposed compacts the one which best comports with the terms of this chapter and any other applicable Federal law and with the findings and order of the court.

(v) The mediator appointed by the court under clause (iv) shall submit to the State and the Indian tribe the compact selected by the mediator under clause (iv).

(vi) If a State consents to a proposed compact during the 60-day period beginning on the date on which the proposed compact is submitted by the mediator to the State under clause (v), the proposed compact shall be treated as a Tribal-State compact entered into under paragraph (3).

(vii) If the State does not consent during the 60-day period described in clause (vi) to a proposed compact submitted by a mediator under clause (v), the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures—

(I) which are consistent with the proposed compact selected by the mediator under clause (iv), the provisions of this chapter, and the relevant provisions of the laws of the State, and

(II) under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction.

(8)(A) The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe.

(B) The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates—

(i) any provision of this chapter,

(ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or

(iii) the trust obligations of the United States to Indians.

(C) If the Secretary does not approve or disapprove a compact described in subparagraph (A) before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter.

(D) The Secretary shall publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved, under this paragraph.

(9) An Indian tribe may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman. The Chairman's review and approval of such contract shall be governed by the provisions of subsections (b), (c), (d), (f), (g), and (h) of section 2711 of this title.

Wash. Rev. Code § 9.46.0269. "Professional gambling."

(1) A person is engaged in "professional gambling" for the purposes of this chapter when:

(a) Acting other than as a player or in the manner authorized by this chapter, the person knowingly engages in conduct which materially aids any form of gambling activity; or

(b) Acting other than in a manner authorized by this chapter, the person pays a fee to participate in a card game, contest of chance, lottery, or other gambling activity; or

(c) Acting other than as a player or in the manner authorized by this chapter, the person knowingly accepts or receives money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of gambling activity; or

(d) The person engages in bookmaking; or

(e) The person conducts a lottery; or

(f) The person violates RCW 9.46.039.

(2) Conduct under subsection (1)(a) of this section, except as exempted under this chapter, includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation. If a person having substantial proprietary or other authoritative control over any premises shall permit the premises to be used with the person's knowledge for the purpose of conducting gambling activity other than gambling activities authorized by this chapter, and acting

other than as a player, and the person permits such to occur or continue or makes no effort to prevent its occurrence or continuation, the person shall be considered as being engaged in professional gambling: PROVIDED, That the proprietor of a bowling establishment who awards prizes obtained from player contributions, to players successfully knocking down pins upon the contingency of identifiable pins being placed in a specified position or combination of positions, as designated by the posted rules of the bowling establishment, where the proprietor does not participate in the proceeds of the "prize fund" shall not be construed to be engaging in "professional gambling" within the meaning of this chapter: PROVIDED FURTHER, That the books and records of the games shall be open to public inspection.

Wash. Rev. Code § 9.46.0364.  Sports wagering authorized.

(1) Upon the request of a federally recognized Indian tribe or tribes in the state of Washington, the tribe's class III gaming compact may be amended pursuant to the Indian gaming regulatory act, 25 U.S.C. Sec. 2701 et seq., and RCW 9.46.360 to authorize the tribe to conduct and operate sports wagering on its Indian lands, provided the amendment addresses: Licensing; fees associated with the gambling commission's regulation of sports wagering; how sports wagering will be conducted, operated, and regulated; issues related to criminal enforcement, including money laundering, sport integrity, and information sharing between the commission and the tribe related to such enforcement; and responsible and problem gambling. Sports wagering conducted pursuant to the gaming compact is a gambling activity authorized by this chapter.

(2) Sports wagering conducted pursuant to the provisions of a class III gaming compact entered into by a tribe and the state pursuant to RCW 9.46.360 is authorized bookmaking and is not subject to civil or criminal penalties pursuant to RCW 9.46.225.

Wash. Rev. Code § 9.46.220.  Professional gambling in the first degree.

(1) A person is guilty of professional gambling in the first degree if he or she engages in, or knowingly causes, aids, abets, or conspires with another to engage in professional gambling as defined in this chapter, and:

(a) Acts in concert with or conspires with five or more people;

(b) Personally accepts wagers exceeding five thousand dollars during any thirty-day period on future contingent events;

(c) The operation for whom the person works, or with which the person is involved, accepts wagers exceeding five thousand dollars during any thirty-day period on future contingent events;

(d) Operates, manages, or profits from the operation of a premises or location where persons are charged a fee to participate in card games, lotteries, or other gambling activities that are not authorized by this chapter or licensed by the commission; or

(e) Engages in bookmaking as defined in RCW 9.46.0213.

(2) However, this section shall not apply to those activities enumerated in RCW 9.46.0305 through 9.46.0361 or to any act or acts in furtherance of such activities when conducted in compliance with the provisions of this chapter and in accordance with the rules adopted pursuant to this chapter.

(3) Professional gambling in the first degree is a class B felony subject to the penalty set forth in RCW 9A.20.021.

Wash. Rev. Code § 9.46.221. Professional gambling in the second degree.

(1) A person is guilty of professional gambling in the second degree if he or she engages in or knowingly causes, aids, abets, or conspires with another to engage in professional gambling as defined in this chapter, and:

(a) Acts in concert with or conspires with less than five people; or

(b) Accepts wagers exceeding two thousand dollars during any thirty-day period on future contingent events; or

Add.13

(c) The operation for whom the person works, or with which the person is involved, accepts wagers exceeding two thousand dollars during any thirty-day period on future contingent events; or

(d) Maintains a "gambling premises" as defined in this chapter; or

(e) Maintains gambling records as defined in RCW 9.46.0253.

(2) However, this section shall not apply to those activities enumerated in RCW 9.46.0305 through 9.46.0361 or to any act or acts in furtherance of such activities when conducted in compliance with the provisions of this chapter and in accordance with the rules adopted pursuant to this chapter.

(3) Professional gambling in the second degree is a class C felony subject to the penalty set forth in RCW 9A.20.021.

Wash. Rev. Code § 9.46.222.  Professional gambling in the third degree.

(1) A person is guilty of professional gambling in the third degree if he or she engages in, or knowingly causes, aids, abets, or conspires with another to engage in professional gambling as defined in this chapter, and:

(a) His or her conduct does not constitute first or second degree professional gambling;

(b) He or she operates any of the unlicensed gambling activities authorized by this chapter in a manner other than as prescribed by this chapter; or

(c) He or she is directly employed in but not managing or directing any gambling operation.

(2) This section shall not apply to those activities enumerated in RCW 9.46.0305 through 9.46.0361 or to any acts in furtherance of such activities when conducted in compliance with the provisions of this chapter and the rules adopted pursuant to this chapter.

Add.14

(3) Professional gambling in the third degree is a gross misdemeanor subject to the penalty established in RCW 9A.20.021.

## Rules

Fed. R. Civ. P. 12.

(b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

Fed. R. Civ. P. 19.

(a) Persons Required to Be Joined if Feasible.

Add.15

(1) *Required Party*. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) *Joinder by Court Order*. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

(3) *Venue*. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

(c) Pleading the Reasons for Nonjoinder. When asserting a claim for relief, a party must state:

(1) the name, if known, of any person who is required to be joined if feasible but is not joined; and

(2) the reasons for not joining that person.

(d) Exception for Class Actions. This rule is subject to Rule 23.