NO. 23-35136

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

MAVERICK GAMING LLC,

Appellant,

v.

UNITED STATES OF AMERICA, et al.,

Appellees,

SHOALWATER BAY TRIBE

Intervenor-Appellee.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
No. 3:22-CV-05325-DGE
The Honorable David G. Estudillo
United States District Court Judge

## STATE DEFENDANTS-APPELLEES' ANSWERING BRIEF

ROBERT W. FERGUSON
Attorney General of Washington
KRISTIN BENESKI
TERA HEINTZ
WILLIAM MCGINTY
BRIAN ROWE

*Counsel for State Defendants-Appellees*

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................1

II.  STATEMENT OF THE ISSUES ......................................3

III.  STATEMENT OF THE CASE ........................................3

    A.  Historical Background......................................................3

        1.  Washington's longstanding regulation of gambling..............3

        2.  *Cabazon Band* and the Indian Gaming Regulatory Act ........5

        3.  Tribal gaming in Washington post-IGRA ...........................9

    B.  Procedural Background ............................................13

IV.  SUMMARY OF THE ARGUMENT ..............................15

V.  ARGUMENT ..................................................................18

    A.  Standard of Review ................................................18

    B.  The Shoalwater Bay Tribe Is a Necessary Party......................19

        1.  Maverick's claims would impair the Shoalwater Bay Tribe's substantial interests in its gaming compact, gaming operations, and sovereign prerogatives...............................20

        2.  The federal defendants cannot adequately represent the interests of the Shoalwater Bay Tribe...................................23

    C.  The Shoalwater Bay Tribe Cannot Be Joined Due to Its Sovereign Immunity ................................................36

    D.  No Adequate Remedy Can Be Awarded in the Shoalwater Bay Tribe's Absence.........................................................39

VI.  CONCLUSION.............................................................47

# TABLE OF AUTHORITIES

## Cases

*Alto v. Black*
  738 F.3d 1111 (9th Cir. 2013) .................................................................. 24, 34

*Am. Greyhound Racing, Inc. v. Hull*
  305 F.3d 1015 (9th Cir. 2002) ..................................................... 20, 21, 22, 23

*Amador Cnty., Cal. v. Salazar*
  640 F.3d 373 (D.C. Cir. 2011) ......................................................................... 33

*Amador Cnty., Cal. v. U.S. Dep't of the Interior*
  772 F.3d 901 (D.C. Cir. 2014) ........................................................................ 34

*Arakaki v. Cayetano*
  324 F.3d 1078 (9th Cir. 2003) ........................................................................ 34

*Artichoke Joe's California Grand Casino v. Norton*
  353 F.3d 712 (9th Cir. 2003) ........................................................... 1, 7, 11, 33

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*
  140 S. Ct. 2335 (2020) ................................................................. 17, 41, 43, 44

*Bd. Of Regents of Univ. Of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*
  653 F.3d 448 (7th Cir. 2011) .......................................................................... 37

*Bond v. United States*
  564 U.S. 211 (2011) ....................................................................................... 22

*California v. Cabazon Band of Mission Indians*
  480 U.S. 202 (1987) ............................................................................... 5, 6, 38

*Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*
  471 F. Supp. 2d 295 (W.D.N.Y. 2007) .......................................................... 34

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*
  276 F.3d 1150 (9th Cir. 2002) ........................................................................ 39

*Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*
932 F.3d 843 (9th Cir. 2019) ................................................................. passim

*E.E.O.C. v. Peabody W. Coal Co.*
400 F.3d 774 (9th Cir. 2005) .................................................................. 18

*Friends of Amador Cnty. v. Salazar*
554 F. App'x 562 (9th Cir. 2014) ........................................................... 29

*Gradel v. Piranha Cap., L.P.*
495 F.3d 729 (7th Cir. 2007) .................................................................. 37

*Haaland v. Brackeen*
143 S. Ct. 1609 (2023) ...................................................................... 14, 38

*Heath v. Alabama*
474 U.S. 82 (1985) ............................................................................. 17, 40

*Heckler v. Mathews*
465 U.S. 728 (1984) ...................................................................... 17, 41, 45

*In re Bayshore Ford Trucks Sales, Inc.*
471 F.3d 1233 (11th Cir. 2006) ............................................................. 37

*In re Greektown Holdings, LLC*
917 F.3d 451 (6th Cir. 2019) *abrogated by Lac du Flambeau Band of
Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689 (2023 ......... 37

*Iowa–Des Moines Nat. Bank v. Bennett*
284 U.S. 239 (1931) ............................................................................... 45

*Jamul Action Comm. v. Chaudhuri*
200 F. Supp. 3d 1042 (E.D. Cal. 2016) ............................................ 45, 46

*Jamul Action Comm. v. Simermeyer*
974 F.3d 984 (9th Cir. 2020) ........................................................ 18, 36, 46

*Kescoli v. Babbitt*
101 F.3d 1304 (9th Cir. 1996) .............................................................. 22

*Klamath Irrigation Dist. v. United States Bureau of Reclamation*
    48 F.4th 934 (9th Cir. 2022) ................................................................... passim

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.*
    535 U.S. 613 (2002) ..................................................................... 36

*Lomayaktewa v. Hathaway*
    520 F.2d 1324 (9th Cir. 1975) ................................................. 15, 22

*Manygoats v. Kleppe*
    558 F.2d 556 (10th Cir. 1977) ................................................... 26

*McDonald v. Means*
    309 F.3d 530 (9th Cir. 2002) ...................................................... 34

*Miller v. Albright*
    523 U.S. 420 (1998) ................................................................ 44, 45

*Morton v. Mancari*
    417 U.S. 535 (1974) ...................................................................... 14

*Murphy v. Nat'l Collegiate Athletic Ass'n*
    138 S. Ct. 1461 (2018) ................................................................. 12

*Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*
    498 U.S. 505 (1991) ......................................................... 16, 36, 38

*Parravano v. Babbitt*
    70 F.3d 539 (9th Cir. 1995) ......................................................... 34

*Pettigrew v. Oklahoma ex rel. Oklahoma Dep't of Pub. Safety*
    722 F.3d 1209 (10th Cir. 2013) ................................................... 37

*Pit River Home & Agr. Co-op. Ass'n v. United States*
    30 F.3d 1088 (9th Cir. 1994) ....................................................... 29

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*
    87 F.3d 1338 (D.C. Cir. 1996) .................................................... 34

*Republic of Philippines v. Pimentel*
  553 U.S. 851 (2008) ...................................................................... 18

*Sac & Fox Nation of Missouri v. Norton*
  240 F.3d 1250 (10th Cir. 2001) .................................................... 34

*Seminole Nation of Oklahoma v. Norton*
  206 F.R.D. 1 (D.D.C. 2001) .......................................................... 34

*Sessions v. Morales-Santana*
  582 U.S. 47 (2017) ........................................................................ 44

*Shermoen v. United States*
  982 F.2d 1312 (9th Cir. 1992) ...................................................... 30

*Sw. Ctr. for Biological Diversity v. Babbitt*
  150 F.3d 1152 (9th Cir. 1998) ...................................................... 27

*United States v. Alpine Land & Reservoir Co.*
  431 F.2d 763 (9th Cir. 1970) ........................................................ 34

*United States v. City of Los Angeles, Cal.*
  288 F.3d 391 (9th Cir. 2002) ........................................................ 34

*United States v. James*
  980 F.2d 1314 (9th Cir. 1992) ...................................................... 35

*United States v. Robertson*
  895 F.3d 1206 (9th Cir. 2018) ...................................................... 18

*United States v. State of Or.*
  657 F.2d 1009 (9th Cir. 1981) ...................................................... 37

*Victim Rts. L. Ctr. v. Rosenfelt*
  988 F.3d 556 (1st Cir. 2021) ........................................................ 34

*W. Flagler Assocs., Ltd. v. Haaland*
  71 F.4th 1059 (D.C. Cir. 2023) ............................................... 32, 33

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation*
    439 U.S. 463 (1979) ........................................................................... 5

*Washington v. Daley*
    173 F.3d 1158 (9th Cir. 1999) ................................................... 31, 34

*West Flagler Assocs. v. Haaland*
    573 F. Supp. 3d 260 (D.D.C. 2021) ............................................... 32

*White v. Univ. of Cal.*
    765 F.3d 1010 (9th Cir. 2014) .................................................. 26, 29

*Wichita & Affiliated Tribes of Oklahoma v. Hodel*
    788 F.2d 765 (D.C. Cir. 1986) ................................................. 37, 38

*Ysleta del Sur Pueblo v. State of Tex.*
    36 F.3d 1325 (5th Cir. 1994) .......................................................... 6

## Constitutional Provisions

Wash. Const. art. II, § 24
    (as amended by Amendment 56, approved Nov. 7, 1972) ....................... 4, 42

Wash. Const. art. II, § 24 (1889) .................................................. 3, 42

## Statutes

25 U.S.C. § 2703(6) ........................................................................ 7

25 U.S.C. § 2703(6), (7), (8) ........................................................ 6

25 U.S.C. § 2703(7) ........................................................................ 7

25 U.S.C. § 2710(d) ................................................................. passim

Indian Gaming Regulatory Act
    PL 100–497 (S 555), PL 100–497, October 17, 1988, 102 Stat 2467 ........... 6

Public Law 280 .............................................................................. 5

vi

Wash. Laws of 2020, ch. 127 § 1 ................................................................ 12

Wash. Laws of 2020, ch. 127 § 2 ................................................................ 12

Wash. Rev. Code § 9.46.010 ...................................................................... 4

Wash. Rev. Code § 9.46.0364 .................................................................... 12

Wash. Rev. Code § 9.46.222 ...................................................................... 42

Wash. Rev. Code § 9.46.360 ...................................................................... 10

Wash. Rev. Code § 9.46 ............................................................................. 4

Wash. Rev. Code. §§ 9.46.0269, .220−.222 ............................................... 4

Wash. Rev. Code § 43.06.010 .................................................................... 10

## Other Authorities

H. Com. & Gaming 2638, 66th Leg., Reg. Sess. (Wash. 2020) ................... 42

S. Rep. 100−446 (1988) ........................................................................ 6, 9

## Rules

Fed. R. Civ. P. 19 ..................................................................................... 19

Fed. R. Civ. P. 19(a)(1) ............................................................................. 20

Fed. R. Civ. P. 19(a)(2)(i) .......................................................................... 21

Fed. R. Civ. P. 24(a)(2) ............................................................................. 30

## Treatises

Wright & Miller, 7C Fed. Prac. & Proc. § 1901 (3d ed.) ............................. 30

vii

## I.    INTRODUCTION

Maverick Gaming LLC, a private cardroom operator, has been lobbying the Washington legislature for years to legalize casino-style gambling and sports betting, which has been illegal on non-tribal lands in Washington since the State's inception. Having failed to persuade Washington's legislature, Maverick now seeks to bend the State to its political will by attacking Washington's tribal gaming compacts with 29 federally-recognized tribes, which permit gaming on tribal lands under the federal Indian Gaming Regulatory Act (IGRA). But while Maverick's lawsuit seeks to invalidate these gaming compacts and tear down the entire tribal–state–federal statutory and administrative structure governing gaming on tribal lands, Maverick's lawsuit does not name any of the affected Indian tribes as defendants.

Controlling Ninth Circuit precedent squarely forecloses Maverick's claims attacking the tribal–state gaming compacts in this case. *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003) (state law authorizing class III gaming exclusively on Indian lands by Indian tribes comported with IGRA and equal protection guarantees). But the merits are not at issue here because Maverick's complaint falters out of the gate for failing to name the Shoalwater Bay Indian Tribe as a necessary party under Federal Rule

1

of Civil Procedure 19. The district court—following what the Ninth Circuit has described as a "wall of circuit authority" requiring dismissal of lawsuits in which tribes have legally protectable interests at stake and are immune from suit— correctly found that the Shoalwater Bay Tribe was an indispensable party that cannot be joined due to its sovereign immunity. It correctly found that the case could not fairly proceed in the Tribe's absence.

Maverick does not dispute that its claims strike at the heart of the Shoalwater Bay Tribe's economic lifeblood and sovereignty, but argues that this case can proceed in the Tribe's absence because the federal government can adequately represent all of the Tribe's interests and positions in this case. Maverick's reliance on inapplicable federal rules, vacated and inapposite case law, and mischaracterizations of the law, however, only highlight the weaknesses in its argument. The district court followed a long line of Circuit precedent in concluding that the federal government cannot adequately represent a tribe where, as here, the federal government's obligation to follow potentially conflicting federal law creates a conflict with the tribe's interests; the federal government has no investment in the substantive "outcome" of this case (as opposed to defending its own administrative decision-making); and an adverse merits ruling by the district court could change the federal government's future

litigation position and plans. The district court acted well within such settled authority in exercising its discretion to dismiss Maverick's lawsuit, and its decision should be upheld.

## II.    STATEMENT OF THE ISSUES

1.    Whether the Shoalwater Bay Tribe is a necessary and indispensable party in a case challenging the Tribe's gaming compact with the State of Washington, and the state and federal statutory and administrative structure providing for the compact's negotiation.

2.    Whether the district court properly dismissed Maverick's lawsuit when the Shoalwater Bay Tribe could not be joined due to its sovereign immunity and the case could not equitably proceed without the Tribe.

## III.    STATEMENT OF THE CASE

### A.    Historical Background

#### 1.    Washington's longstanding regulation of gambling

Washington has strictly regulated gambling since its statehood in 1889. For eighty-three years, Washington's constitution prohibited *all* forms of gambling.   Wash. Const. art. II, § 24 (1889)   ("The legislature shall never authorize any lottery . . . ."). A constitutional amendment in 1972 authorized specific types of gambling if approved by a supermajority of the state legislature

or electorate. Wash. Const. art. II, § 24 (as amended by Amendment 56, approved Nov. 7, 1972) ("Lotteries shall be prohibited except as specifically authorized upon the affirmative vote of sixty percent of the members of each house of the legislature or . . . by referendum or initiative approved by a sixty percent affirmative vote of the electors voting thereon.").

The following year, the state legislature created Washington's Gambling Commission and passed a statute authorizing certain limited forms of gambling, such as charitable bingo games and raffles, amusement games, and the use of punch boards and pull-tabs, "when licensed and utilized or operated" pursuant to state law. 1973 1st ex.s. c 218 § 22. To this day, most forms of gambling are illegal on non-tribal lands in Washington, with continued exceptions for certain charitable activities, social card games, and similar amusement games. *See generally* Wash. Rev. Code § 9.46. Otherwise, the legislature has chosen to "restrain all persons from seeking profit from professional gambling activities" on non-tribal lands in recognition of the "close relationship between professional gambling and organized crime" on non-tribal lands. Wash. Rev. Code § 9.46.010. In short, gambling for money is generally a crime in Washington. Wash. Rev. Code. §§ 9.46.0269, .220–.222. This prohibition includes "class III"

gambling under IGRA—including roulette, craps, slot machines, and other casino-style games. *See generally id.*

### 2.  *Cabazon Band* and the Indian Gaming Regulatory Act

Congress enacted IGRA in response to a U.S. Supreme Court decision in 1987, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), holding that states could not apply state gambling regulations on Indian land under a federal statute granting state criminal jurisdiction over Indian lands, Public Law 280.[1] *Cabazon Band*, 480 U.S. at 210. "[I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation." *Id.* The Court held that a California state law which made the operation of bingo games a misdemeanor if not conducted in conformity with state laws and regulations designed to ensure that such games were for charitable purposes only, was civil/regulatory,

---

[1] Public Law 280, enacted in 1953, "was the first federal jurisdictional statute of general applicability to Indian reservation lands." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 472 (1979). Five states (including California) were immediately given criminal and civil jurisdiction over Indian country, with the remaining states (including Washington) having an option to assume such jurisdiction. *Id.*

precluding application of the law to gaming conducted by tribes on tribal lands. *Id.* at 212. This meant that if, like California, a state allowed gambling in even the most limited circumstances—such as only for charitable purposes—it could not prohibit gaming on tribal lands. *See id.*

Congress enacted IGRA the next year. Indian Gaming Regulatory Act, PL 100–497 (S 555), PL 100–497, October 17, 1988, 102 Stat 2467; *see also* S. Rep. 100–446 (1988). *Cabazon Band* had led to "an explosion in unregulated gaming" on Indian reservations located in states that, like California, did not criminally prohibit all gaming. *Id.* While Congress recognized that substantial gaming revenues "fostered tribal autonomy, it nonetheless became concerned that unregulated growth might invite criminal elements." *Ysleta del Sur Pueblo v. State of Tex.*, 36 F.3d 1325, 1330 (5th Cir. 1994), *abrogated on other grounds by Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 213 L. Ed. 2d 221 (2022). Congress passed IGRA to balance the "right of tribes to self-government while, at the same time, to protect both the tribes and the gaming public from unscrupulous persons." *Id.*; *see also* S. Rep. 100–446 at 2 (1988).

IGRA pertains exclusively to gaming offered by Indian tribes on Indian lands, dividing gaming into three classes. 25 U.S.C. § 2703(6), (7), (8). Class I gaming "means social games solely for prizes of minimal value or traditional

forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Class II gaming is defined as bingo and card games played in conformity with the laws of the state in which the tribal gaming is conducted. 25 U.S.C. § 2703(7). Class III gaming includes all other gaming, such as slot machines, roulette, banked card games, and—as discussed further below—the recently legalized activity of sports betting. 25 U.S.C. § 2703(7); *see also Artichoke Joe's*, 353 F.3d at 715.

This case ostensibly concerns class III gaming. *See* ER92, ¶ 34. Under IGRA, tribes can negotiate class III gaming rights with states that do not categorically criminalize such gaming. 25 U.S.C. § 2710(d). Specifically, class III gaming is lawful on Indian lands "only if" such activities (1) are authorized by a tribal ordinance; (2) are "located in a State that permits such gaming for any purpose by any person, organization, or entity"; and (3) are conducted in conformance with a tribal–state compact. 25 U.S.C. § 2710(d)(1).

IGRA establishes a process for negotiating a tribal–state compact that requires a tribe to (1) enact an ordinance allowing class III gaming; (2) request that the state in which the tribal lands are located negotiate a tribal–state compact setting the terms under which tribal gaming will be conducted; and (3) obtain the Secretary of the Interior's approval of the compact. 25 U.S.C. § 2710(d).

During the negotiation process, a tribe may sue a state in federal court if the state is not negotiating in good faith. 25 U.S.C. § 2710(d)(7)(A)(i). IGRA grants courts authority to order states to negotiate in good faith. *Id.* If no compact results from such ordered negotiations within 60 days, "the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." 25 U.S.C. § 2710(d)(7)(B)(iv). The mediator selects the compact that "best comports with the terms of this chapter and any other applicable Federal law and with the findings and order of the court," and forwards it to the tribe and the state for consent. 25 U.S.C. § 2710(d)(7)(B)(iv), (v). If the state does not consent to the mediator-selected compact, the mediator notifies the Secretary of the Interior and the Secretary "shall prescribe, in consultation with the Indian tribe, procedures . . . under which class III gaming may be conducted on Indian lands over which the Indian tribe has jurisdiction." 25 U.S.C. § 2710(d)(7)(B)(vii). But these compact-negotiation provisions apply only to states that do not categorically criminalize class III gaming; states that do not allow such gaming for "any" purpose are not obligated to negotiate compacts with tribes. 25 U.S.C. § 2710(d)(1).

Among the reasons Congress chose to allow states to enter into compacts with Indian tribes regarding class III gaming was that "there is no adequate Federal regulatory system in place for class III gaming, nor do tribes have such systems for the regulation of class III gaming currently in place. Thus a logical choice is to make use of existing State regulatory systems . . . ." S. Rep. No. 100–446 at 13. Accordingly, the compacting process permits—but does not require—states and tribes to include compact provisions relating to "the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of [tribal or state] laws and regulations," among other terms. 25 U.S.C. § 2710(d)(3)(C).

The compacting process allows tribes and states to negotiate and establish "various matters between two equal sovereigns." S. Rep. 100–446 at 13. "[B]oth State and tribal governments have significant governmental interests in the conduct of class III gaming. States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribe and States." *Id.* IGRA provides the framework for such negotiations.

### 3.    Tribal gaming in Washington post-IGRA

A few years after IGRA went into effect, Washington enacted a statute addressing the negotiation of gaming compacts with federally recognized Indian

tribes. Wash. Laws of 1992, ch. 172, § 2, *codified at* Wash. Rev. Code § 9.46.360. The statute directs the Washington Gambling Commission to negotiate, and the Governor to sign, compacts permitting class III gaming on Indian lands with federally recognized Indian tribes on behalf of the State. *Id.*; *see also* Wash. Rev. Code § 43.06.010 ("[T]he governor is authorized and empowered to execute on behalf of the state compacts with federally recognized Indian tribes in the state of Washington . . . for conducting class III gaming . . . on Indian lands."). Class III gaming remains illegal on non-Indian lands in Washington.

Washington thereafter negotiated and entered into gaming compacts with each of the twenty-nine federally recognized tribes within its borders. *See* Washington State Gambling Commission, Gaming Compacts, https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts. In accordance with IGRA, each of these tribal–state compacts has been reviewed and approved by the Secretary of the Interior as compliant with federal law. *See id.* Most of the tribes that have entered into gaming compacts with Washington State operate some form of class III gaming on their lands. Washington State Gambling Commission, Casino Locations, https://www.wsgc.wa.gov/tribal-gaming/casino-locations (22 tribes operate 29 casinos).

The path toward these negotiated compacts was not always smooth. Indeed, the compacts represent the successful resolution of longstanding intergovernmental disputes over gambling on tribal lands. For instance, throughout the 1990s and early 2000s, the Shoalwater Bay Tribe, the State of Washington, and the federal government were embroiled in disputes and litigation over gambling activities conducted by the Tribe. *See* ER-42–43 (Shoalwater Bay Tribe's account of this history). Only in 2002, after the United States Department of the Interior's Office of Hearings and Appeals enjoined the National Indian Gaming Commission from taking further enforcement action against the Tribe, did the Tribe and the State succeed in reaching agreement on a gaming compact. *See id.*[2] The following year, the Ninth Circuit confirmed that such tribal–state gaming compacts are consistent with IGRA and do not violate constitutional equal protection guarantees. *Artichoke Joe's California Grand Casino*, 353 F.3d 712.

---

[2] The original 2002 Tribal–State Compact for Class III Gaming Between the Shoalwater Bay Indian Tribe and the State of Washington is available at https://wsgc.wa.gov/sites/default/files/public/searchable-compacts/shoalwater-bay/H-2002%20Compact%20%28s%29.pdf. Three amendments have been made, including a 2021 amendment authorizing sports wagering, which is available at https://wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Shoalwater_Bay%28H%29/Shoalwater_Bay_Amendment_3_%26_Appendix_S%28s%29.pdf.

In 2020, after the U.S. Supreme Court struck down a federal statute prohibiting most states[3] from allowing gambling on sporting events, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), Washington enacted a state law permitting amendment of its tribal–state gaming compacts to authorize tribes to conduct and operate sports betting on their lands. Wash. Laws of 2020, ch. 127 § 2, *codified at* Wash. Rev. Code § 9.46.0364. The legislature specifically stated its reasoning for limiting sports betting to tribal lands because of the tribes' "more than twenty years' experience with, and a proven track record of, successfully operating and regulating gaming facilities in accordance with tribal gaming compacts." Wash. Laws of 2020, ch. 127 § 1. The legislature concluded that "Tribal casinos can operate sports wagering pursuant to these tribal gaming compacts, offering the benefits of the same highly regulated environment to sports wagering." *Id.*

Since then, most of the tribal–state compacts in Washington have been amended to specifically permit sports wagering as part of tribal gaming operations. *E.g.*, StateSER-030–050. In general, these compacts establish the

---

[3] The Professional and Amateur Sports Protection Act (PASPA) contained "grandfather" provisions allowing sports betting to continue in states in which it was legal at the time of the statute's enactment. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1471 (2018).

methods by which such gaming will be conducted, its surveillance, and the security measures that will be in place to guard against crime and fraud. *See generally* Washington State Gambling Commission, Gaming Compacts, https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts.

## B. Procedural Background

Maverick filed this lawsuit in January 2022, seeking to dismantle the tribal–state–federal legal framework for regulating gaming on Indian lands, and to invalidate each of the twenty-nine tribal–state gaming compacts in Washington. ER-134–175. Maverick asserts claims against various federal and state defendants[4] under the Administrative Procedure Act, 42 U.S.C. § 1983, "Equity," and the Declaratory Judgment Act, based on allegations that Washington's criminal gambling laws and its tribal–state compacts violate IGRA, equal protection, and the Tenth Amendment. ER-116–123. Maverick further alleges that IGRA itself violates the Tenth Amendment and that "none of IGRA's provisions can stand[.]" ER110, ¶128. Central to Maverick's claims is

---

[4] The federal defendants are the United States of America, United States Department of the Interior, Deb Haaland in her official capacity as Secretary of the Interior, and Bryan Newland in his official capacity as Assistant Secretary – Indian Affairs.

The state defendants are Jay Inslee in his official capacity as the Governor of Washington, Robert Ferguson in his official capacity as the Attorney General of Washington, and the members of the Washington State Gambling Commission in their official capacities as such.

its theory that tribal status is not a political classification, but a racial one, and that state and federal gaming laws that draw distinctions on the basis of tribal status are racially discriminatory and subject to strict scrutiny. *See, e.g.*, ER-86–122, ¶¶ 5, 107–119, 134, 139, 156–157, 170, 179, 181–182, 196–199; *contra Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974) (holding that federally recognized tribal status is "political rather than racial in nature" and is subject to judicial review under the lenient rational basis test); *accord Haaland v. Brackeen*, 143 S. Ct. 1609, 1648 (2023) (Gorsuch, J., concurring).

Maverick first filed its lawsuit in the U.S. District Court for the District of Columbia. *See* ER-134–175. After the Washington state defendants moved to transfer the suit to Washington state for improper venue and lack of personal jurisdiction over them, Maverick attempted to avoid the transfer by seeking to drop the state defendants from this case, even as it continued to challenge the validity of Washington's criminal laws and compacts. *See* StateSER- 051–093. The D.C. district court rejected these attempts and transferred the case to the U.S. District Court for the Western District of Washington.

Maverick thereafter filed an amended complaint in the Western District of Washington. ER-84–126. The following month, the Shoalwater Bay Tribe filed a successful motion to intervene for the limited purpose of moving to

dismiss the case under Rule 19 and Rule 12(b)(7). StateSER-094–113; ER-64–71. The Tribe then moved to dismiss Maverick's complaint, and after briefing by all parties, the district court granted the Tribe's motion. ER-5–20. Maverick filed this appeal.

## IV.   SUMMARY OF THE ARGUMENT

Maverick's claims strike directly at the interests of the Shoalwater Bay Tribe enshrined in its gaming compact and its rights under state and federal law. The law is clear that the Shoalwater Bay Tribe is a necessary party in these circumstances. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 852 (9th Cir. 2019) ("absent tribes [are] necessary" when "the litigation could affect already-negotiated lease agreements and expected jobs and revenue"); *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) ("[I]n an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.").

The district court properly exercised its discretion in concluding that the federal government could not adequately represent the Shoalwater Bay Tribe's interests in this case because its obligations to comply with potentially conflicting federal law conflicted with the Tribe's interests, and because the federal government did not share the same investment in the outcome of this

15

case—continued class III gaming on tribal lands in Washington—as its interest was merely in defending its necessarily limited decision-making in this case. The district court further found, based on the federal government's own briefing, that IGRA itself required the federal government to balance the public's interests against the Tribe's interests, such that the federal government would not "undoubtedly" make all of the Tribe's arguments in this case in the Tribe's absence.

The district court also properly concluded that the Shoalwater Bay Tribe's sovereign immunity prevents it from being joined as a party in this case. *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991). The Tribe intervened for the limited purpose of moving to dismiss under Rule 19 without waiving its immunity, and the well-established law of this Circuit confirms that this was proper. *See Klamath Irrigation Dist. v. United States Bureau of Reclamation*, 48 F.4th 934, 938 (9th Cir. 2022); *Diné Citizens Against Ruining Our Env't*, 932 F.3d at 847–48.

Maverick seeks to end-run tribal sovereignty by proposing that this Court, in lieu of invalidating the tribal–state compacts at issue, take the drastic step of decriminalizing *all* class III gaming in Washington. This is not a proper remedy for Maverick's equal protection claim (even if that claim had merit, which it does

not), because *the compacts*—not Washington's criminal laws—are the sole basis for Maverick's allegation of "discriminatory" treatment. Supreme Court precedent dictates that where, as here, an equal protection claim challenges an allegedly discriminatory exception to a general legal burden, the appropriate remedy is severance of the exception—not nullification of the general burden. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2354 (2020) (plurality); *Heckler v. Mathews*, 465 U.S. 728, 740 (1984). Maverick therefore cannot sidestep the Shoalwater Bay Tribe's sovereign immunity by asking this Court to strike down Washington's criminal laws, the enforcement of which is "[f]oremost among the prerogatives of sovereignty." *Heath v. Alabama*, 474 U.S. 82, 93 (1985). The only remedy Maverick may seek for its equal protection claim is invalidation of the Shoalwater Bay Tribe's gaming compact—a remedy that necessarily makes the Tribe an indispensable party.

Because the Shoalwater Bay Tribe is a necessary and indispensable party that cannot be joined, the district court properly dismissed Maverick's lawsuit under Rule 19.

# V.    ARGUMENT

## A.    Standard of Review

A district court's dismissal under Rule 19 is reviewed for abuse of discretion. *Klamath Irrigation District*, 48 F.4th at 943. A district court abuses its discretion "only if its [decision is] (1) illogical, (2) implausible, or (3) without support in the record" or if the court applies the wrong legal standard. *United States v. Robertson*, 895 F.3d 1206, 1213 (9th Cir. 2018). Underlying legal issues relevant to the Rule 19 determination, such as "issues of tribal sovereign immunity," are reviewed de novo. *Id.* (citing Jamul Action Comm. v. Simermeyer, 974 F.3d 984, 991 (9th Cir. 2020)). The Court also reviews de novo "the question whether a tribe feasibly can be joined" to a lawsuit. *Diné Citizens Against Ruining Our Environment*, 932 F.3d at 851 (citing *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005)). A district court, for example, errs as a matter of law if it gives "insufficient weight to [an absent party's] sovereign status." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 865 (2008).

Dismissal under Rule 19 turns on a three-step inquiry: (1) whether a party is necessary under Rule 19(a); (2) if the party is necessary, whether it may be feasibly joined; and (3) if the party cannot be joined, whether it is indispensable

such that "in equity and good conscience, the action should . . . be dismissed."

Fed. R. Civ. P. 19; *see Klamath Irrigation District*, 48 F.4th at 943.

## B.     The Shoalwater Bay Tribe Is a Necessary Party

Maverick does not and cannot demonstrate that the trial court abused its

discretion in dismissing Maverick's claim for failure to join the Shoalwater Bay

Tribe as an indispensable party in a suit that, if successful, would "eviscerate[]

the Tribe's 'very ability to govern itself, sustain itself financially, and make

decisions about its own' gaming operation." ER-13. The district court correctly

applied a "wall" of Ninth Circuit authority to determine that Maverick's claims

would necessarily impair the Shoalwater Bay Tribe's sovereign and substantial

pecuniary interests, and that neither the State nor the federal government could

adequately represent the Tribe's sovereign interests in its absence.

Maverick ignores this Court's deferential review of the district court's

determination that the federal government could not adequately represent the

Tribe's interests in this suit. It cites inapplicable, vacated, and mischaracterized

case law to suggest that the district court should have applied "presumptions"

that Maverick concedes have never been applied in the Rule 19 context. This

Court should reject Maverick's efforts to manufacture legal error and should

affirm the district court's considered exercise of discretion and application of precedent in this case.

### 1. Maverick's claims would impair the Shoalwater Bay Tribe's substantial interests in its gaming compact, gaming operations, and sovereign prerogatives

At the first step of the Rule 19 analysis, an absent party is "required" if "in that [party's] absence, the court cannot accord complete relief among existing parties" or if "that [party] claims an interest relating to the subject of the action" and "disposing of the action in [their] absence may . . . as a practical matter impair or impede the person's ability to protect the interest[.]" Fed. R. Civ. P. 19(a)(1); *see Klamath Irrigation District*, 48 F.4th at 943. Here, all of Maverick's requests for relief—invalidating tribal gaming compacts and enjoining state officials from enforcing state laws—if successful, would radically impair the Shoalwater Bay Tribe's interests in its gaming compacts and gaming operations in Washington, making it a "required" or "necessary" party to Maverick's case. ER-123–124.

More than 20 years ago, this Court made clear that a tribe is a necessary party in litigation challenging the validity of an IGRA gaming compact to which the tribe is a party. *See Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002). In *American Greyhound*, like here, private gaming operators

challenged Arizona's continuation of existing tribal–state gaming compacts as violating state and federal law, including equal protection guarantees. *Id.* at 1021. The Court had no trouble recognizing that the tribes had "substantial" protectable interests in the "bargained contracts" with the state regarding the regulation of gaming on the tribes' lands, and that these interests would be "impaired by the litigation" under the first step of the Rule 19 inquiry. *Id.* at 1023–24 (citing Fed. R. Civ. P. 19(a)(2)(i)). The Court also flatly rejected hollow arguments by the private operators that they were not attacking tribes' protectable legal interests: the Court admonished that the suit did "not *incidentally* affect the gaming tribes in the course of enforcing some public right," but was, in fact "*aimed* at the tribes and their gaming," making it the quintessential type of interest Rule 19 was intended to protect. *Id.* at 1026 (emphasis in original).

Along the same lines, *American Greyhound* squarely forecloses Maverick's invocation of Rule 19's narrow "public-rights exception." *See* Op. Br. at 64–66. That case held that, where plaintiffs sought "to avoid competitive harm to their own operations" by preventing tribes and states from entering new, renewed, or modified gaming compacts under IGRA, "the rights in issue between the plaintiffs in this case, the tribes[,] and the state are more private than

public." *Am. Greyhound Racing, Inc.*, 305 F.3d at 1026. Maverick's attempt to call *American Greyhound* into question by citing *Bond v. United States*, 564 U.S. 211 (2011)—a case having nothing to do with Rule 19 or the public-rights exception—falls flat; *Bond*'s comments about the relationship between separation-of-powers principles and individual rights have no discernable relationship to Maverick's claims in this case, which do not invoke or implicate those principles. *Compare* 564 U.S. 211, 222 (2011) *with* ER-84–126.

Since *American Greyhound*, this Court has repeatedly affirmed that tribes are necessary parties to litigation that "may have retroactive effects on approvals already granted" to them, *Diné Citizens*, 932 F.3d at 852, or may affect their operating conditions, royalties, employment, *et cetera*, *Kescoli v. Babbitt*, 101 F.3d 1304, 1309–10 (9th Cir. 1996); *cf. Lomayaktewa*, 520 F.2d at 1325 ("[I]n an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."). Given this settled authority, Maverick does not and cannot dispute that the Shoalwater Bay Tribe has protectable legal interests in its gaming compact with the State that would be impaired by Maverick's suit. Maverick instead argues only that the federal defendants can adequately protect the Tribe's interests without the Tribe's participation. But as detailed below, Maverick's citation to inapplicable

"presumptions" and inapposite and vacated case law cannot transform the district court's proper exercise of discretion into a nonexistent legal error.

### 2. The federal defendants cannot adequately represent the interests of the Shoalwater Bay Tribe

The district court properly concluded that the federal defendants cannot adequately represent the interests of the Shoalwater Bay Tribe because their interests and obligations in this case differ from and conflict with the Tribe's interests.[5] An absent party's interest in litigation is not necessarily "impaired" under Rule 19 if a party to the litigation can adequately represent such interests. Courts consider three factors in assessing the adequacy of such representation: (1) "whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments;" (2) "whether the party is capable of and willing to make such arguments;" and (3) "whether the absent party would offer any necessary element to the proceedings that the present

---

[5] Maverick does not even attempt to argue that the state defendants could adequately represent the Shoalwater Bay Tribe's interests in this litigation—indeed, it concedes they cannot. Op. Br. at 29. This is unsurprising, given this Court's recognition that the State "owes no trust duty to the tribes" and shares an adversarial history in disputes over tribal gaming. *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 n.5 (9th Cir. 2002). Nor does Maverick offer any reason why the federal defendants would be remotely interested in or capable of representing the Tribe's interests as to the state-focused claims.

parties would neglect." *Diné Citizens*, 932 F.3d at 852 (quoting *Alto v. Black*, 738 F.3d 1111, 1127–28 (9th Cir. 2013)).

Here, the district court correctly applied a long line of case law in this Circuit recognizing that the federal government cannot adequately represent an absent Tribe's interests in a variety of scenarios, including when the government's competing obligation to comply with potentially conflicting federal law could result in divergent interests, or when there is a history of adversity between the tribe and the federal government. In each of the cases, the courts examined the possible trajectory of the litigation in identifying potentially divergent interests—not just past or presently existing conflicts, as argued by Maverick. *E.g.*, Op. Br. at 34–36.

In *Diné Citizens*, for example, this Court held that the federal government could not adequately represent an absent tribe's interests due to the federal government's "overriding" obligation to comply with the federal environmental laws allegedly violated in that case. The Court explained that the government's interest in defending its "own analyses that formed the basis of the approvals at issue" did not equate to an investment "in the outcome of the approvals." *Diné Citizens*, 932 F.3d at 855. Instead, if the district court accepted the plaintiff's arguments or found flaws in the federal agency's analysis, the agency's interests

could diverge from absent tribes' interests and alter the agency's planned actions or litigation positions, such that it would not "undoubtedly" make all of the tribe's arguments in its absence. *Id.*

This Court conducted a similar analysis to reach the same conclusion in *Klamath Irrigation District*, 48 F.4th at 944–45, holding that the federal government could not adequately represent the absent tribes' interests because the "Tribes' primary interest is in ensuring the continued fulfillment of their reserved water and fishing rights," whereas the federal government's primary interest was "in defending the propriety of its analysis." *Id.* The *Klamath* Court also rejected the argument made by Maverick here that that the federal government's trust relationship with the Tribe guaranteed a unity of interest. *E.g.*, Op. Br. at 27–28, 33. The Court explained that a "unity of *some* interests does not equal a unity of *all* interests." *Klamath Irrigation District*, 48 F.4th at 945 (emphasis added). The Court reasoned that the federal government and absent tribes shared an interest in the outcome "for very different reasons": the government wanted to defend its administrative actions, whereas the tribe was invested in the actual fishing and water rights in dispute. *Id.* The Court thus rejected a superficial alignment in legal positions as "insufficient for us to hold

that the government is an adequate representative of the tribes." *Id.*;[6] *see also White v. Univ. of Cal.*, 765 F.3d 1010, 1027 (9th Cir. 2014) (finding state inadequate to represent absent tribe's interest, despite aligned positions in lawsuit over repatriation of aboriginal remains, because it was "questionable" that state would "pursue the same next course of action" as absent tribal group if district court ruled against the state on the merits); *Manygoats v. Kleppe*, 558 F.2d 556, 558 (10th Cir. 1977) (tribal and federal interests not aligned where tribe had practical interest in the continued operation of a mine, whereas federal government had broader interests, including obligations under environmental laws).

This Court's holdings in these cases flatly contradict Maverick's argument here that mere alignment in litigation positions controls the adequacy of representation issue, or that adequacy of representation can only be determined by identifying specific arguments the federal government would or would not make on behalf of the Tribe. *E.g.*, Op. Br. at 28–36. Instead, this Court in *Diné Citizens* and *Klamath* considered the true nature of the federal government's

---

[6] Contrary to Maverick's argument, the *Klamath* Court primarily relied on this lack of shared investment in the water and fishing rights in deciding the Rule 19 motion at issue there, citing the earlier litigation only as additional evidence that the federal government would not "'undoubtedly' make all of the same arguments that the Tribes would make in this case." 48 F.4th at 944–45.

interest in the case—whether in defending its own process and decision-making, or the actual substantive outcome sought by the tribes—as well as the government's overriding obligation to comply with federal law that may conflict with the tribes' position or interests. Indeed, both *Diné Citizens* and *Klamath* distinguished this Court's decision in *Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152 (9th Cir. 1998) (per curiam), also cited by Maverick, because there, the federal government and tribes shared the same practical interest "in a suit brought to stall the government from utilizing a newly built dam pending further environmental study"—namely, a shared interest in "ensuring that the [dam was] available for use as soon as possible." *Klamath Irrigation District*, 48 F.4th at 945; *Diné Citizens*, 932 F.3d at 854.

Here, the federal government's interest in defending its approval of the Shoalwater Bay Tribe's gaming compact with the State is much weaker than the government's insufficient interests in *Diné Citizens* and *Klamath*, and the federal government here has no practical interest in the ultimate outcome of preserving the Shoalwater Bay Tribe's class III gaming rights in Washington. To the contrary, under IGRA, the federal government remains agnostic about whether class III gaming by tribes is permitted in any particular state. IGRA simply sets forth a *process* for tribes and states to negotiate gaming compacts subject to

27

federal approval: it provides no role for the federal government in negotiating the substantive terms of those compacts, and it also leaves states free to criminalize all forms of gaming, including tribal gaming. Nor does the federal government have a strong investment in its necessarily limited decision-making in approving the gaming compacts at issue in this case. Unlike in *Diné Citizens*, *Klamath*, or *Babbitt*, where the government independently analyzed and approved the relevant permits, here, the Secretary of the Interior only has authority to disapprove compacts entered into by Indian tribes and states based on a narrow and exclusive set of statutory factors. 25 U.S.C. § 2710(d)(8)(A)–(B). The federal government thus has *no* investment in the outcome and little investment in defending its specific decision-making about whether the Shoalwater Bay Tribe may continue its class III gaming operations in Washington State.

Moreover, as in *Diné Citizens* and *Klamath*, the federal government here has an overriding obligation to comply with potentially conflicting federal law. If Maverick were to succeed on the merits of its arguments that Washington's approval of class III gaming for tribes violates IGRA or federal constitutional principles, it is at best "questionable" that the federal government would pursue the "same next course of action" that the Shoalwater Bay Tribe would take with

28

the Tribe's very sovereignty and economic lifeblood on the line. *White*, 765 F.3d at 1027. The district court rightly identified these divergent interests, noting that "it was IGRA that the United States looked to for authority to shutter the Tribe's gaming operation, highlighting the United States' view that its overriding obligation to ensure compliance with federal law supersedes its general trust responsibility to the Tribe." ER-14. The district court also cited the federal government's own acknowledgment of its competing interests under IGRA to "balance[] efforts to promote tribal self-sufficiency with 'a regulatory and supervisory role for the states and the federal government to prevent the infiltration of 'organized crime and other corrupting influences.'" *Id.*

The federal government's investment in defending the outcome of this case is particularly in doubt here, as noted by the district court, where a change in administrations could result in a sea change in litigation strategies or positions. ER-15. The district court's "considered judgment" falls well within the discretion afforded courts under established Circuit precedent that recognizes tribes' unique investment in defending against litigation aimed at destroying their economic livelihood and sovereign prerogatives. *Friends of Amador Cnty. v. Salazar*, 554 F. App'x 562, 564 (9th Cir. 2014) (citing *Pit River Home & Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1101 (9th Cir. 1994)).

Unable to challenge the district court's appropriate exercise of discretion here, Maverick attempts to invent a legal error by citing court rules and case law having no bearing on this case. Its arguments lead nowhere. To start, Maverick argues that the district court violated a "presumption" of adequate representation when the federal government defends its own decision and has a trust obligation to an absent party, Op. Br. at 31–34, but it cites inapplicable case law interpreting a different federal rule—not Rule 19. Indeed, Maverick acknowledges that the "presumption" it invokes applies only under Rule 24, which differs in both text and history from Rule 19. *Id.* at 32 n.9. Not one of this Court's cases addressing the dismissal of an indispensable party under Rule 19 has applied such a presumption.[7] Indeed, the very case Maverick cites analogizing the Rule 24 and Rule 19 inquiries, *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992), did not apply any presumption in affirming a district court's conclusion

---

[7] Unlike Rule 19, Rule 24 specifically provides that so-called "mandatory" intervention is not required if "existing parties adequately represent that interest" of the party seeking intervention. Fed. R. Civ. P. 24(a)(2). Moreover, Rule 24 provides a mechanism whereby an absent party "*may* be allowed in on personal application" (through either "mandatory" or "permissive" intervention), whereas Rule 19 governs cases in which the absent party's interest is "so affected by the litigation that it *cannot* be permitted to proceed without joining the absentee, at least where it is possible to do so." Wright & Miller, 7C Fed. Prac. & Proc. § 1901 (3d ed.) (emphasis added).

30

that the federal government could not adequately represent an absent tribe's interests.

To be sure, this Court has recognized that the United States "can" adequately represent an absent tribe where there is no conflict of interest when the district court, in exercising its discretion to deny a Rule 19 motion, has made a practical determination that there were no conflicting interests in a particular case. *See, e.g.*, *Washington v. Daley*, 173 F.3d 1158 (9th Cir. 1999) (holding that district court did not abuse its discretion in denying Rule 19 motion). But Maverick fails to cite a *single* case reversing a district court's determination that the federal government could not adequately represent an absent tribe based on divergent interests that could arise in the future and its lack of investment in the actual practical outcome of the case. *Diné Citizens*, *Klamath*, and *White* are all to the contrary.

Maverick also attempts to distinguish *Diné Citizens*'s and *Klamath*'s analyses as applicable only in environmental cases. But nothing in those cases suggests that the federal government faces potentially conflicting obligations with tribes in environmental cases alone. Certainly the federal government has no less an obligation to comply with federal gaming laws or equal protection principles than it does to comply with environmental laws. If the district court

31

were to agree with Maverick here that the Secretary's approval of the Shoalwater Bay Tribe's gaming compact violates IGRA or equal protection, the federal government's overriding obligation to comply with federal law would create the same type of conflict recognized in *Diné Citizens* and *Klamath*. And in the proceedings below, the federal government itself acknowledged its need to balance its obligations to the tribes against the interests in combating crime and regulating gambling under IGRA. StateSER-114–121. While Maverick now claims that the federal government's trust obligations require it to always interpret IGRA in the Shoalwater Bay Tribe's favor, its complaint alleges to the contrary, asserting that the Secretary's approval of compacts in Washington violated IGRA's terms. ER-116–118.

Maverick's remaining legal citations only further weaken its case. Maverick relies heavily on the district court decision in *West Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 270–71 (D.D.C. 2021), for the broad proposition that "federal courts have uniformly held that the federal government adequately represents an Indian tribe when it shares the Tribe's position that an IGRA Compact is consistent with federal law." Op. Br. at 52, 53, 29. But that case is *not good law*. The D.C. Circuit *vacated* the district court's opinion in its entirety. *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059 (D.C. Cir. 2023). The D.C.

32

Circuit affirmed the district court's denial of the tribe's Rule 19 motion to dismiss *only* because it had first decided to grant the Interior Secretary's motion for summary judgment on all the plaintiff's claims challenging the absent tribe's compact, thus granting the tribe all the relief it had requested. *Id.* at 1071 ("Both [dismissal under Rule 19 and dismissal under Rule 56] would keep intact the 2021 Compact, the relief that the Tribe ultimately seeks."). The D.C. Circuit went out of its way to note that it "do[es] not discount or take lightly the Tribe's 'substantial interest' in its sovereign immunity," but held only that the injury to sovereignty was remote as a "practical matter" in the "unique circumstances" of that case because the court had granted the tribe its exact requested relief. *Id.* *West Flagler* does not help Maverick here.

Maverick cites numerous other cases that did not address Rule 19. For example, it cites *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003), Op. Br. at 29, even though this Court explicitly declined to address Rule 19 in that case because the issue had only been raised in an amicus brief. It cites *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 375 (D.C. Cir. 2011), Op. Br. at 29, even though the court there denied a tribe's motion to intervene to file a Rule 19 motion as untimely because it was filed more than six-and-a-half years after the suit was filed, without ever addressing

Rule 19 factors. *Amador Cnty., Cal. v. U.S. Dep't of the Interior*, 772 F.3d 901, 902 (D.C. Cir. 2014). *See also Arakaki v. Cayetano*, 324 F.3d 1078 (9th Cir. 2003); *United States v. City of Los Angeles, Cal.*, 288 F.3d 391 (9th Cir. 2002); *McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002); *Parravano v. Babbitt*, 70 F.3d 539 (9th Cir. 1995); *United States v. Alpine Land & Reservoir Co.*, 431 F.2d 763 (9th Cir. 1970); *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556 (1st Cir. 2021); *Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1 (D.D.C. 2001) (all cases in which Rule 19 was not at issue). And the cases Maverick cites in which Rule 19 dismissal was found to be unwarranted in other contexts, where the validity of IGRA gaming compacts was not at issue, afford no support for Maverick's contention that the district court abused its discretion here. *See Daley*, *supra* at 31; *see also Alto v. Black*, 738 F.3d 1111 (9th Cir. 2013); *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001); *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996); *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295 (W.D.N.Y. 2007). Maverick's reliance on vacated and inapposite case law only underscores the weakness of its argument.

The potential need for discovery only available from the Shoalwater Bay Tribe further confirms the Tribe's necessary-party status. Maverick's own filings

belie its assertion that "there is no need for the Tribe to offer or conduct any discovery." Op. Br. 37. Maverick cites a prior stipulation preceding the Tribe's limited intervention for the proposition that this case "presents questions of law that appear to be resolvable through dispositive motions . . . without the need for factual discovery." *Id.* 37–38 (citing ER-128). But Maverick omits that it later filed an expert report and other factual materials, notwithstanding its prior stipulation. *See* StateSER-4–29. Maverick's expert report presents a customer survey and purports to establish certain economic impacts of Washington's gambling laws. *See* StateSER-14. As counsel promptly advised Maverick, this report would necessitate discovery for rebuttal, potentially including a survey of customers of a tribal casino who were not surveyed by Maverick's expert. Maverick cannot show that the federal defendants would devote the same resources or share the Shoalwater Bay Tribe's objectives and approach to discovery, nor that they would have the same access to rebuttal evidence. *See United States v. James*, 980 F.2d 1314, 1320 (9th Cir. 1992) (recognizing tribe's sovereign immunity against a subpoena). The necessity for discovery—of Maverick's own making—further underscores that the Shoalwater Bay Tribe is a necessary party to the litigation.

### C. The Shoalwater Bay Tribe Cannot Be Joined Due to Its Sovereign Immunity

The Shoalwater Bay Tribe is entitled to sovereign immunity and cannot be sued without its consent. *See Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 509 ("Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation"). When a party is necessary under Rule 19(a) but cannot be joined due to tribal sovereign immunity, a "wall of circuit authority" dictates dismissal under Rule 19(b). *Diné Citizens*, 932 F.3d at 857; *accord Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 998 (9th Cir. 2020) ("The balancing of equitable factors under Rule 19(b) almost always favors dismissal when a tribe cannot be joined due to tribal sovereign immunity.").

The district court allowed the Shoalwater Bay Tribe to intervene on a limited basis without waiving its sovereign immunity—an allowance this Court affirmed in *Diné Citizens*, 932 F.3d at 850. None of the cases Maverick cites involved a tribe's limited intervention for the purpose of defending its sovereign immunity from attack under Rule 19—at most, Maverick's cited cases involved a state or a tribe *participating in litigation on the merits*, which the Shoalwater Bay Tribe has not done here. *See* Op. Br. 66–67 (citing *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) (state's removal of suit to federal

court constituted waiver of immunity); *Pettigrew v. Oklahoma ex rel. Oklahoma Dep't of Pub. Safety*, 722 F.3d 1209, 1213 (10th Cir. 2013) (venue provision in settlement agreement waived state's sovereign immunity); *Bd. Of Regents of Univ. Of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 463 (7th Cir. 2011) (state waived immunity against counterclaims by initiating federal litigation on same subject); *United States v. State of Or.*, 657 F.2d 1009, 1014 (9th Cir. 1981) (tribe waived immunity by expressly agreeing to federal jurisdiction and litigating its fishing rights in federal court); *In re Greektown Holdings, LLC*, 917 F.3d 451, 464 (6th Cir. 2019) (tribe did not waive immunity by filing bankruptcy petition), *abrogated by Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689 (2023); *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 773 (D.C. Cir. 1986) (tribes waived immunity by intervening as party defendants, with one tribe filing a cross-claim); *Gradel v. Piranha Cap., L.P.*, 495 F.3d 729, 731 (7th Cir. 2007) (non-immune receiver submitted to jurisdiction by intervening to vacate an asset attachment); *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1248 (11th Cir. 2006) (non-immune class-action plaintiff acquiesced to jurisdiction by intervening to oppose motion to enjoin state court proceedings)). Because the

Shoalwater Bay Tribe has not intervened to argue the merits here, Maverick has no ground to assert a waiver of the Tribe's sovereign immunity.

What Maverick paints as "seriously unfair results" merely reflects Maverick's dissatisfaction with the reality that its commercial interests cannot overcome the immunity of a sovereign Indian tribe. Op. Br. 66 (citation omitted). "Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life. It promises them sovereignty for as long as they wish to keep it." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1661 (2023) (Gorsuch, J., concurring in judgment). In the words of one of Maverick's cited cases, although "[i]mmunity doctrines inevitably carry within them the seeds of occasional inequities[,] . . . the doctrine of tribal immunity reflects a societal decision that tribal autonomy predominates over other interests." *Wichita and Affiliated Tribes of Oklahoma*, 788 F.2d at 781; *see also Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 510 (noting that Congress' "approval of the immunity doctrine" reflects a desire to promote its "'overriding goal' of encouraging tribal self-sufficiency and economic development") (quoting *Cabazon Band*, 480 U.S. at 216).

### D. No Adequate Remedy Can Be Awarded in the Shoalwater Bay Tribe's Absence

The four factors courts use to determine indispensability include "whether an adequate remedy, even if not complete, can be awarded without the absent party[.]" *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1161–62 (9th Cir. 2002). Maverick argues that as an adequate remedy, the district court could sidestep the Shoalwater Bay Tribe's gaming compact and instead enjoin the State from enforcing its criminal laws across the board. Op. Br. 56–57. Maverick's novel and drastic proposal is meritless.

Maverick attempts to end-run Rule 19 by imagining an indirect remedy that avoids invalidating any tribal–state gaming compacts by decriminalizing unauthorized gambling in Washington state across the board. Op. Br. at 47–48. But tribal–state gaming compacts, as exemptions from general criminal laws, are the sole basis for Maverick's allegation of "discriminatory" treatment in its equal protection challenge. *See* ER-121 ("In the Compacts and Compact Amendments, however, Washington has purported to exempt the Tribes from the application of its criminal prohibitions on these forms of class III gaming."). Maverick does not allege that Washington's criminal laws against unauthorized gaming are unequally applied. Nor could it, as history makes clear. *See supra* at 3–13 (discussing federal and state enforcement actions against Shoalwater Bay

39

Tribe's gaming activities). It would be improper for a court to invalidate one law, whose equal application is unchallenged, as a remedy for an equal protection challenge to another law. The state defendants are aware of no authority for doing so, and certainly Maverick cites none in this sparse section of its brief. Op. Br. at 47–48. Since tribal gaming compacts are the only subject of Maverick's allegations of discriminatory treatment, the benefits of the compacts are the only subject for potential severance or extension as a remedy for Maverick's equal protection claim. Washington's constitutional and criminal laws are not on the table for severance.

Even if the severability of Washington's criminal laws were put into question by Maverick's equal protection challenge, an injunction against their enforcement would be improperly intrusive and overly circuitous. Maverick's proposed remedy would elevate Maverick's commercial interests above the State's sovereign interests. *See Heath v. Alabama*, 474 U.S. 82, 93 (1985) ("Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code."). It would gut 134 years of state constitutional and criminal law as a roundabout way of undermining Maverick's true target—tribal gaming compacts. Though Maverick mischaracterizes its proposed remedy as "extend[ing] benefits to Maverick," Op. Br. 57, Maverick does not seek an order

40

requiring the State to grant Maverick some exemption from its prohibition on class III gaming absent an IGRA compact, *see* ER-123–24. Rather, Maverick seeks to invalidate the State's constitutional gaming provision and its criminal laws. *See id.* (seeking relief that would "prevent enforcement against Maverick of Washington's criminal laws prohibiting class III gaming").[8] This runs contrary to the Supreme Court's directive to sever allegedly discriminatory exceptions rather than nullify general burdens:

> "When . . . the Court confronts an equal-treatment constitutional violation, the Court generally applies the same commonsense severability principles described above. If the statute contains a severability clause, *the Court typically severs the discriminatory exception or classification, and thereby extends the relevant statutory benefits or burdens to those previously exempted, rather than nullifying the benefits or burdens for all*. In light of the presumption of severability, the Court generally does the same even in the absence of a severability clause. The Court's precedents reflect that preference for extension rather than nullification."

*Barr*, 140 S. Ct. at 2354 (plurality) (emphasis added); *see also Heckler*, 465 U.S. at 740 (holding that severability principles would forbid "extension of benefits to the excluded class" rather than "withdrawal of benefits from the favored class").

---

[8] Maverick does not allege that the State has taken any enforcement action against it. Rather, Maverick argues that the State's criminal laws should not *apply* to Maverick (and by extension, should not apply to any similarly situated commercial interests).

Through the lens of the Supreme Court's severability principles, Washington imposes a general burden: offering gambling for profit is generally a crime except where specifically authorized. That general law applies equally to Maverick, the Shoalwater Bay Tribe, and all other gambling operators, regardless of race, ancestry, or tribal affiliation.[9] Indeed, the longstanding policy of the State, traceable to its 1889 Constitution, is "to prohibit all forms and means of gambling except where carefully and specifically authorized and regulated." H. Com. & Gaming 2638, 66th Leg., Reg. Sess. (Wash. 2020); *see* Wash. Const. art. II, § 24 (1889) ("The legislature shall never authorize any lottery . . . ."); Wash. Const. art. II, § 24 (1972) ("Lotteries shall be prohibited except as specifically authorized . . . ."); Wash. Rev. Code § 9.46.222 (defining the operation of unlicensed gambling activities as a gross misdemeanor). Maverick's grievance is not that the *general burden of the criminal prohibition* on unauthorized gaming is unequally enforced (it is not), but that Washington has granted *allegedly discriminatory exceptions—the specific authorization of gaming compacts* that allow federally recognized tribes to offer class III gaming on their tribal lands.

_____

[9] In fact, Maverick is owned by a member of the Shoalwater Bay Tribe. *See* ER-45 (noting Maverick's ownership by a Tribal member and citing Maverick's press releases).

The Supreme Court's severability principles thus require limiting the remedy for Maverick's equal protection claim to severance of the tribal–state compacts' beneficial exception and extension of the criminal law's general burden—not extension of the beneficial exception and nullification of the general burden. Since severance of the exception here would require striking directly at the Shoalwater Bay Tribe's gaming compact (and its rights under state and federal law to negotiate for the compact), Maverick cannot get around Rule 19.

Maverick provides no meaningful support for its suggestion that the Shoalwater Bay Tribe's sovereign immunity "raise[s] complex questions" that "should have steered [the district court] toward" a remedy that nullifies the general burden rather than one that severs the allegedly discriminatory exception. Op. Br. 57 (quoting and citing *Barr*, 140 S. Ct. at 2354 (plurality)). Both of the examples cited in *Barr*, 140 S. Ct. at 2354, concerned beneficial and burdensome provisions of singular statutes concerning citizenship laws. Both examples refused to extend beneficial exceptions or nullify general burdens in the face of complex questions. *See Sessions v. Morales-Santana*, 582 U.S. 47, 77 (2017) (abrogating beneficial exception and extending the general rule within a single statute); *Miller v. Albright*, 523 U.S. 420, 459 (1998) (Scalia, J.,

concurring in judgment) (finding no equal protection violation in "the particularly sensitive area of immigration and naturalization," where severance would require "radical statutory surgery"). Neither example involved sovereign immunity, nullified a general rule, nor even considered invalidating other statutes whose application was not alleged to be unequal. If anything raises "complex questions" that this Court should avoid, it is Maverick's unprecedented request to undermine the State's sovereignty by enjoining the enforcement of its criminal laws (and effectively gutting a longstanding provision of its constitution). *Barr*, 140 S. Ct. at 2354.

An injunction against enforcement of Washington's criminal laws would be an improper remedy for the additional reason that it would grant Maverick a privilege not available to sovereign tribal governments. IGRA conditions the legality of tribal gaming on the existence of a "Tribal–State compact" regardless of the State's criminal laws. 25 U.S.C. § 2710(d)(1)(C) ("Class III gaming activities shall be lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State . . . ."). If Maverick's remedy were granted and Washington's criminal laws were enjoined, then unlike tribes subject to IGRA, Maverick would not need to negotiate with the State to obtain a class III gaming license. In fact, such

a result would give *Maverick* a monopoly[10] on gaming in Washington state without the constraints of a negotiated compact, resulting in disfavorable treatment of Tribes. Unequal treatment is not an appropriate remedy for an equal protection claim. *See Heckler*, 465 U.S. at 740 ("[W]hen the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of *equal* treatment[.]") (quoting *Iowa–Des Moines Nat. Bank v. Bennett*, 284 U.S. 239, 247 (1931)) (emphasis in original); *Miller*, 523 U.S. at 459 (Scalia, J., concurring in judgment) ("eliminating the restrictions on fathers does not produce a law that complies with the Equal Protection Clause (assuming it is initially in violation), but rather produces a law that treats fathers *more* favorably than mothers") (emphasis in original).

The only case Maverick cites for the proposition that the Shoalwater Bay Tribe "cannot possibly have a 'legally protectable interest' in" Maverick's equal protection claim is inapposite. Op. Br. 48 (citing *Jamul Action Comm. v. Chaudhuri*, 200 F. Supp. 3d 1042, 1052 (E.D. Cal. 2016)). In *Jamul Action Committee*, the tribe had no legally protectable interest in the "federal defendants' execution of a [National Environmental Policy Act (NEPA)]

---

[10] Maverick repeatedly mischaracterizes the tribal–state compacts with twenty-nine independent sovereign tribal governments as a "monopoly," without offering any legal reasoning or authority to substantiate its use of that term.

review," 200 F. Supp. 3d at 1052, unlike the Shoalwater Bay Tribe's clear and direct interest in its gaming compact that Maverick puts at issue in its equal protection claim. *See, e.g.*, ER-121, ¶ 198 (challenging gaming compacts in context of equal protection claim). The plaintiff in *Jamul Action Committee* was not asking the court to enjoin the enforcement of a generally applicable law. Nor was it asking the court to review a federal agency's decision on the legality of the tribe's gaming compact. The court found only that the tribe was not a necessary party to the plaintiff's claim for violation of NEPA; the court held that *the tribe was necessary and indispensable to the plaintiff's other claims, including equal protection*. 200 F. Supp. 3d at 1047, 1049–51. In the end, the outcome in *Jamul Action Committee* is the same warranted here: dismissal of the equal protection claim because it challenges the legal rights and interests of a sovereign that cannot be joined. 200 F. Supp. 3d at 1051; *see Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 998 (9th Cir. 2020) ("virtually all the cases to consider the question appear to dismiss under Rule 19, regardless of whether [an alternate] remedy is available, if the absent parties are Indian tribes invested with sovereign immunity") (cleaned up).

## VI.   CONCLUSION

The district court's order should be affirmed.

RESPECTFULLY SUBMITTED this 1st day of September, 2023.

ROBERT W. FERGUSON
Attorney General of Washington

*s/ Kristin Beneski*
KRISTIN BENESKI, WSBA No. 45478
First Assistant Attorney General
BRIAN H. ROWE, WSBA No. 56817
WILLIAM MCGINTY, WSBA No. 41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
kristin.beneski@atg.wa.gov
brian.rowe@atg.wa.gov
william.mcginty@atg.wa.gov

TERA HEINTZ, WSBA No. 54921
Deputy Solicitor General
1125 Washington Street SE
Olympia, WA 98504-0100
(360) 753-6200
tera.heintz@atg.wa.gov

*Counsel for State Defendants-Appellees*