No. 23-35136

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

MAVERICK GAMING LLC,

*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA, *et. al.*,

*Defendant-Appellee,*

SHOALWATER BAY TRIBE,

*Intervenor-Defendant-Appellee.*

_____

On appeal from the United States District Court, Western District of Washington
Case No. 3:22-cv-05325-DGE
The Honorable David G. Estudillo

_____

**SHOALWATER BAY TRIBE'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 2**

_____

| | |
|---|---|
| Lael Echo-Hawk | Scott Crowell |
| MTHIRTYSIX, PLLC | CROWELL LAW OFFICE |
| 700 Pennsylvania Avenue SE | TRIBAL ADVOCACY GROUP LLP |
| The Yard-2nd Floor | 1487 W. State Route 89A, Ste. 8 |
| Washington, D.C. 20003 | Sedona, AZ 86336 |
| Telephone: (206) 271-0106 | Telephone: (425) 802-5369 |
| Email: Lael@MThirtySixPLLC.com | Email: scottcrowell@clotag.net |

1

THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MAVERICK GAMING LLC, | No. 22-cv-05325 DGE |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO LIMITED INTERVENOR SHOALWATER BAY TRIBE'S MOTION TO DISMISS** |
| v. | |
| UNITED STATES OF AMERICA, et al., | NOTED ON MOTION CALENDAR: October, 28, 2022 |
| Defendants. | |

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

1

2

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 2

LEGAL STANDARDS ............................................................................................ 4

ARGUMENT ........................................................................................................... 5

    I.     The Tribe Is Not A "Required Party" Under Rule 19(a) ........................ 5

          A.     Disposition Of This Action In The Tribe's Absence Would Not Impair The Tribe's Ability To Protect Its Interests ..................... 5

          B.     The Tribe's Joinder Is Not Required To Accord Complete Relief .......... 14

    II.    This Action Should Proceed In The Tribe's Absence ......................... 17

CONCLUSION ...................................................................................................... 24

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

i

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER003**

# <u>TABLE OF AUTHORITIES</u>

CASES

*Alto v. Black,*
    738 F.3d 1111 (9th Cir. 2013) ............................................................4, 5, 7, 13, 16, 17

*Am. Greyhound Racing, Inc. v. Hull,*
    305 F.3d 1015 (9th Cir. 2002) ..............................................................11, 17, 18, 19

*Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.,*
    795 F.3d 351 (2d Cir. 2015) ........................................................................................19

*Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.,*
    674 F.2d 1227 (9th Cir. 1982) ..................................................................................20

*Artichoke Joe's Cal. Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003) .......................................................................................6

*Cassidy v. United States,*
    875 F. Supp. 1438 (E.D. Wash. 1994) .......................................................................6

*Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne,*
    471 F. Supp. 2d 295 (W.D.N.Y. 2007) ......................................................................6

*City of Sault Ste. Marie v. Andrus,*
    458 F. Supp. 465 (D.D.C. 1978) .................................................................................6

*Clinton v. Babbitt,*
    180 F.3d 1081 (9th Cir. 1999) ..................................................................................17

*Confederated Tribes of Chehalis Indian Rsrv. v. Lujan,*
    928 F.2d 1496 (9th Cir. 1991) ...................................................................9, 17, 18, 19

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ....................................................................22, 23, 24

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,*
    276 F.3d 1150 (9th Cir. 2002) ............................................................................17, 18

*De Csepel v. Republic of Hungary,*
    27 F.4th 736 (D.C. Cir. 2022) ...........................................................................10, 19

*Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs,*
    932 F.3d 843 (9th Cir. 2019) ...............................................................8, 9, 12, 14, 18, 21

*Friends of Amador Cnty. v. Salazar,*
    554 F. App'x 562 (9th Cir. 2014) .....................................................................10, 17

ii

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER004**

*Issa v. Sch. Dist. of Lancaster,*
    847 F.3d 121 (3d Cir. 2017)................................................................12

*Jamul Action Comm. v. Simermeyer,*
    974 F.3d 984 (9th Cir. 2020) ..........................................................8, 10

*Klamath Irrigation Dist. v. U.S. Bureau of Reclamation,*
    48 F.4th 934 (9th Cir. 2022) ..............................................................10

*Knox v. U.S. Dep't of Interior,*
    759 F. Supp. 2d 1223 (D. Idaho 2010) ....................................6, 11, 14

*Makah Indian Tribe v. Verity,*
    910 F.2d 555 (9th Cir. 1990) ...........................................9, 11, 12, 19, 20

*Manygoats v. Kleppe,*
    558 F.2d 556 (10th Cir. 1977)...........................................................23

*Metcalf v. Daley,*
    214 F.3d 1135 (9th Cir. 2000) ............................................................8

*Naartex Consulting Corp. v. Watt,*
    722 F.2d 779 (D.C. Cir. 1983)............................................................17

*National Licorice Co. v. NLRB,*
    309 U.S. 350 (1940)...........................................................22, 23, 24

*Pimentel. Gensetix, Inc. v. Bd. of Regents,*
    966 F.3d 1316 (Fed. Cir. 2020)..........................................................19

*Pit River Home & Agric. Coop. Ass'n v. United States,*
    30 F.3d 1088 (9th Cir. 1994) .......................................................11, 17

*Ramah Navajo Sch. Bd., Inc. v. Babbitt,*
    87 F.3d 1338 (D.C. Cir. 1996) ............................................................6

*Republic of Philippines v. Pimentel,*
    553 U.S. 851 (2008)....................................................................18, 20

*Sac & Fox Nation of Mo. v. Norton,*
    240 F.3d 1250 (10th Cir. 2001) .......................................................6, 16

*Sw. Ctr. for Biological Diversity v. Babbitt,*
    150 F.3d 1152 (9th Cir. 1998) ...........................................7, 12, 13, 17

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978).............................................................................8

iii

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

*United States v. Dion,*
    476 U.S. 734 (1986) ................................................................8

*Washington v. Daley,*
    173 F.3d 1158 (9th Cir. 1999) ...............................6, 7, 12, 13

*West Flagler Associates v. Haaland,*
    573 F. Supp. 3d 260 (D.D.C. 2021) ........6, 7, 11, 13, 14, 16, 19, 20, 21

*White v. Univ. of Cal.,*
    765 F.3d 1010 (9th Cir. 2014) ...............................................11

*Wichita & Affiliated Tribes of Okla. v. Hodel,*
    788 F.2d 765 (D.C. Cir. 1986) ...............................................10

**STATUTES**

5 U.S.C. § 702 ...........................................................................21

25 U.S.C. § 2702(1)–(2) ...............................................................9

25 U.S.C. § 2703(8) .....................................................................2

25 U.S.C. § 2710(d)(1) ..................................................................2

25 U.S.C. § 2710(d)(1)(A) .............................................................2

25 U.S.C. § 2710(d)(1)(B) ...........................................................2, 3

25 U.S.C. § 2710(d)(1)(C) ...............................................15, 17, 24

25 U.S.C. § 2710(d)(8) ..................................................................3

**OTHER AUTHORITIES**

*Washington Indian Gaming Association Statement on Maverick Gaming's Federal Lawsuit
    Seeking to Undermine Washington's State's System of Tribal Gaming* (Jan. 11, 2022),
    https://tinyurl.com/5y598e3c ................................................10

**RULES**

Fed. R. Civ. P. 19(a)(1) ...............................................................4

Fed. R. Civ. P. 19(a)(1)(A) ...........................................................5

Fed. R. Civ. P. 19(a)(1)(B)(i) ........................................................5

Fed. R. Civ. P. 19(b) ...............................................................5, 21

iv

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**REGULATIONS**

86 Fed. Reg. 51,373, 51,373 (Sept. 15, 2021) ...................................................................3

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

v

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

## **INTRODUCTION**

The Administrative Procedure Act ("APA") establishes the right to judicial review of illegal and unconstitutional federal governmental action and waives federal sovereign immunity to ensure the vindication of that right. The Shoalwater Bay Tribe ("Tribe") has moved to dismiss this action on a sweeping theory that would prevent *any* private plaintiff from *ever* bringing an APA challenge to the Secretary's approval of a state-tribal gaming compact; indeed, it would eliminate the right to judicial review of illegal governmental action whenever an absent sovereign claims an interest in the suit. The Tribe has also presented its argument via an unusual and inequitable use of the Federal Rules of Civil Procedure, first using Rule 24 to be joined to this action, and then using Rule 19 to argue that it "cannot be joined," requiring the dismissal of this action. The stunning position that tribes must be joined as parties in all APA challenges to the Secretary's approvals of state-tribal gaming compacts, and that those challenges must then be dismissed because of sovereign immunity, would render these APA claims unreviewable, a result at odds with common sense, fundamental principles of review of agency action, and the practice of federal courts—including the Ninth Circuit—which routinely hear APA claims challenging the Secretary's approval of state-tribal compacts.

The Tribe's theory is fundamentally mistaken. Rule 19 does not require the presence of any tribes in this litigation. In order for the Tribe's motion to dismiss to succeed, it must demonstrate that it is both (1) a required party under Rule 19(a); and (2) an indispensable party under Rule 19(b). It cannot make either showing.

*First*, the Tribe is not a required party because the United States adequately represents its interest in defending the compacts. The federal government adequately represents the interests of an absent Indian tribe unless there is an actual conflict of interest between the government and the tribe in the context of the suit. In fact, the United States takes the position that absent tribes are not required parties in IGRA challenges like this one for just this reason. The Tribe even admits that the federal government will vigorously defend the challenged compacts and provides only speculation that some undetermined conflict could emerge at some future date. This speculation

1

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER008**

is woefully insufficient, as demonstrated by the fact that the cases on which the Tribe relies involve an *actual* conflict between the federal government and an absent tribe.

Moreover, although the Tribe claims that it is impossible for this Court to accord Maverick complete relief in its absence, neither form of relief would require the Tribe to be bound by a judgment of this Court. This Court could either (a) enjoin the state defendants from enforcing Washington's criminal class III gaming prohibitions against Maverick, which would have *no effect* on the Tribe, its compact, or its gaming operations; or (b) hold that the compacts and compact amendments violate IGRA and the Constitution, in which case it would be the operation of IGRA, the Constitution, and federal criminal statutes—not the judgment of this Court—that would prohibit the Tribe from conducting class III gaming. The Tribe therefore is not a required party.

*Second*, even if the Tribe were a required party, this challenge can and should "in equity and good conscience" proceed in its absence under Rule 19(b). The Tribe will not be prejudiced because the United States adequately represents its interests. And because there is no prejudice in the first place, there is no need to consider whether the prejudice to the Tribe could be minimized. A judgment rendered in the Tribe's absence would be adequate and would not risk piecemeal litigation. Finally, dismissing the action for nonjoinder would deprive Maverick of any judicial remedy for its injuries, especially considering that APA claims can be brought in federal court alone. All four factors therefore weigh against dismissal.

The Tribe does not seriously contest any of this. Rather, the Tribe repeatedly emphasizes its entitlement to sovereign immunity. Rule 19 is not a rule that allows an absent sovereign to obtain the dismissal of any case in which it claims an interest. Because the Tribe is neither a required nor indispensable party, its motion must be denied.

## BACKGROUND

Most forms of casino gaming (referred to as "class III gaming," *see* 25 U.S.C. § 2703(8)) on Indian lands are presumptively illegal and may be conducted only if the requirements of the Indian Gaming Regulatory Act ("IGRA") are met. 25 U.S.C. § 2710(d)(1). First, the tribe must authorize such gaming in an ordinance or resolution that is approved by the Chairman of the

2

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER009**

National Indian Gaming Commission. *Id.* § 2710(d)(1)(A). Second, the gaming must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." *Id.* § 2710(d)(1)(B). Finally, the gaming must be "conducted in conformance with a Tribal-State compact" that has been approved by the Secretary of the Interior. *Id.* § 2710(d)(1)(B), (8).

Maverick, the owner and operator of 18 cardrooms in the State of Washington, wishes to expand its gaming offerings to include games such as roulette, craps, sports betting, and dealer-assisted electronic table games, but Maverick cannot do so because Washington permits only federally recognized Indian tribes to offer these types of games and makes it a crime for anyone else to offer them. Dkt. # 66, ¶¶ 1–3.

The State of Washington has entered into IGRA gaming compacts with all 29 Indian tribes in the state that authorize those tribes to offer a wide range of class III games, such as craps and roulette, and these compacts were approved by the Secretary of the Interior, rendering them effective under IGRA. Dkt. # 66, ¶¶ 66–73. By contrast, it is a crime for any non-tribal entity to offer those class III games. RCW 9.46.220–.222, 9.46.0269(1); Dkt. # 66, ¶¶ 57–66. The State of Washington and several Indian tribes (including the Tribe) have also executed compact amendments permitting the tribes—and only the tribes—to offer sports betting, which the Secretary of the Interior has approved. *See, e.g.*, 86 Fed. Reg. 51,373, 51,373 (Sept. 15, 2021).

On January 11, 2022, Maverick filed this action challenging the Secretary of the Interior's approval of the sports-betting compact amendments under the Administrative Procedure Act ("APA") because the amendments violate IGRA, the Constitution's guarantee of equal protection, and the Constitution's anti-commandeering doctrine. Dkt. # 1, ¶¶ 161–73. Maverick also challenged under 42 U.S.C. § 1983 various Washington State officials' execution and administration of the State's gaming compacts and criminal gaming prohibitions because they violate IGRA, equal protection, and the anticommandeering doctrine. *Id.* ¶¶ 174–203.

The compacts and compact amendments, by permitting the Tribes—and *only the Tribes*—to offer most forms of class III gaming violate IGRA's rule that class III gaming on Indian lands must be located in a state that permits such gaming, which Washington does not. Dkt. # 66, ¶¶ 96–

3

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER010**

107, 134.  Because membership in a Washington Indian tribe often depends on a person's lineal descent from historical tribal rolls and a minimum blood quantum, Washington's decision to limit class III gaming to Indian tribes (and the Secretary's approval of that decision) discriminates on the basis of race in violation of the Constitution's guarantee of equal protection. Dkt. # 66, ¶¶ 108–21, 135, 139.  And because the compacts and compact amendments are the product of IGRA's command that the States must negotiate compacts with the Tribes, they violate the constitutional principle that Congress may not commandeer state governments.  Dkt. # 66, ¶¶ 122–28, 136.

On August 3, 2022, the Shoalwater Bay Tribe moved for limited intervention for purposes of moving to dismiss this action under Rule 19 of the Federal Rules of Civil Procedure, Dkt. # 68. This Court granted the Tribe's motion.  Dkt. # 84.

## LEGAL STANDARDS

Rule 19(a) of the Federal Rules of Civil Procedure states that a "required party" must be joined in an action if feasible.  It defines a "required party" as (1) a person in whose absence "the court cannot accord complete relief among existing parties"; or (2) a person who "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1).  "As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013) (quotation marks omitted).

If it is not feasible to join a party that is required under Rule 19(a), the court then "determine[s] whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).  In making this determination, courts consider four factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:

4

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER011**

(A) protective provisions in the judgment;
(B) shaping the relief; or
(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

## ARGUMENT

## I. The Tribe Is Not A "Required Party" Under Rule 19(a).

The Tribe claims that it is a required party under Rule 19(a) for two reasons. First, it argues that disposing of this action in its absence would impair its ability to protect its interests in the action. Dkt. # 85, at 13–14; *see* Fed. R. Civ. P. 19(a)(1)(B)(i). Second, the Tribe claims that this Court cannot accord complete relief to Maverick in its absence. Dkt. # 85, at 14–15; *see* Fed. R. Civ. P. 19(a)(1)(A). Both attempts to claim "required party" status are foreclosed by precedent.

### A. Disposition Of This Action In The Tribe's Absence Would Not Impair The Tribe's Ability To Protect Its Interests.

**1.** The Tribe claims that it is a required party because it has an interest in conducting class III gaming under its compacts with Washington. But that interest does not suffice to render it a required party under Rule 19(a), which requires the Tribe to show that disposition of this action in its absence would impair the Tribe's ability to protect its interest. It is black-letter law in this circuit that "an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Alto*, 738 F.3d at 1127 (quotation marks omitted). Further, in light of the federal government's "trust responsibility" to Indian tribes, "Tribes are not necessary parties" when the federal government is already a party because "[t]he United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe." *Washington v. Daley*, 173 F.3d 1158, 1167–68 (9th Cir. 1999) (quotation marks omitted); *see also Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1259 (10th Cir. 2001); *Ramah Navajo Sch. Bd., Inc. v. Babbitt¸* 87 F.3d 1338, 1351 (D.C. Cir. 1996); *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471

5

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER012**

F. Supp. 2d 295, 315 (W.D.N.Y. 2007) (Department of Interior's interests in "Indian self-government, including tribal self-sufficiency and economic development … make[] it uniquely qualified to represent a tribe's interests"); *Cassidy v. United States*, 875 F. Supp. 1438, 1445 (E.D. Wash. 1994); *City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465, 473 (D.D.C. 1978).

Accordingly, federal courts have uniformly held that the federal government adequately represents an Indian tribe in IGRA challenges like this one when it "share[s] the Tribe's position … that [a] Compact is consistent with [federal law]." *W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 270–71 (D.D.C. 2021). Even if "a decision striking down the Compacts at issue would have a substantial and serious financial impact on the Tribe[]," it is not a "necessary part[y] under Rule 19(a) if [its] interests are adequately protected by the Secretary" of the Interior. *Knox v. U.S. Dep't of Interior*, 759 F. Supp. 2d 1223, 1235–36 (D. Idaho 2010). Because the Secretary of the Interior had approved the challenged compact amendments in *Knox*, he had "every incentive to zealously defend" their legality, so the Tribes were not necessary parties. *Id.* at 1236–37; *see also Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003) (noting in similar IGRA challenge that, under Rule 19, "[t]he Secretary's interests are not adverse to the tribes' interests and the Department of Interior has the primary responsibility for carrying out the federal government's trust obligation to Indian tribes").

The federal government, too, has repeatedly taken the position that Indian tribes are not required parties in IGRA challenges of this nature because "the Federal Defendants adequately represent the Tribes' interest in seeing [a compact] approval upheld." Federal Defendants' Response to Seminole Tribe of Florida's Motion to Dismiss 9, *W. Flagler*, 2021 WL 8344054 (D.D.C. Oct. 26, 2021). Finding a Tribe to be a necessary party in a challenge to governmental action of this sort would "undermine important public rights crafted by Congress," such as the right to "judicial review of agency action." *Id.* at 8. In fact, as the United States has explained, it "is the only required or necessary party in such suits." *Id.* at 9.

To show that the federal government will not adequately represent its interests, it is not enough for the Tribe to point out conflicts that are not "at issue" in the present suit or speculate

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER013**

that the federal government's "potentially inconsistent responsibilities" might result in some undetermined conflict with the Tribe. *Daley*, 173 F.3d at 1168. To the contrary, the Tribe bears the burden to "demonstrate how such a conflict might actually arise in the context of this case." *Id.*; *see also Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir. 1998) (denying motion to dismiss because tribe never "explained how [a hypothetical] conflict might actually arise in the context of Southwest's suit" and "identif[ied] no argument the United States would not or could not make on [the tribe's] behalf"). For example, the Ninth Circuit, in determining that the BIA adequately represented the absent tribe in *Alto*, emphasized that "the United States shares with the Tribe an interest in defending" the challenged action, "which granted precisely the relief the Tribe sought," and that the Secretary's trust responsibilities to the tribe obligated him to protect the Tribe's interests. 738 F.3d at 1128. "To be sure, conflicts can arise between the United States and an Indian tribe; when they do, the government cannot adequately represent the tribe's interest. But no such conflict has surfaced to this point in this case," and therefore the motion to dismiss necessarily failed. *Id.* (citation omitted).

The Tribe has not come anywhere close to articulating a conflict of interest with the federal defendants that would render them inadequate representatives in this action. The Tribe relies on cases in which a conflict between the United States and an absent tribe already *did* exist, but those cases simply underscore the Tribe's failure to point to any existing conflict here.

For example, the Tribe relies on *Dine Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, 932 F.3d 843 (9th Cir. 2019). *Dine Citizens* involved a suit claiming that federal defendants' environmental analyses—which were prerequisites to the reauthorization of mining by a tribally owned mine—were insufficient under the Endangered Species Act and the National Environmental Policy Act. 932 F.3d at 850. But those statutes are fundamentally different from IGRA. They require the federal government to take actions in the interest of the general public, without consideration of the effects those actions might have on Indian tribes. Indeed, they impose obligations that directly conflict with the interests of Indian tribes. *See, e.g.*, *United States v. Dion*, 476 U.S. 734, 735–36 (1986) (upholding Endangered Species Act conviction of member of

7

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER014**

Yankton Sioux Tribe); *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000) (federal government's authorization of Makah Indian Tribe to resume whaling "delay[ed] … by the need to respect NEPA's commands"); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, *whatever the cost*." (emphasis added)).

The Ninth Circuit accordingly concluded that the federal defendants could not adequately represent the tribal mine owner because, while they had "an interest in defending their own [environmental] analyses that formed the basis of the approvals at issue," their "overriding interest … must be in complying with environmental laws such as NEPA and the ESA," not the approval of continued mining operations. *Dine Citizens*, 932 F.3d at 855. Because the "overriding interest[s]" of the federal defendants were not to grant the tribal mining permits but to ensure that "the proposed action would not jeopardize the continued existence of any of the threatened and endangered species evaluated" and to take a "'hard look' at the various impacts of the mining complex," the federal defendants could not be "counted on to adequately represent" the tribal interests in the continued operation of the mine. *Id.* at 849–50, 855. The interests of the tribes and the federal government thus were fundamentally misaligned. *See Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 997 (9th Cir. 2020) (federal defendants' "obligations to follow relevant environmental laws were in tension with tribal interests" in *Dine Citizens*).

This case, by contrast, involves IGRA, a statute that is explicitly concerned with the federal government's trust obligation towards Indian tribes. Among IGRA's primary goals are "promoting tribal economic development, self-sufficiency, and strong tribal governments," and "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702(1)–(2). A suit to compel the federal government to comply with a statute that expressly directs the federal government to protect the interests of Indian tribes—in contrast to a statute passed to protect the environment, endangered species, or some other public interest—does not present a conflict of interest.

Nor can the Tribe analogize this case to *Dine Citizens* on the ground that its interests might

8

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER015**

diverge with the federal government *after* this Court holds that the challenged compacts violate IGRA and the Constitution. Dkt. # 85, at 21–22. Rule 19 is concerned not with *any conceivable* interest of an absent party, but only with its "*legally protected interest*[*s*]." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990); *see also Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1503 (9th Cir. 1991) (O'Scannlain, J., concurring in part and dissenting in part) ("The relevant inquiry for Rule 19(a), however, must be whether *cognizable legal rights* of the absent non-party will be prejudiced by the suit's continuation. 'Prejudice to one's self-interest' and 'prejudice to one's legally protected interests' are not synonymous." (footnotes omitted)). If this Court concludes that the tribal gaming monopoly violates IGRA and the Constitution, the Tribe will obviously not have any legally protected right in maintaining that illegal monopoly. In *Dine Citizens*, by contrast, if the court had concluded that the federal defendants needed to conduct additional analysis under NEPA and the ESA, the tribal mine owner's interest in operating a mine would not have been rendered illegal—let alone unconstitutional. Rather, it merely would have been subject to delay. *Dine Citizens* thus involved a conflict of interest that the legal issues in this case do not present.

Furthermore, because "tribal … conservation organizations" were among the parties that had challenged the federal decisions reauthorizing coal mining at a tribally owned mine, *Dine Citizens*, 932 F.3d at 847, there were tribal interests on both sides of the litigation in *Dine*. Where the "allegiance the government owes to the tribes as trustee[] is necessarily split among … competing tribes," it cannot represent them all, so its representation is inadequate. *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 775 (D.C. Cir. 1986). Here, however, the tribes "stand united in opposing" Maverick's challenge. WIGA, *Washington Indian Gaming Association Statement on Maverick Gaming's Federal Lawsuit Seeking to Undermine Washington's State's System of Tribal Gaming* (Jan. 11, 2022), https://tinyurl.com/5y598e3c. When, as here, the interests of the absent sovereign and the remaining defendants are "closely aligned," there is no risk of prejudice, and dismissal is improper. *De Csepel v. Republic of Hungary*, 27 F.4th 736, 750 (D.C. Cir. 2022).

9

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER016**

1    Similarly, the Tribe points to *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48

2    F.4th 934 (9th Cir. 2022), but that case is inapposite for the same reasons that *Dine Citizen* is.  The

3    federal defendants' interest in *Klamath Irrigation* was in fulfilling their duties under the ESA—

4    specifically, preserving "the largest remaining contiguous habitat for endangered suckers in the

5    Upper Klamath Basin"—not in defending the Tribes' "reserved water and fishing rights."  *Id.* at

6    939, 944–45.  This general public-interest obligation to preserve endangered species of fish in the

7    Upper Klamath Basin conflicted with the Tribes' specific interests in fishing in the basin.  In

8    addition, "the Tribes [were] in active litigation over the degree to which Reclamation is willing to

9    protect the Tribes' interests in several species of fish" in the basin, which "would materially limit

10   Reclamation's representation of the Tribes' interests." *Id.* at 945.  The federal government thus

11   already had material conflicts of interest with the tribe in question.

12       The Tribe's other authorities are likewise inapt.  In most of them, the court had identified

13   an actual conflict between the federal government and the absent tribe that made the United States

14   an inadequate representative.  *See, e.g.*, *Jamul Action Comm.*, 974 F.3d at 997–98 (lawsuit

15   involving tribal lands that plaintiff "contends are owned by individual Indians rather than the

16   Village, thus calling into question the government's ability to adequately represent the Village's

17   interests"); *Friends of Amador Cnty. v. Salazar*, 554 F. App'x 562, 564 (9th Cir. 2014)

18   ("government's response to the district court's questions" led district court to suspect government

19   "would seek to avoid taking positions contrary to its national Indian policy, even if contrary to the

20   Tribe's interest"); *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1099 (9th

21   Cir. 1994) (lawsuit involved "conflicting claims" of two Native American groups); *Makah*, 910

22   F.2d at 559 ("federal government could not protect the interests of the absent tribes because those

23   interests conflict among themselves").  In others, no federal parties were present in the suit, so the

24   presumption that the federal government adequately represents the interests of absent Indian tribes

25   could not have applied.  *See White v. Univ. of Cal.*, 765 F.3d 1010 (9th Cir. 2014); *Am. Greyhound

26   Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002).

     Here, by contrast, the interests of the federal defendants and the Tribe are perfectly aligned.

10

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER017**

Both believe that the compacts do "not violate the Indian Gaming Regulatory Act" or "any other provision of Federal law" and should continue in effect. *See, e.g.*, Dkt. # 67-9, at 1. The Tribe has not identified—and cannot identify—any conflict of interest with the federal defendants in this lawsuit similar to those that existed in the cases it relies on. Indeed, the Tribe admits that "the State and the United States appear poised to vigorously defend the compacts at issue." Dkt. # 85, at 23. The Tribes' admission that the United States will forcefully defend its interests in the challenged compacts—in other words, be an adequate representative—dooms its motion to dismiss. *See W. Flagler*, 573 F. Supp. 3d at 271 (tribe was adequately represented because "[t]he Secretary and the State share the Tribe's position on the key issue in this case—*i.e.*, that the Compact is consistent with IGRA"); *Knox*, 759 F. Supp. 2d at 1236 (tribes were adequately represented because "the Secretary approved [the compact] amendments and hence has every incentive to zealously defend its approval").

2. With its interests in this litigation perfectly aligned with the federal defendants, the Tribe attempts to show that the federal defendants' representation is inadequate by making arguments that have been soundly rejected in this circuit.

*First*, the Tribe argues that the federal government does not have a pecuniary interest in the Tribe's gaming operations. Dkt. # 85, at 21. But a party is not required to have a shared financial interest with an absent party in order to be an adequate representative under Rule 19, nor can the Tribe cite any authority for that proposition. *Dine Citizens* held only that a mere shared financial interest was *insufficient* to make a party an adequate representative. 932 F.3d at 856. Moreover, the Ninth Circuit has repeatedly made clear that financial stakes are largely irrelevant for the purposes of Rule 19. *See id.* at 852 (holding that an absent party's legally protected interest under Rule 19 "must be 'more than a financial stake'" (quoting *Makah*, 910 F.2d at 558)).

*Second*, the Tribe speculates that some hypothetical and as-yet-unknown conflicts *might* emerge at some point. In particular, the Tribe contends that if this Court enters judgment in Maverick's favor, then, *after* the litigation, the federal government may "take enforcement action to stop the Tribe's gaming." Dkt. # 85, at 21–22. But the only relevant question is whether the

11

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

TribeSER018

Tribes' and the federal defendants' positions are aligned *in the litigation*. *See Daley*, 173 F.3d at 1168 ("A conflict would arise only in regard to the level of allocations, which are not at issue here" and the "Tribes have failed to demonstrate how such a conflict might actually arise in the context of this case."); *Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154 (similar). If this Court concludes that the compacts violate federal law, any interest the Tribe might have in continuing to conduct gaming in violation of federal law is not an interest that justifies deeming the Tribe a required party. *See Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) (a party has "'no interest in continuing practices' that violate" the law).

*Third*, The Tribe claims that the federal defendants do not adequately represent it because they have not made the Tribe's Rule 19 arguments. Dkt. # 85, at 22. The Ninth Circuit has emphatically rejected this "circular" argument: It "would preclude the United States from opposing frivolous motions to dismiss out of fear that its opposition would render it an inadequate representative" and "would also create a serious risk that non-parties clothed with sovereign immunity, such as [an Indian tribe], whose interests in the underlying merits are adequately represented could defeat meritorious suits simply because the existing parties representing their interest opposed their motion to dismiss." *Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154.

*Fourth*, the Tribe speculates that the federal government *might* pursue a litigation strategy that diverges from the Tribe's, and that, in light of the federal government's obligation to serve multiple constituencies, its interests *might* diverge at some unknown point in the litigation in some unknown way. Such conjectures have never been enough to demonstrate that the federal government is an inadequate representative of an absent Indian tribe. *Alto*, 738 F.3d at 1128 ("conflicts can arise between the United States and an Indian tribe … [b]ut no such conflict has surfaced to this point in this case"); *Daley*, 173 F.3d at 1168 (the "Tribes have failed to demonstrate how such a conflict *might actually arise in the context of this case*") (emphasis added). Indeed, the Ninth Circuit reversed a district court's conclusion that the federal government could not adequately represent an absent Indian tribe due to "the possibility of conflict arising from the federal government's potentially inconsistent responsibilities" because "[n]either the district court

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

nor any of the parties has explained how such a conflict might actually arise in the context of [the] suit." *Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154.

Nor is a mere difference in litigation strategy—let alone the hypothetical one in this case—sufficient to make the federal government an inadequate representative. In *Daley*, the Ninth Circuit agreed with the district court "that the Tribes are better prepared than the federal defendants to present" certain evidence, but it reversed the district court's conclusion that the absent Tribes were required parties because "this concern is outweighed by the absence of any direct conflict of interest between the United States and the Tribes in this matter." 173 F.3d at 1167 n.11. Even if a difference in litigation strategy *were* enough to make the federal defendants' representation inadequate, the Tribe has not identified any such actual difference in this case.

*Finally*, the Tribe claims that its sovereign immunity and interests are implicated in this action and that those interests cannot be adequately represented by the federal defendants. Dkt. # 85, at 14, 18, 21. But the Tribe has not explained how its "sovereignty would be implicated in the adjudication" of this action. *See Sw. Ctr. for Biological Diversity*, 150 F.3d at 1154–55. As with the challenge to the gaming compact in *West Flagler*, "the Tribe is not a party to this case, and the plaintiff[] make[s] no attempt to bind either the Tribe or its agents." 573 F. Supp. 3d at 270. Nor does it "resolve the ownership of any asset to which the Tribe has a 'nonfrivolous, substantive claim,' which would indirectly violate the Tribe's immunity." *Id.* Rather, Maverick seeks a holding that the federal defendants violated federal law by approving the challenged gaming compact amendments and that the state defendants are violating federal law by simultaneously enforcing the challenged compacts and compact amendments and Washington's criminal prohibitions of class III gaming. Dkt. # 66, ¶¶ 164–206. Such holdings "would fully respect the Tribe's sovereign immunity." *W. Flagler*, 573 F. Supp. 3d at 270.

Again relying on the inapt *Dine Citizens*, the Tribe wrongly suggests that the federal defendants cannot adequately represent its sovereign interests in conducting class III gaming and obtaining the revenue such gaming provides the Tribe. Dkt. # 85, at 21. But the problem in *Dine Citizens* was not that it was impossible for the federal government to represent the tribe's

13

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

TribeSER020

"sovereign interest in ensuring that the Mine and Power Plant continue to operate and provide profits to the Navajo Nation," but that the federal government's "overriding interest … in complying with environmental laws … differs in a meaningful sense" from the tribe's interest. 932 F.3d at 855. Where there is no such conflict, the federal government is fully capable of representing a tribe's interest in continuing to conduct class III gaming pursuant to a state-tribal compact. *W. Flagler*, 573 F. Supp. 3d at 270–71; *Knox*, 759 F. Supp. 2d at 1236–37. Because the Tribe's presence in this litigation is not necessary to accord Maverick complete relief and the Tribe's interests in this action are adequately represented by the federal defendants, the Tribe is not a required party under Rule 19(a). Its motion to dismiss should be denied for that reason alone.

## B. The Tribe's Joinder Is Not Required To Accord Complete Relief.

The Tribe contends that this Court cannot accord complete relief to Maverick in its absence because it would not be bound by a judgment in Maverick's favor, but this argument rests on a fundamental misunderstanding of the nature of Maverick's claims and injuries. Washington's tribes would not have to be bound by a judgment in this action for Maverick to obtain full relief on its claims.

The Tribe repeatedly claims that the Washington Tribes "are the true target of Maverick's suit," and that, because the Tribes are immune from suit, Maverick has circumvented that immunity by suing state and federal officials instead. Dkt. # 85, at 1, 10, 13–14. The Tribe is mistaken. It is not the Tribes' operation of class III gaming—standing alone—that injures Maverick. Maverick is injured because it is forced to compete with the Tribes on an unequal playing field, in which the Tribes are given carte blanche to offer a wide variety of class III games, while Maverick is criminally prohibited from offering those same games. Dkt. # 66, ¶¶ 144–45, 152–63. Washington's Tribes did not create and do not administer this discriminatory gaming regime. Rather, it is the product of Washington's decision to simultaneously allow the Tribes to offer class III gaming while criminally prohibiting everyone else from doing so, and the Secretary of the Interior's decision to permit this regime to go into effect. Dkt. # 66, ¶¶ 152–56. Maverick has thus named as defendants the persons responsible for its injuries, and would have sued the

14

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER021**

same state and federal officials even if the Washington Tribes weren't immune from suit.

Because Maverick's injuries are caused by the actions of the state and federal defendants—not Washington's Tribes—the Tribe would not have to be bound by a judgment of this Court for Maverick to obtain complete relief. Indeed, this Court could redress Maverick's injuries by simply enjoining the State defendants from enforcing against Maverick Washington's criminal prohibitions against the forms of class III gaming that it permits Indian tribes in the State to offer. Dkt. # 66, ¶ 157. That would allow Maverick to offer the full range of games that the tribes currently offer and compete on an equal playing field without having any effect on the tribes' existing gaming operations or compacts. The availability of this form of relief *alone* is a basis to reject the Tribe's argument that it is impossible to accord complete relief in its absence.

Alternatively, if this Court decided to create parity by leveling down instead of leveling up, Dkt. # 66, ¶ 158, an order declaring the compacts and compact amendments void and enjoining the State defendants from enforcing them would render the compacts not "in effect" under IGRA. *See* 25 U.S.C. § 2710(d)(1)(C). It would be *IGRA and the Constitution*—not this Court's judgment—that would prohibit the Tribes from offering the class III games that Washington forbids Maverick from offering. The Tribe is therefore incorrect in claiming that, as a party not bound by this Court's judgment, it could still "assert its rights under the agreement." Dkt. # 85, at 14. The Tribes' compact rights would not be legally enforceable if a judgment of this Court rendered the compacts not "in effect" under IGRA.

The Ninth Circuit's decision in *Alto v. Black*, 738 F.3d 1111 (9th Cir. 2013), compels the conclusion that the Tribe's presence is not necessary to award complete relief. In that case a tribe had disenrolled members, and the BIA issued an order upholding that decision. *Id.* at 1115. The disenrolled members sued the federal officials, seeking a preliminary injunction of the approval order, which would have rendered the tribe's disenrollment decision unenforceable. *Id.* at 1117–19. The tribe intervened to move to dismiss under Rule 19 for failure to join it as an indispensable party, claiming that complete relief could not be accorded in its absence. *Id.* at 1119, 1126.

The Ninth Circuit disagreed, explaining that the plaintiffs' requested "relief is 'meaningful'

15

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER022**

as between [them] and the BIA, even if it does not bind the Tribe directly," because "[t]he injury resulted from the Secretary's actions in ruling the [plaintiffs] ineligible for tribal membership, not from the Band's prior actions with regard to the membership issue" and "[w]e may assume that the Band will then abide by the BIA's [court-ordered] decision, as it is committed by [law] to do." *Id.* at 1126–27; *id.* at 1127 ("The practical implications of the Secretary's decision … hinge not on any court order, but on the Band's legal duties … under its own governing documents and applicable federal law.").

The Ninth Circuit explained that the cases the Tribe relies on here were inapposite because "[i]n those cases, however, the injury complained of was a result of the absent *tribe's* action, not only or principally that of the named agency defendant," whereas in *Alto*, "the injury complained of" was "the BIA's violation of the APA." *Id.*; *see also Sac & Fox Nation*, 240 F.3d at 1258 (complete relief could "clearly" be accorded in tribe's absence because action focused on "the propriety of the Secretary's determinations," so "the absence of the Wyandotte Tribe does not prevent the plaintiffs from receiving their requested declaratory relief"); *W. Flagler*, 573 F. Supp. 3d at 271 (Tribe's presence was not necessary to award complete relief in challenge to Secretary's approval of the Tribe's gaming compact because the "plaintiffs challenge an action by the Secretary and obtaining relief against the Secretary would fully redress their injury"). The Court explained that the Navajo Nation was a required party in *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150 (9th Cir. 2002), because enjoining the tribe's lessee from enforcing a challenged lease condition would not stop the absent tribe from enforcing the same condition. *Alto*, 738 F.3d at 1126. And it explained that the Quinault Nation was a required party in *Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496 (9th Cir. 1991), because it would still be able to assert sovereign power over the reservation, the "very practice that prompted the plaintiffs' complaint." *Alto*, 738 F.3d at 1127; *see also Clinton v. Babbitt*, 180 F.3d 1081, 1088 (9th Cir. 1999) (absent tribe would still be able to assert rights under challenged accommodation agreement); *Pit River*, 30 F.3d at 1099 (absent tribe would still be able to exercise

16

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

TribeSER023

1    right to possess land).[1]

2        This case is governed not by the Tribe's inapposite cases but by *Alto*. A declaratory

3    judgment that the compacts and compact amendments violate IGRA and the Constitution, *see* Dkt.

4    # 66, ¶ 207, would render them not "in effect" under IGRA, 25 U.S.C. § 2710(d)(1)(C). The

5    practical implication of that decision would thus bar the Tribe from asserting its rights under the

6    compacts not because it would be bound by this Court's judgment (it would not be) but because

7    the operation of *federal law* would prevent the Tribe from conducting class III gaming pursuant to

8    compacts that are not in effect under IGRA. The Tribe's contention that this Court cannot accord

9    complete relief in its absence is therefore meritless.

10   **II.    This Action Should Proceed In The Tribe's Absence.**

11       **A.** As a threshold matter, it is far from clear that Rule 19(b) even applies. Rule 19(b)

12   applies only if a required party "cannot be joined." Fed. R. Civ. P. 19(b). But by seeking and

13   obtaining intervention, the Tribe has now been joined to this action, necessarily defeating any

14   argument that it "cannot be joined." The Tribe asserts that it has waived its immunity *solely* for

15   the purposes of arguing that it cannot be joined and the action cannot proceed in its absence. Dkt.

16   # 85, at 2. But the Supreme Court does not permit the "seriously unfair results" that would occur

17   if a sovereign were permitted to both voluntarily "invoke federal jurisdiction" while

18   simultaneously claiming immunity from that jurisdiction. *Lapides v. Bd. of Regents*, 535 U.S. 613,

19   619 (2002). Because that would be "anomalous or inconsistent … it is not surprising that more

20   than a century ago this Court indicated that a State's voluntary appearance in federal court

21   amounted to a waiver of its" immunity. *Id.*; *see also Pettigrew v. Oklahoma ex rel. Okla. Dep't of

22   Pub. Safety*, 722 F.3d 1209, 1213 (10th Cir. 2013) ("moving to intervene in federal-court

23   litigation" constitutes waiver of sovereign immunity); *Bd. of Regents v. Phoenix Int'l Software,*

---

24   [1] The Tribe also relies on several irrelevant cases that did not even *consider* whether it was possible
25   to accord complete relief. *See* Dkt. # 85, at 14–15 (citing *Friends of Amador Cnty. v. Salazar*, 554
     F. App'x 562 (9th Cir. 2014); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002);
26   *Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152 (9th Cir. 1998); *Naartex Consulting
     Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983)).

17

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER024**

*Inc.*, 653 F.3d 448, 463 (7th Cir. 2011) ("When a state chooses to intervene in a federal case, it waives its immunity for purposes of those proceedings."). Because the Tribe has waived its immunity and voluntarily joined this action, it cannot now turn around and argue that it cannot be joined to an action *it has already joined* because it is immune from suit.

**B.** Even if this Court were to conclude that the Tribe is a required party that cannot be joined (despite already being joined), that still would not justify dismissal because *none* of the Rule 19(b) factors weighs in favor of dismissal. Sensing that it cannot succeed under the Rule 19(b) factors, the Tribe urges this Court to ignore them, stating that when an absent party is immune from suit, "there is 'very little room for balancing of other factors' under Rule 19(b)." Dkt. # 85, at 17 (purporting to quote *Am. Greyhound Racing*, 305 F.3d at 1025). The quoted language appears nowhere in *American Greyhound Racing*. In fact, that case said the exact opposite: That court noted that "some courts have held that sovereign immunity forecloses in favor of tribes the entire balancing process under Rule 19(b), *but we have continued to follow the four-factor process even with immune tribes*." *Am. Greyhound Racing*, 305 F.3d at 1025 (emphasis added). Numerous other Ninth Circuit decisions have made the same point. *See, e.g.*, *Dawavendewa*, 276 F.3d at 1162 ("Cognizant of these out-of-circuit decisions, the Ninth Circuit has, nonetheless, consistently applied the four part balancing test to determine whether Indian tribes are indispensable parties."); *Confederated Tribes*, 928 F.2d at 1499 ("Some courts have noted, however, that when the necessary party is immune from suit, there is very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor," but "[w]e have nonetheless consistently applied the four-part test to determine whether Indian tribes are indispensable parties."). Even in the Tribe's preferred case, *Dine Citizens*, the Ninth Circuit made this same point. 932 F.3d at 857 (quoting *Am. Greyhound Racing*, 305 F.3d at 1025).

Moreover, the Tribe's proposed rule is inconsistent with Supreme Court precedent. In *Republic of Philippines v. Pimentel*, 553 U.S. 851, 855 (2008), the Supreme Court considered the Philippines' claim that an action needed to be dismissed under Rule 19(b) because it was absent (it had previously been dismissed from the suit as an immune foreign sovereign). The Supreme

18

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

Court considered the prejudice that would result to the Philippines if a judgment were rendered in its absence, *Pimentel*, 553 U.S. at 865–69, but it did not ignore the other Rule 19(b) factors simply because the Philippines was an absent sovereign. Rather, the Court conducted "further analysis under the additional provisions of Rule 19(b)," noting that, "in the Rule 19(b) inquiry, a court *must* examine, to some extent, the claims presented and the interests likely to be asserted both by the joined parties and the absent entities or persons." *Id.* at 868, 872 (emphasis added). As the Federal Circuit has noted, any rule that an absent party's status as an immune sovereign should be given controlling weight in the Rule 19(b) balancing is inconsistent with the Supreme Court's reasoning in *Pimentel*. *Gensetix, Inc. v. Bd. of Regents*, 966 F.3d 1316, 1327 n.9 (Fed. Cir. 2020).

The Tribe contends that the first Rule 19(b) factor—the extent to which the Tribe would be prejudiced by a judgment in its absence—weighs in its favor simply because its compacts might be rendered ineffectual under IGRA if Maverick succeeds. Dkt. # 85, at 16. This factor "asks whether a party might suffer prejudice not simply from an adverse result, but specifically from the decision being 'rendered in [its] absence.'" *De Csepel*, 27 F.4th at 748 (alteration in original). This factor "largely duplicates" the consideration under Rule 19(a) whether an absent party has "a protectible interest that will be impaired or impeded by the party's absence." *Am. Greyhound Racing*, 305 F.3d at 1025; *see also Confederated Tribes*, 928 F.2d at 1499 ("prejudice test under Rule 19(b) is essentially the same as the inquiry under Rule 19(a)"). Accordingly, "[c]ourts recognize that 'prejudice to absent parties approaches the vanishing point' when 'the absent and remaining parties' interests are aligned in all respects,' including in cases in which *the absent party is an immune sovereign*." *De Csepel*, 27 F.4th at 748 (emphasis added) (citation omitted) (quoting *Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 360 (2d Cir. 2015)); *see also Makah*, 910 F.2d at 560 ("As in Rule 19(a)(2), the presence of a representative may lessen prejudice."). The first Rule 19 factor weighs against dismissal for the same reason that the Tribe is not a required party: The federal defendants adequately represent its interests. *See supra* at 5–14; *W. Flagler*, 573 F. Supp. 3d at 270–71 ("the Tribe's absence is not prejudicial because both the Secretary and the State of Florida have defended the Compact on its merits" and "share the

19

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER026**

Tribe's position on the key issue in this case—*i.e.*, that the Compact is consistent with" federal law).

The Tribe offers no serious argument that the second and third factors weigh in favor of dismissal, offering only a single, conclusory sentence that they do. Dkt. # 85, at 16. The Tribe offers no explanations for this unsupported assertion because there are none. The second factor—the extent to which prejudice to the Tribe could be minimized—is irrelevant because its adequate representation by the federal defendants ensures that it will not be prejudiced. *W. Flagler*, 573 F. Supp. 3d at 271 ("[T]he ability to minimize prejudice … bears on indispensability only when there is prejudice to be minimized."). Thus, the second factor also weighs against dismissal.

The third factor—whether a judgment rendered in the Tribe's absence would be adequate—also counsels against dismissal. "[A]dequacy refers to the 'public stake in settling disputes by wholes whenever possible" and "the avoidance of multiple litigation." *Pimentel*, 553 U.S. at 870 (quotation marks omitted). As explained above, *see supra* at 15–16, Maverick's injuries are not caused by the Tribe but by the federal and state defendants, and granting Maverick relief from the defendants' actions would fully redress its injuries. *See W. Flagler*, 573 F. Supp. 3d at 271–72. There is no risk of follow-on litigation: If this Court enters a judgment either (1) enjoining Washington from enforcing against Maverick its criminal prohibitions of class III gaming; or (2) holding the challenged compacts and compact amendments to be not in effect under IGRA, there will be no need for any further litigation. Maverick would be able to offer class III gaming on an even playing field. There is no possibility that failure to join the Tribe would render the judgment inadequate because "obtaining relief against the Secretary [and the state defendants] would fully redress the[] injury." *Id.* at 271.

Finally, the fourth factor—whether Maverick would have an adequate remedy if this action were dismissed for nonjoinder—weighs heavily against dismissal. "[I]f no *alternative forum* is available to the plaintiff, the court should be 'extra cautious' before dismissing the suit." *Makah*, 910 F.2d at 560. Dismissing this action for failure to join the Tribe would leave Maverick with no alternative forum for its suit. Maverick would not be able to bring its claim in any non-federal

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER027**

forum because the United States' waiver of sovereign immunity for suits against it and its officers applies only to suits in federal courts. *Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.*, 674 F.2d 1227, 1233 (9th Cir. 1982). And Maverick would not be able to bring its suit in any federal forum because the Tribe would always be able to raise the same Rule 19 argument it makes here.

Indeed, the implications of the Tribe's Rule 19 argument are startling. Were the Tribe's Rule 19 arguments to prevail, they would not only bar *Maverick* from obtaining relief for its injuries; they would effectively prohibit any person in any court from ever obtaining judicial review of the Secretary of the Interior's approval of a class III state-tribal gaming compact, making those actions unreviewable and nullifying the APA's cause of action. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, *is entitled to judicial review thereof*." (emphasis added)).

The District Court for the District Court of Columbia rejected this "extreme and unworkable" argument in a similar challenge to an IGRA gaming compact: "[H]olding that the Tribe is indispensable in this case, where the Tribe has made no particularized showing of prejudice, would require treating tribes as indispensable in *every* case that challenges the Secretary's approval of a gaming compact. And under that rule, those approvals will *never* be subject to judicial review because the nonjoinder of a tribe will *always* require dismissal." *W. Flagler*, 573 F. Supp. 3d at 272.

The Rule 19(b) factors are designed to help a court "determine whether, in equity and conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). It would be highly inequitable to adopt a rule that would make agency action approving state-tribal compacts—no matter how flagrantly such a compact might violate federal law—completely unreviewable.

The Tribe contends that Maverick has alternative fora for its claims in this action because it could lobby Congress or the Washington legislature to amend their laws or ask the federal

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

government to institute enforcement actions against the tribes. Dkt. # 85, at 3, 17. But as the Tribe's own authority makes clear, this factor looks to whether a plaintiff has an "alternate forum in which to *sue*." *Dine Citizens*, 932 F.3d at 858 (emphasis added). Maverick's claim is that the federal and state defendants have injured it by violating federal law *as it currently stands*, so amendments to IGRA are unnecessary. It is no answer under Rule 19 to say that a plaintiff could lobby legislatures to accord it relief or beg the defendants outside the context of litigation to stop injuring it. If that were so, a plaintiff would *always* have an adequate alternate forum for remedying his injuries. Because all four Rule 19(b) factors weigh against dismissal, this action should in equity and good conscience proceed in the Tribe's absence.

**C.** Even if the Tribe *were* a required party under Rule 19(a), and even if the Rule 19(b) factors *did* weigh in favor of dismissal, this Court *still* should not dismiss this action because the public-rights exception to Rule 19 would apply. "In a proceeding … narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *National Licorice Co. v. NLRB*, 309 U.S. 350, 363 (1940). When the "rights asserted [in a suit] arise independently of any contract which an adverse party may have made with another, not a party to the suit, even though their assertions may affect the ability of the former to fulfill his contract[,] … the Court may, in a proper case, proceed to judgment without joining other parties to the contract." *Id.*

The Ninth Circuit has similarly "refused to require the joinder of all parties affected by public rights litigation—even when those affected parties have property interests at stake— because of the tight constraints traditional joinder rules would place on litigation against the government." *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988). In *Conner*, the Bureau of Land Management had leased federal land for oil and gas exploration, and many of the leases were "non-NSO leases," which "authorize[d] the government to impose reasonable conditions on drilling, construction, and other surface-disturbing activities," but, unlike leases with NSO stipulations, "they do not authorize the government to preclude such activities altogether." *Id.* at 1443–44. The Ninth Circuit "enjoin[ed] the federal defendants from permitting any surface-

22

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER029**

disturbing activity to occur on any of the leases until they have fully complied with NEPA and ESA." *Id.* at 1461. The Ninth Circuit concluded that the lessees were not indispensable parties under the public-rights exception to Rule 19, explaining that the "litigation against the government does not purport to adjudicate the rights of current lessees; it merely seeks to enforce the public right to administrative compliance with the environmental protection standards of NEPA and the ESA." *Id.* at 1460. The Ninth Circuit reached this conclusion even though its order "essentially creat[ed] NSO leases out of non-NSO leases," subjecting the lessee's surface-disturbing activities to governmental *approval* rather than mere *reasonable conditions*. *Id.* at 1461. "The order as modified will obviously preclude immediate government approval of surface-disturbing activity, but such foreclosure of the lessees' ability to get 'specific performance' until the government complies with NEPA and the ESA is insufficient to make the lessees indispensable to this litigation." *Id.* at 1461.

Because Maverick's suit does not seek to adjudicate the rights of the Tribe under the terms of its compact with the State of Washington but to enforce the public right to administrative compliance with IGRA and the Constitution, the public-rights exception to Rule 19 applies to this action, and it should not be dismissed. As in *Conner*, the Tribe is not an indispensable party simply because an order compelling the federal and state defendants to comply with federal law might as a practical matter prohibit it from exercising rights under its gaming compact.

The Tribe contends that the public-rights exception does not apply on the ground that this "lawsuit seeks to extinguish" its "substantial legal entitlements." Dkt. # 85, at 23. But the rule that an adjudication must not "destroy the legal entitlements of the absent parties," is designed to cover actions that would destroy an absent party's rights *under the terms of an agreement to which it is party*. *Conner*, 848 F.2d at 1459, 1461 ("The order as modified does not adjudicate or 'prejudge' the rights of the lessees against the government," and "the lessees remain free to assert whatever claims they may have against the government."); *see Nat'l Licorice*, 309 U.S. at 364 ("[T]he right asserted by the Board is not one arising upon or derived from the contracts between petitioner and its employees."). In *Manygoats v. Kleppe*, 558 F.2d 556, 557–59 (10th Cir. 1977),

23

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER030**

the Tenth Circuit distinguished between an action seeking the "cancellation of [a] lease," in which a party to the lease was deemed indispensable, and an action challenging the government's *approval* of an agreement without complying with NEPA, where "[d]ismissal of the action for nonjoinder of the Tribe would produce an anomalous result."

An interpretation of the public-rights doctrine that would bar its application in cases where an order compelling the government to comply with federal law has the *practical effect* of eliminating an absent party's ability to assert a legal entitlement is inconsistent with the public-rights cases. In creating the public-rights exception to joinder rules, the Supreme Court relied on cases where an "injunction was broad enough to prevent the offender from carrying out contracts with persons not parties to the suits," where "the order restraining unfair methods of competition may preclude the performance of outstanding contracts by the offender," and where "the effect of the decree was to order the employer to deal exclusively with [one party], although the employer had a contract with [another party] not a party to the suit." *Nat'l Licorice*, 309 U.S. at 365–66. The order in *Conner* effectively destroyed the lessees' right to "get 'specific performance'" under the their leases. 848 F.2d at 1461. In all these cases, "the public right was vindicated by restraining the unlawful actions of the defendant *even though the restraint prevented his performance of the contracts*,"—*i.e.*, had the practical effect of eliminating a contractual right of a nonparty. *Nat'l Licorice*, 309 U.S. at 366 (emphasis added).

So too here. An order holding the challenged compacts and compact amendments illegal under IGRA and the Constitution would render them not "in effect" under IGRA, 25 U.S.C. § 2710(d)(1)(C), which would, as a practical matter, prevent the Tribe from exercising its rights under its compact. But the fact that an order compelling the government to respect public rights may incidentally "foreclos[e]" the assertion of a nonparty's legal entitlement does not render the public-rights exception inapplicable. The Tribe's interest in this matter provides no basis to dismiss this action, which seeks solely to enforce Maverick's public rights under federal law.

## <u>CONCLUSION</u>

This Court should deny the Tribe's Motion to Dismiss.

24

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER031**

DATED October 24, 2022.

**BRENNAN LEGAL, PLLC**


By: *s/ Thomas M. Brennan*
Thomas M. Brennan, WSBA No. 30662
P.O. Box 1384
144 Railroad Ave. S., Suite 308
Edmonds, WA 98020
Phone: (425) 967-3550
Email: tom@brennanlegalpllc.com


**GIBSON, DUNN & CRUTCHER LLP**

By: *s/ Theodore B. Olson*
By: *s/ Matthew D. McGill*
By: *s/ Lochlan F. Shelfer*
Theodore B. Olson, D.C. Bar No. 367456
Matthew D. McGill, D.C. Bar No. 481430
Lochlan F. Shelfer, D.C. Bar No. 1029799
1050 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036-5303
Phone: (202) 955-8668
Email: tolson@gibsondunn.com
Email: mmcgill@gibsondunn.com
Email: lshelfer@gibsondunn.com

*Attorneys for Plaintiff Maverick Gaming LLC*

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on this date I caused the foregoing document to be electronically filed

3 with the Clerk of the Court using the CM/ECF system which sends notification of the filing to all

4 counsel of record.

5      DATED October 24, 2022.

6                                   /s/ Thomas M. Brennan
                                    Thomas M. Brennan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER033**

# ATTACHMENT A

**HONORABLE DAVID G. ESTUDILLO**

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

10
11
12

MAVERICK GAMING LLC,

13

    Plaintiff,

14

v.

15

UNITED STATES OF AMERICA, et al.,

16
17

    Defendants.

18
19

Case No.: 22-cv-05325-DGE

**[PROPOSED] *AMICUS CURIAE* BRIEF OF NON-PARTY TRIBES IN SUPPORT OF LIMITED INTERVENOR SHOALWATER BAY TRIBE'S MOTION TO DISMISS**

20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTERESTS OF THE *AMICI* .............................................................................1

II.    INTRODUCTION .............................................................................................2

III.    FACTUAL BACKGROUND .............................................................................3

      A.     The Indian Gaming Regulatory Act......................................................3

      B.     Tribal Gaming in Washington ...............................................................4

      C.     Sports Wagering in Washington ...........................................................7

IV.    ARGUMENT .....................................................................................................8

      A.     The Tribes Are Required Parties Because Maverick's Claims Would Severely Impair Their Existing Rights to Their Compacts and Gaming Activities. .............8

      B.     Existing Defendants Do Not Adequately Represent the Tribes' Interests.............12

          1.     The Federal and State Defendants Do Not Share the Tribes' Sovereign Interests. ............................................................12

          2.     The Interests of the Federal and State Defendants and the Tribes Could Fully Diverge. ...........................................................14

          3.     Maverick's Adequate Representation Arguments are Wrong. ..................17

      B.     This Action Cannot Proceed in Equity and Good Conscience Without the Tribes. ............................................................18

V.    CONCLUSION..................................................................................................20

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – i

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

**TribeSER036**

# TABLE OF AUTHORITIES

**CASES**

*American Greyhound Racing, Inc. v. Hull*,
305 F.3d 1015 (9th Cir. 2002) ..........................................9–12, 16, 18, 20–21

*Artichoke Joe's California Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) ............................................................................17

*Backcountry Against Dumps v. United States Bureau of Indian Affairs*,
No. 20-CV-2343, 2021 WL 3611049 (S.D. Cal. Aug. 6, 2021),
*appeal docketed*, No. 21-55869 (9th Cir. Aug. 13, 2021) ......................................12

*City of Cleveland v. Ohio*, 508 F.3d 827 (6th Cir. 2007)......................................16

*Connecticut v. United States Department of Interior*,
344 F. Supp. 3d 279 (D.D.C. 2018) ..............................................................16

*Daniels-Hall v. National Education Ass'n*, 629 F.3d 992 (9th Cir. 2010) ....................................6

*Dawavendewa v. Salt River Project Agricultural Improvement &*
*Power District*, 276 F.3d 1150 (9th Cir. 2002)........................................10–13, 20

*Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136 (D. Or. 2005) ...................10–11, 16, 20

*Diné Citizens Against Ruining Our Environment v. BIA*,
932 F.3d 843 (9th Cir. 2019) ......................................13–15, 18–19, 21

*Friends of Amador County v. Salazar*, 554 F. App'x 562 (9th Cir. 2014) ......................10, 17, 20

*Hansen v. Group Health Cooperative*, 902 F.3d 1051 (9th Cir. 2018) ........................................20

*Jamul Action Committee v. Simermeyer*, 974 F.3d 984 (9th Cir. 2020),
*cert. denied*, 142 S. Ct. 83 (2021) ......................................................9, 12

*Kalispel Tribe of Indians v. United States Department of the Interior*,
999 F.3d 683 (9th Cir. 2021) ....................................................................5

*Kescoli v. Babbitt*, 101 F.3d 1304 (9th Cir. 1996)..............................................12, 19

*Klamath Irrigation District v. United States Bureau of Reclamation*,
No. 20-36009, __ F.4th __, 2022 WL 4101175
(9th Cir. Sept. 8, 2022)..........................................10, 13–15, 18–19

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – ii

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

TribeSER037

*Lomayaktewa v. Hathaway*, 520 F.2d 1324 (9th Cir. 1975) ...................................................10

*Maine v. Wheeler*, No. 14-CV-00264, 2018 WL 6304402 (D. Me. Dec. 3, 2018)........................16

*Manygoats v. Kleppe*, 558 F.2d 556 (10th Cir. 1977)............................................................15

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) .....................................................................16

*Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014) ................................................5

*Nevada v. United States*, 463 U.S. 110 (1983) ...................................................................18

*Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165 (1977) ...........................................17

*Southwest Center for Biological Diversity v. Babbitt*,
    150 F.3d 1152 (9th Cir. 1998) .................................................................................17

*Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151 (9th Cir. 2015)...............................15

*United States v. AT&T Co.*, 642 F.2d 1285 (D.C. Cir. 1980) ..................................................16

*United States v. Egan Marine Corp.*, 843 F.3d 674 (7th Cir. 2016)...........................................16

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011) ...............................................18

*United States v. Spokane Tribe of Indians*, 139 F.3d 1297 (9th Cir. 1998)..................................17

*United States v. Washington*, 853 F.3d 946 (9th Cir. 2017),
    *aff'd by an equally divided Court*, 138 S. Ct. 1832 (2018)...............................................17

*Washington State Department of Licensing v. Cougar Den, Inc.*,
    139 S. Ct. 1000 (2019)..........................................................................................17

*Washington v. Confederated Tribes of Colville Indian Reservation*,
    447 U.S. 134 (1980) .............................................................................................17

*White v. University of California*, 765 F.3d 1010 (9th Cir. 2014) ..............................................16

**STATUTES**

25 U.S.C. § 2702...................................................................................................5

25 U.S.C. § 2710...............................................................................................5, 15

RCW § 9.46.010....................................................................................................8

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – iii

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

**LEGISLATIVE MATERIALS**

2020 Wash. Sess. Laws ch. 127 ................................................................8

2638-S AMH APP H4708.1, 66th Leg.,
    2020 Reg. Sess. (Wash. 2020), https://bit.ly/3T6dSYF ...................8–9

H.B. 1674, 67th Leg., Reg. Sess. (Wash. 2022) .........................................9

H.B. Rep. on H.B. 2638, 66th Leg., Reg. Sess.
    (Wash. 2020), https://bit.ly/3RMewcy ...........................................8–9

S.B. 5212, 67th Leg., Reg. Sess. (Wash. 2021) .........................................9

S.B. Rep. on Engrossed Substitute H.B. 2638,
    66th Leg., Reg. Sess. (Wash. 2020), https://bit.ly/3SNmxzh ...............8

**OTHER AUTHORITIES**

*2021: ACS 1-Year Estimates Subject Tables, Employment Status*,
    U.S. Census Bureau (Sept. 29, 2022), https://bit.ly/3fRwb5e ................7

*Annual Gambling Activity Report: Fiscal Year 2020*,
    Wash. State Gambling Comm'n (updated Apr. 25, 2022), https://bit.ly/3fPQznh ...................5

Geoff Baker, *Pledge to Boost Depleted Washington Tax Revenues
    Now a Main Thrust of Expanded Sports Gambling Push*, Seattle Times (Jan. 14, 2021),
    https://bit.ly/3fpVStq ....................................................................15

Will Campbell, *ilani to Add 14-Story Hotel, Enlarge Gaming Space*,
    The Columbian (Oct. 3, 2020), https://bit.ly/3CFHwP6 .........................8

*Casino Locations*, Wash. State Gambling Comm'n, https://bit.ly/3SAlAdz (last visited Oct. 10,
    2022) ...........................................................................................6

The Columbian (Oct. 3, 2020), https://bit.ly/3CFHwP6 ..............................8

*Distressed Areas List*, Wash. State Emp't Sec.
    Dep't (Apr. 28, 2022), https://bit.ly/3CDL18w ...................................6

*The Economic & Community Benefits of Tribes in Washington*,
    Wash. Indian Gaming Ass'n (May 2022), https://bit.ly/3RGO8Ri .............6

Fed. R. Civ. P. 19 ........................................................9, 11, 12, 19–20

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – iv

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Fed. R. Evid. 201 ...................................................................................................................6

*Gambling Industry Overview 2022*,
    Wash. State Gambling Comm'n (2022), https://bit.ly/3RKErkO (last visited Oct. 10, 2022) ..7

*Gaming Compacts*, Wash. State Gambling Comm'n,
    https://bit.ly/3MdcgKr (last visited Oct. 10, 2022).................................................................2

Indian Entities Recognized by and Eligible To Receive Services
    From the United States Bureau of Indian Affairs, 87 Fed. Reg. 4636 (Jan. 28, 2022).............2

Office of Inspector General, Report No: 18-0480,
    *Former Secretary and Chief of Staff Did Not Comply With Their Duty of Candor* (2022),
    https://bit.ly/3T97XSC................................................................................................16

Tribal-State Compact for Class III Gaming
    Between the Shoalwater Bay Indian Tribe and the State of Washington (Sept. 4, 2002),
    https://bit.ly/3fX45FI.................................................................................................11

Tribal-State Compact for Class III Gaming Between the Tulalip Tribes
    and the State of Washington (Aug. 2, 1991), https://bit.ly/3CD70wa......................................5

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – v

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

# I.   INTERESTS OF THE *AMICI*

The Suquamish Tribe, the Confederated Tribes of the Chehalis Reservation, the Hoh Indian Tribe, the Kalispel Tribe, the Makah Indian Tribe, the Nisqually Indian Tribe, the Nooksack Indian Tribe, the Port Gamble S'Klallam Tribe, the Puyallup Tribe of Indians, the Quinault Tribe, the Samish Indian Nation, the Skokomish Indian Tribe, the Spokane Tribe, the Squaxin Tribe, the Swinomish Indian Tribal Community, the Tulalip Tribes, and the Confederated Tribes and Bands of the Yakama Nation ("*Amici* Tribes") submit this brief in support of the motion to dismiss filed by Limited Intervenor Shoalwater Bay Tribe of the Shoalwater Bay Indian Reservation ("Shoalwater Bay").  Doc. 85.  *Amici* Tribes are federally recognized Indian nations that exercise sovereign powers of self-government over their lands in the State of Washington.  *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 87 Fed. Reg. 4636, 4637–39 (Jan. 28, 2022).  *Amici* Tribes are parties to class III gaming compacts with the State of Washington that Plaintiff Maverick Gaming LLC ("Maverick") challenges in this lawsuit.  *See Gaming Compacts*, Wash. State Gambling Comm'n, https://bit.ly/3MdcgKr (last visited Oct. 10, 2022).  Pursuant to their compacts, *Amici* Tribes own and operate casinos within the State, and/or lease all or a portion of their allocation of video lottery terminals to tribes that own and operate casinos.  *Id.*  The revenues from these casinos and/or leases have, for decades, provided essential funding for *Amici* Tribes' governments and services for their members.  *Amici* Tribes' interests are thus directly implicated by this suit, and *Amici* Tribes themselves are required parties to it, as this brief explains.  Moreover, *Amici* Tribes possess unique knowledge and information as to, *inter alia*, how (1) Maverick's claims would impair the sovereign interests of the Tribes in Washington ("the Tribes") in their compacts and gaming activities, (2) the inability of the Federal and State Defendants to adequately represent those

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 1

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

interests, and (3) the devastating effects that this lawsuit could have on the Tribes and their members if it proceeded in their absence.

## II.    INTRODUCTION

As Shoalwater Bay correctly observes, "[i]t is [Shoalwater Bay], along with the twenty-eight other Washington Tribes, that are the real parties in interest in this litigation." Doc. 85 at 22. Maverick asks this Court to "void" the Tribes' gaming compacts and amendments, First Am. Comp., Doc. 66 ¶¶ 6, 187, 189, 207(1), declare "that the Tribes' class III gaming activities violate IGRA," *id.* ¶¶ 189, 207(4), and even rule that the Tribes' gaming activities violate federal criminal law, *id.*  Yet Maverick did not sue Shoalwater Bay, *Amici* Tribes, nor any other Tribe that is targeted by these claims.  Rather, recognizing that the Tribes' sovereign immunity would bar suit, Maverick tried to circumvent that immunity by proceeding in their absence.  Federal Rule of Civil Procedure 19 ("Rule 19") is designed to prevent such gamesmanship.  Because Maverick's suit would impair the sovereign rights of the Tribes, they are, for the reasons set forth herein, required parties to this suit.

To avoid this inescapable conclusion, Maverick argues that the existing Federal and State Defendants adequately represent the Tribes' interests.  It is wrong.  The Tribes depend upon gaming revenues to fund their governments and essential services for their members, and Maverick's claims thus strike directly at the Tribes' independence, self-governance, and economic well-being.  The Federal and State Defendants do not share these unique tribal sovereign interests.  Under controlling Ninth Circuit precedent, that divergence alone makes the Federal and State Defendants inadequate substitutes for the Tribes.  Moreover, the Federal and State Defendants' interests could further diverge from the Tribes' later in this case because their overriding interest is to comply with their understanding of their legal obligations and with their duties to their broader citizenry, which may not align with the Tribes' sovereign interests.  Indeed, both the United States

NON-PARTY TRIBES' *AMICUS* BRIEF (No. 22-cv-05325) – 2

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

and the State opposed tribal gaming in Washington in the past.  And while Maverick observes that the United States owes a trust obligation to the Tribes, the Ninth Circuit has made plain that the trust obligation alone does not render the United States an adequate tribal representative.

Equity and good conscience also preclude this case from proceeding. A wall of Ninth Circuit authority requires dismissal when a required party cannot be joined due to tribal sovereign immunity.  Nor does dismissal leave Maverick without recourse.  Maverick could continue its efforts to lobby the State to allow it to conduct the types of gaming that it seeks in this case.  And it could go to Congress itself—which is free to amend the Indian Gaming Regulatory Act ("IGRA").

For these reasons, *Amici* Tribes urge this Court to recognize their sovereign interests, rule that the Tribes are required parties who cannot be joined, and grant the motion to dismiss.

## III.    FACTUAL BACKGROUND

### A.    The Indian Gaming Regulatory Act

The primary purpose of IGRA is "to provide a … means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1018 (9th Cir. 2002) (quoting 25 U.S.C. § 2702(1)).  The interests of Indian tribes are thus both paramount and unique in IGRA's statutory scheme.  IGRA achieves its purpose by authorizing Indian tribes to offer different forms of gaming activity on the condition that certain statutory requirements are met.  Most significantly, IGRA allows Indian tribes to offer "class III" gaming activities, including traditional casino-style games such as roulette, keno, and sports wagering, if: "(1) the tribe has authorized the Class III gaming by a tribal ordinance or resolution; (2) the Class III gaming will be 'located in a State that permits such gaming for any purpose by any person, organization, or entity'; and (3) the Class III gaming is conducted in conformity with a tribal-state compact that is in effect."  *Id.* at 1019 (quoting 25 U.S.C. § 2710(d)(1)).  In the

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 3

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

1    compact negotiation process, the State and Indian tribes are in an inherently adversarial position,

2    with each side representing its sovereign interests. *See id.* at 1023 n.5 (state and tribes "often"

3    adversaries in disputes over gaming and their "interests under the compacts are potentially

4    adverse").

5        IGRA specifies that the net revenues from tribal gaming can only be used for certain

6    purposes, namely: "(i) to fund tribal government operations or programs; (ii) to provide for the

7    general welfare of the Indian tribe and its members; (iii) to promote tribal economic development;

8    (iv) to donate to charitable organizations; or (v) to help to fund operations of local government

9    agencies." 25 U.S.C. § 2710(b)(2)(B), (d)(1)(A)(ii); *see Kalispel Tribe of Indians v. U.S. Dep't of

10   the Interior*, 999 F.3d 683, 686 n.1 (9th Cir. 2021). IGRA also requires that tribes have the "sole

11   proprietary interest" in any gaming activity, 25 U.S.C. § 2710(b)(2)(A), (d)(1)(A)(ii), and that

12   tribes are "primary beneficiar[ies]" of gaming operations, *id.* § 2702(2). These statutory

13   requirements ensure that tribal gaming operations are a critical source of funding for tribal

14   governments and the variety of services they provide to their communities, not "mere profit-

15   making ventures." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 810 (2014) (Sotomayor, J.,

16   concurring). For some tribes, gaming may be the only viable means to raise government revenues,

17   due to legal barriers to tribes' authority to impose taxes on tribal lands. *See id.* at 810–13.

18       **B.    Tribal Gaming in Washington**

19       Over the past thirty years, the Tribes have built successful gaming operations throughout

20   the State of Washington, which have become an essential source of funding for tribal governments

21   and services, just as Congress intended. The first tribal gaming compact in Washington was

22   executed on August 2, 1991, between the State and the Tulalip Tribes. *See* Tribal-State Compact

23   for Class III Gaming Between the Tulalip Tribes and the State of Washington, 37 (Aug. 2, 1991),

24

25

26   NON-PARTY TRIBES' *AMICUS* BRIEF                      JENNER & BLOCK LLP
27   (No. 22-cv-05325) – 4                                 1099 New York Avenue, NW, Suite 900
                                                           Washington, DC 20001-4412
28                                                         Tel. 202 639-6000

**TribeSER044**

https://bit.ly/3CD70wa.[1]  Today, all 29 federally recognized Indian tribes in Washington have class III gaming compacts.  *See Casino Locations*, Wash. State Gambling Comm'n, https://bit.ly/3SAlAdz (last visited Oct. 10, 2022).

Currently, 22 Tribes operate 29 class III casinos within the state, and the remaining 7 Tribes lease all or a portion of their compact allocation of video lottery terminals to the other Tribes.  *Id.*  These gaming enterprises have been successful in advancing IGRA's goal of promoting tribal economic development—in Fiscal Year 2021, for example, the Tribes' net gambling receipts (gross wagering receipts minus prizes paid) amounted to $2.297 billion. *See Gambling Industry Overview 2022*, Wash. State Gambling Comm'n, 2 (2022), https://bit.ly/3RKErkO.  In Fiscal Year 2020, the Tribes' net gambling receipts were $2.824 billion.  *See Annual Gambling Activity Report: Fiscal Year 2020*, Wash. State Gambling Comm'n, 3 (updated Apr. 25, 2022), https://bit.ly/3fPQznh.

Tribal casinos provide employment to over 14,000 tribal members and non-members across Washington.  *See The Economic & Community Benefits of Tribes in Washington*, Wash. Indian Gaming Ass'n, 12 (May 2022), https://bit.ly/3RGO8Ri (data from 2020).  In some places, Tribal casinos are the primary source of on- or near-reservation employment.  At least eleven tribal casinos are located in "distressed" counties where the unemployment rate is greater than or equal to 7.2%.  *See Distressed Areas List*, Wash. State Emp't Sec. Dep't (Apr. 28, 2022), https://bit.ly/3CDL18w;  *Gaming Compacts*, Wash. State Gambling Comm'n, https://bit.ly/3MdcgKr (last visited Oct. 10, 2022) (identifying tribal casinos).[2]  Tribal gaming thus

---

[1] *Amici* Tribes respectfully request that the Court take judicial notice of the documents posted on government websites cited in this brief.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010); Fed. R. Evid. 201(b)(2).

[2] The tribal casinos located in counties with unemployment rates of at least 7.2% are: 7 Cedars Casino (Jamestown S'Klallam Tribe) and the Elwha River Casino (Lower Elwha Klallam Tribe) in Clallam County; Quinault Beach Resort and Casino (Quinault Nation) in Grays Harbor County; Little Creek Casino Resort (Squaxin Island Tribe) and Lucky Dog Casino (Skokomish Indian Tribe) in Mason County; 12 Tribes Omak Casino Hotel and 12 Tribes Coulee

---

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 5

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

provides an employment lifeline to tribal citizens and others living on or near reservations. And it remains essential: while the overall unemployment rate for Washington is 5.9%, approximately 9.3% of the Indian population in Washington remains unemployed. *See 2021: ACS 1-Year Estimates Subject Tables, Employment Status*, U.S. Census Bureau (last visited Oct. 11, 2022), https://bit.ly/3fRwb5e.

After paying their employees and the scores of local businesses that provide the goods and services necessary to support their gaming operations, Tribes use gaming revenues, consistent with the purpose and requirements of IGRA, to invest in their communities, build their economies, and strengthen their governmental operations—including funding health and wellness programs, education and child development, public safety, law enforcement, conservation and habitat protection, cultural programs, and much more. *See* WIGA 2022 at 4–24. Tribal gaming also provides significant funding for local governments and services throughout the State. In 2022, contributions from tribal gaming to non-tribal government entities and nonprofits totaled $25,744,687, which included approximately $8 million for non-tribal government agencies, fire departments, and police departments; $10.8 million for charitable organizations; $3.2 for anti-smoking programs; and $3.5 million for problem gaming programs. *See Gambling Industry Overview 2022*, Wash. State Gambling Comm'n, 3 (2022), https://bit.ly/3RKErkO.

In reliance on the rights secured by their gaming compacts, the Tribes have invested hundreds of millions of dollars in their gaming facilities and associated business enterprises. *See, e.g.*, Steve Powell, *New Casino, Hall, Marina Add to Economic Power of Tulalip*, The Marysville

---

Dam Casino (Confederated Tribes of the Colville Reservation) in Okanogan County; Shoalwater Bay Casino (Shoalwater Bay) in Pacific County; Kalispel Casino in Pend Oreille County (Kalispel Tribe); Chewelah Casino (Spokane Tribe) in Stevens County; and Legends Casino (Yakama Nation) in Yakima County. Moreover, some tribes that do not own and operate casinos are located in rural and remote parts of the same counties, and revenue from leasing their allocation of video lottery terminals to tribes with casinos in larger markets provides direct, vital support for tribal employment and essential governmental services in those areas. *See The Economic & Community Benefits of Tribes in Washington*, Wash. Indian Gaming Ass'n, 21 (May 2022), https://bit.ly/3RGO8Ri ("WIGA 2022"); *Distressed Area List.*

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 6

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Globe (Jul. 4, 2019), https://bit.ly/3SVxy1o (discussing construction of $125 million tribal casino); Will Campbell, *ilani to Add 14-Story Hotel, Enlarge Gaming Space*, The Columbian (Oct. 3, 2020), https://bit.ly/3CFHwP6 (discussing $30 million expansion of tribal casino and hotel).

In sum, over the past thirty years, the Tribes have developed substantial vested interests in their gaming operations and gaming compacts. The invalidation of those compacts and the disruption of tribal gaming would cripple tribal governmental operations, decimating tribal budgets for the law enforcement, health care, housing, education, and other essential services upon which their members and surrounding communities rely.

### C. Sports Wagering in Washington

In 2020, the Washington Legislature authorized the Tribes to offer sports wagering. *See* 2020 Wash. Sess. Laws ch. 127. The Legislature explicitly decided to limit sports wagering to tribal casinos due to the Tribes' "more than twenty years' experience with, and … proven track record of, successfully operating and regulating gaming facilities in accordance with tribal gaming compacts." *Id.* ch. 127, § 1. The Legislature also explained that restricting sports wagering to tribal casinos would further the State's longstanding policy of "prohibit[ing] all forms and means of gambling except where carefully and specifically authorized and regulated." *Id.*; *see also* RCW § 9.46.010 (state gambling policy). The Legislature's stated policy preferences squarely aligned with the public testimony that the Legislature heard in support of tribal sports wagering. *See* H.B. Rep. on H.B. 2638, at 6, 66th Leg., Reg. Sess. (Wash. 2020), https://bit.ly/3RMewcy ("H.B. Rep. on H.B. 2638") (Staff summary of public testimony: "The state has a history of acting conservatively in terms of expanding gambling. Tribal gaming is a structured regulatory environment and there are significant internal controls."); S.B. Rep. on Engrossed Substitute H.B. 2638, at 5, 66th Leg., Reg. Sess. (Wash. 2020), https://bit.ly/3SNmxzh ("S.B. Rep. on E.S.H.B. 2638") (similar). Proponents of tribal sports wagering additionally pointed out that for tribal

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 7

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

gaming, "100 percent of the profit supports tribes, and the money is re-invested in the community," which "is not the case with gaming conducted by private companies." H.B. Rep. on H.B. 2638 at 6; *see also* S.B. Rep. on E.S.H.B. 2638 at 5, 7 (similar).

While considering sports wagering at tribal casinos in 2020, the Legislature considered and rejected multiple alternative proposals to more broadly authorize sports wagering, including proposals that would have allowed sports wagering by Maverick and other cardrooms. *See* 2638-S.E AMS RIVE JOSU 302, 66th Leg., 2020 Reg. Sess. (Wash. 2020), https://bit.ly/3CDwk5h; S.B. 6277, 66th Leg., 2020 Reg. Sess. (Wash. 2020), https://bit.ly/3CqYzCU. In testimony to the Legislature, Maverick argued why it should be permitted to offer sports wagering, but the Legislature was unpersuaded. *See* H.B. Rep. on H.B. 2638 at 7–9; S.B. Rep. on E.S.H.B. 2638 at 6–8. In both 2021 and 2022, the Legislature again rejected bills that would have authorized sports wagering in cardrooms and racetracks. S.B. 5212, 67th Leg., Reg. Sess. (Wash. 2021), https://bit.ly/3COQEk8; H.B. 1674, 67th Leg., Reg. Sess. (Wash. 2022), https://bit.ly/3emrHmU. Maverick disagrees with the Legislature's informed policy choice and now seeks to achieve its objectives through this litigation by attacking tribal compacts.

## IV.    ARGUMENT

### A.    The Tribes Are Required Parties Because Maverick's Claims Would Severely Impair Their Existing Rights to Their Compacts and Gaming Activities.

Maverick's complaint, in its own words, makes abundantly clear that the Tribes are "required parties" in this case under Rule 19(a)(1). In the Ninth Circuit, a tribe has "legally protected interest[s]" under Rule 19(a)(1) when the claims at issue "would have retroactive effects on rights already enjoyed by a tribe." *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 997 (9th

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 8

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Cir. 2020) (quotation marks omitted), *cert. denied*, 142 S. Ct. 83 (2021).[3]  That is indisputable where, as here, Maverick's claims directly threaten the existing rights of the Tribes in multiple respects.

Most obviously, Maverick's claims seek to "void" the Tribes' gaming compacts and amendments—some of which have been in effect for over thirty years.  *See, e.g.*, Doc. 66 ¶¶ 6, 104, 187, 189, 207(1).  The Ninth Circuit has specifically held that tribes have a "substantial" legal interest, and thus are required parties, when claims seek to invalidate their gaming compacts.  *Am. Greyhound Racing*, 305 F.3d at 1023–24; *see also Friends of Amador Cnty. v. Salazar*, 554 F. App'x 562, 564 (9th Cir. 2014); *accord Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1147 (D. Or. 2005).  And as this Court has already recognized with respect to Shoalwater Bay, "even if the Tribe is not currently a named defendant, it may be affected by the outcome given this suit could nullify the Washington Tribe's Compacts."   Order Granting Mot. for Relief from Summ. J. Deadlines, Doc. 81 at 6; *see also id.* (noting that "Maverick concedes this interest").  The Ninth Circuit has also affirmed the "fundamental principle" that "a party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract." *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002); *see also Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside … a contract, all parties who may be affected by the determination of the action are indispensable.").

---

[3] Maverick frames one of its counts as arising under the federal Administrative Procedure Act ("APA"), *see* Doc. 66 ¶¶ 164–176, but the rule is the same for APA claims: "an absent party may have a legally protected interest at stake in procedural claims where the effect of a plaintiff's successful suit *would be to impair a right already granted.*" *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, No. 20-36009, __ F.4th __, 2022 WL 4101175, at *6 (9th Cir. Sept. 8, 2022) (emphasis added) (quoting *Diné Citizens Against Ruining Our Env't v. BIA*, 932 F.3d 843, 852 (9th Cir. 2019)).

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 9

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Maverick further confirms the applicability of Rule 19(a)(1) by seeking a declaration "that the Tribes' class III gaming activities violate IGRA." Doc. 66 ¶ 189; *see also, e.g.*, *id.* ¶ 207(4) (same). It is clear that Maverick's true target is the Tribes' gaming; in fact, Maverick's complaint acknowledges that its requested relief would "prohibit the Tribes from offering class III gaming that Washington does not permit non-tribal entities to offer." Doc. 66 ¶ 187. Maverick even asks the Court to declare that the Tribes are conducting gaming activities in violation of federal *criminal* statutes. *See* Doc. 66 ¶¶ 189, 207(4). In short, Maverick seeks to stop the Tribes' gaming in the absence of the Tribes themselves.

The Tribes' legally protected interests are also implicated by Maverick's challenges to the State Defendants' authority to execute and administer the compacts. *See, e.g.*, Doc. 66 ¶¶ 6, 105, 189, 190, 207(2), 207(6), 207(7), 207(8); *see also Am. Greyhound Racing*, 305 F.3d at 1023–24 (tribes required parties to action challenging Governor's authority to enter into compacts); *Dewberry*, 406 F. Supp. 2d at 1147 (same). Such claims threaten the validity of the Tribes' compacts, including the provision stating the compacts shall "be in effect until terminated by the written agreement of both parties." *E.g.*, Tribal-State Compact for Class III Gaming Between the Shoalwater Bay Indian Tribe and the State of Washington § XV(C) (Sept. 4, 2002), https://bit.ly/3fX45FI; *see also Am. Greyhound Racing*, 305 F.3d at 1023 (tribes' interests impaired by termination of compacts' automatic renewal provision). Maverick's equal protection arguments similarly threaten the validity of the Tribes' compacts by challenging the legality of the state law provisions that permit tribal gaming. *See* Doc. 66 ¶ 198. Maverick's request for an injunction prohibiting the State Defendants from executing new compacts, *see* Doc. 66 ¶¶ 6, 190, would additionally impair "[t]he sovereign power of the tribes to negotiate compacts." *Am. Greyhound Racing*, 305 F.3d at 1024; *see also Dawavendewa*, 276 F.3d at 1157 ("Undermining

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 10

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

the [tribe's] ability to negotiate contracts also undermines the [tribe's] ability to govern the reservation effectively and efficiently.").

Maverick's claims, if successful, would have "far-reaching retroactive effects on the [Tribes'] existing sovereignty and proprietary interests." *Jamul Action Comm.*, 974 F.3d at 997. Maverick's claims not only directly threaten the Tribes' gaming compacts and gaming revenues—which are essential for funding the Tribes' governments and important tribal services—they also jeopardize other vested sovereign interests of the Tribes, including the employment of tribal members and non-members, investments in tribal gaming facilities and related enterprises, and the Tribes' contracts with gaming vendors and other third parties. *See Backcountry Against Dumps v. U.S. Bureau of Indian Affairs*, No. 20-CV-2343, 2021 WL 3611049, at *9 (S.D. Cal. Aug. 6, 2021) (tribe could be prejudiced by loss of "tens of millions of dollars in revenue that it plans to use to fund its governance"), *appeal docketed*, No. 21-55869 (9th Cir. Aug. 13, 2021); *Dawavendewa*, 276 F.3d at 1157 (tribe could be "grievously impaired" by claims that "challenge[] the [tribe's] ability to secure employment opportunities and income for the reservation"); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996) ("action could affect the [tribes'] interests in their lease agreement and the ability to obtain the bargained-for royalties and jobs"); *see also supra* pp. 5–7 (explaining how the Tribes have deployed gaming revenues).

In short, the Tribes' interests would be "as a practical matter impair[ed] or impede[d]" if the case were to proceed in their absence. Fed. R. Civ. P. 19(a)(1)(B)(i); *see also Am. Greyhound Racing*, 305 F.3d at 1024 (tribes' interests may be "affected *as a practical matter* by the judgment that [their gaming] operations are illegal"). Maverick's suit also subjects the State Defendants "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(B)(ii). If Maverick prevailed in enjoining the State Defendants' administration of the compacts, for instance, the Tribes could seek to continue operating under the compacts and

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 11

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

could even seek enforcement of the compacts against the State Defendants in a separate action. *See Dawavendewa*, 276 F.3d at 1158–59 (defendant subject to substantial risk of inconsistent obligations because absent tribe would not be bound by ruling on tribal contract). In other words, if this case were allowed to proceed, the State of Washington could find itself trapped between conflicting court orders requiring it to simultaneously implement and not administer the gaming compacts. This is the precise type of situation that Rule 19 is intended to avoid.

**B.      Existing Defendants Do Not Adequately Represent the Tribes' Interests.**

Controlling Ninth Circuit case law makes plain that the Tribes are not adequately represented by the Federal or State Defendants in this case. To evaluate whether an existing party adequately represents the interests of an absent tribe, courts consider (1) "whether the interests of a present party to the suit are such that it will undoubtedly make all of the [tribe's] arguments"; (2) "whether the party is capable of and willing to make such arguments"; and (3) "whether the [tribe] would offer any necessary element to the proceedings that the present parties would neglect." *Diné Citizens*, 932 F.3d at 852 (quoting *Alto v. Black*, 738 F.3d 1111, 1127–28 (9th Cir. 2013)). In *Diné Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, the Ninth Circuit held that these considerations compel dismissal where no existing party shares an absent tribe's "*sovereign* interest," or where the interests of the existing parties and the tribe "might [later] diverge." *Id.* at 855–56 (emphasis in original). Here, the Tribes have critical sovereign interests in their compacts and gaming activities that no existing party shares, and there is also a risk of further divergence between the interests of the Tribes and the existing parties, which would leave the Tribes' interests completely unrepresented in this case.

**1.      The Federal and State Defendants Do Not Share the Tribes' Sovereign Interests.**

Although the Federal and State Defendants and the Tribes "share an interest in the ultimate outcome of this case," they do so "for very different reasons." *Klamath Irrigation District*, 2022

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 12

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

WL 4101175, at *8.  As explained above, the Tribes use their tribal gaming revenues to further tribal sovereignty in a variety of respects, including by funding tribal governments and essential government services, and fostering economic development on tribal lands.  The Tribes thus have a unique "sovereign interest in ensuring that [their gaming establishments] continue to operate and provide profits." *Diné Citizens*, 932 F.3d at 855.  Neither the Federal nor State Defendants share these tribal sovereign interests, making them "necessary element[s] to the proceedings that the present parties would neglect," *id.* at 852 (quoting *Alto*, 738 F.3d at 1127–28), and, in turn, rendering the Federal and State Defendants "not … adequate representative[s] of the tribes," *Klamath*, 2022 WL 4101175, at *7.

*Diné Citizens* is instructive.  There, environmental groups challenged federal action authorizing the operation of a Navajo coal mine and a related non-Indian power plant.  932 F.3d at 847–50.  The environmental groups claimed that the existing defendants—federal agencies and officials and the non-tribal operator of the power plant—adequately represented the interests of the Navajo Nation and its corporation that owned the mine.  *Id.*  The Ninth Circuit disagreed.  It held that the named defendants did "not share the Navajo Nation's *sovereign* interest in controlling its own resources, and in the continued operation of the Mine and Power Plant and the financial support that such operation provides." *Id.* at 856 (emphasis in original).  So too here, Maverick asks this Court to invalidate the Tribes' gaming compacts, Doc. 66 ¶ 207(1), and "[d]eclar[e] that the Tribes' class III gaming activities" are unlawful, *id.* ¶ 207(4).  Such relief would vitiate the Tribes' unique sovereign interests by eliminating their "very ability to govern [and] sustain" themselves "financially, and make decisions about [their] own" gaming operations. *Diné Citizens*, 932 F.3d at 856.  Indeed, at least in *Diné Citizens*, the non-tribal power plant operator "share[d] … some of [the Navajo Nation's] financial interest in the outcome of the case." *Id.*  Here, the federal government has no pecuniary interest in the Tribes' gaming operations.  And the State—

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 13

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

TribeSER053

according to Maverick—has a financial interest in *ending* tribal gaming exclusivity. *See* Geoff Baker, *Pledge to Boost Depleted Washington Tax Revenues Now a Main Thrust of Expanded Sports Gambling Push*, Seattle Times (Jan. 14, 2021), https://bit.ly/3fpVStq (Maverick maintains the State could increase its revenues by "up to $50 million … annually" if it expanded sports wagering).[4]

In short, Washington Tribes' unique interests are not shared—and thus not represented—by the Federal and State Defendants.

### 2. The Interests of the Federal and State Defendants and the Tribes Could Fully Diverge.

The State and Federal Defendants also cannot adequately represent the Tribes because of the substantial risk that their interests could fully diverge from the Tribes' as this case proceeds. Start with the Federal Defendants. "Although Federal Defendants have an interest in defending their decisions," they "do not share an interest in the *outcome* of the [compact] approvals." *Diné Citizens*, 932 F.3d at 855 (emphasis in original). Rather, "their overriding interest … must be in complying with" federal law—here, IGRA and the Constitution. *Id.*; *see also, e.g.*, *Klamath*, 2022 WL 4101175, at *7–8 (same). As a result, if this Court were to issue a "holding that [federal law] required something other than what [the] Federal Defendants have interpreted [it] to require," that ruling could "change [the] Federal Defendants' planned actions," including whether to continue to defend their actions on appeal. *Diné Citizens*, 932 F.3d at 855.[5]

---

[4] What is more, the gaming compacts that Maverick seeks to invalidate are the product of complex and inherently adversarial negotiations between the Tribes and the State over subjects like the allocation of criminal and civil jurisdiction, tribal payments to states, and other core interests of both parties. *See* 25 U.S.C. § 2710(d)(3)(C); *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1154–58 (9th Cir. 2015) (discussing complicated nature of gaming compact terms and negotiations in compact interpretation dispute between Tribe and State). The State thus has its own sovereign interests at stake that make it an inadequate representative of the Tribes' sovereign interests.

[5] *See also, e.g.*, *Manygoats v. Kleppe*, 558 F.2d 556, 558 (10th Cir. 1977) (holding that the Secretary of the Interior could not adequately represent absent tribe because "[t]he Secretary must act in accord with the obligations imposed by [law]"). Precisely because the federal government's ultimate obligation in every case is to comply with federal law, it is not uncommon for the federal government to reverse its position on appeal in response to an adverse district

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 14

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

TribeSER054

Further, it is possible that the Federal Defendants could change their litigation position because of, *inter alia*, a change in internal policy or change in leadership.[6]  There is thus no assurance, let alone a guarantee, that the Federal Defendants will maintain a litigation position that aligns with the Tribes' interests.

The State Defendants' interests are even more prone to divergence from the Tribes' interests.  Washington State has "a broad obligation to serve the interests of the people of [Washington], rather than any particular subset, such as the people of the [Tribes]."  *White v. Univ. of Cal.*, 765 F.3d 1010, 1027 (9th Cir. 2014).  Thus, if the Court were to determine that the State acted unlawfully in executing and amending its compacts with the Tribes, it is "questionable whether—perhaps even unlikely that—the [State defendants] would pursue the same next course of action" as the Tribes.  *Id.*  Indeed, the Ninth Circuit has squarely held that a state cannot adequately represent tribes in a dispute over the validity of compacts.  *Am. Greyhound Racing*, 305 F.3d at 1023 n.5; *see also, e.g.*, *Dewberry*, 406 F. Supp. 2d at 1147 (same).  That is for good reason.  As the Supreme Court recently observed, states are "the very neighbors who might be least inclined to respect [Tribes' legal rights]."  *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020).  While the State of Washington and Tribes work together successfully in many areas, the State is

---

court decision.  *See United States v. AT&T Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980) (concluding that the United States did not adequately represent a private party because "the United States did not share the strong interest [the private party] had to appeal for protection of its work product privilege" and because "in fact the United States chose not to appeal"); *see also, e.g.*, *City of Cleveland v. Ohio*, 508 F.3d 827, 837 (6th Cir. 2007) ("When the district court rejected its position, … the United States chose not to appeal."); *United States v. Egan Marine Corp.*, 843 F.3d 674, 679 (7th Cir. 2016) (observing that a district court decision in a related case was "reviewable," but "the United States chose not to appeal").

[6] *See, e.g.*, *Maine v. Wheeler*, No. 14-CV-00264, 2018 WL 6304402, at *1–2 (D. Me. Dec. 3, 2018) (allowing EPA to not defend its disapproval of state water quality standards that insufficiently protected tribal fishing rights); *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 292–93 (D.D.C. 2018) (recounting that Interior Department "repeatedly informed" tribes that it supported compact amendments before changing its position); *see also* Office of Inspector General, Report No: 18-0480, *Former Secretary and Chief of Staff Did Not Comply With Their Duty of Candor*, 6–15 (2022), https://bit.ly/3T97XSC (detailing the political influence that caused Interior Department to reverse its position in *Connecticut*).

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 15

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

also often at odds with tribal rights.[7]  The State Defendants are thus not adequate representatives to defend the Tribes' gaming rights in their absence.

The possibility of interests diverging in this suit is not hypothetical.  Even at this early stage, it is evident that the Federal and State Defendants are not willing and able to make all of the Tribes' arguments.  The Federal and State Defendants, for instance, did not raise a Rule 19 defense and would have proceeded with briefing on the merits if Shoalwater Bay had not intervened.  That "indicate[s] divergent interests between the Tribe and the government." *Friends of Amador Cnty.*, 554 F. App'x at 564.[8]  Moreover, the Federal and State Defendants are unable to fully address Maverick's arguments specific to the Tribes' interests.  Maverick maintains, for instance, that statutory classifications based on tribal status violate equal protection unless they "affect uniquely Indian interests."  Doc. 75 at 23.  While Maverick is wrong that equal protection requires such a showing in this case, *see Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 735 (9th Cir. 2003), only the absent Tribes themselves could fully and effectively explain the impact on their "unique" interests.

History confirms the substantial possibility that the Federal and State Defendants could change their position as this case proceeds. As Shoalwater Bay recounts, when the federal government and Washington State (wrongly) believed in the 1990s and early 2000s that

---

[7] *E.g.*, *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1006 (2019) (involving Yakama Nation's treaty right to travel); *United States v. Washington*, 853 F.3d 946, 954 (9th Cir. 2017) (involving treaty fishing rights), *aff'd by an equally divided Court*, 138 S. Ct. 1832 (2018) (per curiam); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 162 (1980) (involving tribal tax immunity); *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 172-73 (1977) (involving tribal sovereign immunity); *see also United States v. Spokane Tribe of Indians*, 139 F.3d 1297, 1301 (9th Cir. 1998) (noting that "Washington invoked its rights under the Eleventh Amendment and caused the Tribe's suit to be dismissed, distorting the IGRA process").

[8] Relying on *Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152 (9th Cir. 1998) (per curiam), Maverick says the Ninth Circuit has rejected this supposedly "circular" argument.  Pl.'s Opp'n to Mot. for Limited Intervention, Doc. 78 at 12.  But *Southwest Center* was a situation where the refusal to raise the Rule 19 argument was the *only* concrete divergence that the tribe identified.  *See* 150 F.3d at 1154.  *Friends of Amador County* subsequently made clear that the federal government's decision not to "move for its own dismissal under Rule 19" is a proper basis for dismissal when, as here, it is one of several factors that "indicate divergent interests between the Tribe and the government."  554 F. App'x at 564.

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 16

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Shoalwater Bay's gaming operation did not comply with IGRA, they actively worked to *halt* the operation. *See* Doc. 85 at 14–16. In this respect, this case is the same as *American Greyhound Racing, Inc. v. Hull*, where the Ninth Circuit held that the governor of Arizona was an inadequate representative of absent tribes in a challenge to tribal-state gaming compacts because "the State and the tribes have often been adversaries in disputes over gaming." 305 F.3d at 1023 n.5. Because the state and the federal government have previously sought to shut down tribal gaming, they "cannot be counted on" to vigorously defend against this suit that seeks precisely that relief. *Diné Citizens*, 932 F.3d at 855. For this and the other reasons stated here, the Federal and State Defendants do not adequately represent the Tribes.

### 3. Maverick's Adequate Representation Arguments are Wrong.

Maverick's attempts to show adequate representation fail. First, Maverick argues that the United States adequately represents the Tribes' interests because of the federal government's "'trust responsibility' to Indian tribes." Doc. 78 at 9. But the Ninth Circuit "has firmly rejected the notion that a trustee-trustor relationship alone is sufficient to create adequate representation." *Klamath*, 2022 WL 4101175, at *8. Indeed, as the Supreme Court has explained, the federal government's "'general trust relationship' with the Indian people" is subject to limitations— including that "[t]he Government may need to comply with other [legal] duties." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 182 (2011); *see also, e.g.*, *Nevada v. United States*, 463 U.S. 110, 127–28 (1983) (explaining that the federal government can be required to represent "potentially conflicting interests" despite trust obligations).

Next, Maverick says that unlike in *Diné Citizens*, the Tribes have only shown the possibility of conflict "*after* th[is] litigation." Doc. 78 at 11. Maverick, however, ignores that: (1) the Federal and State Defendants already do not share the Tribes' unique sovereign interests, (2) that their and the Tribes' interests could fully diverge as this case moves forward, and (3) the

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 17

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

TribeSER057

defendants are already unwilling or unable to advance all of the Tribes' arguments. *Diné Citizens* is thus squarely on point.[9]

Maverick also fails to distinguish *Klamath*. It contends that *Klamath* turned on the existence of separate "active litigation" between the tribal parties and the Bureau of Reclamation over the Bureau's defense of tribal interests. Pl.'s Resp. to Shoalwater Bay's Not. Suppl. Auth., Doc. 83 at 2 (quoting *Klamath*, 2022 WL 4101175, at *7–8). Not true. As the Ninth Circuit made clear, even absent the separate litigation the United States was an inadequate representative in *Klamath*—the litigation merely "*further increase[d]* the likelihood that [the Bureau] would not" adequately represent the tribes. 2022 WL 4101175, at *8 (emphasis added).

Finally, Maverick cites to out-of-circuit authorities. *See* Doc. 78 at 9–12. But those cases are of no moment because Ninth Circuit precedent directly controls. In short, neither the Federal nor State Defendants can adequately represent the Tribes, rendering the Tribes required parties.

### B. This Action Cannot Proceed in Equity and Good Conscience Without the Tribes.

Since the Tribes cannot be joined to this action due to their sovereign immunity, *see Kescoli*, 101 F.3d at 1310, the final consideration is whether this case can "in equity and good conscience" continue in the absence of the Tribes, Fed. R. Civ. P. 19(b). It cannot. In the Ninth Circuit, "there is a wall of circuit authority in favor of dismissing actions in which a necessary party cannot be joined due to tribal sovereign immunity." *Klamath*, 2022 WL 4101175, at *10 (quoting *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021)).

---

[9] Maverick further claims that "because [a] tribal conservation organization[] [was] among the" *Diné* plaintiffs, "tribal interests [were] on both sides of the litigation in *Dine*," dividing the federal government's allegiance. Doc. 78 at 12 (cleaned up). But *Diné Citizens* never identified such a conflict, and for good reason: the United States' trust obligation to a tribe is not impacted when a few tribal members merely disagree with a tribe's decision. Moreover, even if, counterfactually, *Diné Citizens* had turned on that consideration, this case remains on all fours: just as one of the plaintiff organizations in *Diné Citizens* had Navajo members, *see* Compl. ¶ 16, *Diné Citizens Against Ruining Our Environment v. BIA*, No. 16-cv-08077 (D. Ariz. Apr. 20, 2016), 2016 WL 1614184, Maverick's CEO is a member of Shoalwater Bay, *see* Doc. 85 at 17.

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 18

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Indeed, "virtually all the cases to consider the question appear to dismiss under Rule 19, regardless of whether [an alternative] remedy is available, if the absent parties are Indian tribes invested with sovereign immunity." *Id.* (alteration in original) (quoting *Deschutes*, 1 F.4th at 1163). Accordingly, "[t]he balancing of equitable factors under Rule 19(b) almost always favors dismissal when a tribe cannot be joined due to tribal sovereign immunity." *Id.* (quoting *Deschutes*, 1 F.4th at 1163).

Application of the four factors under Rule 19(b) confirms dismissal is appropriate here. On the first factor, which "largely duplicates" the required party analysis under Rule 19(a), the "amount of prejudice to the tribes from termination of [their] existing compacts and inability to enter new ones would be enormous." *Am. Greyhound Racing, Inc.*, 305 F.3d at 1025. Second, there is no way to shape relief in this case to avoid the prejudice to the Tribes from the potential effects of a determination that the Tribes' compacts or gaming activities are illegal. *Id.*; *Friends of Amador Cnty.*, 554 F. App'x at 566; *see supra* pp. 8–12. Third, a judgment would not be "adequate" in the Tribes' absence because any judgment would severely impair the Tribes' legally protected interests. And if the judgment were tailored to avoid such prejudice to the Tribes, it would not be "adequate" to address Maverick's alleged injury. *See, e.g.*, *Am. Greyhound Racing*, 305 F.3d at 1025; *Dawavendewa*, 276 F.3d at 1162; *Dewberry*, 406 F. Supp. 2d at 1148.[10] Fourth, "the tribes' interest in maintaining their sovereign immunity outweighs the plaintiff['s] interest in litigating [its] claims." *Am. Greyhound Racing*, 305 F.3d at 1025; *see also Diné Citizens*, 932 F.3d

---

[10] Maverick now suggests this Court could authorize Maverick to "offer the full range of games the tribes currently offer" and allow the Tribes to continue their operations. Doc. 78 at 13. But the relief Maverick requests in its complaint would end tribal gaming in Washington. *E.g.*, Doc. 66 ¶ 207(4); *see also Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1056 (9th Cir. 2018) (a "plaintiff is the master of the plaintiff's complaint"). Moreover, in order to authorize Maverick to expand its class III gaming in Washington State, the Court would need to strike down the general prohibitions on gambling under Washington law, which would effectively legalize *all* gambling by *any* person or entity, despite Washington State's choice to generally prohibit class III gaming within its borders subject only to narrow exceptions. *See supra* pp. 7–8 (discussing the Washington Legislature's reasons for limiting sports wagering to tribal casinos). That goes well beyond the appropriate role of this Court.

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 19

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

**TribeSER059**

at 858 ("Even assuming that no alternate remedy exists … we would hold that dismissal is proper.").

This conclusion is underscored by the opportunities Maverick has had to pursue redress for its grievance in alternative fora.  For the past several years, Maverick has sought legal authorization from the Washington Legislature to conduct sports wagering.  While the Legislature has declined to adopt Maverick's preferred public policy, that does not entitle it to attack the existing rights and interests of the Tribes in their absence and without their sovereign consent.  Going forward, additional opportunities to voice Maverick's complaints will arise: Maverick can continue to lobby the Washington Legislature or it could even ask Congress to amend IGRA.  What Maverick cannot do is pursue this suit in the absence of the Tribes.

## V.    CONCLUSION

The Court should grant Shoalwater Bay's motion to dismiss.

Dated: October 11, 2022                    Respectfully submitted,

By:   /s/ Tim Woolsey

Tim Woolsey
Washington Bar No. 33208
OFFICE OF THE TRIBAL ATTORNEY
SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 394-8493
twoolsey@suquamish.nsn.us

Keith M. Harper*
Leonard R. Powell*
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
kharper@jenner.com

NON-PARTY TRIBES' *AMICUS* BRIEF          JENNER & BLOCK LLP
(No. 22-cv-05325) – 20                     1099 New York Avenue, NW, Suite 900
                                           Washington, DC 20001-4412
                                           Tel. 202 639-6000

leonardpowell@jenner.com

***Counsel for the Suquamish Tribe***

———

Cory J. Albright
Washington Bar No. 31493
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
(206) 344-8100
calbright@kanjikatzen.com

Harold Chesnin
Washington Bar No. 398
LEAD COUNSEL FOR THE TRIBE
420 Howanut Road
Oakville, WA 98568
(360) 529-7465
hchesnin@chehalistribe.org

***Counsel for the Confederated Tribes of the Chehalis Reservation***

———

Kathleen M. Gargan
Washington Bar No. 56452
DORSAY & EASTON LLP
1737 NE Alberta Street, Suite 208
Portland, OR 97211
(503) 790-9060
katie@dorsayindianlaw.com

***Counsel for the Hoh Indian Tribe***

———

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 21

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Lorraine A. Parlange
Washington Bar No. 25139
Aubrey A. Seffernick
Washington Bar No. 37998
KALISPEL TRIBE OF INDIANS LEGAL OFFICE
934 S .Garfield Road
Airway Heights, WA 99001
(509) 789-7600
lparlange@kalispeltribe.com
aseffernick@kalispeltribe.com

***Counsel for Kalispel Tribe***

———

Brian C. Gruber
Washington Bar No. 32210
Crystal Pardue
Washington Bar no. 54371
ZIONTZ CHESTNUT
2101 Fourth Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230
bgruber@ziontzchestnut.com
cpardue@ziontzchestnut.com

***Counsel for Makah Indian Tribe***

———

Nate J. Cushman
Washington Bar No. 34944
OFFICE OF THE TRIBAL ATTORNEY
NISQUALLY TRIBE
4820 She-Nah-Num Drive SE
Olympia, WA 98513
(360) 456-5221
cushman.nate@nisqually-nsn.gov

***Counsel for Nisqually Indian Tribe***

———

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 22

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Charles N. Hurt, Jr.
Washington Bar No. 46217
NOOKSACK INDIAN TRIBE
5047 Mt. Baker Highway
P.O. Box 63
Deming, WA 98244
(360) 592-4158
churt@nooksack-nsn.gov

***Counsel for Nooksack Indian Tribe***

———

Steven D. Moe
Washington Bar No. 41123
LEGAL DEPARTMENT
PORT GAMBLE S'KLALLAM TRIBE
31912 Little Boston Road NE
Kingston, WA 98346
(360) 297-6242
smoe@pgst.nsn.us

***Counsel for Port Gamble S'Klallam Tribe***

———

Robert L. Hunter, Jr.
Washington Bar No. 48726
PUYALLUP TRIBE OF INDIANS
3009 E. Portland Avenue
Tacoma, WA 98404
(253) 573-7873
robert.hunter@puyalluptribe-nsn.gov

***Counsel for Puyallup Tribe of Indians***

———

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 23

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

1    Lori Bruner
     Washington Bar No. 26652
2    QUINAULT INDIAN NATION
     OFFICE OF THE ATTORNEY GENERAL
3    136 Cuitan Street
     P.O. Box 613
4    Taholah, WA 98587
     (360) 276-8215
5    lbruner@quinault.org

6
     ***Counsel for Quinault Tribe***
7
                              ———
8

9    Corin La Pointe-Aitchison
     Washington Bar No. 54924
10   DORSAY & EASTON
     1737 NE Alberta Street, Suite 208
11   Portland, OR 97211
     (503) 790-9060
12   corin@dorsayindianlaw.com

13   ***Counsel for Samish Indian Nation***

14
                              ———
15

16   Earle David Lees, III
     Washington Bar No. 30017
17   SKOKOMISH LEGAL DEPARTMENT
     SKOKOMISH INDIAN TRIBE
18   N. 80 Tribal Center Road
     Skokomish Nation, WA 98584
19   (360) 877-2100
     elees@skokomish.org
20

21   ***Counsel for the Skokomish Indian Tribe***

22
                              ———
23

24

25

26   NON-PARTY TRIBES' *AMICUS* BRIEF        JENNER & BLOCK LLP
27   (No. 22-cv-05325) – 24                  1099 New York Avenue, NW, Suite 900
                                             Washington, DC 20001-4412
28                                           Tel. 202 639-6000

Scott Wheat
Washington Bar No. 25565
WHEAT LAW OFFICES
23215 West Long Lake Road
Ford, WA 99013
(509) 458-6521
scottwheat@me.com

*Counsel for Spokane Tribe*

———

Nathan Schreiner
Washington Bar No. 31629
SQUAXIN ISLAND LEGAL DEPARTMENT
3711 SE Old Olympic Highway
Kamilche, WA 98584
(360) 432-1771
nschreiner@squaxin.us

*Counsel for Squaxin Tribe*

———

Rachel Sage
Washington Bar No. 42231
OFFICE OF TRIBAL ATTORNEY
SWINOMISH INDIAN TRIBAL COMMUNITY
11404 Moorage Way
La Conner, WA 98257
(360) 707-1501
rsage@swinomish.nsn.us

*Counsel for Swinomish Indian Tribal Community*

———

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 25

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

Lisa Koop Gunn
Washington Bar No. 47115
THE TULALIP TRIBES
6406 Marine Drive
Tulalip, WA 98271
(206) 683-5667
lkoop@tulaliptribes-nsn.gov

***Counsel for the Tulalip Tribes***

———

Marcus Shirzad
Washington Bar No. 50127
YAKAMA NATION OFFICE OF LEGAL COUNSEL
P.O. Box 150 / 401 Fort Road
Toppenish, WA 98948
Skokomish Nation, WA 98584
(509) 865-7268
marcus@yakamanation-olc.org

***Counsel for the Confederated Tribes and Bands
of the Yakama Nation***

———

*\*Pro Hac Vice Motion Forthcoming*

NON-PARTY TRIBES' *AMICUS* BRIEF
(No. 22-cv-05325) – 26

JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Tel. 202 639-6000

1

**HONORABLE DAVID G. ESTUDILLO**

2

3

4

5

6

7

8

9

10

11        **UNITED STATES DISTRICT COURT**
          **WESTERN DISTRICT OF WASHINGTON**
12                    **AT TACOMA**

13

14

15    MAVERICK GAMING LLC,                    Case No.: 22-cv-05325-DGE

16              Plaintiff,

17    v.                                      **SHOALWATER BAY TRIBE'S REPLY**
                                              **IN SUPPORT OF MOTION FOR**
18                                            **LIMITED INTERVENTION**

19    UNITED STATES OF AMERICA, et al.,       **Note on Motion Calendar: August 19, 2022**

20              Defendants.                   **ORAL ARGUMENT REQUESTED**

21

22

23

24

25

26

27

28

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336
Tel: (425) 802-5369

**TribeSER067**

# TABLE OF CONTENTS

1    **The Tribe is not Adequately Represented by the Federal Defendants and State Defendants.**................................................................................................................1

2.    **The Tribe's Rule 24 Motion is Timely.**................................................................6

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER068**

# TABLE OF AUTHORITIES

**Cases**

*Backcountry Against Dumps v. United States*,
(9th Cir. Dkt. 21-55869) ("*BAD Appeal*")........................................................4

*California v. Cabazon Band*,
107 S. Ct. 1087 (1987) ......................................................................................5

*Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*,
932 F.3d 843 (9th Cir. 2019) ....................................................................2, 3, 5, 6

*Jamul Action Comm. v. Simermeyer*,
974 F.3d 984 (9th Cir. 2020) ..........................................................................5

*Knox v. U.S. Dep't of Interior*,
759 F. Supp. 2d 1223 (D. Idaho 2010) ...........................................................3

*No Casino in Plymouth v. Nat'l Indian Gaming Comm'n*,
2022 WL 1489498 (E.D. Cal. 2022) ...............................................................4

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006)...........................................................................3

*Southwest Center for Biological Diversity v. Babbitt*,
150 F.3d 1152 (9th Cir. 1998) ......................................................................2, 3

*United States v. Spokane Tribe*,
139 F.3d 1297 (9th Cir. 1998) ........................................................................5

*Washington v. Daley*,
173 F.3d 1158 (9th Cir. 1999) ......................................................................2, 3

*West Flagler Associates v. Haaland*,
573 F. Supp. 3d 260 (D.D.C. 2021)................................................................4

**Statutes**

25 U.S.C. 2702(1)................................................................................................6

ii

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER069**

Indian Gaming Regulatory Act 25 U.S.C. §§ 2701 et seq. ("IGRA") ........................................5, 6


**Rules**

Fed. R. Evid. 201 ...........................................................................................................3

Local Rule 7(e)(3) .........................................................................................................1

Local Rule 7(e)(2) .........................................................................................................1

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER070**

Specially appearing proposed-limited-intervenor, the Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation ("Tribe") submits this reply in support of its Rule 24 Motion (Dkt. 68). Plaintiff Maverick Gaming LLC ("Maverick") opposes (Dkt. 78). The various named Federal officials (collectively "Federal Defendants") do not oppose. The various named officials of the State of Washington ("State Defendants") consent to permissive intervention and do not oppose intervention as of right.

Notably, although Maverick purports to be responding to the Tribe's Rule 24 Motion, its argument leapfrogs Rule 24 and instead argues that the Court should deny limited intervention because the Tribe's [Proposed] Rule 19 Motion should be denied, (Dkt. 78 at 3-4). This gambit is procedurally improper because it denies the Court full briefing from *all* parties (and other Washington Tribes may seek to participate as *amici*) on the merits of the [Proposed] Rule 19 Motion, which is not yet pending. This gambit also unfairly limits the Tribe's own reply to the merits of the [Proposed] Rule 19 Motion. *Compare* Local Rule 7(e)(2) (allowing six pages to reply to the Rule 24 Motion) *with* Local Rule 7(e)(3) (allowing twelve pages to reply to the Rule 19 Motion). Maverick makes no effort to show why limited intervention should be denied except to assert, wrongly, that the Tribe's Rule 24 Motion is untimely.

**1. The Tribe is not Adequately Represented by the Federal and State Defendants**

Maverick argues that the Federal Defendants can adequately represent the Tribe's interests.[1] Maverick's arguments ignore the governing standard in the Ninth Circuit. The Tribe's Rule 24 Motion (Dkt. 68 at 10-12) and [Proposed] Rule 19 Motion (Dkt. 68-1 at 18-23), explain

---

[1] Although Maverick proffers that both the Federal and State Defendants can adequately represent the Tribe, Maverick never explains how the State Defendants can do so.

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER071**

that *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843 (9th Cir. 2019), is the controlling precedent in the Ninth Circuit regarding Rule 19 where the absent required party is a sovereign Indian Tribe that is immune from the claims in the case. Namely, on the specific inquiry of the ability of the Federal Defendants to adequately represent the interest of the absent Tribe, while Federal Defendants "have an interest in defending their own analyses," they "do not share an interest in the *outcome* of the approvals" due to the absent tribe's sovereign interest in the operations subject to federal approval. 932 F.3d. at 855.

The Tribe provides extensive unrefuted detail in its [Proposed] Rule 19 Motion that *Dine Citizens* compels the conclusions that the Federal and State Defendants do <u>not</u> provide adequate representation – there is recent historic pre-compact tension between the Tribe and the Federal and State Defendants such that their interests clearly are not aligned if Maverick achieves its intended *outcome* in this litigation.

Maverick attempts to evade *Dine Citizens* by advancing five principal contentions. All fail.

First Maverick tries to bury *Dine Citizens* under older appellate cases from the Ninth Circuit, issued more than twenty years ago: *Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir. 1998) (private parties challenge federal approval of dam improvements allegedly in violation of ESA); and *Washington v. Daley*, 173 F.3d 1158, 1167–68 (9th Cir. 1999) (commercial fishing challenge to tribal allocations of certain coastal fisheries). The Ninth Circuit expressly distinguished *Southwest* in *Dine Citizens*:

> This case is unlike *Southwest*, because while Federal Defendants have an interest in defending their own analyses that formed the basis of the approvals at issue, here they do not share an interest in the outcome of the approvals—the continued operation of the Mine and Power Plant. And no party in *Southwest* had explained how the tribe's "sovereignty would be implicated.

2

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER072**

*Dine Citizens*., 932 F.3d at 855. And *Daley* is no more on point than *Southwest*, because it did not address whether the parties share an interest in the outcome with the absent tribe or how tribal sovereignty could be implicated by the relief the plaintiffs sought therein.

Second, Maverick keeps digging, citing another a pre-*Dine Citizens* decision, *Knox v. U.S. Dep't of Interior*, 759 F. Supp. 2d 1223, 1235–36 (D. Idaho 2010). The plaintiffs in *Knox* sued the United States to invalidate its approval of compact amendments agreed to by the Idaho Tribes. Therein, the United States sought dismissal on Rule 19 grounds.  Notably, the plaintiff's in *Knox* dismissed their lawsuit by stipulation while the United State's motion for reconsideration was pending, which motion was supported by declarations of Shoshone Bannock tribal officials, and by an amicus brief submitted by the Shoshone Bannock Tribes, specifically informing the Court of an analogous situation wherein the compacts at issue resolved years of tension between the Shoshone Bannock Tribes and both the State and United States for the Tribes' previous operation of class III gaming without a compact. [2] Hence, *Knox* never addressed whether the parties shared an interest in the outcome with the absent tribe.

Third, Maverick asserts "the federal government has repeatedly taken the position that Indian tribes are not required parties in challenges of this nature" (Dkt. 78 at 5).  That is mistaken.  Indeed, it was the federal government that sought dismissal pursuant to Rule 19 in *Knox*. Moreover, Maverick points only to litigation *outside of the Ninth Circuit*.  Inside the Ninth Circuit,

---

[2] The Docket sheet in *Knox v. U.S. Dep't of Interior,* case no. 4:09-cv-00162 (D. Idaho) and pleadings and orders referenced in the above discussion are attached to the Declaration of Scott Crowell in Support of the Tribe's Motion for Limited Intervention ("Crowell Declaration") as Exs. 3(A-E). The Tribe requests that the Court take judicial notice of the briefs filed in other cases and attached to the Crowell Declaration. *See* Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc*., 442 F.3d 741, 746 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record").

3

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER073**

the United States recognizes that *Diné Citizens* is the controlling precedent. In another case concerning Rule 19 currently on appeal to the Ninth Circuit, the United States explained:

> Federal Defendants acknowledged below that dismissal was compelled by this Court's recent decision in *Diné Citizens.* In that case, this Court held that an Administrative Procedure Act (APA) challenge to final action of a federal agency was properly dismissed under (Rule) 19 where an absent tribal entity had a legally protected interest in the subject of the challenge and could not be joined due to sovereign immunity. Here, the district court faithfully applied *Diné Citizens'* holdings and concluded that dismissal of this suit was likewise appropriate.

> Although Federal Defendants continue to adhere to the position that the United States is generally the only required party in litigation challenging final agency action, this case is materially indistinguishable from *Diné Citizens*. Accordingly, and consistent with its position below, the United States maintains that affirmance is compelled by circuit precedent.

Federal Appellees' Answering Brief[3], *Backcountry Against Dumps v. United States*, (9th Cir. Dkt. 21-55869) ("*BAD Appeal*"). *See also No Casino in Plymouth v. Nat'l Indian Gaming Comm'n*, 2022 WL 1489498 at *9-10 (E.D. Cal. 2022) (Federal Defendants did not oppose Ione Tribe's Rule 24 motion). And although Plaintiff relies heavily on the district court decision in *West Flagler Associates v. Haaland*, 573 F. Supp. 3d 260 (D.D.C. 2021), which is now on appeal[4] (D.C. Cir. Dkts. 21-52 65 & 22-5022), in that case the Federal Defendants did oppose the Seminole Tribe's Rule 24 motion. The correct history is that the United States has at times has been the movant, and other times joined or not opposed, and at times opposed, Rule 19 motions regarding absent and immune Indian Tribes depending on the circumstances and the law of the Circuit. Here, in contrast to *West Flagler*, the Federal Defendants do not oppose the Tribe's Rule 24 Motion.

---

[3] Attached to the Crowell Declaration as Ex. 2.
[4] *See* Brief of Appellant Seminole Tribe of Florida attached to Crowell Declaration as Ex. 1.

4

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

Fourth, Maverick finally attempts to distinguish *Dine Citizens*, contending that "the interests of the federal defendants and the Tribe are perfectly aligned" (Dkt. 78 at 6). Maverick fails to address the Tribe's analysis that the federal and state interests differ from the Tribes (Dkt 68 at 8-12)[5]. Specifically, Maverick asserts that the possibility of the State or United States taking enforcement action against the Tribe if Maverick prevails would only exist "after" the litigation is resolved rather than "in the litigation" (Dkt. 78 at 6). That analysis defies *Dine Citizens*, in which the United States and the absent tribe held the same position on the validity of the federal government's approval action during the litigation, and in which the Ninth Circuit expressly looked at whether the United States and tribe shared an interest in the "outcome" of the litigation. *See also Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 987 (9th Cir. 2020) (describing *Dine Citizens* as a case where "[federal] obligations to follow relevant environmental laws were in tension with tribal interests"). It is also folly – the conflict could well become critical "in the litigation" if the Court grants Maverick's request to find that the Tribe's Compact is "void" or to enjoin the Federal and State Defendants from the "continued administration" of the Compact (Dkt 65 at ¶¶ 207(1) and (2)). In that instance, the Tribe would contend that the State and federal government should take no action against the Tribes' gaming activities because the Indian Gaming Regulatory Act 25 U.S.C. §§ 2701 et seq. ("IGRA") cannot be interpreted in a manner that deprives the Tribes of their sovereign right to offer gaming activities as affirmed in *California v. Cabazon Band*, 107 S. Ct. 1087 (1987). *See United States v. Spokane Tribe*, 139 F.3d 1297, 1302 (9th Cir. 1998) (parties and courts will need to resolve issues regarding viable remedies to protect tribal interests if a compact cannot be reached). Given the historic tension between the Tribe and the

---

[5] *See also* Brief of Appellant Seminole Tribe of Florida attached to Crowell Declaration as Ex. 1 at 24-26.

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER075

Federal and State Defendants, there is no assurance that the Federal and State Defendants will agree with the Tribe, and are likely to take an opposite position. Maverick suggests it would be "IGRA and the Constitution - not this Court's judgment that would prohibit" the Tribe from operating (Dkt. 78 at 8). But that question would be squarely before this Court "in this litigation" if it were to declare the Compacts to be void. Moreover, *this Court's* judgment could result in divergence while this case is on appeal. *See Dine Citizens*, 932 F.3d at 855.

Last, Maverick makes the disingenuous assertion that the Court could fashion its relief to avoid directly invalidating the Tribe's Compact by simply enjoining the State from seeking enforcement action against Maverick (Dkt. 78 at 8). But such relief would require a Court ruling on the validity of the compacts, in a decision that would bind the United States. The Tribe would then be subject to significant risk of enforcement action against the Tribe's gaming operation. No amount of sophistry can avoid the reality that any of the relief sought by Maverick has the very real effect of crippling the Tribe's gaming operations and the Tribe's and IGRA's goals of self-governance and self-sufficiency. 25 U.S.C. 2702(1).

## 2. The Tribe's Rule 24 Motion is Timely.

Maverick repeats those arguments made in its opposition (Dkt. 71) to the Tribe's Motion for Relief from Summary Judgment (Dkt. 69), that none of the Tribe's motions are timely. That argument fails for the reasons explained in the Tribe's Reply in Support of Motion for Relief from Summary Judgment Deadlines (Dkt. 73).

The Tribe's Motion for Limited Intervention should be granted.

Respectfully submitted this 19th day of August, 2022.

Respectfully submitted,

6

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER076**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*s/ Scott Crowell*
SCOTT CROWELL (WSBA No. 18868)
CROWELL LAW OFFICES-TRIBAL
ADVOCACY GROUP
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
Fax: (509) 290-6953
Email: scottcrowell@hotmail.com

LAEL ECHO-HAWK (WSBA No.
MThirtySix, PLLC
700 Pennsylvania Avenue SE
The Yard – 2nd Floor
Washington, D.C. 20003
Telephone: (206) 271-0106
Email: Lael@MThirtySixPLLC.com

*Attorneys for Proposed Limited Intervenor*
*Shoalwater Bay Indian Tribe*

7

Reply in Support of Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER077**

1

## **CERTIFICATE OF SERVICE**

2

3        I hereby certify that on August 19, 2022, I filed the foregoing REPLY IN SUPPORT OF

4    MOTION FOR LIMITED INTERVENTION with the Clerk of the Court using the CM/ECF

5    system, which will send notification of such filing to the parties of record in this matter.

6    DATED: August 19, 2022

7

8                                                    *s/ Scott Crowell*
                                                     SCOTT CROWELL (WSBA No. 18868)
9                                                    CROWELL LAW OFFICES-TRIBAL
                                                     ADVOCACY GROUP
10                                                   1487 W. State Route 89A, Suite 8
                                                     Sedona, AZ 86336
11                                                   Telephone: (425) 802-5369
                                                     Fax: (509) 290-6953
12                                                   Email: scottcrowell@hotmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Reply in Support of Motion for Limited Intervention                          Scott D. Crowell
Case No.: 22-cv-05325-DGE                              Crowell Law Office-Tribal Advocacy Group
                                              1487 W. State Route 89A, Suite 8, Sedona, AZ 86336
                                                                          Tel: (425) 802-5369

**TribeSER078**

THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MAVERICK GAMING LLC,

     Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

     Defendants.

No. 22-cv-05325 DGE

**DECLARATION OF JONATHAN
CHAVEZ IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

I, Jonathan Chavez, declare under penalty of perjury that the following is true and
correct:

     1.    I currently serve as Co-Founder and Chief Analytics Officer at SocialSphere, Inc.,
a market research firm based out of Cambridge, MA, and as a Senior Associate Research Analyst
at Spectrum Gaming Group.

     2.    I make this Declaration in support of Plaintiffs' Motion for Summary Judgment.

     3.    Attached as **Exhibit A** to this Declaration is a true and correct copy of my August
3, 2022 expert report titled, "Impacts of Online Sports Wagering on Maverick Gaming Facilities
in the State of Washington."

1

DECLARATION OF JONATHAN CHAVEZ
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed on August 12, 2022.

3

4                                                          Jonathan Chavez

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

DECLARATION OF JONATHAN CHAVEZ
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER080**

# EXHIBIT A

# EXPERT REPORT OF JONATHAN CHAVEZ:

## Impacts of Online Sports Wagering on Maverick Gaming Facilities in the State of Washington

Prepared for Maverick Gaming
August 3, 2022

1

TribeSER082

# Contents

**Qualifications**...................................................................**3**

**Methodology** ....................................................................**5**

    **Survey Design Considerations**.................................**5**

    **Survey Details and Implementation** .......................**5**

**Survey Results and Conclusion** ......................................**7**

**Appendix I: Resume of Jonathan Chavez**...................**12**

**Appendix II: Material Used** .........................................**14**

**Appendix III: Full Survey** ...........................................**15**

**Appendix IV: Summary of Statistical Assessment** ...................**20**

2

# 1. Qualifications

My name is Jonathan Chavez, and I currently serve as Co-Founder and Chief Analytics Officer at SocialSphere, Inc., a market research firm based out of Cambridge, MA, and as a Senior Associate Research Analyst at Spectrum Gaming Group.

I hold an A.B. in Social Studies with Honors in Field from Harvard College, where my coursework focused on statistics, econometrics, and public opinion research. I did extensive coursework in public opinion methodologies, and my thesis focused on understanding trends in public opinion research. Since 2005, I have worked professionally in market research, focusing on lotteries and gaming. In that time, I have conducted research on behalf of 10 state lotteries, and have conducted market assessments for casinos, thoroughbred racing entities, including the National Thoroughbred Racing Association, and jurisdictions implementing sports betting, including New Hampshire and Washington, DC.

During that time, I have led more than 100 qualitative and quantitative studies into player habits and attitudes within the lottery and gaming industry. Those studies have been used for various purposes, including assessing the viability of new games and products, making sales projections, and segmenting players based on attitudes towards gaming and other behavioral factors. A key component of my work within the lottery and gaming industry has been developing methodologies for assessing reported gambling spending levels in market research and correlating those figures to real-world spending data.

In addition to my work in the lottery and gaming industries, I am the primary market researcher for clients across various sectors. I have served as the lead market researcher for the Marine Corps Recruiting Command since 2011, working with their advertising agency to assess trends in recruiting. On behalf of Marine Corps Recruiting Command and J. Walter Thompson, in 2012, I led the research effort awarded the Gold Jay Chait Award for Strategic Excellence in Research Innovation.

I have implemented qualitative research designs, including in-depth interviews, ethnographies, online tracking studies, focus groups, and town halls. I have implemented quantitative studies that have included in-person interviewing, telephone-based interviewing, and online surveys using proprietary databases, opt-in panels, and address-based sampling methodologies. When designing the methodology for a project, my primary goal is to implement a research design that minimizes the potential sources for error, assures the broadest possible coverage of respondents, is replicable, and meets industry standards for transparency of methods. In addition, much of my work uses surveys and other market research to make business and financial projections on behalf of clients. I have worked in the business planning process with dozens of clients.

My resume is attached hereto as Appendix I. Because my work is usually done on behalf of clients who use my data and opinions for proprietary market purposes, I have not publicly authored articles in the last ten years. In 2021, I served as an expert witness in Case No. 1:21-cv-02192-DLF in the United States Circuit Court for the District of Columbia. In that case, I served as an expert witness on issues similar to the current case being litigated.

The list of materials that I have considered is contained in Appendix II.

Maverick Gaming ("Client") retained me to assess the current impact of the implementation of sports betting in the state of Washington on its properties in the state. This assessment involved two parts – an assessment of the current shift in behavior that has occurred among players and the potential shifts in behavior that would occur if Maverick Gaming were able to offer sports betting and Class III gaming at its properties.

My compensation for this report and the fielding of the survey underlying the report is a fixed fee of $28,000.

3

My compensation does not depend on my conclusions or the outcome of this case.

In addition to this compensation, my agreement with Maverick Gaming stipulates that I will be paid for the following, if necessary:

i.      In-person presentation ($2,500 per travel/on-site day, plus travel expenses billed at cost),

ii.     Preparation for deposition ($350 per hour),

iii.    Deposition ($350 per hour),

iv.     General consultation ($350 per hour), and

v.      Serving as an expert witness at trial (in-court hourly rate of $450 per hour, plus travel expenses billed at cost).

I understand that I am obligated to provide my independent expert assessment even though I am being engaged by counsel in this matter.

My analysis and conclusions are based on the information available to me at present. I reserve the right to update my opinions and analysis as appropriate if additional information or materials become available or should other experts present opinions or testimony. I also reserve the right to create and use demonstrative exhibits to assist me should I ever be required to present testimony. All of my opinions and conclusions throughout this report are rendered to a reasonable degree of professional certainty.

4

## 2. Methodology

### Survey Design Considerations

I, Jonathan Chavez, was responsible for designing a survey of Maverick Gaming customers that occurred between July 22 and August 2, 2022. The objective of this study was to assess the current and potential future impacts of current gaming laws in Washington on Maverick Gaming's properties, with a specific focus on sports betting[1] and Class III gaming. In designing this research, the following major factors were the primary consideration in research design, implementation, and analysis:

- Defining the survey audience and ensuring that the audience surveyed accurately represented Maverick Gaming's player base;

- Designing the survey to clearly test whether or not the implementation of sports betting has impacted Maverick Gaming;

- Using methodologies that are repeatable and acceptable, conforming to relevant industry standards, particularly those defined by the American Association of Public Opinion Researchers;

- Reducing sources of sampling;

- Reducing sources of question bias by designing neutral, non-biased questions and;

- Analyzing the data using industry-standard statistical procedures.

### Survey Details and Implementation

I was contracted to design the sampling procedure and questions for an in-person-to-online and online study of Maverick Gaming's customers in the state of Washington. My independent recommendation for conducting this study is that the methodology chosen provided the best possible coverage of Maverick Gaming's player base. There are a few rationales for that assessment. I have participated regularly in sports betting, poker, and other forms of casino-based gaming recreationally for over 15 years. My specific knowledge of these fields was part of my methodological recommendations.

Maverick Gaming has 16 properties in the state of Washington that were included as part of this survey. Additionally, Maverick Gaming has a loyalty club, which includes a database of players' names, loyalty numbers, and the telephone numbers, addresses, and email addresses for a subset of players. In conversations with executives at Maverick Gaming, including Aaron Huang, Vice President of Operations for Maverick Gaming's properties in Washington, I determined that the loyalty club's database encompassed the vast majority of players and that tracked play from players in the database accounted for over 85% of Maverick Gaming's revenue in Washington. As such, I determined that using the database as a primary method of sampling Maverick Gaming's players would methodologically comport with industry best practices.

In addition to using the database to field the study, I determined that supplementing the survey sample with in-person respondents would yield a potentially more robust and statistically valid sample. Working with Mr. Huang and Mark Juliano, Maverick Gaming's Vice President of Marketing, I created unique survey links for each property, and Maverick Gaming then embedded those links into Q.R. codes that were posted at multiple locations in each property, with a focus on high traffic areas such as entrances, cashier cages, and restrooms. The signs invited individuals to complete a short survey, and upon completion, they could enter their name, Play Maverick Loyalty number, and either their phone number or email address to receive $20 in match play and a chance to win $200. I included the incentivization component to ensure that individuals completing the survey provided personal information about themselves. I wanted to be sure that I had a mechanism to control for players only responding to the

---

[1]For this report, "sports betting" should be understood to refer to non-parimutuel sports betting.

TribeSER086

survey once. A primary concern for non-probability-based sampling is ensuring that individuals are not completing the survey multiple times and biasing the results.

In the survey, we included basic demographic questions about age and gender. I asked Mr. Huang to review the responses to those questions to ensure that the data matched customer data. He assured me that the sample drawn was reflective of the age, gender and gameplay patterns of players at Maverick Gaming properties in Washington.

I left the survey open for more than a week to ensure that the base of players surveyed was not biased by the time of day, day of the week, or other factors. Additionally, I wanted to design a sampling procedure that would be least intrusive to players. Players could complete the survey at their convenience, and they did not have to interrupt their gambling.

The survey's questions were designed to ensure that the sample was unbiased and reflective of the overall player base to understand the likely adoption of any expansion in sports betting and shifts in behavior. My previous experience with asking players about shifts in spending has shown that asking about percentages of a shift in spending is more accurate than asking about shifts in the dollar amount spent.

Most players do not accurately assess their current gambling spending in raw dollar terms. They will often, for a variety of reasons, underestimate their spending and losses. However, players are much better at understanding the share of wallets they devote to each type of gambling spending. In constructing sales models in the gambling space, I have found that asking about the percentage of spending yields more accurate results than asking about the amount spent.

The survey was completed online and has been included as Appendix III to this report. The survey was programmed on the Confirmit survey platform and took respondents an average of 6.5 minutes to complete. The survey data was then downloaded to SPSS for analysis.

It is always the case in surveys like this that ambiguity can exist for individual responses. Respondents can incorrectly understand a question at times. To analyze the survey results, I have, in each instance, interpreted ambiguous data in the most conservative way possible, meaning that if there is ambiguity regarding what a response might mean, I have assumed that the response will default to no change in spending or behavior shifts that would impact Maverick Gaming. In other words, any potential revenue loss extrapolations from the survey results rely only on clear, unambiguous responses that indicate that respondents:

- Have already shifted their spending away from Maverick Gaming properties;

- Would potentially increase their spending or shift their spending back to Maverick Gaming properties if Maverick Gaming offered sports betting and/or Class III gaming, and;

- The shift in spending comes from the proportion of money that players previously spent at Maverick Gaming properties (in the case of current shifts away from Maverick Gaming) or from money not currently being spent at Maverick Gaming properties in the case of potential shifts towards Maverick Gaming properties).

The methodology used is meant to understand whether or not a loss of revenue is likely, and what degree of statistical certainty there is that revenue loss would occur.

6

# 3. Survey Results and Conclusion

A total of 627 Maverick Gaming players completed the survey. The first step in my analysis was assessing the samples to ensure that they reflected the generally known composition of the players at Maverick Gaming Properties. The sample for the survey had the following demographics:

**Gender**

Male..........................................................................68%
Female ....................................................................32%

**Age**

Under 35 .................................................................32%
35-55 ......................................................................39%
Over 55 ...................................................................29%

**Maverick Gaming Properties Visit and Betting Frequency[2]**

Multiple times per week...............................................39%
About once a week....................................................18%
Less than once a week, but
At least a few times per month....................................16%
Less than once a month.............................................13%
Don't know ...............................................................3%

When conducting a mixed methodology survey (sampling through a player database and sampling via in-person recruitment), it is important to assess each methodology separately to ensure that the samples reflect similar populations. The database sample and the in-person sample were demographically similar. On each question throughout the survey, we observed *no statistically significant differences* between the 289 surveys completed via in-property Q.R. codes and 338 completed via the Play Maverick loyalty club. As such, I feel comfortable reporting the samples as a single dataset.

Next, my analysis focused on assessing the current impact that the implementation of sports betting has had on Maverick Gaming and the potential impact of allowing Maverick Gaming to accept sports wagers and Class III gaming wagers. To conduct this analysis, I have used a statistical analysis that focuses on the set of survey responses that unambiguously indicate the behavior that would be indicative of each of the categories below. The survey was constructed to quantify the percent of Maverick Gaming's customers who fall into each of these three categories.

- **Current Sports Bettors, Lost Maverick Gaming Revenue:** Players who have already engaged in legal sports betting at a tribal property in Washington **and** who would have placed a sports bet at a Maverick property instead of at a tribal property if sports betting were available at a Maverick property **and** who say that at least some of the money they have spent on sports betting in Washington at a tribal property comes from the money they previous bet at Maverick properties.

- **Would Bet on Sports at a Maverick Gaming Property, New Revenue**: Players who indicate that they would definitely bet on sports if available at Maverick Gaming **and** who indicate that at least

---

[2] Respondents were first shown a list of Maverick Gaming properties and asked, "In the last year, which of the following Washington casinos or cardrooms have you visited and placed a bet or gambled, if any?" For the list of casinos that they selected, they were then asked, "How often do you visit any of the following and gamble?"

7

some of that spending would come from money they are not currently spending at Maverick properties.

- **Would Bet on Class III Gaming at a Maverick Gaming Property, New Revenue**: Players who indicate that they definitely would bet on Class III gaming if available at Maverick Gaming **and** who indicate that at least some of that spending would come from money they are not currently spending at Maverick properties.

To construct the category of **Current Sports Bettors, Lost Maverick Gaming Revenue**, the following responses were used. Respondents had to fit all of the following criteria in order to qualify:

| Question | Answer Choices | Qualifying Answer(s) |
|---|---|---|
| Sports betting was legalized in Washington in 2020, and in 2021 the first retail sports book opened in Washington. While betting on thoroughbred racing was legal prior to this, betting on sports like football, baseball, and basketball became legal in Washington in September 2021. All the currently legal sports books in Washington are located at tribal casinos. Since the first legal sports books opened in Washington in September of 2021, have you placed at least one sports bet in-person at a sportsbook located in the state of Washington? | Yes ................................................................. 1 <br> No .................................................................... 2 <br> Don't know ....................................................... 3 | Yes |
| Thinking about all the times you have placed a sports bet at a casino in Washington, has there ever been an occasion where you specifically went to a casino to place a sports bet – and would not have visited that casino if sports betting was not available? | Yes ................................................................. 1 <br> No .................................................................... 2 <br> Don't know ....................................................... 3 | Yes |
| Thinking back to the times that you visited a casino in Washington and placed a sports bet, if **[Maverick Gaming property/properties]**[3] offered sports betting, would you have ever visited one of these properties to place that sports bet **instead** of the casino where you placed the bet, or would you still have always gone to the casino where you placed that sports bet? | I definitely would have visited **[Maverick Gaming property/properties]** to place a sports bet instead of the casino where I bet ......................................... 1 <br> I probably would have visited **[Maverick Gaming property/properties]** to place a sports bet instead of the casino where I bet ......................................... 2 <br> I probably would not have visited **[Maverick Gaming property/properties]** to place a sports bet instead of the casino where I bet ......................................... 3 <br> I definitely would not have visited **[Maverick Gaming property/properties]** to place a sports bet instead of the casino where I bet ......................................... 4 <br> Don't know ....................................................... 5 | I definitely would have visited **[Maverick Gaming property/pr operties]** to place a sports bet instead of the casino where I bet |
| When you think about the money you have used to place a sports bet at a casino in Washington, how much of that money came from the following sources? Please make sure your responses add up to 100% | Money you are currently wagering at **[Maverick Gaming property/properties]** ....... 1 <br> Money you are currently wagering elsewhere, such as at other casinos or playing the Lottery. ................................................................... 2 <br> Money you are currently betting on sports elsewhere, including at other casinos, in other states, at offshore casinos or through some other means ............. 3 | Money you are currently wagering at **[Maverick Gaming property/pr operties]** is greater than 0% |

---

[3] In a previous question, respondents were asked, "In the last year, which of the following Washington casinos or cardrooms have you visited and placed a bet or gambled, if any? Please select all that apply." – and shown a list of Maverick Gaming properties. In this question, the properties that they had visited and bet or gambled at were shown.

8

| | Money you are not currently spending on wagering....................................4 | |
|---|---|---|

When analyzing survey responses, I found that 63 customers out of the 627 surveyed fell into the category of **Current Sports Bettors, Lost Maverick Gaming Revenue**, or 10% of Maverick's customers.

To arrive at that, I found that:

- 23% of Maverick Gaming's players indicate that yes, they have placed at least one sports bet in-person at a sports book in Washington since September 2021;

**And**

- 61% of those players, or 14% of Maverick Gaming's total player base, indicate that they specifically went to a casino to place a sports bet that they would not have visited otherwise;

**And**

- 76% of those players, or 11% of Maverick Gaming's total player base, indicate that they definitely would have visited a Maverick Gaming property instead of the location they visited when they previously participated in sports betting if sports betting were available at Maverick Gaming properties;

**And**

- 90% of those players, or 10% of Maverick Gaming's total player base, indicate that at least some of the money they spent on sports wagering came from the money they were previously spending wagering at Maverick Gaming properties.

As I will show later in the report, 10% represents a statistically meaningful percentage of Maverick Gaming's players. It is large enough to allow the null hypothesis of no lost revenue to be rejected.

To construct the category of **Would Bet on Sports at a Maverick Gaming Property, New Revenue**: the following responses were used. Respondents had to fit all of the following criteria in order to qualify:

| Question | Answer Choices | Qualifying Answer(s) |
|---|---|---|
| Earlier in this survey, you indicated that you have gambled at **[Maverick Gaming property/properties]**. If any or all of those properties made sports betting available on-site - assuming that they offered bets similar to other sports books currently operating in Washington - would you wager on sports betting at any of these properties or not? | Yes, I definitely would .......................................1<br>I probably would .................................................2<br>I probably would not...........................................3<br>I definitely would not..........................................4<br>Don't know ..........................................................5 | Yes, I definitely would |
| If you did place a sports bet at **[PROPERTIES FROM Q2]**, how much of the money would come from each of the following sources of spending? Please make sure your responses add up to 100%. | Money you are currently wagering at **[Maverick Gaming property/properties]**.......1<br>Money you are currently wagering elsewhere, such as at other casinos or playing the Lottery. ................................................................................2<br>Money you are currently betting on sports elsewhere, including at other casinos, in other states, at offshore casinos or through some other means.............3<br>Money you are not currently spending on wagering.......................................................4 | Money you are currently wagering at **[Maverick Gaming property/properties]** is less than 100% |

9

When analyzing survey responses, I found that 172 customers out of the 627 surveyed fell into the category of **Would Bet on Sports at a Maverick Gaming Property, New Revenue,** or 28% of Maverick's customers.

To arrive at that, I found that:

- 33% of Maverick Gaming's total player base indicates that they definitely would wager on sports betting at Maverick Gaming property if sports betting were available;

**And**

- 82% of those players, or 28% of Maverick Gaming's total player base, indicate that at least some of the money they spent on sports wagering would come from money they were not previously spending wagering at Maverick Gaming properties.

As I will show later in the report, 28% represents a statistically meaningful percentage of Maverick Gaming's players. It is large enough to allow the null hypothesis of no lost revenue to be rejected.

To construct the category of **Would Bet on Class III Gaming at a Maverick Gaming Property, New Revenue**: the following responses were used. Respondents had to fit all of the following criteria in order to qualify:

| Question | Answer Choices | Qualifying Answer(s) |
|---|---|---|
| Earlier in this survey, you indicated that you have gambled at **[Maverick Gaming property/properties]**. If any or all of those properties let you bet on casino games they don't currently offer, like craps and roulette, would you visit any of those properties in order to gamble on those games? | Yes, I definitely would ........................................ 1<br>I probably would .................................................. 2<br>I probably would not ............................................ 3<br>I definitely would not........................................... 4<br>Don't know ........................................................... 5 | Yes, I definitely would |
| If you did place a wager on games like craps or roulette at **[PROPERTIES FROM Q2]**, how much of the money would come from each of the following sources of spending? Please make sure your responses add up to 100%. | Money you are currently wagering at **[Maverick Gaming property/properties]**.......1<br>Money you are currently wagering elsewhere, such as at other casinos or playing the Lottery. ............................................................................. 2<br>Money you are currently betting on sports elsewhere,<br>including at other casinos, in other states, at offshore<br>casinos or through some other means............. 3<br>Money you are not currently spending on wagering..................................................... 4 | Money you are currently wagering at **[Maverick Gaming property/properties]** is less than 100% |

When analyzing survey responses, I found that 169 customers out of the 627 surveyed fell into the category of **Would Bet on Sports at a Maverick Gaming Property, New Revenue,** or 27% of Maverick's customers.

To arrive at that, I found that:

- 38% of Maverick Gaming's total player base indicates that they definitely would wager on sports betting at Maverick Gaming property if sports betting were available;

**And**

- 71% of those players, or 27% of Maverick Gaming's total player base, indicate that at least some of the money they spent on Class III gaming would come from money they were not previously spending wagering at Maverick Gaming properties.

These responses were chosen as the universe because they represent the smallest possible universe of respondents who could fit into each universe. There is no interpretative ambiguity in their responses. For

10

the purposes of reasonable business planning and making financial projections, a broader universe would be used; however, the purpose of this analysis is to evaluate the null hypothesis,[4] meaning is there any way to interpret the survey results to say that no shift has occurred or would occur.

The results of this analysis showed that the null hypothesis could be rejected: Through any reasonable statistical analysis, the percent of players in each universe of bettors tested who would shift is statistically significant at the 95% confidence interval.

In each universe, the sample is served by a hypergeometric distribution,[5] for which I formed a normal approximation. Using this normal approximation, I calculated both the odds of $x$ or more doing harm (one-tailed), and the odds of $x$-$hn$ difference or more doing harm (two-tailed)[6], both given baseline $h$. $h$ has been set at 5%, as a reasonable calculation of fielding error. The assumed universe of players is based on discussions with Mr. Huang.

Every universe shows that a statistically significant number of players would follow the patterns described above and either have already shifted spending away from Maverick Gaming's properties or would increase their spending at Maverick Gaming properties if Class III gaming were authorized. Put simply: at the 95% confidence interval, I can say Maverick Gaming has already lost revenue as a result of sports betting being legalized and only giving tribal properties access to it, and Maverick Gaming would gain revenue if it were allowed to have sports betting at their properties or Class III wagering. The survey results tabulated below support these conclusions. Those results are summarized below, and full statistical results are included in **Appendix IV.**

| Category | Percent of Maverick Gaming Customers Who Fall Into Each Category | Sample Size | P Two-Tailed |
|---|---|---|---|
| Current Sports Bettors, Lost Maverick Gaming Revenue | 10% | 627 | 6.38801E-09 |
| Would Bet on Sports at a Maverick Gaming Property, New Revenue | 28% | 627 | 0 |
| Would Bet on Class III Gaming at a Maverick Gaming Property, New Revenue | 27% | 627 | 0 |

Taken as a whole, the results of the survey and an analysis of the data show Maverick Gaming has already lost revenue as a result of not having access to sports betting, and that access to sports betting and Class III gaming would result in incremental gaming revenue for Maverick Gaming.

---

[4] In statistics, the null hypothesis is that chance alone is responsible for the results.

[5] In a hypergeometric distribution, selections are made from two groups without replacing members of the groups. It assists in statistical quality control.

[6] One-tailed significance assumes that all error is one direction away from the mean, above or below. Two-tailed tests variance in both directions from the mean and is the standard used in most statistical tests.

**TribeSER092**

**Appendix I: Resume of Jonathan Chavez**

**JONATHAN CHAVEZ**
**PROFESSIONAL EXPERIENCE**

**SocialSphere, Inc.**

Co-Founder and Chief Analytics Officer, Cambridge, MA                January 2011 – Present
- Serves as the primary client council for ongoing strategic engagements with C-level contacts at The United States Marine Corps, J. Walter Thompson, The White House Office of Public Engagement, Bridgewater Associates, The Office of the Chairman of Joint Chiefs of Staff, Thomas H. Lee Partners, the Walton Family Foundation, The National Thoroughbred Racing Association, and others.
- Serves as the lead of the firm's lottery and gaming client practice, working with numerous state lotteries and gaming entities to develop customer marketing strategies and economic models.
- Works with these organizations to implement strategies that combine the use of social and digital media, mobile technology, and qualitative and quantitative research. Strategies focus on streamlining internal communications systems and architectures and aiding in external communications planning.
- Leads a team of developers to further improve key technology assets by adapting software designed to improve internal workflows to function as client-facing products. Development focuses on the incorporation of real-time translation, messaging, and monitoring into tracking software and collaboration platforms in desktop and mobile environments.

Co-Founder and Director of Analytics, Cambridge, MA        November 2008 – December 2010
- Conceived of SocialSphere's ORBIT™ Methodology and developed the algorithms that drive SocialSphere's ORBIT™ Report and Platform. Reports and Platform are currently the company's highest grossing business unit as measured by both EBITA and profit margin.
- Built SocialSphere's analytics department from a single member to a team of six. In the processes, implemented workflow plans defined analytic perspective, and managed vendor relationships. Department profitability exceeded board expectations in eight of nine quarters.
- Managed, analyzed, and served as the primary contact on the two largest public opinion research projects conducted by The United States Marine Corps in its recent history. One project focused on understanding how the USMC could communicate more efficiently with the families of Marines, which led to the development of a completely new multi-channel (email, phone, SMS, MMS, Twitter, internal social network, etc.) messaging system that relied on self-correction methods to improve responsiveness metrics. The second project, conducted on behalf of Marine Corps Recruiting Command, focused on the impact of the Millennial generation and their changing demographics on USMC assessments. The research laid the groundwork for all upcoming United States Marine Corps advertising from FY2012-FY2022.

Co-Founder and Senior Analyst, Cambridge, MA                January 2007 – November 2008
- Worked on SocialSphere's political campaign work during the 2008 election cycle. Clients included a Presidential campaign (Primary and General election), three Senate Races, four House of Representative Races, a Governor's Race, and work with Harvard's Institute of Politics. Work included qualitative and quantitative research, media tracking, model design for the selection of exit poll locations during the New Hampshire Primary, and primary and caucus delegate count modeling.
- Served as an on-site advisor for a major Private Equity Firm during the evaluation of the purchase of a state Lottery. Led the team that included firm members and an outside management consultant to build the valuation model used during the purchase process.

**Spectrum Gaming Group**

Senior Associate Research Analyst                                    September 2021 – Present

12

- Retained on a contract basis to provide independent survey research services.

**Prime Group, LLC.**

Analyst, Concord, MA                                            August 2005 – December 2006
- Conducted all aspects of opinion research and marketing consulting, including: research and questionnaire design, data analysis and presentation, brand and reputation research, focus group preparation, product testing, and extensive experience in secondary research, in particular market trends and news content analysis. Clients served came from both private and public sectors with a focus on marketing and public relations. Worked on cases from research design through client implementation of recommendations.

## EDUCATION
**Harvard University**, Cambridge, MA
Degree: A.B. in Social Studies with Honors in Field, June 2005

Coursework
- Thesis work focused on a quantitative assessment of the role of nationalist sentiments in liberal Western democracies. The research delved into the literary and cultural origins of far-right and far-left wing movements and the building of a model that effectively predicted the impacts of the systematic process whereby civic nationalism bifurcates the role of founding documents into their role as the country's legal framework and their role as the nation's "the creation myth" - which in turn drives the evolution of extreme positions into the mainstream over time. The thesis included significant economic modeling, opinion research methodologies and statistics.

## ADDITIONAL SKILLS AND INTERESTS

Skills
- Computer Skills: Proficient in both Windows and Mac environments with extensive experience in the Microsoft Office Suite, with particular expertise in Excel modeling including use of VBA. Proficient in PASW/SPSS including multivariate regression analysis, factor analysis, CHAID, and Answer Tree. Familiar with CATI programming, Qualtrics programming, MySQL, R, SAS, Stata, multiple social media tracking platforms (Radian6, Buzzlogic, Buzzmetrics, Cymphony, Visible Technologies), web analytics platforms (Google Analytics and Omniture) and syndicated research.

Personal Interests
- Basketball and Golf Statistics: Developed original and advanced metrics for analyzing roster construction in the NBA with a particular focus on using Black-Scholes based analysis to predict the variable value of a dollar over time in the NBA due to salary cap restrictions. Metrics have been discussed with NBA GM's to develop long-term free agent plans. In Golf, developed course and hole databases in order to use past performance to accurately predict upcoming Major Tournaments. The database uses likely scenarios (club use and likely outcomes) to run simulations on future courses to predict players who are likely to succeed on a given course given likely weather conditions. The methodology has significantly outperformed both expert predictions and Las Vegas gambling lines for Major Tournaments since 2007, returning positive ROIs over in 10 out of 12 years.

13

**Appendix II: Material Used**

I, Jonathan Chavez, have used, reviewed and/or considered the following resources in overseeing this survey and preparing this report:

- Survey data file, full results

14

**Appendix III: Full Survey**

Thank you for taking some time to complete this survey. It should take you no more than 5-to-7 minutes to complete. The survey will be about your current wagering activity. By completing the survey and providing your Maverick Loyalty Number and a phone number or email address, you will receive $20 in Match Play and be entered into a $200 cash drawing. The rules for the drawing can be found here **[link]**.

1.  Do you agree to participate in this survey?

    Yes ................................................................................... 1
    No............................................................. **[TERMINATE]**

2.  In the last year, which of the following Washington casinos or cardrooms have you visited and placed a bet or gambled, if any? Please select all that apply.

    **Caribbean Cardroom .....................................................1**
    **Casino Caribbean Kirkland ...........................................2**
    **Casino Caribbean Yakima ..............................................3**
    **Coyote Bob's Roadhouse Casino Kennewick ...........4**
    **Crazy Moose Casino Mountlake Terrace ...................5**
    **Crazy Moose Casino Pasco ...........................................6**
    **Great American Casino Everett ....................................7**
    **Great American Casino Lakewood...............................8**
    **Great American Casino Tukwila ...................................9**
    **Macau Casino Lakewood ...........................................10**
    **Macau Casino Tukwila ................................................11**
    **Red Dragon Casino Mountlake Terrace...................12**
    **Roman Casino ..............................................................13**
    **Royal Casino Everett ..................................................14**
    **Silver Dollar Casino Mill Creek .................................15**
    **Silver Dollar Casino SeaTac ......................................16**
    **Silver Dollar Casino Renton.......................................17**
    **Wizards Casino ...........................................................18**
    **None of the above .............................. 19 [TERMINATE]**

3.  How often do you visit any of the following casinos <u>**and gamble**</u> **[PROPERTIES FROM Q2]**?

    Multiple times per week.....................................................1
    About once a week............................................................2
    Less than once a week but at least a
    few times per month ........................................................3
    About once a month ..........................................................4
    Less than once a month.....................................................5
    Don't know .......................................................................6

4.  What is your average bet size when you gamble at **[PROPERTIES FROM Q2]?** If you only play poker, please just list the stakes you play for. **Min =0 max = 10,000**

15

5.      On your visits to **[PROPERTIES FROM Q2]** over the past year, on average, how long do you gamble? **MIN=0 HRS 0 MIN MAX = 24 HRS 59 MIN**

        __hrs

        __min

6.      Sports betting was legalized in Washington in 2020, and in 2021 the first retail sports book opened in Washington.

        While betting on thoroughbred racing was legal prior to this, betting on sports like football, baseball, and basketball became legal in Washington in September 2021.

        All the currently legal sports books in Washington are located at tribal casinos.

        Since the first legal sports books opened in Washington in September of 2021, have you placed at least one sports bet in-person at a sportsbook located in the state of Washington?

        Yes ................................................................................ 1
        No.................................................................................. 2
        Don't know .................................................................... 3

## [IF NO IN Q6, ASK Q7]

7.      How interested or uninterested are you in placing an in-person sports bet at a sportsbook located in Washington at some point in the future?

        Very interested ............................................................. 1
        Somewhat interested ...................................................... 2
        Not very interested ........................................................ 3
        Not at all interested ....................................................... 4
        Don't know .................................................................... 5

## [IF YES IN Q6, ASK Q8]

8.      Thinking about all the times you have placed a sports bet at a casino in Washington, has there ever been an occasion where you specifically went to a casino to place a sports bet – and would not have visited that casino if sports betting was not available?

        Yes ................................................................................ 1
        No.................................................................................. 2
        Don't know .................................................................... 3

**[IF YES IN Q8, ASK Q9]**

9.    Thinking back to the times that you visited a casino in Washington and placed a sports bet, if **[PROPERTIES FROM Q2]** offered sports betting, would you have ever visited one of these properties to place that sports bet <u>**instead**</u> of the casino where you placed the bet, or would you still have always gone to the casino where you placed that sports bet?

I definitely would have visited **[PROPERTIES FROM Q2]**
to place a sports bet instead of the casino where I bet ... 1
I probably would have visited **[PROPERTIES FROM Q2]**
to place a sports bet instead of the casino where I bet ... 2
I probably would not have visited **[PROPERTIES FROM Q2]**
to place a sports bet instead of the casino where I bet ... 3
I definitely would not have visited **[PROPERTIES FROM Q2]**
to place a sports bet instead of the casino where I bet ... 4
Don't know ..................................................................... 5

10.    Have you ever visited a casino that is less conveniently located than **[PROPERTIES FROM Q2]** to bet on casino games those properties don't offer, such as craps and roulette?

Yes ................................................................................. 1
No ................................................................................... 2
Don't know ..................................................................... 3

**[IF YES IN Q6, ASK Q11]**

11.    When you think about the money you have used to place a sports bet at a casino in Washington, how much of that money came from the following sources? Please make sure your responses add up to 100%

Money you are currently wagering at
**[PROPERTIES FROM Q2]** ............................................. 1
Money you are currently wagering elsewhere,
such as at other casinos or playing the Lottery. ............. 2
Money you are currently betting on sports elsewhere,
including at other casinos, in other states, at offshore
casinos or through some other means ............................ 3
Money you are not currently spending on wagering ....... 4

17

12.     Earlier in this survey, you indicated that you have gambled at **[PROPERTIES FROM Q2]**. If any or all of those properties made sports betting available on-site - assuming that they offered bets similar to other sports books currently operating in Washington -  would you wager on sports betting at any of these properties or not?

Yes, I definitely would ....................................................1
I probably would ...............................................................2
I probably would not ........................................................3
I definitely would not........................................................4
Don't know ......................................................................5

13.     Earlier in this survey, you indicated that you have gambled at **[PROPERTIES FROM Q2]**. If any or all of those properties let you bet on casino games they don't currently offer, like craps and roulette, would you visit any of those properties in order to gamble on those games?

Yes, I definitely would ....................................................1
I probably would ...............................................................2
I probably would not ........................................................3
I definitely would not........................................................4
Don't know ......................................................................5

**[IF YES DEFINITELY OR I PROBABLY WOULD IN Q12, ASK Q14 AND Q15]**

14.     If you did visit **[PROPERTIES FROM Q2]** and placed a sports bet, would you:

Visit the property and only place a sports bet – I
would not participate in any other form of
gambling on those trips.....................................................1
Visit the property and place other wagers.......................2
Don't know .....................................................................3

15.     If you did place a sports bet at **[PROPERTIES FROM Q2]**, how much of the money would come from each of the following sources of spending? Please make sure your responses add up to 100%.

Money you are currently wagering at
**[PROPERTIES FROM Q2]** .............................................1
Money you are currently wagering elsewhere,
such as at other casinos or playing the Lottery. .............2
Money you are currently betting on sports elsewhere,
including at other casinos, in other states, at offshore
casinos or through some other means............................3
Money you are not currently spending on wagering .......4

18

16.     If you did place a bet on games like craps or roulette at **[PROPERTIES FROM Q2]**, how much of the money would come from each of the following sources of spending? Please make sure your responses add up to 100%.

Money you are currently wagering at
**[PROPERTIES FROM Q2]** ............................................ 1
Money you are currently wagering elsewhere,
such as at other casinos or playing the Lottery. ............. 2
Money you are currently betting on sports elsewhere,
including at other casinos, in other states, at offshore
casinos or through some other means........................... 3
Money you are not currently spending on wagering ....... 4

These last questions are for demographic purposes only.

17.     What is your age? **MIN=18 MAX =99**

18.     What is your gender?
   •
Male................................................................................. 1
Female ............................................................................. 2

Thank you for participating in this survey. In order to be eligible for the drawing of **$200 and to receive $20 in Match Play,** please enter your:

Maverick Loyalty Number_____
Phone Number_____
Email Address_____

To receive the $20 in Match Play and to be entered into the $200 drawing, you must enter both your Maverick Loyalty Number and Email Address. If you do not have a Maverick Loyalty number, please enter your phone number and or/email address, and you will be sent a link to sign up for a Maverick Loyalty account in order to claim your $20 in Match Play.

19

**TribeSER100**

**Appendix IV: Summary of Statistical Assessment**

| Location | Category | Sample Size | Assumed Universe | Fielding Error Assumption | Mean Hyper Geometric Approximation | Var. HyperGeometric Approx. | Test Z | P_One-Tailed | P_Two-Tailed |
|---|---|---|---|---|---|---|---|---|---|
| Current Sports Bettors, Lost Maverick Gaming Revenue | 63 | 627 | 270,000 | 0.05 | 31.35 | 29.71344847 | 5.80626944 | 3.19401E-09 | 6.38801E-09 |
| Would Bet on Sports at a Maverick Gaming Property, New Revenue | 172 | 627 | 270,000 | 0.05 | 31.35 | 29.71344847 | 25.80258442 | 0 | 0 |
| Would Bet on Class III Gaming at a Maverick Gaming Property, New Revenue | 168 | 627 | 270,000 | 0.05 | 31.35 | 29.71344847 | 25.06877469 | 0 | 0 |

20

THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MAVERICK GAMING LLC,

        Plaintiff,

    v.

UNITED STATES OF AMERICA, et al.,

        Defendants.

No. 22-cv-05325 DGE

**DECLARATION OF ERIC PERSSON IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I, Eric Persson, declare under penalty of perjury that the following is true and correct:

1.      I am the Chief Executive Officer of Maverick Gaming LLC ("Maverick"), the plaintiff in this case.

2.      Maverick is a Washington limited liability company with a residence at 12530 NE 144th Street, Kirkland, WA 98034.

3.      Maverick owns and operates 18 cardrooms in Washington.  Those cardrooms do not offer casino-style games like roulette, craps, sports betting, and dealer-assisted electronic table games because Washington law does not allow Maverick to offer those types of games.

4.      Maverick seeks to expand its gaming offerings in Washington to include additional games such as roulette, craps, sports betting, and dealer-assisted electronic table games.

1

DECLARATION OF ERIC PERSSON
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER102**

5.     Maverick has identified economically viable opportunities to expand its Washington operations if doing so were legally permitted.

6.     Maverick is able, ready, and prepared to expand its gaming operations in Washington to include roulette, craps, sports betting, dealer-assisted electronic table games, and other casino-style games.  Maverick would offer these games if Washington law allowed it to do so.

7.     Maverick has access to the capital needed to finance casino-style gaming operations in Washington and to purchase the necessary facilities and equipment.

8.     Maverick has also conducted market analysis, identified suitable locations, contracted with vendors and business partners who could service the Washington market, and studied Washington's gaming laws.

9.     Maverick has the necessary background and experience in casino-style gaming activities to offer such activities in the Washington market.

10.     Maverick competes with other casinos, including tribal casinos in Washington, to offer the best and most attractive selection of games allowed by law.

11.     Because Indian tribes in Washington can offer casino-style gaming—including roulette, craps, sports betting, and dealer-assisted electronic table games, among other games— but Maverick cannot legally do so, Maverick incurs increased expenses and lost revenue.

12.     Specifically, because tribal casinos in Washington can offer a broader selection of games to their patrons, Maverick incurs increased advertising expense, increased promotional expenses, and increased entertainment expenses.  Maverick also loses revenue from customers who would frequent Maverick's cardrooms if they offered casino-style gaming activities, but who instead frequent tribal casinos.  Maverick also suffers a loss of goodwill by failing to offer the

2

DECLARATION OF ERIC PERSSON
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER103**

same set of products as its tribal competitors.

13.     Maverick has commissioned third parties to conduct studies assessing its commercial casino revenue opportunities in Washington, and these studies concluded that Maverick could earn significant revenue in the Washington market were it not for Washington's prohibition of most forms of casino-style gaming.

14.     Tribal casinos' gaming activities in Washington alter competitive conditions in a way that is unfavorable to Maverick.  Maverick would be able to increase the revenue from its cardrooms in Washington if it could offer casino-style games, or if tribal gaming facilities could *not* offer casino-style games, because either outcome would allow Maverick to compete more effectively with tribal gaming facilities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2022.

_Eric Persson_
Eric Persson

DECLARATION OF ERIC PERSSON
(3:22-cv-05325 DGE)

3

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER104**

THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MAVERICK GAMING LLC,

       Plaintiff,

   v.

UNITED STATES OF AMERICA, et al.,

       Defendants.

No. 22-cv-05325 DGE

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

ORAL ARGUMENT REQUESTED

NOTE ON MOTION CALENDAR: November 4, 2022

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER105**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF MATERIAL FACTS ........................................................................ 2

LEGAL STANDARD ..................................................................................................... 6

BACKGROUND ............................................................................................................. 6

    I.      Statutory Scheme ........................................................................................... 6

          A.     Indian Gaming Regulatory Act ........................................................... 6

          B.     The Johnson Act and Other Federal Laws ......................................... 8

          C.     Washington Law and Compacts ......................................................... 8

    II.     Maverick ...................................................................................................... 11

ARGUMENT ................................................................................................................. 13

    I.      The Constitution's Guarantee Of Equal Protection Forbids Granting Tribal
          Casinos A Monopoly Over Class III Gaming ............................................. 13

          A.     Limiting class III gaming to Indian tribes constitutes racial
                   discrimination and is therefore subject to strict scrutiny ......................... 13

          B.     Washington's tribal monopoly cannot survive strict scrutiny .................. 17

          C.     Even if strict scrutiny did not apply, Washington's naked
                   protectionism for a favored class lacks a rational basis ........................... 18

    II.     IGRA Does Not Allow States To Create A Tribal Monopoly Over Class
          III Gaming .................................................................................................. 20

          A.     IGRA's text imposes a state-permission requirement ............................. 21

          B.     Neighboring provisions confirm that class III tribal gaming is
                   allowed only if it is permitted for non-tribal entities .............................. 22

          C.     Congress's purpose in passing IGRA was to create parity between
                   tribal and non-tribal gaming ................................................................... 24

          D.     Even if IGRA were ambiguous, the canon of constitutional
                   avoidance requires reading it to avoid the serious constitutional
                   questions that a tribal monopoly raises ................................................... 25

    III.    IGRA's State-Negotiation Mandate Violates The Anti-Commandeering
          Principle ...................................................................................................... 26

CONCLUSION .............................................................................................................. 29

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

i

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER106**

# TABLE OF AUTHORITIES

**CASES**

*Adarand Constructors, Inc. v. Peña,*
    515 U.S. 200 (1995) .................................................................................13, 17

*Adoptive Couple v. Baby Girl,*
    570 U.S. 637 (2013) ...........................................................................................16

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) .....................................................................................27, 28

*Amador Cnty. v. Salazar,*
    640 F.3d 373 (D.C. Cir. 2011) ........................................................................27

*Artichoke Joe's Cal. Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003) .............................................13, 16, 19, 20, 25

*Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n,*
    14 F.3d 633 (D.C. Cir. 1994) ...........................................................................25

*California v. Cabazon Band of Mission Indians,*
    480 U.S. 202 (1987) .........................................................................6, 21, 23

*Cheyenne River Sioux Tribe v. South Dakota,*
    3 F.3d 273 (8th Cir. 1993) ...............................................................................23

*Chickasaw Nation v. United States,*
    534 U.S. 84 (2001) .............................................................................................25

*Citizen Band of Potawatomi Indian Tribe of Okla. v. Green,*
    995 F.2d 179 (10th Cir. 1993) .........................................................................21

*City & Cnty. of San Francisco v. United States,*
    130 F.3d 873 (9th Cir. 1997) .............................................................................6

*City of Los Angeles v. Barr,*
    929 F.3d 1163 (9th Cir. 2019) .........................................................................11

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) ...........................................................................................18

*Craigmiles v. Giles,*
    312 F.3d 220 (6th Cir. 2002) ...........................................................................18

*Duncan v. Walker,*
    533 U.S. 167 (2001) ...........................................................................................21

ii

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988) ............................................................................................24

*Fisher v. Univ. of Tex. at Austin,*
    570 U.S. 297 (2013) ............................................................................................18

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) ............................................................................................18

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,*
    861 F.3d 944 (9th Cir. 2017) ..............................................................................12

*Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony,*
    538 U.S. 701 (2003) ............................................................................................22

*Keweenaw Bay Indian Cmty. v. United States,*
    136 F.3d 469 (6th Cir. 1998) ..........................................................................7, 24

*KG Urban Enters., LLC v. Patrick,*
    693 F.3d 1 (1st Cir. 2012) ..................................................................................17

*Mashantucket Pequot Tribe v. Connecticut,*
    913 F.2d 1024 (2d Cir. 1990) .............................................................................28

*Merrifield v. Lockyer,*
    547 F.3d 978 (9th Cir. 2008) ..............................................................................19

*Montana v. Blackfeet Tribe of Indians,*
    471 U.S. 759 (1985) ............................................................................................25

*Morton v. Mancari,*
    417 U.S. 535 (1974) ......................................................................................14, 15

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) ..................................................................................26, 28

*Nat'l Mining Ass'n v. Zinke*
    877 F.3d 845 (9th Cir. 2017) ..............................................................................28

*Nationwide Mut. Ins. Co. v. Darden,*
    503 U.S. 318 (1992) ............................................................................................21

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656 (1993) ............................................................................................12

*New Mexico v. Dep't of Interior,*
    854 F.3d 1207 (10th Cir. 2017) ....................................................................26, 28

iii

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Nixon v. Mo. Mun. League,*
    541 U.S. 125 (2004)....................................................................................22

*N. Arapaho Tribe v. Wyoming*
    389 F.3d 1308 (10th Cir. 2004) ................................................................28

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007)....................................................................................17

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.,*
    946 F.3d 1100 (9th Cir. 2020) .............................................................11, 12

*Powers v. Harris,*
    379 F.3d 1208 (10th Cir. 2004) ................................................................19

*Printz v. United States,*
    521 U.S. 898 (1997)..............................................................................26, 27

*Rice v. Cayetano,*
    528 U.S. 495 (2000)................................................................14, 15, 16, 17

*Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,*
    602 F.3d 1019 (9th Cir. 2010) ..................................................................26

*Robers v. United States,*
    572 U.S. 639 (2014)....................................................................................22

*Rumsey Indian Rancheria of Wintun Indians v. Wilson,*
    64 F.3d 1250 (9th Cir. 1994) ....................................................................23

*Rust v. Sullivan,*
    500 U.S. 173 (1991)....................................................................................24

*S. Cal. Darts Ass'n v. Zaffina,*
    762 F.3d 921 (9th Cir. 2014) ......................................................................6

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1995)......................................................................................27

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) ....................................................................12

*St. Joseph Abbey v. Castille,*
    712 F.3d 215 (5th Cir. 2013) ....................................................................18

*Tafoya v. City of Albuquerque,*
    751 F. Supp. 1527 (D.N.M. 1990) ......................................................16, 18

iv

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Taxpayers of Mich. Against Casinos v. State,*
 685 N.W.2d 221 (Mich. 2004) ...................................................................21

*W. Flagler Assocs. v. Haaland,*
 2021 WL 5492996 (D.D.C. Nov. 22, 2021) ............................................12

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation,*
 439 U.S. 463 (1979) .............................................................................17, 21

*Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n,*
 443 U.S. 658 (1979) ...................................................................................14

*Williams v. Babbitt,*
 115 F.3d 657 (9th Cir. 1997) ..........................................14, 15, 17, 24, 25

*Wisconsin v. Ho-Chunk Nation,*
 784 F.3d 1076 (7th Cir. 2015) ..................................................................24

**STATUTES**

5 U.S.C. § 706(2)(A) .......................................................................................6

5 U.S.C. § 706(2)(C) .......................................................................................6

5 U.S.C. § 706(2)(E) .......................................................................................6

15 U.S.C. § 1175(a) ...................................................................................8, 23

18 U.S.C. § 1166(a) ...................................................................................8, 22

18 U.S.C. § 1955(a) .........................................................................................8

25 U.S.C. § 2701(5) .......................................................................................23

25 U.S.C. § 2703 ............................................................................................22

25 U.S.C. § 2703(6) .........................................................................................7

25 U.S.C. § 2703(7) .........................................................................................7

25 U.S.C. § 2703(8) .........................................................................................7

25 U.S.C. § 2710(a)(1) .....................................................................................7

25 U.S.C. § 2710(b)(1) .....................................................................................7

25 U.S.C. § 2710(b)(1)(A) .............................................................................22

25 U.S.C. § 2710(d)(1) .........................................................................8, 20, 21

v

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER110**

25 U.S.C. § 2710(d)(1)(A) ....................................................................................7

25 U.S.C. § 2710(d)(1)(B) .............................................................7, 20, 21, 22, 24

25 U.S.C. § 2710(d)(1)(C) ...............................................................................7, 21

25 U.S.C. § 2710(d)(3)(A) .............................................................................23, 26

25 U.S.C. § 2710(d)(3)(B) ....................................................................................4

25 U.S.C. § 2710(d)(5) .......................................................................................19

25 U.S.C. § 2710(d)(6) ....................................................................................8, 23

25 U.S.C. § 2710(d)(8)(A) ....................................................................................4

25 U.S.C. § 2710(d)(8)(B)(ii) ..............................................................................27

25 U.S.C. § 2721 .................................................................................................27

33 U.S.C. § 1362(4)–(5) ......................................................................................22

42 U.S.C. § 300f(10) ...........................................................................................22

42 U.S.C. § 300f(12) ...........................................................................................22

42 U.S.C. § 6903(13) ...........................................................................................22

42 U.S.C. § 6903(15) ...........................................................................................22

RCW 9.46.220(3) ..................................................................................................9

RCW 9.46.220–.222 ..........................................................................................2, 3

RCW 9.46.221(3) ..................................................................................................9

RCW 9.46.222 .......................................................................................................8

RCW 9.46.222(3) ..................................................................................................9

RCW 9.46.225 .......................................................................................................3

RCW 9.46.0237 .................................................................................................2, 8

RCW 9.46.0269 .....................................................................................................2

RCW 9.46.0269(1) ................................................................................................8

RCW 9.46.0269(1)(a)–(c) .....................................................................................9

vi

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER111**

RCW 9.46.0305–.0361 ...................................................................................2, 9

RCW 9.46.360 ...........................................................................................2, 3, 10

RCW 9.46.360(2) ...............................................................................................10

RCW 9.46.360(3) ...............................................................................................10

RCW 9.46.360(4) ...............................................................................................10

RCW 9.46.360(6) ...............................................................................................10

RCW 9.46.360(9) ...............................................................................................10

RCW 9.46.0364 ....................................................................................................2

RCW 9.46.0364(1) ...............................................................................................3

RCW 9.46.0364(2) ...............................................................................................3

2020 Wash. Legis. Serv. ch. 127 ........................................................................3

## REGULATIONS

25 C.F.R. § 83.11(e) ..........................................................................................13

86 Fed. Reg. 49,046 (Sept. 1, 2021) ..................................................................4

86 Fed. Reg. 51,370 (Sept. 15, 2021) ................................................................4

86 Fed. Reg. 58,685 (Oct. 22, 2021) ..................................................................4

86 Fed. Reg. 73,800 (Dec. 28, 2021) ..................................................................4

87 Fed. Reg. 35,992 (June 14, 2022) ..................................................................4

87 Fed. Reg. 39,866 (July 5, 2022) .....................................................................4

## RULES

Fed. R. Civ. P. 56(a) ...........................................................................................6

## OTHER AUTHORITIES

134 Cong. Rec. 24,027 (1988) (statement of Senator McCain) .......................24

*Administrative Orders*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/4t759k6h...................................................9

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER112**

*Annual Report – 2019 Fiscal Year*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/yc7d72zu ..................................................5

*Casino Locations*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/58czhnwk ..................................................4

*Enrollment FAQ*, Confederated Tribes of the Colville Reservation,
    *available at* https://tinyurl.com/mjwxaym6..................................................13

First Amendment to the Tribal/State Compact for Class III Gaming Between the Confederated
    Tribes of the Colville Reservation and the State of Washington, (Mar. 30, 2007),
    *available at* https://tinyurl.com/mpnmxkhp..................................................4

*Gaming Compacts*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/5n6eacrb ..................................................3, 4

*Illegal Activities*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/5x5j5ayb ..................................................9

S. Rep. No. 100-446 (1988)..................................................6, 24

*Submit a Tip*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/k7fcz26s ..................................................9

Third Amendment to the Tribal-State Compact for Class III Gaming Between Confederated
    Tribes of the Colville Reservation and the State of Washington (July 6, 2021),
    *available at* https://tinyurl.com/4vhe7sjb ..................................................3, 4

Transcript of Oral Argument, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1995) (No. 94-
    12), 1995 WL 606007 ..................................................27

*Tribal Community Contributions*, Wash. State Gambling Comm'n (May 12, 2022),
    *available at* https://tinyurl.com/mwyn6zz4 ..................................................5

Tribal-State Compact for Class III Gaming Between the Tulalip Tribes of Washington and the
    State of Washington (Aug. 2, 1991),
    *available at* https://tinyurl.com/2urbfu2c ..................................................2

viii

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

## **INTRODUCTION**

Casino gaming is a lucrative industry. In 2019 alone, Washington's gambling industry generated almost $3.5 billion in net gambling receipts. The lion's share of that revenue—more than $2.9 billion—came from tribal casinos, which offer patrons an array of options ranging from sports betting to roulette to dealer-assisted electronic table games. Maverick Gaming LLC ("Maverick"), a non-tribal cardroom operator, wants to expand its Washington operations to offer those types of games to its patrons and effectively compete in Washington's casino gaming market.

Under Washington law, however, Maverick is restricted from entering this market because it is not a tribal entity. Washington criminalizes most forms of casino-style gaming for non-tribal entities but allows tribal casinos to offer those games under tribal-state compacts. Washington has thereby created a tribal monopoly over this multi-billion-dollar industry. Maverick, along with every other non-tribal entity, is shut out of the market.

Washington's grant of a tribal monopoly over an entire sector of its economy is unconstitutional and violates federal law governing tribal gaming regulation. States retain considerable leeway in how they regulate commercial casino gaming—they may adopt broad bans like Utah, embrace it wholeheartedly like Nevada, or fall in the middle like Colorado. What they may not do, however, is allow Indian tribes to offer casino gambling but criminalize it for everyone else. That approach violates the Constitution's guarantee of equal protection and contravenes the detailed scheme that Congress set out in the Indian Gaming Regulatory Act ("IGRA"). Additionally, IGRA itself violates the anti-commandeering doctrine by ordering states to negotiate with Indian tribes over gaming compacts. Maverick brought this suit to vindicate its right to compete on an equal footing with tribal casinos, and it is entitled to judgment as a matter of law.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

1

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER114**

## STATEMENT OF MATERIAL FACTS

Pursuant to LCR 56.1, Maverick contends that no genuine issue exists with respect to the following facts:

1.      Maverick is a Washington limited liability company that owns and operates 18 cardrooms in Washington.  *See* Declaration of Eric Persson in Support of Plaintiff's Motion for Summary Judgment ("Persson Decl.") ¶¶ 2–3.  Maverick seeks to expand its gaming offerings in Washington to include additional games such as roulette, craps, sports betting, and dealer-assisted electronic table games.  *Id.* ¶ 4.  Maverick has identified economically viable opportunities to expand its Washington operations if doing so were legally permitted.  *Id.* ¶ 5.

2.      Washington allows tribal casinos—and tribal casinos alone—to offer these forms of gaming within the State.  *See, e.g.*, RCW 9.46.0237, 9.46.0269, 9.46.0305–.0361, 9.46.0364, 9.46.220–.222, 9.46.360.  But for Washington's tribal monopoly, Maverick is able, ready, and prepared to expand its gaming operations in Washington to include roulette, craps, sports betting, and dealer-assisted electronic table games, as well as other casino-style games.  *See* Persson Decl. ¶ 6.  Maverick has access to the capital needed to finance a class III gaming operation in Washington and to purchase the necessary facilities and equipment.  *Id.* ¶ 7.  Maverick has conducted market analysis, identified suitable locations, contracted with vendors and business partners who could service the Washington market, and studied Washington's gaming laws.  *Id.* ¶ 8.  Maverick has the necessary background and experience in class III gaming activities to offer class III games in the Washington market.  *Id.* ¶ 9.

3.      Purporting to act pursuant to IGRA—a federal scheme regulating gaming on Indian lands—Washington entered into its first tribal-state compact with the Tulalip Tribes of Washington on August 2, 1991.  That compact authorized the Tulalip Tribes of Washington to conduct a wide range of class III games that are illegal for non-tribal entities to offer, including roulette and craps.  *See* Tribal-State Compact for Class III Gaming Between the Tulalip Tribes of Washington and the State of Washington at 4–5 (Aug. 2, 1991), *available at* https://tinyurl.com/2urbfu2c.

2

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER115**

4.      Since 1991, Washington has entered into analogous compacts with "[a]ll 29 federally recognized tribes in Washington," giving the Tribes the exclusive right to offer certain class III games such as craps and roulette.  *Gaming Compacts*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5n6eacrb.

5.      On March 25, 2020, Washington passed a new law, S.H.B. No. 2638, giving Indian tribes in the state a monopoly over sports betting.  *See* 2020 Wash. Legis. Serv. ch. 127.  It remains a crime for non-tribal entities to offer sports betting.  *See* RCW 9.46.220–.222.

6.      The new act states that "[u]pon the request of a federally recognized Indian tribe or tribes in the state of Washington, the tribe's class III gaming compact may be amended … to authorize the tribe to conduct and operate sports wagering on its Indian lands … .  Sports wagering conducted pursuant to the gaming compact is a gambling activity authorized by this chapter."  RCW 9.46.0364(1).  The statute makes clear that "[s]ports wagering conducted pursuant to the provisions of a class III gaming compact entered into by a tribe and the state pursuant to RCW 9.46.360 is authorized bookmaking and is not subject to civil or criminal penalties pursuant to RCW 9.46.225."  *Id.* § 9.46.0364(2).

7.      So far, 18 of the 29 federally recognized Indian tribes in Washington have executed Compact Amendments to permit the Tribes to offer sports betting at their gaming facilities.  *See, e.g.*, Third Amendment to the Tribal-State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021) (hereinafter "Colville Compact Amendment"), *available at* https://tinyurl.com/4vhe7sjb.[1]

8.      These Tribes include the following: the Confederated Tribes of the Colville Reservation; the Cowlitz Indian Tribe; the Jamestown S'Klallam Tribe; the Kalispel Tribe; the Lummi Nation; the Muckleshoot Indian Tribe; the Puyallup Tribe of Indians; the Shoalwater Bay Indian Tribe; the Snoqualmie Indian Tribe; the Spokane Tribe; the Squaxin Island Tribe; the

---

[1]  Because the terms of each sports-betting amendment are materially identical, the Colville Compact Amendment is used for reference throughout this motion.

3

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER116**

Stillaguamish Tribe of Indians; the Suquamish Tribe; the Swinomish Indian Tribal Community; and the Tulalip Tribes of Washington.

9.    The Secretary of the U.S. Department of the Interior ("Secretary") has approved these compact amendments pursuant to IGRA.  *See* 86 Fed. Reg. 49,046, 49,046–47, 49,049–54 (Sept. 1, 2021); 86 Fed. Reg. 51,370, 51,370, 51,373–74 (Sept. 15, 2021); 86 Fed. Reg. 58,685 (Oct. 22, 2021); 86 Fed. Reg. 73,800 (Dec. 28, 2021); 87 Fed. Reg. 35,992 (June 14, 2022); 87 Fed. Reg. 39,866 (July 5, 2022).  Those approvals purport to authorize Washington's tribal sports-betting monopoly.  *See* 25 U.S.C. § 2710(d)(3)(B), (8)(A).

10.    The Compact Amendments add "Sports Wagering" to the list of class III gaming activities that the Tribes are permitted to offer, subject to a new Appendix S prescribing certain conditions.  Colville Compact Amendment at 2.

11.    The Compact Amendments require each of the Tribes to contribute their share of a "Start-Up Costs fee," which "includes the actual costs incurred by the State Gaming Agency for negotiations, rule development, regulatory program development, training, and similar activities necessary to implement Sports Wagering."  Colville Compact Amendment at 3.

12.    The Compact Amendments also provide that the Tribes' sports-betting net win will be included in the Tribes' total net gaming revenues, of which the Tribes are required to pay 0.13% to Washington for "problem gambling education, awareness, and treatment in the State of Washington."  Colville Compact Amendment, Appendix S, § 8.1; First Amendment to the Tribal/State Compact for Class III Gaming Between the Confederated Tribes of the Colville Reservation and the State of Washington, Appendix X2, §§ 14.4, 14.6 (Mar. 30, 2007), *available at* https://tinyurl.com/mpnmxkhp.

13.    The Tribes currently operate 29 casinos on Indian lands in Washington.  *See Casino Locations*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/58czhnwk.  Of these 29 casinos, 23 are governed by compacts that Washington and the Tribes have amended to permit sports betting.  *Id.*; *Gaming Compacts*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5n6eacrb.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER117**

14.     These casinos offer a range of class III games that are illegal for non-tribal entities to offer in Washington, including roulette, craps, sports betting, and dealer-assisted electronic table games (among other games).

15.     In 2019, Washington's entire gambling industry generated $3.462 billion in net gambling receipts.  *See Annual Report – 2019 Fiscal Year* at 8, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/yc7d72zu.  The Tribes' net class III gaming receipts generated approximately $2.93 billion of those receipts.  *See Tribal Community Contributions* at 11–12, Wash. State Gambling Comm'n (May 12, 2022), *available at* https://tinyurl.com/mwyn6zz4.  The Tribes' net receipts were approximately $2.75 billion in 2018 and approximately $2.56 billion in 2017.  *See id.*

16.     There are no non-tribal casinos in Washington that offer the full range of class III games that Washington permits tribal casinos to offer.  No non-tribal casinos in Washington offer roulette, craps, sports betting, or dealer-assisted electronic table games.

17.     Maverick competes with other casinos, including tribal casinos, to offer the best and most attractive selection of games allowed by law.  Because the Tribes can offer class III games (including roulette, craps, sports betting, and dealer-assisted electronic table games), but Maverick cannot, Maverick incurs increased expenses and lost revenue, including: increased advertising expenses; increased promotional expenses; increased entertainment expenses; and lost revenue from customers who would frequent Maverick's cardrooms if Maverick offered the class III games that it is currently prohibited from offering, but who instead frequent tribal casinos. Maverick also suffers a loss of goodwill by failing to offer the same set of products as its tribal competitors.  If Maverick were able to offer the same games as tribal casinos—or if tribal casinos were limited to the same games as Maverick's existing cardrooms—Maverick would be able to compete more effectively and increase the revenue from its Washington cardrooms.  *See* Persson Decl. ¶¶ 10–14; Ex. A to the Declaration of Jonathan Chavez in Support of Plaintiff's Motion for Summary Judgment ("Chavez Decl.") ("Ex. A").

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014). "A dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

In reviewing a motion for summary judgment challenging agency action under the Administrative Procedure Act ("APA"), "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks omitted). A court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

**BACKGROUND**

**I.    Statutory Scheme**

**A.    Indian Gaming Regulatory Act**

The Indian Gaming Regulatory Act was Congress's response to a Supreme Court decision that created disuniformity between tribal and non-tribal gaming operations. In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Supreme Court held that California could not enforce its generally applicable gaming regulations against Indians on Indian lands within the State. Congress, the Court reasoned, had not consented to any such exercise of state jurisdiction over Indian gaming. *See id.* at 207. Dissatisfied with the uneven regulatory landscape that *Cabazon* produced, Congress passed IGRA the next year to "foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied" and to promote "free market competition" between state-licensed gaming operators and Indian tribes. S. Rep. No. 100-446, at 6, 13 (1988).

6

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

TribeSER119

IGRA divides gaming into three classes. "Class I gaming" includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Its regulation on Indian lands is left "within the exclusive jurisdiction of the Indian tribes." *Id.* § 2710(a)(1). "Class II gaming" includes bingo and a limited set of non-banked card games (*i.e.*, games in which players compete against each other rather than against the house). *Id.* § 2703(7). Class II gaming is allowed on Indian lands if those lands are "located within a State that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law)" and if "the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman" of the National Indian Gaming Commission. *Id.* § 2710(b)(1).

"Class III gaming"—the kind at issue here—includes "all forms of gaming that are not class I gaming or class II gaming," including many of the games typically found in casinos (such as blackjack, roulette, and craps). 25 U.S.C. § 2703(8). Class III gaming is lawful on Indian lands only if three conditions are met. *First*, the gaming activities must be "authorized by an ordinance or resolution" that "is adopted by the governing body of the Indian tribe having jurisdiction over such lands," "meets the requirements of subsection (b)"—*i.e.*, the rules governing class II gaming—and "is approved by the Chairman." *Id.* § 2710(d)(1)(A). *Second*, the gaming activities must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." *Id.* § 2710(d)(1)(B). *Third*, the gaming activities must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." *Id.* § 2710(d)(1)(C).

In line with IGRA's goal of promoting regulatory uniformity, the second requirement—the "state-permission requirement"—maintains parity between Indian tribes and non-tribal entities by conditioning the lawfulness of tribal gaming on the lawfulness of non-tribal gaming in the state. *See Keweenaw Bay Indian Cmty. v. United States*, 136 F.3d 469, 473 (6th Cir. 1998) (IGRA

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

"provides that tribes are entitled to engage in all forms of Class III gaming that a state permits for other citizens").

**B.    The Johnson Act and Other Federal Laws**

Unless IGRA's three conditions are satisfied, federal law criminalizes class III gaming on Indian lands.  IGRA itself states that class III gaming on Indian land is lawful "only if" § 2710(d)(1)'s conditions are met.  Additionally, the Johnson Act prohibits "any gambling device … within Indian country," 15 U.S.C. § 1175(a), and IGRA waives application of the Johnson Act only if class III gaming is "conducted under a Tribal-State compact that—(A) is entered into under paragraph (3) by a State in which gambling devices are legal, and (B) is in effect," 25 U.S.C. § 2710(d)(6).  Other provisions of federal law prohibit operating "an illegal gambling business," 18 U.S.C. § 1955(a), and make "all State laws pertaining to the licensing, regulation, or prohibition of gambling" applicable to non-IGRA-compliant gaming in Indian country "in the same manner and to the same extent as such laws apply elsewhere in the State," *id.* § 1166(a).

**C.    Washington Law and Compacts**

It is illegal to offer most forms of gaming in Washington.  Washington makes it a crime to engage in "professional gambling," *see, e.g.*, RCW 9.46.222, which Washington defines to include: (1) unless acting as a player or in a manner authorized by law, "engag[ing] in conduct which materially aids any form of gambling activity"; (2) unless acting in a manner authorized by law, "pay[ing] a fee to participate in a card game, contest of chance, lottery, or other gambling activity"; (3) unless acting as a player or in a manner authorized by law, "knowingly accept[ing] or receiv[ing] money or other property pursuant to an agreement or understanding with any person whereby he or she participates or is to participate in the proceeds of gambling activity"; (4) "engag[ing] in bookmaking"; (5) "conduct[ing] a lottery"; or (6) offering wagering on greyhound races, *id.* § 9.46.0269(1).[2]    Washington law specifies three degrees of illegal

---

[2]  Washington defines "gambling" as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

"professional gambling."  Depending on the scale of the gaming operation, a person offering unauthorized gaming may be guilty of a gross misdemeanor, *id.* § 9.46.222(3), a class C felony, *id.* § 9.46.221(3), or a class B felony, *id.* § 9.46.220(3).

Because Washington's definition of "professional gambling" excepts from its definition activities "authorized by this chapter," RCW 9.46.0269(1)(a)–(c), a business may offer gaming only if that form of gaming is expressly authorized by Washington law.  *See also Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5x5j5ayb ("Gambling in Washington is illegal unless the activity is specifically authorized by state law.").  Washington permits non-tribal entities to offer only limited types of gaming, such as raffles, bingo, card games, amusement games, pull-tabs, punchboards, sports pool boards, and fundraising events. RCW 9.46.0305–.0361.  None of these statutory exceptions authorizes non-tribal entities to engage in the full range of casino-style gaming in Washington.  As a result, it is a crime in Washington for non-tribal entities to offer the vast majority of class III games, including roulette, craps, and sports betting.

The threat of prosecution hangs over anyone who violates Washington's criminal gambling prohibitions, and Washington has made clear that it will not hesitate to make good on that threat. The Washington State Gambling Commission warns on its website:  "Gambling in Washington is illegal unless the activity is specifically authorized by state law. … Conducting illegal gambling activities may result in criminal charges being filed against you, your organization and/or its officers, and forfeiture of all property or money associated with the illegal gambling."  *Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5x5j5ayb.   The Commission also provides a form for people to "submit a tip regarding illegal [gambling] activities occurring in Washington," and the form includes a field for "[b]usiness [n]ame."  *Id.*; *Submit a Tip*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/k7fcz26s.   And the Commission routinely prosecutes enforcement actions against unlawful gambling operations.  *See*

---

the event of a certain outcome."  RCW 9.46.0237.

9

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

TribeSER122

*Administrative Orders*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/4t759k6h (collecting administrative orders).

Tribal casinos, however, are not subject to these criminal prohibitions. Since the early 1990s, Washington has authorized tribal casinos located within the State to conduct a wide range of class III games. Washington codified its process for negotiating tribal-state class III gaming compacts pursuant to IGRA in 1992. RCW 9.46.360. Under that process, the director of the Washington State Gambling Commission (or the director's designee) "shall negotiate compacts for class III gaming on behalf of the state with federally recognized Indian tribes in the state of Washington." *Id.* § 9.46.360(2). After reaching a tentative agreement with an Indian tribe on a proposed compact, "the director shall immediately transmit a copy of the proposed compact to all voting and ex officio members of the gambling commission" and to the two standing committees designated by the Washington House of Representatives and Senate, each of which shall "forward its respective comments to the gambling commission." *Id.* § 9.46.360(3), (5).[3] Within 45 days of receiving a proposed compact from the director, the gambling commission, including the four ex officio members, "shall vote on whether to return the proposed compact to the director with instructions for further negotiation or to forward the proposed compact to the governor for review and final execution." *Id.* § 9.46.360(6). Washington law also empowers the gambling commission to "enforce the provisions of any compact between a federally recognized Indian tribe and the state of Washington." *Id.* § 9.46.360(9).

As explained in Maverick's Statement of Material Facts, *see supra* ¶¶ 3–9, Washington has entered into gaming compacts with all 29 federally recognized Indian tribes in the State, giving them the exclusive right to offer most forms of class III gaming, and, pursuant to a 2020 law, has entered into compact amendments with 18 tribes giving them the exclusive right to offer sports betting in the State, all of which have been approved by the Secretary and are now in effect.

---

[3] The four ex officio members of the gambling commission are voting members for the sole purpose of voting on proposed tribal-state compacts. RCW 9.46.360(4).

10

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

## II.     Maverick

Maverick, a non-tribal gaming company, owns and operates cardrooms in Washington. Because of Washington's tribal monopoly over class III gaming, however, Maverick is shut out from competing in that multi-billion-dollar market.  Even for Maverick's existing cardrooms, Washington's tribal monopoly requires Maverick to incur increased advertising expenses, increased promotional expenses, and increased entertainment expenses in order to better compete with the tribal casinos' expanded gaming offerings, and Maverick loses revenue from customers who would frequent Maverick's cardrooms if they offered the class III games that they are currently prohibited from offering.  Maverick also suffers a loss of goodwill by failing to offer the same set of products as its tribal competitors.  But for Washington's tribal monopoly, Maverick is able and ready to offer class III games at its existing facilities.

Maverick commissioned a survey of its customers, which confirmed that "Maverick Gaming has already lost revenue as a result of not having access to sports betting, and that access to sports betting and Class III gaming would result in incremental gaming revenue for Maverick Gaming." Ex. A at 11.  76% of Maverick's customers who had placed an in-person sports bet in Washington stated that they would have placed their bet at one of Maverick's properties—rather than the tribal casino they went to—if Maverick offered sports betting.  *Id.* at 9.  28% of Maverick's total player base stated that they would spend additional money at Maverick's properties to engage in sports betting if Maverick offered it.  *Id.* at 10.  And 27% of Maverick's total player base indicated that they would spend additional money at Maverick's properties to play other class III games like crap and roulette if Maverick offered them.  *Id.*  So, were it not for Washington's tribal class III gaming monopoly, some of Maverick's customers would spend additional money at Maverick's properties, including money that they might otherwise spend at tribal casinos.

This Circuit recognizes "an ample competitor standing doctrine." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1109 (9th Cir. 2020).  The "inability to compete on an even playing field constitutes a concrete and particularized injury," and even a "slight competitive disadvantage … is sufficient." *City of Los Angeles v. Barr*,

11

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER124**

929 F.3d 1163, 1173–74 (9th Cir. 2019).  Further, "[a] plaintiff need not participate in the competition; the plaintiff need only demonstrate that it is 'able and ready … .'"  *Planned Parenthood of Greater Wash.*, 946 F.3d at 1108 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).  The "doctrine of 'competitor standing' is grounded in the 'basic law of economics that increased competition leads to actual injury.'"  *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (9th Cir. 2017) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)).

"Causation and redressability are generally implicit in injury-in-fact under the competitor standing doctrine."  *Planned Parenthood of Greater Wash.*, 946 F.3d at 1108.  This is because "the injury is the increase in competition," not just "the ultimate … loss of sales."  *Id.*  With the injury properly defined, "causation and redressability then derive from [b]asic economic logic": a "change of a competition's rules causes the injury and a court's invalidation of the change redresses the injury."  *Id.* at 1108–09 (internal quotation marks and alteration omitted); *see id.* at 1109 (noting that while a court cannot "decide the winner" of a competition, it "does have the power to decide that particular criteria are impermissible").

Maverick has standing under these well-settled rules to challenge Washington's tribal class III gaming monopoly.  That monopoly plainly imposes a competitive disadvantage on Maverick by giving Indian tribes a right to offer class III games that Maverick is criminally prohibited from offering, and a judicial decision invalidating this monopoly would redress Maverick's injury by guaranteeing it the right to compete with the Tribes on an even playing field.  *Accord W. Flagler Assocs. v. Haaland*, 2021 WL 5492996, at *4–6 (D.D.C. Nov. 22, 2021) (finding casino operator had standing to bring similar challenge to Secretary's approval of compact authorizing tribal sports-betting monopoly).

Because Maverick is shut out from the lucrative class III gaming market and because Washington's tribal gaming monopoly inflicts competitive harm on Maverick's existing cardrooms, Maverick filed this suit.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

# ARGUMENT

## I. The Constitution's Guarantee Of Equal Protection Forbids Granting Tribal Casinos A Monopoly Over Class III Gaming.

Washington's tribal gaming monopoly, which allows tribal casinos—and tribal casinos alone—to offer the full gamut of class III gaming in the state, constitutes discrimination that is subject to strict scrutiny under the Constitution's guarantee of equal protection. But the tribal monopoly at issue here cannot survive even rational-basis review, let alone strict scrutiny. Washington's restriction of class III gaming to state-approved groups therefore violates Maverick's equal-protection rights, and Maverick is entitled to nominal damages and declaratory and injunctive relief putting an end to this disparate treatment. Maverick acknowledges that its equal-protection argument is currently foreclosed in this Circuit by the Ninth Circuit's decision in *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 731–42 (9th Cir. 2003), but it respectfully preserves its argument for further review.

### A. Limiting class III gaming to Indian tribes constitutes racial discrimination and is therefore subject to strict scrutiny.

"[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995). Washington's maintenance of a tribal monopoly over class III gaming is one such racial classification.

Classifications based on tribal status generally constitute classifications based on race. Tribal membership is not available to just anyone; it hinges on lineal descent from historical tribal rolls and, often, a minimum blood threshold. *See, e.g.*, *Colville Tribes – Enrollment FAQ*, Confederated Tribes of the Colville Reservation, *available at* https://tinyurl.com/mjwxaym6 ("In order to be eligible for enrollment the applicant must possess at least one-fourth (1/4) degree of the blood of the tribes which constitute the Colville Tribes."). Indeed, under federal regulations, one of the "criteria for acknowledgment as a federally recognized Indian tribe" is that the tribe's "membership consists of individuals who descend from a historical Indian tribe." 25 C.F.R. § 83.11(e). When a law makes a classification based on tribal membership, it is often making a

13

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

TribeSER126

racial classification subject to strict scrutiny because it uses ancestry as "a proxy for race." *Rice v. Cayetano*, 528 U.S. 495, 514, 520 (2000) (holding that a state law giving preferential voting rights "to a class of *tribal Indians*, to the exclusion of all *non-Indian* citizens," is an impermissible "racial classification") (emphases added). A classification based on tribal status contains baked-in classifications based on ancestry and blood—precisely the sort of classification subject to strict scrutiny.

This general rule—that classifications based on tribal status are generally racial in nature—is subject to a limited exception for laws that draw "political" classifications rather than racial ones. *Morton v. Mancari*, 417 U.S. 535, 552, 553 n.24 (1974); *see also Rice*, 528 U.S. at 520 (describing *Mancari*'s rule as a "limited exception" and declining to extend it). But this limited exception extends only to the regulation of tribes as political entities in matters pertaining to Indian self-government or internal tribal affairs. That limited exception does not save Washington's tribal monopoly for two reasons.

*First*, *Mancari*'s limited exception shields "only those statutes that affect uniquely Indian interests." *Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997). "[T]he peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf *when rationally related to the Government's* '*unique obligation toward the Indians*.'" *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.20 (1979) (quoting *Mancari*, 417 U.S. at 555) (emphasis added). That limitation is evident in *Mancari* itself, which allowed a hiring preference for Indians in the Bureau of Indian Affairs. The special treatment in *Mancari* dealt with issues related to Indian land, tribal status, self-government, or culture. *See Mancari*, 417 U.S. at 555; *see also Williams*, 115 F.3d at 664–65 & n.6 (collecting cases and statutes). The *Mancari* Court expressly acknowledged that a federal hiring preference *outside* the Bureau of Indian Affairs—*i.e.*, in a context untethered to uniquely Indian interests—would present an "obviously more difficult question." 417 U.S. at 554; *see also Williams*, 115 F.3d at 664–65.

*Rice* confirmed *Mancari*'s limited scope. There, the Supreme Court confronted a Hawaii state law that allowed only "descendants of people inhabiting the Hawaiian Islands in [or before]

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER127**

1778" to vote in a "statewide election" for an agency that "administer[ed] programs designed for the benefit of" those descendants. *Rice*, 528 U.S. at 498–99. Hawaii sought to justify its voting scheme by arguing that it "fit[] the model of *Mancari*." *Id.* at 520. The Court assumed that it could "treat Hawaiians or native Hawaiians as [Indian] tribes," but it nevertheless rejected Hawaii's "far reaching" argument and invalidated Hawaii's restrictive voting scheme, holding that this ancestral classification functioned as a "proxy" for race because it sought "to preserve th[e] commonality of [these] people." *Id.* at 514–20. The Court declined to extend *Mancari*'s reach beyond the Bureau of Indian Affairs—"an agency described as '*sui generis*'"—and described *Mancari*'s "limited exception" as dependent on the Court's conclusion that "the BIA preference could be 'tied rationally to the fulfillment of Congress' unique obligation toward the Indians,' and was 'reasonable and rationally designed to further Indian self-government.'" *Id.* at 520 (quoting *Mancari*, 417 U.S. at 554–55). The Court rejected any reading of *Mancari* that would stretch its "limited exception" to "a new and larger dimension." *Id.* at 520. "To extend *Mancari* to this context would be to permit a State, by racial classification, to fence out whole classes of its citizens from decisionmaking in critical state affairs." *Id.* at 522.

In the same way, allowing Washington to "fence out whole classes" of entities from the casino-gaming industry would impermissibly extend *Mancari*'s "limited exception" to "a new and larger dimension." *Rice*, 528 U.S. at 520, 522. Unlike the Bureau of Indian Affairs' hiring practices at issue in *Mancari*, casino gaming is not a uniquely tribal interest. "[U]niquely" tribal interests include matters inherently related to Indian land, tribal status, self-government, or culture. *See Williams*, 115 F.3d at 664–65 & n.6 (collecting cases and statutes); *see also, e.g.*, *Mancari*, 417 U.S. at 554 (hiring preference in BIA was "directed to participation by the governed in the governing agency"). As the existence of countless non-tribal casinos (including Maverick's) and non-Indian casino patrons demonstrates, the gaming industry is not a "uniquely Indian interest." Casinos are no more "uniquely Indian" than the host of other businesses that happen to be tribally operated. Nor is there any indication of past discrimination against tribal casinos in the

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER128**

Washington casino industry that might justify special treatment.  *Cf. Tafoya v. City of Albuquerque*, 751 F. Supp. 1527, 1531 (D.N.M. 1990).

In *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003), the Ninth Circuit, confronting a similar challenge to California's tribal monopoly over class III gaming, refused to apply strict scrutiny, but its reasoning was inconsistent with both Supreme Court and prior Ninth Circuit precedent.  Maverick recognizes that this Court is bound by *Artichoke Joe's* as a precedent of the Ninth Circuit.  But Maverick respectfully preserves for the Ninth Circuit's review its arguments that *Artichoke Joe's* is inconsistent with the Constitution, IGRA, and Supreme Court precedent.

In holding that California's tribal gaming monopoly was subject only to rational-basis review, *Artichoke Joe's* observed that IGRA's operative provisions "expressly relate only to *tribes*, not to individual Indians," and asserted that IGRA "relates to tribal status and tribal self-government" and "regulates activities only on Indian lands."  353 F.3d at 734–35.  But Supreme Court precedent has made clear that tribal classifications, too, can discriminate on the basis of race. In *Rice*, for example, the Court held that a tribal classification—even one designed to afford "a measure of self-governance"—can be an impermissible "racial classification."  528 U.S. at 520–22.  A classification based on an "ancestral inquiry mandated by the State implicates the same grave concerns as a classification specifying a particular race by name," *id.* at 517, and as detailed above, classifications based on tribal status bake in classifications based on ancestry and blood. Likewise, in *Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013), the Supreme Court considered a statute that imposed heightened standards to terminate parental rights for a child who is a member of an Indian tribe or who is the biological child of a member of an Indian tribe.  The Court explained that interpreting the statute to permit an absentee parent who was a member of an Indian tribe to defeat adoption proceedings "would put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian," which "would raise equal protection concerns."  *Id.* at 655–56.

16

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER129**

Moreover, even if IGRA itself—which contemplates parity between tribal and non-tribal class III gaming—could be tied to "uniquely Indian interests," the exclusion of non-tribal casinos from class III gaming cannot. Indeed, the decision in *Artichoke Joe's* is in tension with prior Ninth Circuit precedent expressing "serious[] doubt that Congress could give Indians a complete monopoly on the casino industry." *Williams*, 115 F.3d at 665. The Ninth Circuit was correct in *Williams*. Its subsequent decision in *Artichoke Joe's* that a State may exclude persons from a highly lucrative sector of the economy based on their bloodlines without offending the Constitution's guarantee of equal protection should be reconsidered.

*Second*, even if *Mancari* could be read more broadly for *federal* statutes, it would not justify discriminatory *state* laws like Washington's tribal gaming monopoly. *Mancari* relied on special federal sources of authority—the Indian Commerce Clause, the treaty power, and the federal government's trust relationship with Indian tribes—that do not apply to exercises of state power. *See Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 501 (1979) (noting that states "do not enjoy this same unique relationship with Indians"). Because states lack the power and position of the federal government vis-à-vis Indian tribes, it is "quite doubtful that *Mancari*'s language can be extended to apply to preferential *state* classifications based on tribal status." *KG Urban Enters., LLC v. Patrick*, 693 F.3d 1, 19 (1st Cir. 2012).[4]

Washington's decision to allow tribal casinos—and only tribal casinos—to offer class III gaming within the state is therefore subject to strict scrutiny.

**B.    Washington's tribal monopoly cannot survive strict scrutiny.**

A law fails strict scrutiny unless it is "narrowly tailored" to "further compelling governmental interests." *Adarand*, 515 U.S. at 227. "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."

---

[4] The Supreme Court's decision in *Yakima* does not save Washington's tribal monopoly from strict scrutiny. *Yakima* relaxes the standard of review only where federal law explicitly authorizes a particular state law. *See Yakima*, 439 U.S. at 501; *Rice*, 528 U.S. at 518; *KG Urban Enters.*, 693 F.3d at 20–24. For the reasons explained *infra* in Part II, IGRA does not allow tribal monopolies over class III gaming.

17

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER130**

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)). Here, Washington's tribal monopoly cannot come close to clearing that exceptionally high bar.

To begin, there is no compelling interest in protecting tribal casinos from competition. Again, there is no indication of past discrimination against tribal casinos in the Washington gaming industry. *Cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504 (1989); *Tafoya*, 751 F. Supp. at 1531. Indeed, as Part II demonstrates, a tribal monopoly is affirmatively *contrary* to IGRA's policy of promoting free-market competition in the gaming industry.

Nor is a tribal monopoly a narrowly tailored means of furthering any interests a state may have in tribal economic development. First, the government receives "no deference" on narrow tailoring. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013). Moreover, granting a monopoly in any context will rarely, if ever, be a narrowly tailored solution. *See Croson*, 488 U.S. at 508 (finding it "obvious" that "an absolute preference over other citizens based solely on their race" was "not narrowly tailored to remedy the effects of prior discrimination"); *Tafoya*, 751 F. Supp. at 1531 (similar). Any generalized interest in promoting tribal economic development could be pursued through non-discriminatory subsidies, incentive programs, tax breaks, or other means substantially narrower than a state-conferred monopoly.

Indeed, if a monopoly over an entire industry were considered narrow tailoring and tribal economic development a compelling interest, then tribes could be awarded monopolies over entire sectors of the economy. That is not the law. And it follows that the casino-gaming industry—which brought in more than $2.9 billion to Washington's tribal casinos in 2019 alone—cannot, consistent with equal protection, be designated "tribal casinos only."

C. **Even if strict scrutiny did not apply, Washington's naked protectionism for a favored class lacks a rational basis.**

Even under rational-basis review, Washington's tribal monopoly would fail constitutional muster. Numerous courts have recognized that bare economic protectionism for a favored class does not satisfy the constitutional need for a rational basis to justify legal classifications. *See, e.g.*,

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER131**

*St. Joseph Abbey v. Castille*, 712 F.3d 215, 222 (5th Cir. 2013); *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002). In this Circuit, "favor[ing] economically certain constituents at the expense of others similarly situated" is considered "irrational," and "economic protectionism for its own sake … cannot be said to be in furtherance of a legitimate governmental interest." *Merrifield v. Lockyer*, 547 F.3d 978, 991 & n.15 (9th Cir. 2008). Washington's tribal monopoly does nothing more than that.

Even in courts that have recognized some forms of economic protectionism as a sufficient rational basis, Washington's tribal monopoly would fail. The Tenth Circuit, for example, has stated that "intrastate economic protectionism constitutes a legitimate state interest," *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir. 2004), but even that generous reasoning does not stretch far enough to cover the situation here. The *Powers* court focused on "favoring one intrastate industry over another," *id.*; here, Washington's tribal monopoly does not favor the *gambling industry* but rather one discrete, racially defined class *within* the gambling industry.

The Ninth Circuit in *Artichoke Joe's* held that it is rational for a state to prohibit class III gambling as a vice activity associated with crime while simultaneously permitting "Indian tribes to choose a different path." 353 F.3d at 736–42. But that reasoning does not hold together. First, it is not rational to broadly ban class III gaming on the ground that it is a vice associated with criminality while at the same time giving Indian tribes *carte blanche* to offer a wide variety of those very class III games. Second, the "vice" rationale assumes that offering class III gaming is detrimental, but this assumption is at war with the case-dispositive conclusion in *Artichoke Joe's* that allowing class III gaming by tribal casinos *benefits* Indian tribes. *See infra* at 25. Third, any State interest in permitting tribal lands to become gaming hotspots exempt from the State's gaming laws is inconsistent with IGRA, which states that a tribe's regulation of gaming should be just as strict as that of the State in which it is located. *See* 25 U.S.C. § 2710(d)(5) ("Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, *except* to the extent that such regulation is inconsistent with, *or less*

19

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER132**

*stringent than*, the State laws and regulations made applicable by any Tribal-State compact … ." (emphases added)).

Washington's tribal monopoly cannot survive under any standard of review.

## II.     IGRA Does Not Allow States To Create A Tribal Monopoly Over Class III Gaming.

Congress has squarely addressed the issue of class III gaming on Indian lands and the States' power to regulate it, and it has created a three-part test to determine whether such gaming is lawful:

Class III gaming activities shall be lawful on Indian lands *only* if such activities are—

> (A)     authorized by an ordinance or resolution that—
>
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
>
> (ii) meets the requirements of subsection (b), and
>
> (iii) is approved by the Chairman,
>
> (B)     *located in a State that permits such gaming for any purpose by any person, organization, or entity*, and
>
> (C)     conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1) (emphases added).  The second of these requirements—the "state-permission requirement"—establishes Congress's vision of parity between tribal and non-tribal gaming regulations.  A state need not allow class III gaming at all, but to allow it on Indian land, the State must "permit[] such gaming" for non-tribal entities as well.  That plain textual reading is confirmed by neighboring provisions in IGRA, Congress's purpose in passing IGRA, and the constitutional problems that would arise from a contrary reading.  Maverick acknowledges that its statutory argument concerning the proper interpretation of IGRA is foreclosed in this Circuit by the Ninth Circuit's decision in *Artichoke Joe's*, 353 F.3d at 720–31, but it respectfully preserves its argument for further review.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER133**

### A. IGRA's text imposes a state-permission requirement.

Under IGRA, class III gaming is unlawful on Indian land unless the state "permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). This means that the State must allow *non-tribal entities* to engage in class III gaming as a condition of *tribal* gaming, for several reasons.

*First*, a state lacks the power to "permit" class III gaming *only on Indian lands*. Under IGRA, class III gaming is unlawful by default. Only *federal* law can permit class III gaming on Indian lands, and it does so only when Section 2710(d)(1)'s three conditions are met. And Section 2710(d)(1)(B) lacks any language delegating authority to states to "permit" tribal gaming on tribal lands. *Cf. Yakima*, 439 U.S. at 501 (upholding state law only because the state "was legislating under explicit authority granted by Congress"). A state simply has no power, outside its role in Section 2710(d)(1)'s compacting process, to regulate class III gaming on Indian land. *See Taxpayers of Mich. Against Casinos v. State*, 685 N.W.2d 221, 227 (Mich. 2004). Indeed, the Supreme Court in *Cabazon* made clear that, while a State could ban gaming within its borders altogether, States do not have any other jurisdiction over gaming on tribal lands. 480 U.S. at 209. And because states lack authority to "permit" class III tribal gaming, the state-permission requirement must refer to permission for *non-tribal* gaming.

*Second*, a tribal-state compact cannot satisfy *both* Section 2710(d)(1)(B)'s state-permission requirement *and* Section 2710(d)(1)(C)'s compact requirement. Section 2710(d)(1)(C) conditions the lawfulness of tribal gaming on a valid compact. Section 2710(d)(1)(B)'s state-permission requirement, then, must require something different, as the canon against superfluity counsels against reading the state-permission requirement and the compact requirement to require the same thing. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (rejecting statutory interpretation that was "completely circular"). Allowing a compact to satisfy not only the compact requirement but also the state-permission requirement would result in "patent bootstrapping." *Citizen Band of Potawatomi Indian Tribe of Okla. v. Green*, 995 F.2d 179, 181 (10th Cir. 1993).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER134**

*Third*, the phrase "any person, organization, or entity" does not include Indian tribes. As a matter of plain English, it would be awkward for "any person, organization, or entity" to refer to the very tribes whose authority is under question, whose authority the state has no power to regulate, and whose authority is dealt with in a separate provision (Section 2710(d)(1)(C), the compacting provision).

Moreover, Congress knows how to include Indian tribes when it wants to, and it failed to do so here. Other laws define the term "person" to expressly include Indian tribes. *See, e.g.*, 33 U.S.C. § 1362(4)–(5); 42 U.S.C. § 6903(13), (15); *id.* § 300f(10), (12); *see also Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701 (2003) (a tribe is not a "person" who may sue under § 1983); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 132–33 (2004) ("any entity" does not include state political subdivisions). IGRA's definitional section, unlike other statutes, does not define "person" (or "organization," or "entity") to include Indian tribes. *See* 25 U.S.C. § 2703.

Thus, the only way for a state to "permit" class III gaming—and satisfy Section 2710(d)(1)(B)'s state-permission requirement—is to allow class III gaming by non-tribal entities. Because Washington has not done so, class III gaming remains unlawful on Indian lands.

### B. Neighboring provisions confirm that class III tribal gaming is allowed only if it is permitted for non-tribal entities.

Section 2710(d)(1)(B)'s state-permission requirement is reinforced throughout IGRA's statutory scheme, which is full of language that requires or assumes parity between a state's general regulatory framework over gaming and the regulations applicable to tribal gaming on Indian lands.

IGRA gives Indian tribes the power to "license and regulate" class II gaming on Indian lands that are "within a State that permits such gaming for any purpose by any person, organization or entity." 25 U.S.C. § 2710(b)(1)(A). It would make no sense to give *Indian tribes* this regulatory power if *the state* had already "permit[ted]" tribes to engage in class II gaming. Moreover, States have no role whatsoever in regulating class II gaming on Indian land (not even a compacting role), so the "permits such gaming" language of Section 2710(b)(1)(A) must refer to non-tribal gaming.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER135**

And Section 2710(d)(1)(B)'s identical language should be read in the same way. *See Robers v. United States*, 572 U.S. 639, 643 (2014).

Additionally, 18 U.S.C. § 1166(a)—which was enacted alongside IGRA—provides that state gaming laws apply to non-IGRA-compliant gaming "in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." In line with the rest of the Act, that provision maintains parity of regulation between tribal and non-tribal gaming. Similarly, IGRA itself waives application of the Johnson Act—which prohibits "any gambling device … within Indian country," 15 U.S.C. § 1175(a)—only if class III gaming is "conducted under a Tribal-State compact that—(A) is entered into under paragraph (3) *by a State in which gambling devices are legal*, and (B) is in effect." 25 U.S.C. § 2710(d)(6) (emphasis added). These criminal laws make clear that IGRA exists in a broader context that insists on parity between tribal and non-tribal gambling.

Other provisions of IGRA further confirm this reading. When an Indian tribe wants to conduct class III gaming on Indian land and asks the state to negotiate a tribal-state compact, IGRA requires the state to "negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A). But if a state *prohibits* class III gaming for non-tribal entities, the negotiation requirement does not apply. *See Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1258 (9th Cir. 1994); *Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 279 (8th Cir. 1993). That is because "a state need only allow Indian tribes to operate games that others can operate." *Rumsey*, 64 F.3d at 1258. IGRA simply has no application when the State generally forbids non-tribal entities from offering class III games.

Finally, Congress's textually expressed findings in IGRA drive the point home. Congress found that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands" if the gaming is "conducted within a State which does not, as a matter of criminal and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). If a state *does* "prohibit such gaming activity," however, then Indian tribes have no such right.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER136**

1

2

### C. Congress's purpose in passing IGRA was to create parity between tribal and non-tribal gaming.

3

4

5

6

7

8

9

10

11

All of this textual and contextual evidence is consistent with Congress's purpose in passing IGRA. Congress passed IGRA in response to *Cabazon*, 480 U.S. 202, which had denied States the power to apply generally applicable gaming regulations to tribal gaming and had thereby created a divergence between tribal and non-tribal gaming within a single state. "IGRA was designed to avoid precisely that kind of patchwork prohibition, in which the state banishes gaming in one county or situation and allows it in another." *Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1084 (7th Cir. 2015). Hoping to foster "free market competition" between state-licensed gaming operators and Indian tribes, Congress sought to promote "a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied." S. Rep. No. 100-446, at 6, 13 (1988); *see also Keweenaw*, 136 F.3d at 473.

12

13

14

15

16

17

18

19

20

21

22

23

IGRA was meant to extend existing state regulatory backdrops onto Indian lands— effectively reversing *Cabazon*. *See* S. Rep. No. 100-446, at 6. Numerous excerpts from IGRA's Senate Report reveal Congress's assumption that Indian gaming would be conducted in line with States' otherwise-applicable gaming regulations. *See id.* at 2, 12–15. That report specifically decried the "uncertainty" of a pre-IGRA system in which "some tribes may engage in forms of commercial gaming that have been banned completely by the State in which that tribe has its reservation." *Id.* at 23. IGRA was designed to "ensure that the Indians are given a level playing field in order to install gaming operations that are the same as the States in which they reside." 134 Cong. Rec. 24,027 (1988) (statement of Senator McCain). And as the provisions discussed above make clear, Congress drafted IGRA to ensure that a level playing field existed. If Washington wishes to grant Indian tribes the right to offer class III gaming to the public, it must grant the same right to non-tribal entities as well.

24

25

26

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER137**

**D.** **Even if IGRA were ambiguous, the canon of constitutional avoidance requires reading it to avoid the serious constitutional questions that a tribal monopoly raises.**

Under the canon of constitutional avoidance, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also Rust v. Sullivan*, 500 U.S. 173, 191 (1991). Because of the serious equal-protection problems that a tribal monopoly would raise, Section 2710(d)(1)(B)'s state-permission requirement must be interpreted to require permission for non-tribal entities. *Cf. Williams*, 115 F.3d 657 (rejecting Indian monopoly over reindeer herding in order to avoid constitutional questions).

The Ninth Circuit's contrary conclusion in *Artichoke Joe's* rests on an infirm foundation. After weighing each side's textual and contextual arguments, the court concluded that IGRA's text, context, purpose, and legislative history were "in equipoise." 353 F.3d at 725. The court broke the tie in the State's favor only by resorting to "[t]he *Blackfeet* presumption"—a canon of construction that favors resolving ambiguities in favor of Indian tribes. *Id.* at 728–29 (citing *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985)). The court thus adopted the State's interpretation "not because it is necessarily the better reading, but because it favors Indian tribes and the statute at issue is both ambiguous and intended to benefit those tribes." *Id.* at 730.

That reasoning is flawed for several reasons. *First*, the text, context, purpose, and legislative history of IGRA are not "in equipoise," so there is no occasion to invoke the *Blackfeet* presumption at all. *Second*, if there were any ambiguity to resolve, the constitutional avoidance canon takes priority over the *Blackfeet* presumption. *See Williams*, 115 F.3d at 663 & n.5; *cf. Chickasaw Nation v. United States*, 534 U.S. 84, 95 (2001) (disclaiming proposition that "the pro-Indian canon is inevitably stronger" than the anti-tax-exemption canon). *Third*, the *Blackfeet* presumption does not apply here in any event, as it is not clear that allowing increased class III gaming on Indian lands—but not the rest of the state—would actually "favor" Indians. *Cf.*

25

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER138**

*Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n*, 14 F.3d 633, 637 (D.C. Cir. 1994) (questioning whether a more lax regulatory approach over gaming would favor Indians in light of IGRA's objective of "protecting tribes and their members from the dangers associated with large-scale gaming operations").

## III.    IGRA's State-Negotiation Mandate Violates The Anti-Commandeering Principle.

In addition to the equal-protection and statutory problems described above, the Secretary was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment's anti-commandeering principle. The Ninth Circuit has not yet confronted this argument.

"The anticommandeering doctrine … is simply the expression of a fundamental structural decision incorporated into the Constitution," and "confirm[ed]" by the Tenth Amendment, to "withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475–76 (2018). Congress may not "command the States[] … to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). This constitutional principle serves three "important" purposes: "First, the rule serves as 'one of the Constitution's structural protections of liberty.'" *Murphy*, 138 S. Ct. at 1477. "Second, the anticommandeering rule promotes political accountability." *Id.* "Third, the anticommandeering principle prevents Congress from shifting the costs of regulation to the States." *Id.*

Thus, the anti-commandeering doctrine holds that, while "[t]he legislative powers granted to Congress are sizable, … they are not unlimited," and "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy*, 138 S. Ct. at 1476. IGRA, however, does exactly that. Its state-negotiation mandate issues a "direct order" to state governments: Upon receiving a request from an Indian tribe to negotiate a class III gaming compact, "the State *shall* negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A) (emphasis added). This negotiation requirement is mandatory, and "the United States may sue" a State to enforce the requirement.

26

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER139**

1   *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1235 (10th Cir. 2017). Indeed, the Ninth Circuit

2   has described the States' role under IGRA as an "obligation." *Rincon Band of Luiseno Mission*

3   *Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1030 (9th Cir. 2010) ("In IGRA,

4   Congress … imposed on the states the obligation to work with tribes to reach an agreement under

5   the terms of IGRA permitting [tribes] to engage in lawful class III gaming activities.").

6       That sort of "direct order[]" violates the Constitution's anti-commandeering principle and

7   renders the process for entering into the Compact Amendments unlawful. *See Murphy*, 138 S. Ct.

8   at 1476. Indeed, IGRA's offense against state authority exceeds that of laws previously invalidated

9   by the Supreme Court. The provision struck down in *Printz*, for example, imposed duties on state

10  officers only as an "interim" measure until a federal system became operative. *Printz*, 521 U.S. at

11  902–03. By contrast, IGRA imposes on States an ongoing duty to negotiate with Tribes, with no

12  end date in sight.

13      When the Supreme Court analyzed IGRA in *Seminole Tribe of Florida v. Florida*, it

14  expressly declined to decide the anti-commandeering issue. 517 U.S. 44, 61 n.10 (1996). At oral

15  argument, however, several of the Justices noted the commandeering difficulties that the statute

16  raised. *See* Transcript of Oral Argument at *14–15, *Seminole Tribe of Florida v. Florida*, 517

17  U.S. 44 (1995) (No. 94-12), 1995 WL 606007 (Justice Kennedy noting: "I simply know of no

18  precedent for" "allow[ing] the national Government to order the States to invoke their political

19  processes in behalf of a national goal."); *id.* at *28 (Justice Scalia articulating Florida's argument

20  as objecting to being forced to act "as a flunky of the Federal Government"). They were correct.

21  Congress lacks the power to order States to "negotiate in good faith" with Indian tribes in order to

22  carry out the federal IGRA scheme.

23      Because the process through which the Compact Amendments were entered into—namely,

24  IGRA's mandatory State-tribe negotiation requirement—violated the Constitution's anti-

25  commandeering principle, they were not validly completed, they are unconstitutional, and the

26  Secretary was required to disapprove them. 25 U.S.C. § 2710(d)(8)(B)(ii); *see also Amador Cnty.*

27  *v. Salazar*, 640 F.3d 373, 381 (D.C. Cir. 2011). By approving the Compact Amendments and

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER140**

1  purporting to authorize a violation of the Tenth Amendment, the Secretary violated IGRA.  The

2  Secretary's approvals of the compact amendments therefore must be vacated so that Washington

3  and the Tribes could have an opportunity to *voluntarily* negotiate compact amendments untainted

4  by IGRA's unconstitutional command.

5      Additionally, the Compact Amendments must fall for the independent reason that IGRA's

6  state-negotiation mandate is not severable from the remainder of the Act, so all of IGRA must be

7  invalidated.  To be sure, IGRA has a severability clause stating that, if any of its provisions are

8  invalidated, the remaining provisions shall remain in effect.  25 U.S.C. § 2721.  But a statute's

9  inclusion of a severability clause creates only a rebuttable "presumption that Congress did not

10  intend the validity of the statute in question to depend on the validity of the constitutionally

11  offensive provision."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).  This presumption

12  is overcome by a showing that "Congress intended the entire relevant portion of the statute to

13  depend upon the unconstitutional provision."  *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 862 (9th

14  Cir. 2017).  In particular, courts must consider "whether the law [would] remain[] fully operative

15  without the invalid provisions."  *Murphy*, 138 S. Ct. at 1482 (internal quotation marks omitted).

16  Regardless of whether a statute includes a severability clause, the bottom-line rule is that an

17  unconstitutional provision is not severable when "the statute created in its absence is legislation

18  that Congress would not have enacted."  *Alaska Airlines*, 480 U.S. at 685.

19      The compacting process is IGRA's centerpiece, and the state-negotiation mandate is what

20  ensures that process takes place.  If IGRA did not "require[] the state to negotiate with the Tribe,"

21  then "'[t]he compact process that Congress established as the centerpiece of the IGRA's regulation

22  of Class III gaming would thus become a dead letter.'"  *N. Arapaho Tribe v. Wyoming*, 389 F.3d

23  1308, 1312 (10th Cir. 2004) (quoting *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024,

24  1031 (2d Cir. 1990)).  Congress never would have enacted IGRA without this central requirement.

25  Indeed, when the Tenth Circuit confronted the related question whether the provision that allowed

26  tribes to sue States (which the Supreme Court struck down in *Seminole Tribe*) was severable from

27  the rest of IGRA, that court held that the severance question was "a close one."  *New Mexico v.*

28

**TribeSER141**

*Dep't of Interior*, 854 F.3d at 1235. That court ultimately concluded that the provision was severable from the rest of IGRA for the sole reason that IGRA's good-faith-negotiation requirement could still be enforced in several ways, including if a State waives or chooses not to raise its sovereign immunity, or if the United States brings suit to enforce the requirement. *Id.* at 1234–35. But if the good-faith-negotiation requirement as a whole were struck down, it would be impossible for IGRA to function "as intended." *Id.* at 1234. All of IGRA therefore must fall along with the state-negotiation requirement. And because that mandate is not severable from the remainder of the Act, none of IGRA's provisions can stand, and the Secretary lacked any authority to approve the Compact Amendments.

## CONCLUSION

For the reasons set forth above, Maverick respectfully requests that the Court grant its motion for summary judgment and award the relief requested in the complaint.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER142**

DATED August 12, 2022.

**BRENNAN LEGAL, PLLC**

By: *s/ Thomas M. Brennan*
Thomas M. Brennan, WSBA No. 30662
P.O. Box 1384
144 Railroad Ave. S., Suite 308
Edmonds, WA 98020
Phone: (425) 967-3550
Email: tom@brennanlegalpllc.com

**GIBSON, DUNN & CRUTCHER LLP**

By: *s/ Theodore B. Olson*
By: *s/ Matthew D. McGill*
By: *s/ Lochlan F. Shelfer*
Theodore B. Olson, D.C. Bar No. 367456
Matthew D. McGill, D.C. Bar No. 481430
Lochlan F. Shelfer, D.C. Bar No. 1029799
1050 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036-5303
Phone: (202) 955-8668
Email: tolson@gibsondunn.com
Email: mmcgill@gibsondunn.com
Email: lshelfer@gibsondunn.com

*Attorneys for Plaintiff Maverick Gaming LLC*

30

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**TribeSER143**

**CERTIFICATE OF SERVICE**

 I hereby certify that on this date I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which sends notification of the filing to all counsel of record.

 DATED August 12, 2022.

*/s/ Thomas M. Brennan*　　　
Thomas M. Brennan

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

31

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER144**