No. 23-35136

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

MAVERICK GAMING LLC,

*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA, *et. al.*,

*Defendant-Appellee*,

SHOALWATER BAY TRIBE,

*Intervenor-Defendant-Appellee*.

_____

On appeal from the United States District Court, Western District of Washington
Case No. 3:22-cv-05325-DGE
The Honorable David G. Estudillo

_____

**SHOALWATER BAY TRIBE'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 2 OF 2**

_____

| | |
|---|---|
| Lael Echo-Hawk | Scott Crowell |
| MTHIRTYSIX, PLLC | CROWELL LAW OFFICE |
| 700 Pennsylvania Avenue SE | TRIBAL ADVOCACY GROUP LLP |
| The Yard-2nd Floor | 1487 W. State Route 89A, Ste. 8 |
| Washington, D.C. 20003 | Sedona, AZ 86336 |
| Telephone: (206) 271-0106 | Telephone: (425) 802-5369 |
| Email: Lael@MThirtySixPLLC.com | Email: scottcrowell@clotag.net |

1

1

**HONORABLE DAVID G. ESTUDILLO**

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

11

12

13

14

15    MAVERICK GAMING LLC,

16              Plaintiff,

17    v.

18

19    UNITED STATES OF AMERICA, et al.,

20              Defendants.

21

Case No.: 22-cv-05325-DGE

**SHOALWATER BAY TRIBE'S MOTION**
**FOR LIMITED INTERVENTION**

**Note on Motion Calendar: August 19, 2022**

<u>**ORAL ARGUMENT REQUESTED**</u>

22

23

24

25

26

27

28

Motion For Limited Intervention
Case No. 22-cv-05325-DGE

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336
Tel: (425) 802-5369

**TribeSER146**

# **TABLE OF CONTENTS**

I. BACKGROUND AND CONTEXT ........................................................2

   A.  Statutory and Historical Context. ..........................................2

   B.  B. The Instant Suit ..................................................................3

II. ARGUMENT ................................................................................3

   A.  The Tribe Should Be Granted Permissive Intervention.......................5

   B.  The Tribe Is Entitled to Intervene as of Right ..............................7

     i.  Timeliness .........................................................................8

     ii.  Significant Protectable Interest ..........................................8

     iii. Impairment ......................................................................9

     iv. Adequate Representation...................................................10

       a. State Defendants and Federal Defendants Will Not Make the Tribe's Arguments........10

       b. The Tribe Will Offer Necessary Elements that the Federal Defendants and the State Defendants Will Neglect..................................................11

III. CONCLUSION ...........................................................................12

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

i

**TribeSER147**

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336
Tel: (425) 802-5369

# TABLE OF AUTHORITIES

**Cases**

*Aguayo v. Jewell*,
    827 F.3d 1213 (9th Cir. 2016) ................................................................. 9

*American Greyhound Racing, Inc. v. Hull*,
    305 F.3d 1015 (9th Cir. 2002) ............................................................ 6, 12

*Backcountry Against Dumps v. U.S. Bureau of Indian Affairs*,
    2021 WL 2433942 (S.D. Cal. 2021) ......................................................... 4

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987) ................................................................................ 11

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
    647 F.3d 893 (9th Cir. 2011) ......................................................... 6, 8, 10

*Confed. Tribes of Chehalis Indian Reservation v. Lujan*,
    928 F.2d 1496 (9th Cir. 1991) .................................................................. 4

*Dawavendewa v. Salt River Project Agr. & Power Dist.*,
    276 F.3d 1150 (9th Cir. 2002) .............................................................. 7, 9

*Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*,
    932 F.3d 843 (9th Cir. 2019) .............................................................. 4, 11

*Enter. Mgmt. Consultants, Inc. v. United States*,
    883 F.2d 890 (10th Cir. 1989) .................................................................. 7

*Friends of Amador County*,
    554 Fed. Appx. 562 (9th Cir. 2014) ....................................................... 11

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*,
    43 F.3d 1491 (D.C. Cir. 1995) ................................................................. 9

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*,
    523 U.S. 751 (1998) .................................................................................. 4

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE
**TribeSER148**
Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336
Tel: (425) 802-5369

*Kootenai Tribe of Idaho v. Veneman,*
313 F.3d 1094 (9th Cir. 2004) ................................................................6

*Low v. Altus Fin. S.A.,*
44 F. App'x 282 (9th Cir. 2002) .............................................................6

*McClendon v. United States,*
885 F.2d 627 (9th Cir. 1989) ..................................................................7

*MGM Global Resorts Dev. LLC v. Dept. of the Interior,*
2020 WL 5545496 (D. D.C. 2020) .....................................................7, 11

*Michigan v. Bay Mills Indian Cmty.,*
572 U.S. 782 (2014) .............................................................................3, 4

*No Casino in Plymouth v. Nat'l Indian Gaming Comm'n,*
2022 WL 1489498 (E.D. Cal. 2022) .....................................................4, 6

*Nooksack Indian Tribe v. Zinke,*
321 F.R.D. 377 (W.D. Wash. 2017) .......................................................6

*Nw. Forest Res. Council v. Glickman,*
82 F.3d 825 (9th Cir. 1996) ...................................................................5

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland,*
960 F.3d 603 (9th Cir. 2020) ..............................................................7, 9

*Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.,*
498 U.S. 505 (1991) ................................................................................3

*Pit River Home & Agric. Coop. Ass'n v. United States,*
30 F.3d 1088 (9th Cir. 1994) ..................................................................7

*Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States,*
921 F.2d 924 (9th Cir. 1990) ..................................................................8

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton,*
327 F. Supp. 2d 995 (W.D. Wis. 2004) ...................................................5

*Shermeon v. United States,*
982 F.2d 1312 (9th Cir. 1992) ..............................................................10

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

**TribeSER149**

Crowell Law Offce-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

*United States v. City of Los Angeles*,

   288 F.3d 391 (9th Cir. 2002) ...................................................................5, 8

*United States v. Oregon*,

   745 F.2d 550 (9th Cir. 1984) ...........................................................................6

*United States v. Spokane Tribe*,

   139 F.3d 1297 (9th Cir. 1998) ...............................................................11, 12

*United States v. Wheeler*,

   435 U.S. 313 (1978) ........................................................................................3

*W. Watersheds Project v. Haaland*,

   22 F. 4th 828 (9th Cir. 2022) ..........................................................6, 7, 9, 10

*Wash. State Bldg. & Constr. Trades Council, AFL-CIO v. Spellman*,

   684 F.2d 627 (9th Cir. 1982) ...........................................................................5

*White v. Univ. of Cal.*,

   765 F.3d 1010 (9th Cir. 2014) .......................................................................10

*Wilderness Soc'y v. U.S. Forest Serv.*,

   630 F.3d 1173 (9th Cir. 2011) .........................................................................6

*Zych v. Wrecked Vessel Believed to Be the Lady of Elgin*,

   960 F.2d 665 (7th Cir. 1992) ...........................................................................5

**Statutes**

25 U.S.C. § 2710(d)(3)(A) ....................................................................................3

Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721 ............................2

Wash. Rev. Code § 9.46.360 ....................................................................................2

**Rules**

Fed. R. Civ. P. 19(a)(1)(A) .................................................................................10

Fed. R. Civ. P. 12(b)(7) ................................................................................passim

Fed. R. Civ. P. 19 ........................................................................................passim

Fed. R. Civ. P. 24 ....................................................................................5, 6

Fed. R. Civ. P. 24(a) ........................................................... 1, 7, 10, 12

Fed. R. Civ. P. 24(b) ........................................................... 1, 5, 7, 12

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ................................................... 3

In this action, Plaintiff Maverick Gaming LLC ("Maverick") seeks to halt the gaming activities of proposed limited intervenor, the Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation ("Shoalwater Bay Tribe" or "Tribe") on its tribal lands, to deprive the Tribe of its rights under federal law, and to invalidate its gaming compact (together with its amendments, the "Compact") with the State of Washington (the "State")—all without even naming the Tribe as a defendant. Instead, Maverick sues the United States, various Federal officials (collectively "Federal Defendants"), and various officials of the State of Washington ("State Defendants"). With its substantial rights at stake, the Tribe is a necessary party to this action, and the Tribe now specially appears and moves for permissive intervention under Fed. R. Civ. P. 24(b) for the limited purpose of moving to dismiss under Rules 12(b)(7) and 19. In the alternative, the Tribe moves to intervene as of right under Rule 24(a) for the same limited purpose.[1] The Tribe attaches as Exhibit A, the [Proposed] Motion to Dismiss, which the Tribe intends to file with this Court immediately if this Court grants the Tribe limited intervenor status.

For avoidance of doubt, by intervening in this action for the limited purpose of moving to dismiss under Rules 12(b)(7) and 19, the Tribe does not waive, and reserves in full, its sovereign immunity. Nothing herein shall be construed as a waiver, in whole or in part, of the Tribe's immunity, or as the Tribe's consent to be sued, and the legal counsel for the Tribe, undersigned, lack authority to waive the Tribe's immunity or consent to the jurisdiction of this Court.

---

[1] The Federal Defendants take no position on the Tribe's motion for limited intervention. The State Defendants consent to permissive intervention under Rule 24(b) and take no position on the Tribe's intervention under Rule 24(a). Maverick opposes the Tribe's motion for limited intervention.

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

1   Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

## I.     BACKGROUND AND CONTEXT

### A.  Statutory and Historical Context.

At issue in this litigation is the Tribe's Compact, and those compacts entered by the twenty-eight other federally recognized tribes in Washington , entered into pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721, and pursuant to Washington State law.  Wash. Rev. Code § 9.46.360.  The background and intent in the passage of those statutes are more fully set forth in the Tribe's [Proposed] Motion to Dismiss, Exhibit A hereto at 2-4.

Proposed intervenor Shoalwater Bay Tribe is compelled to seek limited intervention because its Compact is one of the agreements that Maverick's Complaint seeks to "void". The Shoalwater Bay Tribe is a small rural tribe. Its government relies heavily on the gaming facility's revenues, and the tribal community relies on the facility as a major source of local employment. Both risk being destroyed if Maverick, which is owned by one of the Tribe's own members, succeeds in this litigation. The Compact and the amendments thereto, which Maverick seeks to destroy, brought an end to a decade of acrimonious dispute between the Tribe and both the Federal and State Defendants, including litigation resulting in the United States efforts to shutter the Tribe's gaming facility. Accordingly, the Tribe is compelled to seek limited intervention to protect its interests from Maverick's claims. The history of the Tribe and its relationship with the State Defendants and Federal Defendants is more fully set forth in the Tribe's [Proposed] Motion to Dismiss, Exhibit A hereto at 5-9, and the supporting Declaration of Chairperson Charlene Nelson, Exhibit B, thereto.

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

**TribeSER153**

**B.    The Instant Suit**

On July 1, 2022, Maverick filed a First Amended Complaint ("FAC"), Dkt. 66, in this Court, making a sweeping request for declaratory and injunctive relief to prohibit Class III gaming on Shoalwater Bay Indian lands.  More specifically, Maverick's FAC seeks, inter alia:

(1) a declaration that the Tribe's Compact (and all such Compacts and amendments between the State and twenty-nine federally recognized Indian tribes) are "void, were not validly entered into, and are not in effect." FAC, Dkt. 66 at 40, prayer for relief at ¶ 207 (1);

(2) a declaration that the "Tribes' class III gaming activities violate IGRA." FAC, Dkt. 66 at 40, prayer for relief at ¶ 207 (4); and

(3) an order "enjoining the continued administration of the Compacts and Compact Amendments by the members of the Washington State Gambling Commission." FAC, Dkt. 66 at 40, prayer for relief at ¶ 207 (6).

Despite seeking relief against the Tribe, and despite the fact that federal law expressly recognizes the Tribe's direct interest in its Compact, *see* 25 U.S.C. § 2710(d)(3)(A), Maverick did not name the Tribe—or any other Indian tribe—as a defendant.  Thus, to protect its substantial interests in this matter, the Tribe now moves for leave to intervene under Rule 24 for the purpose of moving to dismiss under Rule 12(b)(7) and Rule 19.  As the Tribe explains in the appended proposed motion, *see* Exhibit A at 10-24, because the Tribe is a required party, and because the Tribe is protected by sovereign immunity and cannot be joined, this action must be dismissed.

**II.    ARGUMENT**

Indian tribes are "domestic dependent nations" that exercise "inherent sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)).  "Thus, unless and 'until Congress acts, the tribes retain' their historical sovereign authority." *Id.* (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)); *see also* U.S. Const. art. I, § 8, cl. 3 (authorizing Congress to "regulate Commerce . . . with the Indian Tribes"); *see also Bay Mills Indian Cmty,*

572 U.S. at 789 (sovereign immunity extends to bar suit whether on or off-reservation, whether or not the action concerns commercial activity). As such, "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998).

Maverick seeks sweeping relief against the Tribe that would cripple the Tribe's economy, jeopardize government services, and deprive the Tribe of its Compact rights. But Maverick cannot sue the Tribe due to sovereign immunity. *Bay Mills Indian Cmty.*, 572 U.S at 788–89. To sidestep this bar, Maverick seeks to proceed against other entities to indirectly obtain the relief that it cannot obtain directly.

The Federal Rules of Civil Procedure forbid this sleight of hand. Under Rules 12(b)(7) and 19, when an absent party like the Tribe is both "required" and "indispensable" to the action and cannot be joined due to sovereign immunity, the action must be dismissed. *E.g.*, *Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 850 (9th Cir. 2019); *Confed. Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1498-1500 (9th Cir. 1991)[2]. Rule 24 provides non-party tribes with the means to intervene for the limited purpose of asserting that argument. *Diné Citizens*, 932 F.3d at 847-48 (upholding dismissal of action for inability to join immune tribal party, where tribal party had "intervened in the action for the limited purpose of moving to dismiss" under Rule 19); *No Casino in Plymouth v. Nat'l Indian Gaming Comm'n*, 2022 WL 1489498 at *9-10 (E.D. Cal. 2022) (appeal pending); *Backcountry Against Dumps v. U.S. Bureau of Indian Affairs*, 2021 WL 2433942 at *2-3 (S.D. Cal. 2021) (appeal pending); *MGM*

---

[2] Many of the cases cited in support of the Tribe's Motion were issued prior to 2007. When Rule 19 was amended in 2007, the word 'necessary' was replaced by the word 'required' and the word 'indispensable' was removed. The changes were intended to be 'stylistic only" and "the substance and operation of the Rule both pre- and post-2007 are unchanged." *Republic of Philippines v. Pimental*, 553 U.S. 853, 855-56; *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 969 n.6 (9th Cir. 2008).

*Global Resorts Dev. LLC v. Dept. of the Interior*, 2020 WL 5545496 (D. D.C. 2020). Limited intervention is also appropriate because it preserves the sovereign immunity that the Tribe seeks to vindicate through its Rule 19 motion. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 327 F. Supp. 2d 995, 1000 (W.D. Wis. 2004) (entities that have sovereign immunity may intervene for a limited purpose, such as moving to dismiss the lawsuit for failure to join an indispensable party, without waiving their sovereign immunity), *aff'd*, 422 F.3d 490 (7th Cir. 2005); *Zych v. Wrecked Vessel Believed to Be the Lady of Elgin*, 960 F.2d 665, 667-68 (7th Cir. 1992) (intervention by a state for limited purpose of moving to dismiss suit for lack of jurisdiction did not result in a waiver of its immunity).

### A.    The Tribe Should Be Granted Permissive Intervention

Under Rule 24(b), permissive intervention should be granted where (i) the applicant's motion is timely; and (ii) "the applicant's claim or defense, and the main action, have a question of law or a question of fact in common."[3] *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002) (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 839 (9th Cir. 1996)). Courts must afford these two requirements a "liberal construction in favor of applicants for intervention." *Wash. State Bldg. & Constr. Trades Council, AFL-CIO v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982). The Tribe easily satisfies both requirements.

The Tribe's intervention motion is timely. To determine whether a Rule 24 motion is timely, courts evaluate three factors: "(1) the stage of the proceeding at which the applicant seeks

---

[3] The Tribe does not need to demonstrate an independent basis for jurisdiction. Rule 24(b)'s independent-jurisdiction requirement prevents intervenors from destroying or unduly enlarging federal jurisdiction over state-law claims. *Freedom from Religion Found. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). Thus, the requirement "does not apply to proposed intervenors in federal-question cases when the proposed intervenor is not raising new claims." *Id.* (emphasis added). This is a federal-question case. FAC, Dkt. 66 at ¶ 25. Because the Tribe is intervening for the limited purpose of moving for joinder and dismissal—not to bring new claims—the independent-jurisdiction requirement does not apply. *Freedom from Religion Found.*, 644 F.3d at 844.

to intervene; (2) the prejudice to other parties; and (3) the reason for and length of delay." *W. Watersheds Project v. Haaland*, 22 F. 4th 828, 836 (9th Cir. 2022). All three factors favor intervention here. The Tribe has intervened at the earliest possible stage of the proceeding—less than a month after Maverick filed its FAC, Dkt. 66, on July 5, 2022. By contrast, courts regularly hold that intervention motions are timely even years after a complaint is filed. *See, e.g.*, *Low v. Altus Fin. S.A.*, 44 F. App'x 282, 284 (9th Cir. 2002) (three years); *United States v. Oregon*, 745 F.2d 550, 552 (9th Cir. 1984) (fourteen years); *No Casino in Plymouth*, 2022 WL 1489498 at *9-10 (four years). And because no party has responded to that complaint, no party could possibly be prejudiced by intervention. *See, e.g.*, *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).

The Tribe's proposed defense and the main action share common questions of fact and law. The factual commonality between the Tribe's defense and Maverick's complaint could not be any closer. The Tribe's interest in this litigation "arises from the same set of facts as Plaintiff's claims." *Nooksack Indian Tribe v. Zinke*, 321 F.R.D. 377, 383 (W.D. Wash. 2017) (emphasis added). The Tribe, its Compact, and its gaming operations are all named and described in Maverick's FAC. Dkt. 66 at. ¶¶ 78, 79, 88. Moreover, the Tribe is "assert[ing] an interest in" the very same Compact that Maverick seeks to "void," and the very same gaming operations that Maverick intends to stop by bringing this lawsuit. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2004), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); FAC, Dkt. 66 at ¶ 207(1), (4). This is more than sufficient to create Rule 24 factual commonality. *See, e.g.*, *Kootenai Tribe of Idaho*, 313 F.3d at 1110–11. Moreover, the analogous federal case law regarding Rule 19 is clear that where a lawsuit seeks to invalidate a contract, the parties to that contract are required and indispensable parties. *See* e.g., *American Greyhound*

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

**TribeSER157**

*Racing, Inc. v. Hull*, 305 F.3d 1015,1022-23 (9th Cir. 2002) (tribes had "substantial" interest sufficient for Rule 19 purposes in renewal of their compacts)*; McClendon v. United States*, 885 F.2d 627, 633 (9th Cir. 1989) (non-party tribe in action seeking to enforce lease agreement it signed); *Enter. Mgmt. Consultants, Inc. v. United States*, 883 F.2d 890, 893 (10th Cir. 1989) (non-party tribe in action seeking to invalidate its contracts); *Dawavendewa v. Salt River Project Agr. & Power Dist.*, 276 F.3d 1150, 1156-57 (9th Cir. 2002) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or contract, all parties who may be affected by the determination of the action are indispensable."). It follows that such non-party tribes satisfy the commonality requirements of Rule 24(b).

The Tribe's defense also shares legal commonality with Maverick's claims. An intervening defendant establishes Rule 24(b) commonality when its defense is "directly responsive" to a plaintiff's claim. *Id.* at 1110. Here, the Tribe's proposed request for Rule 12(b)(7) and Rule 19 dismissal is a complete bar to all of Maverick's claims. Because the Tribe is a required and indispensable party, and its sovereign immunity deprives this court of subject-matter jurisdiction, it squarely prohibits the relief which Maverick seeks. *See Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1100-03 (9th Cir. 1994).

### B. The Tribe Is Entitled to Intervene as of Right

Even if permissive intervention is not warranted, the Tribe is entitled to intervene as of right under Rule 24(a). Under Rule 24(a), "a nonparty is entitled to intervention as of right when it (i) timely moves to intervene; (ii) has a significantly protectable interest related to the subject of the action; (iii) may have that interest impaired by the disposition of the action; and (iv) will not be adequately represented by existing parties." *W. Watersheds Project*, 22 F. 4th at 835 (quoting *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020)).

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

**TribeSER158**

The rule, again, "is construed broadly, in favor of the applicants for intervention." *Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 926 (9th Cir. 1990). The Tribe satisfies each of the four requirements for intervention as of right under Rule 24(a) and is entitled to intervene for the limited purpose of dismissing this action under Rules 12(b)(7) and 19.

### i. Timeliness

First, this motion is timely. As explained above, the Tribe has intervened at the earliest possible stage of the proceedings. Because no response to the complaint has been filed, no party would be prejudiced by the Tribe's limited intervention in this matter. *See, e.g.*, *Citizens for Balanced Use*, 647 F.3d at 897.

### ii. Significant Protectable Interest

Second, Rule 24(a) intervenors must have an interest that is "significantly protectable," meaning that it is "protectable under some law" and that there is a "relationship between [the applicant's] legally protected interest and the plaintiff's claims." *City of Los Angeles*, 288 F.3d at 398. The Tribe's interests in this matter could not be more clear and protectible. The Tribe has federal rights to conduct Class III gaming on its own lands, rights to its Compact, which federal law expressly recognizes, and the right to sovereign immunity as a domestic dependent nation. As discussed above, where the complaint seeks to invalidate a contract with a non-party, or impair a contracting non-party's interest in the contract, those protectable interests warrant dismissal under Rule 19. It follows that such non-parties to contracts at issue have significant protectable interests that warrant intervention under Rule 24(a).

Nor could the "relationship between [those] legally protected interest[s] and the plaintiff's claims" be any more direct: Maverick brought this action to infringe all of the Tribe's interests in

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336
Motion for Limited Intervention
Case No.: 22-cv-05325-DGE
**TribeSER159**

this matter.  Maverick's own prayer for relief seeks to "void" the Tribe's Compact, to declare its gaming activities are "illegal" and to "enjoin" the administration of the Compact  FAC, Dkt. 66 at 40, prayer for relief ¶¶ 207 (1), (4) and (6).

### iii.    Impairment

Third, all of the Tribe's interests would clearly be "impaired by the disposition of the action" in Maverick's favor.  *W. Watersheds Project*, 22 F.4th at 835 (quoting *Oakland Bulk & Oversized Terminal*, 960 F.3d at 620).  Nullification of the Tribe's Compact would directly impair the Tribe's rights in its Compact.  Clearly, a sovereign "has an interest in the validity of a compact to which it is a party, and this interest would be directly affected by . . . relief" that purports to affect the validity of the compact.  *Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491, 1495 (D.C. Cir. 1995).

Voiding the Tribe's Compact could also deprive the Tribe of the legal basis for Class III gaming, threatening to leave the Tribe to once again face the risks of its gaming equipment being seized or the NIGC issuing a closure order, which would leave the Tribe without the means to support core governmental functions.

Finally, Maverick's efforts to make an "'end run' around tribal sovereign immunity" would impair the Tribe's immunity.  *Aguayo v. Jewell*, 827 F.3d 1213, 1222 (9th Cir. 2016).  It is well established that plaintiffs cannot "circumvent the barrier of sovereign immunity by merely substituting" other parties or officials "in lieu of the Indian tribe."  *Dawavendewa* 276 F.3d at 1160. That is because sovereign immunity protects a tribe's ability to "govern [its] reservation," and suits that indirectly attack a Tribe's "ability to negotiate contracts" go to the heart of that core sovereign right.  *Id.* at 1157.

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

**TribeSER160**

### iv. Adequate Representation

Finally, the Tribe is not adequately represented by the other parties in the case. At the Rule 24 stage, "[t]he burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *W. Watersheds Project*, 22 F.4th at 840 (emphasis added) (quoting *Citizens for Balanced Use*, 647 F.3d at 898). In evaluating whether this "minimal" threshold is met, courts consider "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Id.* (emphasis added) (quoting *Citizens for Balanced Use*, 647 F.3d at 898). [4] These factors are satisfied here.

#### a. State Defendants and Federal Defendants Will Not Make the Tribe's Arguments

The first and second factors are satisfied here because no defendant has moved under Rule 12(b)(7) or 19 for failure to join the Tribe, or otherwise raised the Tribe's sovereign immunity. No defendant has indicated in filings, during the April 28, 2022 status conference, or in the scheduling order, that it would make such a motion. And in the process of conferring with the parties in advance of filing this motion, none of the parties—not the United States, not the State, and certainly not Maverick—stated they would raise this Rule 19 issue if the Tribe did not. That

---

[4] These factors apply to determine inadequacy of representation in both the Rule 24 and Rule 19 context. *See Shermeon v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992) ("In assessing an absent party's necessity under Fed.R.Civ.P. 19(a), the question whether that party is adequately represented parallels the question whether a party's interests are so inadequately represented by existing parties as to permit intervention of right under Fed.R.Civ.P. 24(a)."). However, the Rule 24 standard is more liberal standard, as it imposes only a "minimal" burden on a party seeking intervention to show that representation of its interests 'may be' inadequate, *see W. Watersheds*, 22 F.4th at 840-41 (quoting *Citizens for Balanced Use*, 647 F.3d at 898), while Rule 19 requires a court to "determine whether the absent party has a 'legally protected interest' in the subject of the action and, if so, whether the party's absence will 'impair or impede' that interest," *White v. Univ. of Cal.*, 765 F.3d 1010, 1026 (9th Cir. 2014) (quoting Fed. R. Civ. P. 19(a)(1)(A)).

**TribeSER161**

factor itself demonstrates that their interests diverge from the Tribes. *Friends of Amador County*, 554 Fed. Appx. 562, 564 (9th Cir. 2014). Nor has any defendant raised the argument that constitutional defects in IGRA cannot deprive Tribes of their sovereign rights to govern gaming as established in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216, 221–22 (1987). *See United States v. Spokane Tribe*, 139 F.3d 1297 (9th Cir. 1998) (vacating injunction of tribal gaming and remanding for further proceedings in light of Supreme Court holding a portion of IGRA unconstitutional).

### b. The Tribe Will Offer Necessary Elements that the Federal Defendants and the State Defendants Will Neglect.

The third factor is satisfied here because of real or potential conflicts of interest between the Tribe and the parties with respect to issues in the case. Of course, Maverick seeks to shut down Class III gaming on the Tribe's reservation, and thus can be expected to actively oppose the Tribe's interests in this matter. Further, the other named Defendants in this case cannot be counted upon to represent the Tribe.

The Federal Defendants do not adequately represent the Tribe. *Dine Citizens*, 932 F.3d at 847-48, informs that this Court should determine adequacy of representation by looking to the relative position between the parties and the non-parties if the plaintiffs' requested relief is granted. (Although *Dine Citizens* was a Rule 19 case, its analysis of inadequate representation is properly applied in the Rule 24 context, *see supra* at n.*, but should be applied in light of Rule 24's lenience in favor of intervention.)

The United States and its officers' "overriding obligation" is to comply with federal law. *Diné Citizens*, 932 F.3d at 855. "This interest differs in a meaningful sense from" the Tribe's sovereign interest in ensuring that its gaming operations "continue to operate and provide profits to" the tribal government. *Id.*; *accord, e.g.*, *MGM Global Resorts Dev.*, 2020 WL 5545496, at *5.

11

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

**TribeSER162**

Those interests can and do diverge—just as they did when the Federal Defendants took action to stop the Tribe from conducting Class III gaming activities on its tribal lands, as more fully discussed in Exhibit A at 5-9. Past experience thus shows that granting the relief that Maverick seeks would create conflict between the Tribe and the Federal Defendants.  For example, the United States may take enforcement action to stop the Tribe's gaming following a court order granting such relief, while the Tribe would resist such an effort. *See Spokane Tribe*, 139 F.3d at 1297 Accordingly, the Federal Defendants are not able to adequately represent the interests of the Tribe.

Finally, it is black letter law in the Ninth Circuit that a State cannot represent a Tribe's interest in a dispute over tribal gaming. *American Greyhound Racing, Inc.*, 305 F.3d at 1023, n.5, is the controlling case in the Ninth Circuit on the inadequacy of the State to represent the interest of absent tribes – and although decided in the Rule 19 context, its reasoning is even more compelling here, under the more-lenient Rule 24 inadequate representation test.  In *Greyhound Racing*, a commercial racetrack filed a lawsuit against then-Arizona Governor Hull seeking to invalidate the gaming compacts Arizona had reached with several tribes. The Court noted "the State and the tribes have often been adversaries in disputes over gaming, and the State owes no trust duty to the tribes" and noted the "Governor's and the tribes' interests under the compacts are potentially adverse," *Id.* Those circumstances are also present here, and so the State Defendants are not able to adequately represent the interests of the Tribe.

## III.  CONCLUSION

For the foregoing reasons, the Tribe respectfully requests to intervene under Rule 24(b) or Rule 24(a) for the limited purpose of moving to dismiss pursuant to Rules 19 and 12.

Respectfully submitted this 3rd day of August, 2022.

1

2

3    *s/ Scott Crowell*

SCOTT CROWELL (WSBA No. 18868)

4    CROWELL LAW OFFICES-TRIBAL
ADVOCACY GROUP

5    1487 W. State Route 89A, Suite 8
Sedona, AZ 86336

6    Telephone: (425) 802-5369
Fax: (509) 290-6953

7    Email: scottcrowell@hotmail.com

8
LAEL ECHO-HAWK (WSBA No. 34525)

9    MThirtySix, PLLC
700 Pennsylvania Avenue SE

10   The Yard – 2nd Floor
Washington, D.C. 20003

11   Telephone: (206) 271-0106
Email: Lael@MThirtySixPLLC.com

12

13

14   *Attorneys for Limited Intervenors*
*Shoalwater Bay Tribe*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2022, I filed the foregoing MOTION FOR LIMITED INTERVENTION with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record in this matter.

DATED: August 3, 2022

*s/ Scott Crowell*
SCOTT CROWELL (WSBA No. 18868)
CROWELL LAW OFFICES-TRIBAL ADVOCACY GROUP
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
Fax: (509) 290-6953
Email: scottcrowell@hotmail.com

Motion for Limited Intervention
Case No.: 22-cv-05325-DGE

**TribeSER165**

Crowell Law Office-Tribal Advocacy Group
1487 W. State Route 89A, Ste. 8, Sedona AZ, 86336

1    **HONORABLE DAVID G. ESTUDILLO**

2

3

4

5

6

7

8

9

10

11    **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
12    **AT TACOMA**

13

14

15    MAVERICK GAMING LLC,                         Case No.: 22-cv-05325-DGE

16                      Plaintiff,

17    v.                                           **[PROPOSED] LIMITED INTERVENOR
                                                   SHOALWATER BAY TRIBE'S MOTION
18                                                 TO DISMISS**

19    UNITED STATES OF AMERICA, et al.,            **Note on Motion Calendar:_____**

20                      Defendants.                **ORAL ARGUMENT REQUESTED**

21

22

23

24

25

26

27

28

[Proposed] Motion to Dismiss                                      Scott D. Crowell
Case No. 22-cv-05325-DGE                      Crowell Law Offices-Tribal Advocacy Group
                                                          1487 W. State Route 89A, Suite 8
                                                                        Sedona, AZ 86336
                                                                     Tel: (425) 802-5369

## TABLE OF CONTENTS

I. Introduction ...........................................................................................................1

II. Background and Context ...................................................................................2

   A. Statutory Context: The Tribal-State Gaming Compact. .................................2

      i. Federal Law: The Indian Gaming Regulatory Act .................................2

      ii. State Law:  Statutory Structure for Negotiation and Ratification of Tribal-State Gaming Compacts .................................................................................4

   B. Historical Context: The Shoalwater Bay Indian Tribe .......................................5

   C. The Instant Litigation ...........................................................................................9

III. Argument ...........................................................................................................10

   A. Legal Standards for Dismissal Per Rule 12(b) 7 and Rule 19. ...........................10

   B. The Shoalwater Bay Tribe is a Required or Necessary Party. ...........................13

   C. The Shoalwater Bay Tribe Cannot Be Joined Because It Has Not Waived its Sovereign Immunity. .................................................................................................15

   D. All Four Factors Considered under Rule 19(b) weigh in the Tribe's favor; The Tribe's Interest in Maintaining Sovereign Immunity Leaves Very Little Room in Balancing the Four Factors of Rule 19(b). .................................................................16

   E. The Federal and State Defendants Are Not Able to Adequately Represent the Tribe's Protectable Interests. ....................................................................................18

   F. The Narrow Public Rights Exception Does Not Apply Where the Claims Threaten an Absent Party Tribe's Legal Entitlement and Sovereignty. ................................23

IV. Conclusion ...........................................................................................................24

i

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER167

# TABLE OF AUTHORITIES

**Cases**

*Aguayo v. Jewell,*
    827 F.3d 1213 (9th Cir. 2016) ........................................................................ 14

*Alto v. Black,*
    738 F.3d 1111 (9th Cir. 2013) ........................................................................ 18

*American Greyhound Racing, Inc. v. Hull,*
    305 F.3d 1015 (9th Cir. 2002) .................................................................. passim

*Artichoke Joe's California Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003) ........................................................................ 22

*Backcountry Against Dumps v. United States Bureau of Indian Affairs,*
    2021 WL 2433942 (S.D. Cal. 2021) .............................................................. 21

*Behrens v. Donnelly,*
    236 F.R.D. 509 (D. Hawaii 2006) ................................................................ 12

*Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California,*
    547 F.3d 962 (9th Cir. 2008) ................................................................... 2, 12

*California v. Cabazon Band of Mission Indians,*
    480 U.S. 202 (1987) ......................................................................................... 2

*Chicken Ranch Rancheria of Me-wuk Indians v. California,* __F.4th __,
    2022 WL 2978615 (9th Cir. July 28, 2022) ............................................... 3, 4

*Clinton v. Babbitt,*
    180 F.3d 1081 (9th Cir. 1999) ...................................................................... 13

*Comenout v. Whitener,*
    2015 WL 917631 (W.D. Wash. 2015) .......................................................... 18

*Confed. Tribes of Chehalis Indian Reservation v. Washington,*
    96 F.3d 334 (9th Cir. 1996) ............................................................................ 5

ii

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER168**

1  *Confederated Tribes of Siletz Indians v. Oregon,*

2      143 F.3d 481 (9th Cir.1998) ........................................................................13

3  *Confederated Tribes of the Chehalis Indian Reservation v. Lujan,*

4      928 F.2d 1496 (9th Cir. 1991) ....................................................................11

5  *Conner v. Burford,*

6      848 F.2d 1441 (9th Cir. 1988) ...................................................................24

7  *Crow Tribe of Indians v. Racicot,*

8      87 F.3d 1039 (9th Cir. 1996) .....................................................................13

9  *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,*

10     276 F.3d 1150 (9th Cir. 2002) .................................................11, 13, 14, 17

11  *Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs,*

12     932 F.3d 843 (9th Cir. 2019) ..............................................................passim

13  *E.E.O.C. v. Peabody Western Coal Co.,*

14     400 F.3d 774 (9th Cir. 2005) ...............................................................11, 12

15  *Enterprise Management Consultants, Inc. v. United States ex rel. Hodel,*

16     883 F.2d 890 (10th Cir. 1989) ...................................................................17

17  *Friends of Amador County v. Salazar,*

18     554 Fed. Appx. 562 (9th Cir. 2014) .......................................10, 14, 18, 22

19  *Harris v. Lake of the Torches Resort,*

20     2015 WL 1014778 (Wisc. App. March 10, 2015) ......................................16

21  *Jamul Action Comm. v. Simermeyer,*

22     974 F.3d 984 (9th Cir. 2020) .....................................................................20

23  *Kennedy v. United States Dept. of the Interior,*

24     282 F.R.D. 588 (E.D. Cal. 2012) ...............................................................24

25  *Kescoli v. Babbitt,*

26     101 F.3d 1304 (9th Cir. 1996) ...........................................................11, 12, 17, 24

27

28

iii

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER169**

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*,

   43 F.3d 1491 (D.C. Cir. 1995)...................................................................13

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*,

   523 U.S. 751 (1998). ...............................................................................15

*Knox v. United States*,

   759 F. Supp. 2d 1123 (D. Idaho 2010) .....................................................22

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,

   327 F. Supp. 2d 995 (W.D. Wis. 2004) ...................................................22

*Makah Indian Tribe v. Verity*,

   910 F.2d 555 (9th Cir. 1990) .........................................................11, 12, 24

*McShan v. Sherrill*,

   283 F.2d 462 (9th Cir. 1960) ....................................................................12

*Michigan v. Bay Mills Indian Cmty.*,

   572 U.S. 782 (2014) ............................................................................1, 15

*Milligan v. Anderson*,

   522 F.2d 1202 (10th Cir. 1975) ................................................................10

*MM&A Productions v. Yavapai Apache Nation*,

   234 Ariz. 60, 316 P.3d 1248 (Ariz. App. 2014) ........................................16

*Naartex Consulting Corp. v. Watt*,

   722 F.2d 779 (D.C. Cir.1983)...................................................................15

*National Licorice Co. v. N.L.R.B.*,

   309 U.S. 350 (1940) .................................................................................23

*No Casino in Plymouth v. National Indian Gaming Comm'n*,

   2022 WL 1489498 (E.D. Cal. 2022) ........................................................21

*Northern Alaska Envtl. Ctr. v. Hodel*,

   803 F.2d 466 (9th Cir. 1986)....................................................................12

iv

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER170

*Northern Arapahoe Tribe v. Harnsberger*,

 660 F. Supp. 2d 1264 (D. Wyo. 2009) ...................................................18

*Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*,

 498 U.S. 505 (1991) ......................................................................15

*Pit River Home & Agric. Coop. Ass'n v. United States*,

 30 F.3d 1088 (9th Cir. 1994) .............................................2, 10, 21

*Puyallup Tribe, Inc. v. Dep't of Game*,

 433 U.S. 165 (1977) ......................................................................20

*Quileute Indian Tribe v. Babbitt*,

 18 F.3d 1456 (9th Cir. 1994) ........................................................17

*Republic of Philippines v. Pimental*,

 553 U.S. 851 (2008) ..................................................................2, 11

*Safe Air v. Meyer*,

 373 F.3d 1035 (9th Cir. 2004) ......................................................12

*Salt River Project Agric. Improvement & Power Dist. v. Lee*,

 672 F.3d 1176 (9th Cir. 2012) ................................................11, 13

*Santa Clara Pueblo v. Martinez*,

 436 U.S. 49 (1978) ........................................................................15

*Shermoen v. United States*,

 982 F.2d 1312 (9th Cir. 1992) ................................................11, 24

*Shields v. Barrow*,

 58 U.S 130 (1855) .........................................................................12

*Southwest Center for Biological Diversity v. Babbitt*,

 150 F.3d 1152 (9th Cir. 1998) ......................................................14

*Tulalip Tribes of Wash. v. Washington*,

 783 F.3d 1151 (9th Cir. 2015) ........................................................2

v

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER171

*Union Pacific Railroad Co. v. Runyan*,

    320 F.R.D. 245 (D. Ore. 2017) ...............................................................................23, 24

*United States   v. USF&G*,

    309 U.S. 506 (1940) ..........................................................................................................16

*United States v. Bowen*,

    172 F.3d 682 (9th Cir. 1999) ...........................................................................................11

*United States v. Kagama*,

    118 U.S. 375 (1886) ..........................................................................................................19

*United States v. Shoalwater Bay Indian Tribe*,

    205 F.3d 1353 (9th Cir. 1999) ...........................................................................................5

*United States v. Spokane Tribe*,

    139 F.3d 1297 (9th Cir. 1998) ...........................................................................5, 20, 21

*United States v. Washington*,

    853 F.3d 946, 954–64 (9th Cir. 2017), *aff'd by an equally divided Court*, 138 S. Ct. 1832

    (2018) ................................................................................................................................19

*United States v. Wheeler*,

    435 U.S. 313 (1978) ..........................................................................................................15

*Ward v. Apple, Inc.*,

    791 F.3d 1041 (9th Cir. 2015) .........................................................................................11

*Wash. State Dep't of Licensing v. Cougar Den, Inc.*,

    139 S. Ct. 1000 (2019) .....................................................................................................19

*Washington v. Confed. Tribes of Colville Indian Reservation*,

    447 U.S. 134 (1980) ..........................................................................................................20

*White v. Univ. of Cal.*,

    765 F.3d 1010 (9th Cir. 2014) ..................................................................................passim

vi

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER172**

1

**Statutes**

2  18 U.S.C. §§ 1166 ..............................................................................................3

3  18 U.S.C. §§ 1955 ..............................................................................................3

4  25 U.S.C. § 2702(1) ...........................................................................................3

5  25 U.S.C. § 2710(a) ...........................................................................................3

6  25 U.S.C. § 2710(d)(3)(A) ...........................................................................3, 10

7  25 U.S.C. §§ 2705(a) ..........................................................................................3

8  25 U.S.C. §§ 2713 ..............................................................................................3

9  25 U.S.C. §§ 2710(d)(7)(A)(ii) ..........................................................................3

10  Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA") ...................passim

11  RCW § 9.46.360 .................................................................................................4

12  RCW §§ 39.34.020, 39.34.030 ..........................................................................4

13

**Other Authorities**

14  Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure: Civil*

15    *3d*. § 1359 at 68 (2004)..................................................................................19

16  Office of Indian Gaming within the Department of the Interior. www.bia.gov/as-ia/oig ............13

17

**Rules**

18  Fed. R. Civ. P. 12(b)(7) ...........................................................................passim

19  Fed. R. Civ. P. 19 ....................................................................................passim

20  Fed. R. Civ. P. 19(a).........................................................................................11, 12

21  Fed. R. Civ. P. 19(b).........................................................................12, 16, 17

22

**Public Notices**

23  67 Fed. Reg. 68152 .............................................................................................6

24  72 Fed. Reg. 30392 .............................................................................................7

25  80 Fed. Reg. 31918 .............................................................................................7

26  86 Fed. Reg. 51373 .............................................................................................7

27

28

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER173**

1

87 Fed. Reg. 4636 ...................................................................................................... 5

2

**Constitutional Provisions**

3

House Bill Report H.B. 2638 at 6 ............................................................................... 8

4

Laws of 2020, Chapter 127 § 1 ................................................................................... 4

5

U.S. Const. art. I, § 8, cl. 3 ...................................................................................... 15

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER174**

Limited Intervenor the Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation ("Shoalwater Bay Tribe" or "Tribe") moves pursuant to Fed. R. Civ. P. 12(b)(7) and Fed. R. Civ. P. 19 to dismiss this lawsuit filed by Plaintiff Maverick Gaming LLC ("Maverick").

## I.    Introduction

In this lawsuit, Maverick seeks to invalidate the compacts between the State of Washington (the "State") and twenty-nine Indian tribes ("Washington Tribes") entered into under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"). The Washington Tribes are the true target of its suit as the requested relief is intended to shutter tribally owned and operated casinos across the State of Washington and deprive them of a critical source of funding for governmental programs. Yet, Maverick has not brought this action against any of the Washington Tribes, each of which possesses Indian lands within the boundaries of the State of Washington. Instead, Maverick sues the United States, various federal officials (collectively, "Federal Defendants"), and various officials of the State of Washington (collectively, "State Defendants").

There is a reason for the Tribes' absence from Maverick's corrected First Amended Complaint, Dkt. 66 ("FAC"): the Tribes are immune from suit. *See, e.g., Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014). Maverick cannot sue the Washington Tribes directly seeking a declaration that their gaming is illegal. So, Maverick tries to circumvent the Washington Tribes' immunity by suing other defendants instead. This type of gamesmanship is precisely the circumstance that Rule 19 of the Federal Rules of Civil Procedure prevents – having a suit proceed in the absence of a necessary and required party.

The stated purpose of Maverick's lawsuit is to void the Tribal-State gaming compacts entered into by the non-party Washington Tribes and the State of Washington. The Tribe has not

1

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER175**

waived its sovereign immunity from the lawsuit. As a proper party that cannot be joined to the FAC, the case cannot in equity and good conscience proceed in the Tribe's absence. Accordingly, the FAC in its entirety should be dismissed.  With its substantial rights at stake, the Tribe is specially appearing for the limited purpose of moving to dismiss under Rules 12(b)(7) and 19.  For avoidance of doubt, by intervening in this action for the limited purpose of filing the instant Motion, the Tribe does not waive, and fully reserves, its sovereign immunity.  *See, e.g.*, *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir. 1994)[1]; *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 327 F. Supp. 2d 995, 1000 (W.D. Wis. 2004). Nothing herein shall be construed as a waiver, in whole or in part, of the Tribe's immunity, or as the Tribe's consent to be sued, and the legal counsel for the Tribe, undersigned, lack any authority to waive the Tribe's immunity or to consent to the jurisdiction of this Court.

## II.  Background and Context

### A.  Statutory Context: The Tribal-State Gaming Compact.

"In Washington, the process for entering into tribal gaming compacts is governed by both federal and state law." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1153 (9th Cir. 2015).

### i.  Federal Law: The Indian Gaming Regulatory Act

In 1987, the Supreme Court ruled that due to "traditional notions of Indian sovereignty and the congressional goal of Indian self-government," states may not regulate tribal gaming on tribal land absent congressional authorization. *California v. Cabazon Band of Mission Indians*, 480 U.S.

---

[1] Many of the cases cited in support of the Tribe's Motion were issued prior to 2007. When Rule 19 was amended in 2007, the word 'necessary' was replaced by the word 'required' and the word 'indispensable' was removed. The changes were intended to be 'stylistic only" and "the substance and operation of the Rule both pre- and post-2007 are unchanged." *Republic of Philippines v. Pimental*, 553 U.S. 853, 855-56; *Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California*, 547 F.3d 962, 969 n.6 (9th Cir. 2008).

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER176**

202, 216, 221–22 (1987).  The following year, Congress enacted IGRA with the purpose of creating a clear regulatory framework for Indian gaming that would allow for "gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).

Consistent with its purpose, IGRA broadly protects Indian tribes' right to conduct and regulate gaming activities within a three-tier framework.  *See, e.g., Chicken Ranch Rancheria of Me-wuk Indians v. California*, __F.4th __, 2022 WL 2978615 at *4 (9th Cir. July 28, 2022).  Class I gaming (traditional and ceremonial games) and Class II gaming (bingo and non-banked card games) are regulated principally by tribes.  25 U.S.C. § 2710(a).  But Class III gaming (including casino games and sports betting) is regulated differently because IGRA provides an opportunity for states to be involved in the regulatory oversight of tribal gaming by negotiating compacts that will "govern[] the conduct of [Class III] gaming activities" on Indian land.  25 U.S.C. § 2710(d)(3)(A).

Congress vested the National Indian Gaming Commission ("NIGC") and the Department of Justice ("DOJ") with authority to take action against illegal gaming on Indian lands. 25 U.S.C. §§ 2705(a) and 2713; 18 U.S.C. §§ 1166 and 1955. Congress identified allocation of criminal jurisdiction as a proper subject of negotiation between states and Indian tribes. Congress vested the federal courts with jurisdiction over an action by a state against a tribe for breach of compact. 25 U.S.C. §§ 2710(d)(7)(A)(ii). Maverick has remedies available to redress its perceived grievances. It sought and failed to secure a sports betting entitlement in the Washington legislature. Maverick could ask Congress to amend IGRA. Maverick could plea its case to the NIGC, DOJ or the State and request that they take enforcement action against the Washington Tribes. But

3

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER177

Maverick filing its own federal litigation to shutter the Washington Tribes' gaming facilities is not among the remedies available to it.

### ii. State Law: Statutory Structure for Negotiation and Ratification of Tribal-State Gaming Compacts

Congress provided states an opportunity to have a role in the regulation of tribal gaming, if they "engage in compact negotiations in good faith." *Chicken Ranch*, 2022 WL 2978615 at *5. To capture this opportunity, Washington state law directs the State's Gambling Commission to "negotiate compacts for class III gaming on behalf of the state with federally recognized Indian tribes in the state of Washington." RCW § 9.46.360. Moreover, Washington statutes authorize intergovernmental joint powers agreements between tribes and local government agencies regarding provision of services to tribal casinos and reimbursement to local government for the costs of such services. RCW §§ 39.34.020, 39.34.030.

The State's approach to embracing the opportunities allowed by IGRA was most recently exemplified by the Washington legislature's approval of sports wagering in Indian country pursuant to IGRA compacts, which the legislature passed over Maverick's objection. The legislature found:

> It has long been the policy of this state to prohibit all forms and means of gambling except where carefully and specifically authorized and regulated. The legislature intends to further this policy by authorizing sports wagering on a very limited basis by restricting it to tribal casinos in the state of Washington. Tribes have more than twenty years' experience with, and a proven track record of, successfully operating and regulating gaming facilities in accordance with tribal gaming compacts. Tribal casinos can operate sports wagering pursuant to these tribal gaming compacts, offering the benefits of the same highly regulated environment to sports wagering.

Laws of 2020, Chapter 127 § 1.

4

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER178

### B. Historical Context: The Shoalwater Bay Indian Tribe

The Shoalwater Bay Indian Tribe is a federally recognized tribe located in rural western Washington State.  87 Fed. Reg. 4636, 4639 (2022).  The Shoalwater Bay people descend from the Lower Chinook and Lower Chehalis peoples who for centuries populated the villages that dotted Washington's coastal waterways.  Despite severe population loss and cultural displacement that European settlement brought to the region, the Tribe steadfastly resisted outside pressure to relinquish its lands.  *Confed. Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 338 (9th Cir. 1996).  Ultimately, the federal government relented, and in 1866 President Andrew Johnson set aside the Shoalwater Bay Indian Reservation within the Tribe's ancestral lands.  *Id.*

In the 1990s, seeking a source of employment and revenue to fund crucial tribal government operations, the Tribe exercised its rights under IGRA and approached Washington State to negotiate a gaming compact.  The State, however, insisted that the gambling machines the tribes sought to operate gaming activities were illegal, while refusing to waive its Eleventh Amendment immunity or otherwise consent to IGRA's negotiation/mediation remedial process. *See United States v. Spokane Tribe*, 139 F.3d 1297, 1298 (9th Cir. 1998). After years of unsuccessful negotiations, in 1998, the Tribe opened a gaming facility on the Shoalwater Bay Indian Reservation, over the objections of the State and without a compact. Specifically, the Tribe installed 108 gambling devices wherein random number generators ("RNGs") contained within the machines determined the outcome. *See United States v. Shoalwater Bay Indian Tribe*, 205 F.3d 1353 (9th Cir. 1999) (unpublished decision).

The United States Attorney inserted itself in the dispute on the side of the State, filed an *in rem* action against the 108 machines, and, deploying federal officers**,** halted the Tribe's gaming

5

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER179**

operation by seizing and carrying away the gaming machines from tribal property. *See generally* Arthur Santana & Jack Broom, *Shoalwater Tribe, Marshals Face Off—Agents Start to Confiscate Slot Machines*, SEATTLE TIMES, Sept. 23, 1998 (article attached to the Declaration of Chairperson Charlene Nelson, Ex. B ("Nelson Declaration") as Ex. B-1). The gaming operation was the Tribe's most significant source of employment and the primary source of discretionary governmental revenue, and the seizure resulted in the loss of sixty much-needed reservation jobs. *Id.*

Shortly after the seizure of the Tribe's gaming machines by the United States marshals, the Tribe installed a different type of gaming machine with a pre-determined win/loss percentage resembling the compacted class III games in operation today within the State. That development resulted in further enforcement action, but instead of United States marshals raiding the reservation and seizing machines, the NIGC, in 1999, issued a Notice of Violation, NOV-99-10, and an Order of Closure, OC-99-10. In the Tribe's subsequent administrative appeal to the United States Department of the Interior Office of Hearings and Appeals, Docket No. NIGC 99-2, the Tribe was successful in securing an Order enjoining the NIGC from taking further enforcement action until the United States demonstrated that it was seeking to provide an effective remedy for the Tribe's injuries resulting from Washington State's refusal to negotiate a gaming compact. *See* Order Deferring Decision and Staying Proceedings on Reconsideration Motion, August 23, 2001 (Attached to Nelson Declaration as Ex. B-2). While that injunction was pending, the Tribe and the State successfully reached agreement on a tribal/state Compact, which became effective on November 8, 2002. 67 Fed. Reg. 68152.[2]  Significant to the Tribe's instant motion to intervene

---

[2] The complete text of the Compact and the several amendments thereto are available for public viewing at the official web page of the Office of Indian Gaming within the Department of the Interior. www.bia.gov/as-ia/oig

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER180**

and proposed Rule 19 motion, despite the coordinated and parallel efforts of both the United States and the State of Washington to prevent the Tribe from conducting gaming, the Tribe's gaming operation never closed, except for the few weeks between the seizure of the 108 gambling devices with RNGs and the installation of machines without RNGs.

That Compact marked a turning-point in the relationship between the three governments: the Tribe, the State and the United States, ending years of contentious and often confrontational disputes over gaming on the Tribe's lands. The Tribe and the State have subsequently reached agreement on three amendments to the Compact, all approved by the Department of the Interior, in 2007, 72 Fed. Reg. 30392, in 2015, 80 Fed. Reg. 31918; and most recently in 2021, 86 Fed. Reg. 51373. The Third Amendment in 2021, authorizing sports wagering, is the focus of Maverick's FAC, but notably, it seeks to invalidate the initial compact and the three amendments thereto in their entirety.

In stark contrast to the contentious and tumultuous non-compacted environment of the 1990s, today, the Tribe operates a small gaming facility free of disputes with the State and United States. The casino provides an anchor for the Tribe's economy and the economies of the surrounding rural communities. Willapa Bay Enterprises, the Tribally-owned entity which operates the casino along with the restaurant, small lodge and other businesses, employs 120 people, approximately 30% of which are Tribal members, their spouses or direct family members (*See* Nelson Declaration at 2, ¶ 7). The casino purchases goods and services from local vendors, and creates a gathering place for the Tribe and the surrounding community. Importantly, the small gaming facility is a source of pride for the Tribe and self-esteem for the Tribe's members. *Id.* at 2-3, ¶¶ 8-9.

7

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

The Tribe and the State have replaced the adversity of the 1990s with a constructive, working relationship for more than twenty years. Today's relationship is an example of the successful relationship between all Washington Tribes and the State, a key factor in the Washington legislature's decision to authorize sports betting at tribal casinos:

> Tribes and the state have an excellent working partnership already as sovereign-to-sovereign governments, including work done related to problem gambling, and so it makes sense to continue that partnership and add sports wagering as an additional offering at tribal casinos. The state has a history of acting conservatively in terms of expanding gambling. Tribal gaming is a structured regulatory environment and there are significant internal controls. Because tribes are located throughout the state, there will be access for consumers to sports betting no matter where they live. It is best to start slowly by authorizing sports wagering at existing tribal facilities, without adding mobile sports betting, and then to evaluate how it works.

House Bill Report H.B. 2638[3] at 6.

These facts are brought to this Court's attention in the context of the current motion as they highlight that the Compact, in effect as amended, is the vehicle that ended the adversity of the pre-compact relationship between the Tribe, the State and the United States. These facts are also relevant here because they highlight, as discussed in greater detail below in Section III(D), the adversarial environment which Maverick intends to recreate between the three respective governments if Maverick's requested relief, invalidation of the Compact, is ordered by this Court.

Maverick's owner, Eric Persson, boasts that he is a "proud" enrolled member of the Tribe and that his acquisition of commercial card rooms allows him "to come home again" to work with his "tribal brothers." *See* Maverick Gaming Press Releases of June 14, 2019; June 27, 2019; August 19, 2019; and October 1, 2019 (collectively included as Ex. B-3 to Nelson Declaration). As a

---

[3] https://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bill%20Reports/House/2638%20HBR%20APP%2020.pdf?q=20220519085734.

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER182

tribal member, Mr. Persson has access to the Tribe's governance and dispute mechanisms (voting, running for office, litigating in tribal court, etc.) to air his grievances. Mr. Persson has not had to use or rely upon the employment opportunities provided by, and/or the tribal programs funded by, the Tribe's gaming operation, because he left the reservation and relocated to the State of Nevada, where he amassed his own wealth with a very successful gaming company comprised of five casinos in northern Nevada, four casinos in Colorado, and eighteen commercial card rooms in Washington State. *See* official webpage of Maverick Gaming LLC, www.maverickgaming.com. Rather than returning to Washington State to assist his own Tribe, he returned to Washington State to purchase a majority of the State's commercial card rooms, and he now seeks to destroy, through his requested prayer for relief in the instant litigation, the major source of employment and discretionary revenue for his own Tribe.

The irony of Eric Persson boasting of his proud membership in the Tribe, while filing an action to destroy the Tribe's gaming facility and the governmental revenues, programs and jobs it supports, while not even attempting to join the Tribe as a party to the litigation, is not lost on the Tribe. Accordingly, the Tribe is compelled to seek limited intervention in this case and bring an end to his efforts to undermine his own Tribe's efforts to achieve economic self-sufficiency and provide adequate governmental services to its membership.

### C. The Instant Litigation

On July 5, 2022, Maverick filed the FAC, in this Court, making a sweeping request for declaratory and injunctive relief to prohibit Class III gaming on Shoalwater Bay Indian lands. More specifically, Maverick's FAC seeks, inter alia:

(1) a declaration that the Tribe's compact and its amendments (and all such compacts and amendments between the State and the Washington Tribes) are "void, were not validly

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER183**

entered into, and are not in effect." FAC, Dkt. 66 at 40, prayer for relief at ¶ 207 (1);

(2) a declaration that the "Tribes' class III gaming activities violate IGRA." FAC, Dkt. 66 at 40, prayer for relief at ¶ 207 (4); and

(3) an order "enjoining the continued administration of the Compacts and Compact Amendments by the members of the Washington State Gambling Commission." FAC, Dkt. 66 at 40, prayer for relief at ¶ 207 (6).

Despite seeking relief that is unmistakably directed against the Tribe, and despite the fact that federal law expressly recognizes the Tribe's direct interest in its Compact, *see* 25 U.S.C. § 2710(d)(3)(A), Maverick did not name the Tribe—or any other Washington Tribe—as a defendant. Thus, to protect its substantial interests in this matter, the Tribe now moves to dismiss under Rule 12(b)(7) and Rule 19. *See Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 850 (9th Cir. 2019). Because the Tribe is a necessary party, and because the Tribe is protected by sovereign immunity and cannot be joined, this action must be dismissed. *See, e.g.*, *Pit River Home and Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1103 (9th Cir. 1994).

## III. Argument

### A. Legal Standards for Dismissal Per Rule 12(b) 7 and Rule 19.

The Tribe seeks an order dismissing the lawsuit in its entirety pursuant to Rule 12(b)(7) because the Tribe is a required party that cannot be joined, and accordingly, pursuant to Rule 19, the Court cannot in equity and good conscience proceed with the case without the Tribe.

A party may move to dismiss a complaint for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7); *Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1022-25 (9th Cir. 2002). Similarly, non-parties that have not consented to the court's jurisdiction may specially appear to seek dismissal pursuant to Rule 19. *See Friends of Amador County v. Salazar*, 554 Fed. Appx. 562, 564 (9th Cir. 2014); *Milligan v. Anderson*, 522 F.2d 1202, 1203-04 (10th Cir. 1975).

10

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER184

Furthermore, a court may address whether to dismiss a case under Rule *19 sua sponte*. *Republic of Philippines v. Pimental*, 553 U.S. 851, 861 (2008).

Rule 19 provides a three-step process for determining whether the court should dismiss an action for failure to join a purportedly indispensable party. *E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005); *United States v. Bowen*, 172 F.3d 682, 688 (9th Cir. 1999); *see also Pimental*, 553 U.S. at 855-57; accord, *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) (describes same process as a two-step process).

First, Rule 19 asks whether the absent party is "necessary (i.e., required to be joined if feasible) under Rule 19(a)." *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012); *White v. Univ. of Cal.*, 765 F.3d 1010, 1026 (9th Cir. 2014); *Confederated Tribes of the Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991). To make such a determination, the court "must consider whether 'complete relief' can be accorded among the existing parties, and whether the absent party has a 'legally protected interest' in the subject of the suit." *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992); *Ward, v. Apple, Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015). If the court finds that a party is not "necessary," then the court need not consider the second step under Rule 19 and the case may continue without the absent party. *Makah,* 910 F.2d at 559; *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996).

If the party is "required" or "necessary," the court must then determine whether that party is "indispensable." *Id.* To make such a determination, the court asks whether it is "feasible to order that the absent party be joined." *Id.* "A party is indispensable if in 'equity and good conscience,' the court should not allow the action to proceed in its absence." *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1161 (9th Cir. 2002) (citing Fed. R. Civ. P.

11

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER185

19(b)). To make this determination, the court balances four factors: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. *Id.* at 1161–62; *Kescoli*, 101 F.3d at 1310.

If it is not feasible to join the absent party, the court asks whether the case can proceed without it — and if not, dismisses the action. *Peabody Western Coal*, 400 F.3d at 779, Fed. R. Civ. P. 19(b). An indispensable party is one which "not only [has] an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." *Peabody Western Coal*, 400 F.3d at 780 (quoting *Shields v. Barrow*, 58 U.S 130, 139 (1855)).

The movant bears the burden of persuading the court that a party must be joined (or the case dismissed). *Makah*, 910 F.2d at 558. There is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a). The determination is heavily influenced by the facts and circumstances of each case. *Cachil Dehe Band*, 547 F.3d at 970; *Northern Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 468 (9th Cir. 1986). To determine whether Rule 19 requires the joinder of additional parties, the court may consider evidence outside the pleadings. *Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960); *Behrens v. Donnelly*, 236 F.R.D. 509, 512 (D. Hawaii 2006) (citing Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure: Civil 3d*. § 1359 at 68 (2004).

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER186**

Application of these standards to the FAC and the circumstances of the Tribe compels the dismissal of Maverick's lawsuit. Because the Tribe is immune and therefore cannot be joined involuntarily, and because the Tribe is a necessary, indispensable party under Rule 19, the entire case must be dismissed per Rule 12(b)(7). *Salt River Project*, 672 F.3d at 1179; *Greyhound Racing*, 305 F.3d at 1022-25.

### B. The Shoalwater Bay Tribe is a Required or Necessary Party.

The Tribe is a required or necessary party because the Tribe's protectable interests in continuing to offer gaming activities on its Indian lands are at stake, and Maverick cannot secure complete relief without joining the Tribe. The Tribe's interests in this matter could not be more clear. The Tribe has a federal right to conduct Class III gaming on its Reservation, rights in its Compact with Washington State that federal law expressly recognizes, and sovereign right to immunity from unconsented suit. The relationship between those legally protected interests and Maverick's claims could not be any more direct: Maverick brought this action to "void" the Tribes Compact in the Tribe's absence. FAC, Dkt. 66 at 40, ¶¶ 207 (1), (4) and (6). "Clearly," a sovereign "has an interest in the validity of a compact to which it is a party, and this interest would be directly affected by . . . relief" that purports to affect the validity of the compact. *Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491, 1495 (D.C. Cir. 1995). The Ninth Circuit recognizes that IGRA "compacts are agreements . . . and are interpreted as contracts." *Chehalis*, 958 P.2d at 750 (citing *Confederated Tribes of Siletz Indians v. Oregon*, 143 F.3d 481, 485–486 (9th Cir.1998) and *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996)): *see also Dawavendewa*, 276 F.3d at 1156-57 ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or contract, all parties who may be affected

13

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER187

by the determination of the action are indispensable.") *Greyhound Racing*, 305 F.3d at 1022-23 (tribes had "substantial" interest sufficient for Rule 19 purposes in renewal of their compacts). It is the Tribe, along with the twenty-eight other Washington Tribes, that are the real parties in interest in this litigation. It is the Tribe that will be devastated by the loss of employment and governmental revenue if Maverick succeeds. It is the Tribe that will be severely hampered from achieving Congress' purpose in enacting IGRA: economic development, self-sufficiency and strengthened tribal governance through compacted gaming on its Indian lands.

Moreover, Maverick's efforts to make an "'end run around tribal sovereign immunity" would impair the Tribe's immunity. *Aguayo v. Jewell*, 827 F.3d 1213, 1222 (9th Cir. 2016). It is well established that plaintiffs cannot "circumvent the barrier of sovereign immunity by merely substituting" other parties or officials "in lieu of the Indian tribe." *Dawavendewa*, 276 F.3d at 1160. That is because sovereign immunity protects a tribe's ability to "govern [its] reservation," and suits that indirectly attack a Tribe's "ability to negotiate contracts" go to the heart of that core sovereign right. *Id.* at 1157.

Moreover, complete relief is not available where the absent party is a tribe that is a signatory to the agreement at issue because the judgment would not be binding on the tribe, which could assert its rights under the agreement. *Friends of Amador County*, 554 Fed. Appx. at 564 (appellants seek to invalidate tribe's compact with state); *Greyhound Racing*, 305 F.3d at 1022-25 ("[t]he interests of the tribes in their compacts are being impaired and, not being parties, the tribes cannot defend those interests."); *Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152 (9th Cir. 1998) (party to settlement agreement regarding water rights at issue in litigation); *Dawavendewa*, 276 F.3d at 1161 (absent tribe was party to lease that provided for tribal preference

14

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER188**

in hiring); *Clinton v. Babbitt*, 180 F.3d 1081, 1089 (9th Cir. 1999) (requested judgment would preclude absent tribe from fulfilling its obligations under settlement agreement); *Pit River*, 30 F.3d at 1099 ("[E]ven if the Association obtained its requested relief in [a dispute over which group of Indians are beneficial owners of a certain piece of property], it would not have complete relief, since judgment against the government would not bind the [other group of Indians], which could assert its right to possess the [property]."); *Chehalis*, 928 F.2d at 1498 (noting that judgment against federal officials in an action challenging an agreement between the United States and the Quinault Nation would not bind the Nation); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir.1983) ("an action seeking rescission of a contract must be dismissed unless all parties to the contract, and others having a substantial interest in it, can be joined"). There can be no doubt that the Tribe is a required or necessary party.

## C. The Shoalwater Bay Tribe Cannot Be Joined Because It Has Not Waived its Sovereign Immunity.

Indian tribes are "domestic dependent nations" that exercise "inherent sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)). "Thus, unless and 'until Congress acts, the tribes retain' their historical sovereign authority." *Id.* (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)); *see also* U.S. Const. art. I, § 8, cl. 3 (authorizing Congress to "regulate Commerce . . . with the Indian Tribes"); *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756 (1998). As "distinct, independent political communities" with sovereign powers that have never been extinguished, "Indian tribes have long been recognized as possessing the common law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). *See also Bay Mills Indian Cmty*, 572 U.S. at 789

<center>15</center>

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER189**

(sovereign immunity extends to bar suit whether on or off-reservation, whether or not the action concerns commercial activity). As such, "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe*, 523 U.S. at 754. Further, any purported waiver must be duly authorized as a matter of tribal law. The person or entity that allegedly waived the immunity must have the authority to waive that immunity. *United States v. USF&G*, 309 U.S. 506, 513 (1940); *MM&A Productions v. Yavapai Apache Nation*, 234 Ariz. 60, 316 P.3d 1248 (Ariz. App. 2014); *Harris v. Lake of the Torches Resort*, 2015 WL 1014778 (Wisc. App. March 10, 2015) (An attorney's attestations in court are insufficient to waive tribal immunity unless the attorney is duly authorized under tribal law to do so).

Maverick seeks sweeping relief that would cripple the Tribe's economy, jeopardize government services, and deprive the Tribe of its compact rights. But Maverick cannot sue the Tribe due to the Tribe's sovereign immunity. The Tribe has not waived its sovereign immunity regarding this litigation. Ex. B, Nelson Declaration at 2, ¶ 5. The Tribe has not consented to this Court's jurisdiction to hear Maverick's claims. *Id.* No Tribal officials, including its attorneys in this litigation, are authorized under Tribal law waive the Tribe's sovereign immunity regarding this litigation. *Id*. To sidestep this bar, Maverick seeks to proceed against *other* parties to indirectly obtain the relief that it cannot obtain directly. Federal Rule 19 forbids this sleight of hand.

    **D.**  **All Four Factors Considered under Rule 19(b) weigh in the Tribe's favor; The Tribe's Interest in Maintaining Sovereign Immunity Leaves Very Little Room in Balancing the Four Factors of Rule 19(b).**

Addressing and balancing the four factors of Rule 19(b) (citing Fed. R. Civ. P. 19(b)). To make this determination, the court balances four factors: (1) the prejudice to any party or to the

16

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER190**

absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. *Dawavendewa*, 276 F.3d at 1161 (9th Cir. 2002)*; Kescoli*, 101 F.3d at 1310, merely reinforces the correctness of dismissal. The first factor, prejudice to the Tribe is overwhelming – Maverick seeks to "void" the Tribe's Compact through which these tribal opportunities directly flow. The second and third factors on the adequacy and form of relief also weigh in favor of dismissal. Any relief in Maverick's favor thrusts the Tribe into uncharted legal waters that threaten to terminate its sovereign rights and to destroy the tribal economy. As discussed in Section II(A)(i) above, Congress afforded Maverick alternative forums to seek redress, but a private party's legal challenge to the legality of a Tribe's gaming facility is not among them. All four factors weigh heavily in favor of dismissal.

A tribe's interest in sovereign immunity so greatly outweighs a plaintiff's interest in litigating its claims that there is "very little room for balancing of other factors" under Rule 19(b) in such cases. *Greyhound Racing*, 305 F.3d at 1025. Virtually all the cases to consider the question have dismissed under Rule 19, regardless of whether an alternative remedy is available, if the absent parties are Indian tribes possessing sovereign immunity. *Dine Citizens*, 932 F.3d at 857; *White*, 765 F.3d at 1028; *Dawavendewa*, 276 F.3d at 1152*; Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir. 1994) ("Plaintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining its sovereign immunity."); *Chehalis*, 928 F.2d at 1499; *Enterprise Management Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) ("[w]hen, as here, a necessary party under Rule 19(a) is immune from suit, there is very little room for balancing of other factors set out in Rule 19(b), because immunity may be viewed as one

17

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

of those interests compelling by themselves"). Federal courts acknowledge that plaintiffs may be left with no adequate remedy upon dismissal for non-joinder, "[b]ut this result is a common consequence of sovereign immunity, and [the Tribe's] interest in maintaining [its] sovereign immunity outweighs the [Appellants'] interest in litigating their claims." *White*, 765 F.3d at 1028; *Greyhound Racing*, 305 F.3d at 1025; *Friends of Amador County*, 554 Fed. Appx. at 566. Thus, although the Rule 19(b) factors still must be considered, the court's "discretion in balancing the equities ... is to a great degree circumscribed, and the scale is already heavily tipped in favor of dismissal." *Id. See also Comenout v. Whitener*, 2015 WL 917631 at *4 (W.D. Wash. 2015); *Northern Arapahoe Tribe v. Harnsberger*, 660 F. Supp. 2d 1264, 1280 (D. Wyo. 2009).

### E. The Federal and State Defendants Are Not Able to Adequately Represent the Tribe's Protectable Interests.

In evaluating whether an existing party adequately represents the interests of an absent party, courts consider "whether the interest of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments; whether the party is capable of and willing to make such arguments; and whether the absent party would offer any necessary element to the proceedings that the present parties would neglect." *Dine Citizens*, 932 F.3d at 852 (quoting *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013)). In evaluating these considerations, it is not enough that the absent party and the existing defendants both currently wish to prevail in the suit. As the Ninth Circuit has explained, an absent party is required (i) where the interests of the existing and intervening defendants "might [later] diverge" or (ii) where, in cases involving absent tribal parties, no existing defendant shares the absent tribe's "sovereign interest in ensuring that [a tribal business] continue[s] to operate and provide profits to the [Tribe]." *Dine Citizens*, 932 F.3d at 855.

18

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER192**

No party can be expected to defend the Tribe's interests in this matter. Maverick is opposed to the Washington Tribes' interests as it seeks to **shut down** all Class III gaming in the State. Nor can the Federal Defendants or the State Defendants be counted upon to represent the Tribe.

The State Defendants cannot represent the Tribe. It is black letter law in this Circuit that the State Defendants cannot represent the Tribe's interests. *American Greyhound Racing, Inc.*, 305 F.3d at 1023, n.5, is the controlling case in the Ninth Circuit on the inability of a state to adequately represent the interest of absent tribes. In *Greyhound Racing*, a commercial racetrack filed a lawsuit against then-Arizona Governor Hull seeking to invalidate the gaming compacts Arizona had reached with several tribes. The Court noted "the State and the tribes have often been adversaries in disputes over gaming, and the State owes no trust duty to the tribes" and noted the "Governor's and the tribes' interests under the compacts are potentially adverse," *Id.* Those circumstances are also present here, hence, the State Defendants are not able to adequately represent the interests of the Tribe.

Moreover, the historical animosity between tribal and state interests stemming from competition over sovereign power prevents the State Defendants from adequately representing the Tribe. *See, e.g.*, *United States v. Kagama*, 118 U.S. 375, 384 (1886) ("These Indian tribes . . . owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies."). That is why, unlike the Tribe's desire to vigorously assert its immunity in this action, the State has frequently sought to *undermine* tribal sovereignty in order to expand its *own* authority. *E.g.*, *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000 (2019); *United States v. Washington*, 853 F.3d 946, 954–64 (9th Cir. 2017), *aff'd by an equally divided Court*, 138 S. Ct. 1832 (2018)

19

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

(per curiam); *Washington v. Confed. Tribes of Colville Indian Reservation*, 447 U.S. 134, 152 (1980); *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 167 (1977); *Spokane Tribe*, 139 F.3d at 1301.

Nor can the Federal Defendants represent the Tribe's interests here. *Dine Citizens* is the controlling case in the Ninth Circuit on when the United States cannot adequately represent the interest of absent tribes. There the Ninth Circuit held that Federal Defendants are unable to adequately represent an absent tribe where their obligations to follow relevant laws are in tension with tribal interests. 932 F.3d. at 855. In *Dine Citizens*, the absent tribal entity of the Navajo Nation intervened in an APA action challenging the federal government's compliance with federal laws requiring review of the potential environmental impacts of federal approval for the operation of a tribal coal mine and a power plant that relied on the coal mine. The Nation sought intervention for the limited purpose of filing a motion to dismiss pursuant to Rule 19. *Id.* at 850. Finding the absent tribal entity to be a required party, the court turned to whether another party could adequately represent the absent tribal entity's interests, and opined that neither the United States nor the tribal entity's business partners could do so. The court reasoned that while federal defendants "have an interest in defending their own analyses," they "do not share an interest in the *outcome* of the approvals—the continued operation of" the tribe's mine and associated powerplant. *Id.* at 855.

*Dine Citizens* also noted that the Navajo Nation's interest in being able to operate a mine and benefit from an associated power plant to support its population was not merely pecuniary but "sovereign" in nature, and the tribal entity's business partners could not adequately represent these sovereign interests. *Id.; see also Jamul Action Comm. v. Simermeyer*, 974 F.3d 984 (9th Cir. 2020)

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER194**

1  (applying *Dine Citizens*); *Pit River*, 30 F.3d at 1101 ("We have held that the United States cannot

2  adequately represent an absent tribe, when it may face competing interests."); *No Casino in*

3  *Plymouth v. National Indian Gaming Comm'n,* 2022 WL 1489498 at *9-10 (E.D. Cal. 2022)

4  (appeal pending); *Backcountry Against Dumps v. United States Bureau of Indian Affairs*, 2021 WL

5  2433942 at *2-3 (S.D. Cal. 2021) (appeal pending). The same is true here. A "[d]eclar[ation] that

6  the Tribe['s] class III gaming activities" are unlawful, FAC ¶ 207(4), would undermine the Tribe's

7  unique sovereign interests by eviscerating the Tribe's "very ability to govern itself, sustain itself

8  financially, and make decisions about its own" gaming operation. *Dine Citizens*, 932 F.3d at 856.

9  Indeed, this case is far clearer than *Dine Citizens*. There, one of the existing defendants

10  "share[d] at least some of [the absent tribal parties'] financial interest in the outcome of the case."

11  *Id.* at 856. Here, by contrast, the federal government has no pecuniary interest in the Tribe's

12  gaming operation. Quite the contrary: If the Court grants Maverick the requested relief, that likely

13  would result in conflict between the Shoalwater Bay Tribe and both the Federal Defendants and

14  the State Defendants over the Tribe's operation of gaming. The history discussed above at Section

15  II(B) suggests a finding the Compact is void could lead to renewed disagreements about the Tribe's

16  right to conduct gaming. For example, the United States may take enforcement action to stop the

17  Tribe's gaming following a court order granting such relief, while the Tribe would resist such an

18  effort. *See United States v. Spokane Tribe*, 139 F.3d 1297 (9th Cir. 1998) (vacating injunction of

19  tribal gaming and remanding for further proceedings in light of Supreme Court holding a portion

20  of IGRA unconstitutional). Applying *Dine Citizens*, the outcome of Maverick's lawsuit, if it were

21

22

23

24

25

26

27

28

21

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

successful, creates potentially competing interests between the Tribe and the United States. Accordingly, the Federal Defendants are not able to adequately represent the interests of the Tribe.[4]

Moreover, no Defendant has moved under Rule 12(b)(7) or 19 for failure to join the Tribe, or otherwise raised the Tribe's sovereign immunity as an issue. No Defendant has indicated in filings in this case, during the April 28, 2022 status conference, or in the scheduling order, that it would make such a motion. And in the process of conferring with the parties in advance of filing this Motion, none of the parties—not the Federal Defendants, not the State Defendants, and certainly not Maverick—stated that they would raise the Rule 19 issue if the Tribe did not. That factor itself demonstrates that their interests diverge from those of the Tribe's. *Friends of Amador County*, 554 Fed. Appx. 562, 564 (9th Cir. 2014).

Further, governmental entities are unable to adequately represent tribal interests where the governmental entity (or other remaining parties) may pursue a settlement or litigation strategy that diverges from the Tribe's. *Friends of Amador County*, 554 Fed. Appx. at 564 ("[t]he government's response to the district court's questions on this issue at a status conference caused the district court to suspect that the government favored judicial resolution of the lawsuit as opposed to early dismissal, and would seek to avoid taking positions contrary to its national Indian policy, even if contrary to the Tribe's interest"). Still further, governmental entities such as Federal and State

---

[4] In a footnote in an earlier decision involving a challenge to IGRA gaming by tribes, *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003), a panel of the Ninth Circuit declined to address whether that case should have been dismissed pursuant to Rule 19 because that issue was not raised by the United States in its pleadings on appeal. In a dictum, *see Knox v. United States*, 759 F. Supp. 2d 1123, 1236 (D. Idaho 2010), the court commented that Interior's interests were not adverse to the gaming tribes in that case because the Department has the primary responsibility in carrying out the United States' trust responsibility to tribes. 353 F.3d at 719 n.10. That dictum is not consistent with the holding in *Diné Citizens* that tribes and federal agency defendants do not share "an interest in the outcome of [federal agency] approvals" of tribal business operations or involving tribal sovereignty interests, 932 F.3d at 855.

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER196**

Defendants have a "broad obligation" to serve many people, which may conflict with the governmental entities' obligations to a tribe. *White*, 765 F.3d at 1027 (finding that a state university could not adequately represent the interests of the absent tribes because the university had a "broad obligation to serve the interests of the people of California, rather than any particular subset," and therefore had different motivations); *Union Pacific Railroad Co.* v. *Runyan*, 320 F.R.D. 245, 252 (D. Ore. 2017) (County government has broad obligations and no trust responsibility to protect absent tribes' treaty rights). Still further, even if the positions of the present parties are aligned with the absent tribe at a given point in time, they may diverge over the course of the litigation, including on appeal. *See, e.g.*, *White* 765 F.3d at 1027. ("At present, their interests are aligned. There is some reason to believe that they will not necessarily remain aligned."). Certainly, the Tribe, the State and the United States appear poised to vigorously defend the compacts at issue, but they all have different and potentially competing interests which may diverge, or which may change over the course of the litigation.

For all of these reasons, this Court cannot conclude that the State Defendants or the Federal Defendants are able to adequately represent the protectable interests of the Tribe.

### F. The Narrow Public Rights Exception Does Not Apply Where the Claims Threaten an Absent Party Tribe's Legal Entitlement and Sovereignty.

The federal courts do recognize a public rights exception to the joinder rules when the lawsuit is narrowly restricted to the protection and enforcement of public rights. *National Licorice Co. v. N.L.R.B.*, 309 U.S. 350, 363 (1940). In order for the public rights exception to apply, (1) "the litigation must transcend the private interests of the litigants and seek to vindicate a public right," and (2) "although the litigation may   adversely affect the absent parties' interests, the

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER197**

litigation must not destroy the legal entitlements of the   absent parties". *White*, 765 F.3d at 1028; *Kescoli*, 101 F.3d at 1311; *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988); *Union Pacific Railroad Co.*, 320 F.R.D. at 256-57. However, the public rights exception is generally precluded where the lawsuit seeks to extinguish a tribe's substantial legal entitlements, it precludes application of the public rights exception. *See Shermoen*, 982 F.2d at 1319 ("Because of the threat to the absent tribes' legal entitlements, and indeed to their sovereignty, posed by the present litigation, application of the public rights exception to the joinder rules would be inappropriate."); *see also Kennedy v. United States Dept. of the Interior*, 282 F.R.D. 588, 599 (E.D. Cal. 2012). The only circumstance of which the Tribe is aware in which the public rights exception arguably prevented dismissal of a claims involving absent tribes has been found necessary and indispensable under Rule 19 is *Makah*, 910 F.2d at 559 n.6. There, the Ninth Circuit affirmed the District Court's dismissal on Rule 19 grounds in most respects, but allowed Makah's claims seeking ***future*** compliance with administrative procedures to be heard on remand. *Id.* Given the broad relief requested in Maverick's FAC, Dkt. 66 at 40, that extremely narrow exception is inapplicable to the circumstances here. *Id*. at 559 ("[T]he scope of the relief available to the Makah on their procedural claims is narrow.").

## IV.    Conclusion

The Shoalwater Bay Tribe and the other Washington Tribes are the real parties in interests in this litigation, none of which have waived their immunity from Maverick's lawsuit. Accordingly, the Tribe respectfully requests this Court to dismiss Maverick's claims in their entirety pursuant to Rule 12(b)(7) and Rule 19.

Respectfully submitted this _____ day of _____, 2022.

24

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

**TribeSER198**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

s/_____

SCOTT CROWELL (WSBA No. 18868)
CROWELL LAW OFFICES-TRIBAL
ADVOCACY GROUP
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
Fax: (509) 290-6953
Email: scottcrowell@hotmail.com

LAEL ECHO-HAWK (WSBA No. 34525)
MThirtySix, PLLC
700 Pennsylvania Avenue SE
The Yard – 2nd Floor
Washington, D.C. 20003
Telephone: (206) 271-0106
Email: Lael@MThirtySixPLLC.com

*Attorneys for Limited Intervenor Shoalwater
Bay Tribe*

25

[Proposed] Motion to Dismiss
Case No.: 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER199

1

**CERTIFICATE OF SERVICE**

2

3        I hereby certify that on August 3, 2022, I filed the foregoing PROPOSED MOTION TO

4    DISMISS with the Clerk of the Court using the CM/ECF system, which will send notification of

5    such filing to the parties of record in this matter.

6    DATED: August 3, 2022

7

8                                                    *s/ Scott Crowell*
                                                     SCOTT CROWELL (WSBA No. 18868)
9                                                    CROWELL LAW OFFICES-TRIBAL
                                                     ADVOCACY GROUP
10                                                   1487 W. State Route 89A, Suite 8
                                                     Sedona, AZ 86336
11                                                   Telephone: (425) 802-5369
                                                     Fax: (509) 290-6953
12                                                   Email: scottcrowell@hotmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[Proposed] Motion to Dismiss                                              Scott D. Crowell
Case No.: 22-cv-05325-DGE                          Crowell Law Offices-Tribal Advocacy Group
                                                              1487 W. State Route 89A, Suite 8
                                                                            Sedona, AZ 86336
                                                                          Tel: (425) 802-5369

**TribeSER200**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MAVERICK GAMING LLC,

Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

Case No.: 22-cv-05325-DGE

**DECLARATION OF CHARLENE NELSON IN SUPPORT OF THE SHOALWATER BAY INDIAN TRIBE MOTION TO DISMISS**

I, CHARLENE NELSON declare:

1.  I am the elected Chairwoman of the Shoalwater Bay Indian Tribe ("Tribe"). I make this Declaration in support of the Tribe's Motion to Dismiss. I have served on the Shoalwater Bay Indian Tribe Tribal Council for sixteen years. I have personal knowledge of the facts stated below and would be competent to testify to them in court.

2.  The Tribe is a federally-recognized tribe located in Tokeland, Washington on the

1

Declaration of Charlene Nelson
Case No. 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER201

Shoalwater Bay Indian Tribe Reservation. The Reservation was created in 1866 by an Executive Order signed by President Andrew Johnson.

3. As Chairwoman of the Tribe, I am the presiding officer over the Tribal Council, and am the highest-ranking officer among the tribal officers. I make this declaration based on my role as a Tribal member and as the highest-elected official of the Tribe.

4. The Constitution of the Tribe Article VI, Section 1(s) delegates sole authority to the Tribal Council to assert sovereign immunity as a defense and to waive the sovereign immunity of the Tribe.

5. The Tribal Council has not waived its sovereign immunity in this matter nor has it consented to this Court's jurisdiction to hear the claims brought by the Plaintiff. The Tribal Council has not authorized any tribal officials or representatives, including the Tribe's legal counsel representing the Tribe in this litigation, to waive the Tribe's immunity or otherwise consent to this Court's jurisdiction.

6. In 2007, the Tribe incorporated Willapa Bay Enterprises ("WBE") to build a stronger economic base. Today, WBE operates the Shoalwater Bay Casino, a restaurant, gas station, a small motel and conference center, oyster company and liquor store.

7. Collectively, the WBE employs 120 employees, thirty percent (30%) of whom are tribal members, tribal spouses or their immediate family, jobs that are critically needed in our rural community

8. The Shoalwater Bay Casino provides a gathering place for the Tribe and members of our local community who do not otherwise have entertainment and relaxation options in our small town.

9. The Tribe and its tribal members are proud of the investment and growth of the WBE in

2

Declaration of Charlene Nelson
Case No. 22-cv-05325-DGE

Scott D. Crowell
Crowell Law Offices-Tribal Advocacy Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Tel: (425) 802-5369

TribeSER202

1    our town.

2    10.    I have reviewed the pleading entitled Tribe's [Proposed] Motion to Dismiss, including that

3          section entitled "Historical Context: Shoalwater Bay Indian Tribe" at pages 4 – 9, and upon

4          information and belief, understand the factual statements therein to be true.

5
6    11.    Attached hereto as Ex. B-1 is a true and correct copy of the following newspaper article:

7          Arthur Santana & Jack Broom, *Shoalwater Tribe, Marshals Face Off—Agents Start to*

8          *Confiscate Slot Machines*, SEATTLE TIMES, Sept. 23, 1998. .

9    12.    Attached hereto as Ex. B-2 is a true and correct copy of the Order Deferring Decision and

10         Staying Proceedings on Reconsideration Motion, August 23, 2001 issued by United States

11         Department of the Interior Office of Hearings and Appeals, Docket No. NIGC 99-2.

12
13   13.    Attached hereto as Ex. B-3 are true and correct copies of "Maverick Gaming Press Releases

14         of June 14, 2019; June 27, 2019; August 19, 2019; and October 1, 2019".

15   14.    Attached hereto as Ex. B-4 is a true and correct copy of SHOALWATER BAY INDIAN TRIBE

16         CONSTITUTION.

17

18         I declare under penalty of perjury that the foregoing is true and correct.

19
            Executed this ___3 rd___ Day of August, 2022.
20

21

22                                    *Charlene Nelson*

23                                    CHARLENE NELSON, Chairwoman
                                      Shoalwater Indian Bay Tribe
24

25

26

27

28

Declaration of Charlene Nelson                           Scott D. Crowell
Case No. 22-cv-05325-DGE           Crowell Law Offices-Tribal Advocacy Group
                                            1487 W. State Route 89A, Suite 8
                                                         Sedona, AZ 86336
                                                    Tel: (425) 802-5369

**TribeSER203**

Exhibit B-1

# Shoalwater Tribe, Marshals Face Off -- Agents Start To Confiscate Slot Machines

Sep 23, 1998

## Arthur Santana, Jack Broom

*Seattle Times Staff Reporters*

Anger, resentment and impromptu roadblocks today greeted federal marshals who began confiscating more than 100 slot machines operated by the Shoalwater Bay Tribe at its small casino in Pacific County.

About 200 tribal members and supporters shouted, chanted and beat on drums as moving-company workers hired by federal authorities wheeled handcarts carrying out the machines that a federal judge had ruled violate state law.

Protesters parked cars and trucks across approaches to the small casino at Tokeland on the north edge of Willapa Bay.

"We're just making it harder for them to load their trucks," said George Shipman, assistant manager of the casino.

One demonstrator pushed his sign toward the face of a marshal as two moving vans approached the casino.

As tensions increased, the tribe's attorney, Scott Crowell, urged demonstrators not to physically confront authorities. "This is not the time to fight, we'll fight another day," he said.

Protesters carried signs with messages such as, "My mom needs this job" and "You are witnesses to the murder of a nation."

Gary DiMartino, chief deputy for the U.S. Marshal's Office, said he had been alerted in advance that a protest was likely and was told that tribal officials had urged their members to keep it nonviolent.

**TribeSER205**

Shoalwater Tr be  Marshals Pass on Agency Starts to Split Stake Slot Machines Hit Seattle Times
Case 3:25-cv-05926-DGE  Document 67-16  Filed 08/08/22  Page 23 of 35
8 2 22 10:27 AM

DiMartino said he was not told the protest would involve a blockade at the casino.

Authorities were hoping to avoid a dangerous confrontation, said DiMartino, adding that marshals would "assess the situation" to see whether to continue with the seizure today.

Some demonstrators hanged an effigy of U.S. Attorney Kate Pflaumer, who won a federal-court order authorizing seizure of the devices, which are not allowed under Washington law.

Earlier today, leaders of the demonstration specifically encouraged protesters not to assault or spit on marshals.

Job loss expected

Shoalwater Bay Tribal Chairman Herb Whitish said loss of the machines would cost the tribe about 60 jobs at the casino, which employs 88 people.

"The federal government is about to walk off with our future," Whitish said. "It feels like our hearts are being pulled out."

The Shoalwaters have been the only tribe in Western Washington to install slot machines, saying they took the action because the state has been unwilling to negotiate a gambling agreement that is satisfactory to the tribe.

Last week, a federal judge in Seattle authorized federal marshals to seize the machines.

U.S. District Judge Barbara Jacobs Rothstein instructed the tribe to allow marshals access to the casino "to seize the machines immediately."

Federal authorities hoped to remove the machines without a confrontation of the kind that occurred in Arizona in 1992.

In that incident at the Fort McDowell Indian Reservation near Scottsdale, protesters blocked a road and prevented federal authorities from leaving the area after gambling machines were seized.

**TribeSER206**

The standoff lasted five hours.

The Shoalwater Bay Tribe, whose reservation is near the mouth of Willapa Bay, is not the only tribe in Washington operating slot machines. The Spokane and Colville tribes operate about 1,800 slot machines at six locations in Eastern Washington.

Those devices are the subject of a separate legal challenge filed by the U.S. Attorney's Office in Spokane.

Most tribal casinos in Western Washington operate under agreements with the state and do not include slots.

Even at some of those casinos, however, officials say some form of gaming machine is necessary to make the establishments profitable. They have installed devices that look and operate as much like slot machines as Washington law will allow.

State voters have twice turned down ballot proposals that would have allowed tribal casinos to feature slot machines.

Action called `extortion'

Among demonstrators outside the Shoalwater casino today was Gary Webb, 46, of South Bend, a casino patron who said he has played the machines. "I believe in the casino and what it's doing for the tribe," Webb said, calling the government's position "extortion."

The tribes' authority to conduct casino-style gambling stems from a 1988 federal law giving tribes the right to operate casinos as a means of employing their members and raising revenue for tribal programs.

But the law requires that states negotiate with tribes on any form of gambling within the states.

At the time the law was passed, Washington allowed charitable groups to hold "casino nights" featuring such games as blackjack and roulette. But slot machines were not allowed.

**TribeSER207**

In Washington, as in other states, tribal gaming operations close to major cities have been profitable, while those in more remote locations have suffered.

A casino operated by the Lummi Tribe near Bellingham closed last year, and several others have sharply cut their staff.

**TribeSER208**

Exhibit B-2



IN REPLY REFER TO:

# United States Department of the Interior

### OFFICE OF HEARINGS AND APPEALS

4015 WILSON BOULEVARD
ARLINGTON, VIRGINIA  22203

August 23, 2001

IN THE MATTER OF                                    :
SHOALWATER BAY INDIAN TRIBE        :        Docket No. NIGC 99-2

Indian Gaming Regulatory Act,              :        Notice of Violation NOV-99-10
25 U.S.C. Secs. 2701-2721                     :        and Order of Closure OC-99-10
                                                                 :

### Order Deferring Decision and Staying Proceedings on Reconsideration Motion

**Factual Background:**  The Shoalwater Bay Indian Tribe (the Tribe), a Federally recognized Indian Tribe which governs the one-square-mile Shoalwater Bay Indian Reservation on the southwestern coast of Washington State, and which has a membership of approximately 155 members, seeks to have the above Notice of Violation (Notice) and Order of Closure (Order) dissolved in their entireties.  The Notice and Order were issued by the Chairman of the National Indian Gaming Commission (NIGC) on August 11, 1999, because the Tribe was admittedly conducting Class III gaming activities in the State without a Tribal-State compact in apparent violation of 25 U.S.C. § 2710(d)(1)(C).

However, the NIGC enforcement action was stayed by a Stipulation of the parties entered into the day before the Notice and Order were issued, intended to enable the Tribe to pursue this appeal.  The Tribe's defense is that it has made extensive efforts to obtain a compact but that Washington State (the State) has adamantly refused to negotiate a compact or even to enter into negotiations that might lead to the establishment of a compact.

On October 7, 1999, the former Presiding Official directed the parties to submit briefs on the issue of whether the circumstances under which the Tribe failed to obtain a compact for Class III games was an issue properly before the Presiding Official and the Commission.  The Chairman's Brief was received on October 25; the Tribe's Brief on November 8; and the Chairman's Reply on November 18.  On June 30, 2000, the Chairman's counsel requested a ruling on the matter so that this appeal could proceed expeditiously.  The appeal was reassigned to the undersigned Presiding Official, who issued an Order dated July 10 denying the materiality of the State's reasons to the enforcement action contemplated by NIGC and seeking to have the appeal go forward (the Order).

<u>Current Status:</u>  On May 17, 2001, however, the Presiding Official received a telephone conference call from the parties to the effect that the Tribe was seeking reconsideration of the Order denying the materiality of the circumstances surrounding the Tribe's failure to obtain a compact, and was requesting oral argument on the issue; whereas, the NIGC, while it fully supported the decision set forth in the Order and was planning to seek Summary Judgment on its basis, had no objection to the reconsideration request.  A briefing schedule was agreed to and was confirmed by a second Order dated the same day.  The briefs and reply briefs were submitted on schedule and the matter is procedurally ripe for the Presiding Official's decision.

<u>Legal Background:</u>  The Tribe has argued extensively and persuasively that the explicit purpose of the Indian Gaming Regulatory Act (the Act) was to benefit Indian Tribes by assuring them full gaming rights on their reservations, rights that had already been judicially recognized in <u>Cabazon Band of Mission Indians v. California</u>, 480 U.S. 202, 107 S. Ct. 1087 (1987).  In support, it cites the Act's stated purpose: "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. §2702(1).  The Tribe notes that this purpose was premised on very specific Congressional findings, including the following:

> (5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming.

25 U.S.C. 2701(5).  In addition, the Tribe notes the view of House Interior Committee Chairman Morris Udall, who stated:

> Mr. Speaker, while this legislation does impose new restrictions on tribes and their members, it is legislation enacted basically for their benefit.  I would expect that the federal courts in any litigation arising out of this legislation [S.B. 555] would apply the Supreme Court's time-honored rule of construction: that any ambiguities in legislation enacted for the benefit of Indians will be construed in their favor.

134 Cong. Rec. at H8153, September 26, 1988.

The Tribe then goes on to clarify the issue that the Order addressed, pointing out that "bad faith" was not the Tribe's principal concern, but rather that "[w]hether or not Washington State negotiated in bad faith, it has undeniably deprived the Shoalwater Bay Tribe of the remedies intended under IGRA."  Reconsideration Motion, p. 7.  The Tribe also urges that "it is irresponsible to move forward with this enforcement action without consideration of Shoalwater Bay Tribe's [having been]

2

deprived of IGRA's remedies," alleging that NIGC has, in fact, previously refrained from enforcement actions in California for precisely the same reasons advocated by the Tribe in this case.  Ibid. at 11.

The whole rationale of the IGRA, according to the Tribe, was to permit state governments to be involved in a process that had previously excluded them under the Cabazon decision; namely, the process of establishing a framework for Class III gaming.  Ibid. at 15-16.  Thus, "[t]he compacting process is the crux of the entire IGRA; if the tribes have no recourse, and otherwise have no remedy against a state that fails to negotiate...the foundation of IGRA will have collapsed.  Without a remedy against state governments, the remaining shell would be nonsensical."  Ibid. at 16-17. Also, the Tribe argues, citing case law, that the tests of an unconstitutional Congressional act include situations where the Congress would not have enacted the provisions within its power independently of those outside its power; where the legislation cannot function independently of the flawed provision; where the legislation, absent the flawed provision, will not operate in a manner consistent with the intent of Congress, or where the statute would not have been enacted in the absence of the flawed provision.  Ibid. at 17.

The effect of the Order, the Tribe asserts, "would be the deprivation of the tribes' ability to engage in Class III gaming if the states simply ignore the tribes' requests. ... Congress intended to avoid such an effect:"

> It is the Committee's intent that the compact requirement for Class III not be used as justification by a state for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.

S. Rep. No. 446, 100th Congress, 2d Sess. at 13; reprinted in 1988 U.S. Code Congr. & Admin. News 3071, 3082.  Ibid. at 19-20.  Yet, "the effect of IGRA without a viable remedy is to eliminate the very tribal sovereignty that IGRA was intended to protect. ... The compact process is the key to the delicate balance desired by Congress:"

> [T]he Committee has attempted to balance the need for sound enforcement for gaming laws and regulations with the strong federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian lands.  The Committee recognizes and affirms the principle that by virtue of their original tribal sovereignty, tribes reserved certain rights when entering into treaties with the United States, and that today, tribal governments retain all rights that were not expressly relinquished.

S. Rep., op. cit., at 5; U.S. Code, op. cit. at 3076.  Ibid. at 21-22.

3

In response to the Tribe's position, the Government replies essentially that (1) the position taken by the Presiding Official in the Order previously issued was correct; (2) the Tribe has a right to obtain a federal court review of the final Commission decision; (3) an alternative to a compact exists under the provisions of 25 CFR part 291, which permits an appeal to the Secretary of the Interior when a State refuses to enter into a compact; (4) the IGRA does not add caveats regarding the reasonableness, vel non, of a state's reasonableness at the bargaining table; it simply, and unequivocally, prohibits the operation of Class III gaming devices until a compact has been adopted.

Discussion:  The issues before us are in many respects simply a rehash of the issues before the 9th Circuit in United States v. The Spokane Tribe of Indians, 139 F. 3d 1297, decided in March 1998.  As the court noted:

> A different section of IGRA makes it a federal crime to violate state gambling law in Indian country unless authorized by a compact.  See 18 U.S.C. § 1166. Only the federal government, not the state, may enforce this provision.

Thus, the court explained:

> The tribal-sate compact is pivotal to the IGRA provisions governing class III gaming.  Without a compact in place, a tribe may not engage in class III gaming.  To guard against the possibility that states might choose not to negotiate, or to negotiate in bad faith, Congress included a complex set of procedures designed to protect tribes from recalcitrant states.

At first blush, it appears that the view previously taken by the Presiding Official and currently by NIGC is correct.  The court goes on to observe, however, that the Seminole decision, supra, "emasculated these procedures by holding that tribes are constitutionally precluded from bringing suit against recalcitrant states that do not consent to being sued," citing Seminole Tribe of Florida v. Florida, 517 U.S. 44 at 72, 116 S. Ct. 1114 at 1131 (1996).  "The Supreme Court did not consider whether the rest of IGRA survives," the court notes.  139 F. 3d at 1299, emphasis added.

The court concluded that it was "highly unlikely" that Congress would have passed the compact requirement without tribes having the right to sue the states to force them to enter into a compact, thus leaving the tribes essentially powerless.  139 F. 3d at 1300.  And that is the real issue here: whether NIGC should be able to pursue alleged Class III violations against an Indian tribe lacking a compact when the tribe is unable to persuade the state to enter into a compact.

The Shoalwater Bay Tribe takes strong issue with NIGC's suggestion that an alternative to a compact exists for the Tribe under 25 CFR Part 291 because, it

4

alleges, that remedy is illusory and unavailable. Apparently the Secretary has testified before Congress that no such procedures would be issued for any tribe unless a Federal court first determines that the rule was lawfully issued, an issue that the States of Florida and Alabama have raised and that other states have threatened to raise. Of the four tribes known to have invoked the procedure, according to the Tribe, none has received relief.

The Tribe therefore urges that:

Given that the Secretary is placing such procedures on hold pending court determinations, the Shoalwater Bay Tribe respectfully suggests that enforcement actions should also be on hold pending court determinations. ... The Shoalwater Bay Tribe avers to the Presiding Official and to the NIGC that it will pursue such procedures if the federal courts rule that such procedures are lawfully issued under IGRA. ... The crux of the arguments presented by the Shoalwater Bay Tribe is that Congress did not intend and would not have countenanced a situation wherein Tribes are deprived of their sovereign and statutory gaming rights by states simply refusing to consent to IGRA's negotiation/mediation process.

There appear to be too many unresolved political, equitable, legal, moral, and factual issues complicating this matter for the Presiding Official to take the path of least resistance and simply affirm the previous Order without reconsideration.

On the other hand, a reconsideration not based on a solid legal framework of knowing whether alternative avenues for relief are actually available to Indian tribes under a crippled statute and/or under a disavowed administrative procedure established by rule also makes little sense. Thus, the Tribe's suggestion of a stay until the legal status of these procedures has been determined seems appropriate and sound.

Decision: Accordingly, the request for reconsideration is hereby stayed until 30 days commencing after (1) Congress amends the Act, (2) a Federal appeals court sustains the administrative procedure under 25 CFR Part 291, (3) the Secretary affirms the availability of the procedure, or (4) the Tribe enters into a compact with the State as contemplated by the IGRA, whichever occurs first. The Presiding Official's May 17 Order is hereby amended to the extent that it is inconsistent with this decision.

Bernard V. Parrette
Presiding Official

5

Exhibit B-3

TribeSER215



LEADERSHIP          LOCATIONS          WASHINGTON

MAVERICK CARES          CAREERS          RELEASES                    🔍

June 14, 2019

# MAVERICK GAMING™ CLOSES PURCHASE OF NEVADA GOLD (NYSE: UWN)

## MAVERICK GAMING™ CLOSES PURCHASE OF NEVADA GOLD (NYSE: UWN)

Seattle, WA – June 14th, 2019 – Maverick Gaming LLC ("Maverick") and Nevada Gold &

TribeSER216

Seattle, WA – June 14th, 2019 – Maverick Gaming LLC ("Maverick") and Nevada Gold & Casinos, Inc. (NYSE: UWN) announce the closing of Maverick's purchase of Nevada Gold.

Maverick Gaming and Nevada Gold & Casinos, Inc. (NYSE: UWN) ("Nevada Gold") announced that on Friday, June 14, 2019, Maverick completed the purchase of Nevada Gold via merger between Nevada Gold and a wholly owned subsidiary of Maverick established for that purpose at a final price of $2.559333 for each share of Nevada Gold common stock.

The purchase includes nine card rooms in Washington, with seven in the Seattle area.

"With this purchase, Maverick begins its journey into Washington. This purchase coupled with the three card rooms we are in the process of purchasing from Great American Gaming will give us twelve card rooms and a significant foothold in this market" said Eric Persson, majority owner of Maverick Gaming. "We intend to close the Great American purchase by the end of June, and in fact are looking forward to announcing several other acquisitions in the very near future."

Each of the card rooms in Washington are eligible for fifteen table games. "This purchase gives Maverick 135 table games in this market, and as important a platform for Maverick to grow in this State," added Tim Merrill, the President of Maverick Washington. "We look forward to raising the bar by building entertainment destinations that table games will be an element of. It's no secret that Maverick has over 1200 hotel rooms, and we look forward to adding more and integrating, hotels, food, entertainment and gaming into the same locals' space," added Mr. Merrill.

"Our cardrooms are neighborhood hangouts, and we look forward to applying our extensive locals experience as we begin to compete in this market," added Mr. Merrill.

"Growing up in Hoquiam Washington, and as a member of the Shoalwater Tribe I couldn't be more excited to be back home," added Mr. Persson.

**TribeSER217**

As a result of the closing, Nevada Gold's common stock will be suspended from the NYSE after the close today and subsequently deregistered under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Following delisting from NYSE, Nevada Gold's common stock will not trade on any exchange. Nevada Gold also intends to suspend its reporting obligations under the Exchange Act, which it will be able to do because, following the merger, Maverick is the sole shareholder of Nevada Gold.

---

## Leave A Comment

Comment...

Name (require    Email (require    Website

☐ Save my name, email, and website in this browser for the next time I comment.

Post Comment

## Related Posts

TribeSER218



LEADERSHIP          LOCATIONS          WASHINGTON

MAVERICK CARES          CAREERS          RELEASES                    

*June 27, 2019*

# MAVERICK GAMING™ CLOSES PURCHASE OF GREAT AMERICAN GAMING

## MAVERICK GAMING™ CLOSES PURCHASE OF GREAT AMERICAN GAMING

TribeSER219

*Acquisition includes three properties in greater Seattle area.*

LAS VEGAS, NV – June 27th, 2019 – Maverick Gaming LLC ("Maverick" or "Maverick Gaming") today announced they purchased all of the shares and assets of Great American Gaming Corporation ("GAG", a US affiliate of Great Canadian Gaming Corporation). The assets include three cardrooms located in Everett, Tukwila and Lakewood. The transaction includes 45 table games, four restaurants, three bars and supporting amenities. The purchase price was $56 million dollars.

"With the closing of this purchase, Maverick's footprint in Washington continues to grow. We now have twelve properties, nearly 180 table games in this important market" said Eric Persson, majority owner of Maverick Gaming.

"In the next month we expect to give details on seven more Washington properties, and we look forward to competing in this robust market" said Tim Merrill, President of Maverick Washington. "With 4.6 million residents, and a strong local economy, we couldn't be more excited to close this transaction."

"As a Washington native, and a member of the Shoalwater Tribe, I couldn't be prouder to be able to come back home. When all of our contemplated Washington transactions close we will provide over 3,000 jobs which have annual compensation above $75,000 and pay over $40 million in annual taxes. This is truly a dream come true" added Mr. Persson.

Maverick intends to fund this GAG transaction primarily with cash on hand and debt financing from HG Vora Capital Management, a private investment firm.

Leave A Comment

**TribeSER220**

MAVERICK GAMING™ ANNOUNCES PURCHASE OF FIVE WASHINGTON AREA CASINOS – Maverick Gaming



LEADERSHIP       LOCATIONS       WASHINGTON

MAVERICK CARES       CAREERS       RELEASES       

———————— August 19, 2019 ————————

# MAVERICK GAMING™ ANNOUNCES PURCHASE OF FIVE WASHINGTON AREA CASINOS

## MAVERICK GAMING™ ANNOUNCES PURCHASE OF FIVE WASHINGTON AREA CASINOS

**TribeSER221**

Case 3:23-cv-05020-DGE-JRC   Document 6-85   Filed 08/03/22   Page 78 of 225

LAS VEGAS, NV – August 19th, 2019 – Maverick Gaming LLC ("Maverick" or "Maverick Gaming") today announced the signing of a definitive purchase agreement for the Macau Casino in Lakewood, the Macau Casino in Tukwilla, the Caribbean Casino in Kirkland and the Caribbean Cardroom in Kirkland, and the Caribbean Casino in Yakima.

"This purchase gives Maverick eighteen card rooms in Washington and nearly 275 table games in that market" said Eric Persson, Owner of Maverick Gaming.

"In the next month we expect to give details on another five Washington properties, and will begin to outline our growth strategy which includes a comprehensive entertainment product inclusive of restaurants, hotel rooms, meeting space and of course table games" said Mr. Persson.

"We are quickly becoming an employer of choice in Washington. With over 3,000 jobs – which have an average salary above $75,000 and great benefits, we have a great team and are looking forward to investing another $100 million into this State over the next few years" said Tim Merrill, President of Maverick Washington.

"Growing up in Hoquiam Washington, and as a member of the Shoalwater Bay Nation, I never dreamed an opportunity like this would one day exist. In my case, it's definitely true that you can come home again" said Mr. Persson.

This transaction is expected to close in the next month, pending Washington State Gambling Commission approval. Terms of the transaction were not disclosed.

Maverick intends to fund this transaction primarily with cash on hand and debt financing from HG Vora Capital Management, a private investment firm.

ABOUT MAVERICK GAMING LLC

Maverick Gaming is majority owned and was founded by gaming industry veterans Eric

TribeSER222

Persson, who previously served as Global SR Vice President of Slots at Las Vegas Sands and Justin Beltram, former Vice President of Slots at Bellagio and Marina Bay Sands. Together they bring over 30 years of gaming experience spanning gaming markets around the world including the Las Vegas Strip (Venetian, Palazzo, Bellagio), Macau (Sands China Limited), Singapore (Marina Bay Sands), and many regional markets in North America. Maverick Gaming currently owns the Wendover Nugget and Red Garter Hotel, the Red Lion Casino, and the Gold Country Casino, and thirteen card rooms in Washington State.

Currently Maverick Gaming owns seventeen casino and card rooms in Nevada and Washington State with approximately 1,500 slot machines, over 225 table games and 1,200 hotel rooms nationwide.

_____            _____

## Leave A Comment

|                                                                                    |
| Comment...                                                                         |
|                                                                                    |
|                                                                                    |
|                                                                                    |

| Name (require | Email (require | Website |

☐ Save my name, email, and website in this browser for the next time I comment.

Post Comment

TribeSER223



LEADERSHIP        LOCATIONS        WASHINGTON

MAVERICK CARES        CAREERS        RELEASES        

October 1, 2019

# MAVERICK GAMING CLOSES ON PURCHASE OF FIVE WASHINGTON STATE CARD ROOMS

## MAVERICK GAMING CLOSES ON PURCHASE OF FIVE WASHINGTON STATE CARD ROOMS

**TribeSER224**

LAS VEGAS, NV – Oct 1st, 2019 – Maverick Gaming LLC ("Maverick" or "Maverick Gaming") today announced they closed on the purchase of five Washington State Card rooms.  The card rooms are as follows: Macau Casino in Lakewood, the Macau Casino in Tukwilla, the Caribbean Casino in Kirkland and the Caribbean Cardroom in Kirkland, and the Caribbean Casino in Yakima.

"This purchase gives Maverick nineteen card rooms in Washington and nearly 290 table games statewide," said Eric Persson, Owner of Maverick Gaming.

"With our growing footprint in Washington, we are very excited to be making this substantial investment in Washington and adding these properties to our portfolio.  Additionally, we are actively looking to construct new projects in Everett, SeaTac and the Tri Cities area.  These projects are likely to include hotel rooms, a nationally known sports bar, 50,000 square feet of convention space and our table game amenities.  Our expansion plans will create even more employment opportunities to Washingtonians" said Eric Persson, owner of Maverick Gaming.

"The purchase of these cardrooms not only increases our footprint, but now Maverick is ontrack to employ over 3,000 Washingtonians – with an average salary above $75,000 per year along with a benefits package that is unparalleled.  I'm proud to say that Maverick is quickly becoming an employer of choice in Washington" said Tim Merrill, President of Maverick Gaming Washington.

"We see our cardroom investment and our future expansion plans as a natural benefit for legal and regulated sports wagering in Washington.  As a member of the Shoalwater Bay Indian Nation, I look forward to working with my tribal brothers and statewide decision makers to bring this amenity that is so strongly desired by Washingtonians" said Mr. Persson.

ABOUT MAVERICK GAMING LLC

**TribeSER225**

Maverick Gaming is majority owned and was founded by gaming industry veterans Eric Persson, who previously served as Global SR Vice President of Slots at Las Vegas Sands and Justin Beltram, former Vice President of Slots at Bellagio and Marina Bay Sands. Together they bring over 30 years of gaming experience spanning gaming markets around the world including the Las Vegas Strip (Venetian, Palazzo, Bellagio), Macau (Sands China Limited), Singapore (Marina Bay Sands), and many regional markets in North America. Maverick Gaming currently owns the Wendover Nugget and Red Garter Hotel, the Red Lion Casino, and the Gold Country Casino, and thirteen card rooms in Washington State.

Currently Maverick Gaming owns Twenty-Three casino and card rooms in Nevada and Washington State with approximately 1,500 slot machines, over 290 table games and 1,200 hotel rooms nationwide.  Maverick Gaming has also Entered into an agreement to purchase three Black Hawk Colorado casinos from CC Gaming which are scheduled to close in November.

---

## Leave A Comment

Comment...

Name (require  Email (require  Website

☐ Save my name, email, and website in this browser for the next time I comment.

Exhibit B-4

**TribeSER227**

# CONSTITUTION
## OF THE
## SHOALWATER BAY INDIAN TRIBE



## SHOALWATER BAY INDIAN RESERVATION
### TOKELAND, WASHINGTON

Approved: MARCH 10, 1971

Ratified: MAY 22, 1971

Amended: 1975 and 1978

Approved: JANUARY 19, 1982

Amended: SEPTEMBER 17, 1993

Amended: APRIL 22, 1998

Amended: AUGUST 6, 2005

Amended: NOVEMBER 16, 2005

# CONSTITUTION
## of the
### Shoalwater Bay Indian Tribe
## of the
### Shoalwater Bay Indian Reservation



## TABLE OF CONTENTS

**ARTICLE/SECTION**                                                     **PAGE**

**PREAMBLE** — 1

**ARTICLE I – SOVEREIGNTY AND JURISDICTION** — 1
Section 1. — 1
Section 2. — 1

**ARTICLE II MEMBERSHIP** — 2
Section 1. Members. — 2
Section 2. Enrollment. — 2
Section 3. Dual Enrollment Prohibited. — 3

**ARTICLE III – THE GENERAL COUNCIL** — 3
Section 1. Membership. — 3
Section 2. Regular Meetings. — 3
Section 3. Meetings By Petition. — 3
Section 4. Quorum. — 3
Section 5. Agenda. — 3
Section 6. Powers of the General Council. — 4

**ARTICLE IV – THE TRIBAL COUNCIL** — 5
Section 1. Composition of the Tribal Council. — 5
Section 2. Regular Meetings. — 5
Section 3. Emergency Meetings. — 5

# TABLE OF CONTENTS continued

**ARTICLE V – ELECTIONS, REMOVALS, RECALL AND**
                **FILLING VACANCIES**     **5**
Section 1.  Tribal Elections.      5
Section 2.  Removal.      7
Section 3.  Recall.      8
Section 4.  Filling of Vacancies.      8

**ARTICLE VI – POWERS OF THE TRIBAL COUNCIL**     **9**
Section 1.  General Powers.      9
Section 2.  Public Hearings.      11

**ARTICLE VII – INITIATIVE AND REFERENDUM**     **11**
Section 1.  Initiative.      11
Section 2.  Referendum.      12
Section 3.      12

**ARTICLE VIII – RATIFICATION OF CONSTITUTION**     **12**

**ARTICLE IX – AMENDMENTS**     **12**

**ARTICLE X – SAVINGS CLAUSE**     **12**

**ARTICLE XI – APPROVAL**     **13**

**ARTICLE XII – CERTIFICATION OF RESULTS OF ELECTIONS**     **13**

## ATTACHMENTS

**TRIBAL COUNCIL RESOLUTION:**     **NO. 09-17-93-68**     **14**
**09/22/1997 CONSTITUTIONAL AMENDMENT VOTING RESULTS**     **15**
**TRIBAL COUNCIL RESOLUTION:**     **NO. 04-22-98-30**     **16**
                                           **NO. 04-22-98-31**     **17**
**08/06/2005 CONSTITUTIONAL AMENDMENT VOTING RESULTS**     **18**
**TRIBAL COUNCIL RESOLUTION:**     **NO. 11-16-05-43**     **19**
**VOTER REGISTRATION FORM**     **20**

# CONSTITUTION
of the
## Shoalwater Bay Indian Tribe
of the
### Shoalwater Bay Indian Reservation



## PREAMBLE

We, the members of the Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation, in order to improve the Tribal Organization established by the Constitution ratified on March 10, 1971, and amended in 1975 and 1978, to secure the rights and powers inherent in our sovereign status and guaranteed to us by the laws of the United States, develop and protect the Shoalwater Bay Indian Reservation, and all other Tribal resources, preserve peace and order in our community, promote the general welfare of our people and our descendants, protect the rights of the Tribe and of its members, and preserve our land base, culture and identity, do hereby establish this Constitution.

## ARTICLE I – SOVEREIGNTY AND JURISDICTION

**Section 1.**    The jurisdiction and governmental power of the Shoalwater Bay Indian Tribe shall extend over the following, to the fullest extent permitted by Federal Law:

(a)    All lands, waters, property, airspace, other resources and any interest therein, within the boundaries of the Shoalwater Bay Indian Reservation as established by the Executive Order of September 22, 1866, or as hereafter constituted, notwithstanding the issuance of any patent or right-of-way;

(b)    All persons, property and activities located or found within the Tribe's jurisdiction;

(c)    All persons exercising or purporting to exercise any rights reserved by the Tribe by treaty or authority granted to the Tribe by Federal Law.

**Section 2.**     Nothing in this Article shall be construed to limit the ability of the Shoalwater Bay Indian Tribe to exercise its jurisdiction to the fullest extent permitted by Federal Law.

# ARTICLE II – MEMBERSHIP

**Section 1.** **Members.** The membership of the Shoalwater Bay Indian Tribe shall consist of:

(a) All persons whose names appear on the Membership Roll of the Tribe to be prepared as of the effective date of this Constitution. The Roll shall be approved by the Secretary of the Interior or his authorized representative;

(b) The following persons who have applied for and established membership in accordance with those procedures and requirements set forth pursuant to Section 2 of this Article:

    (1) All children born to, or legally adopted by, any Tribal member on or before the effective date of this Constitution who are not on the officially approved Membership Roll of the Tribe;

    (2) Any child born to a Tribal member after the effective date of this Constitution, <u>provided however, that a child whose parent has been enrolled under Section 1 (b)(3) shall not be entitled to enrollment under this Constitution after the effective date of this Amendment to this Section. Nothing herein shall prevent each child of these Tribal members from independently applying for membership and establishing membership in accordance with the procedures and requirements of this Constitution if they are entitled to enrollment.</u>

    (3) All other persons of one-quarter (1/4) degree or more Indian blood enrolled into the Tribe by, and at the sole discretion of, the General Council.

    (4) All persons whose names appear on the Official Voters List which was prepared for the purpose of voting in the election in which the residents of the Shoalwater Bay Reservation rejected the provisions of the ***Indian Reorganization Act*** of June 18, 1934 (48 Stat. 984 <u>et. seq.</u>) and their direct descendants; <u>and the brothers and sisters of those persons whose names appear on the official voters list and their direct descendants.</u>

**Section 2.** **Enrollment.** The Tribal Council shall have the power:

(a) To enact ordinances governing enrollment, disenrollment, and maintenance and correction of the Tribal Roll; <u>provided</u>, however, that no ordinance herein shall be effective until approved by the General Council, and that no person shall be enrolled as a member of the Tribe under Section 1 (b)(3) of this Article until the General Council has approved

such enrollment by a majority vote, and _provided_, _further_, that the ordinance setting forth procedures for disenrollment shall be subject to the approval of the Secretary of the Interior or his authorized representative;

(b)     To correct the original or current Tribal Roll at any time by adding the names of persons who should have been included or by deleting the names of persons who have relinquished their Tribal Membership or who were incorrectly included on the Roll; provided, that disenrollment shall be in line with the provisions of the ordinance governing that action, enacted pursuant to Section 2 (a) of this Article.

**Section 3.   Dual Enrollment Prohibited.**    No person who is an enrolled member of another Tribe or band of Indians or Alaskan Natives shall, at the same time, be a member of the Shoalwater Bay Indian Tribe.

# ARTICLE III – THE GENERAL COUNCIL

**Section 1.   Membership.**    All Tribal members shall be members of the General Council.  Members of the General Council who are eighteen (18) years of age or older shall be entitled to vote in all Tribal elections and to participate in all open meetings.

**Section 2.   Regular Meetings.**    The General Council shall meet annually during the month of January and at such other times as may be designated by the Tribal Council or upon petition by members of the General Council.  Notice of all meetings of the General Council—other than recall meetings—shall be provided by the Secretary of the Tribal Council to all members of the General Council who are entitled to vote, at least fourteen (14) days prior to such meeting, and shall be posted at conspicuous places on the Reservation.  Procedures for recall meetings shall be determined by Article V, Section 3.

**Section 3.   Meetings By Petition.**    Upon receipt of a valid petition requesting a meeting of the General Council, signed by at least twenty-five percent (25%) of the eligible voters, the Tribal Secretary shall schedule the meeting to be held not later than twenty (20) days from receipt of such petition, unless otherwise agreed upon by the Tribal Council and the spokesperson for the petitioners.  Notice of the meeting shall be provided by the Tribal Council Secretary to all members of the General Council who are entitled to vote, and shall be posted at conspicuous places on the Reservation.

**Section 4.   Quorum.**    A quorum for conducting business at any General Council meeting shall be twenty-five percent (25%) of the eligible voters.

**Section 5.   Agenda.**    The agenda for each meeting of the General Council shall be posted by the Secretary of the Tribal Council in advance of such meeting.  Members of the General Council may submit to the Secretary, items to be placed

on the agenda.  Items on the agenda shall be considered before issues are raised from the floor.

### Section 6.   Powers of the General Council.

(a)   The General Council shall have the powers enumerated in this subsection, subject to any limitations imposed by Federal Law or provisions of this Constitution.  The Tribal Council, all Tribal officers and agents, and all subordinate Tribal organizations shall be required to obtain the approval of the General Council prior to taking any action with regard to these powers.  Any action taken with regard to these powers without first obtaining the approval of the General Council shall be void.

   (1)   To relinquish any area of Tribal jurisdiction to any government, person, organization, or agency, whether public or private; provided, however, that cooperative law enforcement agreements shall not be considered a relinquishment of Tribal jurisdiction;

   (2)   To deal with questions concerning the termination of all or any part of the Shoalwater Bay Indian Reservation;

   (3)   To enroll persons into membership in the Shoalwater Bay Indian Tribe under Article II, Section 1 (b)(3) and (4) and to approve all ordinances and resolutions adopted by the Tribal Council affecting membership and enrollment in the Tribe as provided in Article II, Section 2 (a);

   (4)   To take final Tribal action concerning the alienation or encumbrance of Tribal real property, waters, natural resources, or interests therein, as outlined in Article VI, Section 1 (p), whether owned by the Shoalwater Bay Indian Tribe or held by the United States in trust for the Tribe;

   (5)   To condemn property or any interests therein which is within the jurisdiction of the Tribe;

   (6)   To delegate such powers to the Tribal Council, Tribal officers, and agents or subordinate Tribal organizations as it deems appropriate.

(b)   All other inherent Tribal powers not expressly delegated by the General Council in this Constitution or in the future to the Tribal Council or to any officer or agency of the Tribe are reserved to the General Council and may be exercised without amendment to this Constitution, subject to the limitations set forth in subsection (a) of this Section.

(c)    In addition to, and furtherance and implementation of, all powers currently held by the General Council or Tribal Council, the General Council shall have the power to exclude any Tribal Member from the Shoalwater Bay Indian Reservation and other Tribal lands, and to enact ordinances and procedures allowing and governing the exclusion of Tribal Members from the Shoalwater Bay Indian Reservation and other Tribal lands, under such terms and conditions as it may deem to be appropriate.

# ARTICLE IV – THE TRIBAL COUNCIL

**Section 1.**    **Composition of the Tribal Council.**    The Shoalwater Bay Tribal Council shall consist of five (5) members duly elected to serve staggered terms of two (2) years each as provided in Article V, Section 1 (g). The Tribal Council shall include a Chairperson, a Vice-Chairperson, a Secretary, a Treasurer, and a Member-at-Large.

**Section 2.**    **Regular Meetings.**    The Tribal Council shall meet at least once a month at a designated regularly scheduled time. The Council may set additional meetings as necessary. Such additional meetings may be called by either the Chairperson or by any three (3) Council members; provided, however, that persons calling such meeting shall post the schedule of those additional meetings. Any meeting additional to the designated regular monthly meeting shall be preceded by actual notice to all persons on the Council. A quorum of the Tribal Council shall be three (3) members.

**Section 3. Emergency Meetings.**    Emergency meetings of the Tribal Council may be called by either the Chairperson or by any three (3) Council members. The persons calling such meetings shall make reasonable efforts to provide notice of the meetings to every Council member and to the Tribal Membership.

# ARTICLE V – ELECTIONS, REMOVAL, RECALL, AND FILLING VACANCIES

**Section 1.**    **Tribal Elections.**

(a)    Voter Qualifications.    Any duly enrolled member of the Tribe who is at least eighteen (18) years of age on the date of the election shall be considered an eligible voter and is entitled to cast a ballot in that Tribal election.

(b)    Qualifications of Candidates.    Any duly enrolled member of the Tribe who is at least twenty-one (21) years of age on the election date shall be eligible to become a candidate for election to membership on the Tribal Council and serve in that capacity if such person meets the following conditions, provided that, no person shall be a candidate for more than one (1) position in any election:

(1)    Has physically resided within Pacific or Grays Harbor Counties of Washington for a period of at least six (6) months immediately preceding the date of the election in which he or she seeks office; <u>provided, however</u>, that any Tribal member shall be eligible to run for the Member-at-Large position if he or she physically resides for a period of six months immediately preceding the election at a location no more than 200 miles from the Reservation as measured by travel by motor vehicle on public highways.

(2)    Has not been convicted of a crime punishable by imprisonment for more than one (1) year, excepting State fishing or hunting convictions, or, within the year immediately preceding the election, of a crime punishable by imprisonment of less than one (1) year;

(3)    Is not employed in a salaried policy-making position with any agency of the State or Federal Government engaged in community service on the Reservation.

(c)    <u>Election Date.</u>   General elections shall be held annually on the second Saturday of January.  In case the date of the regular election shall conflict with a holiday or if circumstances require that the regular election be postponed, the election shall be held within thirty (30) days thereafter.

(d)    <u>Election Board.</u>   There shall be an Election Board appointed by the Tribal Council whose duties shall be to supervise and administer all Tribal elections to insure that they are objectively and fairly conducted. The Election Board shall certify the election of Tribal Council members within five (5) days after the election.  No member of the Election Board shall at the same time be a member of the Tribal Council a candidate for Tribal office.

(e)    <u>Election Ordinance.</u>   The Tribal Council shall enact an Election Ordinance, consistent with this Constitution, setting forth the procedures to be followed in conducting each of the various types of Tribal elections called for in this Constitution.  The ordinance shall include provisions for conducting all Tribal elections by secret ballot, absentee voting, maintenance of a current list of eligible voters, screening of prospective candidates, and settling election disputes.  Further, the ordinance shall spell out the procedures and format to be used whenever it is necessary to submit petitions for any purpose, to the Tribal Council or any office of the Tribe and set forth a procedure for determining the validity of such petitions.

(f)    <u>Inaugurations.</u>   Every person elected to the Tribal Council shall, after certification of the election, assume office when he or she takes an oath or swears to uphold the Constitution and laws of the Shoalwater Bay Indian Tribe.  Those appointed to office shall also take such oath.  Tribal

Council members shall hold office after expiration of their terms of office until their successors are duly elected and take the oath of office.

(g)   First Election.

(1)   Incumbent members of the Tribal Council on the effective date of this Constitution shall continue to serve on the Council until replaced in accordance with this Section.

(2)   Within sixty (60) days following the effective date of this Constitution, or as soon thereafter as is practicable, a special election shall be called to elect a Treasurer and Member-at-Large; provided, however, that if the effective date of this Constitution is within ninety (90) days before the next regularly scheduled election under the preceding Constitution, the Tribal Council shall appoint the two (2) new Council members to serve until the next regular election.  Following the special election or appointment of the two (2) new Council members, the incumbent Secretary-Treasurer shall become the Secretary of the Tribal Council.

(3)   The Council members elected or appointed under subsection (2) of this Section shall, with the three (3) incumbent Council members, serve until the first regular election scheduled under this Constitution.  At the first regular election, a Chairperson, a Treasurer, and a Secretary shall be elected for a two (2) year period and a Vice-Chairperson and a Member-at-Large shall be elected for a one (1) year period.  In January of the year following the first regularly scheduled election provided for under this Constitution, a Vice-Chairperson and a Member-at-Large shall each be elected to serve a period of two (2) years.

**Section 2.   Removal.**   Should any of the following circumstances occur involving a Tribal Council Member, the remaining members of the Tribal Council shall, by Resolution, remove such person from office:

(a)   Failure to continue to satisfy any of the requirements to hold office in Article V, Section 1 (b);

(b)   Absence from three (3) successive meetings without being excused;

(c)   Gross misconduct in office or neglect of duty;

(d)   Becoming physically or mentally incapable of performing his or her duties.

Any Tribal Council member who is the object of a removal resolution shall, before a vote is taken, be provided with reasonable and detailed written notice of the charges against him or her and with a fair opportunity to reply to such charges and present evidence on his or her behalf. A Council member may appeal to the General Council from a decision by the Tribal Council to remove him or her from office under this Section. The decision of the General Council shall be final. A General Council meeting shall be called for appeal of the removal of a Tribal Council member according to the same procedures for a recall meeting.

## Section 3.  Recall.

(a)  Tribal members shall have the power to recall any member of the Tribal Council. The recall process shall be initiated by filing with the Secretary of the Tribal Council, a valid petition asking for such recall, signed by at least twenty-five percent (25%) of the eligible voters, setting forth reasons for the petition. If the Secretary of the Tribal Council is the object of a recall petition, the petition shall be filed with the Vice-Chairperson of the Tribal Council. A copy of the petition shall be provided to the Tribal Council member who is the object of that petition.

(b)  Within forty (40) days after receipt of a valid recall petition, the Secretary of the Tribal Council, or if he or she is the object of a recall petition, the Vice-Chairperson, shall call a General Council meeting to be held within sixty (60) days, unless the annual meeting is scheduled within that period. The Tribal Council member who is being considered for recall shall be provided with written notice of the meeting, and be provided with a fair opportunity to reply to such charges and present evidence on his or her behalf at the General Council meeting. A majority vote by secret ballot shall determine whether such Council member is recalled from office.

(c)  Notice of all recall meetings shall be provided to the eligible voters of the General Council at least thirty (30) days prior to such meeting, and shall be posted at conspicuous places on the Reservation.

(d)  No Tribal Council member, validly elected, shall be subject to recall under this Section during the first six (6) months of his or her term of office.

## Section 4.  Filling of Vacancies.

(a)  In the event that the position of Chairperson becomes vacant, the Vice-Chairperson shall automatically succeed to the Chairpersonship. The Vice-Chairperson shall serve as Chairperson until the next regularly scheduled election for Chairperson.

(b)    If any vacancies, other than that of Chairperson, occur in the membership of the Tribal Council, due to resignation, removal, recall, succession to another office, or death, the remaining Tribal Council members shall appoint someone to fill the position until the next regularly scheduled election for that position; provided, that such appointee shall meet the same qualifications as a candidate for election to that office.

## ARTICLE VI – POWERS OF THE TRIBAL COUNCIL

**Section 1.    General Powers.**    The following powers are hereby delegated by the General Council to the Tribal Council subject to any limitations contained in this Constitution or Federal Law:

(a)    To consult, negotiate, contract, and conclude agreements, on behalf of the Tribe, with Federal, State, local and Tribal governments and officers and agencies thereof, and with public and private persons and organizations;

(b)    To regulate and define the duties and procedures of the Tribal Council, of all Tribal Council members and of subordinate Tribal committees and organizations and otherwise establish policies and procedures for the employment of Tribal governmental personnel;

(c)    To enact ordinances and regulations consistent with this Constitution for the conduct and administration of all Tribal elections, the appointment of the Election Board and the regulation of its duties;

(d)    To impose taxes on all persons, property and activities within the Tribe's jurisdiction;

(e)    To license and regulate the conduct of business activities within the Tribe's jurisdiction;

(f)    To enact ordinances and laws governing the conduct of all persons and defining offenses against the Shoalwater Bay Indian Tribe; maintain order and protect the safety and welfare of all persons within the Shoalwater Bay Tribe's jurisdiction; and pass any ordinances or laws necessary to govern the administration of justice and the enforcement of all laws, ordinances or regulations;

(g)    To establish and maintain a Tribal Court or Courts;

(h)    To set aside and spend for Tribal purposes, any available Tribal funds;

(i)    To regulate the social and domestic relations of persons and provide for the guardianship of minors and incompetent persons within the Tribe's

jurisdiction; and provide services for the health, education and welfare of all persons within the Tribe's jurisdiction;

(j)     To establish any business enterprise as an agency or department of the Tribal government and otherwise engage in any lawful business, program, or project that may further the economic well-being of the Tribe or its members;

(k)     To borrow money from the Federal Government or other source and use such funds for the benefit of the Tribe; and pledge, mortgage or assign Tribal assets or income due or to become due; provided, that any pledge or mortgage of Tribal real property shall be void without the approval of the General Council;

(l)     To prescribe and enforce the conditions upon which non-Tribal members may enter and remain on the Reservation, and establish procedures for the exclusion of non-Tribal members from the Reservation and for the extradition from areas within the jurisdiction of the Tribe of persons accused of crimes in other jurisdictions;

(m)     To employ legal counsel on behalf of the Tribe or on behalf of the Tribal members, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior, or his authorized representative, so long as such approval is required by Federal Law;

(n)     To regulate the inheritance of property within the jurisdiction of the Tribe and provide for escheat to the Tribe of property which is within the Tribal jurisdiction belonging to persons who die intestate and without ascertainable heirs;

(o)     To develop, manage, protect and regulate the use of water, fish, animals, wildlife, minerals, timber and all other natural resources within the Tribe's jurisdiction;

(p)     To deal with questions concerning the encumbrance, lease, use, management, assignment, zoning, exchange, mortgage, purchase, acquisition, sale, placement in trust and disposal of land and other assets owned by the Tribe or held in trust for the Tribe; and regulate land use and development in areas within the Tribe's jurisdiction provided, however, that any alienation, encumbrance, lease, assignments, sale, mortgage or pledge of Tribal real property shall be void unless approved by the General Council;

(q)     To approve or veto any sale, disposition, lease, or encumbrance of Tribal land or assets which may be proposed or executed by the Secretary of the Interior or other agency or official of the Federal Government; provided, that any approval shall be void unless approved by the General Council;

(r)    To condemn for public purposes, real property or interests in real property within the jurisdiction of the Shoalwater Bay Indian Tribe; <u>provided</u>, <u>however</u>, that owners of property proposed to be condemned shall be provided with a fair hearing and, if the property is condemned, shall be paid the fair market value of their land and all improvements on it; <u>provided</u>, <u>further</u>, that no condemnation shall be valid unless approved by the General Council;

(s)    To assert as a defense to lawsuits against the Tribe and to waive by express written agreement the sovereign immunity of the Shoalwater Bay Tribe;

(t)    To charter and regulate corporations, cooperatives, associations, special districts, educational, and charitable institutions, political subdivisions and other entities;

(u)    To delegate to subordinate Tribal boards, groups and committees, or qualified individuals, any of the foregoing powers, unless otherwise limited by this Constitution; <u>provided</u>, <u>that</u> subordinate entities or individuals shall be under the supervision of, and accountable to, the Tribal Council;

(v)    To exercise any power or duty which may now or in the future be delegated to it by the Federal or State governments;

(w)    To enact ordinances governing persons, property, lands, water, air space and resources within the Tribe's jurisdiction to the extent necessary to implement and protect those rights and powers reserved by the Tribe by treaty and the authority granted to the Tribe by the Constitution and laws of the United States;

(x)    To take any and all actions necessary and proper for the exercise of the foregoing powers and duties and all other powers and duties hereafter delegated to or vested in the Tribal Council.

**Section 2.** **Public Hearings.** Before enacting any ordinance or resolution that will apply generally to private persons or property, the Tribal Council shall hold a hearing at which interested adult members of the General Council shall have the opportunity to comment on the proposed legislation.

## ARTICLE VII – INITIATIVE AND REFERENDUM

**Section 1.** **Initiative.** The eligible voters shall have the right to propose legislation and vote by secret ballot to determine whether it will be adopted or rejected. Upon receipt of a valid petition signed by at least twenty-five percent (25%) of the eligible voters, the Secretary of the Tribal Council shall call an election

to be conducted pursuant to the Tribal Election Ordinance no later than thirty (30) days after receipt of the petition.  An affirmative vote by at least a majority of the eligible voters shall be required to determine such issues and/or questions contained in the petition.

**Section 2.    Referendum.**    The Tribal Council, by an affirmative vote of at least three (3) of its members, shall call an election, to be conducted pursuant to the Tribal Election Ordinance within thirty (30) days of such Tribal Council decision, for the purpose of deciding by secret ballot issues or questions that are either within the authority of the General Council or those powers vested in the Tribal Council. An affirmative vote by at least a majority of the eligible voters shall be required to determine the issues or questions submitted to the voters.

**Section 3.**    The decisions of the voters in both initiative and referendum elections shall be binding on the Tribal Council and the Tribe and shall remain in force until amended or rescinded by subsequent action of the voters, or expire by its own terms.

# ARTICLE VIII – RATIFICATION OF CONSTITUTION

This Constitution shall take effect after it has been approved by the Secretary of the Interior, or his authorized representative, and it has been duly ratified by a majority of the qualified voters in an election authorized by the Secretary of the Interior in which at least thirty percent (30%) of those entitled to vote, cast ballots.

# ARTICLE IX – AMENDMENTS

Proposals to amend this Constitution may be initiated by the Tribal Council or by a valid petition signed by at least twenty-five percent (25%), or a minimum of ten (10), of the eligible voters, whichever is greater.  Upon determination that the petition is valid, or by its own initiative, the Tribal Council shall provide all eligible voters with a complete text of the proposed amendment(s) at least thirty (30) days prior to the General Council meeting at which an election shall be conducted on the proposed amendment(s).  The Election Board shall supervise and administer the election in accordance with the Tribal Election Ordinance.  Adoption of an amendment shall require a majority vote of the eligible voters who cast ballots in the election; provided that at least thirty percent (30%) of the eligible voters of the Tribe, cast ballots.

# ARTICLE X – SAVINGS CLAUSE

The Constitution of the Shoalwater Bay Indian Tribal Organization of the Shoalwater Bay Indian Reservation approved on March 10, 1971, and ratified on May 22, 1971, as amended in 1975 and 1978, is hereby superseded by this Constitution.

All ordinances and resolutions heretofore enacted by the Tribe shall remain in effect to the extent that they are consistent with this Constitution.

# ARTICLE XI – APPROVAL

ARTICLE XI – APPROVAL

Acting

I, _____, Deputy Assistant Secretary – Indian Affairs (Operations), by virtue of the authority granted to me by 209 DM 8.3, and in line with Article X of the 1971 tribal Constitution, do hereby approve this Constitution which shall not become effective until it is duly ratified pursuant to Article VIII of this Constitution; provided, that nothing in this approval shall be construed as authorizing any action under this document that would be contrary to Federal Law.

Acting     Deputy Assistant Secretary – Indian Affairs (Operations)

Washington, D.C.

Date: 1/19/82

# ARTICLE XII – CERTIFICATION OF RESULTS OF ELECTIONS

Following the _____, 20___, approval of the proposed governing document by the Deputy Assistant Secretary – Indian Affairs (Operations), this Constitution was submitted to the qualified voters of the Tribe on _____, 20___, and was duly ratified by a vote of _____ for, and _____ against, in an election in which at least thirty percent (30%) of the _____ entitled to vote cast their ballots, in accordance with the ratification provisions of this Constitution.

_____
Chairperson, Election Board

_____
Election Board Member

_____
Election Board Member

Date: _____



# SHOALWATER BAY INDIAN TRIBE

P.O. Box 130 • Tokeland, Washington 98590
Telephone (206) 267-6766 • FAX (206) 267-6778

SHOALWATER BAY INDIAN TRIBE
RESOLUTION#09-17-93-68

WHEREAS, The Shoalwater Bay Indian Tribe is a Federally Recognized Tribe headquartered on the Shoalwater Bay Indian Reservation in the State of Washington; and

WHEREAS, The Shoalwater Bay Tribal Council is the governing body of the Shoalwater Bay Indian Tribe in accordance with their Constitution;and

WHEREAS, At least 25% of the Shoalwater Bay Voting Membership initiated by petition their desire to amend the Constitution of the Shoalwater Bay Indian Tribe; and

WHEREAS, The Shoalwater Bay Tribal Council provided a complete text of the proposed amendment and the Shoalwater Bay Election Board conducted an Election in accordance to the Tribal Election Ordinance in which at least 30% of the Shoalwater Bay Voting Membership participated; and

WHEREAS, The Shoalwater Bay Election Board certified that the majority of the Shoalwater Bay Voting Membership approved by ballot measure to amend the Constitution; now

THEREFORE BE IT RESOLVED, That the Shoalwater Bay General Council and Tribal Council are hereby Amending the Constitution of the Shoalwater Bay Indian Tribe by addition to the end of Article V, Section 1 (b)(1): PROVIDED, HOWEVER, THAT ANY TRIBAL MEMBER SHALL BE ELIGIBLE TO RUN FOR THE MEMBER-AT-LARGE POSITION IF HE OR SHE PHYSICALLY RESIDES FOR A PERIOD OF SIX MONTHS IMMEDIATELY PRECEDING THE ELECTION AT A LOCATION NO MORE THAN 200 MILES FROM THE RESERVATION AS MEASURED BY TRAVEL BY MOTOR VEHICLE ON PUBLIC HIGHWAYS.

C E R T I F I C A T I O N

The above Resolution was passed at a Regular Tribal Council Meeting in which a quorum was present on September 17, 1993. _4_ FOR _0_ AGAINST AND _0_ ABSTENTION.

_Herbert Mark Whitish_
Herbert Mark Whitish, Chairman
Shoalwater Bay Tribal Council

_Lynn Clark_
Lynn Clark, Secretary
Shoalwater Bay Tribal Council



SHOALWATER BAY INDIAN TRIBE
P.O. Box 130 • Tokeland, Washington 98590
Telephone (360) 267-6766 • FAX (360) 267-6778

September 22, 1997

TO: The Shoalwater Bay Tribal Council

FROM: the Shoalwater Bay Election Board

RE: The Results of the Enrollment Ballot Voting

The Results of the Enrollment Ballot Voting are as follows:

| | | |
|---|---|---|
| Amendment #1 | 8 yes & 16 no | |
| Amendment # 2 | 6 yes & 13 no | |
| Amendment # 3 | 19 yes & 6 no | ★ |
| Amendment #4 | 29 yes & 2 no | ★ |
| Amendment #5 | 12 yes & 11 no | |

There are 101 voting members of the Tribe.
31 members of the Tribe voted on this issue.

Present to count ballots were: Election Board Chairman Lorraine Anderson, Vice-Chairman Richard Anderson, & Secretary, Rose Shipman

We Started at 4:45 and finished at 5:55

Thank You

Rose Shipman, Secretary

# SHOALWATER BAY INDIAN TRIBE

P.O. Box 130 • Tokeland, Washington 98590
Telephone (360) 267-6766 • FAX (360) 26?-6?78

## SHOALWATER BAY INDIAN TRIBE
### RESOLUTION #04-22-98-30

WHEREAS, The Shoalwater Bay Indian Tribe is a Federally Recognized Tribe headquartered on the Shoalwater Bay Indian Reservation in the State of Washington; and

WHEREAS, The Shoalwater Bay Tribal Council is the governing body of the Shoalwater Bay Indian Tribe in accordance with the Tribal Constitution and By-Laws; and

WHEREAS, The Shoalwater Bay General Council voted by ballot in accordance to their Tribal Election Ordinance with at least 30% of the eligible voters casting ballots voting their approval to Amend the Shoalwater Bay Tribal Constitution; now

THEREFORE BE IT RESOLVED, That the Shoalwater Bay Tribal Council does hereby approve these Amendment(s) to the Constitution of the Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation for the Shoalwater Bay General Council direction to:

Article II, Sec. 1 (b.) (2) Now Reads: (2.) Any child born to a tribal member after the effective date of this Constitution, provided however, that a child whose parent has been enrolled under Section 1 (b) (3) shall not be entitled to enrollment under this Constitution after the effective date of this amendment to this section. Nothing herein shall prevent each child of these Tribal members from independently applying for membership and establishing membership in accordance with the procedures and requirements of this Constitution if they are entitled to enrollment.

And: Article II, Sec. 1 (b.) (4) Now Reads: (4.) All persons whose names appear on the official voters list which was prepared for the purpose of voting in the election in which the residents of the Shoalwater Bay Indian Reservation rejected the provisions of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984 et. Seq.) and their direct descendants; and the brothers and sisters of those persons whose names appear on the official voters list and their direct descendants.

## CERTIFICATION

This Resolution was passed at a Regular Meeting of the Shoalwater Bay Tribal Council at which a quorum was present on April 22, 1998 by vote of 5 FOR ☒ AGAINST ☐ ABSTAINING

_____
Herbert Mark Whitish, Chairman
Shoalwater Bay Tribal Council

_____
Lynn Clark, Secretary
Shoalwater Bay Tribal Council



# SHOALWATER BAY INDIAN TRIBE

P.O. Box 130 • Tokeland, Washington 98590
Telephone (360) 267-6766 • FAX (360) 267-6778

### SHOALWATER BAY INDIAN TRIBE
### RESOLUTION #04-22-98-31

WHEREAS, The Shoalwater Bay Indian Tribe is a Federally Recognized Tribe headquartered on the Shoalwater Bay Indian Reservation in the State of Washington; and

WHEREAS, The Shoalwater Bay Tribal Council is the governing body of the Shoalwater Bay Indian Tribe in accordance with the Tribal Constitution and By-Laws; and

WHEREAS, The Shoalwater Bay General Council voted by ballot to Amend the Shoalwater Bay Tribal Constitution regarding membership; now

THEREFORE BE IT RESOLVED, That the necessary membership amendments be reflected in the Tribal ENROLLMENT Ordinance and shall read: 15.2.010 ELIGIBILITY FOR ENROLLMENT. b) (2.) Any child born to a tribal member after the effective date of this Constitution, provided however, that a child whose parent has been enrolled under Section 1 (b) (3) shall not be entitled to enrollment under this Constitution after the effective date of this amendment to this section. Nothing herein shall prevent each child of these Tribal members from independently applying for membership and establishing membership in accordance with the procedures and requirements of this Constitution if they are entitled to enrollment.

15.2.010 ELIGIBILITY FOR ENROLLMENT. (b.) (4.) All persons whose names appear on the official voters list which was prepared for the purpose of voting in the election in which the residents of the Shoalwater Bay Indian Reservation rejected the provisions of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984 et. Seq.) and their direct descendants; and the brothers and sisters of those persons whose names appear on the official voters list and their direct descendants.

### CERTIFICATION

This Resolution was passed at a Regular Meeting of the Shoalwater Bay Tribal Council at which a quorum was present on April 22, 1998 by vote of: 5 FOR ○ AGAINST ○ ABSTAINING.

Herbert Mark Whitish, Chairman
Shoalwater Bay Tribal Council

Lynn Clark, Secretary
Shoalwater Bay Tribal Council



# SHOALWATER BAY INDIAN TRIBE

P.O. Box 130 • Tokeland, Washington 98590
Telephone (360) 267-6766 • FAX (360) 267-6778

DATE:      August 26, 2005

TO:        All Tribal Members

FROM:      Election Board

SUBJECT:   Constitutional Amendment of August 6, 2005 Election Results

The results for the August 6, 2005 Election pertaining to the Amendment to Article III, Section 6 of the Constitution to add a new subsection 6(c):

> *In addition to, and furtherance and implementation of, all powers currently held by the General Council or Tribal Council, the General Council shall have the power to exclude any Tribal member from the Shoalwater Bay Indian Reservation and other Tribal lands, and to enact ordinances and procedures allowing and governing the exclusion of tribal members from the Shoalwater Bay Indian Reservation and other tribal lands, under such terms and conditions as it may deem to be appropriate.*

A total of 81 ballots (50% of eligible voters) were received and counted on August 26, 2005. The results are as follows:

## I DO APPROVE <u>48</u>

## I DO NOT APPROVE <u>33</u>

Respectfully,

Carolyn Moore, Election Board Chairperson          Leatta Anderson, Election Board Vice-Chairperson

Lisa Shipman, Election Board Member



# SHOALWATER BAY INDIAN TRIBE

P.O. Box 130 • Tokeland, Washington 98590
Telephone (360) 267-6766 • FAX (360) 267-6778

## SHOALWATER BAY INDIAN TRIBE
### RESOLUTION 11-16-05-43

WHEREAS, The Shoalwater Bay Indian Tribe is a Federally Recognized Tribe headquartered on the Shoalwater Bay Indian Reservation in the State of Washington; and

WHEREAS, The Shoalwater Bay Tribal Council is the governing body of the Shoalwater Bay Indian Tribe in accordance to their Constitution and By-Laws; and

WHEREAS, At least 25% of the Shoalwater Bay Voting Membership initiated by petition their desire to amend the Constitution of the Shoalwater Bay Indian Tribe; and

WHEREAS, The Shoalwater Bay Tribal Council provided a complete text of the proposed amendment and the Shoalwater Bay Election Board conducted an Election in accordance to the Tribal Election Ordinance in which at least 30% of the Shoalwater Bay Voting Membership participated; and

WHEREAS, The Shoalwater Bay Election Board certified that the majority of the Shoalwater Bay Voting Membership approved by ballot measure to amend the Constitution; now

THEREBY BE IT RESOLVED That the Shoalwater Bay General Council and Tribal Council are hereby amending the Constitution of the Shoalwater Bay Indian Tribe pertaining to the Amendment to Article III, Section 6 of the Constitution to add a new subsection 6 (c):

> In addition to, and furtherance and implementation of, all powers currently held by the General Council or Tribal Council, the General Council shall have the power to exclude any Tribal member from the Shoalwater Bay Indian Reservation and other Tribal lands, and to enact ordinances and procedures allowing and governing the exclusion of tribal members from the Shoalwater Bay Indian Reservation and other tribal lands, under such terms and conditions as it may deem to be appropriate.

### CERTIFICATION

This Resolution was passed at a Special Meeting of the Shoalwater Bay Tribal Council on November 16, 2005 at which a quorum was present 5 FOR 0 AGAINST 0 ABSTAIN.

_Charlene Nelson_
Charlene Nelson, Chairperson
Shoalwater Bay Tribal Council

_Lynn Clark_
Lynn Clark, Secretary
Shoalwater Bay Tribal Council

Form BIA – 8302
6-81

OMB Clearance No. 1076-003
Expires June 30, 1983

United States Department of the Interior
Bureau of Indian Affairs

**VOTER REGISTRATION FORM**

Name: _____

Address: _____

_____

I, _____, hereby certify that I am a member of the
              (Print Name)

_____ Tribe and that I am at least 18 years of age or will be
    (Name of Tribe)

at least 18 years of age on the date of the election: _____, or will be such age
                    (Election Date)

within 150 days (180 days for Alaska Tribes) from the date the election is authorized

_____.
  (Authorization Date)

_____    _____
(Signature)              (Date)

Completion of and return of this Registration Form is necessary is you desire to become qualified to vote in the forthcoming **Constitution or Charter Election** as required by **Title 25, Code of Federal Regulations, Part 52.11.**

This form, upon completion and return to the election board, shall be the basis for determining whether you qualify to have your name placed upon the list of registered voters and to receive a ballot.

Completion and return of this form is voluntary.

1                            THE HONORABLE DAVID G. ESTUDILLO

2

3

4

5

6

7                       UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
8                              AT TACOMA

9

10  MAVERICK GAMING LLC,              No. 22-cv-05325 DGE

11             Plaintiff,           **FIRST AMENDED COMPLAINT**

12      v.

13  UNITED STATES OF AMERICA, et al.,

14            Defendants.

15

16       Plaintiff Maverick Gaming LLC, alleges as follows:

17                      **PRELIMINARY STATEMENT**

18       1.     Maverick Gaming LLC ("Maverick") owns and operates 18 cardrooms in the State

19  of Washington.  Maverick also owns casinos in Colorado and Nevada, which offer a wide variety

20  of games, including roulette, craps, sports betting, and dealer-assisted electronic table games.

21  Maverick seeks to expand its gaming offerings in Washington to include additional games such as

22  roulette, craps, sports betting, and dealer-assisted electronic table games, but it is unable to do so

23  because Washington allows only Indian tribes to offer these forms of gaming within the State.

24       2.     Purporting to act pursuant to the Indian Gaming Regulatory Act ("IGRA" or "the

25  Act")—a federal statute regulating gaming on Indian lands—Washington entered into compacts

26

<div align="center">1</div>

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

(the "Compacts") with 29 Indian tribes (the "Tribes").  The Compacts grant the Tribes the exclusive right to offer most forms of casino-style gaming (known as "class III" gaming under IGRA).  In 2020, Washington passed a new law giving federally recognized Indian tribes the exclusive right to offer sports betting, which had previously been omitted from the list of class III games that Indian tribes could offer.  Washington has since amended its compacts with 18 Indian tribes (the "Compact Amendments") to permit them to offer sports betting at tribal casinos.

3.      At the same time, Washington's criminal laws prohibit any non-tribal entities, such as Maverick, from offering most forms of class III gaming in Washington, including roulette, craps, and sports betting.  The U.S. Secretary of the Interior approved this discriminatory tribal gaming monopoly by allowing the Compacts and recent Compact Amendments to go into effect.

4.      With a monopoly over most forms of casino-style gaming, the Tribes have established expansive casino operations in Washington.  This class III gaming monopoly has been extremely profitable for the Tribes.  In 2017, even before they were permitted to offer sports betting, the Tribes' net receipts from class III gaming totaled approximately $2.56 billion.  But the monopoly prevents non-tribal entities from competing on an equal footing with the Tribes.

5.      Washington's tribal monopoly is inconsistent with IGRA and federal criminal statutes, which prohibit class III gaming activity by tribal casinos on Indian lands unless a State permits the same activity by non-tribal entities.  The tribal monopoly also violates the Constitution's guarantee of equal protection of the laws by irrationally and impermissibly discriminating on the basis of race and ancestry.  Neither a State nor the federal government may give Indian tribes the exclusive right to engage in commercial activities that have no relation to uniquely tribal interests.  And IGRA itself violates the Tenth Amendment by mandating that States enter into negotiations with Indian tribes over class III gaming compacts.

2

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER252**

6.     Maverick brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706; IGRA; 42 U.S.C. § 1983; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and the United States Constitution to challenge the validity of Washington's tribal gaming monopoly and the Compacts and Compact Amendments that purport to authorize it.  For the reasons stated herein, and as set forth in greater detail below, Maverick prays that this Court: (1) declare that the Compacts and Compact Amendments violate federal law, and are therefore void; (2) vacate and set aside the Secretary of the Interior's approvals of the Compacts and Compact Amendments; (3) enjoin the state Defendants from continuing to administer the Compacts and Compact Amendments; (4) declare that the enforcement of Washington's criminal gaming laws against Maverick violates the Constitution's guarantee of equal protection, and enjoin the same; (5) enjoin the execution of new compacts granting tribal class III gaming monopolies; and (6) award nominal damages.

## PARTIES

7.     Plaintiff Maverick Gaming LLC, is a Washington limited liability company with a residence at 12530 NE 114th Street, Kirkland, WA 98034.  Maverick owns and operates 18 cardrooms in Washington and owns several hotel/casinos in Nevada and Colorado.  Maverick's casinos in Nevada and Colorado offer a variety of games, including roulette, craps, sports betting, and dealer-assisted electronic table games.  Maverick seeks to expand its gaming offerings in Washington to include the same forms of gaming that its casinos have successfully provided in Nevada and Colorado, but it is unable to proceed because of Washington's criminal prohibitions of most forms of class III gaming.

8.     Defendant the United States of America is sued as a party to a claim seeking declaratory and injunctive decrees against federal officers.  *See* 5 U.S.C. § 702.  The U.S.

3

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Attorney's Office for the Western District of Washington is located at 555 700 Stewart Street, Suite 5220, Seattle WA 98101.

9.      Defendant the U.S. Department of the Interior is an executive department of the United States.  The U.S. Department of the Interior is headquartered at 1849 C Street, NW, Washington, DC 20240.

10.     Defendant Deb Haaland is the U.S. Secretary of the Interior and the official charged with approving tribal-state class III gaming compacts under IGRA.  25 U.S.C. § 2710(d)(3)(B), (8)(A)–(D).  Secretary Haaland maintains an office at 1849 C Street, NW, Washington, DC 20240. Maverick is suing the Secretary in her official capacity.

11.     Defendant Bryan Newland is the U.S. Assistant Secretary – Indian Affairs.  The Assistant Secretary has been delegated the Secretary of the Interior's authority under IGRA to approve tribal-state class III gaming compacts.  Assistant Secretary Newland maintains an office at 1849 C Street, NW, Washington, DC 20240.  Maverick is suing the Assistant Secretary in his official capacity.

12.     For ease of reference, Maverick refers to the Secretary of the Interior and the Assistant Secretary – Indian Affairs collectively as "the Secretary of the Interior" or "the Secretary."

13.     Defendant Jay Inslee is the Governor of Washington.  The Governor is authorized by state statute to review and execute tribal-state class III gaming compacts on behalf of the State once approved by the Washington State Gambling Commission.  Wash. Rev. Code § 9.46.360(6). The Governor of Washington executed each of the tribal-state class III gaming Compacts and Compact Amendments at issue in this case.  The Governor is also authorized by statute to request that Washington's Attorney General initiate criminal investigations and proceedings.  *Id.*

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

§ 43.10.090.  Governor Inslee maintains an official address at Office of the Governor, P.O. Box 40002, Olympia, WA 98504.  Maverick is suing the Governor in his official capacity.

14.     Defendant Robert Ferguson is the Attorney General of Washington.  The Attorney General is authorized by state statute to investigate, direct the prosecution of, and prosecute violations of state criminal laws.  Wash. Rev. Code § 43.10.090.  The Attorney General's office is located in Olympia, Washington.  Attorney General Ferguson maintains an official address at 1125 Washington Street, SE, P.O. Box 40100, Olympia, WA 98504.  Maverick is suing the Attorney General in his official capacity.

15.     Defendant Alicia Levy is the Chair of the Washington State Gambling Commission (the "Commission").  The Commission is charged by state statute with implementing Washington's gaming policies.  Among other things, the Commission: (1) makes licensing decisions under Washington's gaming laws; (2) serves as a law-enforcement agency for the enforcement of Washington's gaming laws; (3) appoints a director charged with negotiating tribal-state gaming compacts and transmitting such compacts to the Commission; (4) reviews tribal-state compacts and votes on whether to return a compact to the director for further negotiation or to forward it to the Governor; and (5) is empowered to enforce the provisions of any tribal-state compact.  Wash. Rev. Code §§ 9.46.070, 9.46.075, 9.46.080, 9.46.140, 9.46.210, 9.46.360.  The Commission is headquartered in Lacey, Washington.  Chair Levy maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Ms. Levy in her official capacity.

16.     Defendant Julia Patterson is the Vice-Chair of the Washington State Gambling Commission.  Vice-Chair Patterson maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Ms. Patterson in her official capacity.

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

TribeSER255

17.     Defendant Bud Sizemore is a Commissioner of the Washington State Gambling Commission.  Commissioner Sizemore maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Mr. Sizemore in his official capacity.

18.     Defendant Kristine Reeves is a Commissioner of the Washington State Gambling Commission.  Commissioner Reeves maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Ms. Reeves in her official capacity.

19.     Defendant Sarah Lawson is a Commissioner of the Washington State Gambling Commission.  Commissioner Lawson maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Ms. Lawson in her official capacity.

20.     Defendant Steve Conway is an ex officio member of the Washington State Gambling Commission.  The ex officio members of the Commission are "deemed voting members of the gambling commission for the sole purpose of voting on proposed [tribal-state] compacts." Wash. Rev. Code § 9.46.360(4), (6).  Mr. Conway maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Mr. Conway in his official capacity.

21.     Defendant Jeff Holy is an ex officio member of the Washington State Gambling Commission.  Mr. Holy maintains an official address at P.O. Box 42400, Olympia, WA 98504. Maverick is suing Mr. Holy in his official capacity.

22.     Defendant Shelley Kloba is an ex officio member of the Washington State Gambling Commission.  Ms. Kloba maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Ms. Kloba in her official capacity.

23.     Defendant Brandon Vick is an ex officio member of the Washington State Gambling Commission.  Mr. Vick maintains an official address at P.O. Box 42400, Olympia, WA 98504.  Maverick is suing Mr. Vick in his official capacity.

6

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

TribeSER256

24. Defendant Tina Griffin is the Director of the Washington State Gambling Commission. The Director is appointed by the Commission and is tasked with carrying out the powers and duties of the Commission, issuing rules and regulations adopted by the Commission, supervising Commission employees, negotiating tribal-state gaming compacts, and transmitting proposed compacts to the Commission for a vote. Wash. Rev. Code §§ 9.46.080, 9.46.360. Ms. Griffin maintains an official address at P.O. Box 42400, Olympia, WA 98504. Maverick is suing Ms. Griffin in her official capacity.

## JURISDICTION AND VENUE

25. This action arises under the APA, IGRA, 42 U.S.C. § 1983, the Declaratory Judgment Act, and the U.S. Constitution. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (review of agency action), and 28 U.S.C. § 1346(a)(2) (nominal damages).

26. Venue is proper in this Court as to the federal Defendants under 28 U.S.C. § 1391(e)(1) because this is an action against officers and agencies of the United States, the state defendants reside in this district, a substantial part of the events giving rise to the claims in this lawsuit occurred in this district, and no real property is involved in the action.

27. Venue is proper in this Court as to the state Defendants under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this district.

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

7

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**FACTUAL ALLEGATIONS**

**I.    The Indian Gaming Regulatory Act**

   **A.    Background**

   28.    The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, provides a comprehensive scheme for regulating gaming on Indian lands.

   29.    Congress enacted IGRA in 1988 in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that California could not regulate gaming on Indian lands within the State.

   30.    IGRA established, for the first time, a federal framework governing gaming on "Indian lands"—defined principally as land "within the limits of any Indian reservation." 25 U.S.C. § 2703(4)(A).

   31.    IGRA divides gaming activities into three classes—class I, class II, and class III—and imposes a different regulatory framework for each.

   32.    Class I gaming encompasses low-stakes "social games" and "traditional forms of Indian gaming." 25 U.S.C. § 2703(6).

   33.    Class II gaming covers bingo and lotto games, as well as non-banked card games that are either "explicitly authorized" by state law, or "not explicitly prohibited" and legally "played at any location in the State." 25 U.S.C. § 2703(7)(A)(i)–(ii). Non-banked card games are card games where players play against one another, rather than against the house. *Id.* § 2703(7)(B).

   34.    Class III gaming—the type of gaming at issue here—is the most highly regulated under IGRA. It encompasses "all forms of gaming that are not class I gaming or class II gaming," including casino games (*e.g.*, craps and roulette), banked card games (*e.g.*, blackjack), pari-mutuel

8

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER258**

wagering (*e.g.*, wagering on horse races), lotteries, and sports betting. 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4.

35. IGRA allows tribes to conduct a particular class III gaming activity on Indian lands "only if" that activity: (1) is authorized by a federally approved tribal ordinance meeting certain statutory conditions; (2) is "located in a State that permits such gaming for any purpose by any person, organization, or entity"; and (3) is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." 25 U.S.C. § 2710(d)(1)(A)–(C).

36. "Failure to comply with any one of the three conditions" renders class III gaming on Indian lands illegal under IGRA and "subject to applicable criminal statutes," including the Johnson Act, 15 U.S.C. § 1175 (prohibiting gambling devices in Indian country); the Organized Crime Control Act, 18 U.S.C. § 1955 (prohibiting illegal gambling businesses); and IGRA, 18 U.S.C. § 1166 (incorporating state-law gaming prohibitions into federal law and applying them on Indian lands). *See Amador Cnty. v. Salazar*, 640 F.3d 373, 376–77 (D.C. Cir. 2011).

37. IGRA's second and third requirements—that the class III gaming activity be located in a State that "permits such gaming" and conducted pursuant to a valid tribal-state compact—are central to this case.

**B. IGRA's State-Permission Requirement**

38. Congress designed IGRA's second condition of class III gaming—the state-permission requirement—to guarantee parity between tribal and non-tribal gaming, thereby "foster[ing] a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied." S. Rep. No. 100-446, at 6 (1988).

39. The state-permission requirement precludes tribal class III gaming monopolies by mandating that each form of class III gaming must remain illegal on Indian lands unless the State

9

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

"permits" the same activity for non-tribal entities. 25 U.S.C. § 2710(d)(1)(B). A State's purported authorization of class III gaming by Indian tribes alone does not suffice because a State cannot unilaterally "permit[]" class III gaming that federal law makes illegal without a valid tribal-state compact. The state-permission requirement thus reflects Congress's express finding that Indian tribes should be able to conduct a "gaming activity" on Indian lands only if the same activity "is conducted within a State." *Id.* § 2701(5).

40. By the same token, the state-permission requirement prevents States from creating non-tribal class III gaming monopolies: If a State "permits" a form of class III gaming for non-tribal entities, IGRA gives Indian tribes within the State the right to negotiate a tribal-state compact authorizing the same form of class III gaming on Indian lands. 25 U.S.C. § 2710(d)(1)(B). IGRA thus "provides that tribes are entitled to engage in all forms of Class III gaming that a state permits for other citizens." *Keweenaw Bay Indian Cmty. v. United States*, 136 F.3d 469, 473 (6th Cir. 1998).

41. IGRA's state-permission requirement, and the parity and uniformity principles it embodies, are fundamental features of the statutory scheme.

42. Class II gaming has a materially identical state-permission requirement: Tribes cannot engage in class II gaming on Indian lands unless "such Indian gaming is located *within a State that permits such gaming.*" 25 U.S.C. § 2710(b)(1)(A) (emphasis added).

43. Class II non-banked card games likewise are prohibited on Indian lands unless the games are expressly authorized elsewhere in the State or are not expressly prohibited and "played at any location in the State." 25 U.S.C. § 2703(7)(A)(ii)(II).

44. IGRA also waives application of the Johnson Act—a federal criminal statute prohibiting the possession of gambling devices in Indian country, 15 U.S.C. § 1175—only if the

10

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER260**

gambling devices are authorized under a tribal-state compact in "a State *in which gambling devices are legal*." 25 U.S.C. § 2710(d)(6)(A) (emphasis added).

45.     Congress omitted the state-permission requirement only with respect to class I gaming, and only because Congress left such gaming "within the exclusive jurisdiction of the Indian tribes." 25 U.S.C. § 2710(a)(1).

**C.     IGRA's Compacting Process**

46.     IGRA requires as a further condition of class III gaming on Indian lands that the gaming at issue be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." 25 U.S.C. § 2710(d)(1)(C).

47.     To initiate the compacting process, IGRA provides that "[a]ny Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A). "Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.*

48.     As Congress recognized, conditioning class III gaming on preexisting state-law permission for non-tribal entities to offer the same games allows States and tribes to "make use of existing State regulatory systems" in their "negotiated compacts." S. Rep. No. 100-446, at 13–14 (1988).

49.     A tribal-state class III gaming compact thus may include, among other things, provisions addressing "the application of the criminal and civil laws and regulations of the . . . State that are directly related to, and necessary for, the licensing and regulation of" the class III gaming activity under negotiation. 25 U.S.C. § 2710(d)(3)(C)(i).

11

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

50.      IGRA's compact condition imposes two requirements: (1) the tribe must enter "a compact with the state"; and (2) "[t]he Secretary of the Interior must approve any such compact before it may become effective." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 136 (D.C. Cir. 2006).

51.      To satisfy the first requirement, the State must have authority to enter into the compact. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556 (10th Cir. 1997).

52.      To satisfy the second requirement, the Secretary of the Interior must approve the compact and provide "notice of approval" in the Federal Register. 25 U.S.C. § 2710(d)(3)(B).

53.      The Secretary may either approve or disapprove the proposed compact within 45 days of its submission. 25 U.S.C. § 2710(d)(8)(C).

54.      If the Secretary does not approve or disapprove the compact within 45 days, the compact is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter." 25 U.S.C. § 2710(d)(8)(C).

55.      The Secretary must disapprove a compact if it violates: (1) any provision of IGRA, (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands," or (3) "the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B); *see also Amador Cnty.*, 640 F.3d at 381 ("The Secretary must . . . disapprove a compact if it would violate any of [IGRA's] three limitations . . . .").

## II.      Washington Has Long Authorized Tribal Class III Gaming Monopolies

56.      Since the early 1990s, despite IGRA's prohibition of class III tribal gaming monopolies, Washington has authorized Indian tribes—and only Indian tribes—to engage in most forms of class III gaming, while subjecting non-tribal entities to criminal sanctions for the same activities. Most recently, Washington has expanded that tribal monopoly to include sports betting.

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER262**

## A. Limited Non-Tribal Gaming In Washington

57.     It is illegal to offer most forms of gaming in Washington.  Washington makes it a crime to engage in "professional gambling," *see, e.g.*, Wash. Rev. Code § 9.46.222, which Washington defines to include: (1) unless acting as a player or in a manner authorized by law, "engag[ing] in conduct which materially aids any form of gambling activity"; (2) unless acting in a manner authorized by law, "pay[ing] a fee to participate in a card game, contest of chance, lottery, or other gambling activity"; (3) unless acting as a player or in a manner authorized by law, "knowingly accept[ing] or receiv[ing] money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of gambling activity"; (4) "engag[ing] in bookmaking"; (5) "conduct[ing] a lottery"; or (6) offering wagering on greyhound races, *id.* § 9.46.0269(1).

58.     Washington defines "gambling" as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."  Wash. Rev. Code § 9.46.0237.

59.     Washington law specifies three degrees of illegal "professional gambling." Depending on the scale of the gaming operation, a person offering unauthorized gaming may be guilty of a gross misdemeanor, Wash. Rev. Code § 9.46.222(3), a class C felony, *id.* § 9.46.221(3), or a class B felony, *id.* § 9.46.220(3).

60.     Because Washington's definition of "professional gambling" excepts from its definition activities "authorized by this chapter," Wash. Rev. Code § 9.46.0269(1)(a)–(c), a business may offer gaming only if that form of gaming is expressly authorized by Washington law. *See also Illegal Activities*, Wash. State Gambling Comm'n, *available at*

13

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

TribeSER263

https://www.wsgc.wa.gov/regulation-enforcement/illegal-activities ("Gambling in Washington is illegal unless the activity is specifically authorized by state law.").

61.     Washington permits non-tribal entities to offer only limited types of gaming, such as raffles, bingo, card games, amusement games, pull-tabs, punchboards, sports pool boards, and fundraising events.  Wash. Rev. Code §§ 9.46.0305–.0361.

62.     None of these statutory exceptions authorizes non-tribal entities to engage in the full range of casino-style gaming in Washington.

63.     As a result, it is a crime in Washington for non-tribal entities to offer the vast majority of class III games, including roulette, craps, and sports betting.

64.     The Washington State Gambling Commission warns on its website, "Gambling in Washington is illegal unless the activity is specifically authorized by state law. . . .  Conducting illegal gambling activities may result in criminal charges being filed against you, your organization and/or its officers, and forfeiture of all property or money associated with the illegal gambling." *Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/regulation-enforcement/illegal-activities.

65.     The Washington State Gambling Commission also provides a form for people to "submit a tip regarding illegal [gambling] activities occurring in Washington," and the form includes a field for "[b]usiness [n]ame." *Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/regulation-enforcement/illegal-activities; *Submit a Tip*, Wash. State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/regulation-enforcement/submit-tip.  The Washington State Gambling Commission routinely prosecutes enforcement actions against unlawful gambling operations. *See Administrative Orders*, Wash.

14

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/regulation-enforcement/administrative-orders (collecting administrative orders).

**B.  Washington's Tribal Gaming Monopoly**

66.  In contrast to its broad criminal prohibition of class III casino-style gaming among non-tribal entities, since the early 1990s Washington has authorized Indian tribes located within the State to conduct a wide range of class III games.

67.  In 1992 Washington codified its process for negotiating tribal-state class III gaming compacts pursuant to IGRA.  Wash. Rev. Code § 9.46.360.

68.  The director of the Washington State Gambling Commission (or the director's designee) "shall negotiate compacts for class III gaming on behalf of the state with federally recognized Indian tribes in the state of Washington."  Wash. Rev. Code § 9.46.360(2).

69.  On reaching a tentative agreement with an Indian tribe on a proposed compact, "the director shall immediately transmit a copy of the proposed compact to all voting and ex officio members of the gambling commission" and to the two standing committees designated by the Washington House of Representatives and Senate, each of which shall "forward its respective comments to the gambling commission."  Wash. Rev. Code § 9.46.360(3), (5).  The four ex officio members of the gambling commission are voting members of the gambling commission for the sole purpose of voting on proposed tribal-state compacts.  *Id.* § 9.46.360(4).

70.  Within 45 days of receiving a proposed compact from the director, the gambling commission, including the four ex officio members, "shall vote on whether to return the proposed compact to the director with instructions for further negotiation or to forward the proposed compact to the governor for review and final execution."  Wash. Rev. Code § 9.46.360(6).

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

71.     The gambling commission "is authorized and empowered to enforce the provisions of any compact between a federally recognized Indian tribe and the state of Washington."  Wash. Rev. Code § 9.46.360(9).

72.     In its first tribal-state compact (executed with the Tulalip Tribes of Washington on August 2, 1991), Washington authorized the Tulalip Tribes of Washington to conduct a wide range of class III games that are illegal for non-tribal entities to offer, including roulette and craps.  *See* Tribal-State Compact for Class III Gaming Between the Tulalip Tribes of Washington and the State of Washington at 4–5 (Aug. 2, 1991) (hereinafter "Tulalip Compact"), *available at* https://www.wsgc.wa.gov/sites/default/files/public/searchable-compacts/tulalip/A-1991%20Compact%20%28s%29.pdf.

73.     Since 1991, Washington has entered into analogous compacts with "[a]ll 29 federally recognized tribes in Washington," giving the Tribes the exclusive right to offer certain class III games such as craps and roulette.  Gaming Compacts, Washington State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts (last visited July 1, 2022).

74.     On March 25, 2020, Washington passed a new law, S.H.B. No. 2638, giving Indian tribes in the state a monopoly over sports betting.  *See* 2020 Wash. Legis. Serv. ch. 127.  It remains a crime for non-tribal entities to offer sports betting.  *See* Wash. Rev. Code §§ 9.46.220–.222.

75.     The law states:

> It has long been the policy of this state to prohibit all forms and means of gambling except where carefully and specifically authorized and regulated.  The legislature intends to further this policy by authorizing sports wagering on a very limited basis by restricting it to tribal casinos in the state of Washington.

2020 Wash. Legis. Serv. ch. 127, § 1.

16

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

76. The new act states that "[u]pon the request of a federally recognized Indian tribe or tribes in the state of Washington, the tribe's class III gaming compact may be amended . . . to authorize the tribe to conduct and operate sports wagering on its Indian lands . . . . Sports wagering conducted pursuant to the gaming compact is a gambling activity authorized by this chapter." Wash. Rev. Code § 9.46.0364(1). The statute makes clear that "[s]ports wagering conducted pursuant to the provisions of a class III gaming compact entered into by a tribe and the state pursuant to [Wash. Rev. Code § 9.46.360] is authorized bookmaking and is not subject to civil or criminal penalties pursuant to [Wash. Rev. Code § 9.46.225]." *Id.* § 9.46.0364(2).

77. On July 6, 2021, Governor Jay Inslee and 15 of the 29 federally recognized Indian tribes in Washington executed Compact Amendments to each of the Tribes' respective compacts to permit the Tribes to offer sports betting at their gaming facilities. *See, e.g.*, Third Amendment to the Tribal State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Colville%28D%29/2021-0706%20Colville_Amendment_3_%26_Appendix_S%28s%29.pdf.

78. These Tribes are: the Confederated Tribes of the Colville Reservation; the Cowlitz Indian Tribe; the Jamestown S'Klallam Tribe; the Kalispel Tribe; the Lummi Nation; the Muckleshoot Indian Tribe; the Puyallup Tribe of Indians; the Shoalwater Bay Indian Tribe; the Snoqualmie Indian Tribe; the Spokane Tribe; the Squaxin Island Tribe; the Stillaguamish Tribe of Indians; the Suquamish Tribe; the Swinomish Indian Tribal Community; and the Tulalip Tribes of Washington.

79. On September 1, 2021, the Secretary approved the compact amendments for the Spokane Tribe, the Cowlitz Indian Tribe, the Suquamish Tribe, the Snoqualmie Indian Tribe, the

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

Stillaguamish Tribe of Indians, the Squaxin Island Tribe, the Lummi Nation, the Puyallup Tribe of Indians, and the Tulalip Tribes of Washington. *See* 86 Fed. Reg. 49,046, 49,046–47, 49,049–54 (Sept. 1, 2021). On September 15, 2021, the Secretary approved the compact amendments for the Muckleshoot Indian Tribe, the Confederated Tribes of the Colville Reservation, the Shoalwater Bay Indian Tribe, and the Kalispel Tribe. *See* 86 Fed. Reg. 51,370, 51,370, 51,373–74 (Sept. 15, 2021). On October 22, 2021, the Secretary approved the compact amendment for the Swinomish Indian Tribal Community. *See* 86 Fed. Reg. 58,685 (Oct. 22, 2021). On December 28, 2021, the Secretary approved the compact amendment for the Jamestown S'Klallam Tribe. *See* 86 Fed. Reg. 73,800 (Dec. 28, 2021).

80. On September 19, 2021, a sixteenth tribe, the Port Gamble S'Klallam Tribe, amended its compact to permit it to offer sports betting. Memorandum of Incorporation of Most Favored Nation Amendments to the Tribal/State Compact Between the Port Gamble S'Klallam Tribe and the State of Washington (Sept. 19, 2021), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Port_Gamble%28X%29/Port _Gamble_Sports_Wagering_MOI_FINAL%28signed%29.pdf. Because Washington had amended compacts with other tribes to permit sports betting, the Port Gamble S'Klallam Tribe exercised its right under its compact's most-favored nation section to unilaterally amend its compact to permit sports betting as well. *Id.* at 1. On December 28, 2021, the Secretary approved the Port Gamble S'Klallam Tribe's Memorandum of Incorporation. *See* 86 Fed. Reg. 73,800 (Dec. 28, 2021).

81. On February 28, 2022, Washington executed a sports-betting compact amendment with a seventeenth tribe, the Sauk-Suiattle Indian Tribe, which the Secretary approved on June 14, 2022. *See* 87 Fed. Reg. 35,992, 35,992 (June 14, 2022).

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER268**

82.     The sports-betting amendments have therefore been approved by the Secretary pursuant to IGRA, and that approval purports to authorize Washington's tribal sports-betting monopoly.  *See* 25 U.S.C. § 2710(d)(3)(B), (8)(A).

83.     On May 18, 2022, Washington executed a sports-betting compact with an eighteenth tribe, the Nisqually Indian Tribe, which the Secretary has not yet acted on.

84.     Because the terms of each sports-betting amendment are materially identical, the compact amendment between Washington and the Confederated Tribes of the Colville Reservation is used for reference throughout this complaint.  *See* Third Amendment to the Tribal-State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021) (hereinafter "Colville Compact Amendment"), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Colville%28D%29/2021-0706%20Colville_Amendment_3_%26_Appendix_S%28s%29.pdf.

85.     The Compact Amendments add "Sports Wagering" to the list of class III gaming activities that the Tribes are permitted to offer, subject to a new Appendix S prescribing certain conditions.  Colville Compact Amendment at 2.

86.     The Compact Amendments require each of the Tribes to contribute their share of a "Start-Up Costs fee," which "includes the actual costs incurred by the State Gaming Agency for negotiations, rule development, regulatory program development, training, and similar activities necessary to implement Sports Wagering."  Colville Compact Amendment at 3.

87.     The Compact Amendments also provide that the Tribes' sports-betting net win will be included in the Tribes' total net gaming revenues, of which the Tribes are required to pay 0.13% to Washington for "problem gambling education, awareness, and treatment in the State of Washington."  Colville Compact Amendment, Appendix S, § 8.1; First Amendment to the

19

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

Tribal/State Compact for Class III Gaming Between the Confederated Tribes of the Colville Reservation and the State of Washington, Appendix X2, §§ 14.4, 14.6 (Mar. 30, 2007), *available at* https://www.wsgc.wa.gov/sites/default/files/public/searchable-compacts/colville/D-2007%20Amendment%201%20%28App%20X2%29%20%28s%29.pdf.

### C.    The Tribes' Class III Gaming Operations

88.    The Tribes currently operate 29 casinos on Indian lands in Washington.  *See* Casino Locations, Washington State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/tribal-gaming/casino-locations.  Of these 29 casinos, 23 are governed by compacts that Washington and the Tribes have amended to permit sports betting.  *Id.*; Gaming Compacts, Washington State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts.

89.    These casinos offer a range of class III games that are illegal for non-tribal entities to offer in Washington, including roulette, craps, and sports betting (among other games).

90.    In 2019, the Tribes' net receipts from class III gaming were approximately $2.93 billion.  Tribal Community Contributions at 11–12, Washington State Gambling Commission (May 12, 2022), *available at* https://wsgc.wa.gov/sites/default/files/public/05_2022_Tribal_Contributions.pdf?_ga=2.69626903.68622135.1656545003-700351475.1656545003.  The Tribes' net receipts were approximately $2.75 billion in 2018 and approximately $2.56 billion in 2017.  *See id.*

91.    There are no non-tribal casinos in Washington that offer the full range of class III games that Washington permits tribal casinos to offer.

92.    No non-tribal casinos in Washington offer roulette, craps, or sports betting.

20

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

III.     **Washington's Tribal Gaming Monopoly Violates Federal Law**

    A.     **The Federal Defendants' Approval Of Washington's Sports-Wagering Compact Amendments Violated Federal Law**

93.     The Secretary of the Interior's decision to approve the Compact Amendments was not in accordance with IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, or the equal-protection component of the Fifth Amendment's Due Process Clause, U.S. Const. amend. V, or the Tenth Amendment, *id.* amend. X.

94.     IGRA requires the Secretary of the Interior to disapprove any tribal-state class III gaming compact that violates: (1) any provision of IGRA, (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands," or (3) "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B); *see also Amador Cnty.*, 640 F.3d at 383.

95.     The Secretary of the Interior was obligated to disapprove the Compact Amendments for three independent reasons.

96.     *First*, the Secretary of the Interior was obligated to disapprove the Compact Amendments because they purport to authorize tribal class III gaming that violates IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.

97.     IGRA provides that class III gaming on Indian lands is lawful "only if," among other things, the class III gaming activity is "located in a State that permits such gaming for any purpose by any person, organization, or entity" and is conducted in conformance with a tribal-state compact "that is in effect."  25 U.S.C. § 2710(d)(1)(B)–(C).

98.     Failure to comply with either condition renders class III gaming on Indian lands illegal under IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.  *See Pueblo of Santa Ana*, 104 F.3d at 1552.

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

99.     IGRA's state-permission requirement prohibits tribal class III gaming monopolies by ensuring that each class III gaming activity remains illegal on Indian lands unless a State "permits" the same class III gaming activity by non-tribal entities.

100.    IGRA's state-permission requirement has not been satisfied in Washington for sports betting because the State criminally prohibits such gaming by any non-tribal entities. *Compare* Wash. Rev. Code § 9.46.0364, *with id.* §§ 9.46.220–.222.

101.    Washington's grant of a right to only "a federally recognized Indian tribe or tribes in the state of Washington" to "operate sports wagering on its Indian lands," Wash. Rev. Code § 9.46.0364, violates IGRA's state-permission requirement because Washington prohibits any non-tribal entities from offering sports betting, and thereby does not "permit[] such gaming for any purpose by any person, organization, or entity" as IGRA requires, 25 U.S.C. § 2710(d)(1)(B).

102.    Neither the Compact Amendments nor any other state law can unilaterally "permit"—that is, authorize or legalize—sports betting solely on Indian lands because IGRA makes clear that such authorization can occur only through IGRA's statutory compacting process.

103.    Because Washington has not "permit[ted]" sports betting within the meaning of IGRA, 25 U.S.C. § 2710(d)(1)(B), sports betting remains illegal on Indian lands in Washington under IGRA and applicable federal criminal statutes.  *See* 25 U.S.C. § 2710(d)(1); 15 U.S.C. § 1175; 18 U.S.C. § 1955; 18 U.S.C. § 1166.

104.    Because the Compact Amendments purport to authorize the Tribes to offer class III gaming in Washington that federal law prohibits, the Compact Amendments violate federal law and are void.

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

22

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

105.     Because the Compact Amendments violate federal law, the Governor of Washington had no authority to "enter[] into" them within the meaning of IGRA.  25 U.S.C. § 2710(d)(1)(C).

106.     Because the Compact Amendments violate federal law and were not validly entered into, the Secretary was obligated to disapprove the Compact Amendments.   25 U.S.C. § 2710(d)(8)(B)(i).

107.     By instead approving the Compact Amendments and purporting to authorize illegal tribal class III gaming, the Secretary violated IGRA.  *See* 15 U.S.C. § 1175; 18 U.S.C. § 1955; 18 U.S.C. § 1166.

108.     *Second*, the Secretary also was required to disapprove the Compact Amendments under IGRA because they violate the Constitution's guarantee of equal protection.

109.     The Constitution's guarantee of equal protection mandates the equal treatment of people of all races and ancestries without discrimination or preference.  *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

110.     The Compact Amendments discriminate on the basis of race and ancestry, in violation of equal-protection principles, by granting monopolies to Washington Indian tribes over sports betting.

111.     By executing the Compact Amendments, Washington has purported to grant the Tribes a right to offer sports betting, an activity that Washington permits only tribal entities to offer.  *See* Wash. Rev. Code § 9.46.0364.

112.     At the same time, Washington criminally prohibits any entities other than those affiliated with Washington Indian tribes from offering sports betting in Washington.  Wash. Rev. Code §§ 9.46.220–.222.

23

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER273**

113.    The Compact Amendments' grant of sports-betting monopolies to Washington Indian tribes is a racial and ancestral classification, as membership in a Washington Indian tribe depends on lineal descent from historical tribal rolls and often also a minimum blood quantum.

114.    The Compact Amendments' race-based preference for Indian tribal sports betting is subject to strict scrutiny.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

115.    The Compact Amendments' race-based preference does not fall within the narrow exception outlined in *Morton v. Mancari*, 417 U.S. 535 (1974), because Congress has not authorized and could not authorize a State to grant Indian tribes a monopoly over a commercial activity that is unrelated to uniquely Indian interests, *see Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997).

116.    The Compact Amendments' race-based preference for Indian tribal sports betting cannot survive strict scrutiny or even rational-basis review because it is unrelated to the furtherance of Congress's trust obligation to Indian tribes.

117.    Thus, the Compact Amendments' race-based preference for Indian tribal sports betting violates the Constitution's guarantee of equal protection.

118.    Because the Compact Amendments violate equal protection, the Governor of Washington lacked authority to "enter[] into" them within the meaning of IGRA.  25 U.S.C. § 2710(d)(1)(C).

119.    Because the Compact Amendments violate equal protection and were not validly entered into, the Secretary was required to disapprove the Compact Amendments.  25 U.S.C. § 2710(d)(8)(B)(ii).

120.    By instead approving the Compact Amendments and purporting to authorize a violation of equal protection, the Secretary violated IGRA.

24

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER274**

121.     In addition to violating IGRA, the Secretary's approval independently violated the equal-protection component of the Fifth Amendment's Due Process Clause because it blessed and facilitated Washington's unconstitutional race-based preference for Indian tribal sports betting.

122.     *Third*, the Secretary also was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment.

123.     "The legislative powers granted to Congress are sizable, but they are not unlimited." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.*

124.     IGRA's state-negotiation mandate issues a "direct order" to the States: IGRA directs that upon receiving a request from an Indian tribe to negotiate a class III gaming compact, "the State *shall* negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A) (emphasis added). That sort of "direct order" violates the Constitution's anti-commandeering principle, and renders the process for entering into the Compact Amendments unlawful. *See Murphy*, 138 S. Ct. at 1476.

125.     This state-negotiation mandate is not severable from the remainder of the Act. An unconstitutional provision is not severable when "the statute created in its absence is legislation that Congress would not have enacted." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). The compacting process is IGRA's centerpiece, and the state-negotiation mandate is what ensures that process takes place. Congress would not have enacted IGRA without this central requirement.

126.     Because the Compact Amendments violated the Tenth Amendment and were not validly entered into, the Secretary was required to disapprove the Compact Amendments. 25 U.S.C. § 2710(d)(8)(B)(ii).

25

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

127.    By instead approving the Compact Amendments and purporting to authorize a violation of the Tenth Amendment, the Secretary violated IGRA.

128.    In addition, because the state-negotiation mandate is not severable from the remainder of the Act, none of IGRA's provisions can stand, and the Secretary lacked any authority to approve the Compact Amendments.

**B.    The State Defendants' Execution And Administration Of Washington's Tribal-State Class III Gaming Compacts Violates Federal Law**

129.    The Compact Amendments giving the Tribes a monopoly over sports betting violate IGRA, federal criminal gaming statutes, the Constitution's guarantee of equal protection, and the Tenth Amendment.

130.    All of Washington's tribal-state Compacts—not just the recent Compact Amendments concerning sports betting—violate the Constitution's guarantee of equal protection because they give the Tribes a monopoly over many class III games, such as (but not limited to) roulette and craps, that non-tribal entities are criminally prohibited from offering. *See, e.g.*, Tulalip Compact at 4–5.

131.    All of the tribal-state Compacts also violate the Tenth Amendment because the process for entering into them was undertaken in violation of the Constitution's anti-commandeering principle.

132.    The Governor of Washington executed the Compacts and Compact Amendments, rendering them approved as a matter of state law.

133.    The members of the Washington State Gambling Commission continue to administer the Compacts and Compact Amendments.

134.    The Defendants' actions executing and administering the unlawful Compacts and Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166,

26

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

and aid and abet violations of the same, 18 U.S.C. § 2, by purporting to authorize and by facilitating tribal class III gaming that these federal statutes prohibit.

135.     The Defendants' actions executing and administering the unlawful Compacts and Compact Amendments violate the Constitution's guarantee of equal protection by purporting to authorize and by facilitating Washington's race-based preference for tribal gaming.

136.     The Defendants' actions executing and administering the unlawful Compacts and Compact Amendments violate the Tenth Amendment by continuing to administer agreements that were not lawfully entered into.

**C.     Washington's Criminal Prohibition Of Types Of Class III Gaming That It Permits Only Indian Tribes To Offer Violates Federal Law**

137.     Washington criminally prohibits most forms of class III gaming, including (but not limited to) roulette, craps, and sports betting.  *See* Wash. Rev. Code §§ 9.46.220–.222; *id.* §§ 9.46.0305–.0361.

138.     In the Compacts and Compact Amendments, however, Washington has purported to exempt the Tribes from the application of its criminal prohibitions on these forms of class III gaming.  *See* Wash. Rev. Code §§ 9.46.360, 9.46.225; *see also id.* § 9.46.0364(2).

139.     Because the application of Washington's criminal class III gaming prohibitions turns on the race and ancestry of the offender, Washington's continued enforcement of its class III gaming prohibitions against non-tribal entities violates the Constitution's guarantee of equal protection.

140.     The Attorney General of Washington is authorized by state statute to investigate, direct the prosecution of, and prosecute violations of state criminal laws.  Wash. Rev. Code § 43.10.090.  The Governor of Washington is authorized to request that the Attorney General initiate criminal investigations and proceedings.  *Id.*  The members of the Washington State

27

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER277**

Gambling Commission are charged with investigating and enforcing Washington's criminal gaming laws. Wash. Rev. Code §§ 9.46.140, 9.46.210(3).

## IV. Maverick's Injuries Caused By Washington's Tribal Gaming Monopoly

141. Maverick currently owns and operates 18 cardrooms in Washington. Maverick also owns casinos in Nevada and Colorado, which offer a range of class III gaming, including roulette, craps, sports betting, and dealer-assisted electronic table games.

142. Sports betting in the United States has seen extraordinary growth over the past several years.[1] The American Gaming Association reported that sports betting generated more than $1.5 billion in revenue in 2020, which represented a nearly 69% year-over-year growth rate.[2] Revenue from sports betting will continue to rise as consumer demand grows around the country.[3]

143. With sports betting becoming increasingly popular, Maverick would like to offer that form of gaming to the patrons of its Washington cardrooms. Maverick would also like to offer in Washington the kinds of class III games that its Nevada and Colorado casinos offer, including, but not limited to, roulette, craps, and dealer-assisted electronic table games.[4] It would be

_____

[1] *See, e.g.*, David Purdum, *Sports Betting's Growth in U.S. 'Extraordinary'*, ESPN (May 14, 2020), https://www.espn.com/chalk/story/_/id/29174799/sports-betting-growth-us-extraordinary ("More than $20 billion has been bet with U.S. sportsbooks since the Supreme Court struck down the Professional and Amateur Sports Protection Act of 1992 on May 14, 2018.").

[2] *See Commercial Gaming Revenue Tracker: 2020 Fourth Quarter*, Am. Gaming Ass'n, https://www.americangaming.org/wp-content/uploads/2021/02/Q4-Email-PDF.pdf (last visited July 1, 2022).

[3] *See id.*

[4] This Complaint often lists roulette, craps, and sports betting as examples of the types of class III games that Maverick wants to offer in Washington. In doing so, Maverick does not provide an exhaustive list of the class III games it wishes to offer but rather a few illustrative examples. In

28

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

economically viable and profitable for Maverick to offer games like roulette, craps, sports betting, and dealer-assisted electronic table games in Washington and Maverick seeks to do so, but Maverick is unable to proceed because of Washington's criminal prohibition of most forms of class III gaming unless conducted at an authorized tribal gaming facility. *See* Wash. Rev. Code §§ 9.46.0364, 9.46.0368, 9.46.220–.222.

144. Because the Tribes can offer these games (including roulette, craps, sports betting, and dealer-assisted electronic table games), but Maverick cannot, Maverick suffers competitive injury with tribal casinos. That injury includes increased advertising expenses, increased promotional expenses, and increased entertainment expenses that Maverick must undertake in order to compete with tribal casinos. It also includes lost revenue from customers who would frequent Maverick's cardrooms if they offered the class III games that they are currently prohibited from offering, but who instead frequent tribal casinos. Maverick also suffers a loss of goodwill by failing to offer the same set of products as its tribal competitors.

145. The Supreme Court "routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement] . . . . It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies this part of the standing test." *Clinton v. City of N.Y.*, 524 U.S. 417, 432–33 (1998) (alterations in original) (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994)).

146. Maverick competes with other casinos, including tribal casinos, to offer the best and most attractive selection of games allowed by law.

---

this action, Maverick seeks to vindicate its right to offer the full suite of class III games that Washington currently permits only Indian tribes to offer.

29

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

147. But for Washington's tribal gaming monopoly, Maverick is able, ready, and prepared to expand its gaming offerings in Washington to include a wide variety of class III games, including (but not limited to) roulette, craps, sports betting, and dealer-assisted electronic table games.

148. Maverick has access to the capital needed to offer a wide variety of class III games in Washington, including roulette, craps, and sports betting, and to finance any additional facilities or purchase any necessary equipment.

149. As a company that predominantly operates in Washington, Maverick is familiar with the requirements of Washington's gaming laws and regulations.

150. Maverick would earn significant additional revenue if it could offer games such as craps, roulette, and sports betting, and it would also earn additional revenue if tribal casinos could *not* offer such games exclusively.

151. Maverick's successful class III gaming operations in Colorado and Nevada demonstrate that it has the necessary background and experience to offer additional class III games like roulette, craps, and sports betting in Washington.

152. Maverick is unable to take advantage of the commercial opportunities it has identified because Washington criminally prohibits most class III games if offered by non-tribal entities.

153. Due to the threat of enforcement of Washington's criminal laws, which prohibit most forms of class III gaming, Maverick is unable to offer the same forms of class III gaming as the Tribes. As a result, Maverick cannot establish or acquire gaming operations in Washington that can effectively compete with the Tribes' operations.

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER280**

154. The Defendants' unlawful execution, approval, and administration of the Compacts and Compact Amendments also alters competitive conditions in a way that is unfavorable to Maverick.

155. The Secretary's unlawful approval of the Compacts and the Compact Amendments has facilitated and continues to facilitate the Tribes' unlawful class III gaming activities. Those activities harm Maverick by making it more difficult for Maverick to grow its successful gaming offerings in Washington because Maverick cannot compete on an equal footing with the Tribes' much broader gaming offerings.

156. The Secretary's unlawful approval of the Compacts and the Compact Amendments has resulted in the deprivation of Maverick's substantive rights under constitutional equal-protection principles and IGRA to compete on equal terms with the Tribes to offer class III gaming in Washington free from discrimination on the basis of race and ancestry.

157. If Washington did not limit most forms of class III gaming to tribal casinos, Maverick would offer a wide range of class III games (including roulette, craps, and sports betting) at its Washington cardrooms and increase its commercial casino revenue, and it would no longer suffer the violation of its equal-protection rights.

158. If Washington applied its prohibition of most forms of class III gaming to the Tribes and non-tribal entities alike, many patrons of Washington's tribal casinos would instead frequent Maverick's Washington cardrooms, increasing Maverick's commercial casino revenue.

159. This discrimination, on its own, is a cognizable injury in fact. As the Supreme Court has explained, discrimination that results in an "inability to compete on an equal footing" itself is an injury in fact. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).

31

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

160.    Enjoining Washington from enforcing its tribal class III gaming monopoly would either permit Maverick to expand its operations in Washington or would increase the number of patrons at Maverick's existing Washington cardrooms.

161.    Washington's tribal class III gaming monopoly exists only because the Secretary unlawfully approved the Compacts and Compact Amendments.

162.    If the Secretary had disapproved the Compacts and Compact Amendments, Washington would not be able to enforce its tribal class III gaming monopoly.

163.    Vacating the Secretary's approval would make Washington's tribal class III gaming monopoly unlawful, allowing Maverick to increase its commercial casino revenue either by expanding its gaming offerings in Washington or by benefitting from increased patronage at its Washington cardrooms due to the elimination of the Tribes' competitive advantage.

## COUNT ONE:

### The Administrative Procedure Act
### (Not in Accordance with Law – IGRA, Equal Protection, and the Tenth Amendment)

164.    Maverick incorporates all preceding paragraphs by reference.

165.    The Department of the Interior and the Secretary of the Interior are "agencies" under the APA.  5 U.S.C. § 551(1).

166.    The APA prohibits agency actions that are "not in accordance with law."  5 U.S.C. § 706(2)(A).

167.    Federal law obligated the Secretary of the Interior to disapprove Washington's sports-betting Compact Amendments.

168.    *First*, the Secretary of the Interior was obligated to disapprove the Compact Amendments because they purport to authorize tribal class III gaming that violates IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.

32

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

169. *Second*, the Secretary also was required to disapprove the Compact Amendments under IGRA and the equal-protection component of the Fifth Amendment's Due Process Clause because they violate the Constitution's guarantee of equal protection.

170. *Third*, the Secretary also was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment.

171. The Secretary's approval of the Compact Amendments constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

172. Maverick has suffered a legal wrong or has been adversely affected or aggrieved by the Secretary's approval of the Compact Amendments. 5 U.S.C. § 702.

173. The Secretary's approval of the Compact Amendments has resulted in the deprivation of Maverick's substantive rights under equal-protection principles and IGRA to compete on equal terms with the Tribes to offer sports betting in Washington free from discrimination on the basis of race or ancestry.

174. It would be economically viable for Maverick to offer sports betting in Washington and Maverick seeks to do so, but Maverick cannot offer sports betting because of Washington's tribal sports-betting monopoly.

175. The Secretary's approval of the Compact Amendments also has facilitated and continues to facilitate the Tribes' unlawful sports-betting offerings. Those activities harm Maverick by making it more difficult for Maverick to effectively compete with the Tribes' much broader gaming offerings.

176. Maverick therefore is entitled to an order: (1) declaring that the Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the

33

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

TribeSER283

Constitution's guarantee of equal protection, and the Tenth Amendment, and therefore were not validly entered into and are not in effect; (2) declaring that the Secretary's approval of the Compact Amendments violated IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment; (3) setting aside and vacating the Secretary's approval of the Compact Amendments; (4) declaring that the Tribes' sports-betting activities violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166; and (5) awarding nominal damages, reasonable costs (including attorneys' fees), and any other relief this Court deems just and proper.

## COUNT TWO:

### 42 U.S.C. § 1983, Equity, Declaratory Judgment Act
### (Violation of IGRA, Equal Protection, and the Tenth Amendment)

177.    Maverick incorporates all preceding paragraphs by reference.

178.    42 U.S.C. § 1983 provides private parties a cause of action for declaratory and injunctive relief against any person who, under color of state law, deprives them of rights guaranteed by the U.S. Constitution or a federal statute.

179.    Courts of equity likewise provide private parties a cause of action to seek declaratory and injunctive relief against state officials that violate federal law.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *Ex parte Young*, 209 U.S. 123, 127 (1908).

180.    The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

181.    The Defendants' actions executing and administering the unlawful Compacts and Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166,

34

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

TribeSER284

and aid and abet violations of the same, 18 U.S.C. § 2, by purporting to authorize and by facilitating tribal class III gaming that these federal statutes prohibit.

182. The Defendants' actions executing and administering the unlawful Compacts and Compact Amendments violate the Constitution's guarantee of equal protection by purporting to authorize and by facilitating Washington's race-based preference for tribal gaming.

183. The Defendants' actions executing and administering the unlawful Compacts and Compact Amendments violate the Tenth Amendment by continuing to administer agreements that were not lawfully entered into.

184. The Defendants' unlawful actions executing and administering the Compacts and Compact Amendments have directly, personally, and substantially injured Maverick.

185. The Defendants' actions have deprived and continue to deprive Maverick of its substantive rights under the Constitution's guarantee of equal protection and IGRA to compete on equal terms with the Tribes to offer class III gaming in Washington free from discrimination on the basis of race or ancestry.

186. As detailed above, but for Washington's tribal monopoly, Maverick is able, ready, and prepared to expand its class III gaming offerings in Washington to include games such as roulette, craps, and sports betting.

187. The Defendants' actions also have facilitated and continue to facilitate the Tribes' unlawful class III gaming activities. Those activities harm Maverick by making it more difficult for Maverick to compete with the Tribes' much broader gaming offerings in Washington. Declaring that the Compacts and Compact Amendments are illegal and void and enjoining Defendants from enforcing them would eliminate the Tribes' class III gaming monopoly, prohibit the Tribes from offering class III gaming that Washington does not permit non-tribal entities to

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

offer, and redress Maverick's injuries by ensuring that it can compete with the Tribes on equal footing.

188. These injuries give rise to a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

189. Maverick therefore seeks a declaration: (1) that the Compacts and Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment, and therefore were not validly entered into and are not in effect; (2) that the Governor's execution of the Compacts and Compact Amendments violated IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment, and the Compacts and Compact Amendments are therefore void; (3) that the continued administration of the Compacts and Compact Amendments by the members of the Washington State Gambling Commission violates IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment; and (4) that the Tribes' class III gaming activities violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.

190. Maverick also seeks an injunction: (1) prohibiting the members of the Washington State Gambling Commission from continuing to administer the Compacts and Compact Amendments; and (2) prohibiting the Governor from entering into any new class III gaming compacts with the Tribes granting them exclusive rights to engage in any form of class III gaming.

191. Maverick also seeks an award of nominal damages, reasonable costs (including attorneys' fees), and any other relief this Court deems just and proper.

36

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

**TribeSER286**

## COUNT THREE:

### 42 U.S.C. § 1983, Equity, Declaratory Judgment Act
### (Violation of Equal Protection)

192.    Maverick incorporates all preceding paragraphs by reference.

193.    42 U.S.C. § 1983 provides private parties a cause of action for declaratory and injunctive relief against any person who, under color of state law, deprives them of rights guaranteed by the U.S. Constitution or a federal statute.

194.    Courts of equity likewise provide private parties a cause of action to seek declaratory and injunctive relief against state officials that violate federal law. *See Armstrong*, 575 U.S. at 326; *Ex parte Young*, 209 U.S. at 127.

195.    The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

196.    The Constitution's guarantee of equal protection mandates the equal treatment of people of all races and ancestries without discrimination or preference.

197.    Washington criminally prohibits most forms of class III gaming, including roulette, craps, and sports betting. *See* Wash. Rev. Code §§ 9.46.220–.222; *id.* §§ 9.46.0305–.0361.

198.    In the Compacts and Compact Amendments, however, Washington has purported to exempt the Tribes from the application of its criminal prohibitions on these forms of class III gaming. *See* Wash. Rev. Code §§ 9.46.360, 9.46.225; *see also id.* § 9.46.0364(2).

199.    Because the application of Washington's criminal class III gaming prohibitions turns on the race and ancestry of the offender, Washington's continued enforcement of its class III

37

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

gaming prohibitions against non-tribal entities violates the Constitution's guarantee of equal protection.

200.    The Defendants' potential enforcement of Washington's racially discriminatory criminal gaming laws has directly, personally, and substantially injured Maverick.

201.    The Defendants' discriminatory application and enforcement of Washington's criminal laws prohibiting these forms of class III gaming deprives Maverick of its right under the Constitution's guarantee of equal protection to compete on equal terms with the Tribes to offer class III gaming in Washington free from discrimination on the basis of race or ancestry.

202.    As detailed above, but for Washington's tribal monopoly, Maverick is able, ready, and prepared to expand its gaming offerings in Washington to include games such as roulette, craps, and sports betting.

203.    Due to the threat of enforcement of Washington's criminal laws, which prohibit most forms of class III gaming, Maverick is unable to offer the same forms of class III gaming as the Tribes.  As a result, Maverick cannot establish or acquire gaming operations in Washington that can effectively compete with the Tribes' operations.

204.    These injuries give rise to a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

205.    Maverick therefore seeks a declaration that the Defendants' continued enforcement of Washington's criminal laws prohibiting class III gaming—including roulette, craps, and sports betting—violates the Constitution's guarantee of equal protection, and an injunction prohibiting the Defendants from enforcing those laws against Maverick.

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

206.    Maverick also seeks an award of nominal damages, reasonable costs (including attorneys' fees), and any other relief this Court deems just and proper.

## PRAYER FOR RELIEF

207.    Maverick demands a judgment against the Defendants as follows:

1.      Declaring that the Compacts and Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment, and therefore are void, were not validly entered into, and are not in effect;

2.      Declaring that the Secretary of the Interior's approval of the Compacts and Compact Amendments; the Governor's execution of the Compacts and Compact Amendments; and the continued administration of the Compacts and Compact Amendments by the members of the Washington State Gambling Commission violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment;

3.      Declaring that the continued enforcement of Washington's criminal laws prohibiting class III gaming against Maverick violates the Constitution's guarantee of equal protection;

4.      Declaring that the Tribes' class III gaming activities violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166;

5.      Vacating and setting aside the Secretary of the Interior's approval of the Compacts and Compact Amendments;

6.      Enjoining the continued administration of the Compacts and Compact Amendments by the members of the Washington State Gambling Commission;

39

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

7.      Enjoining the Governor, the Attorney General, and the members of the Washington State Gambling Commission from enforcing against Maverick Washington's criminal laws prohibiting class III gaming;

8.      Issuing all process necessary and appropriate to postpone further administration of the Compacts and Compact Amendments and prevent enforcement against Maverick of Washington's criminal laws prohibiting class III gaming pending the conclusion of this case;

9.      Awarding Maverick its reasonable costs, including attorneys' fees, incurred in bringing this action;

10.    Awarding Maverick nominal damages; and

11.    Granting such other and further relief as this Court deems just and proper.

40

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

DATED July 1, 2022.

**BRENNAN LEGAL, PLLC**

By: *s/ Thomas M. Brennan*
Thomas M. Brennan, WSBA No. 30662
P.O. Box 1384
144 Railroad Ave. S., Suite 308
Edmonds, WA 98020
Phone: (425) 967-3550
Email: tom@brennanlegalpllc.com

**GIBSON, DUNN & CRUTCHER LLP**

By: *s/ Theodore B. Olson*
By: *s/ Matthew D. McGill*
By: *s/ Lochlan F. Shelfer*
Theodore B. Olson, D.C. Bar No. 367456
Matthew D. McGill, D.C. Bar No. 481430
Lochlan F. Shelfer, D.C. Bar No. 1029799
1050 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036-5303
Phone: (202) 955-8668
Email: tolson@gibsondunn.com
Email: mmcgill@gibsondunn.com
Email: lshelfer@gibsondunn.com

*Attorneys for Plaintiff Maverick Gaming LLC*

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

41

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

TribeSER291

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which sends notification of the filing to all counsel of record.

DATED July 1, 2022.

/s/ Thomas M. Brennan
Thomas M. Brennan

FIRST AMENDED COMPLAINT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MAVERICK GAMING LLC,

      Plaintiff,

      v.

UNITED STATES OF AMERICA, et al.,

      Defendants.

No. 22-cv-05325 DGE

**MAVERICK GAMING LLC NOTICE TO WITHDRAW PENDING MOTION**

TO:    Clerk of the Court

TO:    Parties and their counsel

      On March 10, 2022, plaintiff Maverick Gaming LLC filed a Motion for Leave to File First Amended Complaint. *See* Dkt. # 35.  The motion was filed in the District Court for the District of Columbia.  It has not been noted on the calendar for the District Court for the Western District of Washington.

      Consistent with Local CR 7(l), Maverick Gaming LLC provides notice that it hereby withdraws the aforementioned motion and will not note the motion for consideration by this Court.

1

NOTICE TO WITDRAW
PENDING MOTION
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

**TribeSER293**

1    DATED May 19, 2022.

2                                        **BRENNAN LEGAL, PLLC**

3

4                                        By: *s/ Thomas M. Brennan*
5                                        Thomas M. Brennan, WSBA No. 30662
                                         P.O. Box 1384
                                         144 Railroad Ave. S., Suite 308
6                                        Edmonds, WA  98020
                                         Phone: (425) 967-3550
7                                        Email: tom@brennanlegalpllc.com

8

9                                        **GIBSON, DUNN & CRUTCHER LLP**

10                                       By: *s/Theodore B. Olson*
                                         By: *s/Mathew D. McGill*
11                                       By: *s/Lochlan F. Shelfer*
                                         Theodore B. Olson, D.C. Bar No. 367456
12                                       Mathew D. McGill, D.C. Bar No. 481430
                                         Lochlan F. Shelfer, D.C. Bar No. 1029799
13                                       1050 Connecticut Avenue, N.W., Suite 900
                                         Washington, D.C.  20036-5303
14                                       Phone: (202 955-8668
                                         Email: tolson@gibsondunn.com
15                                       Email: mmcgill@gibsondunn.com
                                         Email: lshelfer@gibsondunn.com
16

17                                       *Attorneys for Plaintiff Maverick Gaming LLC*

18

19

20

21

22

23

24

25

26

                                         2

NOTICE TO WITDRAW                                              **Brennan Legal, PLLC**
PENDING MOTION                                                        P.O. Box 1384
(3:22-cv-05325 DGE)                                          144 Railroad Ave. S., Ste. 308
                                                                 Edmonds, WA  98020
                             **TribeSER294**                       (425) 967-3550

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused the foregoing document to be electronically

filed with the Clerk of the Court using the CM/ECF system which sends notification of the filing

to all counsel of record.

DATED May 19, 2022.

/s/ Thomas M. Brennan
Thomas M. Brennan

NOTICE TO WITDRAW
PENDING MOTION
(3:22-cv-05325 DGE)

3

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAVERICK GAMING LLC,

12530 NE 144th Street,
Kirkland, WA 98034

        Plaintiff,

    v.

THE UNITED STATES OF AMERICA,

555 4th Street, NW, Washington, DC 20001,

UNITED STATES DEPARTMENT OF THE
INTERIOR,

1849 C Street, NW, Washington, DC 20240,

DEB HAALAND, in her official capacity as
Secretary of the Interior,

1849 C Street, NW, Washington, DC 20240,

BRYAN NEWLAND, in his official capacity
as Assistant Secretary – Indian Affairs,

1849 C Street, NW, Washington, DC 20240,

JAY INSLEE, in his official capacity as the
Governor of Washington,

Office of the Governor, P.O. Box 40002,
Olympia, WA 98504,

ROBERT FERGUSON, in his official capacity
as the Attorney General of Washington,

1125 Washington Street, SE, P.O. Box 40100,
Olympia, WA 98504,

BUD SIZEMORE, in his official capacity as
Chair of the Washington State Gambling
Commission,

P.O. Box 42400, Olympia, WA 98504,

Civil Action No. 1:22-cv-00068-FYP

JULIA PATTERSON, in her official capacity
as Vice-Chair of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

ALICIA LEVY, in her official capacity as
Commissioner of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

KRISTINE REEVES, in her official capacity
as Commissioner of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

SARAH LAWSON, in her official capacity as
Commissioner of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

STEVE CONWAY, in his official capacity as
ex officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

JEFF HOLY, in his official capacity as ex
officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

SHELLEY KLOBA, in her official capacity as
ex officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

BRANDON VICK, in his official capacity as
ex officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

TINA GRIFFIN, in her official capacity as
Interim Director of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

              Defendants.

## MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT
## AND TO DROP THE WASHINGTON STATE DEFENDANTS

Plaintiff Maverick Gaming LLC ("Maverick"), by and through its undersigned counsel, hereby respectfully moves, pursuant to Rules 15(a)(2) and 21 of the Federal Rules of Civil Procedure, for leave to file its First Amended Complaint and to drop the Washington State defendants from this action. The points of law and authority supporting this motion are set forth in the accompanying memorandum.

Dated: March 10, 2022          Respectfully submitted,

                        /s/ *Theodore B. Olson*

                        THEODORE B. OLSON
                          D.C. Bar No. 367456
                        MATTHEW D. MCGILL
                          D.C. Bar No. 481430
                        LOCHLAN F. SHELFER
                          D.C. Bar No. 1029799
                        GIBSON, DUNN & CRUTCHER LLP
                        1050 Connecticut Avenue, N.W.
                        Washington, D.C. 20036
                        Phone: 202.955.8668
                        Email: tolson@gibsondunn.com

                        *Counsel for Maverick Gaming LLC*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAVERICK GAMING LLC, | |
| 12530 NE 144th Street,<br>Kirkland, WA 98034 | |
| Plaintiff, | |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| 555 4th Street, NW, Washington, DC 20001, | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| 1849 C Street, NW, Washington, DC 20240, | |
| DEB HAALAND, in her official capacity as Secretary of the Interior, | Civil Action No. 1:22-cv-00068-FYP |
| 1849 C Street, NW, Washington, DC 20240, | |
| BRYAN NEWLAND, in his official capacity as Assistant Secretary – Indian Affairs, | |
| 1849 C Street, NW, Washington, DC 20240, | |
| JAY INSLEE, in his official capacity as the Governor of Washington, | |
| Office of the Governor, P.O. Box 40002, Olympia, WA 98504, | |
| ROBERT FERGUSON, in his official capacity as the Attorney General of Washington, | |
| 1125 Washington Street, SE, P.O. Box 40100, Olympia, WA 98504, | |
| BUD SIZEMORE, in his official capacity as Chair of the Washington State Gambling Commission, | |
| P.O. Box 42400, Olympia, WA 98504, | |

JULIA PATTERSON, in her official capacity
as Vice-Chair of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

ALICIA LEVY, in her official capacity as
Commissioner of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

KRISTINE REEVES, in her official capacity
as Commissioner of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

SARAH LAWSON, in her official capacity as
Commissioner of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

STEVE CONWAY, in his official capacity as
ex officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

JEFF HOLY, in his official capacity as ex
officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

SHELLEY KLOBA, in her official capacity as
ex officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

BRANDON VICK, in his official capacity as
ex officio member of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

TINA GRIFFIN, in her official capacity as
Interim Director of the Washington State
Gambling Commission,

P.O. Box 42400, Olympia, WA 98504,

              Defendants.

**MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE
TO FILE FIRST AMENDED COMPLAINT AND TO DROP
<u>THE WASHINGTON STATE DEFENDANTS</u>**

**TABLE OF CONTENTS**

BACKGROUND ..................................................................................................... 1

ARGUMENT ......................................................................................................... 2

    I.    Maverick Is Entitled To Amend Its Complaint As Of Right. ................................ 3

    II.   In The Alternative, This Court Should Grant Maverick Leave To Amend Its Complaint.......................................................................................................... 5

    III.  This Court Should Drop The State Defendants From This Action........................ 7

CONCLUSION...................................................................................................... 8

i

# TABLE OF AUTHORITIES

**CASES**

*Atchinson v. District of Columbia,*
    73 F.3d 418 (D.C. Cir. 1996) .................................................................5

*Borda v. Exec. Off. for U.S. Att'y,*
    125 F. Supp. 3d 196 (D.D.C. 2015) ......................................................3

**\*Crane v. Carr,*
    814 F.2d 758 (D.C. Cir. 1987) ...............................................................7

**\*Hayes v. Buttigieg,*
    2021 WL 6619326 (D.D.C. May 3, 2021) ...........................................3

*James V. Hurson Assocs., Inc. v. Glickman,*
    229 F.3d 277 (D.C. Cir. 2000) ...............................................................4

*Jenkins v. Kerry,*
    928 F. Supp. 2d 122 (D.D.C. 2013) ......................................................3

**\*Levinson v. Wilmer Cutler Pickering Hale & Dorr LLP,*
    999 F. Supp. 2d 226 (D.D.C. 2013) ......................................................5

**\*Villery v. District of Columbia,*
    277 F.R.D. 218 (D.D.C. 2011) ..............................................................3

**STATUTES**

28 U.S.C.
    § 1404(a) .................................................................................................2
    § 1406 .....................................................................................................2
    § 1631 .....................................................................................................2

**RULES**

Fed. R. Civ. P. 15(a) .................................................................................2

Fed. R. Civ. P. 15(a)(1) ............................................................................4

Fed. R. Civ. P. 15(a)(1)(A) .......................................................................4

\*Fed. R. Civ. P. 15(a)(1)(B) ........................................................1, 3, 4, 5

\*Fed. R. Civ. P. 15(a)(2) ....................................................................1, 5

\*Fed. R. Civ. P. 21 ............................................................................1, 7

On February 24, 2022, the Washington State defendants ("State Defendants") moved to transfer this case to the Western District of Washington. The State Defendants argue that this Court lacks personal jurisdiction over them and that transferring the case would serve the interests of convenience and justice. *See* Dkt. 30-1. To eliminate any possible concerns, streamline the issues before this Court, and promote judicial efficiency, Plaintiff Maverick Gaming LLC ("Maverick") is amending its complaint to drop the State Defendants and Counts Two and Three. Maverick's First Amended Complaint limits its challenge in this action to Count One of the initial complaint, which requests relief against the federal defendants alone. Because defendants have not yet filed an answer or a Rule 12 motion, Maverick is entitled to amend its complaint as of right. *See* Fed. R. Civ. P. 15(a)(1)(B). But because there is a split of authority in this district on whether a plaintiff may amend his complaint as of right pursuant to Rule 15(a)(1)(B) *before* a defendant files an answer or Rule 12 motion, Maverick therefore moves, in the alternative, for leave to file its First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). Finally, because its First Amended Complaint would eliminate all claims against the State Defendants, Maverick respectfully requests that this Court drop the State Defendants from this action pursuant to Federal Rule of Civil Procedure 21. Maverick has conferred with the defendants pursuant to D.D.C. Local Rule 7(m). The State Defendants oppose this request. The federal defendants take no position.

## BACKGROUND

On January 11, 2022, Maverick filed its initial complaint in this case. The initial complaint brought three counts: Count One alleged that the Secretary of the Interior violated the Administrative Procedure Act ("APA") by approving tribal-state gaming compact amendments that give Indian tribes a monopoly over sports betting because those amendments violate the Indian Gaming Regulatory Act ("IGRA") and related federal statutes, the U.S. Constitution's guarantee

1

of equal protection, and the anticommandeering principle of the Tenth Amendment. Dkt. 1, at 34–35 (Compl. ¶¶ 161–73). Count Two challenged the State Defendants' execution and administration of the tribal-state compacts and compact amendments. *Id.* at 36–38 (Compl. ¶¶ 174–88). Count Three challenged the State Defendants' racially discriminatory enforcement of the State's criminal prohibitions against most forms of class III gaming. *Id.* at 38–40 (Compl. ¶¶ 189–203).

On February 24, 2022, the State Defendants moved to transfer this case to the Western District of Washington. *See* Dkt. 30-1. The State Defendants argue that this Court should transfer the case under 28 U.S.C. §§ 1631 and 1406 on the ground that this Court lacks personal jurisdiction over them. *See* Dkt. 30-1, at 12–20. Alternatively, they argue that this Court should transfer the case pursuant to 28 U.S.C. § 1404(a) on the grounds of convenience and the interest of justice. *See* Dkt. 30-1, at 20–27.

## ARGUMENT

The State Defendants' motion to transfer would require the parties to litigate—and this Court to decide—questions of jurisdiction and venue that are ancillary to the core legal questions in this case. To avoid this unnecessary expenditure of resources and simplify the issues before this Court, Maverick is amending its complaint to drop the State Defendants and to limit its challenge in this action to Count One, which challenges the Secretary of the Interior's approval of tribal-state compact amendments that give Indian tribes a monopoly over sports betting in Washington. *See* Fed. R. Civ. P. 15(a). These changes would moot many of the arguments in the State Defendants' transfer motion, saving the parties and this Court the expense of litigating and deciding that motion.

Maverick accordingly is filing its First Amended Complaint and requesting this Court to drop the State Defendants from this action.[1]

## I.     Maverick Is Entitled To Amend Its Complaint As Of Right.

Rule 15(a)(1)(B) provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier" "if the pleading is one to which a responsive pleading is required."  Fed. R. Civ. P. 15(a)(1)(B).  Because a defendant is required to file an answer in response to a complaint, Rule 15(a)(1)(B) permits Maverick to amend its original complaint once as a matter of right any time before 21 days after service of an answer or Rule 12 motion.  *See Hayes v. Buttigieg*, 2021 WL 6619326, at *1 (D.D.C. May 3, 2021) (alteration in original) (quoting *Villery v. District of Columbia*, 277 F.R.D. 218, 219 (D.D.C. 2011)) (noting that Rule 15(a)(1)(B) gives a plaintiff "an absolute right to amend its complaint . . . at any time from the moment the complaint is filed until [twenty-one] days after the earlier of the filing of a responsive pleading or a motion under Rule 12(b), (e), or (f)").

Because no defendant has filed an answer or a Rule 12 motion, the 21-day clock has not yet started and Maverick is entitled to amend its complaint to drop all claims against the State Defendants as of right.

Maverick notes, however, that some judges in this district have held that Rule 15(a)(1)(B) permits a plaintiff to amend its complaint as a matter of right only *after* an answer or Rule 12 motion has been filed.  *See Borda v. Exec. Off. for U.S. Att'y*, 125 F. Supp. 3d 196, 198–99 (D.D.C. 2015) (noting the "split of authority on [this] issue"); *Jenkins v. Kerry*, 928 F. Supp. 2d 122, 136

---

[1]   Maverick has attached its First Amendment Complaint as Exhibit 1 to this motion and has attached a redline comparison of the initial complaint and the First Amended Complaint as Exhibit 2.

(D.D.C. 2013) (holding that a plaintiff was not entitled to amend her complaint as of right under Rule 15(a)(1)(B) before the defendants filed their motion to dismiss).

The authorities recognizing that Rule 15(a)(1)(B) permits a plaintiff to amend his complaint any time before the filing of an answer or Rule 12 motion are correct. A previous version of Rule 15 "guarantee[d] a plaintiff an absolute right to amend its complaint once at any time before the defendant has filed a responsive pleading." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282–83 (D.C. Cir. 2000). But this rule had a different effect depending on the means a defendant used to attack the pleading: service of a responsive pleading immediately terminated the right to amend, but service of a *motion* attacking the pleading did not. Fed. R. Civ. P. 15(a)(1) advisory committee's note to 2009 amendment.

To eliminate this differential treatment, Rule 15(a)(1) was amended in 2009 to (1) provide that the right to amend as a matter of course terminates 21 days after the service of a Rule 12 motion, whereas such motions previously did not affect the right; and (2) provide that the right to amend as a matter of course also terminates 21 days after the service of a responsive pleading, whereas service of a responsive pleading previously terminated the right *immediately*. *Id.* The 2009 amendment also extended from 20 to 21 days "the period to amend a pleading to which no responsive pleading is allowed." *Id.*

There is no indication that the 2009 amendment to Rule 15(a)(1) eliminated a plaintiff's traditional right to amend his complaint at any time before the filing of a required responsive pleading. Instead, Rule 15(a)(1), properly construed, sets two different deadlines by which a party may amend a pleading as of right, depending on whether it is one that requires a responsive pleading. If no responsive pleading is required, a party has 21 days after serving his pleading to amend it as of right. Fed. R. Civ. P. 15(a)(1)(A). But if a pleading requires a responsive pleading

(as Maverick's complaint does), a party may amend it as of right any time before 21 days after service of a responsive pleading or Rule 12 motion. Fed. R. Civ. P. 15(a)(1)(B). Maverick is thus entitled to amend its complaint as a matter of right and drop the claims against the State Defendants.

## II.     In The Alternative, This Court Should Grant Maverick Leave To Amend Its Complaint.

Should the Court determine that Maverick requires leave to amend its complaint, this Court should grant leave. Rule 15(a)(2) instructs that "[t]he court should freely" allow amendment "when justice so requires." In considering whether to grant a motion for leave to amend a complaint, a court considers: "(1) undue delay; (2) prejudice to the opposing party; (3) futility of the amendment; (4) bad faith; and (5) whether the plaintiff has previously amended the complaint." *Levinson v. Wilmer Cutler Pickering Hale & Dorr LLP*, 999 F. Supp. 2d 226, 227 (D.D.C. 2013). "[A] district court should grant leave to amend a complaint" in the absence of any such factors. *Atchinson v. District of Columbia*, 73 F.3d 418, 425 (D.C. Cir. 1996). Because none of these factors are present, and because Maverick's proposed amendments to its complaint would simplify the issues before this Court and resolve many of the concerns in the State Defendants' transfer motion, this Court should grant Maverick leave to amend its complaint.

Maverick has not delayed in moving to amend its complaint, but has promptly done so within the time period for responding to the State Defendants' transfer motion. Nor has Maverick previously amended its complaint. And no party will be prejudiced by Maverick's amended complaint. First, Maverick's amended complaint *removes* all claims against the State Defendants and drops them from the action. Far from prejudicing them, Maverick's amended complaint benefits the State Defendants by voluntarily dismissing them from this litigation. Second, Maverick's amended complaint will not prejudice the federal defendants because they would have

TribeSER308

to answer Maverick's APA claim against them regardless of whether the claims against the State defendants remain in this litigation.

Maverick's proposed amendments also are neither futile nor made in bad faith. On the contrary, Maverick is proposing to drop the two counts against the State Defendants in a good-faith effort to resolve any possible concerns raised by the State Defendants in their transfer motion and to avoid unnecessary litigation. Maverick's First Amended Complaint would no longer challenge the State Defendants' execution or administration of the tribal-state gaming compacts or their enforcement of Washington's criminal prohibition of most forms of class III gaming. Instead, the First Amended Complaint would argue only that the U.S. Secretary of the Interior's approval of tribal-state compact amendments giving Indian tribes a monopoly over sports betting violates federal statutory and constitutional law.

The State Defendants note that Counts Two and Three "likely involve only the State Defendants," and that any necessary witnesses and proof on these claims are likely to be located in Washington State. Dkt. 30-1, at 26. Maverick's First Amended Complaint obviates these concerns by removing those counts and limiting its challenge to the actions of the federal defendants in the District of Columbia.

Additionally, Maverick's removal of the State Defendants from its First Amended Complaint moots their argument that this Court lacks personal jurisdiction over them. *See* Dkt. 30-1, at 12–20. Because Maverick's amended complaint would resolve the State Defendants' concerns and avoid unnecessary litigation over jurisdiction and venue by focusing on the actions committed by federal officials in this district, the Court should grant Maverick leave to amend its complaint.

TribeSER309

## III.    This Court Should Drop The State Defendants From This Action.

For the same reasons that this Court should permit Maverick to amend its complaint (if it determines that leave is required), it should also drop the State Defendants from this action.  Rule 21 of the Federal Rules of Civil Procedure provides:  "On motion or on its own, the court may at any time, on just terms, add or drop a party."  Because the only claim remaining in Maverick's First Amended Complaint is its APA challenge to the Secretary of the Interior's approval of Washington's tribal-state sports-betting compact amendments, it would be just to drop the State Defendants from this challenge to federal agency action.  *See Crane v. Carr*, 814 F.2d 758, 761 (D.C. Cir. 1987) (opinion of Ruth Bader Ginsburg, J.) (noting that "defendants are appropriately dropped from the party lineup" because the plaintiff "is pursuing no relief against them"). Dropping the State Defendants would not prejudice them.  Indeed, they argue that this Court has no personal jurisdiction over them, Dkt. 30-1, at 13–17, so they cannot simultaneously claim that dismissing them from this action would prejudice them.  As explained above, the federal defendants would not be prejudiced either because they will have to answer Maverick's APA claim against them whether or not the State Defendants remain in this case.

Therefore, Maverick asks that this Court drop the following defendants from this action:

- Jay Inslee, in his official capacity as the Governor of Washington;

- Robert Ferguson, in his official capacity as the Attorney General of Washington;

- Bud Sizemore, in his official capacity as Chair of the Washington State Gambling Commission;

- Julia Patterson, in her official capacity as Vice-Chair of the Washington State Gambling Commission;

- Alicia Levy, in her official capacity as Commissioner of the Washington State Gambling Commission;

- Kristine Reeves, in her official capacity as Commissioner of the Washington State Gambling Commission;

- Sarah Lawson, in her official capacity as Commissioner of the Washington State Gambling Commission;

- Steve Conway, in his official capacity as ex officio member of the Washington State Gambling Commission;

- Jeff Holy, in his official capacity as ex officio member of the Washington State Gambling Commission;

- Shelley Kloba, in her official capacity as ex officio member of the Washington State Gambling Commission;

- Brandon Vick, in his official capacity as ex officio member of the Washington State Gambling Commission; and

- Tina Griffin, in her official capacity as Interim Director of the Washington State Gambling Commission.

## CONCLUSION

For these reasons, Maverick respectfully requests that this Court grant it leave to file its First Amended Complaint and drop the State Defendants from this action.[2]

---

[2] After Maverick filed its complaint on January 11, 2022, it converted from a Nevada limited liability company to a Washington limited liability company. Maverick has also revised the complaint to reflect that change.

Dated:  March 10, 2022                  Respectfully submitted,


                                        /s/ *Theodore B. Olson*

                                        THEODORE B. OLSON
                                             D.C. Bar No. 367456
                                        MATTHEW D. MCGILL
                                             D.C. Bar No. 481430
                                        LOCHLAN F. SHELFER
                                             D.C. Bar No. 1029799
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C. 20036
                                        Phone:  202.955.8668
                                        Email:  tolson@gibsondunn.com

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAVERICK GAMING LLC,

12530 NE 144th Street,
Kirkland, WA 98034

        Plaintiff,

  v.

THE UNITED STATES OF AMERICA,

555 4th Street, NW, Washington, DC 20001,

UNITED STATES DEPARTMENT OF THE
INTERIOR,

1849 C Street, NW, Washington, DC 20240,

DEB HAALAND, in her official capacity as
Secretary of the Interior,

1849 C Street, NW, Washington, DC 20240,

BRYAN NEWLAND, in his official capacity
as Assistant Secretary – Indian Affairs,

1849 C Street, NW, Washington, DC 20240,

        Defendants.

Civil Action No. 1:22-cv-00068-FYP

## FIRST AMENDED COMPLAINT

Plaintiff Maverick Gaming LLC alleges as follows:

## PRELIMINARY STATEMENT

1.      Maverick Gaming LLC ("Maverick") owns and operates 19 cardrooms in the State

of Washington.  Maverick also owns casinos in Colorado and Nevada, which offer a wide variety

of games, including roulette, craps, sports betting, and dealer-assisted electronic table games.

Maverick seeks to compete effectively with tribal casinos in Washington, but it is unable to do so

because only Indian tribes are permitted to offer sports betting within the State.

2.    Purporting to act pursuant to the Indian Gaming Regulatory Act ("IGRA" or "the Act")—a federal statute regulating gaming on Indian lands—Washington entered into compacts (the "Compacts") with 29 Indian tribes (the "Tribes").  The Compacts grant the Tribes the exclusive right to offer most forms of casino-style gaming (known as "class III" gaming under IGRA).  In 2020, Washington passed a new law giving federally recognized Indian tribes the exclusive right to offer sports betting, which had previously been omitted from the list of class III games that Indian tribes could offer.  In 2021, Washington amended its compacts with 16 Indian tribes (the "Compact Amendments") to permit them to offer sports betting at tribal casinos.

3.    At the same time, Washington's criminal laws prohibit any non-tribal entities, such as Maverick, from offering most forms of class III gaming in Washington, including sports betting. The U.S. Secretary of the Interior approved this discriminatory sports-betting monopoly by allowing the Compact Amendments to go into effect.

4.    With a monopoly over most forms of casino-style gaming, the Tribes have established expansive casino operations in Washington.  This monopoly has been extremely profitable for the Tribes.  In 2017, even before they were permitted to offer sports betting, the Tribes' net receipts from class III gaming totaled approximately $2.56 billion.  But the monopoly prevents non-tribal entities from competing on an equal footing with the Tribes.

5.    Washington's tribal monopoly is inconsistent with IGRA and federal criminal statutes, which prohibit class III gaming activity by tribal casinos on Indian lands unless a State permits the same activity by non-tribal entities.  The tribal monopoly also violates the Constitution's guarantee of equal protection of the laws by irrationally and impermissibly discriminating on the basis of race and ancestry.  Neither a State nor the federal government may give Indian tribes the exclusive right to engage in commercial activities that have no relation to

TribeSER315

uniquely tribal interests.  And IGRA itself violates the Tenth Amendment by mandating that States enter into negotiations with Indian tribes over class III gaming compacts.

6.      Maverick brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706; IGRA; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and the United States Constitution to challenge the validity of Washington's sports-betting monopoly and the Compact Amendments that purport to authorize it.  For the reasons stated herein, and as set forth in greater detail below, Maverick prays that this Court: (1) declare that the Compact Amendments violate federal law, and therefore were not validly entered into and are not in effect; (2) declare that the Secretary's approval of the Compact Amendments violated federal law; (3) set aside and vacate the Secretary's approval of the Compact Amendments; (4) declare that the Tribes' sports-betting activities violate federal law; and (5) award nominal damages, reasonable costs (including attorneys' fees), and any other relief this Court deems just and proper.

## PARTIES

7.      Plaintiff Maverick Gaming LLC is a Washington limited liability company with a residence at 12530 NE 144th Street, Kirkland, WA 98034.  Maverick owns and operates 19 cardrooms in Washington and owns several hotel/casinos in Nevada and Colorado.  Maverick's casinos in Nevada and Colorado offer a variety of games, including roulette, craps, sports betting, and dealer-assisted electronic table games.  Maverick would expand its gaming offerings in Washington to include sports betting if it were permitted to do so, but it is unable to proceed because of Washington's criminal prohibitions of most forms of class III gaming.

8.      Defendant the United States of America is sued as a party to a claim seeking declaratory and injunctive decrees against federal officers.  *See* 5 U.S.C. § 702.  The U.S.

Attorney's Office for the District of Columbia is located at 555 4th Street, NW, Washington, DC 20001.

9.     Defendant the U.S. Department of the Interior is an executive department of the United States.  The U.S. Department of the Interior is headquartered at 1849 C Street, NW, Washington, DC 20240.

10.     Defendant Deb Haaland is the U.S. Secretary of the Interior and the official charged with approving tribal-state class III gaming compacts under IGRA.  25 U.S.C. § 2710(d)(3)(B), (8)(A)–(D).  Secretary Haaland maintains an office at 1849 C Street, NW, Washington, DC 20240. Maverick is suing the Secretary in her official capacity.

11.     Defendant Bryan Newland is the U.S. Assistant Secretary – Indian Affairs.  The Assistant Secretary has been delegated the Secretary of the Interior's authority under IGRA to approve tribal-state class III gaming compacts.  Assistant Secretary Newland maintains an office at 1849 C Street, NW, Washington, DC 20240.  Maverick is suing the Assistant Secretary in his official capacity.

12.     For ease of reference, Maverick refers to the Secretary of the Interior and the Assistant Secretary – Indian Affairs collectively as "the Secretary of the Interior" or "the Secretary."

## JURISDICTION AND VENUE

13.     This action arises under the APA, IGRA, the Declaratory Judgment Act, and the U.S. Constitution.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (review of agency action), and 28 U.S.C. § 1346(a)(2) (nominal damages).

TribeSER317

14.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this is an action against officers and agencies of the United States, a substantial part of the events giving rise to the claims in this lawsuit occurred in this district, and no real property is involved in the action.  Venue is also proper under Section 1391(e)(1) because the Defendants perform their official duties in this district and therefore reside in this district.  *See Reuben H. Donnelley Corp. v. FTC*, 580 F.2d 264, 266 n.3 (7th Cir. 1978).

## FACTUAL ALLEGATIONS

### I.     The Indian Gaming Regulatory Act

#### A.     Background

15.     The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, provides a comprehensive scheme for regulating gaming on Indian lands.

16.     Congress enacted IGRA in 1988 in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that California could not regulate gaming on Indian lands within the State.

17.     IGRA established, for the first time, a federal framework governing gaming on "Indian lands"—defined principally as land "within the limits of any Indian reservation."  25 U.S.C. § 2703(4)(A).

18.     IGRA divides gaming activities into three classes—class I, class II, and class III— and imposes a different regulatory framework for each.

19.     Class I gaming encompasses low-stakes "social games" and "traditional forms of Indian gaming."  25 U.S.C. § 2703(6).

20.     Class II gaming covers bingo and lotto games, as well as non-banked card games that are either "explicitly authorized" by state law, or "not explicitly prohibited" and legally

"played at any location in the State."  25 U.S.C. § 2703(7)(A)(i)–(ii).  Non-banked card games are

card games where players play against one another, rather than against the house.  *Id.* § 2703(7)(B).

21.     Class III gaming—the type of gaming at issue here—is the most highly regulated

under IGRA.  It encompasses "all forms of gaming that are not class I gaming or class II gaming,"

including casino games (*e.g.*, craps and roulette), banked card games (*e.g.*, blackjack), pari-mutuel

wagering (*e.g.*, wagering on horse races), lotteries, and sports betting.  25 U.S.C. § 2703(8);

25 C.F.R. § 502.4.

22.     IGRA allows tribes to conduct a particular class III gaming activity on Indian lands

"only if" that activity: (1) is authorized by a federally approved tribal ordinance meeting certain

statutory conditions; (2) is "located in a State that permits such gaming for any purpose by any

person, organization, or entity"; and (3) is "conducted in conformance with a Tribal-State compact

entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C. § 2710(d)(1)(A)–(C).

23.     "Failure to comply with any one of the three conditions" renders class III gaming

on Indian lands illegal under IGRA and "subject to applicable criminal statutes," including the

Johnson Act, 15 U.S.C. § 1175 (prohibiting gambling devices in Indian country); the Organized

Crime Control Act, 18 U.S.C. § 1955 (prohibiting illegal gambling businesses); and IGRA,

18 U.S.C. § 1166 (incorporating state-law gaming prohibitions into federal law and applying them

on Indian lands).  *See Amador Cnty. v. Salazar*, 640 F.3d 373, 376–77 (D.C. Cir. 2011).

24.     IGRA's second and third requirements—that the class III gaming activity be

located in a State that "permits such gaming" and conducted pursuant to a valid tribal-state

compact—are central to this case.

**B.    IGRA's State-Permission Requirement**

25.    Congress designed IGRA's second condition of class III gaming—the state-permission requirement—to guarantee parity between tribal and non-tribal gaming, thereby "foster[ing] a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied."  S. Rep. No. 100-446, at 6 (1988).

26.    The state-permission requirement precludes tribal class III gaming monopolies by mandating that each form of class III gaming must remain illegal on Indian lands unless the State "permits" the same activity for non-tribal entities. 25 U.S.C. § 2710(d)(1)(B).  A State's purported authorization of class III gaming by Indian tribes alone does not suffice because a State cannot unilaterally "permit[]" class III gaming that federal law makes illegal without a valid tribal-state compact.  The state-permission requirement thus reflects Congress's express finding that Indian tribes should be able to conduct a "gaming activity" on Indian lands only if the same activity "is conducted within a State."  *Id.* § 2701(5).

27.    By the same token, the state-permission requirement prevents States from creating non-tribal class III gaming monopolies: If a State "permits" a form of class III gaming for non-tribal entities, IGRA gives Indian tribes within the State the right to negotiate a tribal-state compact authorizing the same form of class III gaming on Indian lands.  25 U.S.C. § 2710(d)(1)(B).  IGRA thus "provides that tribes are entitled to engage in all forms of Class III gaming that a state permits for other citizens."  *Keweenaw Bay Indian Cmty. v. United States*, 136 F.3d 469, 473 (6th Cir. 1998).

28.    IGRA's state-permission requirement, and the parity and uniformity principles it embodies, are fundamental features of the statutory scheme.

TribeSER320

29.     Class II gaming has a materially identical state-permission requirement:  Tribes cannot engage in class II gaming on Indian lands unless "such Indian gaming is located *within a State that permits such gaming*."  25 U.S.C. § 2710(b)(1)(A) (emphasis added).

30.     Class II non-banked card games likewise are prohibited on Indian lands unless the games are expressly authorized elsewhere in the State or are not expressly prohibited and "played at any location in the State."  25 U.S.C. § 2703(7)(A)(ii)(II).

31.     IGRA also waives application of the Johnson Act—a federal criminal statute prohibiting the possession of gambling devices in Indian country, 15 U.S.C. § 1175—only if the gambling devices are authorized under a tribal-state compact in "a State *in which gambling devices are legal*."  25 U.S.C. § 2710(d)(6)(A) (emphasis added).

32.     Congress omitted the state-permission requirement only with respect to class I gaming, and only because Congress left such gaming "within the exclusive jurisdiction of the Indian tribes."  25 U.S.C. § 2710(a)(1).

**C.     IGRA's Compacting Process**

33.     IGRA requires as a further condition of class III gaming on Indian lands that the gaming at issue be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C. § 2710(d)(1)(C).

34.     To initiate the compacting process, IGRA provides that "[a]ny Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities."  25 U.S.C. § 2710(d)(3)(A).  "Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."  *Id.*

TribeSER321

35.     As Congress recognized, conditioning class III gaming on preexisting state-law permission for non-tribal entities to offer the same games allows States and tribes to "make use of existing State regulatory systems" in their "negotiated compacts." S. Rep. No. 100-446, at 13–14 (1988).

36.     A tribal-state class III gaming compact thus may include, among other things, provisions addressing "the application of the criminal and civil laws and regulations of the . . . State that are directly related to, and necessary for, the licensing and regulation of" the class III gaming activity under negotiation.  25 U.S.C. § 2710(d)(3)(C)(i).

37.     IGRA's compact condition imposes two requirements: (1) the tribe must enter "a compact with the state"; and (2) "[t]he Secretary of the Interior must approve any such compact before it may become effective." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 136 (D.C. Cir. 2006).

38.     To satisfy the first requirement, the State must have authority to enter into the compact.  *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556 (10th Cir. 1997).

39.     To satisfy the second requirement, the Secretary of the Interior must approve the compact and provide "notice of approval" in the Federal Register.  25 U.S.C. § 2710(d)(3)(B).

40.     The Secretary may either approve or disapprove the proposed compact within 45 days of its submission.  25 U.S.C. § 2710(d)(8)(C).

41.     If the Secretary does not approve or disapprove the compact within 45 days, the compact is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter."  25 U.S.C. § 2710(d)(8)(C).

42.     The Secretary must disapprove a compact if it violates: (1) any provision of IGRA, (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian

lands," or (3) "the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B); *see also Amador Cnty.*, 640 F.3d at 381 ("The Secretary must . . . disapprove a compact if it would violate any of [IGRA's] three limitations . . . .").

## II. Washington Has Long Authorized Tribal Class III Gaming Monopolies

43.     Since the early 1990s, despite IGRA's prohibition of class III tribal gaming monopolies, Washington has authorized Indian tribes—and only Indian tribes—to engage in most forms of class III gaming, while subjecting non-tribal entities to criminal sanctions for the same activities. Most recently, Washington has expanded that tribal monopoly to include sports betting.

### A.     Limited Non-Tribal Gaming In Washington

44.     It is illegal to offer most forms of gaming in Washington. Washington makes it a crime to engage in "professional gambling," *see, e.g.*, Wash. Rev. Code § 9.46.222, which Washington defines to include: (1) unless acting as a player or in a manner authorized by law, "engag[ing] in conduct which materially aids any form of gambling activity"; (2) unless acting in a manner authorized by law, "pay[ing] a fee to participate in a card game, contest of chance, lottery, or other gambling activity"; (3) unless acting as a player or in a manner authorized by law, "knowingly accept[ing] or receiv[ing] money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of gambling activity"; (4) "engag[ing] in bookmaking"; (5) "conduct[ing] a lottery"; or (6) offering wagering on greyhound races, *id.* § 9.46.0269(1).

45.     Washington defines "gambling" as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." Wash. Rev. Code § 9.46.0237.

TribeSER323

46.     Washington law specifies three degrees of illegal "professional gambling." Depending on the scale of the gaming operation, a person offering unauthorized gaming may be guilty of a gross misdemeanor, Wash. Rev. Code § 9.46.222(3), a class C felony, *id.* § 9.46.221(3), or a class B felony, *id.* § 9.46.220(3).

47.     Because Washington's definition of "professional gambling" excepts from its definition activities "authorized by this chapter," Wash. Rev. Code § 9.46.0269(1)(a)–(c), a business may offer gaming only if that form of gaming is expressly authorized by Washington law. *See also Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/regulation-enforcement/illegal-activities ("Gambling in Washington is illegal unless the activity is specifically authorized by state law.").

48.     Washington permits non-tribal entities to offer only limited types of gaming, such as raffles, bingo, card games, amusement games, pull-tabs, punchboards, sports pool boards, and fundraising events.  Wash. Rev. Code §§ 9.46.0305–.0361.

49.     None of these statutory exceptions authorizes non-tribal entities to engage in the full range of casino-style gaming in Washington.

50.     As a result, it is a crime in Washington for non-tribal entities to offer the vast majority of class III games, including sports betting.

**B.      Washington's Tribal Gaming Monopoly**

51.     In contrast to its broad criminal prohibition of class III casino-style gaming among non-tribal entities, since the early 1990s Washington has authorized Indian tribes located within the State to conduct a wide range of class III games.

52.     In 1992 Washington codified its process for negotiating tribal-state class III gaming compacts pursuant to IGRA.  Wash. Rev. Code § 9.46.360.

53.     The director of the Washington State Gambling Commission (or the director's designee) "shall negotiate compacts for class III gaming on behalf of the state with federally recognized Indian tribes in the state of Washington." Wash. Rev. Code § 9.46.360(2).

54.     On reaching a tentative agreement with an Indian tribe on a proposed compact, "the director shall immediately transmit a copy of the proposed compact to all voting and ex officio members of the gambling commission" and to the two standing committees designated by the Washington House of Representatives and Senate, each of which shall "forward its respective comments to the gambling commission." Wash. Rev. Code § 9.46.360(3), (5).  The four ex officio members of the gambling commission are voting members of the gambling commission for the sole purpose of voting on proposed tribal-state compacts.  *Id.* § 9.46.360(4).

55.     Within 45 days of receiving a proposed compact from the director, the gambling commission, including the four ex officio members, "shall vote on whether to return the proposed compact to the director with instructions for further negotiation or to forward the proposed compact to the governor for review and final execution." Wash. Rev. Code § 9.46.360(6).

56.     The gambling commission "is authorized and empowered to enforce the provisions of any compact between a federally recognized Indian tribe and the state of Washington." Wash. Rev. Code § 9.46.360(9).

57.     In its first tribal-state compact (executed with the Tulalip Tribes of Washington on August 2, 1991), Washington authorized the Tulalip Tribes of Washington to conduct a wide range of class III games that are illegal for non-tribal entities to offer.  *See* Tribal-State Compact for Class III Gaming Between the Tulalip Tribes of Washington and the State of Washington at 4–5 (Aug.     2,     1991)     (hereinafter     "Tulalip     Compact"),     *available     at*

https://www.wsgc.wa.gov/sites/default/files/public/searchable-compacts/tulalip/A-1991%20Com

pact%20%28s%29.pdf.

58.     Since 1991, Washington has entered into analogous compacts with "[a]ll 29

federally recognized tribes in Washington," giving the Tribes the exclusive right to offer certain

class III games.   Gaming Compacts, Washington State Gambling Comm'n, *available at*

https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts (last visited Mar. 10, 2022).

59.     On March 25, 2020, Washington passed a new law, S.H.B. No. 2638, giving Indian

tribes in the state a monopoly over sports betting.  *See* 2020 Wash. Legis. Serv. ch. 127.  It remains

a crime for non-tribal entities to offer sports betting.  *See* Wash. Rev. Code §§ 9.46.220–.222.

60.     The law states:

> It has long been the policy of this state to prohibit all forms and means of gambling
> except where carefully and specifically authorized and regulated.  The legislature
> intends to further this policy by authorizing sports wagering on a very limited basis
> by restricting it to tribal casinos in the state of Washington.

2020 Wash. Legis. Serv. ch. 127, § 1.

61.     The new act states that "[u]pon the request of a federally recognized Indian tribe or

tribes in the state of Washington, the tribe's class III gaming compact may be amended . . . to

authorize the tribe to conduct and operate sports wagering on its Indian lands . . . .  Sports wagering

conducted pursuant to the gaming compact is a gambling activity authorized by this chapter."

Wash. Rev. Code § 9.46.0364(1).   The statute makes clear that "[s]ports wagering conducted

pursuant to the provisions of a class III gaming compact entered into by a tribe and the state

pursuant to [Wash. Rev. Code § 9.46.360] is authorized bookmaking and is not subject to civil or

criminal penalties pursuant to [Wash. Rev. Code § 9.46.225]."  *Id.* § 9.46.0364(2).

62.     On July 6, 2021, Governor Jay Inslee and 15 of the 29 federally recognized Indian

tribes in Washington executed Compact Amendments to each of the Tribes' respective compacts

to permit the Tribes to offer sports betting at their gaming facilities. *See, e.g.*, Third Amendment to the Tribal State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Colville%28D%29/2021-070 6%20Colville_Amendment_3_%26_Appendix_S%28s%29.pdf.

63.     These Tribes are: the Confederated Tribes of the Colville Reservation; the Cowlitz Indian Tribe; the Jamestown S'Klallam Tribe; the Kalispel Tribe; the Lummi Nation; the Muckleshoot Indian Tribe; the Puyallup Tribe of Indians; the Shoalwater Bay Indian Tribe; the Snoqualmie Indian Tribe; the Spokane Tribe; the Squaxin Island Tribe; the Stillaguamish Tribe of Indians; the Suquamish Tribe; the Swinomish Indian Tribal Community; and the Tulalip Tribes of Washington.

64.     On September 1, 2021, the Secretary approved the compact amendments for the Spokane Tribe, the Cowlitz Indian Tribe, the Suquamish Tribe, the Snoqualmie Indian Tribe, the Stillaguamish Tribe of Indians, the Squaxin Island Tribe, the Lummi Nation, the Puyallup Tribe of Indians, and the Tulalip Tribes of Washington. *See* 86 Fed. Reg. 49,046, 49,046–47, 49,049– 54 (Sept. 1, 2021). On September 15, 2021, the Secretary approved the compact amendments for the Muckleshoot Indian Tribe, the Confederated Tribes of the Colville Reservation, the Shoalwater Bay Indian Tribe, and the Kalispel Tribe. *See* 86 Fed. Reg. 51,370, 51,370, 51,373–74 (Sept. 15, 2021). On October 22, 2021, the Secretary approved the compact amendment for the Swinomish Indian Tribal Community. *See* 86 Fed. Reg. 58,685 (Oct. 22, 2021). On December 28, 2021, the Secretary approved the compact amendment for the Jamestown S'Klallam Tribe. *See* 86 Fed. Reg. 73,800 (Dec. 28, 2021).

TribeSER327

65.     The sports-betting amendments have therefore been approved by the Secretary pursuant to IGRA, and that approval purports to authorize Washington's tribal sports-betting monopoly.  *See* 25 U.S.C. § 2710(d)(3)(B), (8)(A).

66.     On September 19, 2021, a sixteenth tribe, the Port Gamble S'Klallam Tribe, amended its compact to permit it to offer sports betting.  Memorandum of Incorporation of Most Favored Nation Amendments to the Tribal/State Compact Between the Port Gamble S'Klallam Tribe     and     the     State     of     Washington     (Sept.     19,     2021),     *available     at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Port_Gamble%28X%29/Port _Gamble_Sports_Wagering_MOI_FINAL%28signed%29.pdf.     Because     Washington     had amended compacts with other tribes to permit sports betting, the Port Gamble S'Klallam Tribe exercised its right under its compact's most-favored nation section to unilaterally amend its compact to permit sports betting as well.  *Id.* at 1.  On December 28, 2021, the Secretary approved the Port Gamble S'Klallam Tribe's Memorandum of Incorporation.  *See* 86 Fed. Reg. 73,800 (Dec. 28, 2021).

67.     Because the terms of each sports-betting amendment are materially identical, the compact amendment between Washington and the Confederated Tribes of the Colville Reservation is used for reference throughout this complaint.  *See* Third Amendment to the Tribal-State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021) (hereinafter "Colville Compact Amendment"), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Colville%28D%29/2021- 0706%20Colville_Amendment_3_%26_Appendix_S%28s%29.pdf.

TribeSER328

68.     The Compact Amendments add "Sports Wagering" to the list of class III gaming activities that the Tribes are permitted to offer, subject to a new Appendix S prescribing certain conditions.  Colville Compact Amendment at 2.

69.     The Compact Amendments require each of the Tribes to contribute their share of a "Start-Up Costs fee," which "includes the actual costs incurred by the State Gaming Agency for negotiations, rule development, regulatory program development, training, and similar activities necessary to implement Sports Wagering."  Colville Compact Amendment at 3.

70.     The Compact Amendments also provide that the Tribes' sports-betting net win will be included in the Tribes' total net gaming revenues, of which the Tribes are required to pay 0.13% to Washington for "problem gambling education, awareness, and treatment in the State of Washington."   Colville Compact Amendment, Appendix S, § 8.1; First Amendment to the Tribal/State Compact for Class III Gaming Between the Confederated Tribes of the Colville Reservation and the State of Washington, Appendix X2, §§ 14.4, 14.6 (Mar. 30, 2007), *available at*           https://www.wsgc.wa.gov/sites/default/files/public/searchable-compacts/colville/D-2007%20Amendment%201%20%28App%20X2%29%20%28s%29.pdf.

C.     **The Tribes' Class III Gaming Operations**

71.     The Tribes currently operate 29 casinos on Indian lands in Washington.  *See* Casino Locations, Washington State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/tribal-gaming/casino-locations.  Of these 29 casinos, 22 are governed by compacts that Washington and the Tribes have amended to permit sports betting.  *Id.*; Gaming Compacts, Washington State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts.

72.     These casinos offer a range of class III games that are illegal for non-tribal entities to offer in Washington, including sports betting.

73.     In 2017, the Tribes' net receipts from class III gaming were approximately $2.56 billion.  Tribal Community Contributions at 14, Washington State Gambling Commission (Sept. 12,   2019),   *available   at*   https://wsgc.wa.gov/sites/default/files/19%20Sept%2012%20- %20Tribal%20Contributions.pdf?_ga=2.85132313.104568771.1636491701-808950696.1634221 088.  The Tribes' net receipts were approximately $2.42 billion in 2016 and approximately $1.98 billion in 2015. *See id.* at 14–15.

74.     No non-tribal casinos in Washington offer sports betting.

**III.     The Defendants' Approval Of The Compact Amendments Violated Federal Law**

75.     The Secretary of the Interior's decision to approve the Compact Amendments was not in accordance with IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, or the equal- protection component of the Fifth Amendment's Due Process Clause, U.S. Const. amend. V, or the Tenth Amendment, *id.* amend. X.

76.     IGRA requires the Secretary of the Interior to disapprove any tribal-state class III gaming compact that violates: (1) any provision of IGRA, (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands," or (3) "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B); *see also Amador Cnty.*, 640 F.3d at 383.

77.     The Secretary of the Interior was obligated to disapprove the Compact Amendments for three independent reasons.

78.     *First*, the Secretary of the Interior was obligated to disapprove the Compact Amendments because they purport to authorize tribal class III gaming that violates IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.

79.     IGRA provides that class III gaming on Indian lands is lawful "only if," among other things, the class III gaming activity is "located in a State that permits such gaming for any

TribeSER330

purpose by any person, organization, or entity" and is conducted in conformance with a tribal-state compact "that is in effect." 25 U.S.C. § 2710(d)(1)(B)–(C).

80. Failure to comply with either condition renders class III gaming on Indian lands illegal under IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166. *See Pueblo of Santa Ana*, 104 F.3d at 1552.

81. IGRA's state-permission requirement prohibits tribal class III gaming monopolies by ensuring that each class III gaming activity remains illegal on Indian lands unless a State "permits" the same class III gaming activity by non-tribal entities.

82. IGRA's state-permission requirement has not been satisfied in Washington for sports betting because the State criminally prohibits such gaming by any non-tribal entities. *Compare* Wash. Rev. Code § 9.46.0364, *with id.* §§ 9.46.220–.222.

83. Washington's grant of a right to only "a federally recognized Indian tribe or tribes in the state of Washington" to "operate sports wagering on its Indian lands," Wash. Rev. Code § 9.46.0364, violates IGRA's state-permission requirement because Washington prohibits any non-tribal entities from offering sports betting, and thereby does not "permit[] such gaming for any purpose by any person, organization, or entity" as IGRA requires, 25 U.S.C. § 2710(d)(1)(B).

84. Neither the Compact Amendments nor any other state law can unilaterally "permit"—that is, authorize or legalize—sports betting solely on Indian lands because IGRA makes clear that such authorization can occur only through IGRA's statutory compacting process.

85. Because Washington has not "permit[ted]" sports betting within the meaning of IGRA, 25 U.S.C. § 2710(d)(1)(B), sports betting remains illegal on Indian lands in Washington under IGRA and applicable federal criminal statutes. *See* 25 U.S.C. § 2710(d)(1); 15 U.S.C. § 1175; 18 U.S.C. § 1955; 18 U.S.C. § 1166.

86.     Because the Compact Amendments purport to authorize the Tribes to offer class III gaming in Washington that federal law prohibits, the Compact Amendments violate federal law and are void.

87.     Because the Compact Amendments violate federal law, the Governor of Washington had no authority to "enter[] into" them within the meaning of IGRA.  25 U.S.C. § 2710(d)(1)(C).

88.     Because the Compact Amendments violate federal law and were not validly entered into, the Secretary was obligated to disapprove the Compact Amendments.  25 U.S.C. § 2710(d)(8)(B)(i).

89.     By instead approving the Compact Amendments and purporting to authorize illegal tribal class III gaming, the Secretary violated IGRA.  *See* 15 U.S.C. § 1175; 18 U.S.C. § 1955; 18 U.S.C. § 1166.

90.     *Second*, the Secretary also was required to disapprove the Compact Amendments under IGRA because they violate the Constitution's guarantee of equal protection.

91.     The Constitution's guarantee of equal protection mandates the equal treatment of people of all races and ancestries without discrimination or preference.  *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

92.     The Compact Amendments discriminate on the basis of race and ancestry, in violation of equal-protection principles, by granting monopolies to Washington Indian tribes over sports betting.

93.     By executing the Compact Amendments, Washington has purported to grant the Tribes a right to offer sports betting, an activity that Washington permits only tribal entities to offer.  *See* Wash. Rev. Code § 9.46.0364.

94.     At the same time, Washington criminally prohibits any entities other than those affiliated with Washington Indian tribes from offering sports betting in Washington.  Wash. Rev. Code §§ 9.46.220–.222.

95.     The Compact Amendments' grant of sports-betting monopolies to Washington Indian tribes is a racial and ancestral classification, as membership in a Washington Indian tribe depends on lineal descent from historical tribal rolls and often also a minimum blood quantum.

96.     The Compact Amendments' race-based preference for Indian tribal sports betting is subject to strict scrutiny.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

97.     The Compact Amendments' race-based preference does not fall within the narrow exception outlined in *Morton v. Mancari*, 417 U.S. 535 (1974), because Congress has not authorized and could not authorize a State to grant Indian tribes a monopoly over a commercial activity that is unrelated to uniquely Indian interests, *see Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997).

98.     The Compact Amendments' race-based preference for Indian tribal sports betting cannot survive strict scrutiny or even rational-basis review because it is unrelated to the furtherance of Congress's trust obligation to Indian tribes.

99.     Thus, the Compact Amendments' race-based preference for Indian tribal sports betting violates the Constitution's guarantee of equal protection.

100.    Because the Compact Amendments violate equal protection, the Governor of Washington lacked authority to "enter[] into" them within the meaning of IGRA.  25 U.S.C. § 2710(d)(1)(C).

TribeSER333

101.   Because the Compact Amendments violate equal protection and were not validly entered into, the Secretary was required to disapprove the Compact Amendments.  25 U.S.C. § 2710(d)(8)(B)(ii).

102.   By instead approving the Compact Amendments and purporting to authorize a violation of equal protection, the Secretary violated IGRA.

103.   In addition to violating IGRA, the Secretary's approval independently violated the equal-protection component of the Fifth Amendment's Due Process Clause because it blessed and facilitated Washington's unconstitutional race-based preference for Indian tribal sports betting.

104.   *Third*, the Secretary also was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment.

105.   "The legislative powers granted to Congress are sizable, but they are not unlimited."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).  "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."  *Id.*

106.   IGRA's state-negotiation mandate issues a "direct order" to the States: IGRA directs that upon receiving a request from an Indian tribe to negotiate a class III gaming compact, "the State *shall* negotiate with the Indian tribe in good faith to enter into such a compact."  25 U.S.C. § 2710(d)(3)(A) (emphasis added).  That sort of "direct order" violates the Constitution's anti-commandeering principle, and renders the process for entering into the Compact Amendments unlawful.  *See Murphy*, 138 S. Ct. at 1476.

107.   This state-negotiation mandate is not severable from the remainder of the Act.  An unconstitutional provision is not severable when "the statute created in its absence is legislation that Congress would not have enacted."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).

TribeSER334

The compacting process is IGRA's centerpiece, and the state-negotiation mandate is what ensures that process takes place. Congress would not have enacted IGRA without this central requirement.

108. Because the Compact Amendments violated the Tenth Amendment and were not validly entered into, the Secretary was required to disapprove the Compact Amendments. 25 U.S.C. § 2710(d)(8)(B)(ii).

109. By instead approving the Compact Amendments and purporting to authorize a violation of the Tenth Amendment, the Secretary violated IGRA.

110. In addition, because the state-negotiation mandate is not severable from the remainder of the Act, none of IGRA's provisions can stand, and the Secretary lacked any authority to approve the Compact Amendments.

## IV. Maverick's Injuries Caused By The Compact Amendments

111. Maverick currently owns and operates 19 cardrooms in Washington. Maverick also owns casinos in Nevada and Colorado, which offer a range of class III gaming, including sports betting.

112. Sports betting in the United States has seen extraordinary growth over the past several years.[1] The American Gaming Association reported that sports betting generated more

---

[1] *See, e.g.*, David Purdum, *Sports Betting's Growth in U.S. 'Extraordinary'*, ESPN (May 14, 2020), https://www.espn.com/chalk/story/_/id/29174799/sports-betting-growth-us-extraordinary ("More than $20 billion has been bet with U.S. sportsbooks since the Supreme Court struck down the Professional and Amateur Sports Protection Act of 1992 on May 14, 2018.").

than $1.5 billion in revenue in 2020, which represented a nearly 69% year-over-year growth rate.[2]

Revenue from sports betting will continue to rise as consumer demand grows around the country.[3]

113.    With sports betting becoming increasingly popular, Maverick would offer that form of gaming to the patrons of its Washington cardrooms if it were permitted to do so.  It would be economically viable and profitable for Maverick to offer sports betting in Washington, but Maverick is unable to proceed because of Washington's criminal prohibition of most forms of class III gaming unless conducted at an authorized tribal gaming facility.  *See* Wash. Rev. Code §§ 9.46.0364, 9.46.0368, 9.46.220–.222.

114.    Because the Tribes can offer sports betting, but Maverick cannot, Maverick suffers competitive injury with tribal casinos.  That injury includes increased advertising expenses, increased promotional expenses, and increased entertainment expenses that Maverick must undertake in order to compete with tribal casinos.  It also includes lost revenue from customers who would frequent Maverick's cardrooms, but who instead frequent tribal casinos because they offer sports betting.  Maverick also suffers a loss of goodwill by failing to offer sports betting while its tribal competitors do so.

115.    The Supreme Court "routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement] . . . .  It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies this

---

[2]    *See Commercial Gaming Revenue Tracker: 2020 Fourth Quarter*, Am. Gaming Ass'n, https://www.americangaming.org/wp-content/uploads/2021/02/Q4-Email-PDF.pdf        (last visited Mar. 10, 2022).

[3]    *See id.*

part of the standing test." *Clinton v. City of N.Y.*, 524 U.S. 417, 432–33 (1998) (alterations in original) (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994)).

116.     Maverick competes with other casinos, including tribal casinos, to offer the best and most attractive selection of games allowed by law.  Maverick would earn additional revenue and have fewer expenses if tribal casinos could not offer sports betting exclusively.  Because of Washington's tribal sports-betting monopoly, Maverick cannot establish or acquire gaming operations in Washington that can effectively compete with the Tribes' operations.

117.     The Secretary's unlawful approval of the Compact Amendments alters competitive conditions in a way that is unfavorable to Maverick.

118.     The Secretary's unlawful approval of the Compact Amendments has facilitated and continues to facilitate the Tribes' unlawful sports-betting activities.  Those activities harm Maverick by making it more difficult for Maverick to grow its successful gaming offerings in Washington because Maverick cannot compete on an equal footing with the Tribes' gaming offerings.

119.     The Secretary's unlawful approval of the Compact Amendments has resulted in the deprivation of Maverick's substantive rights under constitutional equal-protection principles and IGRA to compete on equal terms with the Tribes to offer sports betting in Washington free from discrimination on the basis of race and ancestry.

120.     If Washington applied its prohibition of sports betting to the Tribes and non-tribal entities alike, many patrons of Washington's tribal casinos would instead frequent Maverick's Washington cardrooms, increasing Maverick's commercial casino revenue.

121.     Washington's tribal sports-betting monopoly exists only because the Secretary unlawfully approved the Compact Amendments.

TribeSER337

122.    If the Secretary had disapproved the Compact Amendments, Washington would not be able to enforce its tribal sports-betting monopoly.

123.    Vacating the Secretary's approval would make Washington's tribal sports-betting monopoly unlawful, allowing Maverick to increase its commercial casino revenue by benefitting from increased patronage at its Washington cardrooms due to the elimination of the Tribes' competitive advantage.

## COUNT ONE:

### The Administrative Procedure Act
### (Not in Accordance with Law – IGRA, Equal Protection, and the Tenth Amendment)

124.    Maverick incorporates all preceding paragraphs by reference.

125.    The Department of the Interior and the Secretary of the Interior are "agencies" under the APA.  5 U.S.C. § 551(1).

126.    The APA prohibits agency actions that are "not in accordance with law."  5 U.S.C. § 706(2)(A).

127.    Federal law obligated the Secretary of the Interior to disapprove Washington's sports-betting Compact Amendments.

128.    *First*, the Secretary of the Interior was obligated to disapprove the Compact Amendments because they purport to authorize tribal class III gaming that violates IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.

129.    *Second*, the Secretary also was required to disapprove the Compact Amendments under IGRA and the equal-protection component of the Fifth Amendment's Due Process Clause because they violate the Constitution's guarantee of equal protection.

130.    *Third*, the Secretary also was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment.

TribeSER338

131.    The Secretary's approval of the Compact Amendments constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

132.    Maverick has suffered a legal wrong or has been adversely affected or aggrieved by the Secretary's approval of the Compact Amendments.  5 U.S.C. § 702.

133.    The Secretary's approval of the Compact Amendments has resulted in the deprivation of Maverick's substantive rights under equal-protection principles and IGRA to compete on equal terms with the Tribes free from discrimination on the basis of race or ancestry.

134.    The Secretary's approval of the Compact Amendments has facilitated and continues to facilitate the Tribes' unlawful sports-betting offerings.  Those activities harm Maverick by making it more difficult for Maverick to effectively compete with the Tribes' much broader gaming offerings.

135.    Maverick therefore is entitled to an order: (1) declaring that the Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment, and therefore were not validly entered into and are not in effect; (2) declaring that the Secretary's approval of the Compact Amendments violated IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment; (3) setting aside and vacating the Secretary's approval of the Compact Amendments; (4) declaring that the Tribes' sports-betting activities violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166; and (5) awarding nominal damages, reasonable costs (including attorneys' fees), and any other relief this Court deems just and proper.

TribeSER339

## PRAYER FOR RELIEF

136.     Maverick demands a judgment against the Defendants as follows:

a.     Declaring that the Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment, and therefore are void, were not validly entered into, and are not in effect;

b.     Declaring that the Secretary of the Interior's approval of the Compact Amendments violated IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment;

c.     Setting aside and vacating the Secretary of the Interior's approval of the Compact Amendments;

d.     Declaring that the Tribes' sports-betting activities violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166;

e.     Awarding Maverick nominal damages;

f.     Awarding Maverick its reasonable costs, including attorneys' fees, incurred in bringing this action; and

g.     Granting such other and further relief as this Court deems just and proper.

TribeSER340

Dated: March 10, 2022

Respectfully submitted,


/s/ *Theodore B. Olson*

THEODORE B. OLSON
   D.C. Bar No. 367456
MATTHEW D. MCGILL
   D.C. Bar No. 481430
LOCHLAN F. SHELFER
   D.C. Bar No. 1029799
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: 202.955.8668
Email: tolson@gibsondunn.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAVERICK GAMING LLC,

12530 NE 144th Street,
Kirkland, WA 98034

        Plaintiff,

  v.

THE UNITED STATES OF AMERICA,

555 4th Street, NW, Washington, DC 20001,

UNITED STATES DEPARTMENT OF THE
INTERIOR,

1849 C Street, NW, Washington, DC 20240,

DEB HAALAND, in her official capacity as
Secretary of the Interior,

1849 C Street, NW, Washington, DC 20240,

BRYAN NEWLAND, in his official capacity
as Assistant Secretary – Indian Affairs,

1849 C Street, NW, Washington, DC 20240,

        Defendants.

Civil Action No. 1:22-cv-00068-FYP

## FIRST AMENDED COMPLAINT

Plaintiff Maverick Gaming LLC alleges as follows:

### PRELIMINARY STATEMENT

1.     Maverick Gaming LLC ("Maverick") owns and operates 19 cardrooms in the State of Washington. Maverick also owns casinos in Colorado and Nevada, which offer a wide variety of games, including roulette, craps, sports betting, and dealer-assisted electronic table games. Maverick seeks to compete effectively with tribal casinos in Washington, but it is unable to do so because only Indian tribes are permitted to offer sports betting within the State.

2.    Purporting to act pursuant to the Indian Gaming Regulatory Act ("IGRA" or "the Act")—a federal statute regulating gaming on Indian lands—Washington entered into compacts (the "Compacts") with 29 Indian tribes (the "Tribes"). The Compacts grant the Tribes the exclusive right to offer most forms of casino-style gaming (known as "class III" gaming under IGRA). In 2020, Washington passed a new law giving federally recognized Indian tribes the exclusive right to offer sports betting, which had previously been omitted from the list of class III games that Indian tribes could offer. In 2021, Washington amended its compacts with 16 Indian tribes (the "Compact Amendments") to permit them to offer sports betting at tribal casinos.

3.    At the same time, Washington's criminal laws prohibit any non-tribal entities, such as Maverick, from offering most forms of class III gaming in Washington, including sports betting. The U.S. Secretary of the Interior approved this discriminatory sports-betting monopoly by allowing the Compact Amendments to go into effect.

4.    With a monopoly over most forms of casino-style gaming, the Tribes have established expansive casino operations in Washington. This monopoly has been extremely profitable for the Tribes. In 2017, even before they were permitted to offer sports betting, the Tribes' net receipts from class III gaming totaled approximately $2.56 billion. But the monopoly prevents non-tribal entities from competing on an equal footing with the Tribes.

5.    Washington's tribal monopoly is inconsistent with IGRA and federal criminal statutes, which prohibit class III gaming activity by tribal casinos on Indian lands unless a State permits the same activity by non-tribal entities. The tribal monopoly also violates the Constitution's guarantee of equal protection of the laws by irrationally and impermissibly discriminating on the basis of race and ancestry. Neither a State nor the federal government may give Indian tribes the exclusive right to engage in commercial activities that have no relation to

TribeSER343

uniquely tribal interests.  And IGRA itself violates the Tenth Amendment by mandating that States enter into negotiations with Indian tribes over class III gaming compacts.

6.    Maverick brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706; IGRA; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and the United States Constitution to challenge the validity of Washington's sports-betting monopoly and the Compact Amendments that purport to authorize it.  For the reasons stated herein, and as set forth in greater detail below, Maverick prays that this Court: (1) declare that the Compact Amendments violate federal law, and therefore were not validly entered into and are not in effect; (2) declare that the Secretary's approval of the Compact Amendments violated federal law; (3) set aside and vacate the Secretary's approval of the Compact Amendments; (4) declare that the Tribes' sports-betting activities violate federal law; and (5) award nominal damages, reasonable costs (including attorneys' fees), and any other relief this Court deems just and proper.

## PARTIES

7.    Plaintiff Maverick Gaming LLC is a Washington limited liability company with a residence at 12530 NE 144th Street, Kirkland, WA 98034.  Maverick owns and operates 19 cardrooms in Washington and owns several hotel/casinos in Nevada and Colorado.  Maverick's casinos in Nevada and Colorado offer a variety of games, including roulette, craps, sports betting, and dealer-assisted electronic table games.  Maverick would expand its gaming offerings in Washington to include sports betting if it were permitted to do so, but it is unable to proceed because of Washington's criminal prohibitions of most forms of class III gaming.

8.    Defendant the United States of America is sued as a party to a claim seeking declaratory and injunctive decrees against federal officers.  *See* 5 U.S.C. § 702.  The U.S.

Attorney's Office for the District of Columbia is located at 555 4th Street, NW, Washington, DC 20001.

9.  Defendant the U.S. Department of the Interior is an executive department of the United States.  The U.S. Department of the Interior is headquartered at 1849 C Street, NW, Washington, DC 20240.

10.  Defendant Deb Haaland is the U.S. Secretary of the Interior and the official charged with approving tribal-state class III gaming compacts under IGRA.  25 U.S.C. § 2710(d)(3)(B), (8)(A)–(D).  Secretary Haaland maintains an office at 1849 C Street, NW, Washington, DC 20240. Maverick is suing the Secretary in her official capacity.

11.  Defendant Bryan Newland is the U.S. Assistant Secretary – Indian Affairs.  The Assistant Secretary has been delegated the Secretary of the Interior's authority under IGRA to approve tribal-state class III gaming compacts.  Assistant Secretary Newland maintains an office at 1849 C Street, NW, Washington, DC 20240.  Maverick is suing the Assistant Secretary in his official capacity.

12.  For ease of reference, Maverick refers to the Secretary of the Interior and the Assistant Secretary – Indian Affairs collectively as "the Secretary of the Interior" or "the Secretary."

### JURISDICTION AND VENUE

13.  This action arises under the APA, IGRA, the Declaratory Judgment Act, and the U.S. Constitution.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (review of agency action), and 28 U.S.C. § 1346(a)(2) (nominal damages).

14.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this is an action against officers and agencies of the United States, a substantial part of the events giving rise to the claims in this lawsuit occurred in this district, and no real property is involved in the action.  Venue is also proper under Section 1391(e)(1) because the Defendants perform their official duties in this district and therefore reside in this district.  *See Reuben H. Donnelley Corp. v. FTC*, 580 F.2d 264, 266 n.3 (7th Cir. 1978).

## FACTUAL ALLEGATIONS

## I.     The Indian Gaming Regulatory Act

### A.     Background

15.     The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, provides a comprehensive scheme for regulating gaming on Indian lands.

16.     Congress enacted IGRA in 1988 in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that California could not regulate gaming on Indian lands within the State.

17.     IGRA established, for the first time, a federal framework governing gaming on "Indian lands"—defined principally as land "within the limits of any Indian reservation."  25 U.S.C. § 2703(4)(A).

18.     IGRA divides gaming activities into three classes—class I, class II, and class III—and imposes a different regulatory framework for each.

19.     Class I gaming encompasses low-stakes "social games" and "traditional forms of Indian gaming."  25 U.S.C. § 2703(6).

20.     Class II gaming covers bingo and lotto games, as well as non-banked card games that are either "explicitly authorized" by state law, or "not explicitly prohibited" and legally

TribeSER346

"played at any location in the State."  25 U.S.C. § 2703(7)(A)(i)–(ii).  Non-banked card games are

card games where players play against one another, rather than against the house.  *Id.* § 2703(7)(B).

21.     Class III gaming—the type of gaming at issue here—is the most highly regulated

under IGRA.  It encompasses "all forms of gaming that are not class I gaming or class II gaming,"

including casino games (*e.g.*, craps and roulette), banked card games (*e.g.*, blackjack), pari-mutuel

wagering (*e.g.*, wagering on horse races), lotteries, and sports betting.  25 U.S.C. § 2703(8);

25 C.F.R. § 502.4.

22.     IGRA allows tribes to conduct a particular class III gaming activity on Indian lands

"only if" that activity: (1) is authorized by a federally approved tribal ordinance meeting certain

statutory conditions; (2) is "located in a State that permits such gaming for any purpose by any

person, organization, or entity"; and (3) is "conducted in conformance with a Tribal-State compact

entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C. § 2710(d)(1)(A)–(C).

23.     "Failure to comply with any one of the three conditions" renders class III gaming

on Indian lands illegal under IGRA and "subject to applicable criminal statutes," including the

Johnson Act, 15 U.S.C. § 1175 (prohibiting gambling devices in Indian country); the Organized

Crime Control Act, 18 U.S.C. § 1955 (prohibiting illegal gambling businesses); and IGRA,

18 U.S.C. § 1166 (incorporating state-law gaming prohibitions into federal law and applying them

on Indian lands).  *See Amador Cnty. v. Salazar*, 640 F.3d 373, 376–77 (D.C. Cir. 2011).

24.     IGRA's second and third requirements—that the class III gaming activity be

located in a State that "permits such gaming" and conducted pursuant to a valid tribal-state

compact—are central to this case.

### B.      IGRA's State-Permission Requirement

25.      Congress designed IGRA's second condition of class III gaming—the state-permission requirement—to guarantee parity between tribal and non-tribal gaming, thereby "foster[ing] a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied."  S. Rep. No. 100-446, at 6 (1988).

26.      The state-permission requirement precludes tribal class III gaming monopolies by mandating that each form of class III gaming must remain illegal on Indian lands unless the State "permits" the same activity for non-tribal entities.  25 U.S.C. § 2710(d)(1)(B).  A State's purported authorization of class III gaming by Indian tribes alone does not suffice because a State cannot unilaterally "permit[]" class III gaming that federal law makes illegal without a valid tribal-state compact.  The state-permission requirement thus reflects Congress's express finding that Indian tribes should be able to conduct a "gaming activity" on Indian lands only if the same activity "is conducted within a State."  *Id.* § 2701(5).

27.      By the same token, the state-permission requirement prevents States from creating non-tribal class III gaming monopolies: If a State "permits" a form of class III gaming for non-tribal entities, IGRA gives Indian tribes within the State the right to negotiate a tribal-state compact authorizing the same form of class III gaming on Indian lands.  25 U.S.C. § 2710(d)(1)(B).  IGRA thus "provides that tribes are entitled to engage in all forms of Class III gaming that a state permits for other citizens."  *Keweenaw Bay Indian Cmty. v. United States*, 136 F.3d 469, 473 (6th Cir. 1998).

28.      IGRA's state-permission requirement, and the parity and uniformity principles it embodies, are fundamental features of the statutory scheme.

TribeSER348

29.     Class II gaming has a materially identical state-permission requirement:  Tribes cannot engage in class II gaming on Indian lands unless "such Indian gaming is located *within a State that permits such gaming*."  25 U.S.C. § 2710(b)(1)(A) (emphasis added).

30.     Class II non-banked card games likewise are prohibited on Indian lands unless the games are expressly authorized elsewhere in the State or are not expressly prohibited and "played at any location in the State."  25 U.S.C. § 2703(7)(A)(ii)(II).

31.     IGRA also waives application of the Johnson Act—a federal criminal statute prohibiting the possession of gambling devices in Indian country, 15 U.S.C. § 1175—only if the gambling devices are authorized under a tribal-state compact in "a State *in which gambling devices are legal*."  25 U.S.C. § 2710(d)(6)(A) (emphasis added).

32.     Congress omitted the state-permission requirement only with respect to class I gaming, and only because Congress left such gaming "within the exclusive jurisdiction of the Indian tribes."  25 U.S.C. § 2710(a)(1).

**C.     IGRA's Compacting Process**

33.     IGRA requires as a further condition of class III gaming on Indian lands that the gaming at issue be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C. § 2710(d)(1)(C).

34.     To initiate the compacting process, IGRA provides that "[a]ny Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities."  25 U.S.C. § 2710(d)(3)(A).  "Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."  *Id.*

35.     As Congress recognized, conditioning class III gaming on preexisting state-law permission for non-tribal entities to offer the same games allows States and tribes to "make use of existing State regulatory systems" in their "negotiated compacts."  S. Rep. No. 100-446, at 13–14 (1988).

36.     A tribal-state class III gaming compact thus may include, among other things, provisions addressing "the application of the criminal and civil laws and regulations of the . . . State that are directly related to, and necessary for, the licensing and regulation of" the class III gaming activity under negotiation.  25 U.S.C. § 2710(d)(3)(C)(i).

37.     IGRA's compact condition imposes two requirements: (1) the tribe must enter "a compact with the state"; and (2) "[t]he Secretary of the Interior must approve any such compact before it may become effective."  *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 136 (D.C. Cir. 2006).

38.     To satisfy the first requirement, the State must have authority to enter into the compact.  *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556 (10th Cir. 1997).

39.     To satisfy the second requirement, the Secretary of the Interior must approve the compact and provide "notice of approval" in the Federal Register.  25 U.S.C. § 2710(d)(3)(B).

40.     The Secretary may either approve or disapprove the proposed compact within 45 days of its submission.  25 U.S.C. § 2710(d)(8)(C).

41.     If the Secretary does not approve or disapprove the compact within 45 days, the compact is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter."  25 U.S.C. § 2710(d)(8)(C).

42.     The Secretary must disapprove a compact if it violates: (1) any provision of IGRA, (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian

lands," or (3) "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B); *see also Amador Cnty.*, 640 F.3d at 381 ("The Secretary must . . . disapprove a compact if it would violate any of [IGRA's] three limitations . . . .").

## II.    Washington Has Long Authorized Tribal Class III Gaming Monopolies

43.    Since the early 1990s, despite IGRA's prohibition of class III tribal gaming monopolies, Washington has authorized Indian tribes—and only Indian tribes—to engage in most forms of class III gaming, while subjecting non-tribal entities to criminal sanctions for the same activities.  Most recently, Washington has expanded that tribal monopoly to include sports betting.

### A.    Limited Non-Tribal Gaming In Washington

44.    It is illegal to offer most forms of gaming in Washington.  Washington makes it a crime to engage in "professional gambling," *see, e.g.*, Wash. Rev. Code § 9.46.222, which Washington defines to include: (1) unless acting as a player or in a manner authorized by law, "engag[ing] in conduct which materially aids any form of gambling activity"; (2) unless acting in a manner authorized by law, "pay[ing] a fee to participate in a card game, contest of chance, lottery, or other gambling activity"; (3) unless acting as a player or in a manner authorized by law, "knowingly accept[ing] or receiv[ing] money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of gambling activity"; (4) "engag[ing] in bookmaking"; (5) "conduct[ing] a lottery"; or (6) offering wagering on greyhound races, *id.* § 9.46.0269(1).

45.    Washington defines "gambling" as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."  Wash. Rev. Code § 9.46.0237.

46.     Washington law specifies three degrees of illegal "professional gambling." Depending on the scale of the gaming operation, a person offering unauthorized gaming may be guilty of a gross misdemeanor, Wash. Rev. Code § 9.46.222(3), a class C felony, *id.* § 9.46.221(3), or a class B felony, *id.* § 9.46.220(3).

47.     Because Washington's definition of "professional gambling" excepts from its definition activities "authorized by this chapter," Wash. Rev. Code § 9.46.0269(1)(a)–(c), a business may offer gaming only if that form of gaming is expressly authorized by Washington law. *See also Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/regulation-enforcement/illegal-activities ("Gambling in Washington is illegal unless the activity is specifically authorized by state law.").

48.     Washington permits non-tribal entities to offer only limited types of gaming, such as raffles, bingo, card games, amusement games, pull-tabs, punchboards, sports pool boards, and fundraising events.  Wash. Rev. Code §§ 9.46.0305–.0361.

49.     None of these statutory exceptions authorizes non-tribal entities to engage in the full range of casino-style gaming in Washington.

50.     As a result, it is a crime in Washington for non-tribal entities to offer the vast majority of class III games, including sports betting.

**B.      Washington's Tribal Gaming Monopoly**

51.     In contrast to its broad criminal prohibition of class III casino-style gaming among non-tribal entities, since the early 1990s Washington has authorized Indian tribes located within the State to conduct a wide range of class III games.

52.     In 1992 Washington codified its process for negotiating tribal-state class III gaming compacts pursuant to IGRA.  Wash. Rev. Code § 9.46.360.

TribeSER352

53.     The director of the Washington State Gambling Commission (or the director's designee) "shall negotiate compacts for class III gaming on behalf of the state with federally recognized Indian tribes in the state of Washington."  Wash. Rev. Code § 9.46.360(2).

54.     On reaching a tentative agreement with an Indian tribe on a proposed compact, "the director shall immediately transmit a copy of the proposed compact to all voting and ex officio members of the gambling commission" and to the two standing committees designated by the Washington House of Representatives and Senate, each of which shall "forward its respective comments to the gambling commission."  Wash. Rev. Code § 9.46.360(3), (5).  The four ex officio members of the gambling commission are voting members of the gambling commission for the sole purpose of voting on proposed tribal-state compacts.  *Id.* § 9.46.360(4).

55.     Within 45 days of receiving a proposed compact from the director, the gambling commission, including the four ex officio members, "shall vote on whether to return the proposed compact to the director with instructions for further negotiation or to forward the proposed compact to the governor for review and final execution."  Wash. Rev. Code § 9.46.360(6).

56.     The gambling commission "is authorized and empowered to enforce the provisions of any compact between a federally recognized Indian tribe and the state of Washington."  Wash. Rev. Code § 9.46.360(9).

57.     In its first tribal-state compact (executed with the Tulalip Tribes of Washington on August 2, 1991), Washington authorized the Tulalip Tribes of Washington to conduct a wide range of class III games that are illegal for non-tribal entities to offer.  *See* Tribal-State Compact for Class III Gaming Between the Tulalip Tribes of Washington and the State of Washington at 4–5 (Aug. 2, 1991) (hereinafter "Tulalip Compact"), *available at*

https://www.wsgc.wa.gov/sites/default/files/public/searchable-compacts/tulalip/A-1991%20Com
pact%20%28s%29.pdf.

58.     Since 1991, Washington has entered into analogous compacts with "[a]ll 29
federally recognized tribes in Washington," giving the Tribes the exclusive right to offer certain
class III games.   Gaming Compacts, Washington State Gambling Comm'n, *available at*
https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts (last visited Mar. 10, 2022).

59.     On March 25, 2020, Washington passed a new law, S.H.B. No. 2638, giving Indian
tribes in the state a monopoly over sports betting.  *See* 2020 Wash. Legis. Serv. ch. 127.  It remains
a crime for non-tribal entities to offer sports betting.  *See* Wash. Rev. Code §§ 9.46.220–.222.

60.     The law states:

> It has long been the policy of this state to prohibit all forms and means of gambling
> except where carefully and specifically authorized and regulated.  The legislature
> intends to further this policy by authorizing sports wagering on a very limited basis
> by restricting it to tribal casinos in the state of Washington.

2020 Wash. Legis. Serv. ch. 127, § 1.

61.     The new act states that "[u]pon the request of a federally recognized Indian tribe or
tribes in the state of Washington, the tribe's class III gaming compact may be amended . . . to
authorize the tribe to conduct and operate sports wagering on its Indian lands . . . .  Sports wagering
conducted pursuant to the gaming compact is a gambling activity authorized by this chapter."
Wash. Rev. Code § 9.46.0364(1).   The statute makes clear that "[s]ports wagering conducted
pursuant to the provisions of a class III gaming compact entered into by a tribe and the state
pursuant to [Wash. Rev. Code § 9.46.360] is authorized bookmaking and is not subject to civil or
criminal penalties pursuant to [Wash. Rev. Code § 9.46.225]."  *Id.* § 9.46.0364(2).

62.     On July 6, 2021, Governor Jay Inslee and 15 of the 29 federally recognized Indian
tribes in Washington executed Compact Amendments to each of the Tribes' respective compacts

to permit the Tribes to offer sports betting at their gaming facilities. *See, e.g.*, Third Amendment to the Tribal State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Colville%28D%29/2021-0706%20Colville_Amendment_3_%26_Appendix_S%28s%29.pdf.

63. These Tribes are: the Confederated Tribes of the Colville Reservation; the Cowlitz Indian Tribe; the Jamestown S'Klallam Tribe; the Kalispel Tribe; the Lummi Nation; the Muckleshoot Indian Tribe; the Puyallup Tribe of Indians; the Shoalwater Bay Indian Tribe; the Snoqualmie Indian Tribe; the Spokane Tribe; the Squaxin Island Tribe; the Stillaguamish Tribe of Indians; the Suquamish Tribe; the Swinomish Indian Tribal Community; and the Tulalip Tribes of Washington.

64. On September 1, 2021, the Secretary approved the compact amendments for the Spokane Tribe, the Cowlitz Indian Tribe, the Suquamish Tribe, the Snoqualmie Indian Tribe, the Stillaguamish Tribe of Indians, the Squaxin Island Tribe, the Lummi Nation, the Puyallup Tribe of Indians, and the Tulalip Tribes of Washington. *See* 86 Fed. Reg. 49,046, 49,046–47, 49,049–54 (Sept. 1, 2021). On September 15, 2021, the Secretary approved the compact amendments for the Muckleshoot Indian Tribe, the Confederated Tribes of the Colville Reservation, the Shoalwater Bay Indian Tribe, and the Kalispel Tribe. *See* 86 Fed. Reg. 51,370, 51,370, 51,373–74 (Sept. 15, 2021). On October 22, 2021, the Secretary approved the compact amendment for the Swinomish Indian Tribal Community. *See* 86 Fed. Reg. 58,685 (Oct. 22, 2021). On December 28, 2021, the Secretary approved the compact amendment for the Jamestown S'Klallam Tribe. *See* 86 Fed. Reg. 73,800 (Dec. 28, 2021).

65.     The sports-betting amendments have therefore been approved by the Secretary pursuant to IGRA, and that approval purports to authorize Washington's tribal sports-betting monopoly.  *See* 25 U.S.C. § 2710(d)(3)(B), (8)(A).

66.     On September 19, 2021, a sixteenth tribe, the Port Gamble S'Klallam Tribe, amended its compact to permit it to offer sports betting.  Memorandum of Incorporation of Most Favored Nation Amendments to the Tribal/State Compact Between the Port Gamble S'Klallam Tribe and the State of Washington (Sept. 19, 2021), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Port_Gamble%28X%29/Port _Gamble_Sports_Wagering_MOI_FINAL%28signed%29.pdf.     Because Washington had amended compacts with other tribes to permit sports betting, the Port Gamble S'Klallam Tribe exercised its right under its compact's most-favored nation section to unilaterally amend its compact to permit sports betting as well.  *Id.* at 1.  On December 28, 2021, the Secretary approved the Port Gamble S'Klallam Tribe's Memorandum of Incorporation.  *See* 86 Fed. Reg. 73,800 (Dec. 28, 2021).

67.     Because the terms of each sports-betting amendment are materially identical, the compact amendment between Washington and the Confederated Tribes of the Colville Reservation is used for reference throughout this complaint.  *See* Third Amendment to the Tribal-State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021) (hereinafter "Colville Compact Amendment"), *available at* https://www.wsgc.wa.gov/sites/default/files/public/tribal/Compacts/Colville%28D%29/2021-0706%20Colville_Amendment_3_%26_Appendix_S%28s%29.pdf.

TribeSER356

68.     The Compact Amendments add "Sports Wagering" to the list of class III gaming activities that the Tribes are permitted to offer, subject to a new Appendix S prescribing certain conditions. Colville Compact Amendment at 2.

69.     The Compact Amendments require each of the Tribes to contribute their share of a "Start-Up Costs fee," which "includes the actual costs incurred by the State Gaming Agency for negotiations, rule development, regulatory program development, training, and similar activities necessary to implement Sports Wagering." Colville Compact Amendment at 3.

70.     The Compact Amendments also provide that the Tribes' sports-betting net win will be included in the Tribes' total net gaming revenues, of which the Tribes are required to pay 0.13% to Washington for "problem gambling education, awareness, and treatment in the State of Washington." Colville Compact Amendment, Appendix S, § 8.1; First Amendment to the Tribal/State Compact for Class III Gaming Between the Confederated Tribes of the Colville Reservation and the State of Washington, Appendix X2, §§ 14.4, 14.6 (Mar. 30, 2007), *available at* https://www.wsgc.wa.gov/sites/default/files/public/searchable-compacts/colville/D-2007%20Amendment%201%20%28App%20X2%29%20%28s%29.pdf.

### C.     The Tribes' Class III Gaming Operations

71.     The Tribes currently operate 29 casinos on Indian lands in Washington. *See* Casino Locations, Washington State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/tribal-gaming/casino-locations. Of these 29 casinos, 22 are governed by compacts that Washington and the Tribes have amended to permit sports betting. *Id.*; Gaming Compacts, Washington State Gambling Comm'n, *available at* https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts.

72.     These casinos offer a range of class III games that are illegal for non-tribal entities to offer in Washington, including sports betting.

TribeSER357

73.     In 2017, the Tribes' net receipts from class III gaming were approximately $2.56 billion.  Tribal Community Contributions at 14, Washington State Gambling Commission (Sept. 12, 2019), *available at* https://wsgc.wa.gov/sites/default/files/19%20Sept%2012%20- %20Tribal%20Contributions.pdf?_ga=2.85132313.104568771.1636491701-808950696.1634221 088.  The Tribes' net receipts were approximately $2.42 billion in 2016 and approximately $1.98 billion in 2015. *See id.* at 14–15.

74.     No non-tribal casinos in Washington offer sports betting.

## III.     The Defendants' Approval Of The Compact Amendments Violated Federal Law

75.     The Secretary of the Interior's decision to approve the Compact Amendments was not in accordance with IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, or the equal-protection component of the Fifth Amendment's Due Process Clause, U.S. Const. amend. V, or the Tenth Amendment, *id.* amend. X.

76.     IGRA requires the Secretary of the Interior to disapprove any tribal-state class III gaming compact that violates: (1) any provision of IGRA, (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands," or (3) "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B); *see also Amador Cnty.*, 640 F.3d at 383.

77.     The Secretary of the Interior was obligated to disapprove the Compact Amendments for three independent reasons.

78.     *First*, the Secretary of the Interior was obligated to disapprove the Compact Amendments because they purport to authorize tribal class III gaming that violates IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.

79.     IGRA provides that class III gaming on Indian lands is lawful "only if," among other things, the class III gaming activity is "located in a State that permits such gaming for any

purpose by any person, organization, or entity" and is conducted in conformance with a tribal-state compact "that is in effect." 25 U.S.C. § 2710(d)(1)(B)–(C).

80. Failure to comply with either condition renders class III gaming on Indian lands illegal under IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166. *See Pueblo of Santa Ana*, 104 F.3d at 1552.

81. IGRA's state-permission requirement prohibits tribal class III gaming monopolies by ensuring that each class III gaming activity remains illegal on Indian lands unless a State "permits" the same class III gaming activity by non-tribal entities.

82. IGRA's state-permission requirement has not been satisfied in Washington for sports betting because the State criminally prohibits such gaming by any non-tribal entities. *Compare* Wash. Rev. Code § 9.46.0364, *with id.* §§ 9.46.220–.222.

83. Washington's grant of a right to only "a federally recognized Indian tribe or tribes in the state of Washington" to "operate sports wagering on its Indian lands," Wash. Rev. Code § 9.46.0364, violates IGRA's state-permission requirement because Washington prohibits any non-tribal entities from offering sports betting, and thereby does not "permit[] such gaming for any purpose by any person, organization, or entity" as IGRA requires, 25 U.S.C. § 2710(d)(1)(B).

84. Neither the Compact Amendments nor any other state law can unilaterally "permit"—that is, authorize or legalize—sports betting solely on Indian lands because IGRA makes clear that such authorization can occur only through IGRA's statutory compacting process.

85. Because Washington has not "permit[ted]" sports betting within the meaning of IGRA, 25 U.S.C. § 2710(d)(1)(B), sports betting remains illegal on Indian lands in Washington under IGRA and applicable federal criminal statutes. *See* 25 U.S.C. § 2710(d)(1); 15 U.S.C. § 1175; 18 U.S.C. § 1955; 18 U.S.C. § 1166.

TribeSER359

86.     Because the Compact Amendments purport to authorize the Tribes to offer class III gaming in Washington that federal law prohibits, the Compact Amendments violate federal law and are void.

87.     Because the Compact Amendments violate federal law, the Governor of Washington had no authority to "enter[] into" them within the meaning of IGRA. 25 U.S.C. § 2710(d)(1)(C).

88.     Because the Compact Amendments violate federal law and were not validly entered into, the Secretary was obligated to disapprove the Compact Amendments. 25 U.S.C. § 2710(d)(8)(B)(i).

89.     By instead approving the Compact Amendments and purporting to authorize illegal tribal class III gaming, the Secretary violated IGRA. *See* 15 U.S.C. § 1175; 18 U.S.C. § 1955; 18 U.S.C. § 1166.

90.     *Second*, the Secretary also was required to disapprove the Compact Amendments under IGRA because they violate the Constitution's guarantee of equal protection.

91.     The Constitution's guarantee of equal protection mandates the equal treatment of people of all races and ancestries without discrimination or preference. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

92.     The Compact Amendments discriminate on the basis of race and ancestry, in violation of equal-protection principles, by granting monopolies to Washington Indian tribes over sports betting.

93.     By executing the Compact Amendments, Washington has purported to grant the Tribes a right to offer sports betting, an activity that Washington permits only tribal entities to offer. *See* Wash. Rev. Code § 9.46.0364.

94.     At the same time, Washington criminally prohibits any entities other than those affiliated with Washington Indian tribes from offering sports betting in Washington.  Wash. Rev. Code §§ 9.46.220–.222.

95.     The Compact Amendments' grant of sports-betting monopolies to Washington Indian tribes is a racial and ancestral classification, as membership in a Washington Indian tribe depends on lineal descent from historical tribal rolls and often also a minimum blood quantum.

96.     The Compact Amendments' race-based preference for Indian tribal sports betting is subject to strict scrutiny.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

97.     The Compact Amendments' race-based preference does not fall within the narrow exception outlined in *Morton v. Mancari*, 417 U.S. 535 (1974), because Congress has not authorized and could not authorize a State to grant Indian tribes a monopoly over a commercial activity that is unrelated to uniquely Indian interests, *see Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997).

98.     The Compact Amendments' race-based preference for Indian tribal sports betting cannot survive strict scrutiny or even rational-basis review because it is unrelated to the furtherance of Congress's trust obligation to Indian tribes.

99.     Thus, the Compact Amendments' race-based preference for Indian tribal sports betting violates the Constitution's guarantee of equal protection.

100.    Because the Compact Amendments violate equal protection, the Governor of Washington lacked authority to "enter[] into" them within the meaning of IGRA.  25 U.S.C. § 2710(d)(1)(C).

**TribeSER361**

101.     Because the Compact Amendments violate equal protection and were not validly entered into, the Secretary was required to disapprove the Compact Amendments.  25 U.S.C. § 2710(d)(8)(B)(ii).

102.     By instead approving the Compact Amendments and purporting to authorize a violation of equal protection, the Secretary violated IGRA.

103.     In addition to violating IGRA, the Secretary's approval independently violated the equal-protection component of the Fifth Amendment's Due Process Clause because it blessed and facilitated Washington's unconstitutional race-based preference for Indian tribal sports betting.

104.     *Third*, the Secretary also was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment.

105.     "The legislative powers granted to Congress are sizable, but they are not unlimited."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."  *Id.*

106.     IGRA's state-negotiation mandate issues a "direct order" to the States: IGRA directs that upon receiving a request from an Indian tribe to negotiate a class III gaming compact, "the State *shall* negotiate with the Indian tribe in good faith to enter into such a compact."  25 U.S.C. § 2710(d)(3)(A) (emphasis added).  That sort of "direct order" violates the Constitution's anti-commandeering principle, and renders the process for entering into the Compact Amendments unlawful.  *See Murphy*, 138 S. Ct. at 1476.

107.     This state-negotiation mandate is not severable from the remainder of the Act.  An unconstitutional provision is not severable when "the statute created in its absence is legislation that Congress would not have enacted."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).

The compacting process is IGRA's centerpiece, and the state-negotiation mandate is what ensures that process takes place.  Congress would not have enacted IGRA without this central requirement.

108.    Because the Compact Amendments violated the Tenth Amendment and were not validly entered into, the Secretary was required to disapprove the Compact Amendments.  25 U.S.C. § 2710(d)(8)(B)(ii).

109.    By instead approving the Compact Amendments and purporting to authorize a violation of the Tenth Amendment, the Secretary violated IGRA.

110.    In addition, because the state-negotiation mandate is not severable from the remainder of the Act, none of IGRA's provisions can stand, and the Secretary lacked any authority to approve the Compact Amendments.

## IV.    Maverick's Injuries Caused By The Compact Amendments

111.    Maverick currently owns and operates 19 cardrooms in Washington.  Maverick also owns casinos in Nevada and Colorado, which offer a range of class III gaming, including sports betting.

112.    Sports betting in the United States has seen extraordinary growth over the past several years.[1]  The American Gaming Association reported that sports betting generated more

---

[1]  *See, e.g.*, David Purdum, *Sports Betting's Growth in U.S. 'Extraordinary'*, ESPN (May 14, 2020),  https://www.espn.com/chalk/story/_/id/29174799/sports-betting-growth-us-extraordinary ("More than $20 billion has been bet with U.S. sportsbooks since the Supreme Court struck down the Professional and Amateur Sports Protection Act of 1992 on May 14, 2018.").

than $1.5 billion in revenue in 2020, which represented a nearly 69% year-over-year growth rate.[2]
Revenue from sports betting will continue to rise as consumer demand grows around the country.[3]

113.    With sports betting becoming increasingly popular, Maverick would offer that form
of gaming to the patrons of its Washington cardrooms if it were permitted to do so.  It would be
economically viable and profitable for Maverick to offer sports betting in Washington, but
Maverick is unable to proceed because of Washington's criminal prohibition of most forms of
class III gaming unless conducted at an authorized tribal gaming facility.  *See* Wash. Rev. Code
§§ 9.46.0364, 9.46.0368, 9.46.220–.222.

114.    Because the Tribes can offer sports betting, but Maverick cannot, Maverick suffers
competitive injury with tribal casinos.  That injury includes increased advertising expenses,
increased promotional expenses, and increased entertainment expenses that Maverick must
undertake in order to compete with tribal casinos.  It also includes lost revenue from customers
who would frequent Maverick's cardrooms, but who instead frequent tribal casinos because they
offer sports betting.  Maverick also suffers a loss of goodwill by failing to offer sports betting
while its tribal competitors do so.

115.    The Supreme Court "routinely recognizes probable economic injury resulting from
[governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III
'injury-in-fact' requirement] . . . .  It follows logically that any . . . petitioner who is likely to suffer
economic injury as a result of [governmental action] that changes market conditions satisfies this

---

[2]    *See Commercial Gaming Revenue Tracker: 2020 Fourth Quarter*, Am. Gaming Ass'n,
https://www.americangaming.org/wp-content/uploads/2021/02/Q4-Email-PDF.pdf    (last
visited Mar. 10, 2022).

[3]    *See id.*

part of the standing test." *Clinton v. City of N.Y.*, 524 U.S. 417, 432–33 (1998) (alterations in original) (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994)).

116.    Maverick competes with other casinos, including tribal casinos, to offer the best and most attractive selection of games allowed by law.  Maverick would earn additional revenue and have fewer expenses if tribal casinos could not offer sports betting exclusively.  Because of Washington's tribal sports-betting monopoly, Maverick cannot establish or acquire gaming operations in Washington that can effectively compete with the Tribes' operations.

117.    The Secretary's unlawful approval of the Compact Amendments alters competitive conditions in a way that is unfavorable to Maverick.

118.    The Secretary's unlawful approval of the Compact Amendments has facilitated and continues to facilitate the Tribes' unlawful sports-betting activities.  Those activities harm Maverick by making it more difficult for Maverick to grow its successful gaming offerings in Washington because Maverick cannot compete on an equal footing with the Tribes' gaming offerings.

119.    The Secretary's unlawful approval of the Compact Amendments has resulted in the deprivation of Maverick's substantive rights under constitutional equal-protection principles and IGRA to compete on equal terms with the Tribes to offer sports betting in Washington free from discrimination on the basis of race and ancestry.

120.    If Washington applied its prohibition of sports betting to the Tribes and non-tribal entities alike, many patrons of Washington's tribal casinos would instead frequent Maverick's Washington cardrooms, increasing Maverick's commercial casino revenue.

121.    Washington's tribal sports-betting monopoly exists only because the Secretary unlawfully approved the Compact Amendments.

122.    If the Secretary had disapproved the Compact Amendments, Washington would not be able to enforce its tribal sports-betting monopoly.

123.    Vacating the Secretary's approval would make Washington's tribal sports-betting monopoly unlawful, allowing Maverick to increase its commercial casino revenue by benefitting from increased patronage at its Washington cardrooms due to the elimination of the Tribes' competitive advantage.

## COUNT ONE:

### The Administrative Procedure Act
### (Not in Accordance with Law – IGRA, Equal Protection, and the Tenth Amendment)

124.    Maverick incorporates all preceding paragraphs by reference.

125.    The Department of the Interior and the Secretary of the Interior are "agencies" under the APA.  5 U.S.C. § 551(1).

126.    The APA prohibits agency actions that are "not in accordance with law."  5 U.S.C. § 706(2)(A).

127.    Federal law obligated the Secretary of the Interior to disapprove Washington's sports-betting Compact Amendments.

128.    *First*, the Secretary of the Interior was obligated to disapprove the Compact Amendments because they purport to authorize tribal class III gaming that violates IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166.

129.    *Second*, the Secretary also was required to disapprove the Compact Amendments under IGRA and the equal-protection component of the Fifth Amendment's Due Process Clause because they violate the Constitution's guarantee of equal protection.

130.    *Third*, the Secretary also was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment.

25

131.    The Secretary's approval of the Compact Amendments constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

132.    Maverick has suffered a legal wrong or has been adversely affected or aggrieved by the Secretary's approval of the Compact Amendments. 5 U.S.C. § 702.

133.    The Secretary's approval of the Compact Amendments has resulted in the deprivation of Maverick's substantive rights under equal-protection principles and IGRA to compete on equal terms with the Tribes free from discrimination on the basis of race or ancestry.

134.    The Secretary's approval of the Compact Amendments has facilitated and continues to facilitate the Tribes' unlawful sports-betting offerings. Those activities harm Maverick by making it more difficult for Maverick to effectively compete with the Tribes' much broader gaming offerings.

135.    Maverick therefore is entitled to an order: (1) declaring that the Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment, and therefore were not validly entered into and are not in effect; (2) declaring that the Secretary's approval of the Compact Amendments violated IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment; (3) setting aside and vacating the Secretary's approval of the Compact Amendments; (4) declaring that the Tribes' sports-betting activities violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166; and (5) awarding nominal damages, reasonable costs (including attorneys' fees), and any other relief this Court deems just and proper.

TribeSER367

## PRAYER FOR RELIEF

136.    Maverick demands a judgment against the Defendants as follows:

a.    Declaring that the Compact Amendments violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment, and therefore are void, were not validly entered into, and are not in effect;

b.    Declaring that the Secretary of the Interior's approval of the Compact Amendments violated IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, 18 U.S.C. § 1166, the Constitution's guarantee of equal protection, and the Tenth Amendment;

c.    Setting aside and vacating the Secretary of the Interior's approval of the Compact Amendments;

d.    Declaring that the Tribes' sports-betting activities violate IGRA, 15 U.S.C. § 1175, 18 U.S.C. § 1955, and 18 U.S.C. § 1166;

e.    Awarding Maverick nominal damages;

f.    Awarding Maverick its reasonable costs, including attorneys' fees, incurred in bringing this action; and

g.    Granting such other and further relief as this Court deems just and proper.

TribeSER368

Dated:  March 10, 2022                     Respectfully submitted,


                                           /s/ *Theodore B. Olson*

                                           THEODORE B. OLSON
                                               D.C. Bar No. 367456
                                           MATTHEW D. MCGILL
                                               D.C. Bar No. 481430
                                           LOCHLAN F. SHELFER
                                               D.C. Bar No. 1029799
                                           GIBSON, DUNN & CRUTCHER LLP
                                           1050 Connecticut Avenue, N.W.
                                           Washington, D.C. 20036
                                           Phone:  202.955.8668
                                           Email:  tolson@gibsondunn.com

**TribeSER369**