**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAVERICK GAMING LLC, | No. 23-35136 |
| *Plaintiff-Appellant*, | D.C. No. 3:22-cv-05325-DGE |
| v. | |
| UNITED STATES OF AMERICA; U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Interior; BRYAN NEWLAND, in his official capacity as Assistant Secretary Indian Affairs; JAY INSLEE, in his official capacity as the Governor of Washington; ROBERT FERGUSON, in his official capacity as the Attorney General of Washington; ALICIA LEVY, in her official capacity as Chair of the Washington State Gambling Commission; JULIA PATTERSON, in her official capacity as Vice-Chair of the Washington State Gambling Commission; BUD SIZEMORE, in his official capacity as Commissioner of the Washington State Gambling Commission; KRISTINE REEVES, in her official | OPINION |

capacity as Commissioner of the
Washington State Gambling
Commission; SARAH LAWSON, in
her official capacity as Commissioner
of the Washington State Gambling
Commission; STEVE CONWAY, in
his official capacity as ex officio
member of the Washington State
Gambling Commission; JEFF HOLY,
in his official capacity as ex officio
member of the Washington State
Gambling Commission; SHELLEY
KLOBA, in her official capacity as ex
officio member of the Washington
State Gambling Commission;
BRANDON VICK, in his official
capacity as ex officio member of the
Washington State Gambling
Commission; TINA GRIFFIN, in her
official capacity as Director of the
Washington State Gambling
Commission,

*Defendants-Appellees*,

and

SHOALWATER BAY TRIBE,

*Intervenor-Defendant-
Appellee*.

Appeal from the United States District Court
for the Western District of Washington
David G. Estudillo, District Judge, Presiding

Argued and Submitted March 27, 2024
Seattle, Washington

Filed December 13, 2024

Before:  Kim McLane Wardlaw, William A. Fletcher, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge Miller

## SUMMARY[*]

### Indian Regulatory Gaming Act / Fed. R. Civ. P. 19

The panel affirmed the district court's dismissal of
Maverick Gaming LLC's action—which alleged that the
State of Washington's tribal-state compacts allowing sports
betting on tribal land violate the Indian Regulatory Gaming
Act, the Equal Protection Clause, and the Tenth
Amendment—because the Shoalwater Bay Indian Tribe is a
required party that cannot be joined to the litigation.

The panel held that the Tribe is a required party under
Fed. Civ. P. 19(a) because the Tribe has a legally

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

protected interest in the lawsuit that may be impaired or impeded in the Tribe's absence, and rejected Maverick's argument that the federal government could adequately represent the Tribe's interests. The panel held that the Tribe cannot feasibly be joined to the litigation where the Tribe enjoys sovereign immunity. Finally, the panel held that the litigation cannot proceed in equity and good conscience without the Tribe, and rejected Maverick's argument that the litigation should continue in the Tribe's absence under the public rights exception.

Concurring, Judge Miller agreed that Maverick's action cannot proceed because the Tribe is a required party but sovereign immunity prevents the Tribe from being joined without its consent. He wrote separately to explain that (1) this Court's precedent on Rule 19 has not adequately considered the distinctive character of litigation under the Administrative Procedure Act, and (2) a competitive injury, by itself, is not enough to make a tribe a required party.

## COUNSEL

Lochlan F. Shelfer (argued), Matthew D. McGill, and Theodore B. Olson, Gibson Dunn & Crutcher LLP, Washington, D.C., for Plaintiff-Appellant.

Amber B. Blaha (argued) and Rebecca M. Ross, Attorneys; Todd S. Kim, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Tera M. Heintz (argued), Deputy Solicitor General; William D. McGinty, Assistant Attorney General, Complex Litigation Division; Robert Ferguson, Attorney General; Office of the Washington Attorney General, Olympia, Washington; Brian H. Rowe, Kristin Beneski, Assistant Attorneys General; Office of the Washington Attorney General, Seattle, Washington; Jody H. Schwarz, Senior Attorney, United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

Scott D. Crowell (argued), Crowell Law Offices Tribal Advocacy Group, LLP, Sedona, Arizona; Lael Echo-Hawk, MThirtySix PLLC, Washington, D.C.; for Intervenor-Defendant-Appellee.

Keith M. Harper, Leonard R. Powell, and Allison M. Tjemsland, Jenner & Block LLP, Washington, D.C.; Cory J. Albright and Reed C. Bienvenu, Kanji & Katzen PLLC, Seattle, Washington, for Amicus Curiae Non-Party Compacting Tribes.

**OPINION**

WARDLAW, Circuit Judge:

In 1988, Congress enacted the Indian Regulatory Gaming Act ("IGRA") "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). To this end, IGRA provides a regulatory scheme for the creation and administration of tribal-state gaming compacts. These gaming compacts allow tribes to conduct casino-style gambling, classified under IGRA as "class III" games. In the State of Washington, all twenty-nine federally recognized tribes have entered into IGRA gaming compacts that allow them to offer class III gaming on their land. Class III gaming is otherwise illegal in Washington.

Maverick Gaming LLC ("Maverick") is a casino gaming company. Maverick owns several hotels and casinos in Nevada and Colorado, where it offers a variety of class III games, such as roulette and craps. In 2019, shortly after the Supreme Court struck down a federal statute that prohibited states from allowing sports gambling, *see Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018), Maverick acquired nineteen cardrooms in the State of Washington. Maverick subsequently lobbied the Washington legislature to enact a law that would allow it to offer sports betting at these cardrooms, but without success. Consistent with its criminal prohibition of all other forms of class III gaming, the Washington legislature did not legalize sports betting for private entities. However, the legislature enacted a law that allows Indian tribes to amend their gaming compacts to authorize sports betting on their land.

In response, Maverick filed this lawsuit. Maverick's complaint alleges that Washington's tribal-state compacts and the sports betting compact amendments violate IGRA, the Equal Protection Clause, and the Tenth Amendment of the United States Constitution. The complaint names as defendants the United States and various federal officials responsible for the approval of the tribal-state gaming compacts, as well as the various Washington state officials involved in the execution and administration of those compacts. Although Maverick seeks relief that would invalidate the gaming compacts of all tribes in Washington, Maverick did not include any of these tribes as parties to the suit.

The Shoalwater Bay Indian Tribe ("Tribe") moved to intervene in the suit for the limited purpose of filing a motion to dismiss. The Tribe argues that it is a required party that cannot be joined in the action on account of its sovereign immunity. The district court granted the motion to intervene and the ensuing motion to dismiss. Because we agree with the district court that the Tribe is a required party that cannot be joined in the litigation, and because this suit cannot proceed in equity and good conscience in the Tribe's absence, we affirm.

## I. FACTUAL BACKGROUND

### A. Federal History

In 1987, the Supreme Court decided its landmark decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). Invoking the "traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development," *Cabazon* held that a state cannot enforce its generally

applicable gaming regulations on tribal land without Congress's express authorization. *Id.* at 217 (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335 (1983)).

In response, Congress enacted IGRA. *See In re Indian Gaming Related Cases* (*Coyote Valley II*), 331 F.3d 1094, 1097 (9th Cir. 2003). While drafting the legislation, the Select Committee on Indian Affairs acknowledged the importance of gaming to tribal sovereignty, explaining that the income from gaming has enabled tribes "to provide a wider range of government services to tribal citizens and reservation residents than would otherwise have been possible" and often spells "the difference between an adequate governmental program and a skeletal program that is totally dependent on Federal funding." S. Rep. No. 100-446, at 2–3 (1988). But the Committee also recognized that some sort of regulatory scheme was necessary "to protect both the tribes and the gaming public from unscrupulous persons." *Id.* at 2. Congress thus created IGRA "to balance the need for sound enforcement of gaming laws and regulations, with the strong federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land." *Id.* at 5.

To this end, IGRA's stated purpose is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," while simultaneously seeking "to provide a statutory basis for the regulation of gaming by an Indian tribe." 25 U.S.C. § 2702(1)–(2). To further these goals, IGRA requires that tribes maintain the "sole proprietary interest" for any gaming activity. *Id.* § 2710(b)(2)(A). The statutory scheme further specifies that the net revenues from tribal gaming may be

used solely "(i) to fund tribal government operations or programs; (ii) to provide for the general welfare of the Indian tribe and its members; (iii) to promote tribal economic development; (iv) to donate to charitable organizations; or (v) to help fund operations of local government agencies." *Id.* § 2710(b)(2)(B), (d)(1)(A)(ii).

IGRA creates three classes of gaming, each of which is subject to a different level of regulation. Class I games include social games for prizes of minimal value and traditional forms of Indian gaming. *Id*. § 2703(6). Class II games include bingo and certain card games. *Id.* § 2703(7)(A). At issue in this case are class III games, the most heavily regulated form of gaming under IGRA. This class is comprised of "all forms of gaming that are not class I gaming or class II gaming," *id.* § 2703(8), including blackjack, roulette, and craps, as well as slot machines and sports betting, *see id.* § 2703(7)(B). "Class III gaming is not only 'a source of substantial revenue' for tribes, but the lifeblood on 'which many tribes ha[ve] come to rely.'" *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022) (quoting *Coyote Valley II*, 331 F.3d at 1097, 1099–1100) (alteration in original).

IGRA permits class III gaming on tribal land if three conditions are met: (1) the tribe has authorized the class III gaming by a tribal ordinance or resolution; (2) the state in which the tribe is located permits such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming is conducted in conformity with a tribal-state compact that is in effect. 25 U.S.C. § 2710(d)(1). The last requirement necessitates the existence of a tribal-state gaming compact, which "prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the

agreement's terms." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014). "The compacting process gives to states civil regulatory authority that they otherwise would lack under *Cabazon*, while granting to tribes the ability to offer legal class III gaming." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 716 (9th Cir. 2003). The creation of a tribal-state compact begins with a tribe "request[ing] the State in which [its] lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A). IGRA imposes a duty upon the states to "negotiate with the Indian tribe in good faith to enter into such a compact," and provides the tribe with statutory remedies if no compact results from these negotiations. *Id.* § 2710(d)(3)(A), (d)(7).

Once the state and tribe have entered into a compact, the compact is sent to the Secretary of the Interior (the "Secretary") for approval. *Id.* § 2710(d)(3)(B), (d)(8). The Secretary may disapprove a compact only if it violates (1) any provision of IGRA; (2) any other provision of federal law that does not relate to jurisdiction over gaming on Indian lands; or (3) the trust obligations of the United States to Indians. *Id.* § 2710(d)(8)(B). If the Secretary does not approve or disapprove a compact within 45 days of submission to the Secretary for approval, the compact "shall be considered to have been approved" by operation of law, "but only to the extent the compact is consistent with" IGRA. *Id.* § 2710(d)(8)(C). Approved compacts become effective after the Secretary publishes notice in the Federal Register. *Id.* § 2710(d)(3)(B), (d)(8)(D).

### B. Washington State History

For the first 83 years of Washington's existence, the state's constitution prohibited all forms of gambling. *See* Wash. Const. art. II, § 24 (amended 1972). A 1972 constitutional amendment authorized specific types of gambling, but only if approved by a supermajority of the state legislature or electorate. *See id.* Shortly thereafter, the state legislature created the Washington State Gambling Commission and passed a law authorizing certain limited forms of gambling, such as charitable activities, raffles, and amusement games. *See* Wash. Rev. Code § 9.46.0311. But because it is otherwise "the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state," *id.* § 9.46.010, most forms of casino-style gaming, including those classified as class III games under IGRA, are illegal on non-tribal lands in Washington, *see generally id.* § 9.46.

A few years after IGRA went into effect, the legislature enacted Washington Revised Code § 9.46.360, which directs the Gambling Commission to negotiate "compacts for class III gaming on behalf of the state with federally recognized Indian tribes in the state of Washington" in accordance with IGRA. Wash. Rev. Code § 9.46.360(2). Ultimately, after negotiations and possible public hearings, the proposed compact is sent to the governor for review and final execution. *Id.* § 9.46.360(6). Washington has since negotiated and entered into gaming compacts with all twenty-nine federally recognized tribes within its borders,

allowing the tribes to conduct class III gaming on their land.[1]
Class III gaming has been a source of great economic value
to the tribes.  In 2020, Washington's tribal casinos provided
more than 14,000 jobs.[2]  And in 2021, Washington's tribal
gaming industry netted over \$2 billion.[3]

In March 2020, the Governor of Washington signed into
law House Bill 2638 ("H.B. 2638").  H.B. 2638 created
Washington Revised Code § 9.46.0364, which allows a tribe
to amend its class III gaming compact "to authorize the tribe
to conduct and operate sports wagering on its Indian lands"
pursuant to IGRA and Washington Revised Code
§ 9.46.360.   Before enacting H.B. 2638, the legislature
considered legislation that would have allowed private
cardrooms, such as those owned by Maverick, to conduct
sports wagering.[4]  Maverick also testified in opposition to
H.B. 2638, advocating instead for a law that would authorize
sports betting at licensed cardrooms in addition to tribal

---

[1] *See* Wash. State Gambling Comm'n, *Tribal gaming compacts and amendments* (last visited July 28, 2024), https://www.wsgc.wa.gov/tribal-gaming/gaming-compacts.

[2] Wash. Indian Gaming Ass'n, *The Economic & Community Benefits of Tribes in Washington*, 12 (May 2022) (last visited July 27, 2024), https://tinyurl.com/4dauyxkv.

[3] Wash. State Gambling Comm'n, *Gambling Industry Overview 2022*, 2 (2022) (last visited July 27, 2024), https://tinyurl.com/mr2rzrst.

[4] Senators King and Rivers proposed a bill that would have authorized sports wagering at cardrooms and racetracks. *See* S.B. 6277, 66th Leg., 2020 Reg. Sess. (Wash. 2020).   Senator Rivers also proposed an amendment to H.B. 2638 that would have allowed licensed cardrooms to conduct sports wagering. *See* 2638-S.E AMS RIVE JOSU 302, 66th Leg., 2020 Reg. Sess. (Wash. 2020).  These proposals were not adopted. *Id.*

casinos.[5]     The legislature ultimately decided against allowing private entities to offer sports betting, explaining:

> It has long been the policy of this state to prohibit all forms and means of gambling except where carefully and specifically authorized and regulated. The legislature intends to further this policy by authorizing sports wagering on a very limited basis by restricting it to tribal casinos in the state of Washington. Tribes have more than twenty years' experience with, and a proven track record of, successfully operating and regulating gaming facilities in accordance with tribal gaming compacts. Tribal casinos can operate sports wagering pursuant to these tribal gaming compacts, offering the benefits of the same highly regulated environment to sports wagering.

2020 Wash. Sess. Laws ch. 127, § 1.  In 2021 and 2022, the legislature again rejected bills that would have made it legal to offer sports betting at cardrooms and racetracks.[6]  Since

---

[5] Maverick's Chief Executive Officer, Eric Persson, and several other representatives of the company testified before the House Committee on Gaming & Commerce in opposition to H.B. 2638.  *See* H.B. Rep. 2638, 66th Leg., 2020 Reg. Sess., at 6–7, 8–9 (Wash. 2020).  Summarizing this testimony, the House Bill Report explains that those who opposed the bill argued that private cardrooms should be allowed to offer sports betting because "[l]icensed card rooms are heavily regulated, just as tribal gaming is," *id.* at 6, and allowing only tribal casinos to offer sports betting "creates an unfair playing field," *id.* at 8.

[6] *See* S.B. 5212, 67th Leg., Reg. Sess. (Wash. 2021); H.B. 1674, 67th Leg., Reg. Sess. (Wash. 2022).

then, twenty of Washington's federally recognized tribes have received the Secretary's approval for compact amendments allowing sports wagering on their land.[7]

### C. Shoalwater Bay Indian Tribe's History

The Shoalwater Bay Indian Tribe is a federally recognized Indian tribe located on the Shoalwater Bay Indian Reservation ("Reservation") in rural western Washington.[8]    Like the other twenty-eight federally recognized tribes in Washington today, the Tribe has reached agreement with the State on a gaming compact that allows it to offer class III gaming on its land.[9]

Despite ultimately reaching agreement on a gaming compact with the State, the Tribe's relationship with the State is best characterized as adversarial.  In 1998, after several years of the Tribe's efforts to negotiate a gaming compact, and the State's refusal to do so, the Tribe began operating 108 gambling machines at the Reservation's casino over the objection of the State and without a compact. *See United States v. Shoalwater Bay Indian Tribe*, 205 F.3d 1353, 1999 WL 1269343, at \*1 (9th Cir. 1999).  In response, the United States filed an *in rem* forfeiture action and seized the Tribe's gambling machines.  *Id.*  Undeterred, the Tribe installed a different type of gaming machine on tribal property the following year.  Further enforcement action followed.  The National Indian Gaming Commission issued a Notice of Violation and Order of Closure, which accused

---

[7] Wash. State Gambling Comm'n, *supra* note 1.

[8] *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 2112, 2114 (Jan. 12, 2023).

[9] *See* Indian Gaming, 67 Fed. Reg. 68152-02 (Nov. 8, 2002).

the Tribe of violating IGRA by conducting class III gaming activities on its land without a tribal-state compact. The conflict persisted until the United States Department of the Interior's Office of Hearings and Appeals enjoined the National Indian Gaming Commission from taking further enforcement action against the Tribe in 2002, at which point the Tribe and the State were able to reach an agreement, negotiating and entering into a gaming compact that became effective with the Secretary's approval in November 2002.[10]

The Tribe has since negotiated and received the Secretary's approval for three amendments to its compact.[11] The most recent amendment, effective September 15, 2021, authorizes the Tribe to offer sports gambling.[12]

Today, the Reservation's casino and restaurant are operated by Willapa Bay Enterprises, and help to sustain the Tribe's economic well-being. Incorporated by the Tribe in 2007, Willapa Bay Enterprises employs 120 individuals, approximately thirty percent of whom are tribal members, tribal spouses, or the immediate family members of tribal members. The casino serves as a gathering place for the Tribe and its surrounding community and is a source of pride for the Tribe's members.

---

[10] *See* Indian Gaming, 67 Fed. Reg. 68152, 68152-02 (Nov. 8, 2002).

[11] *See* Indian Gaming, 72 Fed. Reg. 30392-01, 30392 (May 31, 2007); Indian Gaming, 80 Fed. Reg. 31918-02, 31918 (June 4, 2015); Indian Gaming, Approval of Tribal-State Class III Gaming Compact in the State of Washington, 86 Fed. Reg. 51373-01, 51373 (Sept. 15, 2021).

[12] *See* Indian Gaming; Approval of Tribal-State Class III Gaming Compact in the State of Washington, 86 Fed. Reg. 51373-01, 51373 (Sept. 15, 2021).

## II.  PROCEDURAL BACKGROUND

After failing to persuade Washington officials to enact legislation that would allow sports betting at its cardrooms, Maverick decided to try a new strategy.  On January 11, 2022, Maverick sued the various federal officials (collectively, "Federal Defendants") and Washington state officials (collectively, "State Defendants") responsible for the creation, approval, and administration of the Washington tribes' gaming compacts and sports betting compact amendments in the United States District Court for the District of Columbia.  The complaint did not name any of Washington's twenty-nine federally recognized tribes as defendants.

Maverick's complaint alleged three claims.  The first claim, against the Federal Defendants under the Administrative Procedure Act ("APA"), alleged that the Secretary's approval of the Washington tribes' sports betting compact amendments violated IGRA, the Equal Protection Clause of the U.S. Constitution, and the anticommandeering principle of the Tenth Amendment ("APA claim"). Maverick sought declaratory relief to that effect, as well as a declaration that the Tribes' sports gaming violated IGRA and sought vacatur of the Secretary's approval of the sports betting amendments.

Maverick's second claim against the State Defendants, brought under 42 U.S.C. § 1983, equitable principles, and the Declaratory Judgment Act, alleged that the state officials' execution and administration of the tribal-state compacts and the sports betting amendments violated IGRA and related federal statutes, the Equal Protection Clause, and the anticommandeering principle of the Tenth Amendment ("Equal Protection claim").    Maverick again sought

declarative relief to that effect. Maverick also sought an
injunction prohibiting members of the Washington State
Gambling Commission from continuing to administer the
compacts and sports betting amendments and the governor
of Washington from entering into any new compacts.

In its third claim, also against the State Defendants under
42 U.S.C. § 1983, equitable principles, and the Declaratory
Judgment Act, Maverick alleged that the state's exemption
of the tribes from its criminal prohibition on most forms of
class III gaming violated the Constitution's guarantee of
equal protection ("Criminal Prohibition claim"). Again,
Maverick sought declaratory relief to that effect, and an
injunction prohibiting the State Defendants from enforcing
those criminal laws against Maverick.**[13]**

On February 24, 2022, the State Defendants moved to
transfer venue to the Western District of Washington based
on the D.C. District Court's lack of personal jurisdiction
over them and in the interests of justice and convenience. In
response, Maverick moved for leave to amend its complaint
to drop the State Defendants as defendants, even though it
maintained its challenge to the Washington laws.    In
opposition, the State Defendants argued that they were
required parties under Federal Rule of Civil Procedure 19(a).
Without ruling on the motion for leave to file the amended
complaint, the D.C. District Court granted the State
Defendants' motion to transfer the case to the Western
District of Washington on April 28, 2022. Maverick then
filed its First Amended Complaint, which retained the State
Defendants and stated identical claims as its first complaint.

---

[13] On each claim, Maverick also sought an award of nominal damages
and reasonable costs (including attorney's fees).

Shortly thereafter, the Tribe moved to intervene for the limited purpose of filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(7) contending that it is a required party under Federal Rule of Civil Procedure 19. The district court granted the Tribe's motion to intervene on September 29, 2022, and four days later the Tribe moved to dismiss the First Amended Complaint. Both the Federal Defendants and the State Defendants supported the Tribe's motion.

The district court granted the Tribe's motion to dismiss, ruling that the Tribe is a required party under Rule 19(a). Because of "the long history of tribal gaming and associated employment benefits for the tribes and the surrounding community" the district court found that Maverick's suit may impair the Tribe's legally protected interest in "the economic and sovereign rights" conferred by its gaming compact. The district court rejected Maverick's argument that existing parties to the suit could adequately represent these interests in the Tribe's absence, explaining that, under *Diné Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, 932 F.3d 843 (9th Cir. 2019) and its progeny, the Federal Defendants' interests in defending their approval of the sports betting compact amendments "clearly diverge" from the Tribe's sovereign interest in the continued operation of class III gaming.

Next, because the Tribe had not waived its sovereign immunity by intervening for the limited purpose of asserting that it was a required party under Federal Rule of Civil Procedure 19(a), the district court concluded that the Tribe could not feasibly be joined in the litigation. The district court weighed the equitable factors to be considered when determining whether "in equity and good conscience," Fed. R. Civ. P. 19(b), the action should proceed or be dismissed,

and concluded that dismissal was required. The district court noted the "'wall of circuit authority' requiring dismissal when a Native American tribe cannot be joined due to its assertion of tribal sovereign immunity." *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 947 (9th Cir. 2022) (quoting *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021)).

Finally, the district court concluded that the threat posed by Maverick's suit to the Tribe's "legal entitlements is sufficient such that the public rights exception," which applies in cases filed to vindicate a public right, did not relax the joinder rules here. The court noted its doubt that this case was brought in the public interest given Maverick's detailed statements in the complaint explaining how "invalidation of the tribal compacts would increase Maverick's commercial revenue."

## III. STANDARD OF REVIEW

"We review a district court's decision to dismiss a case for failure to join a required party under Rule 19 for abuse of discretion, and we review any legal questions underlying that decision de novo." *Klamath Irrigation*, 48 F.4th at 943. We review de novo issues of tribal sovereign immunity. *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 991 (9th Cir. 2020).

## IV. DISCUSSION

A party may move for dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(7) for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Rule 19 sets forth a three-step inquiry. First, we determine whether the absent party is "required" under Rule 19(a). *Klamath Irrigation*, 48 F.4th at 943. If the absent party is required,

we then "determine whether joinder of that party is feasible."
*Id*.     If joinder is infeasible, we must then "determine
whether, in equity and good conscience, the action should
proceed among the existing parties or should be dismissed."
*Id.* (quoting Fed. R. Civ. P. 19(b)).

A.   The Shoalwater Bay Indian Tribe is a required party.

We must first determine whether the Tribe is a "required
party" under Federal Rule of Civil Procedure 19(a). A party
is required if:

> (A) in that person's absence, the court cannot
>     accord complete relief among existing
>     parties; or
>
> (B) that person claims an interest relating to
>     the subject of the action and is so situated
>     that disposing of the action in the
>     person's absence may:
>
>   (i) as a practical matter impair or impede
>       the person's ability to protect the
>       interest; or
>
>   (ii) leave an existing party subject to a
>        substantial risk of incurring double,
>        multiple, or otherwise inconsistent
>        obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). The district court concluded that
the Tribe is a required party under Rule 19(a)(1)(B)(i)
because the Tribe has a legally protected interest in the
lawsuit that may be impaired or impeded in the Tribe's
absence. We agree.

1.

"To come within the bounds of Rule 19(a)(1)(B)(i), the interest of the absent party must be a legally protected interest and not merely some stake in the outcome of the litigation." *Jamul Action Comm.*, 974 F.3d at 996. This interest "must be 'more than a financial stake.'" *Diné Citizens*, 932 F.3d at 852 (quoting *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)). For example, "an interest that arises from terms in bargained contracts may be protected, but such an interest must be substantial." *Id.* (quoting *Cachil Dehe Band of Mintun Indians of the Colusa Indian Cmty. v. California* (*Colusa*), 547 F.3d 962, 970 (9th Cir. 2008)) (quotation marks and alterations omitted). However, "[t]here is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a)," *Bakia v. Los Angeles Cnty.*, 687 F.2d 299, 301 (9th Cir. 1982) (per curiam), and "we have emphasized the 'practical' and 'fact-specific' nature of the inquiry," *Colusa*, 547 F.3d at 970 (quoting *Makah*, 910 F.2d at 558).

The district court correctly concluded that, because of the importance of tribal gaming compacts and the revenue that these compacts provide to Washington's federally recognized tribes, as well as the long history of tribal gaming and its associated benefits for the tribes and their surrounding communities, Maverick's suit implicates the Tribe's legally protected economic and sovereign interests. Maverick does not contest this conclusion. In fact, Maverick concedes that the Tribe has a legitimate interest in the legality of its gaming compact and sports betting amendment. Therefore, because Maverick's APA and equal protection claims seek relief that would result in the invalidation of the Tribe's gaming compact and sports betting amendment, Maverick does not dispute that the Tribe

has a legally protected interest in the first and second claims in the First Amended Complaint challenging the Secretary's approval and the State Defendants' administration of the compact and amendment.

Straying from the text of the complaint and its argument below, which focuses on the Tribe's exemption from Washington's criminal laws prohibiting class III gaming, Maverick now contends that the Tribe has no legally protected interest in the Criminal Prohibition claim. This issue is not preserved for appellate review because it was not "raised sufficiently for the trial court to rule on it." *Cornhusker Cas. Ins. Co. v. Kachman*, 553 F.3d 1187, 1192 (9th Cir. 2009) (quoting *In re E.R. Fegert*, 887 F.2d 955, 957 (9th Cir. 1989)). Maverick states "in passing," *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010), that the district court "could redress Maverick's injuries by simply enjoining the State defendants from enforcing [Washington's criminal laws prohibiting class III gaming] against Maverick." This statement is far removed from a specific and distinct argument that the Criminal Prohibition claim "does not threaten the Tribe's compact or its gaming activities at all." *See id.* Our court generally "will not hear an issue raised for the first time on appeal," *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992), and we decline to do so here.

2.

Maverick also argues that the Tribe's interest will not be impaired or impeded because the Federal Defendants can

adequately represent the Tribe's interests in this litigation.[14]
"As a practical matter, an absent party's ability to protect its
interest will not be impaired by its absence from the suit
where its interest will be adequately represented by existing
parties to the suit." *Alto v. Black*, 738 F.3d 1111, 1127 (9th
Cir. 2013) (quoting *Washington v. Daley*, 173 F.3d 1158,
1167 (9th Cir. 1999)).  We have held that

> whether an existing party may adequately
> represent an absent required party's interests
> depends on three factors: (1) whether the
> interests of a present party to the suit are such
> that it will undoubtedly make all of the absent
> party's arguments; (2) whether the party is
> capable of and willing to make such
> arguments; and (3) whether the absent party
> would offer any necessary element to the
> proceedings that the present parties would
> neglect.

*Klamath Irrigation*, 48 F.4th at 944 (quoting *Diné Citizens*,
932 F.3d at 852) (internal quotation marks omitted).  The
complaint states only the APA claim against the Federal
Defendants; only the State Defendants are named in the
second and third claims.  The district court did not abuse its
discretion in finding that, under *Diné Citizens* and *Klamath*

---

[14] Maverick concedes that State Defendants cannot adequately represent
the Tribe's interests in this case. *See Am. Greyhound Racing*, 305 F.3d
at 1023 n.5.

24          MAVERICK GAMING LLC V. USA

*Irrigation*, the Federal Defendants will not be able to adequately represent the Tribe's interest here.[15]

In *Diné Citizens*, a coalition of tribal, regional, and national conservation organizations sued the U.S. Department of the Interior challenging its reauthorization of coal mining activities on land reserved to the Navajo Nation. 932 F.3d at 847. The plaintiffs challenged the agency's approval of renewals to leases and mining permits possessed by the Navajo Transitional Energy Company ("NTEC"), a corporation wholly owned by the Navajo Nation, on the grounds that the agency's action violated the requirements of the Endangered Species Act ("ESA") and National Environmental Policy Act ("NEPA"). *Id.* at 847, 849–50. There, like here, NTEC intervened for the limited purpose of filing a motion to dismiss under Rule 12(b)(7) for failure to a join a party required under Rule 19 based on NTCE's and the Navajo Nation's sovereign immunity. *Id.* at 850.

Affirming the district court's dismissal, we rejected the plaintiffs' argument that the federal government could adequately represent the tribe's interests. We reasoned that, "[a]lthough Federal Defendants have an interest in defending their decisions, their overriding interest . . . must be in complying with environmental laws." *Id.* at 855. We determined that "[t]his interest differs in a meaningful sense from NTEC's and the Navajo Nation's sovereign interest in ensuring that the Mine and Power Plant continue to operate and provide profits to the Navajo Nation." *Id.* We

---

[15] Both parties parse the complaint to argue that the Federal Defendants can or cannot adequately defend the Tribe's interest in this action. But this analysis is besides the point because Maverick's concessions below require us to assume that if Maverick prevails on any one of its claims for relief the Tribe's economic and sovereign interests may be impaired.

explained that a judicial holding that "these statutes required something other than what Federal Defendants have interpreted them to require could similarly change Federal Defendants' planned actions, affecting the lease, rights-of-way, and permits at stake," and therefore the "Federal Defendants' interest might diverge from that of NTEC." *Id.*

Three years later in *Klamath Irrigation*, plaintiffs sued the federal Bureau of Reclamation ("Reclamation") to challenge the agency's operating procedures for the distribution of water in the Klamath Water Basin. 48 F.4th at 938. In adopting these procedures, Reclamation had "the 'nearly impossible' task of balancing multiple competing interests," including the interests of the irrigation district members, the requirements of the ESA, and the federal reserved water and fishing rights of the non-party tribes. *Id.* at 940–41. Again, as here, the absent tribes moved to intervene, and then immediately "moved to dismiss . . . under Federal Rule of Civil Procedure 12(b)(7) for failure to join a required party under Federal Rule of Civil Procedure 19, arguing that tribal sovereign immunity barred their joinder." *Id.* at 942.

We held that Reclamation could not adequately represent the absent tribes' water and fishing rights. *Id.* at 944–45. Applying *Diné Citizens*, we explained that although the federal agency and the absent tribes "share an interest in the ultimate outcome of this case, our precedent underscores that such alignment on the ultimate outcome is insufficient for us to hold that the government is an adequate representative of the tribes." *Id.* at 945. Rather, because "[t]he Tribes' primary interest is in ensuring the continued fulfillment of their reserved water and fishing rights, while Reclamation's primary interest is in defending its [action] taken pursuant to the ESA and APA," their interests were "not so aligned as to

make Reclamation an adequate representative of the Tribes."
*Id.* at 944–45.

We agree with the district court that under *Diné Citizens*
and *Klamath Irrigation*, the Federal Defendants cannot
adequately represent the Tribe's interests here. The federal
government and the Tribe undoubtedly "share an interest in
the ultimate outcome of this case"—they both seek to defend
the Secretary's approval of the compacts and sports betting
compact amendments. *Id.* at 945. But they "share an interest
in the ultimate outcome of this case for very different
reasons." *Id.* As the district court explained, "though the
federal government maintains an interest in defending its
own analysis that formed the basis of its decision to approve
the sports-betting compact amendments, it does not share an
interest in the *outcome* of the continued approval of the
sports-betting compact amendments—the continued
operation of sports-betting at tribal casinos." In contrast, the
Tribe is interested in defending the approval of the compacts
and compact amendments to ensure the continued operation
of sports betting and other class III gaming on its land.
Whereas the Federal Defendants' "interests in this litigation
begin and end with" defending the compacts, "for the Tribe,
the stakes of this litigation extend beyond the fate of the
[compact] and implicate sovereign interests in self-
governance." *Deschutes River All.*, 1 F.4th at 1163.
Because the federal government's interest in this litigation is
meaningfully distinct from the Tribe's, the Federal
Defendants cannot serve as an adequate representative of the
Tribe.

Maverick attempts to distinguish *Diné Citizens* and
*Klamath Irrigation* by arguing that they were challenges to
the federal agency enforcement of statutes and regulations
other than IGRA, which were not intended to benefit tribal

interests. So in *Diné Citizens* we found that "[a]lthough Federal Defendants have an interest in defending their decisions, their overriding interest . . . must be in complying with environmental laws." *Diné Citizens*, 932 F.3d at 855. And similarly, in *Klamath Irrigation* we concluded that "Reclamation has the 'nearly impossible' task of balancing multiple competing interests in the Klamath Basin," only one of which was the tribes' federal reserved water and fishing rights. *Klamath Irrigation*, 48 F.4th at 940. By contrast, Maverick argues, IGRA was created "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), and requires the Secretary to disapprove any compact that violates "the trust obligations of the United States to Indians," 25 U.S.C. § 2710(d)(8)(B)(iii). Maverick contends that by defending the Tribe's compact with Washington, the Federal Defendants express their belief that the compact benefits the Tribe, and thus the Tribe's and federal government's interests are aligned. But we do not think the analysis so simple. The Secretary of the Interior does not consider the tribes' interests exclusively when tasked with approving or disapproving a compact that has been reached between a state and a tribe. IGRA requires the Secretary to disapprove any compact that violates "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands." 25 U.S.C. § 2710(d)(8)(B)(ii). Thus, in the event of a conflict between the Tribe's interest in class III gaming and any other provision of federal law, IGRA requires the federal government to consider, and possibly prioritize, the federal

law over the Tribe's interest, just as in *Diné Citizens* and *Klamath Irrigation*.[16]

Maverick also relies upon *Alto* and *Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152 (9th Cir. 1998) (per curiam) to argue that the Federal Defendants can serve as an adequate representative of the Tribe. But these cases are inapposite. In *Alto*, we held that the Bureau of Indian Affairs could adequately represent the absent tribe's interest in limiting tribal enrollment to qualified individuals where "the tribe's own governing documents vest[ed] the United States Department of Interior, Bureau of Indian Affairs ("BIA"), with ultimate authority over membership decisions." 738 F.3d at 1115. We also distinguished *Alto* in *Diné Citizens* on this basis, explaining that "the tribe had specifically granted BIA final decisionmaking authority over tribal membership issues, making it more plausible that the government would represent the tribe's interest—or that the government's interest and the tribe's interest had become one and the same." *Diné Citizens*, 932 F.3d at 855.

Similarly, in *Southwest Center*, environmental organizations brought an action under the ESA and NEPA to

---

[16] Maverick also asserts that *Diné Citizens* is distinguishable because some of the plaintiffs were tribal conservationist organizations, and thus there were tribal interests on both sides of the issue. We have indeed often found that the federal government cannot adequately represent an absent tribe's interests when there are other tribes acting as plaintiffs in the same suit. *See Makah*, 910 F.2d at 559; *Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1500 (9th Cir. 1991) ("[T]he United States cannot adequately represent the [absent tribe's] interest without compromising the trust obligations owed to the plaintiff tribes."). But that the plaintiff coalition in *Diné Citizens* included tribal organizations did not factor into the adequate representation analysis there. *See Diné Citizens*, 932 F.3d at 853–56.

enjoin the federal government's use of a newly built water storage facility until a further environmental study was performed. 150 F.3d at 1153. We found that a non-party tribe had "an interest in the [facility] becoming available for use as soon as possible," and that "an injunction would impair" that interest. *Id*. However, we concluded that the federal government was an adequate representative of the tribe because the federal government and the tribe "share[d] a strong interest in defeating [the plaintiff's] suit on the merits *and* ensuring that the [water storage facility] is available for use as soon as possible." *Id.* at 1154 (emphasis added). The government and the absent tribe did not just share the same interest in the outcome of the litigation, but they also shared the same *reason* for that desired outcome— imminent use of the water storage facility.

Here, in contrast, although the Federal Defendants and Tribe share an interest in defending the Secretary's approval of the gaming compacts and sports betting amendments, the Federal Defendants do not share the Tribe's sovereign and economic interests in protecting and furthering its class III gaming operations. Maverick contends that this is an improper formulation of the adequate representation inquiry. According to Maverick, so long as there is no conflict of interest between the government and the Tribe, the federal government can adequately represent an absent tribe's interests. Maverick relies upon *Washington v. Daley* for this proposition. However, neither *Daley*, nor any other precedent cited by Maverick, stands for the proposition that whether the government can adequality represent a tribe's interests turns solely on whether there is a present conflict of interest between the government and the tribe. Rather, we have consistently examined (1) "whether the interests of a present party to the suit are such that it will undoubtedly

make all of the absent party's arguments; [(2)] whether the party is capable of and willing to make such arguments; and [(3)] whether the absent party would offer any necessary element to the proceedings that the present parties would neglect." *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992) (quoting *Cnty. of Fresno v. Andrus*, 622 F.2d 463, 439 (9th Cir. 1980)) (internal quotations omitted); *Southwest Center*, 150 F.3d at 1153–54 (quoting *Shermoen*, 982 F.2d at 1318); *Daley*, 173 F.3d at 1167 (same); *Alto*, 738 F.3d 1127–28 (same). In the process of this examination some of our older Rule 19 cases have made the statement that "[t]he United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe." *Southwest Center*, 150 F.3d at 1154; *see also Daley*, 173 F.3d at 1167. But it is evident from reading the entire content, the statements form just a piece of the analysis, and do not represent a standalone rule. *Southwest Center*, 150 F.3d at 1154 ("The federal government and [the tribe] share a strong interest in defeating [the] suit on the merits"); *see also Daley*, 173 F.3d at 1167–68 ("[T]he Secretary and the Tribes have virtually identical interests in this regard."); *Makah*, 910 F.2d at 558 ("The inquiry is a practical one[,] fact specific, and is designed to avoid the harsh results of rigid application.") (internal citation omitted).

The Tribe contends that the federal government cannot be expected to assert an important legal argument that the Tribe would raise: That under our precedent, the Tribe can lawfully offer class III gaming even without a compact.[17] In

---

[17] We offer no view as to the merits of this claim, but simply recognize that the Tribe has identified at least one argument that it would make that the Federal Defendants could not make on its behalf, as this argument is

response, Maverick contends that it is irrelevant whether the Federal Defendants would be willing to make this argument, because the question of whether the Tribe can offer class III gaming without a compact would become pertinent, if ever, only after Maverick succeeded in invalidating those compacts in this current litigation. But Maverick's view cannot be reconciled with *Diné Citizens*, which explained that the federal government could not adequately represent the tribe's interest because the "Federal Defendants' interest *might* diverge from that of" the Tribe if the district court decided that "the federal agencies' analyses underlying the approval was flawed." *Diné Citizens*, 932 F.3d at 855 (emphasis added).

And, contrary to Maverick's statements otherwise, a conflict between the Tribe's and the federal government's interests exists in this case. Although today the Tribe and the State of Washington have a valid gaming compact pursuant to which the Tribe successfully operates its casino, that was not always the case. When Washington refused to negotiate a compact with the Tribe in the late 1990s, the federal government filed an *in rem* action against the Tribe, seized the Tribe's gambling machines, and issued a Notice of Violation and Order of Closure against the Tribe. At that time, the federal government relied on IGRA's requirement that the Tribe have a valid gaming compact in effect to prevent the Tribe from offering class III gaming. In light of the federal government's documented history of adverse action toward the Tribe in litigation over the Tribe's gaming

---

contrary to federal law. *See* 25 U.S.C. § 2710(d)(1)(C) ("Class III gaming activities shall be lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal-State compact . . . that is in effect.").

operations, we agree with the district court that this case presents "actual, not hypothetical or unknown conflicts" between the federal government and Tribe. *Cf. Klamath Irrigation*, 48 F.4th at 945 (The fact that "the Tribes are in active litigation over the degree to which [the federal government] is willing to protect the Tribes' interests in several species of fish . . . increases the likelihood that [the government] would not 'undoubtedly' make all of the same arguments that the Tribes would make in this case.").

Therefore, even though IGRA was created to promote tribal interests and codifies the federal government's trust obligation to the tribes, the federal government's interest will not always align with the interests of the tribes. That is because, just like in *Diné Citizens* and *Klamath Irrigation*, the federal government's "overriding interest . . . must be in complying with [federal] laws," which "differs in a meaningful sense from [the Tribe's] sovereign interest in ensuring that [sports betting and other class III gaming] continue to operate and provide profits to the [Tribe]." *See Diné Citizens*, 932 F.3d at 855. In light of these divergent interests, the district court did not abuse its discretion in finding that the Federal Defendants cannot adequately represent the Tribe in this case.

B. The Shoalwater Bay Indian Tribe cannot feasibly be joined to this litigation.

Next, we determine whether the Tribe can feasibly be joined to the litigation. *See Diné Citizens*, 932 F.3d at 856. Because the Tribe enjoys sovereign immunity, we hold that it cannot.

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Jamul Action Comm.*, 974 F.3d at 991

(quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991)). "Among the core aspects of sovereignty that tribes possess is the common law immunity from suit traditionally enjoyed by sovereign powers." *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1016 (9th Cir. 2016) (internal quotation marks and alterations omitted). Although a tribe may waive this immunity, such waiver "cannot be implied but must be unequivocally expressed." *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)).

Here, the Tribe has unequivocally expressed its intent to *not* waive its immunity. When the Tribe filed its motion for limited intervention in the district court, it included the following language:

> For avoidance of doubt, by intervening in this action for the limited purpose of moving to dismiss under Rules 12(b)(7) and 19, the Tribe does not waive, and reserves in full, its sovereign immunity. Nothing herein shall be construed as waiver, in whole or in part, of the Tribe's immunity, or as the Tribe's consent to be sued, and the legal counsel for the Tribe, undersigned, lack authority to waive the Tribe's immunity or consent to the jurisdiction of this Court.

The Tribe's Chairwoman, Charlene Nelson, also submitted a declaration with the motion for limited intervention that explained that the Tribal Council had not waived its sovereign immunity in this matter nor authorized any of the Tribe's representatives, including its legal counsel, to do so.

The Tribe reiterated this same position in its motion to dismiss.

Maverick nevertheless argues that the Tribe waived its sovereign immunity by voluntarily intervening in this suit. We disagree.  It is well-established that a tribe's voluntary participation in litigation for a limited purpose does not constitute a blanket waiver of immunity from suit in general. Rather, "[t]he scope of the waiver depends on the particular circumstances, including the tribe's actions and statements as well as the nature and bounds of the dispute that the tribe put before the court." *Quinault Indian Nation v. Pearson for Est. of Comenout*, 868 F.3d 1093, 1097 (9th Cir. 2017).  That is why a "tribe's participation in litigation does not constitute consent to counterclaims asserted by the defendants in those actions," *McClendon v. United States*, 885 F.2d 627, 630 (9th Cir. 1989); *Potawatomi*, 498 U.S. at 509–10 (holding that a tribe does not waive its immunity to compulsory counterclaims by voluntarily filing suit), and why "a tribe's voluntary participation in administrative proceedings does not waive its immunity in a subsequent court action filed by another party seeking review of the agency proceedings," *Bodi*, 832 F.3d at 1017; *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir. 1994) (finding that the tribe's "voluntary participation [in an administrative action] is not the express and unequivocal waiver of tribal immunity that we require in this circuit"); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996) (holding that tribes "did not waive their immunity by intervening in [an] administrative proceeding[]").

Accordingly, where, as here, a tribe intervenes for the limited purpose of a motion to dismiss the action because it is a required party that cannot be joined due to its sovereign immunity, the court's jurisdiction is "limited to the issues

necessary to decide" that controversy, only. *McClendon*, 885 F.2d at 630. "[I]t would defy logic" to conclude that "the Tribe clearly manifested its intent to waive the very immunity defense that it asserts." *Bodi*, 832 F.3d at 1018.

Maverick takes out of context a statement in our decision in *United States v. Oregon*, 657 F.2d 1009 (9th Cir. 1981) to the effect that the tribe's "intervention" in that particular case waived its sovereign immunity. In that case, a tribe intervened in an action to establish and protect its treaty fishing rights and entered into a consent decree that "expressly retained [the court's] continuing jurisdiction in order to expedite enforcement of its decree." *Id.* at 1011. Over the years, the court exercised its jurisdiction to modify the consent decree at the behest of the parties. *Id.* The district court adopted an agreement by the parties and later intervenors in an additional court order, which included a provision stating: "[I]n the event that significant management problems arise from this agreement that cannot be resolved by mutual agreement, the parties agree to submit the issues to federal court for determination. In any event, the Court shall retain jurisdiction over the case." *Id.* at 1011, 1016.

Over a decade later, an action was brought to enforce the consent decree, and we determined that the tribe waived its sovereign immunity because it had expressly consented to suit. *Id.* at 1014–16. We reasoned that, "[b]y intervening [in the initial action], the Tribe assumed the risk that its position would not be accepted, and that the Tribe itself would be bound by an order it deemed adverse." *Id.* at 1015. Indeed, we found that the tribe had "expressly consented to th[e] suit" by entering into the conservation agreement, in which the tribe "agree[d] to submit the issues to federal court for determination." *Id.* at 1016. Thus, the tribe submitted to

jurisdiction and engaged in the litigation for eleven years, and only attempted to assert sovereign immunity when the outcome appeared likely to favor conservation at the expense of its fishing rights.

Here, far from the "express[] consent" at issue in *Oregon*, the Tribe entered this litigation fully asserting its rights as a sovereign not subject to the court's jurisdiction. *See id.*

Maverick's reliance on *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613 (2002), in which the Supreme Court found that the State of Georgia's removal of a state court lawsuit against it to federal court amounted to a waiver of its Eleventh Amendment immunity, is also unavailing. In *Bodi*, we rejected a plaintiff's similar "attempt to extend *Lapides* from the Eleventh Amendment context to the tribal immunity context." 832 F.3d at 1018. We explained that "States can waive their Eleventh Amendment immunity through litigation conduct that would not effect a waiver of tribal sovereign immunity," and thus "parallels between the two are of limited utility." *Id.* at 1020. Accordingly, although a State's removal of a state court case to federal court may waive its Eleventh Amendment immunity, a tribe's removal of a state court action filed against it to federal court does not waive its sovereign immunity where the tribe "asserted its immunity defense promptly upon removal to federal court and neither it, nor any Defendant, ever voiced an intent to litigate on the merits." *Id.* at 1017. Thus, while there may be circumstances where a State's voluntary participation in litigation waives its Eleventh Amendment immunity, *see, e.g.*, *In re Lazar*, 237 F.3d 967, 978 (9th Cir. 2001) (holding that when a state "files a proof of claim in a bankruptcy proceeding, the state waives its Eleventh Amendment

immunity with regard to the bankruptcy estate's claims that arise from the same transaction or occurrence as the state's claim"), a tribe does not waive its sovereign immunity where, as here, it asserted its immunity defense promptly upon intervention in the suit and only ever voiced an intent to do precisely that.

The Tribe's limited intervention for the purpose of filing a motion to dismiss under Rule 12(b)(7) does not constitute the "clear and unequivocal waiver that is required for a tribe to relinquish its immunity from suit." *Bodi*, 832 F.3d at 1014. Because the Tribe has not waived its sovereign immunity, it cannot be feasibly joined in this action.

## C. This litigation cannot proceed in equity and good conscience without the Shoalwater Bay Indian Tribe.

Turning to the final step of the Rule 19 analysis, we must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed" under Rule 19(b). Fed. R. Civ. P. 19(b); *see also Diné Citizens*, 932 F.3d at 857.

1.

"To determine whether a suit should proceed among the existing parties where a required party cannot be joined, courts consider (i) potential prejudice, (ii) possibility to reduce prejudice, (iii) adequacy of a judgment without the required party, and (iv) adequacy of a remedy with dismissal." *Klamath Irrigation*, 48 F.4th at 947 (citing Fed. R. Civ. P. 19(b)). However, "[t]he balancing of equitable factors under Rule 19(b) almost always favors dismissal when a tribe cannot be joined due to tribal sovereign immunity." *Deschutes River All.*, 1 F.4th at 1163 (quoting *Jamul Action Comm.*, 974 F.3d at 998). The district court

did not abuse its discretion in concluding that a balancing of these factors requires that it dismiss this action.

The first Rule 19(b) factor, which considers "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties," Fed. R. Civ. P. 19(b)(1), "largely duplicates the consideration that made a party necessary under Rule 19(a)," *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1025 (9th Cir. 2002). As discussed, the Tribe has a legitimate and substantial interest in the legality of its tribal-state gaming compact and its amendments, an interest that implicates the Tribe's sovereign rights and which the federal government cannot adequately represent on the Tribe's behalf. *See Diné Citizens*, 932 F.3d at 857. Because Maverick's suit seeks to invalidate that compact and the sports betting amendment, the potential prejudice to the Tribe if a judgment were rendered in its absence "would be enormous." *Am. Greyhound Racing, Inc.*, 305 F.3d at 1025. This factor clearly favors dismissal.

The district court also correctly concluded that the second factor, "the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures," weighs in the Tribe's favor. Fed. R. Civ. P. 19(b)(2). The district court found that the relief that Maverick seeks for its APA and federal equal protection claims cannot be tailored to lessen the prejudice faced by the Tribe because "Maverick seeks nothing less than a wholesale revocation of the tribes' ability to operate casino gaming facilities" through the invalidation of its tribal-gaming compact. Maverick argues that, on its Criminal Prohibition claim, the district court could instead provide relief in the form of an injunction preventing the State Defendants from enforcing the state's

criminal laws against Maverick, thereby shaping the relief to avoid invalidation of the tribal-gaming compacts. But even that relief would impair what Maverick has conceded are the Tribe's sovereign and economic interests in gaming exclusivity.

Maverick also asserts that we could lessen any prejudice to the Tribe by allowing it to participate instead as an *amicus*. But "[a]micus status is not sufficient" to lessen prejudice. *Makah*, 910 F.2d at 560 (citing *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 775 (D.C. Cir. 1986) ("If the opportunity to brief an issue as a non-party were enough to eliminate prejudice, non-joinder would never be a problem since the court could always allow the non-joinable party to file amicus briefs.")).

The third consideration, however, weighs in Maverick's favor mitigating against dismissal. This factor evaluates "whether a judgment rendered in the person's absence would be adequate." Fed. R. Civ. P. 19(b)(3). Despite the varied and extensive relief sought in the First Amended Complaint, Maverick now contends that it would be satisfied with limiting its complaint to its APA claim only and seeking relief solely in the form of a judgment declaring the Secretary's approval of the sports betting compact amendments invalid. Thus, the question becomes whether a judgment that invalidates the Secretary's approval of the sports betting compact amendments would be adequate as between Maverick and the Federal Defendants. Under similar circumstances in *Diné Citizens*, we found that "[a] judgment rendered in NTEC's absence would be adequate and would not create conflicting obligations, because it is Federal Defendants' duty, not NTEC's, to comply with" the federal statutes at issue. *Diné Citizens,* 932 F.3d at 858. Here, because it is the duty of the Secretary, not the Tribe, to

approve the compact amendments under IGRA, a judgment invalidating that approval would provide adequate relief as between the Federal Defendants and Maverick.

Finally, we must determine "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). Because there is no alternative judicial forum in which Maverick could seek the relief it requests, the district court found that this factor weighs in favor of Maverick. However, "we have regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs." *Am. Greyhound Racing, Inc.*, 305 F.3d at 1025. Indeed, we have found "a wall of circuit authority in favor of dismissing actions in which a necessary party cannot be joined due to tribal sovereign immunity—virtually all of the cases to consider the question appear to dismiss under Rule 19, regardless of whether an alternative remedy is available, if the absent tribes are Indian tribes invested with sovereign immunity." *Deschutes River All.*, 1 F.4th at 1163 (quoting *Diné Citizens*, 932 F.3d at 857) (internal quotation marks and alterations omitted). Thus, even though both the third and fourth factors weigh in favor of allowing the litigation to proceed, the district court did not abuse its discretion in concluding that, in light of the Tribe's sovereign immunity and the prejudice the Tribe would suffer if the suit proceeded in its absence, Maverick's suit must be dismissed.

2.

Alternatively, Maverick argues that the litigation should continue in the Tribe's absence under the public rights exception. "The public rights exception is a limited 'exception to traditional joinder rules' under which a party, although necessary, will not be deemed 'indispensable,' and

the litigation may continue in the absence of that party."
*Diné Citizens*, 932 F.3d at 858 (citing *Conner v. Burford*,
848 F.2d 1441, 1459 (9th Cir. 1988)).    This exception is
reserved for those circumstances where the litigation both
"transcend[s] the private interests of the litigants and seek[s]
to vindicate a public right," and does not "destroy the legal
entitlements of the absent parties."    *Kescoli*, 101 F.3d at
1311 (quoting *Connor*, 848 F.2d at 1459).    Maverick's
argument that this action comes within the public rights
exception fails on both counts.

First, although Maverick frames its suit as one merely
"seeking to enforce governmental compliance with
administrative and constitutional law," we have already
rejected this argument in *American Greyhound Racing, Inc.
v. Hull*, where, as here, the plaintiffs challenged the validity
of tribal-gaming compacts under IGRA. 305 F.3d at 1025–
27.  Despite the plaintiffs' contention "that their action seeks
only to ensure that the Governor acts in accordance with the
state constitution and laws," we found that their real "interest
[was] in freeing themselves from the competition of Indian
gaming, not in establishing for all the principle of separation
of powers." *Id.* at 1026.

The same holds true here.  The First Amended Complaint
contains numerous allegations of the competitive harm
Maverick suffers, and hopes to eradicate, by means of this
lawsuit.  For example, Maverick alleges that "[b]ecause the
Tribes can offer [class III] games . . . but Maverick cannot,
Maverick suffers competitive injury with tribal casinos," and
that because Washington's criminal laws prohibit it from
offering class III gaming, "Maverick cannot establish or
acquire gaming operations in Washington that can
effectively compete with the Tribes' operations."    To
diminish this competition, Maverick seeks nothing less than

the invalidation of the tribal-gaming compacts of all Washington's tribes. Just as in *American Greyhound Racing*, Maverick's suit does not "*incidentally* affect the gaming tribes in the course of enforcing some public right," but is instead "*aimed* at the tribes and their gaming." *Id.* at 1026. Any incidental affect that Maverick's suit could have in ensuring "governmental compliance with administrative and constitutional law" does not transcend Maverick's private interest in increasing its own revenue.

Maverick also argues that the district court erred in finding that its suit seeks to invalidate the Tribe's acknowledged legal entitlement, because tribal-state compacts do not confer private legal rights but rather set the balance of public regulatory authority among different sovereigns. Maverick is correct that IGRA, which Congress enacted in response to the Supreme Court's ruling in *Cabazon*, seeks "to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." *Chicken Ranch Rancheria*, 42 F.4th at 1032 (quoting *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1160 (9th Cir. 2015)). But that is not the statute's only, nor even primary, objective. IGRA's stated purpose is to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). It facilitates these goals by, for example, requiring that net revenue from tribal gaming be used for specific sovereign functions. *Id.* § 2710(b)(2)(B), (d)(1)(A)(ii). Although IGRA also seeks "to provide a statutory basis for the regulation of gaming by an Indian tribe," 25 U.S.C. § 2702(2), even those regulatory objectives are "generally focused on the integrity of the gaming enterprise itself." *Chicken Ranch Rancheria*, 42

F.4th at 1031. IGRA's very purpose is to confer legal entitlements to the Tribe, and all other federally recognized Indian tribes, in the form of tribal-state gaming compacts. And these tribal-gaming compacts are what Maverick seeks to invalidate.

Even if "some of the interests [Maverick] seek[s] to vindicate, like the interest in being governed by constitutional laws, are public rights," that is not sufficient where, as here, the litigation poses a threat "to the absent tribes' legal entitlements, and indeed to their sovereignty." *See Shermoen*, 982 F.2d at 1319. Because Maverick's suit could destroy these legal entitlements, the district court did not abuse its discretion in determining that the public rights exception does not apply.

## V. CONLUSION

Because the Tribe is a required party that cannot be joined to the litigation on account of its sovereign immunity, and because the suit cannot in equity and good conscience proceed in the Tribe's absence, we **AFFIRM** the district court's dismissal of Maverick's First Amended Complaint.

**AFFIRMED.**

MILLER, Circuit Judge, concurring:

Maverick Gaming LLC brought this action against the United States and various federal and state officials challenging their actions relating to the regulation of gaming in Washington State, and, in particular, to a gaming compact between the State and the Shoalwater Bay Indian Tribe. Under our precedent, the Tribe is a required party that must be joined as a defendant. Because the Tribe's sovereign immunity prevents it from being joined without its consent, I agree with the court that Maverick's action cannot proceed. Although I join the court's opinion in full, I write separately to explain, first, that our precedent on Rule 19 has not adequately considered the distinctive character of litigation under the Administrative Procedure Act and, second, that a competitive injury, by itself, is not enough to make a tribe a required party.

I

Federal Rule of Civil Procedure 19(a)(1) makes a person a "required party" who "must be joined" when feasible if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1). Ordinarily, "an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013) (quoting *Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999)).

Count one of Maverick's complaint invokes the APA to challenge the Secretary of the Interior's approval of the

Tribe's gaming compact with the State. The Secretary is fully capable of defending her approval of the compact, and she has made clear that she is prepared to do so in this litigation. But under our precedent, that is not enough. In *Diné Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, we held that a tribe that had been issued a mining permit was a required party in an APA challenge to the issuance of the permit. 932 F.3d 843, 856 (9th Cir. 2019). Even though the Department of the Interior was prepared to defend its action, we rejected the view that it could adequately represent the absent tribe's interest. Instead, we held that to be an adequate representative, the federal government must share an interest not only in seeing the challenged agency action upheld but also in the "outcome," or consequences, of upholding that action. *Id.* at 855. We applied similar reasoning in *Klamath Irrigation District v. United States Bureau of Reclamation*, an APA case in which we acknowledged that the federal government and the tribes "share an interest in the ultimate outcome" but nevertheless concluded that "such alignment on the ultimate outcome is insufficient for us to hold that the government is an adequate representative of the tribes" when they shared the same interest for different reasons. 48 F.4th 934, 945 (9th Cir. 2022).

When an Indian tribe is a required party, it cannot be joined without its consent because it enjoys sovereign immunity. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014). Under Rule 19, if a required party "cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In practice, when tribal sovereign immunity is involved, that means that the case must be dismissed: "[W]e

have observed that there is a 'wall of circuit authority' in favor of dismissing actions in which a necessary party cannot be joined due to tribal sovereign immunity— 'virtually all the cases to consider the question appear to dismiss under Rule 19, regardless of whether [an alternate] remedy is available, if the absent parties are Indian tribes invested with sovereign immunity.'" *Diné Citizens*, 932 F.3d at 857 (quoting *White v. University of Cal.*, 765 F.3d 1010, 1028 (9th Cir. 2014)).

Those principles compel affirmance of the dismissal here. Although Maverick attempts to distinguish our decisions in *Diné Citizens* and *Klamath Irrigation District*, I agree with the court that its efforts to do so are unpersuasive. I am not convinced, however, that our precedents on this issue are correct. In my view, our decisions have not given adequate weight to the distinctive character of APA litigation.

In an APA case, the only question to be decided is whether the agency's action should be set aside. Because the agency's action is judged on the rationale articulated by the agency itself, the agency is the best party to defend it. *See SEC v. Chenery*, 332 U.S. 194, 196 (1947). And the APA does not authorize relief against any party other than the agency. *See* 5 U.S.C. §§ 702, 706. (In this case, count one of the complaint was phrased overly broadly and purported to seek relief against the Tribe itself, but Maverick has since made clear that it does not seek such relief; instead, it seeks a judgment setting aside the Secretary's approval of the compact, which is the only relief authorized by the APA.) Although a judgment setting aside the agency's action might have collateral consequences for non-parties like the Tribe, it leaves those non-parties no worse off than they would be had the agency not taken the challenged action in the first

place. In other words, an APA lawsuit threatens no interests beyond the interest in seeing agency action upheld, which the agency itself can be expected to represent. That is true even when the non-parties are sovereigns: Whatever legally protected interest a non-federal sovereign might have in APA litigation is collateral to the federal government's primary interest in seeing its own action upheld.

The required-parties approach of *Diné Citizens* threatens to "sound[] the death knell for any judicial review of executive decisionmaking" in the wide range of cases in which agency actions implicate the interests of Indian tribes. *Conner v. Burford*, 848 F.2d 1441, 1460 (9th Cir. 1988). That is so because, as noted, we have also held that "equity and good conscience" virtually always require dismissal in this context, *see Diné Citizens*, 932 F.3d at 857–58, and because we have refused to apply the "public rights" exception to joinder rules when tribal interests are at stake, *see id.* at 858–61. The combined effect of those holdings "produce[s] an anomalous result"—namely, that "[n]o one, except [a] Tribe, could seek review of" agency actions affecting tribal interests. *Manygoats v. Kleppe*, 558 F.2d 556, 559 (10th Cir. 1977). That result frustrates Congress's directive that a person "adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702.

Our decisions in *Diné Citizens* and *Klamath Irrigation District* have created a circuit conflict. The Tenth Circuit has held that a tribe is not a required party in an APA action challenging a federal decision to acquire land in trust for the tribe because "the Secretary's interest in defending his determinations is 'virtually identical'" to the tribe's interest, and that even if the tribe were a required party, the lack of "any alternative forum in which plaintiffs' claims can be

heard" weighs against dismissal. *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1259–60 (10th Cir. 2001) (quoting *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1412 (10th Cir. 1996)). Similarly, the District of Columbia Circuit has held that a tribe is not a required party to an APA challenge to the Secretary of the Interior's plan for allocating funds to tribes. *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1350–52 (D.C. Cir. 1996). In an appropriate case, we should revisit the application of Rule 19 to APA actions and consider aligning our decisions with those of other courts of appeals.

II

Required-party status under Rule 19 must be assessed on a claim-by-claim basis. *See Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1068 (9th Cir. 2010); *Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 (9th Cir. 1990). Our precedent compels the dismissal of counts one and two of Maverick's complaint, but count three calls for a somewhat different analysis.

Count three seeks a declaration that the State's "enforcement of Washington's criminal laws prohibiting class III gaming . . . violates the Constitution's guarantee of equal protection, and a declaration prohibiting the Defendants from enforcing those laws against Maverick." In other words, Maverick seeks a declaration that it is allowed to conduct gaming. That claim implicates the Tribe's economic interests because the Tribe would suffer competitive injury if non-tribal entities were allowed to conduct gaming. But it does not implicate any *legally protected* interest of the Tribe, which is what Rule 19 requires. *See Diné Citizens*, 932 F.3d at 852 ("To satisfy Rule 19, an interest must be legally protected and must be

'more than a financial stake.'" (quoting *Makah Indian Tribe*, 910 F.2d at 558)). The Tribe is therefore not a required party to this count, any more than a tribe that enjoys an exemption from a state gas tax would be a required party to a suit challenging the application of the gas tax to others. *Cf. Washington State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 350 (2019).

As the court's opinion explains, however, Maverick did not preserve this issue below. To the contrary, the district court correctly observed that Maverick did not dispute that the Tribe "has a legally protected interest that could be impaired by the instant litigation," without distinguishing among the different counts of the complaint. I therefore agree that we must affirm the dismissal of count three along with the rest of the complaint.