Home  >  Tribal Partnerships  >  Tribal Gaming Compa...

# Tribal gaming compacts and amendments

See the agreements with all 29 federally recognized tribes in Washington that allow casino-style gaming.

According to The Indian Gaming Regulatory Act (IGRA) of 1988, states must negotiate gaming compacts with tribes to allow casino-style gaming (if it's legal in that state).

Washington state law delegates our director the responsibility of negotiating Class III gaming compacts. All 29 federally recognized tribes in Washington have a gaming compact:

- Compacts and amendments: Confederated Tribes of the Chehalis Reservation
- Compacts and amendments: Confederated Tribes of the Colville Reservation
- Compacts and amendments: Cowlitz Indian Tribe
- Compacts and amendments: Hoh Tribe
- Compacts and amendments: Jamestown S'Klallam Tribe
- Compacts and amendments: Kalispel Tribe of Indians
- Compacts and amendments: Lower Elwha Klallam Tribe
- Compacts and amendments: Lummi Nation
- Compacts and amendments: Makah Tribe
- Compacts and amendments: Muckleshoot Indian Tribe
- Compacts and amendments: Nisqually Indian Tribe
- Compacts and amendments: Nooksack Indian Tribe
- Compacts and amendments: Port Gamble S'Klallam Tribe
- Compacts and amendments: Puyallup Tribe of Indians
- Compacts and amendments: Quileute Tribe
- Compacts and amendments: Quinault Indian Nation
- Compacts and amendments: Samish Nation
- Compacts and amendments: Sauk-Suiattle Tribe

cited in Maverick Gaming, LLC v. USA
No. 23-35136 archived December 9, 2024

- [Compacts and amendments: Shoalwater Bay Indian Tribe](#)
- [Compacts and amendments: Skokomish Indian Tribe](#)
- [Compacts and amendments: Snoqualmie Indian Tribe](#)
- [Compacts and Amendments: Spokane Tribe](#)
- [Compacts and amendments: Squaxin Island Tribe](#)
- [Compacts and amendments: Stillaguamish Tribe of Indians](#)
- [Compacts and amendments: Suquamish Tribe](#)
- [Compacts and amendments: Swinomish Indian Tribal Community](#)
- [Compacts and amendments: Tulalip Tribes of Washington](#)
- [Compacts and amendments: Upper Skagit Indian Tribe](#)
- [Compacts and amendments: Yakama Nation](#)

# What appendices and amendments authorize

## Appendix X

Appendix X authorized the tribes to operate electronic gaming devices known as the "[Tribal Lottery System](#)" (TLS) which use either:

- Electronic scratch tickets (with a finite number of tickets and a pre-determined number of winning tickets) or
- Online lottery tickets.

Each tribe had an allocation of 675 player terminals and could operate up to 1,500 at a facility by leasing player terminals from other tribes.

The maximum wager amount was $5.00 and cash was not allowed in or out of the player terminals.

## Appendix X2

Appendix X2 authorized a number of changes to the TLS.

- Each tribe's allocation of player terminals increased to 975.
- The maximum number of player terminals increased to 2,500 per facility, except for Muckleshoot, Tulalip and Puyallup. These three

cited in Maverick Gaming, LLC v. USA
No. 23-35136 archived December 9, 2024

tribes had a maximum of 3,500 player terminals, increasing to 4,000 after three years. These tribes are authorized to have up to 2,500 player terminals per facility.

## Appendix X2 amendments

Appendix X2 Amendment authorized a number of changes.

- Tribes ensure all cash dispensing outlets and point of sale machines within its gaming facilities do not accept electronic benefits cards.
- Each Tribe's allocation of player terminals increased 1,075. The maximum number of machines allowed at a facility did not change.
- Annual regulatory fees for each Tribe's gaming activities shall be determined according to the State's current cost allocation model, eliminates the 10% pre-payment discount, credit, and alternative regulatory fee agreement options, the State provides 90 days' notice when changing the cost allocation model, the State shall provide an audited accounting of its actual costs by April 30th of the following year.
- Each Tribe's annual contributions towards problem gambling and smoking cessation services established in Appendix X2 shall be paid within 1 year of the close of the Tribe's fiscal year to match other required contribution timeframes.

## Increasing terminal allocation

Each Tribe may increase its allocation by 50 player terminals, but only if the following conditions are met.

A tribe must provide the state with:

- Written notice that there are 500 or fewer player terminals available for lease among all Tribes participating in the Tribal Lottery System
- A certification from an independent accounting firm that confirms the number of machines available.

Within 30 days, the State reviews the certification and verifies the player terminals available for lease in the state. Any allocation change would be effective 30 days after notification by the State to the Tribe.

This allocation is limited to 1 per 12-month period.

If any Washington Tribe will operate more than 1,075 player terminals upon opening a new gaming facility, a Tribe can notify the State, and with State concurrence, receive an additional 50 player terminal

cited in Maverick Gaming, LLC v. USA
No. 23-35136 archived December 9, 2024

increase within the 12-month period.

When a Tribe receives an increase under this section, any other compacted Washington Tribe shall receive the same increase.

cited in Maverick Gaming, LLC v. USA
No. 23-35136 archived December 9, 2024



cited in Maverick Gaming, LLC v. USA
No. 23-35136 archived December 9, 2024

# GAMBLING INDUSTRY OVERVIEW
## 2022



Washington State

# GAMBLING

## COMMISSION

*Protect the public by ensuring that gambling is legal and honest.*

P.O. Box 42400 Olympia, WA 98504 | www.wsgc.wa.gov

## About the Washington State Gambling Commission

We are an accredited, limited-jurisdiction law enforcement agency, and the only statewide agency devoted to gambling licensing, regulation and enforcement. Our special agents are commissioned law enforcement officers who attend the Basic Law Enforcement Academy and receive the same training as other police officers. Many agents are certified fraud examiners and some are certified public accountants.

Through collaboration with local, state, federal, tribal and international law enforcement agencies, we work to fulfill our legislative declaration of:

    (1)      Keeping the criminal element out of gambling, and

    (2)      Promoting social welfare through strict regulation and control.

We are a non-appropriated agency, funded through licensing and regulatory fees paid by licensees and tribal governments.



# 2021 NET GAMBLING RECEIPTS
## $2.911 Billion

Tribal
$2,297,702,000

Nonprofit
$11,573,338

Commercial
$237,958,338

Horse Racing
$17,241,697

Lottery
$346,635,017

| 2021 Gambling Gross Receipts | 2021 Gambling Tax (Local) |
| --- | --- |
| $643,351,594 | $27,978,274 |

cited in Maverick Gaming, LLC v. USA No. 23-35136 archived December 9, 2024

2

# LICENSING

Our Licensing Division processes more than 20,000 gambling licenses and certifications each year. We conduct thorough background investigations and source funds to ensure crime does not gain a foothold in gambling operations.

## REGULATION & ENFORCEMENT

We enforce state gambling laws and rules for licensed activities such as: card games, bingo, amusement games, pull-tabs, punchboards, raffles and fundraising events. We conduct in-depth audits and on-site "spot" checks to ensure licensees are in compliance with rules and laws. Our Electronic Gambling Lab is responsible for testing equipment for compliance before it is installed. We also enforce laws for gambling activities that don't require a license, including sports pool boards and small raffles.

Agents often conduct undercover investigations to ensure that gambling is legal and honest. They investigate crimes including: theft, fraud, Internet gambling, cheating, bookmaking, animal fighting, embezzlement, money laundering and loansharking.

## TRIBAL GAMING

The federal Indian Gaming Regulatory Act (IGRA) requires states to negotiate gaming compacts with tribes for gambling activities that are authorized under state law. The Gambling Commission's director is delegated the responsibility of negotiating Class III gaming compacts. All 29 federally recognized tribes in Washington have a gaming compact.



### Regulatory Partnerships

We have a cooperative regulatory partnership with tribes. Additionally, we certify tribal gaming employees, who are also licensed by the tribes. Our Electronic Gambling Lab tests Class III gaming machines for compliance and integrity.

### Tribal Lottery System

The system is modeled after the Washington State Lottery's Scratch ticket games. Each tribe is allotted 1,125 machines. Tribes may lease or purchase the rights for additional machines from other tribes, up to 2,500 per facility. The maximum number of machines allowed in the state is 32,625.

## 2022 Tribal Contributions

### $25,744,687*

*Estimated Revenues accrued in 2019. Contribution payments made in 2020. Verified by WSGC in 2021.

**$8.0 million** Government agencies, fire, police

**$10.8 million** Charities

**$3.2 million** Smoking cessation

**$3.5 million** Problem gambling

cited in Maverick Gaming, LLC v. USA
No. 23-35136
archived December 9, 2024

# 2022 LEGISLATIVE PRIORITIES




## Senior Recreational Bingo Games

In the last three years we have been responding to a number of complaints regarding where senior recreational bingo games can be played.

We do not actively regulate unlicensed gambling activities such as these low stakes bingos – but respond to complaints Legislators have asked how we can address this problem posed by constituents.

New legislation regulating the games will add the bona fide charitable or nonprofit qualifications to include a specific exception for nonprofit senior housing organizations and community centers offering unlicensed senior bingo under RCW 9.46.0321

4

# MEET OUR COMMISSIONERS



### Bud Sizemore
**Commission Chair**
Appointed April 2014; Term expires June 2025

Commissioner Sizemore is a former mayor pro tempore and member of the Covington City Council, and legislative liaison for the Washington State Council of Fire Fighters. He is a retired fire fighter from the Kent Fire Department Regional Fire Authority.



### Julia Patterson
**Commission Vice Chair**
Appointed July 2018; Term expires June 2024

Commissioner Patterson is a former member of the Metropolitan King County Council, Washington State Senate, Washington State House of Representatives and the SeaTac City Council. Her public service career spans nearly three decades.



### Alicia Levy
**Commissioner**
Appointed March 2018; Term expires June 2023

Commissioner Levy is an attorney who practices business law, estate planning and real estate law. She completed her undergraduate work at Washington State University and graduated from Gonzaga University School of Law. She gained experience working in larger law firms before starting her own firm in Spokane.



### Kristine Reeves
**Commissioner**
Appointed May 3, 2021; term expires June 30, 2026

Commissioner Reeves served as a Washington State Representative from 2017-2019. She was the first African American woman elected to the Washington State House in 18 years. Commissioner Reeves served as the Washington Senior Advisor for the Biden-Harris campaign. She lives with her husband, Camron, and their two elementary age children in Federal Way, WA.



### Sarah Lawson
**Commissioner**
Appointed October 26, 2021;term expires June 30, 2027

Commissioner Lawson is an enrolled member of the Iowa Tribe of Kansas and Nebraska. She is an attorney with Schwabe, Williamson and Wyatt in Seattle working with tribal governments and tribal entities. Her areas of practice include Native American law.

## Ex Officio Members

Members of the Legislature serve as ex officio members and vote to approve or amend tribal-state Class III gaming compacts.

Senator Steve Conway
Senator Jeff Holy
Representative Brandon Vick
Representative Shelley Kloba

# MEET OUR STAFF



### Tina Griffin
Interim Director | (360) 507-3456 | tina.griffin@wsgc.wa.gov

Tina was appointed Interim Director in April 2021, while the Commissioners seek to fill the position permanently. Prior to this appointment, she served as the agency's assistant director and has held various positions throughout the agency. Tina has a degree from Portland State University, is a graduate of the Basic Law Enforcement Training Academy of the Washington Criminal Justice Training Commission. She is licensed by the State Board of Accountancy and is a certified fraud examiner by the Association of Certified Fraud Examiners.



### Tommy Oakes
Interim Legislative Liaison| (360) 486-3579| tommy.oakes@wsgc.wa.gov

Tommy Oakes is the interim legislative liaison for the Gambling Commission. He is also the professional standards and training supervisor, which involves all law enforcement training. He has been with the Gambling Commission for over 4 years. Tommy has a degree from Union institute & University. Prior to coming to Gambling Commission, Tommy was deputy sheriff in California for over 21 years. There he worked in various assignments such as detectives, SWAT team leader, undercover narcotics, and community policing. Tommy was a firearms instructor, Taser instructor and less lethal instructor in CA.

Cited in Maverick Gaming, LLC v. USA, No. 23-35136 (9th archived December 9, 2024)



# The Economic & Community Benefits
## of Tribes in Washington



MAY 2022

# Strong Tribal Economies Benefit All Washingtonians

Washington's 29 tribal governments generate:

## Economic Activity

**$6.6 billion**
in gross state product

**$1.5 billion**
in wages and benefits

**$2.8 billion** in purchasing power

**$1.2 billion**
in state and local taxes

**100%**
of tribal enterprise profits are government revenue

**$5**
of tribal revenue are from sovereignty

## Jobs

**37,371**
direct employment

**54,000**
jobs trace back to tribes

**72%**
non-Indian employees

**1 in 86**
Washington jobs

# Executive Summary

**Tribes in Washington are making significant investments in the state's quality of life.**

Growing tribal economies fund schools, housing programs, health clinics, environmental rehabilitation, infrastructure development, firefighting, law enforcement, and other public services for Indians and non-Indians alike. Even though COVID-19 brought rapid closures to casinos and other fiscally critical tribal enterprises, tribal governments have been at the vanguard of Washington's pandemic response.

The economic analysis summarized on the right shows tribes are large employers, fiscally independent governments, and contributors to the public good in Washington. Were it not for COVID-19, tribes would be an even greater presence, and tribal resilience promises a complete recovery when it becomes possible.

The stories highlighted throughout show tribes are creative and committed innovators in government, effective during a crisis. Washingtonians benefit directly from tribal actions and initiatives. Tribal governments vaccinate teachers and first responders, open community centers to neighbors, fund off-reservation schools, maintain public safety, and collaborate with state and local governments on everything from road construction to salmon habitat restoration.

If tribes were out-of-state corporations bringing this economic activity and public-spiritedness to Washington, legislators would likely offer tax waivers or reductions. And, rooted as they are in the lands and waters of Washington, tribes will never threaten to take operations or profits out of the state. Washington has substantially benefited from the economic and social resurgence in Indian Country and will for years to come.

Cited in Maverick Gaming, LLC v. USA, No. 23-35136 archived on December 9, 2024

# Table of Contents

**4    Tribal Governments Produce Economic and Community Benefits**

5    Indian tribes are governments
8    Tribal enterprises produce in-state government revenue
9    Washington and tribal governments solve problems together

**10    Stronger Tribal Economies Benefit All Washingtonians**

12    Tribes are top Washington employers
13    Tribes account for $6.6 billion of gross state product
15    Tribal contributions under gaming compacts

**17    Washington Tribes and COVID-19**

17    Caring for communities

**18    Indian Needs Remain Acute**

19    Reservation economic status lags Washington's
19    Chronic underfunding of Indian programs continues
20    Tribes are stepping into the breach

**21    Tribes Strengthen Washington's Economy**

21    Indian economic development helps poor regions of Washington
21    Intertribal transfers boost rural economies
22    Tribes are more fiscally independent

**23    Conclusion**

23    Tribes benefit all Washingtonians

24    Appendices

24    About the author
24    Conservativism in modeling and reporting impacts
24    Additional information
25    References

*cited in Maverick Gaming, LLC v. USA No. 23-35136 on December 9, 2024*



cited in Maverick Gaming, LLC v. USA, No. 23-35136, argued, December 9, 2024

# Tribal Governments Produce Economic and Community Benefits

Popular belief is that the U.S. *gave* casinos, fishing privileges, and other rights to Indians to address Indian poverty or make up for past wrongs. That is false, and the true nature of tribes matters for their economic impact today. This section addresses this misconception by providing facts about three critical features of tribes.

First, tribes retain powers and authorities of self-government. Second, tribal governments own most of the economic activity on Washington's Indian reservations, and 100 percent of tribal enterprise income is government revenue intended to serve their communities. Third, tribes routinely collaborate with Washington's state, county, and municipal governments. All three features amplify tribal economic impacts.

## KALISPEL CAMAS CENTER

### Improving Lives

The Kalispel Tribe of Indians' Camas Center for Community Wellness supports the health and social needs of its citizens and the greater community. The Center offers medical, chiropractic, dental, and behavioral health services for people in Pend Oreille County. In addition, the Camas Early Learning Center (inside the facility) focuses on individual child development by incorporating social-emotional learning and culturally responsive activities for young children. Tribes invest in the communities they have called home since time immemorial. The Camas Center is a testament to the Kalispel Tribe's commitment to the greater community.

*Tribal government revenue pays for public goods and services like public safety and law enforcement.*

## Indian tribes are governments

Tribes have always governed themselves, and they participate in American federalism with powers they retain from before European settlement. Accordingly, the U.S. Constitution explicitly acknowledges four sovereigns: the federal government, state governments, foreign nations, and Indian tribes. Today, treaties and U.S. law give shape to tribal powers. Still, more than anything, self-determination and self-reliance are the order of the day in Indian Country. Fundamentally, Indian tribes *do not* exist because the U.S. granted Indians powers based on ethnicity or race; they exist as political entities.

Today 574 tribal governments operate in the U.S., 29 of them in what is now Washington state (see Figure 1).

Elected tribal officials legislate and execute tribal laws, and governmental departments produce public goods, services, and amenities. Consistent with federalism, tribes cooperate with some of the 1,900 other governments in Washington; that is, with state, county, municipal, school district, and special district governments (U.S. Census, 2018).

**Tribal governments provide healthcare, protect and restore habitats, support and educate children, build infrastructure, protect public safety, care for elders, preserve and honor culture, and develop economies.**



FIGURE 1

**Indian Country in Washington**



* Presentation of treaty and tribal boundaries as reported by the United States and others does not imply the Washington tribes' acceptance and/or endorsement of the boundaries or the processes that produced them. Shaded regions are reservations with the exception of Samish, which is a tribally designated statistical area (TDSA).

FIGURE 2

# Three Decades of Change on WA Reservations

Successful investments in poor communities' human capital yield double dividends: they reduce dependency—on families, tribes, or taxpayers—and increase lifetime productivity.

1990-2020: Percent Change for American Indians on Washington Reservations (U.S. census)

Self-government is critical to American Indian and Alaska Native well-being. After more than a century and a half of federal experimentation, we've learned that recognizing and supporting tribal self-determination, self-government, and self-reliance is what changes Indian life for the better (Kalt, 1996). Prior policies fractionalized land bases, isolated Indians, stripped culture and language, and restricted tribal revenue collection. Self-determination, however, puts decision-making in the right hands and results in business success, enhanced

healthcare, better housing, more effective law enforcement, improved natural resource management, and more (Dixon et al., 1998; Krepps & Caves, 1994; Wakeling et al., 2000; Taylor et al., 1999; Champagne & Goldberg, 2012; Chandler & LaRonde, 1998; Berry, 2009).

Nationwide, Indian reservations have experienced remarkable economic growth (Taylor & Kalt, 2005; Akee et al., 2014). Washington reservations are no exception. Over the last 30 years, Indians on Washington reservations saw their inflation-adjusted incomes rise 46 percent and unemployment fall 31 percent. Meanwhile, the proportion of Indian adults with college degrees living on reservations increased by 65 percent. These and related improvements are beginning to reverse decades of poverty and dependence (see Figure 2). More importantly, successful investments in poor communities' human capital yield double dividends: they reduce dependency—on families, tribes, or taxpayers—and increase lifetime productivity.



**+65%** College Attainment

**−31%** Unemployment

**+46%** Income

FIGURE 3

# Milestones of Tribe–State Relations in Washington

*Cited in Maverick Gaming, LLC v. USA 23-35136, archived December 9, 2024*

## 1828–1887
### Removal, Reservation, and Treaty Era

**1854–1856**
**Indian Treaties with the United States**
*Point Elliott, Medicine Creek, Point No Point, Neah Bay, Yakama, Quinault, and Walla Walla*

## 1887–1934
### Allotment and Assimilation Era

**1887**
**Dawes Act**
*Allotted Indian reservations, precipitating additional land loss*

**1889**
**Washington Statehood**
*The 42nd state joined the Union*

## 1934–1953
### Reorganization Era

**1934**
**Indian Reorganization Act**
*Strengthened tribal governments and Indian control over assets*

## 1953–1968
### Termination Era

**1950s**
*Congress adopted a series of policies aimed at terminating federal obligations to tribes and pushing for assimilation of Indian people*

## 1968–2020
### Self-Determination Era

**1974**
**Bolt Decision**
*Reaffirmed treaty-reserved rights to harvest and co-manage salmon*

**1975**
**Indian Self-Determination and Educational Assistance Act**
*Encouraged tribes to take over program administration on reservations*

**1987**
**California v. Cabazon Band of Mission Indians**
*Upheld Indian gambling*

**1988**
**Indian Gaming Regulatory Act**
*Promoted tribal economic development and self-governance via gaming; created tribal-state compacts*

**1989**
**Centennial Accord**
*Committed Washington and tribes to government-to-government collaboration*

**1994**
**Tribal Self-Governance Act**
*Applied self-governance contracting permanently and broadly to the Dept. of Interior*

**1997**
**Friendly Lawsuit**
*Resolved a gaming impasse amicably*

**1999**
**Millennial Agreement**
*Reaffirmed the Centennial Accord*

**2012**
**Government-to-Government Law**
*Codified collaboration*

**2018**
**Murphy v. NCAA**
*Ban on sports betting struck down*

**2020**
**WA House Bill 2638**
*Regulates sports betting at tribal casinos*

## Tribal enterprises produce in-state government revenue

Tribal governments face unique challenges to their taxation powers (Fletcher, 2004; Croman & Taylor, 2016). Instead of relying on taxes to fund essential services, tribes rely on revenue generated by their government-owned enterprises. The gross reservation product of tribal economies is dominated by government-owned businesses such as Yakama Nation Land Enterprise, Salish Seafoods, Kalispel Market Chevron, and The Cedars at Dungeness Golf Course.

**Virtually 100 percent of Indian enterprise income is revenue to governments in Washington—in-state owners who will not threaten to take operations or revenues out of state.**

Tribal businesses offer more benefits to local and state economies than private enterprises. This is because tribal businesses transfer their earnings to tribal governments.

In contrast, the profits of private enterprises go to the owners and investors who may live out of state or overseas. Thus, tribal government ownership of casinos, gas stations, lumber mills, and other companies concentrates economic benefits in Washington state.

Tribal revenues, in turn, pay for public goods, services, and amenities, benefiting both Indians and non-Indians. These range across the spectrum of government activity, from outstanding schools (Chief Kitsap Academy) and ideal models of resource co-management (Tapash Sustainable Forest Collaborative) to public safety measures (Shoalwater Bay's tsunami tower in Tokeland) and cultural institutions (Hibulb Cultural Center and Natural History Preserve).

### ▶ Building Community

**SHOALWATER BAY TRIBE · TSUNAMI TOWER**

Washington has dozens of coastal communities that are vulnerable to tsunamis, but until recently there were only two tsunami escape towers in the entire state. In 2021, the Shoalwater Bay Tribe partnered with Washington's Emergency Management Division and FEMA Region 10 to construct the state's third tsunami evacuation tower. The successful collaboration inspired the funding and construction of additional towers in the nearby towns of Ocean Shores and Westport.



*Construction of the Shoalwater Bay Tribe's Tsunami Tower is expected to be complete in the summer of 2022.*

*Revenue from tribal government enterprises—from casinos to lumber mills—is in-state revenue that benefits Indians and non-Indians alike.*

cited in Maverick Gaming, LLC v. USA No. 23-35136 archived December 9, 2024



Washington and tribal governments work together to solve problems like restoring salmon habitat.

## Washington and tribal governments solve problems together

Washington state and the 29 federally recognized tribes within its borders routinely work together. The broadest formal framework for such collaboration arises from the 1989 Centennial Accord. It pledges the signatory tribes and Washington to recognize each other's sovereignty and "translate the government-to-government relationship into more efficient, improved and beneficial services to American Indian and non-Indian people."

Refreshed by a Millennium Agreement (1999) and bolstered by state law (RCW 43.376), the Centennial Accord framework strengthens state–tribe cooperation and respect at the state agency level. Recent collaborations include:

- Creating a missing and murdered indigenous women task force (Attorney General),

- Surveying and controlling invasive species (Agriculture),

- Repatriating Native American remains and historical artifacts (Archaeology and Historic Preservation),

- Supporting microgrid development to make electricity more accessible (Commerce),

- Rehabilitating stream flows and habitat for salmon (Ecology, Conservation Commission),

- Preparing "a resource directory for American Indians...to provide continuity of care for [the] health and behavioral health service[s]...and better prepare individuals for reentry to the community (Corrections), and

- Implementing "a voluntary visiting home program that provides specific supports and resources to parents who have newborns" (Children, Youth, and Families) (Bill, 2021).

These and myriad other partnerships help make Washington a better place for Indians and non-Indians.

American Indian self-government is the best means of turning reservations in Washington into vibrant communities. Tribes' governmental nature means that in-state enterprise income addresses in-state problems vastly more than private profits would. Tribes' growing participation in U.S. federalism, from the White House to the local sewage treatment system, means that non-Indians also benefit from increasing Indian success as well. All three features intensify tribal economic impacts. The rest of this report shows how.



**Protecting Resources**

QUILLAYUTE RIVER RESTORATION

The Quileute Tribe is working to restore the Quillayute River to protect its lands. Climate change has brought more flooding to the area. Without intervention, the river threatens to change course and wipe out the village of La Push and most of the lower reservation. The Quileute's restoration efforts rely on green infrastructure techniques where the tribe introduces engineered logjams to help trap sediment and create cold-water pools for adult fish to spawn and young fry to hide. Logjams also slow the river's flow, allowing the groundwater to recharge. These efforts not only protect the environment but may also protect people's lives.




# Stronger Tribal Economies Benefit All Washingtonians

In contrast to the 1960s, when Indian tribes might have been considered an economic afterthought, today, Indian tribes rank among the Washington economy's biggest influences. Economic data shared by 23 of the 29 federally recognized tribes of Washington demonstrate their high-ranking employment, large GDP contribution, and fiscal benefit. The participants represent urban and rural tribes, eastern and western tribes, and small and large tribes. The survey data captures the overwhelming majority (89 percent) of the casino capacity of the Indian gaming sector in Washington (Casino City, 2021).

Collectively, the 23 tribes shared data for 198 enterprises operating in 2019 and 2020, 32 of which were casinos or casino hotels. Tribes have been explicit about the need to diversify their economies, and Washington tribes continue to succeed on this front. The 166 non-gaming companies operate in sectors as wide-ranging as convenience stores, restaurants, construction companies, and a whisky distillery.

*Tribal-owned businesses directly employ 37,000 Washingtonians and are responsible for more than 54,000 jobs throughout the state.*

# Federally Recognized Tribes in Washington

Survey participants in bold

**Confederated Tribes and Bands of the Yakama Nation**

**Confederated Tribes of the Chehalis Reservation**

**Confederated Tribes of the Colville Reservation**

**Cowlitz Indian Tribe**

Hoh Indian Tribe

Kalispel Indian Community of the Kalispel Reservation

**Lower Elwha Tribal Community**

**Lummi Tribe of the Lummi Reservation**

**Makah Indian Tribe of the Makah Indian Reservation**

**Muckleshoot Indian Tribe**

**Nisqually Indian Tribe**

Nooksack Indian Tribe

**Port Gamble S'Klallam Tribe**

**Puyallup Tribe of the Puyallup Reservation**

**Quileute Reservation**

**Quinault Indian Nation**

Samish Indian Nation

Sauk-Suiattle Indian Tribe

**Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation**

**Skokomish Indian Tribe**

Snoqualmie Indian Tribe

**Spokane Tribe of the Spokane Reservation**

**Squaxin Island Tribe of the Squaxin Island Reservation**

**Stillaguamish Tribe of Indians of Washington**

**Suquamish Indian Tribe of the Port Madison Reservation**

**Swinomish Indian Tribal Community**

**Tulalip Tribes of Washington**

Upper Skagit Indian Tribe



11 | Stronger Tribal Economies Benefit All Washingtonians

## Tribes are top Washington employers

The governments and businesses of these 23 tribes employed more than 27,493 Washingtonians at year's end in 2019 and 24,280 in 2020.

Across government, casinos, and non-casino businesses, seven in ten of these employees were non-Indians. Enterprise employment skews even more toward non-Indian workers (see Figure 4). Publicly available information on total tribal employment in Washington indicates another 9,878 jobs are unaccounted for—that is, it shows that total tribal employment in 2019 was 37,371. (Henson et al., 2021). Regardless of the source, collectively, Washington tribes rank seventh in the state (see Figure 5), above Walmart (22,103) and Costco (20,183) and below Providence Health (43,496), according to the Puget Sound Business Journal's ranking of regional employers (Puget Sound Business Journal, 2021).

As noted above, tribes are not private employers, so to contextualize tribal employment another way, it was about as large as the 2020 *combined* employment of the top four departments of Washington state government (outside higher education): Social & Health Service (16,257), Corrections (8,951), Transportation (6,759), and Child, Youth, and Families (4,591) (Management, 2021).

It is important to note that the survey data *understates* the size and impact of the Indian economy in Washington. First, six tribes did not respond to the survey. Second, some responding tribes did not report all their economic activity.

**Collectively, Washington tribes rank seventh in the state for number of employees—more than Walmart or Costco.**

Third, businesses owned by individual Indians operate on and off the reservations, and their jobs and revenues are generally unknown to tribal governments. Fourth, on-reservation businesses owned by non-Indians also contribute to the gross reservation product but do not typically report economic data to tribal governments. Thus, the size of the Indian economy in Washington is larger still than these employment comparisons indicate.



### FIGURE 5
## Top 15 Employers in Washington
In-state employees, 2019

| | | |
|---|---|---|
| 1 | 80,000 | Amazon.com |
| 2 | 57,666 | Microsoft |
| 3 | 56,908 | Boeing |
| 4 | 54,000 | Joint Base Lewis-McChord |
| 5 | 49,526 | University of Washington Seattle |
| 6 | 43,496 | Providence |
| | **37,371** | **Washington Tribes\*** |
| 7 | 22,103 | Walmart |
| 8 | 20,183 | Costco Wholesale |
| 9 | 20,000 | Albertsons & Safeway |
| 10 | 18,288 | MultiCare Health System |
| 11 | 17,762 | Virginia Mason Franciscan Health |
| 12 | 16,441 | King County Government |
| 13 | 16,144 | Fred Meyer Stores |
| 14 | 14,000 | Starbucks |
| 15 | 12,651 | Swedish Health Services |

\* Survey respondents only.

(WIGA, 2021)

### FIGURE 4
## Washington Tribes' Non-Indian & Indian Employment
Survey responses only

| | 2019 | | | | 2020 | | | |
|---|---|---|---|---|---|---|---|---|
| | INDIAN | NON-INDIAN | TOTAL | % NON-INDIAN | INDIAN | NON-INDIAN | TOTAL | % NON-INDIAN |
| ENTERPRISE | 1,163 | 2,443 | 3,606 | 68% | 1,092 | 2,206 | 2,398 | 67% |
| GAMING | 2,837 | 13,898 | 16,735 | 83% | 2,602 | 11,589 | 14,191 | 82% |
| GOVERNMENT | 4,377 | 2,775 | 7,152 | 39% | 4,101 | 2,690 | 6,791 | 40% |
| TOTAL | 8,378 | 19,115 | 27,493 | 70% | 7,795 | 16,485 | 24,280 | 68% |

No. 23-35136 archived December 9, 2024
cited in Maverick Gaming, LLC v. USA

No. 23-35136 archived in Maverick Gaming LLC v. USA, cited in December 9, 2024

## Tribes account for $6.6 billion of gross state product

Tribes hire and buy in the non-Indian economy. In the pre-pandemic economy, 72 percent of the 27,904 employees were non-Indian. And it is reasonable to expect tribes to make most of their purchases from off-reservation vendors (Taylor, 2006). In 2019 and 2020, the responding tribes paid more than $1.5 billion and $1.3 billion, respectively, in employee compensation (including employer contributions to payroll taxes and benefits). Their businesses and governments purchased more than $2.8 billion and $2.5 billion in goods and services in those years, respectively. The responding tribes spent an additional $392.8 million and $332.5 million in 2019 and 2020 on fixed assets, including constructing schools, purchasing emergency response vehicles, and upgrading infrastructure. Such capital investments support the future growth of the Washington economy.

Tribal purchasing—the *direct* economic effect—yields *indirect* effects as the supplying firms themselves purchase inputs and hire workers. When tribes purchase telephones, cleaning supplies, asphalt, fire trucks, water-testing kits, schoolbooks, accounting services, and the like, their suppliers purchase goods and services and hire employees—

the sum of which is the *indirect* effect. Then, as the employees of both the tribes and their suppliers buy groceries, natural gas, shoes, and washing machines, their household spending generates the *induced* effect. The direct, indirect, and induced together make up the total economic impact (see Figure 7, on the following page).

**Total tribal economic activity in the businesses and governments of the survey respondents accounted for $6.6 billion in gross state product in 2019 and $5.6 billion in 2020.**

Tribes were responsible for 54,000 and 47,500 jobs statewide in those years, respectively. COVID-19 certainly had a disruptive effect on tribal economies (see Figure 6). Still, with solid leadership and planning dedicated workforce, caring community and a history of resilience, tribal economies are positioned to recover and people's lives to improve soon.

---

FIGURE 6

### Impact on the Washington State Economy
2020 dollars in millions

|  | 2019 | | | | 2020 | | | |
|---|---|---|---|---|---|---|---|---|
|  | JOBS | LABOR INCOME | TAXES* | VALUE ADDED | JOBS | LABOR INCOME | TAXES* | VALUE ADDED |
| ANNUALLY RECURRING | 50,199 | $3,358 | $1,111 | $6,192 | 43,849 | $2,939 | $971 | $5,282 |
| CONSTRUCTION | 3,980 | $292 | $90 | $380 | 3,659 | $267 | $82 | $347 |
| TOTAL | 54,179 | $3,650 | $1,201 | $6,572 | 47,499 | $3,206 | $1,053 | $5,629 |

* Federal, state, and local taxes on production and imports; does not include social insurance or income taxes. (IMPLAN, 2021)

---




▶ **Building Community**

**CHEHALIS TRIBE GRAND MOUND DEVELOPMENT**

Over the last two decades, the Chehalis Tribe has transformed the Grand Mound community in Thurston County into a hub of economic activity by expanding its tribal enterprises beyond gaming. In 2009, the tribe's partnership with Great Wolf Resorts began to bring hundreds of thousands of visitors to the area each year, and development soon followed elsewhere in the community. The tribe has primed the area for development with water, sewer, and other infrastructure, and purchased additional parcels nearby for a hotel, distillery, and restaurant. Other developers are building complementary services such as gas stations and fast-food restaurants. The tribe and county hope this mixed commercial space will attract development as the area grows into a great place to work, live, and play.

FIGURE 7

# The Economic and Fiscal Flows of Washington Indian Tribes



## Tribal contributions under gaming compacts

As is usually the case, the bulk of value-added (or the gross state product, or GSP) is labor income. Another significant fraction of GSP goes to the federal, state, and local governments as taxes. Even though tribal governments do not pay taxes to other governments, tribes *do* generate tax impacts. The indirect and induced economic impacts yield taxable activities in the economy—$1.2 billion in 2019 and $1.1 billion in 2020—the bulk of which accrued to Washington state and local governments. As noted above, these fiscal effects are understated. And on top of these indirect and induced tax effects, tribes make direct contributions to the governments of Washington.

Under the federal Indian Gaming Regulatory Act of 1988, the tribes and the state of Washington signed compacts to articulate the scope and regulation of Class III gaming (what is commonly known as Vegas-style gaming). In addition, as of 2021, 19 tribes have agreed to compact amendments governing sports betting. Under the terms of the compacts, tribes reimburse the Washington State Gambling Commission's costs of regulating Indian gaming (see Figure 8, on the following page). In 2019, payments by the survey respondents to Washington entities including the State Gambling Commission totaled $31.8 million.

Gaming tribes agree under the compacts to contribute to communities and nonprofits. As a result of these agreements, tribes contribute to local fire, police, and other government bureaus that may bear the impact costs of casinos. Gaming tribes also support the in-state activities of nonprofit and charitable organizations such as Habitat for Humanity and the Wounded Warrior Project. Furthermore, tribes support responsible gaming through contributions to government, nonprofit, or charitable organizations providing education, awareness, or treatment of problem gambling, such as the Asian Counseling and Referral Service and the Evergreen Council on Problem Gambling. Finally, under compact agreements, tribes continue to help fund the smoking cessation activities of governments, nonprofits, and charities (Wegenast & Kam, 2019).

The combination of gambling regulatory reimbursement and community contributions ensures that gaming tribes do not

burden state and local governments with uncompensated costs. What's more, about half of the community contribution funds have been made to general-purpose charities—beyond gaming-related nonprofits. Additional in-kind contributions amplify this outreach by extending health (Port Gamble S'Klallam Health Center), fitness (Kalispel's Camas Center for Community Wellness), and other reservation community resources to non-Indians. In addition,

under Washington law (RCW 82.38.310) and by mutual agreement, 22 tribes in Washington have agreed to expend their share of motor fuel taxes collected on the reservation exclusively on planning, construction, and maintenance of roads, bridges, and boat ramps; transit services and facilities; transportation planning; public safety; or other highway-related purposes. (Licensing, 2020, p. 3).

In 2019, $53.9 million in fuel tax collections were used by the respondent tribes for public transportation infrastructure projects in the state (Licensing 2020 p. 3).



Under Washington law (RCW 43.06.450) and by tribal-state agreement, 27 tribes have cigarette tax compacts with Washington, the principal terms of which require tribal taxes commensurate with Washington's. In addition to the above mutual agreements and partnerships, tribes and local governments regularly work together to connect sewer lines, fund ambulance service, upgrade intersections, and bus children to school.

In sum, the Indian tribes of Washington are both economically large and beneficial to the non-Indian public interest. Tribes contribute via in-kind services, indirect tax collections, and millions in direct contributions to public charities and government agencies. These efforts go beyond just offsetting costs and improve Washington's quality of life.

> "...tribes are running business enterprises, not to maximize profits, but to benefit communities. Gaming opens the door to possibilities."

**W. Ron Allen**
*Chairman of Jamestown S'Klallam Tribe*

*Cited in Maverick Gaming LLC v. USA 23-35136 archived December 9, 2024*



qʷ̓uƛ̓uʔ
Blue Camas

yéʔx̣ʷm
Evergreen
Huckleberry

c̓isic̓
Bracken
Fern

## JAMESTOWN S'KLALLAM TRIBE TRADITIONAL FOODS AND CULTURE PROGRAM

### Preserving Culture

The Jamestown S'Klallam Tribe's y̓aʔuməct Traditional Foods and Culture program supports the continued harvesting and preparation of traditional foods and medicines while encouraging physical activity, social connection, and the Klallam language. Its village model has groups learning together, and elders and knowledge keepers teach tribal citizens and families through hands-on experiences.

cited in Maverick Gaming, LLC v. USA
No. 23-35136 archived December 9, 2024

## Tribal Contributions Under the Gaming Compact

Nominal dollars in millions

| | 2019* | 2020* |
|---|---|---|
| COMMUNITY IMPACT (GOVERNMENT, FIRE, POLICE) | $ 10.5 | $ 8.7 |
| CHARITIES | $ 13.1 | $ 10.1 |
| SMOKING CESSATION & PREVENTION | $ 2.5 | $ 1.9 |
| PROBLEM GAMBLING | $ 3.4 | $ 2.7 |
| WASHINGTON STATE GAMBLING COMMISSION FEES | $ 2.3 | $ 2.2 |
| **WASHINGTON SUBTOTAL** | **$ 31.8** | **$ 25.6** |
| NATIONAL INDIAN GAMING COMMISSION FEES | $ 0.8 | $ 0.9 |
| **TOTAL** | **$ 32.6** | **$ 26.5** |

* From survey respondent tribes

Trial Exhibit in Maverick Gaming, LLC v. USA, No. 23-35136 archived on December 9, 2024



# Washington Tribes and COVID-19

COVID-19 landed on Washington tribes' doorsteps shortly after arriving in the state. Indian communities were already contending with health disparities, making them more vulnerable to infectious diseases. Tribal governments also faced financial strains as their aggressive business closures decimated revenue.

Washington tribal governments flexed their governance capabilities by implementing reservation-wide public health mandates and following CDC protocols even before other governments. In case after case, tribes also deployed their public health capabilities in off-reservation communities.

## Caring for Communities

### Stabilizing Washington's Healthcare System

From the onset of the pandemic, tribal governments reduced strain on Washington's health system by attending to the needs of their on-reservation populations. Tribes distributed protective equipment and other medical supplies, established testing sites, and even created a field hospital.

### Protecting Vulnerable Populations

Tribal governments took a variety of measures to protect their citizens from COVID-19's disproportionate and often devastating impact on Native American communities. Several Washington tribes responded with reservation closures to minimize the spread of the virus and protect the health, safety, and welfare of their communities. Throughout the pandemic, tribes also took precautions to protect elders and found creative ways to support youth.

### Mitigating Economic Fallout

Tribes in Washington went to great lengths to alleviate the economic fallout of COVID-19 for their communities. Tribal governments and enterprises instituted public health mandates early and converted to work-from-home arrangements where possible, and tribal citizens and families received direct relief on many reservations. Some tribal enterprises maintained payroll for employees even if they were unable to work, and many tribes developed food delivery programs for at-risk community members.

17

Cited in May 09, 2024 Netflix v. Gaming, LLC v. USA No. 23-35136 archive.org

# Indian Needs Remain Acute

While off-reservation economies and non-Indian Washingtonians are important to tribes, their prime concern is addressing long-standing poverty among their people. This section demonstrates that even though there has been recent good economic news for tribes, the relative position of Indians is well below that of Washingtonians in general. And, while the federal and state governments are not making enough of a difference in this area, tribes are making a difference.

> "It's our moral obligation to take care of one another."

**Lawrence Solomon**
*Former Chair of Lummi Indian Business Council*



### Reservation socioeconomic status lags Washington's

Despite the United States Supreme Court treaties and public policy over the prosperity of their own nation, and change for western U.S. sessions, Indian socioeconomic status in the 21st century remains well below that of non-Indians. While on-reservation Indian income, employment, and college attainment have been improving over the last three decades, there is still a great deal of ground to cover relative to the status and trends of those indicators for all Washingtonians. In the latest data available, the incomes of American Indians living on Washington Indian reservations averaged less than half the statewide level, unemployment is more than three times higher, and college graduates are nearly four times scarcer (see Figure 9).

Gaps are significant in health and education too. The Indian Health Service reports that Indians nationwide have a life expectancy that is five-and-a-half years lower than the rest of the population (Joseph, Andy et al., 2019). COVID-19-related mortality nationwide was nearly two times higher among Indian people than non-Hispanic whites (Arrazola et al., 2020). The graduation rate among Indian students in 2018–19 stood at 74 percent, compared to 89 percent for white students (NCES, 2021).

---

FIGURE 9

## Indian Socioeconomic Status Lags

**Income per person**

$18,683 — American Indians on WA reservations

$39,401 — All persons in WA

**Unemployment**

15.8% — American Indians on WA reservations

4.9% — All persons in WA

**College attainment**

9.7% — American Indians on WA reservations

36% — All persons in WA

(U.S. Census, 2019)

▶ **Improving Lives**

<span style="color:orange">**SQUAXIN ISLAND TRIBE'S CHILD DEVELOPMENT CENTER**</span>

In many respects, Washington is a leader in early learning, and the Squaxin Island Tribe's Child Development Center is no exception. The Center partners with the community and tribal elders to help support early childhood development for its Native and non-Native students. It also began participating in Washington's Outdoor Preschool Pilot Program in 2018, which has garnered an enthusiastic community response. Through outdoor play, the Center teaches Native knowledge and culture about the land and helps children gain more confidence.

## Federal underfunding of Indian programs continues

Treaties between the United States and tribal governments and federal statutes articulate federal commitments to support Indian well-being. Yet, these commitments remain largely unfulfilled because Congress is persistently unwilling to appropriate sufficient funds. In the last quarter of the 20th century, federal funding on programs targeted to Indians and their governments lost ground in inflation-adjusted, per capita terms *and relative to federal non-defense spending per American generally* (Wake, 2000). Unfortunately, the 21st century is hardly an improvement. In 2021, the U.S. Office of Management and Budget estimates that annual budgets include approximately $28 billion to $29 billion in federal services to tribes across the nation. Tribes have estimated that the annual need is north of $200 billion to address their communities' challenges.

The U.S. Commission on Civil Rights recently observed,

> the efforts undertaken by the federal government in the past 15 years have resulted in only minor improvements, at best, for the Native population. And, in some respects, the U.S. Government has backslid in its treatment of Native Americans (U.S. Commission on Civil Rights, 2018, pp. 3-4).

It further noted,

> Federal funding for Native American programs across the government remains grossly inadequate to meet the most basic needs the federal government is obligated to provide. … Since 2003, funding for Native American programs has mostly remained flat, and in the few cases where there have been increases, they have barely kept up with inflation or have actually resulted in decreased spending power. (U.S. Commission on Civil Rights, 2018, p. 4)

Relative healthcare spending displays the gap. As Figure 10 on the following page shows, per person Indian Health Service spending on direct healthcare was only a fraction of that spent by Medicare (31 percent), the Veterans Health Administration (38 percent), and Medicaid (50 percent) on their service populations in 2017.

*Tribes add their own funding to support healthcare for their citizens, and many provide healthcare services to both Native and non-Native Washingtonians.*

Cited in Maverick Gaming, LLC v. USA, No. 23-35136, decided December 9, 2024

FIGURE 10

## Indian Healthcare is Underfunded

dollars per capita

| | |
|---|---|
| $12,500 | |
| 10,000 | |
| 7,500 | |
| 5,000 | |
| 2,500 | |
| 0 | MEDICARE  NHE*  VHA  U.S. PER CAP  MEDICAID  INDIAN** |

\* Per-capita benchmarks based on national health expenditures (NHE) modeling.
\*\* Indian Health Service (IHS) excludes public health expenditures such as for sanitation infrastructure.
(Tores et al., 2020)

Maverick Gaming, LLC v. USA
Cited in No. 23-35136 argued December 9, 2024

### ◆ Preserving Culture

**PUYALLUP TRIBE OF INDIANS: THE PUYALLUP TRIBE OF INDIANS' LANGUAGE PROGRAM**

The Puyallup Tribe of Indians' Language Program cultivates Twulshootseed language usage in school—Twulshootseed is taught in the K–12 Chief Leschi School and at the University of Washington—at home, at work, and in social settings through engaging social media, creative marketing materials, and traditional storytelling. Cultural revitalization programs help inspire local and statewide systems to appreciate culturally relevant teaching and demonstrate its value for improving student outcomes. Native language programs help tribes create spaces that foster Native student success and equip the next generation with the knowledge and tools to continue their ways of life.

**Tribes are stepping into the breach**

American Indian and Alaska Native tribal governments step into the breach left by federal underfunding and virtually nonexistent state funding to deliver services on reservations. As the sidebars throughout this report indicate, Washington tribes routinely engage in varied, creative, and extensive efforts to improve their societies.

**Tribes work to improve reservation economies, schools, environments, clinics, housing and infrastructure using their unextinguished powers of self-government.**

Tribes add their own funding to support healthcare for their citizens, and many provide healthcare services to both Native and non-Native Washingtonians. Seven State-Tribal Education Compacts permit tribes to fully operate and substantially fund schools (Instruction, n.d.), often with significant effect. Chief Kitsap Academy, for example, has

raised high school graduation rates to par with the state average despite having twice the proportion of children eligible for free lunch (Public School Review, n.d.). Tribes such as Puyallup (Port of Tacoma, n.d; Puyallup Tribe, 2005) and Jamestown S'Klallam (Tribe, n.d.; Tribe, 2020) make significant investments in watersheds to maintain and improve water quality for their communities.

Properly implemented Indian treaties might have prevented the socioeconomic gap from growing so sizable in the first place. Still, with self-determination and self-governance in full swing, tribes are making progress on many fronts—to the benefit of the state economy and federal and state taxpayers.





Cited in Maverick Gaming LLC v. USA No. 23-35136 archived December 9, 2024

# Tribes Strengthen Washington's Economy

## Indian economic development helps poor regions of Washington

Because history (less than economics) has determined reservation locations relative to broader settlement patterns, Indian economic activity, especially casinos, can bring economic growth to areas that need it. Compared with the operation of market forces, which tends to distribute facilities near customers, if a tribe opens a relatively rare business on a reservation (such as a Vegas-style casino), it will attract customers from farther away than its less-rare competitors (that is, movie theaters and restaurants). In other words, Indian casinos routinely recruit more economic activity from farther away than they compete with nearby. Indeed, a literature of systematic evidence on the question links casino introductions with economic vitality (Akee et al., 2014; Baxandall & Sacerdote, 2005; Baxandall et al., 2005; Johnson, 1999; Martin et al., 2006; Rose, 1998; Taylor et al., 2000; Taylor, 2006).



## Intertribal transfers boost rural economies

Under the terms of the tribal-state gaming compacts, each tribe in the state receives an equal allocation of video lottery terminals: 1,125 in 2020. If they choose, tribes may lease some or all of their allotment to other tribes in more favorable locations. Terminal Allocation Transfer Plans (TAPs) filed with the Washington State Gambling Commission and Washington Indian Gaming Association indicate that in 2020, 10 tribes were net lessors, meaning that net leasing of TAPs put them near urban centers. Conversely, 16 tribes were net lessees—they leased out more slots than they leased in. (Three tribes did not partake of TAP agreements.)

In practical terms, the effect of intertribal allocations has been to permit tribes near urban markets to operate more than their number of allocated machines. In the process, they share a portion of the value those machines create with remote tribes in, for example, the far Olympic Peninsula, the Pacific Coast, Northern Puget Sound, and the state's interior. In some cases, such as the Hoh, Quileute, and Makah tribes on the Pacific side of the Olympic Peninsula. TAPs of their entire device allocations mean they benefit from gaming revenue without opening facilities. The geographic dispersal of casino value helps tribes leasing out devices by adding to tribal budgets. The local region benefits as well. As those tribes undertake government activity and spend dollars earned in the larger markets, they employ and purchase from the rural and remote economies around them.

cited in Maverick Gaming, LLC v. USA
No. 23-35136 archived December 9, 2024

## Tribes are more fiscally independent

Before the disruptions of COVID-19, more than three-quarters of tribal budgets originated from tribal sovereignty (see Figure 11). Tribally owned businesses (including leasing out casino device rights), on-reservation tax collections (including tribes' fuel tax shares), land and other lease revenue, and natural resource royalties (like stumpage for standing timber) accounted for 78 percent of the survey-responding tribes' aggregate budgets. Compare that to the 1960s and 1970s, when tribes were predominantly—if not entirely—reliant on federal funding. In 2019, only one-fifth of aggregate tribal budgets were derived from grants and contracts.

As is generally the case nationwide, state contributions to tribal treasuries were minimal. The aggregate shares

mask variation. Some remote, rural tribes may depend more heavily on intergovernmental transfers than their counterparts near urban centers. Nonetheless, the statewide totals paint a welcome picture.

Federal assistance grew substantially as a share of tribal budgets as a result of COVID-19 pandemic relief programs. As with many state and local governments, federal aid in 2020 helped prevent significant financial loss. The federal share of combined tribal budgets nearly doubled, more than making up for reductions in tax, lease, and resource revenue. It remains unclear how persistent this shift in federal funding will be. Still, the data in 2019 corresponds to that of 2017 and earlier, indicating that tribes were sustaining their fiscal independence before the pandemic (Taylor, 2019).



**FIGURE 11**
**Most Tribal Funding Comes From Tribal Governments and Businesses**

2019, 2020: Tribal Government Funding Sources

STATE GRANTS & CONTRACTS

FEDERAL GRANTS & CONTRACTS

TRIBAL TAXES, LEASES, STUMPAGE & OTHER

DISTRIBUTIONS FROM OWNED ENTERPRISES

2019: 4%, 18%, 38%, 40%

2020: 4%, 33%, 26%, 38%

$2B, 1.5, 1.0, 0.5, 0

(WIGA, 2021)

## ▶ Protecting Resources

**CONFEDERATED TRIBES OF THE YAKAMA NATION FOREST MANAGEMENT**

The Yakama Nation, whose 1.4 million-acre reservation includes 650,000 acres of forest, collaborates with partners to fund and implement restoration projects and create a resilient forest ecosystem.




*The Yakama Nation's forest management work includes prescribed burns and aquatic restoration.*

## Conclusion

### Tribes benefit all Washingtonians

American Indians were rooted in the land, sea, and rivers of what is now Washington long before national and state boundaries were drawn. Tribal governments will not come and go based on new incentives, any more than the government of Washington could move to Illinois. Tribal enterprise profits accrue to these permanent fixtures of the Washington economy (rather than to shareholders distributed across global capital markets).

**One hundred percent of tribal net income translates into government efforts to build more vibrant households; ample housing; better schooling; healthier, safer communities; cleaner environments; and other public goods, services, and amenities.**

As reservation economies grow from a position below prevailing conditions in Washington, they bring underutilized resources—especially people—into more productive participation in the state economy. Tribes do this without imposing fiscal burdens on the state to cover, for example, the cost of good gaming regulation or municipal road construction adjacent to reservations. And tribes rely heavily on the off-reservation economy for goods, services, and labor, meaning that reservation economic growth quickly registers in the larger economy and, accordingly, in the Washington treasury. For many remote rural locations, tribes are likely to be substantial contributors to economic growth. In addition, the benefits of increasing spread across the benefits of Indian casinos

to rural Washington. If tribes in Washington were collectively a private out-of-state business, Washington would be brainstorming incentives to attract it. Fortunately, these benefits accrue with no tax expenditures by the state legislature.



C. v. USA

December 9, 2024

Maverick Gaming LLC v. USA

No. 23-35136 arguments

cited in

23

# Appendices

## About the author

Jonathan Taylor is an economist with expertise in natural resources, gaming, and American Indian development. He provides counsel to tribes and bands in the United States and Canada, including public policy analysis, strategic advice, and economic research. He has offered expert testimony in litigation and other public proceedings for many Native American groups.

Taylor is President of the Taylor Policy Group, an economics and public policy consultancy, a Research Affiliate at the Harvard Project on American Indian Economic Development at the Kennedy School of Government, and a Senior Policy Associate at the Native Nations Institute, Udall Center for Studies in Public Policy, University of Arizona, Tucson. He holds a Master of Public Policy from Harvard University (1992) and a Bachelor of Arts in Politics from Princeton University (1986). A current CV is available at taylorpolicy.com. The opinions herein are his own and not those of the institutions with which he is affiliated.

## Conservatism in modeling and reporting impacts

Several modeling approaches improve the precision of the impact estimates and introduce conservatism. Tribal enterprise impacts were modeled to reflect their government-owned nature; top-line enterprise revenue (demand) was used with a modeling assumption to zero out proprietor income. In contrast to run-of-the-mill IMPLAN studies, this approach eliminates the risk of overstating proprietor income (a component of value-added) when modeling a government-owned enterprise with its government. Taxes on production and imports (TOPI) were set to zero in recognition that tribal governments and the commercial enterprises of tribal governments are not themselves subject to taxation. TOPI does not include all taxes paid by industry. Note, TOPI does not include all taxes and the induced impacts. Note, TOPI arises from the indirect of employee compensation, and profits, and other property income.

Tribal government spending was modeled as local government enterprise in both government-owned enterprise. The study responses about total employee compensation (i.e., inclusive of employer contributions to social insurance and benefits) were introduced to calibrate the model to actual operations. When modeling capital expenditures that entailed real estate transactions, the purchase price was not the basis of demand change (since most of its value represents a wealth transfer that does not affect the demand for goods and services in the economy). Instead, an estimate of transaction costs (6 percent of value) was imputed to the legal, real estate, and banking sectors. Debt payments were not modeled, per the recommendation of IMPLAN.

Care in reporting accompanies the above conservatism in modeling. Many impact studies report *output* numbers instead of *value-added*, but output double-counts (and worse). For example, the original value of iron that becomes ore at a mine, steel at a smelter, stamped sheet metal at a mill, a radio housing at an electronics firm, a car stereo at an auto plant, and a car sale at a dealership would be counted six times over in output.

Yes, each firm received revenue to cover the costs of its inputs—in turn, the revenues of its input suppliers—but the economy is not as large as all those firms' revenues. Because it is not appropriate to count the iron ore six times, economists measure gross regional, state, or national product—the sum of all value added—to track growth and recession— not the measure of all firms' revenues (output). Not only is value-added unexaggerated by double-counting, but it also does not vary with vertical integration or segmentation. By contrast, output would shrink in the iron ore example above if the smelter and sheet metal firms merged, despite the economy *not* shrinking by such a merger.

## Additional information

The Washington Indian Gaming Association (WIGA) funded this study under a contract with the Taylor Policy Group, Inc. The views expressed in this document are those of the author and do not necessarily reflect those of the institutions with which he is affiliated. Unless otherwise indicated, WIGA or its member tribes provided the material herein. The titles of tribal leaders are contemporary to the time of publication: 2022. WIGA provided the photographs not otherwise credited.

This work is licensed under the Creative Commons Attribution 4.0 International License. To view a copy of this license, visit http://creativecommons.org/licenses/by/4.0/ or send a letter to Creative Commons, PO. Box 1866, Mountain View, CA 94042.

# References

Akee, R. K. Q., Spilde, K. A., & Taylor, J. B. (2014). Social and economic changes on American Indian reservations in California: An examination of tribal government gaming. UNLV Gaming Research & Review Journal, 18(2), 3. http://bit.ly/2HdZG3w

Arrazola, J., Masiello, M. M., Joshi, S., Dominguez, A. E., Poel, A., Wilkie, C. M., Bressler, J. M., McLaughlin, J., Kraszewski, J., & Komatsu, K. K. (2020). COVID-19 mortality among American Indian and Alaska native persons—14 states, January–June 2020. Morbidity and Mortality Weekly Report, 69(49), 1853. https://doi.org/10.1017/S0950268815001211

Baxandall, P., O'Brien, P., & Sacerdote, B. (2005). The casino gamble in Massachusetts: Full report and appendices. http://bit.ly/2vXd6KO

Baxandall, P., & Sacerdote, B. (2005). Betting on the future: The economic impact of legalized gambling. Rappaport Institute for Greater Boston Policy Briefs, 1-8. http://www.hks.harvard.edu/content/download/68603/1247222/version/1/file/betting_final.pdf

Berry, A. (2009). Two Forests Under the Big Sky: Tribal v. Federal Management. PERC Policy Series, 45). https://www.perc.org/wp-content/uploads/old/ps45.pdf

BIA. (2021). Indian Entities Recognized by and Eligible to Receive Services From the United States Bureau of Indian Affairs. Federal Register, 86(18), 7554–7558.

Bill, C. A. (2021). 2021 Centennial Accord Agency Highlights. https://bit.ly/3CFB9QQ

Casino City. (2021). Gaming Directory. http://www.gamingdirectory.com/

Champagne, D., & Goldberg, C. E. (2012). Captured Justice: Native Nations and Public Law 280. Carolina Academic Press.

Chandler, M. J., & Lalonde, C. (1998). Cultural Continuity as a Hedge against Suicide in Canada's First Nations. Transcultural Psychiatry, 35(2), 191–219. https://doi.org/10.1177/136346159803500202

Cornman, K. S., & Taylor, J. B. (2016). Why beggar thy Indian neighbor? The case for tribal primacy in taxation in Indian Country. http://nni.arizona.edu/application/files/9014/6247/3804/Cornman_-_Taylor_Double_Taxation_JOPNA_2016-01.pdf

Dixon, M., Shelton, B. L., Roubideaux, Y., Mather, D., & Smith, C. M. (1998). Tribal Perspectives on Indian Self-Determination and Self-Governance in Health Care Management. National Indian Health Board.

Fletcher, M. L. M. (2004). In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue. North Dakota Law Review, 80, 759-807.

Henson, E. C., Jorgensen, M. R., Kalt, J. P., & Leonatis, L. G. (2021). Assessing the U.S. Treasury Department's Allocations of Funding for Tribal Governments under the American Rescue Plan Act of 2021. https://ash.harvard.edu/files/ash/files/covid19_response_and_recovery_policy_brief_c_11.3.21.pdf?m=1635951416

IMPLAN. (2021). IMPLAN 2021. http://www.implan.com/

Tribe, J. S. (n.d.i). Habitat Restoration & Enhancement. https://bit.ly/3sfAGsp

Tribe, J. S. (2020). Environmental Planning. https://jamestowntribe.org/natural-resources/environmental-planning/environmental-planning/

Johnson, R. (1999). Chapter 5. Impacts of casino proximity on social and economic outcomes, 1980–1997: a multilevel time-series analysis. In D. Gerstein, R. Volberg, H. Harwood, & E. M. Christiansen (Vol. 5, pp. 65–72).

Joseph, J., Arsdy, Pratt, B., & Joseph, V. (2019). The National Tribal Budget Formulation Workgroup's Recommendations on the Indian Health Service Fiscal Year 2021 Budget: Ending the Health Crisis in Indian Country.

A Path to Fulfill the Trust and Treaty Obligations. https://bit.ly/3CgnY03

Kalt, J. P. (1996). Testimony of Professor Joseph P. Kalt: United States Senate Committee on Indian Affairs. http://hpaied.org/sites/default/files/publications/senatifil.pdf

Kreps, M. B., & Caves, R. E. (1994). Bureaucrats and Indians: Principal-agent relations and efficient management of tribal forest resources. Journal of Economic Behavior and Organization, 24(2), 133–151.

Martin, J., Contreras, K. S., Dedolkar, A., Gelles, P., Gonzalez-Rivera, G., Johnson, M., & Maires, M. (2006). An impact analysis of tribal government gaming in California. Center for California Native Nations, University of California, Riverside.

NCES. (2021). Chapter 2: Public High School Graduation Rates. In Preprimary, Elementary, and Secondary Education. National Center for Education Statistics.

Port of Tacoma. (n.d.). Lower Wapato Creek Habitat Project. https://bit.ly/33u4pic

Public School Review. (n.d.). Chief Kitsap Academy (2021–22 Ranking). Poulsbo, WA. https://bit.ly/32aNfj5

Puget Sound Business Journal. (2021). List of the Largest Employers in Washington State [Data set].

Puyallup Tribe. (2005). Puyallup Tribe Diagnoses Watershed's Health – Northwest Treaty Tribes. https://bit.ly/3JzeibQR

Rose, A. (1998). The regional economic impacts of casino gambling: Assessment of the literature and establishment of a research agenda. Adam Rose and Associates.

Taylor, J. B. (2006). Indian self-government in Washington, Vol. II. The character and effects of the Indian economy in Washington State. Taylor Policy Group, Inc. and Washington Gaming Association.

Taylor, J. B. (2019). The Economic Contribution of the Tribes of Washington. Washington Indian Gaming Association & Taylor Policy Group, Inc. https://bit.ly/3uNNwgmw

Taylor, J. B., & Kalt, J. P. (1999). Indian Gaming in Arizona: Social and Economic Impacts on The State of Arizona, 1-56.

Taylor, J. B., & Wang, P. (2000). The national evidence on the socioeconomic impacts of American Indian gaming on non-Indian communities. Harvard Project on American Indian Economic Development.

Tores, A., Joseph, V., & Abrahamson, G. (2020). Reclaiming Tribal Health: A National Budget Plan to Rise Above Failed Policies and Fulfill Trust Obligations to Tribal Nations: The National Tribal Budget Formulation Workgroup's Recommendations on the Indian Health Service Fiscal Year 2022 Budget. https://bit.ly/329xPNb

U.S. Census. (2018). 2017 Census of Governments. https://bit.ly/3pIcaDU

U.S. Census. (2019). American Community Survey. http://bit.ly/2xKoXmI

U.S. Commission on Civil Rights. (2018). Broken Promises: Continuing Federal Funding Shortfall for Native Americans. http://bit.ly/3DcxSsm

Wakeling, S., Jorgensen, M. R., Michaelson, S., Begay, M. A., Hartmann, F. X., & Kalt, J. P. (2000). Policing on American Indian Reservations: A Report to the National Institute of Justice. Malcolm Wiener Center for Social Policy, Harvard Kennedy School.

Walke, R. (2000). Indian-related federal spending trends FY: 1975–2001 U.S. Congressional Research Service memorandum March 1, 2000. In Report of the Committee on the Budget, United States Senate to Accompany S. Con. Res. 101 Together with Additional and Minority Views, Senate Report 106-251 (pp. 199–250). Congressional Research Service, Library of Congress.

Management, W. O. O. F. (2021). Number of Employees and Headcount Trends. https://bit.ly/3mrKMYK

Instruction, W. O. O. S. P. (in d.j). State-Tribal Education Compact Schools (STECs). https://bit.ly/3FRzg8Y

Licensing, W. S. D. O. (2020). Tribal Fuel Tax Agreement Report. https://bit.ly/3JZK558

Wegenast, D., & Kam, K. (2019). Tribal Community Contributions. https://bit.ly/3vHdEb2

WIGA. (2021). Survey of Washington Indian Tribes [Data set]. Washington Indian Gaming Association.

Maverick Gaming, LLC v. USA No. 23-35136 cited in Indian Gaming's ... archived December 9, 2024



Maverick Gaming, LLC v. USA

No. 23-35136 archived December 9, 2024

www.washingtontribes.org